**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **Crim. No. 4:10-cr-00368** |
| v. ) | |
| ) | |
| **BARRY WALTER BUJOL, JR.**, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

The United States of America, by and through its attorney, Kenneth

Magidson, United States Attorney for the Southern District of Texas, with

Assistant United States Attorneys S. Mark McIntyre and Craig Feazel, and United

States Department of Justice Trial Attorney Garrett Heenan, hereby submits the

following Trial Brief.

## I.   <u>STATUS OF THE CASE</u>

A. Trial as to the defendant Barry Walter Bujol, Jr. is currently set for

November 7, 2011, before the Honorable David Hittner, District Judge, U.S.

District Court for the Southern District of Texas.

B. The defendant has been detained in federal custody since his arrest on

May 31, 2010.

C. The defendant has requested a bench trial and waived his right to a trial by jury.  The government has consented to this request and waived its right to a jury trial as well.

D. Estimated time for the government's case-in-chief is less than five days.

E. Absent any stipulations from the defendant, the government expects to call approximately 14 witnesses in its case-in-chief.

F. The Indictment contains two counts.

## II.     THE CHARGES

On June 3, 2010, a grand jury returned a two-count indictment charging the defendant Barry Walter Bujol, Jr. in Count One with Attempting to Provide Material Support or Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B; and in Count Two with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(2).

## III.    APPLICABLE STATUTES

### A.      Attempted Material Support, 18 U.S.C. § 2339B

The Count One charge of Attempting to Provide Material Support or Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B, provides in relevant part:

(a) Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined by subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

The definition of what constitutes **"material support"** is set forth in 18 U.S.C.

§ 2339B(g)(3), and it references the definition set forth in 18 U.S.C. § 2339A,

which reads in relevant part:

(b) Definitions.– As used in this section – (1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

**"Terrorist activity"** as described in 18 U.S.C. § 2339B is defined as:

Any activity which is unlawful under the laws of the place it was committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any particular State, and which involves any of the following: (1) the seizing or detaining, and threatening to kill, injure, or continue to detain another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as

an explicit or implicit condition for the release of the individual seized or detained; (2) an assassination; (3) the use of any explosive, firearm, or other weapon or dangerous device other than for mere personal monetary gain, with the intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property; and (4) a threat, attempt, or conspiracy to any of the above acts.

8 U.S.C. § 1182(a)(3)(B).  To **"engage in terrorist activity"** as described in 18 U.S.C. § 2339B means:

in an individual capacity or as a member of an organization – (1) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity; (2) to prepare or plan a terrorist activity; (3) to gather information on potential targets for terrorist activity; (4) to solicit funds or other things of value for – a terrorist activity or a designated terrorist organization.

8 U.S.C. § 1182(a)(3)(B)(iv).  The term **"terrorism"** as described in 18 U.S.C. § 2339B means a "premeditated, politically motivated violence perpetrated against non-combatants targeted by sub-national groups or clandestine agents."  22 U.S.C. § 2656f(d)(2).

### B.   Aggravated Identity Theft, 18 U.S.C. § 1028A

The Count Two charge of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(2), provides in relevant part:

(2) Terrorism Offense.– Whoever, during and in relation to any felony violation enumerated in section 2332b(g)(5)(B), knowingly transfers, possesses, or uses, without lawful authority, a means of identification

of another person or a false identification document shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 5 years.

In addition to the mandatory five-year imprisonment term, the statute further provides in relevant part:

> . . . no term of imprisonment imposed on a person under this section shall run concurrently with any other term of imprisonment imposed on the person under any other provision of law, including any term of imprisonment imposed for the felony during which the means of identification was transferred, possessed, or used. . . .

18 U.S.C. § 1028A(b)(2). Accordingly, any term of imprisonment imposed on Count Two must run consecutive to any term of imprisonment imposed on Count One.

## IV.   ELEMENTS OF THE OFFENSES

### A.   Count One – Elements

Count One of the Indictment alleges that one or about May 30, 2010, the defendant unlawfully and knowingly attempted to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to wit: personnel; currency; pre-paid telephone calling cards; mobile telephone SIM cards; global positioning system receivers; public access-restricted United States military publications, including one involving unmanned aerial vehicle operations and one involving the effects of United States military weapon

5

systems in operations in Afghanistan; a military issue lensatic compass; and other materials, to a Foreign Terrorist Organization, that is, Al Qaeda in the Arabian Peninsula, which was designated by the United States Secretary of State as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act, on or about January 19, 2010.

To sustain the charge of attempted material support as alleged in Count One, the Government must prove five elements:

First, that the defendant knowingly attempted to provide material support or resources;

Second, that the defendant believed that the support or resources was going to the organization commonly known as Al Qaeda in the Arabian Peninsula ("AQAP");

Three, that the organization commonly known as AQAP previously had been designated as a Foreign Terrorist Organization by the Secretary of State;

Four, that the defendant knew that one or more of the following conditions existed:

a.   That the organization commonly known as AQAP had been designated a Foreign Terrorist Organization; *or*

b.   That the organization commonly known as AQAP has engaged or engages in terrorist activity; *or*

      c.     That the organization commonly known as AQAP has engaged or engages in terrorism;

<u>Fifth</u>, that one or more of the following conditions is met:

      a.     The defendant is a national of the United States; *or*

      b.     The offense occurred in whole or in part within the United States; *or*

      c.     The offense occurred in or affected interstate or foreign commerce.

For purposes of this fifth element, a "national of the United States" includes a United States citizen.

### B.   Count Two – Elements

Count Two of the Indictment alleges that on or about May 30, 2010, the defendant, during and in relation to the violation charged in Count One, did knowingly possess and use without lawful authority a false identification document, to wit, a false Transportation Worker's Identification Card issued by the Transportation Security Administration of the Department of Homeland Security.  To sustain the charge of aggravated identity theft as alleged in Count Two, the Government must prove three elements:

<u>First</u>, that the defendant knowingly transferred, possessed, or used a means of identification of another person or a false identification document;

Second, that when the defendant possessed the identification document or authentication feature, the defendant did so knowing the document was stolen or produced without lawful authority;

Third, the defendant did so to facilitate an act of international terrorism, i.e., the crime charged in Count One (for increased maximum penalties).

## V.      STATEMENT OF THE FACTS

The investigation of the defendant in this case culminated in his arrest during a "sting" operation that was conducted at the Port of Houston on the evening of May 30, 2010.  The sting operation was facilitated by the use of a Confidential Human Source ("CHS") that was working with the FBI.  The CHS operated under the guise of being a "facilitator" for AQAP.  The CHS initiated a relationship with the defendant and after several weeks the CHS revealed his role of AQAP facilitator to the defendant – an event that was praised by the defendant. Prior to the introduction of the CHS, the defendant had communicated with a radical associate of AQAP and made several attempts to depart the United States, ostensibly to join AQAP.

The government anticipates that the evidence adduced at trial will establish, among other things, the following:

### A.   Defendant's Communications With Anwar Al-Aulaqi

In or about mid-2008, the FBI became aware of a yahoo e-mail account, abdul_bari05@yahoo.com (the "abdul_bari05 account") that was possibly connected to a terrorism-related investigation.  FBI agents eventually obtained three search warrants for this abdul_bari05 account.   Agents learned that the user of the abdul_bari05 account had logged into Yahoo regularly from the John B. Coleman Library on the Prairie View A&M University ("PVAMU") campus in Waller County, Texas.  They also learned that the account had been in contact with a second email account, al_aulaqi@yahoo.com (hereafter, the "Al-Aulaqi email account") that was determined to belong to Anwar Al-Aulaqi ("Al-Aulaqi"), an influential Yemen-based imam who at that time was publicly associated with Al Qaeda in the Arabian Peninsula (hereafter "AQAP").  The abdul_bari05 account also had numerous contacts with a website sponsored by Al-Aulaqi.

Records for the abdul_bari05 account indicated that it was usually accessed from a specific set of computers at the PVAMU John B. Coleman Library on Friday afternoons.  On Friday, October 31, 2008, surveillance agents observed the defendant log into a computer at the PVAMU library following a nearby Muslim prayer service.  Further surveillance and investigative efforts led the agents to determine conclusively that the defendant was the individual who was accessing

9

and using the abdul_bari05 email account (hereafter, the "defendant's email account").

Pursuant to the search warrants referenced above, agents found a series of email communications on the defendant's email account that revealed communications with the Al-Aulaqi email account.  Among the emails obtained pursuant to the search warrants, agents learned the following:

- On July 12, 2008, the Al-Aulaqi account sent an email to the defendant's email account that appears to respond to an initial email sent by the defendant requesting guidance regarding "jihad."  The response email from the Al-Aulaqi email account responds to the request for guidance on "jihad" by attaching a document entitled "*42 Ways of Supporting Jihad,*" which consisted of a 15-page document giving instructions on 42 specific ways to support violent "jihad" and the fighters who carried it out.  The *42 Ways of Supporting Jihad* document advocates armed struggle or "jihad" and pronounces it the duty of all Muslims to travel to Muslim lands to participate in this armed struggle, which the document termed "hijrah."[1]  The email concluded "Your Brother, Anwar Awlaki."

- On July 12, 2008, the defendant sent a response email to the Al-Aulaqi email account asking for additional guidance on "jihad" and stated his intention to assist the "Mujahideen" (holy warriors) and support "jihad."   The defendant also asked for advice on how to get money to the "Mujahideen" overseas.

---

[1] "Hijrah" is translated literally as migration but "hijrah" was specially defined in the "*42 Ways of Supporting Jihad*" under item 36, entitled, "Preparing for Hijrah." It reads in part "Preparation for hijrah is not restricted to Muslims living in non-Muslim countries but applies to every Muslim because more often than not Jihad in its self demands Hijrah...Hijrah does not stop as long as there is an enemy to fight."

He further asked for advice on how to establish a website to support the "jihad" without the website being traced back to him.

- On July 24, 2008, the defendant sent another email to the Al-Aulaqi email account expressing gratitude for the advice and wrote that he was working "towards some specific attainable goals with respect to that email attachment you sent," referring to the *42 Ways of Supporting Jihad* document that was emailed to him on July 12, 2008.

- On September 25, 2008, the defendant sent another email to the Al-Aulaqi email account seeking guidance and stating that the defendant wanted to make hijrah "as soon as possible" and that he is studying Arabic.

## B.    **Prior Efforts To Travel Overseas**

After these initial communications with the Al-Aulaqi email account, the defendant made three separate attempts to travel from the United States to the middle east.  The defendant's arrest disrupted his attempted travel to Yemen.

On February 15, 2009, the defendant was arrested on an outstanding traffic warrant at the George Bush International Airport in Houston while he had tickets and was scheduled to fly to Sana'a, Yemen with his family.

On March 17, 2009, the defendant attempted to cross the international land border between Detroit, Michigan and Windsor, Canada via public transportation. The Canadian authorities denied his admission to Canada.  The defendant's wife, Ernestine Johnson, separately attempted to cross the border into Canada that same

day while driving a vehicle registered in her name.  She was denied admission as well.

On our about March 25, 2009, the defendant was arrested in New Jersey for driving on a suspended license.  Following this arrest, the FBI interviewed the defendant and he stated that he was traveling to JFK airport to fly to Egypt to learn Arabic.

### C.    Defendant's Admissions to the CHS

Beginning in or around November 2009, the FBI successfully introduced a CHS into the investigation who befriended the defendant and met with him on numerous occasions.  The CHS presented himself to the defendant as a recruiter and facilitator for AQAP.  During the meetings, the defendant consistently expressed his desire to travel to the Yemen and/or the Middle East to provide material support to the "brothers" engaged in violent jihad, specifically AQAP.

In the beginning of their relationship, the CHS made suggestive comments that the CHS had a role in recruiting people to fight on behalf of the "Mujahideen" (holy warriors).  The defendant responded to these comments with expressions of his desire to fight among the "Mujahideen."  The CHS eventually told the defendant the CHS was a member of AQAP and the defendant was excited to learn that the CHS was involved with AQAP.

12

The defendant told the CHS many times during their relationship that he wanted to travel to Yemen or to any other place where he could fight in the "jihad."  The CHS told the defendant that the CHS could help him accomplish that goal, but that the defendant first must be evaluated and trained, which formed the rationale for the remainder of their meetings together.  In this regard, the CHS tasked the defendant to complete various "training" regimes, including physical fitness, counter-surveillance, and covert communications training (described below as "dead drops"), to prepare the defendant for his journey to Yemen to join AQAP.  The defendant was a willing and eager participant in these tasks.

During the course of his relationship with the CHS, the defendant emailed the CHS copies of official U.S. military manuals, which the defendant suggested could be used by the "brothers" (an expression frequently used between the defendant and the CHS to refer to AQAP) to exploit the information contained therein to thwart U.S. military forces operating overseas.  The defendant also learned from internet research about locations where the Predator Unmanned Aerial Vehicles are manufactured and/or operated.[2]  The defendant conveyed this

---

[2] The Predator UAVs are used by the U.S. military to support combat operations in Afghanistan among other places.

13

information to the CHS and suggested these locations be targeted for attack by AQAP.

During the course of his relationship with the CHS, the defendant advised the CHS that he did not trust telephones as they were "not safe."  The defendant further advised that he felt more comfortable communicating by email. Throughout this investigation, the CHS and the defendant have frequently exchanged numerous emails to communicate and to coordinate meeting times and locations, as an alternative to using telephones to communicate.

**D.      The Sting Operation**

The sting operation was conducted in the early morning hours on May 30, 2010.  The CHS contacted the defendant and gave him a code word that they had established as a signal to rendevous immediately.  The defendant traveled immediately to the pre-arranged location and waited a few minutes for the CHS to arrive.  The defendant and the CHS then departed for the Houston Port of Entry. As they traveled to the Port, the CHS explained to the defendant that he would be traveling by ship to Algiers, Algeria where the defendant would be met by Abu Bakr, a senior member of AQAP in Algeria and they would travel to a safehouse located in Annaba, Algeria where the defendant would engage in training.  The CHS said that the defendant would learn to shoot at this safehouse.

14

When the defendant and the CHS arrived at the Port, the defendant used the false Transportation Worker Identity Card ("TWIC") issued by the Transportation Security Administration ("TSA") to pass through the security checkpoint. The TWIC card had the defendant's picture and a false name, Paul Mexia. Once they passed through security, the CHS gave the defendant a tan satchel bag that contained items that the defendant had agreed previously to courier overseas to AQAP. The CHS showed the defendant some of the items contained in the bag, including €2,030 in Euros and two nonpublic restricted-access army manuals. The CHS also described the other items in the bag, which included approximately $200 in telephone calling cards, five mobile telephone SIM cards, two handheld Garmin GPS units, 4-5 packs of lithium batteries, one LED flashlight, two handwritten notes in Arabic for delivery to Abu Bakr, and one military issue lensatic compass.

The defendant and the CHS traveled in a shuttle vehicle down the port terminal to the gangway of the ship. When they arrived at the gangway, Bujol left immediately with a second CHS waiting on the gangway without saying anything further to the first CHS. The defendant carried a footlocker, a black backpack, the tan satchel, and the TWIC card onto the ship and he was escorted by the second CHS to his room where he stowed the bags he carried. After, the defendant was in

15

his room alone for approximately five minutes, SWAT police officers entered and arrested him without incident.

### E.    The "For My Wife" Video

During the same evening the defendant was arrested, FBI agents executed a search warrant at the defendant's residence and obtained a video file entitled "For My Wife" that the defendant had created and left on a computer for his wife to explain the reasons for his sudden departure.  In the video, the defendant explains that he met an individual associated with AQAP – going so far as to spell the letters "AQAP" while an accompanying photograph depicts the senior leaders of AQAP surrounded by an array of small arms and rocket propelled grenade launchers – and that he is departing the United States in order to engage in violent jihad with the mujahideen.

## VI.    EVIDENTIARY ISSUES

### A.    Direct Evidence of the Material Support Crime

The evidence regarding the defendant's communications with Anwar Al-Aulaqi, his prior efforts to travel overseas, his admissions to the CHS, and his actions related to the sting operation, should be admitted as direct evidence at trial of the charged crimes of attempting to provide material support or resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and

16

aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(2).  While many of these actions and admissions took place before the sting operation conducted on May 30, 2010, this evidence is directly probative of the defendant's specific intent when he committed these crimes on the date charged.  Even if the Court were to conclude that this is evidence is not direct evidence of the crime charged, it is still admissible as intrinsic evidence inextricably intertwined with the charged offenses, or at the very least as extrinsic evidence introduced as proof of knowledge, intent, preparation, plan, and absence of mistake.  See Fed. R. Evid. 404(b); United States v. Dula, 989 F.2d 772, 777 (5th Cir. 1993) ("In developing proof of intent and motive, the prosecution may offer all of the surrounding circumstances that were relevant.").

The intent necessary to support a conviction can be demonstrated by direct or circumstantial evidence that allows an inference of an unlawful intent.  *United States v. Yi*, 460 F.3d 623, 629 (5th Cir. 2006).  Direct evidence is "evidence which, if believed, proves the fact [in question] without inference or presumption."  Fullen v. Galveston Independent School Dist., 564 F.Supp.2d 719, 728 (5th Cir. 2008) (quoting Fabela v. Socorro Independent School Dist., 329 F.3d 409, 415 (5th Cir. 2003)).  The intention of a person charged with a crime, however, can hardly ever be shown by direct evidence.  Weiss v. United States,

122 F.2d 675, 688 (5th Cir. 1941).  Therefore, for this reason "it is permissible to introduce evidence of other acts of a similar nature," especially when committed continuously and for a long period of time, thereby establishing intent.  Id.

In deciding whether the admissibility of evidence of other acts is governed by the Federal Rules of Evidence, the court must determine if the evidence in question is "intrinsic" or "extrinsic."  United States v. Williams, 900 F.2d 823, 825 (5th Cir. 1990).  Rule 404(b) prohibits evidence of other acts to prove the defendant's conformity therewith.  *See* Fed. R. Evid. 404(b).  However, the rule permits other-acts evidence for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .  Id.; Yi, 460 F.3d at 631–32 (5th Cir. 2006); United States v. Gonzalez-Lira, 936 F.2d 184, 189 (5th Cir. 1991).  Admission of Rule 404(b) evidence must follow a two-step test incorporating Rules 401 and 403: The extrinsic evidence (1) must be relevant to an issue other than the defendant's character and (2) must have probative value that is not substantially outweighed by its prejudicial effect on the jury.  Fed. R. Evid. 401, 403; see United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978).

Rule 404(b), however, only applies to extrinsic evidence and does not prohibit intrinsic evidence.  The Fifth Circuit has defined intrinsic evidence:

> Evidence of acts other than conduct related to the offense is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.

United States v. Freeman, 434 F.3d 369, 374 (5th Cir. 2005) (internal quotations omitted).  Such evidence is "admissible to complete the story of the crime by proving the immediate context of events in time and place." Coleman, 78 F.3d at 156; United States v. Walters, 351 F.3d 159, 166 n. 2 (5th Cir. 2003).  Intrinsic evidence is permissible "so that the jury may evaluate all the circumstances under which the defendant acted." United States v. Royal, 972 F.2d 643, 647 (5th Cir. 1992).

Evidence regarding defendant's communications with Anwar Al-Aulaqi, prior efforts to travel overseas, admissions to the CHS, and actions related to the sting operation, are direct evidence of the charged offenses against him because they prove the fact in question without inference or presumption.  However, even if the court finds that this evidence is not direct evidence, it is still admissible as intrinsic evidence inextricably intertwined with the charged offenses, or at the very least as extrinsic Rule 404(b) evidence introduced as proof of knowledge, intent, preparation, plan, and absence of mistake.

## B.    The Attempt Crime

The Fifth Circuit requires two elements to prove an attempt crime. "[F]irst, that the defendant acted with the kind of culpability otherwise required for the commission of the underlying substantive offense, and, second, that the defendant had engaged in conduct which constitutes a substantial step toward commission of the crime." United States v. Farner, 251 F.3d 510, 513 (5th Cir. 2001); accord United States v. Rudzavice, 586 F.3d 310, 314 (5th Cir. 2009). "The substantial step must be conduct which strongly corroborates the firmness of [the] defendant's criminal attempt." Id.

Here, it is undeniable that the defendant made a "substantial step" towards attempting to provide material support or resources to AQAP when he boarded the ship carrying a satchel of material support items with the belief that he would be transiting to Algeria to deliver himself and the items he carried to AQAP. Furthermore, entering the Port of Houston using a false TWIC card and then crossing the threshold of the ship gangway represent a clear "point of no return" for Bujol that strongly corroborates his longstanding desire to travel overseas to engage in violent jihad.

20

## C.    Stipulations

A stipulation is evidence introduced by both parties, so neither may complain on appeal that the evidence was erroneously admitted. United States v. Banks, 624 F.3d 261, 264 (5th Cir. 2010) (foreclosing defendant from arguing on appeal that his conviction for aggravated identity was not supported by sufficient evidence, where defendant had stipulated to truthfulness of certain facts and agreed that such evidence was sufficient). Where the defendant is aware of the stipulation, and does not object to the stipulation in court, the court presumes that defendant has acquiesced in his counsel's stipulation. United States v. Robertson, 698 F.2d 703, 709 (5th Cir. 1983) (recognizing the binding nature of evidentiary stipulations where the defendant "had ample opportunity during the trial to protest the procedure if he disagreed with it" and made "no allegation that he was under any compulsion to make the challenged stipulations or that he had ineffective assistance of counsel" (citations omitted)).

Here, the government previously invited the defendant, through counsel, to stipulate to several preliminary matters including authentication and foundation for various bank records, telephone company records, and other electronic communications. The government also sought a stipulation to the accuracy of Arabic translations contained in transcripts of recorded audio and video recordings

21

made of the defendant.  Due in part to the defendant's recent decision to waive his right to be represented by counsel and proceed *pro se*, the government has not reached any stipulations with the defendant at this time.

### D.  Defendant's Statements

The defendant has been provided a copy of several audio recordings which contain his statements.  The defendant should be precluded from offering these recordings, or inquiring of any witness what the defendant may have stated on any occasion.

A defendant cannot elicit his own prior statements.  Fed. R. Evid. 801(d)(2)(A); United States v. Bond, 87 F.3d 695, 699 (5th Cir. 1996) (finding transcript of defendant not admissible as an admission by a party-opponent or under any hearsay exception, where it was not offered against a party but to benefit defendant).  Additionally, a defendant cannot admit additional out-of-court statements, even when the government admits a portion of a defendant's out-of-court statement, because such statements are hearsay when offered by the defendant.  Fed. R. Evid. 801(d)(2).

Under Federal Rule of Evidence 801(d)(2)(E), "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" is not hearsay.  Therefore, the defendant cannot admit statements of his conspirators

22

under Rule 801(d)(2)(E); however, the United States can do as is it is not a party

under the rule.  See United States v. Abbas, 74 F.3d 506, 511 (4th Cir. 1996) ("But

the prosecution is not a 'party' against whom such testimony [under Rule

801(d)(2)(E)] may be tendered").

### E.    Character Witnesses

As a general rule, character witnesses called by the defendant may not

testify about specific acts demonstrating a particular trait or other information

acquired only by personal observation and interaction with the defendant; the

witness must summarize the reputation or opinion of the defendant as known in

the community.  Fed. R. Evid. 405(a); Michelson v. United States, 335 U.S. 469,

477 (1948).  On cross-examination of a defendant's character witness, however,

the government may inquire into specific instances of defendant's past conduct

relevant to the character trait at issue.  Fed. R. Evid. 405(a).

In particular, a defendant's character witnesses may be cross-examined

about their knowledge of the defendant's past crimes, wrongful acts, and arrests.

Michelson, 335 U.S. at 479, 481 n.18.  The only prerequisites are (1) that there be

a good faith basis that the incidents inquired about occurred and (2) that the

incidents are relevant to the character trait at issue.  United States v. McCollom,

664 F.2d 56, 58 (5th Cir. 1981); United States v. Bright, 588 F.2d 504, 512 (5th Cir. 1979).

### F.      Evidence of Defendant's Lawful Conduct Not Admissible

Other than testimony from character witnesses fitting within the narrow confines of Federal Rules of Evidences Rule 404(a)(1) and 405(a), evidence offered by defendant of his lawfulness or good conduct is not admissible.

"A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990).  Evidence of the defendant's other lawful behavior is irrelevant because lawful acts do not prove an absence of unlawful acts, including those unlawful acts alleged in the indictment. See, e.g., United States v. Winograd, 656 F.2d 279, 284 (7th Cir. 1981) ("[T]he district judge correctly refused to admit the evidence on this basis because evidence that [the defendant] engaged in certain legal trades is generally irrelevant to the issue of whether he knew of other illegal trades.") (citing United States v. Dobbs, 506 F.2d 445, 447 (5th Cir. 1975)).  Moreover, such evidence is improper propensity evidence and may be excluded under Rule 404. United States v. Heidecke, 900 F.2d 1155, 1162 (7th Cir. 1990) ("Proof that a defendant acted lawfully on other occasions is not necessarily proof that he acted lawfully on the occasion alleged in

the indictment.") (citing <u>United States v. Burke</u>, 781 F.2d 1234, 1243 (7th Cir. 1985); <u>Herzog v. United States</u>, 226 F.2d 561, 565 (9th Cir. 1955)); <u>United States v. Williams</u>, 205 F.3d 23, 34 (2d Cir. 2000) (affirming district court's decision to exclude evidence that the defendant made two innocent trips to Jamaica because such evidence was irrelevant to the question of whether the defendant's trip to Jamaica at issue involved illegal drug activity); <u>United States v. Santos</u>, 65 F. Supp.2d 802, 845-846 (N.D. Ill. 1999) (excluding evidence of specific acts of lawful conduct and rejecting defendant's argument that such evidence was admissible on the grounds that it generally contradicted the government's theory of what occurred).

Evidence admitted pursuant to Rule 404(a) is limited to only the "pertinent" character traits of the defendant. Absent a direct showing that certain character traits are pertinent to the facts and issues in this case, a defendant must be prohibited from offering any specific character traits in his defense.  In addition, evidence admitted pursuant to Rule 405(a) is limited to a description of the subject's reputation or to a brief statement of opinion, without support from specific instances of conduct.  <u>See</u> Advisory Committee Notes to Rule 405.

Accordingly, all evidence of the defendant's lawfulness or good conduct, except evidence offered strictly in accord with the limitations of Rules 404(a) and 405(a), should be barred.

### G.   Lay Witness Opinion

Opinion testimony of lay witnesses is admissible if it is rationally based on the perception of the witness and helpful to a clear understanding of his testimony or to the determination of a fact in issue.  Federal Rule of Evidence 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Moreover, statements are not hearsay if they are introduced to show the effect of a listener's conduct, or establish "knowledge" on the part of a listener. United States v. Parry, 649 F.2d 292, 295 (5th Cir. 1981) (using out-of-court utterance as circumstantial evidence of declarant's knowledge of existence of some fact, rather than as testimonial evidence of truth of matter asserted, does not offend hearsay rule).

H. **Expert Testimony**

If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question. Fed. R. Evid. 702. An expert's opinion may be based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field. Fed. R. Evid. 703.

The government expects to the following expert witnesses to testify at trial:

(1) Terrorism expert **Evan Kohlmann** will testify about the nature of the terrorist organization at issue in this case and the nature of the communications and websites that the defendant participated in. First, Mr. Kohlman will address the nature and activities of AQAP (including where it operates), how AQAP recruits U.S.-based persons (particularly as it occurs via the internet), how and why U.S.-based recruits are valuable assets to AQAP, and the role and actions taken by Anwar Al-Aulaqi in regards to AQAP and/or the recruitment of Islamic radicals to commit terrorist acts. Second, Mr. Kohlman will address the nature of the websites and forums that Mr. Bujol visited and/or posted on (including specific content that Bujol has downloaded, viewed, and/or supplied hotlinks for), and he will likely be asked to render an opinion on whether Mr. Bujol would be

27

considered a candidate for recruitment given the communications he engaged in and the websites and/or internet forums he visited.  To be clear, Mr. Kohlman will *not* be asked to render an opinion on whether Mr. Bujol had the mental state or condition constituting an element of the crime charged to the extent such testimony is barred by Federal Rule of Evidence 704(b).

(2) FBI Special Agent **Bryan Cannon** will testify in regards to specialized investigative techniques, the use and effectiveness of confidential sources, terrorist organizations, violent extremism, designated terrorist organizations and individuals, restricted military documents and information, and activity constituting the material support of a designated terrorist organization.

(3) FBI Language Analyst **Hany Youssef** will testify in regards to the Arabic language translations that he verified for the transcripts prepared from the recorded conversations between the defendant and the CHS.

(4) RCFL Computer Forensics Technician **Keith Medford** will testify in regards to the actions he performed on the defendant's computer that resulted in the FBI's acquisition of the "For My Wife" video that the defendant had on his computer.

Additional expert witnesses may be called during the course of trial as needed and as approved by the Court.

### I.   Audio Recordings

The government also expects to admit evidence that contains voice recordings of the defendant and/or the CHS where portions of the recordings are in the Arabic language.  When doing so, English language transcripts will be provided to the Court and the defendant.

### J.   Authentication and Identification

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  This rule does not limit the type of evidence allowed to authenticate a document; it merely requires "some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be." United States v. Jackson, 636 F.3d 687, 693 (5th Cir. 2011).

### K.   Judicial Notice

Federal Rule of Evidence 201(d) provides that "(a) court shall take judicial notice if requested by a party and supplied with the necessary information."  A judicially noticed fact must be one not subject to reasonable dispute in that it is (1) either generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy

cannot reasonably be questioned.  F.R.E. 201(b).  The government would ask the

court to take judicial notice of the following fact:

- The organization known as Al-Qaeda in the Arabian Peninsula was designated a Foreign Terrorist Organization by the U.S. Department of State on January 19, 2010.

This designation was set forth in Public Notice 6875 of the Federal Register, Vol.

75, No. 11 (January 19, 2010) (Exhibit 1 hereto).

## VII.  CONCLUSION

The government is ready to begin trial on November 7, 2011.

Dated: November 1, 2011                 Respectfully Submitted,

                                        KENNETH MAGIDSON
                                        United States Attorney

                                        /s/ S. Mark McIntyre

                                        BY: S. MARK MCINTYRE
                                        Assistant U.S. Attorney

                                        /s/ Craig Feazel

                                        BY: CRAIG FEAZEL
                                        Assistant U.S. Attorney

                                        /s/ Garrett M. Heenan

                                        BY: GARRETT M. HEENAN
                                        Trial Attorney
                                        U.S. Department of Justice

CERTIFICATE OF SERVICE

I hereby certify that the foregoing Government's Trial Brief was filed electronically on November 1, 2011, using the Court's CM/ECF system. The United States has effected service on the Defendant by providing a copy of this brief to Jennifer Hansen, Senior Staff Attorney for the Federal Detention Center. Ms. Hansen has assured the United States that she will promptly provide a copy of this response to the Defendant.

/S/ S. Mark McIntyre
S. Mark McIntyre
Assistant United States Attorney

31