1                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION

3  UNITED STATES OF AMERICA     .
                        . H-10-CR-368
4       vs.              . HOUSTON, TEXAS
                        . NOVEMBER 7, 2011
5                        . 11:03 A.M.
  BARRY WALTER BUJOL, JR.      .
6  . . . . . . . . . . . . . . . .

7                    TRANSCRIPT OF BENCH TRIAL
8             BEFORE THE HONORABLE DAVID HITTNER
               UNITED STATES DISTRICT JUDGE
9                        VOLUME 1

10

11     *THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER*
  *THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY*
12  *COURT ORDER.  UNAUTHORIZED REPRODUCTION WILL RESULT IN AN*
  *ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE*
13  *COPY AT THE OFFICIAL RATE.*
     *General Order 94-15, United States District Court,*
14  *Southern District of Texas.*

15

16  A P P E A R A N C E S:

17  FOR THE GOVERNMENT:

18      Stephen Mark McIntyre
       Craig M. Feazel
19     Assistant US Attorney
       P O Box 61129
20     Houston, TX 77208

21      Garrett M. Heenan
       United States Department of Justice
22     950 Pennsylvania Avenue NW
       Washington, DC 20530
23

24  Proceedings recorded by mechanical stenography, transcript
  produced by computer-aided transcription.
25                  - - - - -

1    A P P E A R A N C E S:  (Continued)

2    STANDBY COUNSEL FOR THE DEFENDANT PRO SE:

3        Edward A. Mallett
         Mallett & Saper, L.L.P.
4        600 Travis
         Suite 1900
5        Houston, TX 77002-2911

6    OFFICIAL COURT REPORTER:

7        Cheryll K. Barron, CSR, CM, FCRR
         U.S. District Court
8        515 Rusk Street
         Houston, TX  77002

9                                  - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2                                                            PAGE

3    WITNESS

4    Bryan Cannon, Government's Witness

5       Direct Examination by Mr. McIntyre              22

6       Cross-Examination by the Defendant             198

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

11:03   1

11:04   2   THE COURT:  Thank you.  Please be seated.

3          The Court calls the case Criminal Matter 10-368,

4   United States versus Barry Walter Bujol, Jr.

11:04   5          Who represents the government?

6          MR. McINTYRE:  Mark McIntyre for the United States,

7   your Honor, along with --

8          THE COURT:  Hold it.

9          MR. McINTYRE:  -- along with Craig Feazel from the US

11:04   10  Attorney's Office and also Garrett Heenan with the Department

11  of Justice.

12         THE COURT:  All right.  Who else is at your table,

13  please?

14         MR. McINTYRE:  Got the case agent, your Honor, Bryan

11:04   15  Cannon.

16         THE COURT:  Agency?

17         MR. McINTYRE:  FBI, your Honor.

18         THE COURT:  Okay.

19         MR. McINTYRE:  And joint task force agent Sean

11:04   20  McCarroll and I also have my paralegal Patrice Warren, your

21  Honor.

22         THE COURT:  Okay.  One question that was raised I

23  didn't address beforehand as far as our scheduling goes -- you

24  can be seated.

11:04   25         Mr. Bujol inquired about the ability of prayer

11:04  1    sessions.  I take -- I get underway at 10:00 every morning.  We
       2    will take a break at -- as I say, at 1:00 o'clock to 2:15.  I
       3    take a break about 3:45.  So, for -- during that hour and a
       4    half lunch break -- hour and a quarter lunch break and the
11:05  5    3:45 break, and then at 6:00 o'clock, I hope he can fit his
       6    prayer sessions in.  That's probably the best we can do for
       7    just the next few days as we proceed here.
       8               We're also attending to Mr. Bujol's request
       9    relative to a computer.  So, that's on its way and -- if you
11:05 10    see folks working with the computers in here while we're
      11    underway.
      12               I have some motions that I want to go over
      13    briefly, and we're getting right underway.  I'm going to give
      14    the government about 15 minutes, initially, to give me an
11:05 15    opening statement.
      16               Also, I want to acknowledge the presence of
      17    Mr. Edward Mallett.  Just for the record, Mr. Mallett, you are
      18    present, correct?
      19               MR. MALLETT:  Good morning, your Honor.
11:06 20               THE COURT:  And -- as standby counsel.  And I
      21    appreciate your assistance there, if and when it's needed, as
      22    is requested, you know, your counsel -- if your former client
      23    wants to avail himself of it.
      24               So, I'll hear about a 15 minute opening statement
11:06 25    from the government.

Now, this is for Mr. Bujol, not being an
attorney, just for his overview.

An opening statement is merely an overview or a
road map of what the evidence will show.  You cannot argue your
case during an opening statement.

The government will go first.  They've got the
burden of proof.  I'm going to ask you do you want to make an
opening statement, and you'll have 15 minutes to give me what
you say the evidence will show, if you want to.  You can also
reserve that to your part of the case if you desire to put a
case on.

But I'll say it one last time:  You certainly
have a Fifth Amendment right not to state anything whatsoever
in this case, to ask any questions -- although you're free to
do so, of course -- or to make any statement or testimony
yourself.  And we've discussed that at length.  It's certainly
on the record in detail, when you were -- before I dismissed
your counsel and before you decided to go non-jury.

There are a number of matters I do want to get to
here.  First of all, there's the government's motion to admit
their evidence under local Rule of Criminal Procedure 55 --
55.2.  That's granted.

Mr. Bujol has some motions.  A motion to strike
surplusage for -- and for a bill of particulars.  That motion
is denied.

11:07  1          Motion -- in effect, a Rule 12(b)(4)(B)

2    designation of evidence.  Based upon the government's response,

3    the defendant's motion is denied as moot.  The government has a

4    full response in there.

11:08  5          There's Mr. Bujol's motion for the government to

6    give notice of intention to use evidence of other crimes,

7    wrongs, or whatever, under Federal Rule of Criminal Procedure

8    404(b).  There is a response on file.

9          If I'm incorrect, somebody correct me.  All

11:08  10   right?

11         There's a response on file.  Based upon the

12   response, that's denied.

13         Now, there's a motion to exclude audio and video

14   recordings.  I want to hold that for a moment.  I'm going to go

11:08  15   back to that motion in a moment.

16         There's also a motion for hearing on expert

17   testimony.  At this time, right now, that motion is denied

18   without prejudice to either party raising that objection again

19   at the appropriate time.  So, I'm denying it at this time but

11:08  20   without prejudice to renewing it if either side feels it's

21   necessary during the trial.

22         Now, as far as the transcripts go, I understand

23   that there are some transcripts -- some in English and some in

24   Arabic.  Is that correct, Mr. McIntyre?

11:09  25         MR. McINTYRE:  Some of the audio is in Arabic.  It's

11:09  1    been translated, your Honor.

     2              THE COURT:  That's correct.

     3              Now, Mr. Bujol, I'm going to give myself -- since

     4    I'm both the judge and the jury, I'm going to read the

11:09  5    instruction that I have given over the years for transcripts

     6    that are some all in English and some even in a foreign

     7    language.  So, I'm just going to read it into the record that,

     8    being the trier of fact as well as the law, I'm familiar with

     9    this.

11:09  10             But this is the instruction I would routinely

    11    give if a defendant objected, as you have, to the accuracy or

    12    the -- whether or not it's intelligible or not.  So, this is

    13    what a jury would get.  I'm going to read it in as an abundance

    14    of caution.  This is what I usually give to a jury.  So, I'm

11:10  15    not necessarily giving it to myself but just stating that I

    16    fully understand and I recognize it.

    17             Numerous transcripts of tape recorded

    18    conversations, including translations from a foreign language

    19    into English, have been admitted into evidence.  The

11:10  20    transcripts also purport to identify the speakers engaged in

    21    such conversations.  A transcript is evidence of what is

    22    recorded on an audio tape or video tape just as the tape is

    23    evidence of what was said in the original conversation.

    24             I have admitted the transcripts for the limited

11:10  25    and secondary purpose of aiding the trier of fact in following

11:10  1    the content of the conversations as I listen to the tape

2    recordings, particularly those portions that are spoken in a

3    foreign language, and also to aid in identifying the speakers.

4              The trier of fact is specifically instructed that

11:11  5    whether the transcripts correctly or incorrectly reflect the

6    content of the conversations or the identity of the speakers is

7    entirely up to the trier of fact to determine based upon his or

8    her own examination of the transcripts in relation to the trier

9    of fact's hearing of the tape recordings themselves, which are

11:11  10   the primary evidence of their own content.

11             And if the trier of fact should determine that a

12   transcript is in any respect incorrect or unreliable, the trier

13   of fact should disregard it to that extent.  And I intend to do

14   that as the trier of fact.

11:11  15             I entered the word "trier of fact" instead of the

16   word "jury," because it's usually "jury."

17             I have a timer up here.  I'm going to keep track

18   of the time.

19             By the way, anybody is free to go in and out of

11:11  20   the courtroom any time if you want.  The facilities, restrooms,

21   are down the hall.  Mr. Bujol will have access to the jury

22   room.

23             You have 15 minutes for an opening statement as

24   to what you say the evidence will show in this case.

11:12  25             Mr. Heenan -- is that how you pronounce your

11:12    1    name, sir?

     2              MR. HEENAN:  It's "Heenan," your Honor --

     3              THE COURT:  "Heenan," yes, sir.

     4              MR. HEENAN:  -- Garrett Heenan.  I'm trial attorney

11:12    5    with the counter terrorism section of the Department of

     6    Justice.

     7              Your Honor, I will be brief, probably briefer

     8    than the 15 minutes you've allotted.

     9              Late in 2008, the FBI learned that the defendant,

11:12   10    Mr. Barry Walter Bujol, had used an e-mail account,

    11    Abdul_Bari05@Yahoo.com, and that he had used that e-mail

    12    account to communicate with Anwar Awlaki.  Anwar Awlaki was a

    13    United States citizen, now deceased, who was publicly

    14    associated with al-Qaeda in the Arabian Peninsula, the Yemen

11:12   15    based affiliate of al-Qaeda.  And he was associated with that

    16    organization at the time that Mr. Bujol communicated with him.

    17              The evidence will show that Mr. Bujol e-mailed

    18    al-Awlaki seeking guidance regarding jihad.  The evidence will

    19    further show that Anwar al-Awlaki responded to Mr. Bujol's

11:13   20    request for guidance by e-mailing a terrorist manifesto

    21    entitled "42 Ways of Supporting Jihad" which instructs on how

    22    to support violent jihad and the fighters that carry it out.

    23              The evidence will further show that Mr. Bujol

    24    sent follow-up e-mails to Anwar Awlaki, expressing gratitude

11:13   25    and stating his intention to assist the holy warriors, known as

11:13   1    the "mujahideen."

2                   Now, after receiving this guidance from a known

3    al-Qaeda cleric --

4                   THE COURT:  Oh, wait a second.  Hold it.  Before we

11:13   5    even begin, we need to take a -- we need to take -- would you

6    summarize the indictment?

7                   We got to remember that.

8                   MR. HEENAN:  I will, your Honor.

9                   THE COURT:  So --

11:14  10                   MR. HEENAN:  Would the Court prefer that I read it in

11    it's entirety?

12                   THE COURT:  How long is it?

13                   MR. HEENAN:  It's three pages.

14                   THE COURT:  No.

11:14  15                   Mr. Bujol, is it okay if he summarizes it?  Then

16    I ask you how you plead, guilty or not guilty?

17                   You'll give me your plea; and then we can go

18    ahead.  May he summarize it?

19                   THE DEFENDANT:  Summarize it.

11:14  20                   THE COURT:  Okay.

21                   MR. HEENAN:  Your Honor, the defendant is charged in a

22    two-count indictment.  Count 1 charges that on or about

23    May 30th, 2010, that the defendant unlawfully and knowingly

24    attempted to provide material support or resources, as that

11:14  25    term is defined in the United States Code.  Specifically, he

11:14   1    intended to provide personnel, his person, currency, prepaid

2    telephone calling cards, mobile telephone SIM cards, global GPS

3    receivers, public access restricted US military publications,

4    including one that involved unmanned aerial vehicle operations,

11:14   5    and one that involved the effects of US military weapons in

6    Afghanistan, and additional items; and that the defendant

7    attempted to provide these materials to a foreign terrorist

8    organization, specifically al-Qaeda in the Arabian Peninsula,

9    which was designated as a foreign terrorist organization on

11:15   10    January 19th, 2010, and remains designated to this day.

11              In the second count of the indictment, the

12    defendant is charged with, on or about May 30th, 2010, during

13    and in relation to the crime charged in Count 1, knowingly

14    possessing and using without lawful authority a false

11:15   15    identification document, specifically a false Transportation

16    Worker's Identification Card, a TWIC, issued by the

17    Transportation Security Administration of the Department of

18    Homeland Security.

19              THE COURT:  All right.  Mr. Bujol, as to both of those

11:15   20    counts, sir, how do you plead: guilty or not guilty?

21              THE DEFENDANT:  Not guilty.

22              THE COURT:  Thank you, sir.

23              All right.  I'm now going to continue your time.

24    Sorry for that interruption.  It just occurred to me.  Anything

11:15   25    like that occurs to you, please let me know.  Especially in a

11:16  1  non-jury case, we can have a little colloquy back and forth any

2  time on things like that.

3       All right.  You've used two minutes and 13

4  seconds so far.  You got plenty of time.  Go on.

11:16  5       MR. HEENAN:  Thank you, your Honor.

6       Your Honor, as I mentioned, Mr. Bujol, using the

7  Abdul_Bari05 Yahoo! account, had e-mailed Anwar al-Awlaki

8  seeking guidance for jihad.

9       Al-Awlaki responded to Mr. Bujol by providing a

11:16  10  manifesto, a terrorist manifesto, "42 Ways of Supporting

11  Jihad."  And Mr. Bujol followed that up by responding back

12  expressing gratitude for those materials and stating his

13  intention to assist the holy warriors known as the

14  "mujahideen."

11:16  15       Now after receiving that guidance from Anwar

16  al-Awlaki, a known al-Qaeda cleric, the evidence will show that

17  Mr. Bujol set upon a plan to leave the United States and travel

18  to Yemen.  Three times he set out to depart the United States,

19  and three times he was foiled by law enforcement authorities.

11:17  20       The first time, February 15th, 2009, the

21  defendant traveled with his family, his wife, to the George

22  Bush International Airport [sic].  At that time he had airplane

23  tickets to travel to Yemen.  The evidence will show the FBI was

24  aware of his actions and he was under surveillance.  He did

11:17  25  have an outstanding arrest warrant, and he was arrested and

11:17   1   prevented leaving the United States at that time.

2         THE COURT:  Where was the arrest made?

3         MR. HEENAN:  The arrest was made at the George Bush

4   International Airport [sic] in Houston.

11:17   5         THE COURT:  Okay.

6         MR. HEENAN:  Second attempt the defendant made to get

7   out of the United States was March 21st, 2009.  The defendant

8   and his wife and an infant child had traveled up to the border

9   of -- Canada -- border between Detroit and Windsor, Canada.

11:17   10         THE COURT:  Windsor, Ontario.

11         MR. HEENAN:  Windsor, Ontario, your Honor.

12         The defendant made application to the Canadians

13   at the port of entry.  The defendant was traveling in a bus,

14   and the defendant's wife was traveling separately in a vehicle.

11:18   15   They both made separate application at the Canadian port to

16   enter Canada.  They both -- you will hear from a Canadian

17   border guard who took statements from the defendant's wife as

18   well as the defendant.  They gave conflicting stories.

19   Ultimately, they were denied entry into Canada.

11:18   20         Four days after that, March 25th, 2009, the

21   defendant was arrested in New Jersey while driving on a

22   suspended license.  He would later say that he was traveling to

23   the JFK Airport in New York to try to fly to the Middle East.

24   Three separate attempts to leave the United States, all three

11:18   25   attempts foiled.  The defendant, after those unsuccessful

11:18  1    efforts, returned to Prairie View, Texas.

2            Now, later in 2009 the FBI successfully

3    introduced a confidential human source, an undercover

4    informant, who befriended the defendant.  Now, you will hear

11:19  5    from this confidential human source.  He was experienced --

6            THE COURT:  Is that source coming here personally?

7            MR. HEENAN:  He will be here personally, your Honor,

8    testifying.  There will be some -- as I think the Court is

9    aware, there are some precautions that the government has asked

11:19  10    be taken.

11            THE COURT:  Such as?  A screen -- a screen put up?

12            MR. HEENAN:  A screen for the courtroom; and we've

13    asked your Honor for him to use a private entrance as opposed

14    to a public entrance, to protect his identity.

11:19  15            THE COURT:  All this has been arranged ahead of time?

16            MR. HEENAN:  Yes, your Honor.

17            THE COURT:  Go ahead.

18            MR. HEENAN:  And the testimony you will hear from the

19    source is that he is experienced, that he knew how to work as

11:19  20    an undercover and knew the parameters of this investigation.

21    And you'll also hear that he was instructed not to make

22    suggestions to Mr. Bujol but rather to key off what it was that

23    Mr. Bujol wanted to do and let Mr. Bujol lead the relationship

24    in terms of what his desires and intentions were.

11:19  25            Now, as this relationship developed and

11:19  1    progressed, Mr. Bujol shared his radical jihadist beliefs with

2    the source.  He also shared his desire to travel to Yemen.

3         The CHS, for his part --

4         THE COURT:  "CHS"?

11:20  5         MR. HEENAN:  When I say "CHS," your Honor, I mean the

6    confidential human source or the source, the undercover,

7    working for the FBI.  The CHS, or the confidential human

8    source, revealed his cover story to Mr. Bujol.  And his cover

9    story was that he was a facilitator for al-Qaeda in the Arabian

11:20  10   Peninsula.

11        Your Honor, you will hear audio tapes, because

12   the meetings between the CHS, the confidential human source,

13   and the defendant were recorded.  We have audio for all of them

14   and audio and video for many of them.  You'll hear audio tapes

11:20  15   that the first thing Mr. Bujol said when he heard from the CHS,

16   when the source told Mr. Bujol that he worked for al-Qaeda in

17   the Arabian Peninsula, the defendant offered praise to God.

18        After Mr. Bujol was informed the CHS, the source,

19   worked for al-Qaeda in the Arabian Peninsula, Mr. Bujol started

11:21  20   providing all manner of advice and materials to the source,

21   that Mr. Bujol believed would be helpful to al-Qaeda, including

22   finding US Army military manuals on the Internet, finding

23   complaint affidavits from other sting operation cases, that he

24   gave to the source, essentially saying, the evidence will show,

11:21  25   "This is how they try to catch the brothers.  This is how they

1     try to catch terrorists within the United States."

2              The evidence will also show that the defendant

3     would communicate the location of US air bases to the source,

4     where military combat drones are piloted, and suggest that that

5     is an area that the al-Qaeda in the Arabian Peninsula should

6     consider, attacking those drones where the pilots are, where

7     the drones are flown.

8              Now, this relationship was ongoing between

9     Mr. Bujol and the CHS; but it did culminate in -- May 30th of

10    2010, in a controlled sting operation that was conducted by the

11    FBI.  Mr. Bujol and the source had agreed on a plan to smuggle

12    Mr. Bujol out of the country via a freight ship that was docked

13    at the Port of Houston.

14             The evidence will show that the defendant,

15    Mr. Bujol, willingly supplied the CHS, the source, with

16    passport photos and a false name so that the source could

17    obtain a false Transportation Worker Identity Card, the card

18    that's charged in Count 2 of the indictment, that the defendant

19    would then use to access the port of entry.  The evidence will

20    show the defendant received that card and he did in fact

21    possess it and use it when accessing the Port of Houston on

22    May 30th, 2010.

23             The evidence will further show that Mr. Bujol

24    agreed to courier multiple items that he believed he would

25    deliver to al-Qaeda in the Arabian Peninsula overseas.  I

mentioned with the arraignments for the defendant at the beginning of the opening statement, in Count 1 there were multiple items, any number of which constitute material support.

Clearly, he wanted to deliver himself to al-Qaeda in the Arabian Peninsula; but the evidence will also show he carried multiple other items, several of which could be considered material support items: restricted access military manuals, euro currency, multiple GPS devices, prepaid telephone cards, all materials that are -- materially could support the al-Qaeda in the Arabian Peninsula organization.

Shortly after boarding the ship, your Honor, alone, with the items that he couriered, the FBI concluded the sting operation and arrested Mr. Bujol.

Now, based on the evidence that the Court will hear, we will return, your Honor, at the close of evidence in this case and we'll ask you to return the only appropriate and logical verdict in this case; and that is that the defendant, Mr. Bujol, is guilty of both counts in the indictment.

THE COURT:  Thank you.

MR. HEENAN:  Thank you.

THE COURT:  Mr. Bujol, do you desire to make an opening statement, sir?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Pull that microphone in,

11:24  1   please.  Just pull it in.  Can you pull the unit towards you?

2            THE DEFENDANT:  What about that?

3            THE COURT:  Yes, that's fine.

4            You've got 15 minutes.  Go right ahead.

11:24  5         THE DEFENDANT:  Okay.  I'll start from the indictment,

6   kind of work my way through.

7            THE COURT:  What will -- keep in mind it's what will

8   the evidence show.

9            THE DEFENDANT:  Exactly.

11:24  10           The evidence in this case will demonstrate that I

11   did have radical Islamic views.  I was interested in leaving

12   the United States of America.  However, my desire to leave the

13   United States of America was not to commit acts of terrorism,

14   to harm the United States nationals here or abroad.  It was

11:24  15   simply to express my discontent and displeasure, with my tax

16   dollars and what I was doing as a citizen, contributing to

17   foreign policy objectives that I didn't agree with.

18           So, the evidence will show that this intent was

19   stated repeatedly throughout the transcripts, throughout the

11:25  20   audio recordings.  I expressed a desire to increase my Islamic

21   knowledge, to increase my Arabic knowledge, to purify myself

22   and become a better Muslim and part of that involved living in

23   an Islamic environment, raising my children in an Islamic

24   environment.  I had no intention, the evidence will show, of

11:25  25   attacking anyone.

11:25  1              Furthermore, as we go through the evidence, it

2        will demonstrate that it was the CHS who suggested that he

3        wanted me to join al-Qaeda.  I never spoke of al-Qaeda.  I

4        never praised al-Qaeda's operations in Yemen, but it was the

11:26  5        CHS who sort of hoped for me, that that was something he wanted

6        me to do.  But I was simply trying to leave the country.  After

7        which the CHS provided a TWIC from a name he used --

8              THE COURT:  What's a TWIC?

9              THE DEFENDANT:  Text Worker Identification Credential.

11:26  10       That's the identification card I possessed.

11              THE COURT:  All right.  Go on.

12              THE DEFENDANT:  The CHS produced the card with a name

13       that I used in one of the e-mails.  I didn't tell him to use

14       that name.  I didn't request it.  He used it of his own to

11:26  15       further this operation.  And the evidence will show that not

16       only did I not know he was going to use the name, I didn't even

17       think the name used would be suitable because it's -- it's a

18       Hispanic name.  So, we even talked about whether or not that

19       would even be a viable name to use.

11:27  20              After that, on the night of -- on the night in

21       question, rather than me providing the material support myself,

22       I didn't know of anything that was going to be sent, to whom it

23       was being sent to, where it was being -- where it was going.

24       And the evidence will show that this man asked me to be,

11:27  25       essentially, a custodian over items he was going to send to his

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:27  1   friend.  He's essentially turning me into a hot-shot delivery

2   guy, except for I'm not getting paid.

3              So, what the evidence will show is that that's

4   what actually transpired.  I didn't participate in any of the

11:28  5   procurement of these items.  I didn't select them; I didn't

6   purchase these items; I didn't give him money or -- I didn't

7   give him anything.  It was simply a last minute, last ditch

8   effort to get me to pass these items to someone that I don't

9   even know, to further this operation.  And that's what the

11:28  10  evidence will show.

11              THE COURT:  Thank you.

12              Government, call your first witness.

13              MR. McINTYRE:  Your Honor, the government would call

14  Bryan Cannon, of the Federal Bureau of Investigation.

11:28  15              THE COURT:  Yes, sir.  Raise your right hand, be

16  sworn.

17              THE CASE MANAGER:  Do you solemnly swear that the

18  testimony you're about to give in the case now before the Court

19  will be the truth, the whole truth and nothing but the truth?

11:29  20              THE WITNESS:  I do.

21              THE COURT:  Okay.  Have a seat, please.

22              Pull the microphone up a little bit.

23              That will be fine.  All right.

24                        - - - - -

25

1   **BRYAN CANNON, GOVERNMENT'S WITNESS, TESTIFIED:**

2   **DIRECT EXAMINATION**

3   BY MR. McINTYRE:

4   Q.   State your name for the record, please.

5   A.   My name is Bryan, B-R-Y-A-N, S. Cannon, C-A-N-N-O-N.

6   Q.   And, Agent Cannon, where are you currently employed?

7   A.   I'm employed with the FBI in the Houston division, the

8   Bryan resident agency, part of the Joint Terrorism Task Force.

9   Q.   What is the Joint Terrorism Task Force?

10   A.   It's a group of multiple agencies, headed by the FBI,

11   charged with investigating acts of international terrorism,

12   domestic terrorism, gathering intelligence.  Our number one

13   goal is to prevent acts of terrorism or any acts that would

14   support terrorists.

15   Q.   How long have you been employed in Bryan, Texas, with the

16   Joint Terrorism Task Force?

17   A.   A little over four years.

18   Q.   Now, prior to working with the Joint Terrorism Task Force

19   in Bryan, Texas, did you work in any other location for a Joint

20   Terrorism Task Force?

21   A.   Yes.  For just under four years, I was assigned to the

22   Bakersfield, California, Joint Terrorism Task Force, which is

23   part of the Sacramento division of the FBI.  And prior to my

24   joining the FBI, I was what we called a "task force officer,"

25   which is a deputized non-FBI person assigned to a JTTF, in

11:30  1   Austin and also in Houston.

2   Q.  And have you had few or many occasions to investigate and

3   become familiar with terrorism matters?

4   A.  Many.

11:30  5   Q.  And have you previously testified in court proceedings,

6   regarding espionage or terrorism matters?

7   A.  Yes.

8   Q.  And on how many occasions?

9   A.  Two.

11:30  10  Q.  Now, prior to joining the FBI, you went to college.  Is

11  that correct?

12  A.  Yes, sir.

13  Q.  And when and where did you graduate from college?

14  A.  I graduated in August of 1995, Stephen F. Austin State

11:31  15  University in Nacogdoches.

16  Q.  And what did you major in at Stephen F. Austin?

17  A.  Had a double major: political science and history.

18  Q.  Now, during the time period that you attended Stephen F.

19  Austin, did you participate in the ROTC?

11:31  20  A.  Yes, sir.

21  Q.  What is the ROTC?

22  A.  It's Reserve Officer Training Corps.  It's a program you go

23  through in college in order to be commissioned into a branch of

24  service, and I was in the branch of army.

11:31  25  Q.  During the time period that you were a member of the ROTC,

11:31   1  did you receive any sort of specialized or particular army

2  training?

3  A.   Yes.   On multiple occasions, over the summers, we would be

4  sent to multiple military bases for training, one of which was

11:31   5  the airborne school in Fort Benning, Georgia.

6  Q.   And did you receive credentials from the airborne school in

7  Fort Benning, Georgia?   Is that correct?

8  A.   Yes.

9  Q.   Now, after you graduated from college, were you

11:32  10  commissioned into the army?

11  A.   Yes, sir.

12  Q.   What day were you commissioned into the army?

13  A.   On the day of my graduation.

14            THE COURT:   What branch?   What was your branch?

11:32  15            THE WITNESS:   Infantry branch, detailed to MI.

16            THE COURT:   Okay.

17  BY MR. McINTYRE:

18  Q.   So, you were commissioned the day you graduated from

19  Stephen F. Austin.   Is that correct?

11:32  20  A.   Yes, sir.

21  Q.   And once you join the army, what sort of -- or where did

22  they send you for training in regards to the army?

23  A.   My first assignment was there at the university, to help

24  assist recruiting new cadets.   Then I went to Fort Benning,

11:32  25  Georgia, to attend a number of infantry schools designed for

11:32  1   new officers, to include ranger school and other combat

2   courses.

3   Q.  And did you complete the ranger training in order to become

4   an army ranger?

11:32  5   A.  Yes, sir.

6   Q.  And when were you commissioned or dedicated to be an army

7   ranger?

8   A.  February 1997.

9   Q.  Were there other training or commendations that you

11:33  10   received in the army during the time period that you were in

11   the army before you joined the FBI?

12   A.  Yes, sir.

13   Q.  What were those other training commendations?

14   A.  As you progress in the army as an officer, you go to

11:33  15   additional schools related to whatever job you have at the

16   time.  So, I completed schools in Fort Benning, Fort Lewis,

17   Fort Huachuca, Fort Hood, received numerous medals.  And I left

18   the army as a captain.  So, I was promoted twice.

19   Q.  What sort of medals or commendations did you receive while

11:33  20   you were in the army?

21   A.  Achievement medals, commendation medals, meritorious

22   service medals for assignments I completed.

23   Q.  Did you have any training in military intelligence while

24   you were within the army?

11:33  25   A.  Yes, sir.  In 1999, the program I was in -- as I started as

11:33   1    infantry officer, all along your parent branch is what's called

2    military intelligence.  So, at that point, I was sent back to

3    my parent branch, which was military intelligence, to receive

4    my training.  And I spent approximately a year at Fort

11:34   5    Huachuca, attending three military intelligence courses.

6    Q.  And what sort of activity did you do in regard to military

7    intelligence while you were in the army?

8    A.  Following the final course I took at Fort Huachuca, which

9    was a course -- a counterintelligence course, at the end of

11:34   10   which you become a counterintelligence agent with credentials

11   and certain duties and responsibilities in the army, I was sent

12   to Fort Hood, where I was an intelligence officer for a

13   brigade.  And then, after that, I was a commander of a military

14   intelligence detachment in Fort Hood.

11:34   15   Q.  Now, in July of 2008, did you --

16        THE COURT:  Excuse me one second.

17        *(Court confers with court staff)*

18        THE COURT:  All right.  Go right ahead.

19   BY MR. McINTYRE:

11:35   20   Q.  In July 2008 did you receive an investigative lead

21   regarding an IP address and also an e-mail address?

22   A.  Yes, sir.

23   Q.  And can you tell the Court what is an "IP address"?

24   A.  In layman's terms, it's "internet protocol address"; and it

11:35   25   identifies a particular computer and how it registers when it

11:35   1   enters the Internet.

2   Q.   Okay.   And what was the e-mail address that you received

3   the lead on, and where was the IP address located that you

4   received the lead on?

11:35   5   A.   The e-mail address was Abdul -- A-B-D-U-L --

6   _Bari05@Yahoo.com.   And the IP address resolved back to Prairie

7   View A~&~M University, which is within one of the counties that

8   the JTTF that I am on covers.

9   Q.   So, that's why you were given the investigative lead, is

11:36   10   because it occurred in your area.   Is that correct?

11   A.   Yes, sir.

12   Q.   All right.   Once you received this information, what is the

13   next investigative step that you took?

14   A.   After we go through the process to actually open a case, I

11:36   15   traveled to Prairie View A~&~M University.   I was not that

16   familiar with it.   I talked to different people on the campus

17   just to get an idea how the IP addresses worked, where the

18   computers are located, how one goes about obtaining access to a

19   computer.   Also, because it's in one of our counties, one of

11:36   20   the steps that we take is to find out if there's any other kind

21   of unresolved or even unreported activities that the police may

22   think may be involved in terrorism.   So, I did all those over

23   the course of next two or three days after receiving the lead.

24   Q.   And in regards to the IP address you had the lead on, did

11:37   25   you learn that it resolved not only to Prairie View but a

11:37  1   particular bank of elevators [sic] at Prairie View University?

2   A.   Yes.   I spoke with someone at the systems administration,

3   that deals with computers, and found out that the IP address,

4   on the date in question, that was on the lead, resolved back to

11:37  5   the John Coleman Library, which is the main library on campus.

6              They were unable to determine exactly what

7   computer it was, but they were able to narrow it down to one

8   set of computers on the first floor of the Coleman Library.

9   Q.   And how many computers were on the first floor of the

11:37  10  Coleman Library that they were able to resolve this IP address

11  back to?

12  A.   I believe it was 22 or 24, in a -- one common area.

13  Q.   Now, around this same time period, did you become familiar

14  with the Prairie View campus and a place called the All Faiths

11:38  15  Chapel?

16  A.   Yes, sir.

17  Q.   What did you learn about the All Faiths Chapel at Prairie

18  View A~&~M University?

19  A.   I found it's located adjacent to the Coleman Library, no

11:38  20  more than 30 yards, connected by a sidewalk.   I found out that,

21  as the name implies, everyone can worship there.   But there is

22  one room set aside for those of the Muslim faith to use.   And

23  it was published on their website, the Prairie View A & M

24  website, that those prayer times, that was usually held Friday

11:38  25  afternoons, around 1:30.   I don't recall the exact time.

11:38  1  Q.  Now, during this same time period, did you learn of a tip

2  that had been provided to the FBI sometime in 2007?

3  A.  Yes, sir.

4         MR. McINTYRE:  And would you show Exhibit 1, please?

11:38  5  BY MR. McINTYRE:

6  Q.  Let me show you what is marked as Exhibit 1 and ask you if

7  this is a tip that you learned of sometime in 2008, during the

8  start of your investigation?

9  A.  Yes, it is.

11:39  10  Q.  And without reading the whole thing, can you tell the Court

11  a summary of what the tip stated?

12  A.  The tipster, the person that submitted the tip to the FBI's

13  tip line -- that's the www.fbi.gov site -- alleges that the

14  tipster came into contact with someone who tried to recruit the

11:39  15  tipster into supporting a terrorist organization.  It further

16  goes in to describe some of those activities and discusses that

17  the person that tried to recruit the tipster has two sons that

18  may have or may in the future travel overseas to attend and

19  obtain military training.  And, lastly, the tipster gives the

11:39  20  name of Abdul Bari and an address in Houston.

21  Q.  And as you once stated, the e-mail address that you had was

22  an Abdul_Bari05.  Is that correct?

23  A.  Yes, it was.

24  Q.  And, so, once you read this tip, what sort of investigative

11:40  25  steps did you take to determine whether this tip that was in

11:40   1   2007 had any relevance to the investigative lead that you
        2   received about the Yahoo! e-mail account?
        3   A.  A tip like this develops its own line of investigation.  We
        4   completed that.  We tried to figure out who the gentleman named
11:40   5   in the tip, if it was a valid even tip, if this person existed,
        6   this Abdul Bari.  The person did.
        7           One of the things struck me after a few days is
        8   we found an alias for Abdul Bari of Abu Rafi, A-B-U, R-A-F-I
        9   which, to me, based on my knowledge of the names used -- Arabic
11:40  10   convention names, that means that -- Abu Rafi is what's called
       11   a kunya, which is a name given.  It means that Abdul Bari has a
       12   child name of Rafi.  So, I began to look for a person named
       13   Rafi Abdul Bari.
       14   Q.  And that was based on the tip and also the fact of this use
11:41  15   of kunyas within the Islamic culture and Arabic language.  Is
       16   that correct?
       17   A.  Yes.
       18   Q.  And what did you learn about Rafi Abdul Bari during the
       19   course of this early part of the investigation?
11:41  20   A.  I learned that both Abdul Bari, the gentleman mentioned in
       21   the tip, and Rafi Abdul Bari, his son, they were both Black
       22   males.  The father was originally from the Virgin Islands,
       23   converted to Islam.  They lived in Houston, different parts.
       24   They had a long history of moving around.  Rafi Abdul Bari
11:41  25   played a number of sports, and he had recently applied to and

11:41   1   had been accepted but had not yet enrolled at Prairie View

2   A~&~M University.

3   Q.  So, based on this information that you had, did you pursue

4   or look at the Rafi Abdul Bari that had been accepted to but

11:42   5   not yet enrolled in Prairie View?

6   A.  Yes, we did.

7   Q.  What sort of steps did you take to determine whether he had

8   any relevance to this investigative lead you had regarding the

9   Yahoo! e-mail account?

11:42   10   A.  Our main line of investigation at this point -- again,

11   keeping in mind our job is to prevent anything that supports

12   terror -- was did this person ever travel overseas, what kind

13   of activities is he taking on campus, had he ever logged into

14   the Prairie View A & M computer system, checked his criminal

11:42   15   record, checked associates, checked a number of online social

16   networking sites that he may or may not have visited.  Standard

17   procedure.

18   Q.  And one of the online networking sites that you checked,

19   was it called MuslimMatch.com?

11:42   20   A.  Yes, sir.

21   Q.  Can you tell the Court what you did to investigate Abdul

22   Bari or Rafi Abdul Bari in relation to the MuslimMatch.com

23   website?

24   A.  Yes.  I went to the site.  It was -- at the time that I

11:42   25   went to it, which was September 30th, 2008, it was an open

11:43  1    site, meaning you don't have to pay or have a login.  So, I

2    went to it on an Internet computer and typed in variations of

3    Rafi Abdul Bari, Abdul Bari, with the spelling off the tip and

4    a number of other spellings, in an order to find anyone that

11:43  5    had posted that may be Rafi Abdul Bari.

6    Q.  And how many entries did you have that had some

7    relationship to an Abdul Bari when you first looked at it, and

8    then how many did you later determine weren't relevant and you

9    got it down to a smaller number?

11:43  10    A.  As I recall, there were tens of thousands of profiles on

11    the site at that time.  And my search terms that I used brought

12    back maybe 14, approximately, maybe 15, with some variation.

13            And then, after you looked at each and every

14    profile -- I knew that Rafi Abdul Bari and Abdul Bari in the

11:43  15    tip were Black males.  So, I was looking for someone Black and,

16    obviously, from Houston.  And that got me down to two or three.

17    And then you looked further.  There was only one that was a

18    Black male from Houston.  The rest were Asian or from other

19    parts of the world.

11:44  20    Q.  Let me show you what is marked as Exhibit Number 3.  And is

21    this the Muslim Match user profile that you're referencing

22    today that you ultimately eliminated this Abdul Bari search

23    down to?

24    A.  Yes, sir.

11:44  25    Q.  And can you --

11:44   1        THE COURT:  That symbol in the upper left, what is it?
        2  Also a match-making operation, too?
        3        THE WITNESS:  Yes, sir.  There's two hearts overlaid.
        4        THE COURT:  Okay.
11:44   5  BY MR. McINTYRE:
        6  Q.  Now, on the information that's listed on this first page,
        7  were there some things that caught your attention regarding a
        8  description of the person that was Abdul_Bari05 on this
        9  MuslimMatch.com site?
11:44  10  A.  Yes, sir.  I was looking at the login name, date of
       11  birth -- or the age, the fact that it was a male, height and
       12  weight, the person was Black, a Sunni Muslim.  And then, since
       13  it's a dating site, I would assume that the person was single.
       14  So, I was looking for someone younger that was single.
11:45  15        What also jumped out at me that's visible is the
       16  date that it was created, which was 2005.
       17  Q.  And why was 2005 significant?
       18  A.  At the time I didn't know.  I assumed it had something to
       19  do with the "05" in the profile name.  But I later learned,
11:45  20  during the investigation, that that was the year that the
       21  defendant converted to Islam.
       22  Q.  And the user name for this account user is also
       23  "Abdul_Bari05."  Is that correct?
       24  A.  Yes, it is.
11:45  25  Q.  And that's exactly what the e-mail address is, minus the

11:45  1   @Yahoo.com.  Is that correct?

2   A.  Yes, sir.

3   Q.  So, I assume that also drew your attention.  Is that right?

4   A.  Yes, sir.  At this point I'm holding two or three different

11:46  5   possible cases in my hand.  And this looks like it could have

6   been Rafi at the time, it could have been the person using the

7   computer at Prairie View A & M.  So, I had to explore all

8   options.

9   Q.  At this point in the investigation, did you even know who

11:46 10   Barry Bujol was?

11   A.  No, sir.

12   Q.  You were just looking for someone that was using the Yahoo!

13   e-mail account.  Is that correct?

14   A.  Well, I was not only looking for that; but I had opened --

11:46 15   I guess you would use the "can of worms," with the tip.  Now,

16   we have another person that's in the territory that I am

17   supposed to investigate, which is where Prairie View A & M is;

18   and I'm looking at Rafi.  Abdul Bari is someone who may have

19   traveled, as the tip implied, overseas to obtain training.  So,

11:46 20   I've got two possible angles to investigate.

21   Q.  Let's go to Page 2 of that Abdul_Bari05.  And on Page 2 is

22   there information within his profile where he indicates things

23   that he likes and dislikes, personality, and things like that,

24   that drew your attention to this particular profile?

11:47 25   A.  Yes.  In the upper left-hand corner, you can see there's a

11:47   1   section where you list issues about your personality.  And in

2   bold, the person that posted this listed "Jihad."  That in and

3   of itself doesn't raise any flags by itself.  However, when

4   it -- underneath there, it says, "World Change."  And the

11:47   5   person that posted this said, "If it were possible" -- "I would

6   make the entire planet Islamic."

7           I understand from my knowledge of the religion

8   and investigating people that practice the religion, in the

9   course of my terrorism investigations, that it's not an

11:47   10   abnormal thought that the world should change to one religion

11   or another.  But this struck me as -- "I would make the entire

12   planet Islamic," as if it was an act of --

13           THE DEFENDANT:  Objection.

14           THE COURT:  What's the objection?

11:48   15           THE DEFENDANT:  He's leaving out a critical part of

16   the statement that says --

17           THE COURT:  Then -- excuse me.  The critical part of

18   the statement that he's reading from?

19           THE DEFENDANT:  Yes.

11:48   20           THE COURT:  Okay.  All right.  That's the rule of

21   optional completeness.  All right?  So, then, if he may -- if

22   you want, he can read the rest of it, also.

23   BY MR. McINTYRE:

24   Q.  Can you read the whole portion --

11:48   25           THE COURT:  Yeah.

11:48  1    BY MR. McINTYRE:

     2    Q.  -- on the "Self Change," instead of the second half of that

     3    portion?

     4              THE COURT:  That's -- thank you.  That will --

11:48  5              THE WITNESS:  On "Self Change" or --

     6              THE COURT:  In other words, what it is, the rule of

     7    optional completeness --

     8    BY MR. McINTYRE:

     9    Q.  Okay.  "World Change."  I'm sorry.

11:48 10              THE COURT:  -- if somebody reads something, and it's

    11    just a small phrase or two that would fill it out from the

    12    other side, rather than wait until he takes you on cross-exam,

    13    it's a lot quicker to do it now.

    14              THE WITNESS:  "If it was possible before the return of

11:48 15    Isa, alayhis salam [sic], I would make the entire plant

    16    Islamic."

    17              THE COURT:  Okay.  Go right ahead, sir.

    18    BY MR. McINTYRE:

    19    Q.  Now, if you go further down the profile, it's got -- under

11:49 20    "Occupation," it's got some information that later became

    21    relevant to your investigation.  Is that correct?

    22    A.  Yes.

    23    Q.  And what is that information?

    24    A.  The person boasts that he's the owner of a window cleaning

11:49 25    and pressure washing company.

11:49   1   Q.   And did you later learn, during the course of the
        2   investigation, that Mr. Bujol had a window cleaning business?
        3   A.   Yes.   It was named Better Way Windows.
        4   Q.   And on the right hand, this person has entered some
11:49   5   information, what they think about music and instruments.   Is
        6   that correct?
        7   A.   Yes, sir.
        8   Q.   And what is written within the document regarding music and
        9   instruments?
11:49  10   A.   Under "Music" it says, "Music is Haraam."   And under
       11   "Instrument" it said, "Music is Haram," [sic] exclamation
       12   point.
       13   Q.   What does "haraam" mean?
       14   A.   Means it's essentially bad, it's against the religion, and
11:49  15   it shouldn't be done.   To me, when I see that together, it
       16   tells me that the person that posted this takes a more strict
       17   and extremist view of their religion, with making the entire
       18   plant Islamic, jihad, music is haraam.
       19   Q.   And, also, if you go to Page 3, under "Education" is there
11:50  20   information that later would become relevant also?
       21   A.   Yes.   It says under "Education," under the section that's
       22   called "Future," "I would like to take Arabic classes."
       23   Q.   And did you later learn that Mr. Bujol was trying to learn
       24   Arabic?
11:50  25   A.   Yes, sir.

11:50   1   Q.  Now, during the time period that you found this

2   MuslimMatch.com website, was there a search box within that

3   website that led you to other information regarding this Abdul

4   Bari?

11:50   5   A.  Yes, sir.

6   Q.  And tell the Court how you entered that search and then

7   what you found.

8   A.  On the -- back on the first page, there's a text box for

9   searching; and I entered in, again, variants of Abdul Bari.

11:51   10   And when I entered the variant spelled the same as the way the

11   profile is, with the "I" at the end of the "Bari," one of the

12   returns I found was a posting by someone named Abdul Bari to a

13   website entitled Jihad Fields.

14   Q.  And let me show you what is marked as Exhibit 4.  And is

11:51   15   that the website that you refer to which is called "Jihad

16   Fields Are Calling"?  Is that correct?

17   A.  Yes, sir.

18   Q.  What does it say -- even though it's cut off to some

19   degree, what does it say beyond -- or below "Jihad Fields Are

11:51   20   Calling"?

21   A.  "Islam will dominate the world no matter how much

22   kuffar" -- I believe it says "dislike."

23   Q.  And what is a "kuffar"?

24   A.  It's used -- it's a derogatory term for someone that

11:52   25   doesn't believe in the religion of Islam and acts in a way

11:52  1    against that religion.

2    Q.  And did you have occasion to look through this website, and

3    can you tell the Court whether it was a radicalized website or

4    not a radicalized website?

11:52  5    A.  The content was very radical in nature.  The way that

6    website is laid out on the screen, when it's not printed out,

7    is it has the posts, which is there at the bottom, and links

8    you to other sites or websites or documents that are resident

9    somewhere else on the Internet.  Every one of the posts that's

11:52  10   on this page and other pages had to do with the ongoing fights

11   in Chechnya, battles in Iraq, Afghanistan, mujahideen.  A lot

12   of the different sites were glorifying actions that were taking

13   place by the mujahideen elsewhere.

14             The article itself, which was the Jihad Fields

11:53  15   portion, essentially it's an article in English which to me at

16   the time was important because the person that I am looking at

17   I believe to not yet fully know Arabic.  So, therefore,

18   something in English would be important because that would be

19   something they could understand.

11:53  20             It's essentially a call to arms.  It's asking

21   Muslims -- able-bodied Muslims to travel overseas into areas

22   there's ongoing conflict between Muslims and non-Muslims and

23   gives specific places, like the Arabian Peninsula, Chechnya,

24   Palestine, a number of others, and implores them to travel and

11:53  25   obtain victory or martyrdom in that path.

11:53  1    Q.  If we go to Page 3, that's the start of the article that

2    you're referencing.  Is that correct?

3    A.  Yes, sir.

4    Q.  And if we go to Page 8 -- there's a comment section for

11:54  5    people to enter comments regarding the article.  Is that

6    correct?

7    A.  Yes, sir.

8    Q.  And on Page 8, is there an e-mail -- or is there a comment

9    from an Abdul Bari on July 31st of 2008?

11:54  10   A.  Yes, sir.

11   Q.  And this is the comment that led you to this site from the

12   MuslimMatch.com.  Is that correct?

13   A.  Say that again, sir.

14   Q.  This is -- when you did your MuslimMatch.com search, this

11:54  15   is where you ended up.  Is that correct?

16   A.  Oh, yes, sir.

17   Q.  What does Comment 5 from Abdul Bari say?

18   A.  "Asalamu 'alaikum akhi.  What about an English speaking

19   Muslim serious about jihad and wants to know what he can do.

11:54  20   What do you suggest?"

21   Q.  And was there a response immediately below that from the

22   moderator named Mujahid?

23   A.  Yes, sir.

24   Q.  What does the moderator suggest to Abdul Bari?

11:55  25   A.  There's an Arabic greeting back to -- the last word is

11:55  1   "akhi," which is "back to the brother."

2                   "The answer is simple.  Choose the path of Adam

3   Gadahn, also known as Azzam the American.  Choose the path of

4   Hamza Walker Lindh, also known as American Taliban."

11:55  5   Q.  Who is Adam Gadahn?

6   A.  Adam Gadahn is a person from California, who is a member of

7   al-Qaeda; and he's currently overseas.  He's wanted by the FBI.

8   He's been indicted in a number of charges related to terrorism,

9   treason, conspiracy.

11:55  10  Q.  And who is Hamza Walker Lindh?

11  A.  His name is John Walker Lindh.  He's also known as Johnny

12  Walker Lindh.  There's a lot of names for him.  He's American,

13  also from California, traveled to Yemen to attend a language

14  school; and then, from there, went on to the battlefield in

11:56  15  Afghanistan, was captured by US forces, is currently serving

16  time for his assistance to the Taliban, in federal

17  penitentiary.

18  Q.  And if we go to the bottom of the next page, there's a

19  follow-up comment from Abdul Bari.  Is that correct?

11:56  20  A.  Yes, sir.

21  Q.  And essentially what does Abdul Bari say in regards to the

22  advice that he received from the moderator?

23  A.  The way I describe it, he feels like he's been brushed off

24  a little bit.  So, he says, "To 'follow the path of the

11:56  25  American or John Walker Lindh' is a pretty broad answer.  I've

11:56   1   tried to find out how they made their way to the battlefields,

2   but that information isn't out there.  I'm looking for a

3   specific course of action.  Right now I'm learning Arabic and

4   exercising but still that isn't going to tell me how to get

11:56   5   overseas to the Land of Ribaat and fulfill my obligations by

6   defending Islam.  I'm asking yourself or anyone for sincere

7   naseehah."

8   Q.  And was there information within these comments from Abdul

9   Bari that matched the information that you later came to know

11:57  10   about the defendant?

11   A.  Yes.  The exercising, the learning Arabic, and then the --

12   just the pure attempt to gather very specific information on

13   how to get overseas, those are all things that --

14   Q.  And then, below that, there's another -- there's a comment

11:57  15   to the Bari comment, from the moderator.  Is that correct?

16   A.  Yes.

17   Q.  And what's the summary of that information?

18   A.  Basically, the only guidance you can get online is keep

19   your intentions pure, keep looking for opportunities to at

11:57  20   least make hijrah to any Muslim land for -- first before going

21   to the Land of Ribaat, keep praying to Allah sincerely to

22   accept you.

23   Q.  Now, later on during the investigation, after you had

24   received and looked at this information, did you issue a

11:58  25   subpoena for an e-mail account -- or for several e-mail

11:58  1    accounts, actually?

2    A.  Yes, sir.  Given that the Abdul_Bari05 posting on Muslim

3    Match, you know -- we didn't have much to go on.  So, we

4    decided to seek and we did seek and obtain federal grand jury

11:58  5    subpoenas for subscriber information to the major Internet

6    service providers using that extension, for example,

7    Abdul_Bari05 at Yahoo! --

8        THE COURT:  Slow down.  The court reporter needs to

9    take it down.

11:58  10   A.  -- Yahoo!, MSN, AOL, GMail, some of the major service

11   providers.

12   BY MR. McINTYRE:

13   Q.  Did you receive a response from any of the service

14   providers regarding Abdul_Bari05?

11:58  15   A.  We received numerous; but most all said that they didn't

16   exist, with the exception of Yahoo!.

17   Q.  And you received a response from Yahoo!.  Is that correct?

18   A.  Yes, sir.

19   Q.  Show you Exhibit 6, Page 3.

12:00  20       THE COURT:  Are you able to bracket -- you know,

21   bracket and blow it up that way?

22       MR. McINTYRE:  We are, your Honor.  Sometimes with

23   this screen it takes portions too big and takes them off the

24   screen.

12:00  25       THE COURT:  Okay.

BY MR. McINTYRE:

Q.   Agent Cannon, let me show you what is marked as Exhibit 6,
Page 3.  And can you explain to the judge what Exhibit 6,
Page 3, is?

A.   Yes, sir.  It's the page provided by Yahoo!, that gives the
information that whoever created the account provided as
identifying information.

THE COURT:  Is that what it says, "Yahoo! Account
Management Tool"?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Go on.

BY MR. McINTYRE:

Q.   And this was in response to your subpoena.  And in addition
to this registration information, or subscriber information,
you also got login information.  Is that correct?

A.   Yes, sir.

Q.   And what was significant about the subscriber information
on Page 3 of Exhibit 6?

A.   Significant to me was the date that it was created, again,
in 2005, just a few days before the Muslim Match posting; the
name, Mr. Abdul Bari; and the city, which was Prairie View;
and, then, the fact that the account was active.

Q.   And if you go to Page 4 of Exhibit 6, there's login
information.  Is that correct?

A.   Yes, sir.

12:01   1   Q.  And was there anything significant about the login

        2   information, which basically shows when a person logs into

        3   their e-mail account and what IP address they did that from?

        4   Is that correct?

12:01   5   A.  Yes.  What was significant to me was there was a number of

        6   logins, oftentimes, many --

        7           THE COURT:  What page are we on?

        8           MR. McINTYRE:  Page 4, your Honor.  I'm sorry.  Page 4

        9   of Exhibit 6.

12:01   10          THE COURT:  "Page 4," in the upper right-hand corner?

        11   Is that what you are talking about?  Small Page 4 or numerical

        12   Page 4 as you flip in?

        13          MR. McINTYRE:  It's going to be Page 4, numerical

        14   Page 4.

12:01   15          THE COURT:  That's it?

        16          MR. McINTYRE:  Yes.

        17          THE COURT:  Just a set of numbers and letters?

        18          MR. McINTYRE:  Yes, your Honor.

        19   BY MR. McINTYRE:

12:02   20   Q.  All right.  Looking at this information, which shows when

        21   the account was logged into, did you have someone perform,

        22   like, a frequency analysis on this?

        23   A.  Yes.  We learned -- I mean, if I look at the IP addresses,

        24   every one on that page is a Prairie View A & M IP address,

12:02   25   resolves somewhere on the university campus.  So, in order to

12:02  1    figure out who the actual user of this account was, we decided
       2    to see what days was there any kind of pattern developed by the
       3    person that was logging into this account.
       4    Q.   And with these Prairie View login IP addresses and the
12:02  5    dates and times, what did you determine was the best time to
       6    set up surveillance for these computers to see who's actually
       7    accessing this AbdulBari_05 [sic] account?
       8    A.   We chose Friday afternoons because, although there were
       9    other patterns, that was -- that was always -- the person
12:03 10    always logged in that day.
      11    Q.   And you got that information from this information that
      12    we're looking at today.  Is that correct?
      13    A.   Yes, sir.
      14    Q.   Now, on Friday, October 31st, you conducted surveillance.
12:03 15    Where did you conduct surveillance at on the Prairie View
      16    campus?
      17    A.   We conducted surveillance in the vicinity of the John
      18    Coleman Library.
      19    Q.   And where is the All Faiths Chapel in relationship to the
12:03 20    John Coleman Library?
      21    A.   It's just adjacent.  It's 30 or 40 yards or less, next --
      22    it's next to the Coleman Library.
      23    Q.   And what was observed on Friday, October 31st, in relation
      24    to the All Faiths Chapel and the computers that were in the
12:04 25    Coleman Library at Prairie View A & M?

12:04  1    A.  We set up surveillance all around all the logical entrances

2    and exits of the Coleman Library.  And I don't recall the exact

3    time, but it was just before 2:00 o'clock.  A group of

4    gentlemen exited the All Faiths Chapel, moving on foot towards

12:04  5    the Coleman Library.  They were talking amongst themselves and

6    had -- they dispersed different directions after a few minutes.

7    Q.  Was anyone, of this group that left the All Faiths Chapel,

8    observed going to the Coleman Library?

9    A.  There was at least one, yes.

12:04 10    Q.  Can you describe that person?

11    A.  It was a tall Black male dressed in traditional Islamic

12    attire with a long robe, a thawb, and kufi, which is a

13    headdress, and wearing a backpack, approximately 6-foot-4.

14    Q.  And 6-foot-4 matched the information that was on the

12:04 15    MuslimMatch.com website.  Is that correct?

16    A.  Yes.

17    Q.  And was this individual that you just described observed at

18    the computers at the Coleman Library?

19    A.  Yes.

12:05 20    Q.  And do you know approximately the time that he started work

21    on the computer and approximately when he left on October 31st?

22    A.  He got onto the computer on the first floor of the library

23    approximately 2:07.  And I don't recall exactly what time he

24    got off, but it was 20 minutes or so.  He was observed logging

12:05 25    in, had some headphones, printed a few things off, put those

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:05 1  things and the headphones back in his backpack and exited the
     2  library.
     3  Q.  And where did this individual go after he exited the
     4  library?
12:05 5  A.  Walked towards the parking lot that's next to the
     6  architecture building and then eventually got into a vehicle
     7  and drove away.
     8  Q.  And what type of vehicle was this?
     9  A.  It was a green four-door.  I think it was a Nissan, late
12:05 10 model.  I don't recall.
     11          THE COURT:  Sedan?
     12          THE WITNESS:  Yes, sir.
     13          THE COURT:  Sedan.
     14 BY MR. McINTYRE:
12:05 15 Q.  And where was the vehicle followed to after it left Prairie
     16 View?
     17 A.  We followed it off of the campus, a short distance -- 2, 2
     18 and a half, 3 miles -- to Pine Island Road.  There's an
     19 apartment complex there at 20598 Pine Island Road.  And we
12:06 20 canceled the surveillance once the car went into the apartment
     21 complex, because there's only one way in and one way out.
     22 Q.  Later on in the investigation, did you learn that's where
     23 the defendant resided, in that apartment complex?
     24 A.  Yes.
12:06 25 Q.  Let me show you what is marked as Government's Exhibit 7

12:06   1    and have you take a look at that.  And can you tell me what

2    Government's Exhibit Number 7 is?

3    A.  That's a printout of a digital photo taken during that

4    surveillance of the defendant walking away from the Coleman

12:06   5    Library, towards parking lot where the vehicle was.

6    Q.  And let me show you what is marked as Government's Exhibit

7    8 and have you describe what Government's Exhibit 8 is.

8    A.  That's the defendant, parked, at the rear of the car.  As

9    you look at the picture, to the right where his hand is you see

12:07   10   the car that he was about to get into.  To the left there's an

11   unidentified male that he was speaking to at the time.

12   Q.  And do you see that individual in the courtroom today?

13   A.  Yes, I do.

14   Q.  And can you point to him and identify him?

12:07   15   A.  He's wearing a green jumpsuit.

16        MR. McINTYRE:  May the record reflect the witness has

17   identified the defendant, your Honor?

18        THE COURT:  The record will so reflect.

19   BY MR. McINTYRE:

12:07   20   Q.  And that's the defendant that's charged in the indictment

21   before this Court.  Is that correct?

22   A.  Yes, sir.

23   Q.  Now, after you had surveilled the defendant on the

24   computer, what investigative steps did you take at that point

12:07   25   to determine what he had done on the computer and what he was

12:07  1    accessing on the computer?

2    A.  At this point, because of what was going on on the campus,

3    we were still looking at Rafi up to a few days before, the Rafi

4    Abdul Bari.  We were working jointly with the police department

12:08  5    on campus.  And, that day, we seized the computer that the

6    defendant had just logged off of; we put a sign that said, "Out

7    of order," waited till he left the area to seize the computer

8    in order to determine what was done on the computer.

9    Q.  And what did you learn about Prairie View's computers and

12:08  10   whether they save information or don't save information?

11   A.  At the time of the investigation, that portion of the

12   library used a program that's called "Deep Freeze."  And

13   essentially what that means is, as soon as you log off of the

14   computer, whatever user name you used, that computer program

12:08  15   sets in and wipes away any history or anything you may have

16   accessed during the time you were logged on.

17   Q.  And, so, the information had been wiped off the computer

18   you seized.  Is that correct?

19   A.  The information containing anything to do with anybody

12:09  20   logging in that day had been wiped, yes.

21   Q.  Now that you had a photo of the defendant and a general

22   location where he might reside, or at least he went to in his

23   car, what other investigative steps did you take in regards to

24   this case?

12:09  25   A.  We had a description of the vehicle and a Texas license

12:09  1    plate; so, we ran our normal database checks to figure out who

2    owned the vehicle, get a picture of that person, see if they

3    had any relationship with the university, a criminal history.

4    And as I recall, that vehicle had multiple names associated

12:09  5    with it -- former owners, current owners.  And after a few

6    weeks of that, nobody that was associated with that vehicle had

7    any connection to Prairie View.

8    Q.  Now, I guess a few weeks later did you have occasion to see

9    that vehicle at the Prairie View campus?

12:09  10   A.  Yes, sir.

11   Q.  Where did you see it?

12   A.  I was leaving the campus with the co-case agent, and we

13   observed that vehicle turn and eventually park in the health

14   clinic on campus.  It was driven by a female, Black female.

12:10  15   Q.  And what steps did you take to determine who the Black

16   female driving that vehicle that you had previously seen was?

17   A.  We followed it to its parking place at the healthcare -- at

18   the health clinic on campus, and we sat in a vehicle and watch

19   it and determined that -- when the occupant parked, she parked

12:10  20   illegally.  She was unloading her child.  She went inside the

21   building.  So, we contacted the police on campus, informed them

22   of the illegal parking, requested that if they were going to

23   ticket it -- that was the normal procedure -- that they would

24   do so only at the time the occupant returned to the vehicle, in

12:10  25   an effort to identify her.

12:10  1    Q.  And what information did you learn about the driver of the
       2    vehicle?
       3    A.  We learned that her name was Ernestine Johnson and she was
       4    the mother of the child that she was pushing and that the child
12:11  5    was the child of Barry Walter Bujol, Jr., who she stated was a
       6    student on campus.
       7    Q.  So, at this point in the investigation you had the name of
       8    Barry Bujol.  Is that correct?
       9    A.  Yes.  And, also, on the information that the university
12:11  10   police filled out on the ticket, we obtained an address which
       11   was to the same apartment complex, using the Apartment
       12   Number 55.
       13   Q.  And when you say the "same apartment complex," are you
       14   referring to the apartment complex he was followed to by
12:11  15   surveillance in October?
       16   A.  Yes.
       17   Q.  Now, during this investigation, did you obtain or learn of
       18   a phone number that was associated with Mr. Bujol?
       19   A.  Yes, sir.  Now that we had a name, we began anew all the
12:11  20   things we had done with Rafi and the other Abdul Bari.  We went
       21   to the university to get what's called "directory information"
       22   from the university, to determine a name, phone number, things
       23   like that.  We obtained a cell phone number for the defendant,
       24   that was used by his family; and an address, an e-mail address;
12:12  25   things of that nature.

12:12   1    Q.  And did you then search for information based on this cell
        2    phone number that you had for Mr. Bujol?
        3    A.  We did a number of searches on every piece of identifying
        4    information we had on Barry Bujol and Ernestine Johnson,
12:12   5    determined they weren't married but they lived together.  But
        6    the phone number, we ran a number of ways.  One of the ways we
        7    did that was just a simple Google search on the Internet.
        8    Q.  Let me show you what is marked as Government's Exhibit 23.
        9    And I'm going to show you the first page.  And five down -- I
12:12   10   think five paragraphs down there's a reference to Better Way
        11   Windows.  Is that correct?
        12   A.  (No audible response).
        13   Q.  Can you see that?
        14          I think it will be the fifth one down.
12:13   15   A.  Okay.  Yes.  I see -- throughout this page was a number of
        16   links to -- it's the exact same company, but it's Better Way
        17   Windows, Houston, Texas.  Provides a cell phone number; you can
        18   see it in bold there.  It's bolded because that's the number we
        19   actually searched.  Provides a little bit of information about
12:13   20   it.
        21   Q.  Okay.  And if we go to the second paragraph and look to --
        22   I think, the second paragraph down, there's an advertisement
        23   for the sale of a vehicle.  Is that correct?
        24   A.  Yes, sir.  There's a posting for the sale of a van for
12:13   25   $2,500.  And the person lists, "I'm selling because I'll be

12:13   1   leaving the country.  Serious buyers only."  And then, again,

2   same phone number, in bold.

3   Q.  And that's a phone number associated with Mr. Bujol.  Is

4   that correct?

12:14   5   A.  Yes.  And right below it is a number again with Better Way

6   Windows, a PO box for Prairie View.

7   Q.  Now, during this time of the investigation, sometime in

8   November of 2008, did you get what's called an order from the

9   court called a 2703(d) order?

12:14  10   A.  Yes, sir.

11   Q.  What exactly does a 2703(d) order get you in addition to

12   login information and subscriber information?

13   A.  It gives you header and footer information regarding

14   e-mails.  So, it's --

12:14  15            THE COURT:  What do you mean "header and footer"?

16            THE WITNESS:  It give us the "To" and the "From," a

17   date and a time.  It does not give content of an e-mail.

18   BY MR. McINTYRE:

19   Q.  Let me show you what is marked as Government's Exhibit 9A,

12:15  20   Page 2.

21            MR. McINTYRE:  Is this -- or Page 1, I guess.

22   BY MR. McINTYRE:

23   Q.  And it's -- there's a document called "Yahoo! Account

24   Management Tool."  Is that correct?

12:15  25   A.  Yes, sir.

12:15   1   Q.  And, again, that's the subscriber information associated

2   with this account that we've previously talked about.  Is that

3   correct?

4   A.  Yes, sir.  When you do a 2703(d) order, in addition to the

12:15   5   header-footer, you get subscriber and login information, just

6   like you would if you did a subpoena.

7   Q.  And if we go to the next page, there's the login

8   information.  Is that correct?

9   A.  Yes, sir.

12:15   10   Q.  Now, did you -- the login information is given in Greenwich

11   mean time.  Is that right?

12   A.  Yes, sir.

13   Q.  And did you do an analysis of the time period that

14   Mr. Bujol was seen logging on at the Coleman Library at Prairie

12:15   15   View and see if there was a login into this account at or

16   around the same time period?

17   A.  Yes.  There was one within a few minutes of the time we saw

18   him.

19   Q.  What did that tell you during your investigation, regarding

12:16   20   whether Mr. Bujol was accessing this account?

21   A.  It told me that this account was accessed by -- the person

22   that I later identified as the defendant was at the computer at

23   the time it was logged into this account.

24   Q.  So, you had surveillance of him at the computer; and then

12:16   25   you also had an IP address that someone was logging into that

12:16   1    account that same time period -- or within a minute or two of

2    that same time period?

3    A.  Yes, sir.

4    Q.  Now, you also talked about -- and I'm not going to show you

12:16   5    this, but there's a CD marked 9B which is also part of the

6    evidence in this case -- that you received this header

7    information.  Is that right?

8    A.  Yes, sir.

9    Q.  What was on the header information, that was of interest to

12:16  10    you in this investigation, regarding terrorism and regarding

11    this Abdul_Bari05 account?

12    A.  As I recall, there were a number of header-footers; and we

13    had to go through and sort through which ones were duplicative.

14    And we found that there were headers-footers to e-mail

12:17  15    addresses that had the name of an Arabic language institute in

16    it; so, that led me to believe the person was e-mailing that

17    had to do with an Arabic language.  And, also, there were a

18    number of e-mails to and from Anwar Awlaki's website and Anwar

19    Awlaki's Yahoo! account.

12:17  20    Q.  Who is Anwar Awlaki?

21    A.  He is a recently deceased member of al-Qaeda in the Arabian

22    Peninsula.  He's a US born Yemeni who speaks fluent English.

23    He is what's called a "radicalizer."  So, he posts things on

24    the Internet in an effort to recruit and radicalize people.

12:17  25                  What's of importance about him is, because of his

12:17    1    lengthy stay in the United States and the fact he's a US

         2    citizen, he understands social media.  He understands US -- the

         3    English language with US colloquialisms and the common phrases

         4    and current events in America.

12:18    5    Q.  And what was Awlaki's relationship to Nidal Hasan, the Fort

         6    Hood shooter?

         7    A.  Nidal Hasan was a major who had corresponded with Anwar

         8    Awlaki.

         9            THE COURT:  Major where?  Major in what?

12:18   10            THE WITNESS:  He's a major in the United States Army,

        11    stationed at Fort Hood.

        12    BY MR. McINTYRE:

        13    Q.  What is Major Hasan charged with currently?

        14    A.  I'm not sure the exact charge, but he's currently in --

12:18   15    charged under the Uniform Code of Military Justice, which is

        16    the military's judicial system, for multiple murders that took

        17    place on Fort Hood.

        18    Q.  And what is Awlaki's association with Abdulmutallab?

        19    A.  Abdulmutallab was the -- what is called the Christmas Day

12:18   20    bomber that -- Christmas day 2009 he attempted to blow up an

        21    aircraft using underwear -- a bomb placed in his underwear.

        22    Prior to that attempted attack, he had been in contact with and

        23    had been directed by people in al-Qaeda in the Arabian

        24    Peninsula, one of which was Anwar Awlaki.

12:19   25    Q.  So, when you saw this header information, that -- that

became, I guess, a focal point of your investigation.  Is that correct?

A.  Yes, sir.  It was 2008.  A lot of those things hadn't happened yet.  But there was a lot of information, and I was aware that Anwar Awlaki had been reported to have assisted 9-11 hijackers.  So, correspondence with and from him was a -- very important for us.

And one of the particular e-mails was from Anwar Awlaki to Abdul_Bari05 account, and it was much larger in size than the rest.  That led me to believe there might be an attachment associated with it.

Q.  Now, in relationship to finding these -- this footer-header information which indicated e-mail communication between Awlaki and the defendant, did you learn information about the possibility he might travel overseas during the same time period?

A.  Yes, sir.  I mean, I had the Jihad Fields posting that mentioned "hijrah," which I know to be a migration.  I knew -- I had the posting about selling the van, leaving the country.  We did -- we had -- at this point we had identified the defendant.  We had surveillance on him, and we had seen other indications that maybe he was going to leave the country.  And one of the searches we did was to see if maybe he had a passport, to see if it was even possible.

Q.  Let me show you what is marked as Exhibit 24.  And if we go

12:21  1  to Page 4 of Exhibit 24.

2              And do you recognize what I am showing you that's

3  been admitted as Exhibit 24?

4  A.  Yes, sir.

12:21  5  Q.  And what is Exhibit 24?

6  A.  This is a certified -- well, it's a copy of a certified

7  copy of an application for United States passport in the name

8  of Barry Walter Bujol.

9  Q.  And what is the address that Mr. Bujol gives?

12:21  10  A.  20598 Pine Island Road, Apartment 55, Hempstead, Texas.

11  Q.  And there's also an e-mail address that he provides the

12  department of state in this application.  Is that correct?

13  A.  Yes, sir.

14  Q.  And what's the e-mail address?

12:21  15  A.  Barry, B-A-R-R-Y, Bujol, B-U-J-O-L, 6@Yahoo.com.

16  Q.  And is that e-mail address different than the one that you

17  knew him to be using and accessing at Prairie View A & M?

18  A.  It's different from the Abdul Bari one.  I don't recall if

19  that was one he had provided to the university at that time or

12:22  20  not.

21  Q.  And if we go to the next page of his passport application,

22  there's some information in the middle, regarding plans to

23  travel.  Is that correct?

24  A.  Yes, sir.

12:22  25  Q.  And what does Mr. Bujol represent to the state department

12:22   1   regarding his plans to travel, where he's going and when he's

2   going?

3   A.  He put on there that in -- January 15th, 2009, he was

4   planning on taking a two-week trip to one of or all of six

12:22   5   countries: Yemen, Morocco, Egypt, Saudi Arabia, Syria, and

6   Sudan.

7   Q.  And shortly below that is there an indication to whether

8   he's ever been married or whether he is married?

9   A.  He says on Line 20 there, he X'd "no."

12:22   10   Q.  He indicates he's never been married.  Is that correct?

11   A.  Yes.

12   Q.  Now, we've talked about a subpoena for an e-mail account;

13   we've talked about a 2703(d) order for an e-mail account.

14           At some point during the investigation, did you

12:23   15   get a search warrant for an e-mail account?

16   A.  Yes, sir.

17   Q.  And approximately when did you get the search warrant for

18   the e-mail account?

19   A.  In December of 2008.

12:23   20   Q.  I show you what is marked as Government's Exhibit 10.  And

21   is that the search warrant that you obtained in December of

22   2008 as part of this investigation?

23   A.  Yes, sir.

24   Q.  And what was the search warrant for?

12:23   25   A.  It was for content, subscriber login information related to

12:23  1    Abdul_Bari05@Yahoo.com.

2    Q.  And did you receive, in the form of a CD, the contents of

3    the e-mail communications that Yahoo! had stored for that

4    particular e-mail account?

12:23  5    A.  Yes, sir.

6    Q.  And I believe those are in Exhibit 12.  And you've actually

7    printed out and separately labeled those e-mails in Exhibits 49

8    through 88.  Is that correct?

9    A.  Yes, sir.

12:24  10   Q.  Let me show you Exhibit 49, Page 1.  And can you tell the

11   Court what Exhibit 49, Page 1, is?

12   A.  It's an e-mail from Barry Bujol using

13   BarryBujol@Hotmail.com to BarryBujol@Hotmail.com,

14   AbdulBari05@Yahoo.com, and BetterWayWindows@Yahoo.com.  I've

12:24  15   seen that e-mail, BetterWayWindows, previously associated with

16   the defendant.

17   Q.  And if we go to Page 2, there's an attachment.  Is that

18   correct?

19   A.  Yes, sir.

12:24  20          THE COURT:  By the way, is there a business such as

21   Better Way Windows?  Is it an ongoing business or what?

22          THE WITNESS:  It is not ongoing, your Honor.

23          THE COURT:  Was it at any time, to the best of your

24   knowledge?

12:25  25          THE WITNESS:  I believe it was, yes, sir.

12:25   1              THE COURT:  Okay.

      2   BY MR. McINTYRE:

      3   Q.  And if we go to Page 2, there's a résumé that's attached to

      4   this e-mail account.  Is that correct?

12:25   5   A.  Yes, sir.

      6   Q.  And it gives you some indication as to who's using that

      7   Abdul_Bari05 account.  Is that right?

      8   A.  The fact that it was e-mailed by someone named Barry Bujol

      9   to that, yes.  And there's the cell phone number in the upper

12:25  10   right-hand corner.  It's the same one that's on the passport

     11   application, same one that -- provided by the university.

     12   There's a PO box that was the same as Better Way Windows.

     13   Q.  And let me go to -- I'm not going to show you all the

     14   e-mails, but if we could go to Exhibit Number 52.  And could

12:25  15   you tell me what Exhibit 52 is?

     16              MR. McINTYRE:  Highlight the top portion.

     17                  Thank you.

     18              THE WITNESS:  This is an e-mail dated December 23rd,

     19   2005, from Abdul Bari, Abdul_Bari05@Yahoo.com, to a person

12:26  20   named Saba.  The e-mail is personal in nature.  It says that

     21   the person's name is Hanif, he converted to Islam, chose the

     22   name Abdul Bari, and that he owns a window cleaning/pressure

     23   washing company that's called Better Way Windows.

     24   BY MR. McINTYRE:

12:26  25   Q.  And if we go to Exhibit 57, is this also an e-mail that you

12:26    1   found on the Abdul_Bari05 account?

         2   A.  Yes, sir.

         3   Q.  And can you give us a summary of what this e-mail -- who

         4   it's from, who it's to, and then a -- substance of what it

12:26    5   says?

         6   A.  Yes, sir.  It's dated April 25th.  It's from Abdul Bari,

         7   using the same e-mail account.  And it's to three e-mail

         8   addresses with the same extension: alQaeda33@Yahoo,

         9   alQaeda33@Hotmail, alQaeda33@GMail.  In essence, the e-mail

12:27   10   reads that Abdul Bari had seen some videos posted online on

        11   YouTube, posted by a person alQaeda33 and he enjoyed them but,

        12   when he went back to look at them, the account had been deleted

        13   and -- or the video had been removed and that the account had

        14   been suspended but wanted -- this person -- Abdul Bari wanted

12:27   15   to reach out to whoever alQaeda33 was in order to have a

        16   conversation with him.

        17   Q.  What did you learn about alQaeda33 and YouTube and what

        18   sort of content was put on YouTube by alQaeda33?

        19   A.  We served a subpoena to YouTube and were able to recover

12:27   20   some information about that user and were able to see some of

        21   the videos that he had posted.  And they were very radical in

        22   nature, very violent.  They were beheading videos and

        23   propaganda videos and other things like that.

        24   Q.  And why was Mr. Bujol trying to reach out to this alQaeda33

12:28   25   at these various e-mail addresses in relationship to, I guess,

12:28   1   al-Qaeda being -- 33 being suspended from YouTube?

2   A.  Well, as the e-mail reads, I mean, he -- he wants to see

3   them again and wants to have a conversation with the person

4   that posted them.

12:28   5   This is something we had seen just a few months

6   prior.  He also tried to reach out to someone else that had

7   posted something.  And, to me, it looked like a continuing

8   effort, just like the Jihad Fields, to reach out to someone who

9   knew about that part of Islam in an effort to have a

12:28   10   conversation with them.

11   Q.  And if we go to Exhibit Number 58, and this is an e-mail

12   from who to whom and on what date?

13   A.  It's from -- it's titled "List of Sites."  It's from Abdul

14   Bari, the defendant, to Abdul Bari, using the same e-mail

12:29   15   account.  It's dated April 29th, 2008.  And it's a list of

16   sites, links to -- or websites that are on the Internet.

17   Q.  Do you know these websites to be Islamic and radical in

18   nature?

19   A.  I have not been to all of them but I've been to a few of

12:29   20   them and I know that they are.  And what strikes me about this

21   is -- what I know about the Prairie View A & M library is you

22   can't leave favorites like you would at your home computer, and

23   you probably wouldn't want to leave favorites for some of these

24   things if you thought anybody would see it.

12:29   25   So, what I am seeing here is an e-mail to

12:29  1    someone, to themselves, in an effort to easily go back and look

2    at sites without having to go back on the Internet and find

3    them again.

4    Q.   And, again, this goes back to the information you had

12:29  5    regarding the Prairie View computers in which they use the Deep

6    Freeze, which wiped the information after you logged out.   Is

7    that correct?

8    A.   Yes.

9    Q.   And there's several e-mails -- or multiple e-mails within

12:30  10   the e-mails you received from Yahoo! that are from Abdul_Bari05

11   to himself at Abdul_Bari05.   Is that correct?

12   A.   Yes, sir.

13   Q.   Let's go look at Exhibit 59.   And if we look at Page 1, can

14   you tell us who the e-mail is from, who it's to, and what time

12:30  15   it is?

16   A.   It's subject, "My photos."   It's from Abdul Bari,

17   Abdul_Bari05@Yahoo.com.   It's dated June 20th, 2008; and it's

18   to a person named Laci Muslima.   And it says, "Here's some

19   pictures of myself."

12:30  20   Q.   And the person that's himself using this account is

21   Mr. Bujol.   Is that correct?

22   A.   Yes, sir.

23   Q.   If we go to Page 3, there's a different photo.   Is that

24   right?

12:31  25   A.   Yes.

12:31  1   Q.  And let's go to Exhibit 60, which is -- again, it's another

2   e-mail.  And can you identify the information regarding this

3   e-mail?

4   A.  Yes.  It's titled -- subject line of "Site," S-I-T-E, from

12:31  5   AbdulBari05@Yahoo.com dated July 9th, 2008.  And it's also to

6   the same e-mail address.  And, then, inside the e-mail it has

7   two identical links to an Internet website on YouTube.

8   Q.  And you captured that website.  And it's on Exhibit 61,

9   which is a CD or DVD drive.  Is that correct?

12:31  10   A.  Yes, sir.

11   Q.  And let me show you a portion of what's previously been

12   admitted as 61.

13          THE COURT:  While we're waiting, I plan to go on to

14   1:00 o'clock since we started a little late, to get as much

12:32  15   time as we can.  So, I apologize for that.  If anybody

16   absolutely needs to take a break who's up, you know, either

17   cross-examining the witnesses, let me know; and, sure, we will.

18   But if we can -- and, from then on, I don't run on and on.  I

19   just want to get as much as we can in the first session.  We'll

12:32  20   break for hour and a quarter at about 1:00 o'clock.

21          Okay.  Let's go.

22          Again, what exhibit?

23          MR. McINTYRE:  This is 61, your Honor.

24          THE COURT:  Okay.  Any of the ones that go up

12:32  25   different from the what's in the book, let me know.  Okay?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:32   1          MR. McINTYRE:  Yes, your Honor.

2          THE COURT:  Hold it.  Can we center that, get that

3    over there where we can see it, please?

4          MR. McINTYRE:  Yes, your Honor.

12:33   5          THE COURT:  Even if we have to take a moment.

6          MR. McINTYRE:  For some reason -- it should be playing

7    on the whole screen; but it's not.  We'll work with it.

8              Is that better, your Honor?

9          THE COURT:  That's better.  It's got the whole picture

12:33  10    in there.

11              Now, what about -- is there sound, any sound at

12    all on this one?

13          MR. McINTYRE:  Yes, your Honor, there should be.

14          THE COURT:  All right.  What is this, and where is

12:33  15    it --

16          MR. McINTYRE:  This is an e-mail site that was

17    contained in an attachment that Mr. Bujol e-mailed to himself

18    in order to save it with the --

19          THE COURT:  All right.  Let me ask the witness.

12:33  20              Who is it purported to be?  Do you know who that

21    is?  Who is it purported to be?

22          THE WITNESS:  It's purported to be a person named Juba

23    Sniper, meaning someone in Baghdad that was a sniper for the

24    Iraqi insurgency against coalition forces sometime 2003, 2007,

12:34  25    somewhere in there.

12:34   1          THE COURT:  All right.  How long is it?  About.

       2          MR. McINTYRE:  I think it's approximately two and a

       3   half minutes, your Honor.

       4          THE COURT:  Okay.

12:34   5          MR. McINTYRE:  Maybe three minutes.

       6          THE COURT:  Okay.  Go right ahead.

       7          MR. McINTYRE:  It's not very long.

       8      (Tape playing)

       9          THE COURT:  Now, hold it.  Let's go -- stop it right

12:34  10   here.

      11               The language is what?

      12          THE WITNESS:  It's Arabic, sir.

      13          THE COURT:  All right.  Where is the transcript?  In

      14   the book?

12:34  15          MR. McINTYRE:  There's no transcript on this, your

      16   Honor.

      17          THE COURT:  So, what is it being submitted for?

      18          MR. McINTYRE:  It's being shown as -- this is

      19   information that Mr. Bari e-mailed to himself, that he was

12:34  20   interested in.  It shows his intent to aid the al-Qaeda in the

      21   Arabian Peninsula.

      22          THE COURT:  But aside from that -- that's a

      23   determination for the judge and jury, if there was one.

      24          MR. McINTYRE:  Yes, your Honor.

12:34  25          THE COURT:  So, you're offering it just for what the

12:34   1   picture is, not for any translation?

2      MR. McINTYRE:  Correct, your Honor.  Would you like us

3   to turn the sound down?

4      THE COURT:  Doesn't matter.  You can turn it down.

12:35   5   But -- you don't have to turn it off, but turn it down.

6   Unless -- if -- when it comes time for a translation, then

7   we'll go to the transcripts.

8      MR. McINTYRE:  There's two videos that were contained

9   on e-mail attachments, that we've not translated because the

12:35   10   substance of what we're trying to give the Court is just the

11   picture.

12      THE COURT:  Okay.  I tell you what.  Since it takes

13   that much, would you hit the switch, the one with the little

14   tag on it.  Make it a little clearer.

12:35   15      All right.  Go on.

16     (Tape playing)

17      THE COURT:  I tell you what.  Turn it up a bit.  Might

18   as well hear it.

19     (Tape playing)

12:38   20   BY MR. McINTYRE:

21   Q.  Okay.  Agent Cannon --

22      THE COURT:  All right.  Let me mention one thing.

23   After the lunch break, if we can get to that computer and make

24   that larger whenever you show things like that.  Okay?

12:38   25      MR. McINTYRE:  Yes, your Honor.

12:38   1           THE COURT:  All right.  Can we turn the lights back on

2   at this point?

3   BY MR. McINTYRE:

4   Q.  Agent Cannon, you just watched a video of an attachment the

12:39   5   defendant sent to himself.  What is portrayed in that

6   attachment we call "Juba Sniper Video"?

7   A.   It's a little longer than that.  It's an overall

8   glorification of Juba the Sniper, who -- as you noticed, on the

9   wall there was a bunch of hash marks.  That's purporting to be

12:39   10   Americans that were killed.

11           You saw a -- world leaders with a

12   computer-imposed crosshairs and then what was supposed to look

13   like a shot to every one of their foreheads, former President

14   Bush and other world leaders at the time of the Iraqi conflict

12:39   15   2003.  And then there were multiple images of coalition or US

16   soldiers being shot by a sniper.

17   Q.  Let me show you what is marked as Government's Exhibit 62.

18   And this is another e-mail from the Abdul_Bari05 account.  Is

19   that correct?

12:40   20   A.  Yes, sir.

21   Q.  And who is this e-mail from, and who is it to?

22   A.  It's from Dahij Cimalsi to Abdul_Bari05@Yahoo.com, dated

23   July 12, 2008, with, again, another link to a website and a

24   name that has a link to Anwar Awlaki.

12:40   25   Q.  And the sender of this information is Dahij Cimalsi.  What

12:40   1    does that spelled backwards?

2    A.   "Islamic jihad."

3    Q.   All right.  Let me show you what is marked as Exhibit 63,

4    which is an e-mail.

12:41   5            MR. McINTYRE:  Your Honor, may I move the screen back

6    a little bit?

7            THE COURT:  Sure.

8                 Just adjust it during the lunch break.  Okay?  To

9    get the optimal area.  Angle it a little bit so folks, if they

12:41  10    want to see it, can.  But that's fine for now.

11            MR. McINTYRE:  Okay.

12    BY MR. McINTYRE:

13    Q.   All right.  If we look at Exhibit 63, who is this e-mail

14    message from and who is it to and what's the date?

12:41  15    A.   It's an e-mail from Anwar Awlaki, al_Aulaqi@Yahoo.com.

16    It's dated July 12th, 2008.  And it's to

17    Abdul_Bari05@Yahoo.com.

18    Q.   And if we go down to the second paragraph, it's got the

19    original e-mail from Abdul Bari to Mr. Awlaki.  Is that

12:42  20    correct?

21    A.   Yes, sir.

22    Q.   And is it clear enough for you to be able to read what

23    Mr. Bari wrote to Mr. Awlaki during that time period?

24    A.   Sure.  It says, "Abdul Bari wrote:  I have been a Muslim

12:42  25    for approximately three years now; and for the past several

12:42  1    months, I've been searching adamantly for knowledge regarding

2    the issue of jihad and my responsibilities as a Muslim in

3    America.  I initially tried discussing the issue" -- can we go

4    back to the other view?

12:42  5              THE COURT:  I tell you what.  Move the screen.  We can

6    do that eventually, but somehow get it -- maybe make it a

7    little bit smaller.  But I think it's better when it's larger

8    and it can be read by everybody, including me.

9              All right.  There we go.  Thank you.  Thanks.

12:43  10             MR. McINTYRE:  Yes, your Honor.

11             THE WITNESS:  Do you want me to reread the sentence or

12   just keep going?

13   BY MR. McINTYRE:

14   Q.  If you could reread it.

12:43  15   A.  Okay.  "I have been Muslim for about three years now; and

16   for the past several months, I've been searching adamantly for

17   knowledge regarding the issue of jihad and my responsibilities

18   as a Muslim in America.  I initially tried discussing the issue

19   with local imams and brothers in the community, but they

12:43  20   quickly dismissed my concerns.  They told me that every jama'aa

21   out there is invalid and we shouldn't worry about it.  But as

22   time keeps passing and I learn more, the issue becomes more and

23   more unsettling.  I decided to search on my own, and I have

24   tried to discern whatever information I have come across in an

12:43  25   effort to find what is the correct thing to do.  In my quest, I

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:43  1   have become convinced beyond a doubt that I need to step up to

2   the plate and contribute in some form or fashion.  I am

3   sincerely asking for naseeha.  I am married, and I have an

4   eight-month-old daughter.  My wife and I have been planning for

12:44  5   hijrah when I graduate from college, but I am asking for advice

6   about what I can do for the ummah and how I can do it."

7                   And an IP address of the Prairie View A & M

8   campus.

9   Q.  And if you go up to the paragraph immediately above that --

12:44  10   is that correct -- that's a response from Mr. Awlaki to

11   Mr. Bujol.  Is that correct?

12   A.  Right.  The paragraph above it is the actual e-mail that

13   the search warrant captured, but it included the previous

14   response.  And it's from -- it's signed, "Your brother Anwar

12:44  15   Awlaki."

16                   THE COURT:  Why don't you read it?

17                   THE WITNESS:  It says, "Assalamu alaykum brother" --

18   that's "BR" -- "Abdul Bari.  Insha Allah you are on the right

19   track.  Please take a look at the attached article.  If you

12:45  20   need any further help, let me know.  Assalamu alaykum, Your

21   Brother, Anwar Awlaki."

22   BY MR. McINTYRE:

23   Q.  If we go to Page 2, there's an attachment Mr. Awlaki

24   referred to -- or referenced Mr. Bujol to.  Is that correct?

12:45  25   A.  Yes, sir.

Q.  What is that document entitled?

A.  "42 Ways of Supporting Jihad."

Q.  What can you tell the Court about this document and what it's definition of "jihad" is and what are the things that it recommends to Mr. Bujol that he do?

A.  Well, as the name implies, there's 42 specific ways that are spelled out, with one or more paragraphs explaining specific things that the reader is being asked to do in order to support the religion through jihad.

For example, in the middle of the page, it talks about how jihad today is obligatory on every capable Muslim. So, the reader is -- it's designed so that the reader will follow as many of the 42 ways as possible.

Some specific ones, for example, 22 is physical fitness.  You're supposed to, work out in order to be ready to fight.  And it's very specific.  You need to be able to sprint for urban combat.  You need to be able to carry heavy loads for fighting in the mountains.  We don't need power lifters or body builders because they weigh us down in Chechnya.

There's one specifically about Muslims shouldn't waste their time in trying to pursue degrees that aren't going to help jihad.  You should quit school and join the fight.

There's one in there that the work of jihad is clandestine; you need to keep secrets in order to do that.

There's many in there about following the news

12:46  1   and the videos of the martyrs and the extremists and the

2   jihadis online in order to support them, in order for it to, I

3   think, kindle your own desire, as the reader, for martyrdom.

4                   There's one in there about learning Arabic

12:47  5   because it's the international language of jihad and that it's

6   needed in order to communicate on the battlefield.

7                   So, in my opinion, it's very descriptive.

8   There's no ambiguity about it.  It's meant to be a blueprint

9   for how you, as obviously an English speaker, since it's in

12:47  10  English, can support jihad.

11  Q.   During the course of your investigation of Mr. Bujol, did

12  you find that he had done many of the things that Mr. Awlaki

13  suggested in order to prepare for jihad?

14  A.   Yes, sir.  I mean, he had done -- by the time I had this,

12:47  15  he had already done quite a few.  But by the end of the

16  investigation, I believe it was in excess of 23 or 24 of the

17  42.

18  Q.   Let me show you what is marked as Exhibit Number 64, and

19  can you tell me what Exhibit Number 64 is.

12:48  20  A.   It's an e-mail in response to the e-mail that we just

21  looked at; and it's dated July 12th, 2008.  It's from the

22  defendant to Anwar Awlaki.

23  Q.   And it's in response to the e-mail with the "42 Ways to

24  Support Jihad" that we just saw.  Is that correct?

12:48  25  A.   Yes, sir.  You can see the thread -- e-mail thread at the

1    bottom.  So, that one was July 12th; and this is later the same

2    day that this response is made.

3    Q.  And what does the defendant write to Mr. Awlaki about on

4    this particular date, July 12th, 2008?

5    A.  It states that he's read the article, which I believe to be

6    the "42 Ways."

7          "Quite a few things come to mind that I could get

8    started on immediately."  And then he continues to talk about

9    very specific things that are part of the "42 Ways" that he can

10   do to support jihad.

11         And then he spells out two specific questions

12   that he has of Anwar Awlaki.

13   Q.  And what are those two particular questions that he has for

14   him?

15   A.  He asks, "If the website that he wants to start up, which

16   is discussed above, is shut down, how can I set it up in such a

17   way that -- to prevent it from being tracked to me?  And, then,

18   also, once I've gathered enough money, how can I get it to the

19   mujahideen," which means "holy fighters."  It's a common term

20   in jihadi circles.  And then it's signed Abdul Bari.

21   Q.  Let me show you what is marked as Exhibit 68.

22         THE COURT:  When you say "marked," these are all

23   admitted into evidence.

24         MR. McINTYRE:  That's correct, your Honor.

25         THE COURT:  Okay.  Go on.

BY MR. McINTYRE:

Q.   I show you what is admitted as Exhibit 68.   And can you tell me what Exhibit Number 68 is?

A.   Yes, sir.   It's another e-mail from the defendant, a few weeks later, on July 24th, 2008, again to Anwar Awlaki's e-mail account.   And it's signed from Abdul Bari.   Generally provides thanks for the previous guidance, states that everything is going well and "I've been working towards some specific attainable goals with respect to that e-mail attachment you sent.   Thanks for the information and advice.   I'll be in touch.   I will be needing your help and input on some things."

Q.   Let me go to what's admitted as Government's Exhibit Number 76 and have you take a look at that particular e-mail.   Tell me what Government's Exhibit 76 is.

A.   I recognize this.   It's an e-mail that's generated by Anwar Awlaki's website at the time.   And it goes -- in this case, on September 23rd, 2008, it went to Abdul_Bari05@Yahoo.com.   And it's -- oftentimes these are notices about a new sermon or article written by Anwar Awlaki, and that's what this is.

Q.   Okay.   And in particular, the focus of this is hijrah.   Is that correct?

A.   Yes.   It's telling the person that receives this that there's been a new -- in this case, I don't remember if it was audio or video -- dealing with what the title implies, "Hijrah for the Sake of Islam."

Q.  What is "hijrah"?

A.  "Hijrah" is a migration.  It has a history within the Islamic faith and in the history of the Arabic the people in the Arabian Peninsula.  But it essentially means a Muslim moving across a boundary in order to go to be with other Muslims.

Q.  How is "hijrah" defined in the "42 Ways to Support Jihad" as written by Anwar Awlaki?

A.  It's one of the actual 42 ways.  It has its own paragraph. And to paraphrase it, it -- it is obligatory, in order to commit jihad, that the in that you have to travel and commit hijrah in order to get overseas in order to fight.  And it's necessary.  Someone who makes hijrah, if anything happens along the way, they obtain credit or some sort of glory for the attempt to go overseas.

Q.  And is there --

        THE COURT:  Pull that mike in a little bit.

            No.  Lift it up.  Get a little bit closer or move it in just a little bit.  You're carrying okay, but it will help.

            By the way, as we get to 1:00 o'clock, when you reach a good breaking point, do so.  I'll leave it to you, when we get close to 1:00 o'clock.

        MR. McINTYRE:  Yes, your Honor.

BY MR. McINTYRE:

12:52    1    Q.  If we look at Government's Exhibit Number 78 and highlight
         2    the top portion.
         3                 And this is a particular e-mail.  Is that
         4    correct?
12:53    5    A.  Yes, sir.  It's just a very short while after the one we
         6    just looked at.  It's from Abdul Bari to Anwar Awlaki, dated
         7    September 25th, 2008.
         8    Q.  And what does Mr. Bari tell Mr. Awlaki about what he's
         9    planning to do?
12:53   10    A.  It says -- he stated he's looking to make hijrah as soon as
        11    possible; he doesn't completely know Arabic, but he's learning;
        12    he's asking for advice or suggestions and ideas; and he's
        13    looking forward to a response.
        14                 The same theme, going to make hijrah, need to
12:53   15    learn Arabic, those are things I saw throughout the
        16    investigation.
        17    Q.  This was dated September 25th of 2008.  Is that correct?
        18    A.  Yes, sir.
        19    Q.  I show you what's marked as Government's Exhibit Number 85.
12:53   20    And tell me what you know about this particular e-mail.
        21    A.  It's another e-mail from the account to the account.  It's
        22    dated November 24th, 2008.  It's entitled "As-Shabaab Article."
        23    And, again, it has a link to a news article that's obtainable
        24    on the Internet.
12:54   25    Q.  And if we go to Government Exhibit 86, that's the

12:54  1   attachment to Government's Exhibit 85.  Is that correct?
2   A.  Yes.  That's what the article was at the time we went to
3   look at that link.
4   Q.  What's the title of that article, and what's the substance
12:54  5   of it?
6   A.  The title is "Shabaab Leader Sanctioned as Zawahiri
7   Responds to Group's Oath of Loyalty."  And, essentially, it's a
8   news article talking about -- there's a group called
9   al-Shabaab, which is a movement -- a designated terrorist
12:54  10  organization in Somalia.
11          About the time of this article, there had been
12  some reported contacts between al-Shabaab and al-Qaeda and this
13  is talking about how Ayman -- or Ayman al-Zawahiri, who is
14  currently the head of al-Qaeda after Osama bin Laden was
12:55  15  killed, responding that they're going to have -- basically an
16  affiliate of al-Qaeda.
17  Q.  Government's Exhibit 87 is another e-mail.  Is that
18  correct?
19  A.  Yes, sir.
12:55  20  Q.  And what is the subject line on this?
21          And it's e-mail from Mr. Bari to Mr. Bari or --
22  A.  Again, it's dated December 1st, 2008.  It's from Abdul Bari
23  to Abdul Bari; and, again, it's another link to a news article.
24  Q.  Previously admitted Government's Exhibit Number 88 is that
12:55  25  article.  Is that correct?

12:55   1    A.  Yes, sir.

2    Q.  And what's the title of the article that Mr. Bari -- that

3    went from Abdul Bari to Abdul Bari?

4    A.  It's, "Al-Qaeda to Obama:  Welcome Aboard."

12:56   5    Q.  I show you what is marked as Government's Exhibit Number

6    91.  Can you tell me what Government's Exhibit Number 91 is?

7    A.  It's an e-mail from a different Islamic dating site,

8    Qiran.com.  It's dated December 14th, 2008.  And it's from the

9    website to Abdul_Bari05@Yahoo.com.

12:56   10           These are common.  We saw them throughout the

11   course of looking at his e-mail accounts.  He was on multiple

12   dating sites in order to find wives.  And it's addressed to

13   Abdul Bari, with his screen name on that site, which is

14   A_B_Jihad.

12:56   15   Q.  I show you what is marked as Government's Exhibit 95.  Who

16   is this e-mail from and to, and what's the date?

17   A.  It's dated January 21st, 2009.  It's from the defendant to

18   the defendant.

19           THE COURT:  When you say "from the defendant to the

12:57   20   defendant," but what's -- where did it come from?

21           THE WITNESS:  It's Abdul_Bari05@Yahoo.com e-mailed to

22   Abdul_Bari05@Yahoo.com.

23           THE COURT:  What did he do?  Did he write his own

24   letter and then send himself a copy?

12:57   25           THE WITNESS:  Based on the number of e-mails I saw,

1  your Honor, he would start a project, e-mail it to himself in

2  order to come back to it at a later time.

3          THE COURT:  Okay.

4          THE WITNESS:  And then it would already be written.

5          THE COURT:  Could be a draft?

6          THE WITNESS:  That's what I believe it is, your Honor.

7          THE COURT:  Okay.

8  BY MR. McINTYRE:

9  Q.  And let me show you what has been admitted as Government's

10  Exhibit 95.  It's a little bit hard to read up on the screen.

11          And who did you believe Mr. Bujol sent this -- or

12  drafted this e-mail to?

13  A.  Anwar Awlaki.

14  Q.  And what makes you believe that?

15  A.  It's addressed to "The Sheikh," which is an honorific that

16  has been used previously for Anwar Awlaki.  And it's a

17  continuation of themes that were already discussed with Anwar

18  Awlaki.  For example, leaving school, making hijrah, guidance.

19          Further down, on Paragraph 2, it talks about

20  wanting to follow in the path of jihad -- or of Allah, if you

21  see how it's signed, "Your brother and willing soldier in the

22  path of Allah."  So, all that together makes me believe it was

23  meant for Anwar Awlaki.

24  Q.  And was there also a portion in there where Mr. Bujol

25  states that he's studied his lectures, read the books of

12:58  1   Mr. Awlaki?

2   A.  Yes.

3   Q.  And, essentially, is it fair to say what he's trying to

4   decide is whether to take his scholarship money that he's

12:59  5   received, or financial aid money, and then immediately make

6   hijrah or finish school?  Is that correct?

7   A.  Yes.  It's a continuation of multiple attempts to gather

8   advice from alQaeda33 and other people, Anwar Awlaki, Jihad

9   Fields moderator.  In this particular instance, saying he's in

12:59  10  his last semester at university.  "I've got some scholarship

11  money.  If I leave now, I have the money to do so.  If I wait,

12  given the economy under" -- what he calls the "new emperor,

13  Obama," he may not have the money to do so later.

14          And that, again, goes back to my reading of the

12:59  15  "42 Ways."  One of them is direct:  Muslims should not wasting

16  their time obtaining degrees that don't help their religion.

17  They should travel overseas to fight.

18          THE COURT:  We'll take a break at this time.  A little

19  bit of scheduling that you may not be aware of.  It's something

12:59  20  that's on my calendar, involving a number of judges.  So, on

21  Thursday, we will begin at 10:00 and go straight through to

22  2:00 o'clock, with some breaks, and adjourn for the day

23  Thursday, November 10th, at 2:00 p.m. or 1:45, something like

24  that.

01:00  25          Also, as you all know -- or many of you know,

01:00   1   being federal employees, the courthouses are closed around the

2   country on Friday.  It's Veteran's Day; so, we'll not be in

3   session this Friday.  So, I just want to give you a heads up as

4   to the end of the week.

01:00   5           We're in absolutely no rush.  Nobody is going to

6   get pushed time wise in this case.  But I thought I would let

7   you know as far as we can ahead of time what the schedule is.

8           It's now about a minute after 1:00.  We'll take

9   our break at this time.  Please be back, ready to resume, at

01:00  10   2:15.  I'll see you at that time.

11       (Recess was taken)

12           THE COURT:  Thank you.  Be seated.

13           Okay.  Let's continue.  Shall we?

14   BY MR. McINTYRE:

02:19  15   Q.  Agent Cannon, when we left off, we were going over some of

16   the e-mails that you recovered from the Yahoo! e-mail account

17   that we previously referenced.  Is that correct?

18   A.  Yes, sir.

19   Q.  I have a few more of those I want to talk to you about.  I

02:19  20   can show you Government's Exhibit 101.

21           THE COURT:  Let me do this.  Any time, if I can't see

22   or whatever, any time you play a tape, I want to have somebody

23   at your table just run up -- you see there's one of those

24   switches has kind of a little white -- what is it -- a little

02:20  25   white sticker on it?  Just go and turn them off.  Okay?

02:20   1    Whenever it's appropriate.

        2                  Because it's a lot easier for me to see as well

        3    as everybody else.  Okay?  If it's a short thing -- but if it's

        4    anything of any extended length or anything you really want us

02:20   5    to see, turn it off and turn it back on.

        6                  MR. McINTYRE:  Yes, your Honor.

        7                  THE COURT:  All right.  Go right ahead.

        8    BY MR. McINTYRE:

        9    Q.  Let me show you what's marked --

02:20  10                  THE COURT:  Wait a second.

       11                  For the record, Mr. Bujol, when your time comes,

       12    if you want the lights off, let us know; and one of us will go

       13    do it.  All right?

       14                  THE DEFENDANT:  All right.

02:20  15                  THE COURT:  Let's go.

       16    BY MR. McINTYRE:

       17    Q.  I show you what is marked as Government's Exhibit 101.  And

       18    can you tell me who this e-mail is from, who it's to, and when

       19    it was received?

02:20  20    A.  Yes.  It's from Anwar Awlaki's website.  It's dated January

       21    23rd, 2009, and it's to Abdul_Bari05@Yahoo.com.

       22    Q.  And what is this article referencing?

       23    A.  It's another posting by Anwar Awlaki, posted on his

       24    website.  Because this e-mail account was registered as a -- on

02:21  25    the distribution list --

THE COURT:  What's that mean?

THE WITNESS:  There's a spot on the bottom of the e-mail -- if you go to the website, if you check -- if you enter your e-mail address, you can join the e-mail address in order to be provided periodic updates via e-mail.  And this is another example of one of those.

It's entitled "Suicide or Martyrdom?"  It's a question.  And it continues to go into -- the thing that strikes me about it -- this is in English, again.  Again, that's the audience that Anwar Awlaki catered to.

There's mention of as-sadiqeen, which is mentioned in here a few times.  It has to do with the most righteous.  Those are the people that -- in jihadi circles, they are put in at a higher level or upon a pedestal, if you will, because they're willing to go forward and fight and die for their religion.

Q.  And if you go to the second page and look at the last paragraph, there's some information in this regarding --

THE COURT:  Counsel, just aim the mike toward you. You don't have to pull it any further.

Thank you.  We have a new system put in.  So, I'm proud of the system.  It will pick you up.  Go on.

MR. McINTYRE:  Yes, your Honor.

BY MR. McINTYRE:

Q.  In the last paragraph, there's information where al-Awlaki

02:22   1   talks about martyrdom operations.  Is that correct?

2   A.  Yes.

3   Q.  What does Mr. Awlaki speculate about in this "Suicide or

4   Martyrdom?" article he's written?

02:22   5   A.  "Today the world turns upside down when one Muslim performs

6   a martyrdom operation.  Can you imagine what would happen if

7   that is done by 700 Muslims on the same day?"

8   Q.  Let me also take you to Government Exhibit Number 70, which

9   is an e-mail off the Abdul_Bari account.  Who is this from and

02:23   10   to?

11   A.  It's from the defendant, using the e-mail address

12   Abdul_Bari05@Yahoo.com, to the same e-mail address.  It's dated

13   August 6, 2008; and it's entitled, "Check this out," with

14   double exclamation points.

02:23   15   Q.  And, again, this is from the Abdul_Bari account to the

16   Abdul_Bari account so that he can save it for future reference.

17   Is that right?

18   A.  Exactly.  It was common throughout, looking at search

19   warrant results, that he would do this periodically for any

02:23   20   number of things.

21   Q.  And in the subject line, is there something written in the

22   subject line regarding this particular e-mail?

23   A.  It says, "Check this out," double exclamation points.

24   Q.  And on that e-mail, there's an attachment.  Is that

02:23   25   correct?

A.   There's a link to a website.   And we went to that link and

viewed it near in time to when we received this e-mail and

downloaded the video that was at that link.

Q.   And that video is listed as Exhibit Number 71 and it's

previously been admitted and I'm going to show you a portion of

that video and ask you for your comments on it.

     *(Tape playing)*

BY MR. McINTYRE:

Q.   What is significant about this portion of Government's

Exhibit Number 71?

A.   It's a video about al-Qaeda and Yemen, and you can see the

recently deceased Osama bin Laden, who was the head of

al Qaeda.   There's also, in the upper right-hand corner of the

screen, a mujahideen fighter, had a rifle, a Kalashnikov rifle

across his back and is walking towards what's a -- it's an

improvised rocket, basically a bipod with a rocket in order to

launch it.

Q.   Let me show you another small clip from this same exhibit

and then ask for your comments on this particular --

     *(Tape playing)*

BY MR. McINTYRE:

Q.   And, Agent Cannon, what did you find significant about --

again, this is Exhibit 71, and a clip of that, even though it's

a longer video and audio?

A.   Well, again, it has to do with al Qaeda and Yemen.   And the

---

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:28   1   overall context is attacking oil facilities in the Arabian

2   Peninsula.  The man was masked.  So, he was clearly -- given

3   the imagery and all the icons on the screen, had to do with

4   jihadi, mujahideen, supporting the mujahideen, and attacks in

02:28   5   Yemen, by a group in Yemen.

6   Q.  Now, after you viewed these e-mails we previously discussed

7   and based on your surveillance in the case of Mr. Bujol, did

8   you start to form a belief that Mr. Bujol might leave the

9   country?

02:28   10   A.  We operated under that belief from the beginning because of

11   the things that were said on the Internet, about selling a

12   vehicle, the passport application, requesting a passport, and

13   mentioning six Middle Eastern countries to travel, the postings

14   on Jihad Fields, the questions and the context to Anwar Awlaki

02:29   15   about hijrah.  There are multiple of those.  So, we were always

16   assuming he was going to leave at any moment.

17            And when you see -- when we saw things like this,

18   specifically about Yemen and his interest in Yemen, we thought

19   that's where he might be headed.

02:29   20   Q.  Now, on -- during this period of time, which is beginning

21   of 2009, did you become aware that the defendant had warrants,

22   traffic warrants?

23   A.  Yes, we did.

24   Q.  And how did you become aware of that?

02:29   25   A.  During the course of the investigation, as we identified

02:29  1    the defendant, we ran him through different databases.  And,

2    then, as we -- throughout the case, we would always check that.

3    And along the way, we found out that he had some outstanding

4    warrants out of the City of Katy, Texas.

02:29  5    Q.  Let me show you what is marked as Exhibit 25, Page 1.  And

6    can you tell me what Page 1 of Exhibit 25 is?

7    A.  It's a copy of a booking sheet for Waller County Sheriff's

8    Office.

9    Q.  And if we go to Page 3 of this same document, what kind of

02:30  10    information is on Page 3 of this document?

11    A.  This is a warrant confirmation, comes across the computer,

12    teletype, that -- it confirms that the person, in this case

13    Barry Walter Bujol, had outstanding warrants.  In this case

14    there's three.

02:30  15    Q.  And during the course of your surveillance of Mr. Bujol,

16    did you come to learn he was driving without a license and

17    without insurance?

18    A.  Yes.

19    Q.  Now, based on the information you had, did you enlist the

02:30  20    help of the Waller County Sheriff's Department?

21    A.  Yes, we did.  We found out about the warrants and informed

22    them that the warrants existed and then asked for their

23    cooperation to serve those warrants at a time and place that

24    would most assist our case.

02:31  25    Q.  And when were those warrants served on Mr. Bujol?

02:31  1   A.  February 13th, 2009.

2   Q.  And where was he arrested when those warrants were served?

3   A.  He was arrested on Pine Island Road in Hempstead, Texas, on

4   his way back to his apartment.

02:31  5   Q.  And was anything of significance to the investigation

6   recovered during that investigation?

7           THE COURT:  Hold it one second.

8       *(Court confers with staff)*

9           THE COURT:  I'm sorry.  Go right ahead.

02:32  10  BY MR. McINTYRE:

11  Q.  Was there anything recovered during the serving of the

12  warrants, that related to Mr. Bujol and Prairie View A~&~M

13  University?

14  A.  Yes.  The reason we chose that day is he often carried a

02:32  15  small backpack and we knew he had it that day.  So, he was

16  arrested.  Inside that backpack, after he was arrested, there

17  was a form from Prairie View A & M from the registrar's office

18  and it was a form that you had to fill out in order to withdraw

19  from classes.

02:32  20  Q.  And based on the knowledge that you had of the e-mails

21  between Mr. Bujol and Mr. Awlaki, about whether to essentially

22  take the scholarship money and drop out of school and commit

23  hijrah and travel overseas or whether to stay in school, did

24  that inform your opinion in any way in regards to what

02:33  25  Mr. Bujol might be fixing to do?

02:33  1   A.  Absolutely.  We were under the impression at that point --

2   we had seen him for awhile, watched him.  And he had gone to

3   classes in 2008.  But in 2009 -- we're in February now -- he

4   had no longer had gone to class.  He would still go to the

02:33  5   library to use the computer.  And he was making preparations,

6   it looked like, to travel.

7          And once we saw that form, it just confirmed what

8   we had seen in the e-mails and what he had said to Anwar

9   Awlaki, that he was planning on making hijrah.  So, in our

02:33  10  mind, we thought travel was imminent.

11  Q.  Now, he was arrested on February 13th.  Do you know how

12  long he was held in jail on these traffic warrants?

13  A.  It was hours, maybe, no more than a day, that I recall.

14  Q.  And did you receive some information on February 15th

02:33  15  regarding Mr. Bujol and what sort of activities he was engaging

16  in?

17  A.  Yes.  At that point we had pretty heavy surveillance on

18  Mr. -- the defendant, his apartment complex, his vehicle,

19  because we thought it was imminent.  And, again, our job was to

02:34  20  make sure no acts of terror took place.  And we didn't

21  understand -- if he would leave for and how he would leave the

22  country, who he would leave the country with, anybody help him.

23  So, on the 15th, we saw some activity at his house that

24  suggested he was going to leave the country and --

02:34  25  Q.  Okay.  What did you do once you saw some activity that he

02:34   1    might leave the country?

2    A.  We had previously planned for this.  We had -- we took

3    shifts, people watching.  And then there were -- people that

4    were not on shift were the first person to be called in case he

02:34   5    left.  We anticipated he probably would fly, given the

6    passport, things like that.

7           So, our plan was -- we had obtained a -- there

8    was a warrant outstanding for his driving without a license,

9    and we instituted surveillance in Hempstead and followed him

02:35   10   to -- the defendant to Intercontinental Airport.  He was in the

11   car of a professor, an Egyptian professor at Prairie View

12   A & M.

13   Q.  When did you become --

14          THE COURT:  Wait.  Say that again.

02:35   15          THE WITNESS:  He was in the car of an Egyptian

16   professor at Prairie View A & M, being driven to the airport.

17          THE COURT:  Does the professor have any importance to

18   this case or not?  Or not at this time?

19          THE WITNESS:  Not at this time, your Honor.

02:35   20          THE COURT:  All right.

21   BY MR. McINTYRE:

22   Q.  You said you had a plan for when Mr. Bujol tried to fly out

23   of the country.  And, essentially, what was that plan?

24   A.  It was to immediately institute physical surveillance to

02:35   25   determine where he was going, who he was going with, possibly

02:35  1    to gather some information on his intentions, specifically --

2    again, he lives in Hempstead.  Our office is in the

3    Bryan/College Station area.  So, we had to institute

4    surveillance from a distance and catch up.

02:36  5              And we had obtained a warrant.  Previously, one

6    of our task force members had gone to a justice of the peace in

7    Waller County and had obtained a warrant for the defendant

8    driving without a license.  And our plan was to, whatever

9    airport he went to, notify the authorities there, inform them

02:36  10   of the warrant, and request that he be arrested under those

11   charges.

12   Q.  Let me show you what is marked as Exhibit Number 26.  And

13   if we go to Page 2.

14             Is that the warrant you're referencing that you

02:36  15   had in place for -- or was in place for Mr. Bujol on the 15th?

16   A.  Yes, sir.

17   Q.  And who was that signed by?

18   A.  Ted Krenek, Justice of the Peace, Precinct 4, Waller

19   County, Texas.

02:36  20   Q.  And, so, once the surveillance in this case determined that

21   Mr. Bujol was going to the airport with this other Egyptian

22   professor, what steps did you take to prevent him from flying

23   out of the country?

24   A.  We contacted the Houston Police Department by phone and

02:37  25   then eventually in person, informed them of the presence of the

02:37  1    warrant, requested that they execute the warrant prior to the

2    defendant traveling but after the defendant got his ticket and

3    went through security, to make sure we knew where he was going

4    and to positively ID him.

02:37  5    Q.  And was the defendant arrested at the airport?

6    A.  He was.

7    Q.  And at the time he was arrested, where was the defendant

8    flying to?

9    A.  To Sana'a, Yemen, by way of Abu Dhabi.

02:37  10         THE COURT:  What does that mean?

11         THE WITNESS:  "Sana'a"?

12         THE COURT:  What was that first --

13         THE WITNESS:  Sana'a is the capital of Yemen.

14         THE COURT:  Of Yemen?

02:37  15         THE WITNESS:  Yes, sir.

16         THE COURT:  Okay.

17         THE WITNESS:  And by way of Abu Dhabi, which is United

18    Arab Emirates, on an Emirates airline.

19    BY MR. McINTYRE:

02:38  20    Q.  And he had previously purchased his ticket.  Is that

21    correct?

22    A.  I'm not sure if he purchased it that day, but he did have a

23    ticket in hand.

24         THE COURT:  Now, the Emirates Airlines, was that

02:38  25    non-stop all the way?

02:38  1         THE WITNESS:  It was scheduled -- that particular

2  flight was scheduled to stop in Abu Dhabi, and it was a

3  layover --

4         THE COURT:  That's what I mean.  It was non-stop all

02:38  5  the way to the Middle East.

6         THE WITNESS:  Yes, sir.

7  BY MR. McINTYRE:

8  Q.  When the defendant was arrested, was there anything that

9  was obtained from him or his person that might have been of

02:38  10  significance to you?

11  A.  At his time of arrest, he was allowed to give most of his

12  possessions to his wife -- or the person purporting to be his

13  wife.  His luggage was probably somewhere down below, in the

14  airport; so, he didn't have it at the time of arrest.

02:38  15         But on his person, when he was booked in,

16  personal property, he had two thumb drives, which are small

17  external digital storage devices used commonly.

18  Q.  I show you what is marked as Exhibit Number 47.  And is

19  Exhibit 47 the thumb drives that were taken from the defendant

02:39  20  on the 15th?

21  A.  Those -- yes.

22  Q.  Now, after the defendant was arrested at the airport,

23  trying to fly to Yemen, how much time did he spend in jail?

24  A.  It was approximately 10 days, I believe.  Maybe 12.

02:39  25  Q.  And after he was released from jail for these traffic

02:39  1    tickets, did you and other agents maintain surveillance on him?
       2    A.  We did.  When he was arrested, his vehicle was towed.  And
       3    that was the vehicle that we had originally seen him in, the
       4    Nissan sedan.  He never got it out of the tow yard; so, he
02:39  5    started to drive a white Geo Prizm registered to Ernestine
       6    Johnson.  So, we conducted spot surveillance on him after he
       7    got out of jail.
       8    Q.  Was there anything that changed in relationship to his
       9    phone usage?
02:40  10   A.  We had obtained a pen register order, court order, for a
       11   phone.  And then he dropped --
       12         THE COURT:  What's a "pen" -- I know what it is; but,
       13   for the record, what's a "pen register"?
       14         THE WITNESS:  It's a court order that allows the
02:40  15   requesting agency to intercept phone call information: to and
       16   from; duration of phone calls; but, again, no content.  It's
       17   not a wiretap.
       18   BY MR. McINTYRE:
       19   Q.  And what did you find out about the phone that you had the
02:40  20   pen register on?
       21   A.  The same week that we had it signed, the defendant canceled
       22   the service on that phone.
       23   Q.  And what can you tell the Court about whether the defendant
       24   was attending or not attending classes at Prairie View after he
02:41  25   was released from jail?

02:41  1   A.  He was no longer attending classes.  However, he was

2   traveling to the campus for prayers and to use the computer on

3   campus and to visit the professor I mentioned earlier.

4   Q.  And where did the defendant go to worship and pray at the

02:41  5   Prairie View campus?

6   A.  The All Faiths Chapel.

7   Q.  Now, did you receive information on March the 21st of 2009

8   regarding Mr. Bujol in Canada?

9   A.  I did.  I was contacted by telephone from US Customs

02:41  10  informing me that Barry Bujol, the defendant, had just crossed

11  back into the United States at the port of crossing in Detroit,

12  the Windsor crossing and that he had been rejected for entry

13  into Canada and he was driving the white Geo Prizm -- or he was

14  last seen in the white Geo Prizm that I mentioned before.

02:42  15  Q.  And what did you learn about how Mr. Bujol and his wife

16  tried to enter Canada; what was the procedure that they used?

17  A.  The defendant traveled by Greyhound Bus a couple of hours

18  after Ernestine Johnson and the defendant's child attempted to

19  enter in the Geo Prizm, through the Windsor Tunnel.

02:42  20         She was stopped in accordance with their

21  secondary procedures.  And as she was being denied entry, the

22  defendant arrived on a Greyhound Bus.  And he was denied entry,

23  and they were both escorted out of Canada, in their vehicle.

24         THE COURT:  Was there any linkup of the two at that

02:42  25  time up there by the Canadian authorities or they were just

02:42   1    turned back?

2              THE WITNESS:  Initially, there was not.  But when the

3    defendant arrived on the Greyhound Bus, he had to get off of

4    the bus in order to go through, and show his passport and go

02:42   5    through screening.  At that point in time he was able to

6    observe his wife.  The Canadian authorities interviewed them

7    both, connected them; and then, through their own laws, denied

8    them entry, both entry.

9    BY MR. McINTYRE:

02:43   10   Q.  So, after March 21st, 2009, and the defendant had been

11   denied entry into Canada, did you try to locate the defendant,

12   knowing that information?

13   A.  Absolutely.  I mean, our number one goal in February and

14   continued till the end of the case was we can't allow

02:43   15   situations where there could be an act of terrorism.  And given

16   what I knew about the defendant at the time, all the e-mails,

17   the videos that we've looked at, I mean, I was concerned.  Our

18   agency was concerned that he may take matters into his own

19   hands and do something.  So, I didn't know that he was going to

02:43   20   Canada; but once he did that, we continued to look for him.

21   Q.  Were you immediately able to locate the defendant after he

22   was turned back from Canada on March 21st of 2009?

23   A.  No, we were not.

24   Q.  When was the next date that you were able to locate or

02:44   25   determine where the defendant was?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:44    1    A.  On March 25th of 2009 we were contacted by a member of the

         2    Newark, New Jersey, Joint Terrorism Task Force, who is a member

         3    of the New Jersey State Police.  He contacted our office and

         4    spoke with us, that the New Jersey State Police located the

02:44    5    defendant in the course of one of their investigations.  And

         6    they wanted to pull him over based off of his suspicious

         7    activity.  But they found out that we had a case on the

         8    defendant; and they did not want to institute a traffic stop or

         9    begin any kind of investigative activity because they didn't

02:44   10    want to damage whatever kind of case we had, because they

        11    didn't know.

        12    Q.  What did you advise them in that regard?

        13    A.  Well, we advised them that if they had already planned on

        14    initiating a traffic stop, go ahead, "But if you do, here's

02:45   15    some things we would like to know: where is he going, who is he

        16    with," get some information like that.

        17             They informed us that he was driving on a

        18    suspended license.  They already knew that at that point.  So,

        19    they could pull him over at any moment.

02:45   20    Q.  And the defendant was pulled over on March the 25th.  Is

        21    that correct?

        22    A.  Yes.

        23    Q.  What transpired after the defendant was pulled over?

        24    A.  He was contacted by the New Jersey State Police.  There was

02:45   25    a roadside interview.  Consent to search of the vehicle was

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:45  1   provided by the defendant.  I believe there was a drug dog that

2   came forward.  It was called to the scene to look for

3   narcotics, because it was a narcotics unit of the New Jersey

4   State Police that ran into him.

02:45  5   Q.  And was the defendant arrested in New Jersey?

6   A.  He was.

7   Q.  And some of the items that were seized from the defendant

8   or his person or his vehicle are listed in the trial exhibits

9   and have previously been admitted.  Is that correct?

02:46  10  A.  Yes.

11  Q.  Let me show you what is marked as Exhibit 31, and tell

12  me -- and have you describe what Exhibit 31 is.

13  A.  It's a photocopy of a page written in English, taken out of

14  a spiral bound notebook.  It appears to me to be a workout

02:46  15  regimen.

16  Q.  And let me show you what is marked as Exhibit 32.  And can

17  you tell me what Exhibit 32 is?

18  A.  It's a copy of a Texas Department of Health "Child Health

19  Record" form for Najya Bujol, who I know to be the defendant's

02:46  20  daughter.

21  Q.  And is there any information in reference to where the

22  defendant or his daughter is going to be traveling to?

23  A.  Yes.  Under the section of "Child's Health," and written it

24  says, "Going to Yemen on Sunday."  And I think it says, "five

02:47  25  days, duration unknown."

02:47  1   Q.  If we go to Government's Exhibit Number 33, what is

2   Government's Exhibit Number 33?

3   A.  It's a photocopy of the exterior of an audio CD written --

4   or recorded by Anwar Awlaki, and it's part of a series of his

02:47  5   lectures entitled "The Hereafter."

6   Q.  And in smaller print, on the left-hand side, is there

7   something that's call the "Introduction"?

8   A.  Yes.  If you look at the top of the CD, this is Volume 1,

9   CD-1, of the entire series.  And the title of this particular

02:47  10   volume is "Introduction, The Importance of Akhirah - Death."

11   Q.  And if we go to Government's Exhibit Number 35.

12            And can you tell me what Government's Exhibit

13   Number 35 is, and where it was recovered?

14   A.  It was photocopied by the New Jersey State Police as part

02:48  15   of the consent to search.  It was found inside his car, the

16   defendant's car, in New Jersey.  It is a printout of an

17   Internet page that lists links to a number of Anwar Awlaki's

18   audio and written products and also some videos.

19   Q.  And that was recovered in hard copy form in the defendant's

02:48  20   vehicle.  Is that correct?

21   A.  Yes.

22   Q.  And if we go to the last page of that particular exhibit

23   and look at the -- and if you look at the top portion, is there

24   a link for a document that looks somewhat similar to what

02:49  25   Mr. Awlaki sent Mr. Bujol in e-mail format?

02:49  1   A.  Yes.  There's a link in the upper left-hand corner, and

2   it's entitled "44 Ways of Supporting Jihad."  That's what's

3   available on the Internet at the time.  The "42 Ways of

4   Supporting Jihad," which was sent to the defendant was not

02:49  5   available on the Internet at the time and -- it's an earlier

6   version of the 44 ways.

7   Q.  Show you what is marked as Government's Exhibit Number 36.

8   And, again, this is a document that was recovered from the

9   defendant.  And can you tell me what it refers to?

02:49  10  A.  It's a photocopy of some handwritten directions taking

11  someone from New Jersey to New York.  And there's -- on the

12  bottom left there's -- "E-Air" is written there, which I think

13  is Egyptian Air.  And, then, on the bottom right, it says,

14  "Friday, pay with cash, partial, one way, multi-destination."

02:50  15  So I believe that was notes he was taking talking to someone

16  about buying a ticket.

17  Q.  And if you look in the left-hand portion, it says --

18  there's a reference to, "80 to George Washington" and "JFK."

19  What do you believe "JFK" references?

02:50  20  A.  I believe it's JFK Airport.

21  Q.  Go to Government's Exhibit Number 37, and can you tell me

22  what Government's Exhibit Number 37 is?

23  A.  It's an Emirates Airline E-ticket receipt and itinerary in

24  the name of Barry Bujol; and it's for the trip that he

02:50  25  attempted to make on February 15th, 2009.

02:51  1    Q.  And where is his final destination on this one-way ticket?

2    A.  Sana'a, Yemen.

3    Q.  I show you what is marked as Government Exhibit Number 44.

4    And this is a picture of something that was recovered from the

02:51  5    defendant's car.  Can you tell me what this is?

6    A.  This is a photocopy of the exterior of the CD wallet that

7    contained the "Hereafter"  Series.  So, inside it, were sleeves

8    to place individual CDs in.

9    Q.  And, again, who is the author of these CDs?

02:51  10    A.  Anwar Awlaki.

11    Q.  And if you would go to Government's Exhibit Number 45, can

12    you please tell me what that document is?

13    A.  It's a printout from the Internet for Greyhound Bus

14    schedules from Detroit to Ontario -- or to London, Ontario, on

02:51  15    March 21st, 2009.

16    Q.  And does that correspond to the day that he was denied

17    entry into Canada, along with his wife?

18    A.  Yes.

19    Q.  Now, after Mr. Bujol was arrested, did you fly to New

02:52  20    Jersey and attempt to interview Mr. Bujol?

21    A.  Yes, sir.

22    Q.  And can you tell me how that transpired?

23    A.  Again, this is the third time, at this point, that the

24    defendant attempted -- we believe attempted to travel overseas.

02:52  25    And given what I knew about what he had e-mailed himself,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:52 1    questions he had asked of someone I was very concerned about,

2    Anwar Awlaki, and some of his other activities, we needed to

3    talk to him in order to determine was there anybody else in

4    Jersey that maybe shared his views, what were his plans, why

02:52 5    was he in Jersey with about $5,000 in his sock, which was what

6    was recovered, what were his overall intentions.  Because,

7    again, our mind-set is to prevent acts of terror or acts that

8    support terror.

9    Q.  And what was the date that you attempted to interview

02:53 10   Mr. Bujol?

11   A.  I believe it was -- it was either March 29th or March 31st.

12   I don't recall.

13   Q.  Let me show you what is marked as Government's Exhibit

14   Number 46 and see if that refreshes your memory.  Can you tell

02:53 15   me what Government's Exhibit 46 is?

16   A.  This is an FBI "Advice of Rights" form.  And it's a written

17   in English version, call it an "FD-395."

18   Q.  And what's the date of that advice that was given in this

19   case?

02:53 20          THE COURT:  Is that what, in effect, is usually known

21   as a "Miranda warning"?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Okay.

24          THE WITNESS:  The date is March 31st, 2009.

02:53 25   BY MR. McINTYRE:

02:53  1  Q.  Is that the day that you would have attempted the interview
       2  with Mr. Bujol?
       3  A.  Yes, sir.
       4  Q.  And in the bottom there's a signature, stating he's been
02:54  5  read his rights, understands them, and he's willing to answer
       6  questions without a lawyer present.  Is that correct?
       7  A.  Yes, sir.
       8  Q.  Is that Mr. Bujol's signature?
       9  A.  Yes, sir.
02:54 10  Q.  And, so, after you Mirandized him and read him his rights
      11  and he agreed to talk with you, what sort of plan did you and
      12  the co-case agent in this case come around to in regards to how
      13  you would represent yourself to Mr. Bujol during the course of
      14  this interview?
02:54 15  A.  We weren't given a lot of time to prepare for the
      16  interview, just given the nature of us not knowing he was going
      17  to be in New Jersey or Canada.  So, we prepared to start out
      18  acting as if we didn't know anything.  But we had a few backup
      19  plans that, if we were forced to, we would confront him with
02:54 20  everything we knew at that point.
      21          So, we posed as local JTTF agents that, as a
      22  matter of course, were called by the local police based off of
      23  things they saw in the car and specifically the CD from Anwar
      24  Awlaki that said "Importance of Death," and we were just going
02:55 25  to come out and -- we called it a "referral" -- we were just

02:55   1    coming out to get a gauge of who he was, clear his name, and

2    then move on to the next referral.

3    Q.  So, the representation was that these items had aroused the

4    suspicion of the local JTTF and you wanted to ask him about the

02:55   5    items that had been recovered from his car.  Is that correct?

6    A.  It aroused the suspicion of the local police; and, then,

7    their procedures would have been to call someone on the JTTF

8    for a second opinion, basically, about those items, not about

9    the charge that he was arrested under.  No stone unturned kind

02:55   10   of philosophy.

11   Q.  So, during the course of the interview, what did Mr. Bujol

12   tell you regarding his travel plans?

13   A.  He told us that he had planned to travel to Yemen

14   previously, meaning in February; that he was stopped; that he

02:55   15   had since reconsidered Yemen may not be the best destination;

16   and he was going to try to go to Egypt to learn Arabic.

17   Q.  How did he say he was going to Egypt?

18   A.  He said that he was on his way to purchase a ticket the day

19   that he was pulled over and then arrested by the New Jersey

02:56   20   authorities.  The way he described it to me was he was going to

21   an actual Egyptian Air ticket office, which was, I believe,

22   near Madison Square Garden or Times Square, one of those, and

23   he was going to purchase it and then the next day come pick it

24   up and travel.  In the meantime, he was going to visit the

02:56   25   sights with his family.

02:56   1   Q.  Did you question Mr. Bujol about whether he had gone to

2   Mr. Awlaki's sites or he had had any communications with

3   Mr. Awlaki?

4   A.  We did.  We started with the CDs that we've already talked

02:56   5   about and just asked how he came into possession of those, what

6   he understood about Anwar Awlaki.  He informed us that he had

7   purchased that CD set for his wife in a mosque, Masjid, in the

8   St. Louis area.  He didn't give us a time.  Or if he did, I

9   don't recall it.  It was a present for Ernestine Johnson.  And

02:57   10   that -- he actually suggested that I should probably listen to

11   a few of them to understand them better.

12   Q.  What specifically did he say regarding whether he had been

13   to -- had communicated with Awlaki or gone to his websites?

14   A.  As part of that line of questioning -- and, again, this

02:57   15   interview lasted about four hours, including breaks for

16   bathrooms and things.  I wanted to get to the bottom of, "Okay.

17   So, you have the CDs for Anwar Awlaki.  But have you gone to

18   his website or had any communications?"  Because I already knew

19   he had.

02:57   20            So, we asked the question.  And he acknowledged

21   that he knew that Anwar Awlaki was -- leaned that way and was a

22   bad site and he had been informed to not go to that site and he

23   had never gone to -- he had never gone to Anwar Awlaki's sites,

24   he had never communicated with Anwar Awlaki.

02:58   25            So, playing as if I just knew about the CD -- I

02:58  1   had brought some props with me dealing with Anwar Awlaki that I

2   wanted to show the defendant in order to show that Anwar Awlaki

3   was not someone that we thought was a good person.

4   Q.   What were some of those props, and what transpired next?

02:58  5   A.   I brought the 9-11 commission report, and I had it tabbed

6   out on the pages where Anwar Awlaki is mentioned as having

7   supported the 9-11 hijackers, the 9-11-2001 hijackers.

8        I told the defendant that I had done some

9   research, just briefly, after I received the referral, because

02:58  10  I didn't really know who Anwar Awlaki was -- that was my

11  story -- and that "I was concerned that you would be looking --

12  or listening to him."  And then I also had printed off the

13  publicly available "44 Ways of Supporting Jihad."

14  Q.   And, so, with these props did -- at some point did

02:59  15  Mr. Bujol see these props?

16  A.   I specifically showed him the 9-11 commission report to --

17  it's a hard bound book, and I kind of waived it around on the

18  table.  But at one point I dropped the "44 Ways," which was --

19  it was multiple pages, and I had it in a binder clip.  I

02:59  20  dropped it, and it landed between the defendant's legs.  So, he

21  stepped -- he pushed away from the table to look down to

22  actually kind of help me pick up my items.  And as soon as he

23  saw the "44 Ways," he backed away, visibly shaken that I had

24  it.

02:59  25  Q.   What do you mean he "backed away"?

02:59  1    A.  He pushed himself, literally, away from the table.

2    Q.  And did he -- after he was visibly shaken and pushed away

3    from the table, what sort of comments did he make to you after

4    he had seen these documents?

02:59  5    A.  He rubbed his face a number of times, said, "I don't want

6    to be associated with that.  That's not the way I am, and I've

7    never seen that."  And it took -- in terms of the interview, it

8    took five, 10, 15 minutes to get him cooled back down to

9    continue the interview.

03:00  10   Q.  And, again, Mr. Bujol had denied any communication with

11   Mr. Awlaki.  Is that correct?

12   A.  We came back to the topic, and he -- we had confronted him

13   that we thought he had been lying during the course of the

14   interview to that point, about -- just generic things.  We

03:00  15   asked him to tell us what he had been lying about.

16          He admitted that he had received -- the defendant

17   had received an e-mail from someone at Prairie View A & M

18   University that said to go -- to avoid a number of sites.  One

19   of the sites was an Anwar Awlaki site.  So, he admitted that he

03:00  20   had gone to some of the other sites, out of curiosity, but he

21   had never gone to the Anwar Awlaki site or ever posted or

22   communicated with him.

23   Q.  Now, the thumb drives that we had previously shown you, in

24   Exhibit 47, were thumb drives also recovered during the New

03:01  25   Jersey arrest?

A.  Yes, sir.

Q.  And did you try to obtain consent from Mr. Bujol to look at the contents of the thumb drives?

A.  Yes, sir.  We have a similar form that -- to the one that's up here that's for consent to search.  I had the form in my hand, and I asked the defendant for consent to search the two thumb drives.  I couched it in a way that, for me to be thorough and, you know, look my boss in the eye that I thought you were a good person and that this was all a misunderstanding, that for me to be thorough, I need to look at those just to clear everything up.

Q.  And did Mr. Bujol give you consent?

A.  He tried to give qualified -- what I would call "qualified" consent.  And by that I mean he said, "I want you to look at it in my presence.  I want to show you if something on there is mine or someone else's."  And then he went into a story multiple times about a news story that he had seen on 60 Minutes or 20/20 or one of those, about someone that had some relationship with a terrorist and that person got arrested just because of casual contact.

He tried to do what I call the "qualified" consent a couple of times, that he wanted to view it -- he wanted us to view it in his presence.  And I pulled the form back and said, "That's not how our consent works.  So, I consider that you're not giving consent."

03:02  1  Q.  So, ultimately no consent was given.  Is that correct?
       2  A.  No.  He attempted to again offer qualified consent after I
       3  pulled the form away.  And I said, "No, that's not how it
       4  works."  And that concluded that portion of the interview.
03:02  5  Q.  Did you ask Mr. Bujol about e-mail addresses and what sort
       6  of e-mail addresses that he had?
       7  A.  I avoided the issue of Abdul_Bari05@Yahoo.com.  We went
       8  into the interview kind of with a bunch of audible, if you kind
       9  of catch that -- we had a lot of options on what we wanted to
03:03 10  do on the interview.  One of the options was to give up all of
      11  our cards.  We didn't choose to use that.  So, we had e-mails
      12  in his car, that were from that account; but we didn't show him
      13  that we saw those.  So, the only e-mail that we talked to him
      14  about was one that was on one of his resumes, which was not the
03:03 15  Abdul_Bari05 account.
      16  Q.  And what was that e-mail that was not the Abdul_Bari
      17  account?
      18  A.  I believe it was Barry Bujol6@Hotmail.com.
      19  Q.  Did Mr. Bujol say that was the only e-mail address that he
03:03 20  had?
      21  A.  Yes.
      22  Q.  And you knew that to be false based on your results from
      23  the Yahoo! search warrant.  Is that correct?
      24  A.  Yes.
03:04 25  Q.  Now, how long did Mr. Bujol stay in jail in New Jersey,

03:04  1    approximately?

2    A.   I think it was about 10 weeks.

3    Q.   And after he was released, do you know when he arrived back

4    in Houston, Texas?

03:04  5    A.   June 25th, 2009.

6    Q.   And how did he arrive back in Houston, Texas?

7    A.   Greyhound Bus.

8    Q.   And once he arrived by Greyhound Bus in Houston, Texas, do

9    you know how he got back to his residence in Prairie View

03:04  10   Texas?

11   A.   Ernestine Johnson picked him up and brought him back to

12   Prairie View.

13   Q.   Let me show you what's marked as Exhibit 5, and go to

14   Page 5 of that exhibit.

03:05  15            Let me show you what is marked as Government's

16   Exhibit Number 5.   And, again, that's the subscriber

17   information for the Abdul_Bari05 account.   Is that correct?

18   A.   Yes, sir.

19   Q.   If you go to the next page, there's the IP address

03:05  20   information.   Is that right?

21   A.   Yes, sir.

22   Q.   And did you, pursuant to a subpoena, get this information

23   and determine things about when Mr. Bujol logged back into that

24   Abdul_Bari05 account after he was released from jail in New

03:06  25   Jersey?

03:06   1   A.  Yes.  We obtained a federal grand jury subpoena.  This is

2   the results.  In an effort to determine if the defendant, after

3   being confronted in that interview about contacts with Anwar

4   Awlaki, would again make use of the Abdul_Bari05 account.

03:06   5              And the day that he arrived back, after being

6   away for 10 weeks from his family, logged on three times at the

7   university.

8   Q.  And you consider that significant because he had been

9   interviewed about Awlaki, been in jail for 10 weeks, and then

03:06   10  he logs back in through Prairie View to the same account.  Is

11  that correct?

12  A.  Correct.  I mean, I knew that he had used that account to

13  contact Anwar Awlaki, which was a false statement of what he

14  had told me in New Jersey.  So, I was concerned that he was

03:06   15  going in to delete it, maybe cancel the account, or maybe look

16  for a message that he may have missed from Anwar Awlaki in the

17  last 10 weeks.

18  Q.  Now, once the defendant was back around June of 2009, back

19  in Prairie View, did you-all continue the investigation and

03:07   20  continue trying to maintain surveillance on the defendant?

21  A.  Yes, sir.

22  Q.  And can you tell us what transpired from June 25th, 2009,

23  up until November of 2009?

24  A.  We continued our investigation.  We continued to try to

03:07   25  identify anybody that may be associated with the defendant, to

03:07  1   identify any activities that he may start up or any activities
       2   that may have changed, did he go back to school, do we see any
       3   indication that maybe he was going to resume his life style
       4   that he had pre July 2008 when he talked to Anwar Awlaki.
03:07  5   Q.  And what did you observe in regards to whether he had
       6   changed the behavior or not?
       7   A.  He spent less time at campus, but he still went to campus
       8   and used the computer.  He had -- he was essentially a loner at
       9   that point, in terms of anyone outside of that apartment,
03:08 10   didn't seem to trust too many people, didn't interact with any
      11   organizations on campus, didn't seem to travel into Houston and
      12   go to any of the Muslim community organizations or anything
      13   like that.
      14   Q.  And during this time period in November of 2009, did you
03:08 15   learn that the defendant had a warrant for a failure to appear
      16   at a prior court proceeding?
      17   A.  When he left in March of that year, he was on bond from the
      18   arrest at the airport, never came back.  And so, as a result,
      19   he had to appear for court in Waller County for that.  And that
03:08 20   was -- would have been in the JP court, justice of the peace
      21   court, Precinct 4, Waller County.
      22   Q.  Was there several times that he was supposed to appear in
      23   court?
      24   A.  Yes.  I don't recall the exact dates; but there were two
03:09 25   different occasions.  He was provided court dates at that JP

03:09  1   court, justice of the peace court, that he did not appear for.

2   Q.  Okay.  And around this same time period, did you and other

3   agents of the FBI make the decision that you were going to

4   utilize a confidential human source?

03:09  5   A.  Yes, sir.  One of the techniques that we have is a trusted

6   confidential human source.  And up to this point we had

7   exhausted a number of other investigative acts.  We've already

8   talked about pen registers, subpoenas, search warrants,

9   interviews, the like.

03:09  10          And part of my job is not necessarily to arrest

11  people, is to prevent acts, but we -- arrest as one method --

12  and to figure out whether or not the defendant had changed his

13  mind about going overseas and what I believe to be fighting;

14  and the only way we can do that, if he's not going to meet

03:09  15  anybody outside, is to have somebody meet him that -- see if he

16  will confide in and see if he still wants to do the things that

17  I believe he wanted to do when he left in February.

18  Q.  And as part of using this confidential source, did you

19  formulate a plan on how the source and the defendant would

03:10  20  meet?

21  A.  We did.  We had originally planned for the CHS to be in the

22  waiting room of the JP court on the same day, around the same

23  time that the defendant was supposed to be there.

24  Q.  And did that plan work or not work?

03:10  25  A.  Because the defendant didn't appear, it did not work.

03:10   1    Q.   And because the defendant didn't appear and the plan didn't

2    work, ultimately a warrant was obtained.  Is that correct?

3    A.   The JP in that court issued a failure to appear warrant

4    because he had failed to appear twice.

03:10   5    Q.   If we look at Exhibit 27, that's -- that is a listing of

6    that warrant.  Is that correct?  And booking sheet for that

7    warrant?

8    A.   Yes, sir.

9    Q.   Because this plan involving the defendant voluntarily

03:11   10   appearing in court and meeting the source didn't work, what was

11   the next operational plan you had to introduce the source to

12   the defendant?

13   A.   We had a legal warrant that had been issued in a Court, and

14   we decided to -- again, to contact the local authorities -- in

03:11   15   this case it was Waller County -- and ask their assistance in

16   arresting him, the defendant, at a time and place of our

17   choosing, in order to control that the defendant would be in

18   the Waller County jail, booked at a certain place at a certain

19   time.  And our plan was to place the confidential human source,

03:11   20   the CHS, in the same booking area at the same time so that they

21   would bump into each other.

22   Q.   And when and where was the defendant arrested on this

23   warrant that's in Exhibit 27?

24   A.   It was November 13th, 2009.  He was arrested in the parking

03:12   25   lot of his apartment complex, 20598 Pine Island Road,

03:12  1    Hempstead, Texas?

2    Q.   And where was he transported to after he was arrested?

3    A.   The Waller County jail.

4    Q.   And as part of your operational plan, what preparation did

03:12  5    you take to prepare for the defendant being arrested and

6    ultimately meeting the confidential source?

7    A.   Our plan -- the things that we do in order for an

8    operation, we obviously emplace security measures for the

9    confidential human source and for the agents involved in the

03:12  10   investigation.   So, we made arrangements with the jail that the

11   confidential human source would be treated as if he were a

12   prisoner, dressed the same, have to go through the same

13   procedures as any other prisoner.

14            We put together procedures so that law

03:13  15   enforcement outside of Waller County could observe the

16   interaction at the booking area, with the defendant and the

17   confidential human source.   And we determined that, since this

18   was their very first meeting, we wanted to try to set the

19   conditions that they would have at least a few minutes to meet

03:13  20   so that they could try to set up a second meeting.

21   Q.   And after the defendant was arrested on November 13th, he

22   was transported to Waller County jail.   And can you tell us

23   what happened in relation to the defendant and the source

24   meeting?

03:13  25   A.   The defendant was brought into the booking area in

03:13  1   accordance with their -- through the sally port or whatever,

2   the way they normally do that.  And upon being brought into the

3   booking area, since somebody else was already being booked,

4   being fingerprinted and photographed -- that person was the

03:14  5   CHS -- the defendant was placed into a temporary holding cell

6   in that area so that he could observe the CHS being booked.

7            The CHS was then suited out, I call it, and put

8   in an orange county jail jumpsuit and -- and then the CHS

9   was -- after he was finished being booked, was placed in the

03:14  10  same temporary booking cell that the defendant was in.

11  Q.  And approximately how long were the defendant and the

12  confidential source in the same booking cell?

13  A.  In the cell, maybe less than 30 minutes but in the same

14  general area, in sight of each other, about 45.

03:14  15  Q.  And were you or other agents able to observe any

16  interaction between the source and the defendant?

17  A.  Yes.

18  Q.  And what significance was observed during this interaction,

19  if any?

03:14  20  A.  They spoke; they prayed together; they interacted.  And

21  then, at the conclusion, the source, the CHS, said some things

22  in order to be moved back into the holding area so that that

23  ended the meeting.  He had been previously directed when he was

24  ready to end it to do it that way.

03:15  25  Q.  Now, prior to this meeting did you place an audio recording

03:15  1    device on the defendant [sic]?

2    A.  Yes, sir.

3    Q.  And where was it placed?

4    A.  In his waist band.

03:15  5    Q.  Now, as with this recording and all recordings, can you

6    tell me the procedure that you used to assure the accuracy and

7    integrity of the recordings that you use, whether video or

8    audio?

9    A.  We check out devices from our inventory.  And the inventory

03:15  10   is in Houston, and I'm in Bryan.  So, you either go get them or

11   someone else goes and gets them.

12         And what we do is we make sure they're in working

13   order; make sure they're charged, meaning they have a power

14   supply that's working, the battery is fully charged; make sure

03:15  15   there's no resident digital media from a previous recording.

16   If it's a magnetic tape, like an eight millimeter tape or a

17   cassette tape, we, obviously, take a new one from the wrapper.

18         THE COURT:  Let me ask you this.  Is this a

19   self-contained recording device or is it a transmitter through

03:16  20   a receiving device?

21         THE WITNESS:  In this case, it was a self-contained

22   digital recording device.

23         THE COURT:  Okay.  So, it wasn't transmitted somewhere

24   else and recorded, like, a spool going around, for want of a

03:16  25   different term?

03:16  1          THE WITNESS:  Yes, sir.

2          THE COURT:  Do you still use that technology?  Or is

3  it all on a disk?

4          THE WITNESS:  (Indicating)

03:16  5          THE COURT:  On a disk.  Okay.

6          THE WITNESS:  After we've done those tests, then the

7  way we do it is, prior to the emplacement, wherever we're going

8  to put it, we test it one more time, make sure the light comes

9  on and we record what's called a preamble.  And that's -- the

03:16  10  person who is installing it says their name, the place, the

11  date, the time, a brief description of what you anticipate

12  being recorded, the people you think are going to be recorded.

13  And then it's emplaced.

14  BY MR. McINTYRE:

03:17  15  Q.  Once the device has been placed and the recording has been

16  made, what do you do post-recording to ensure the accuracy and

17  the integrity of the recordings?

18  A.  As we're recovering it from wherever it is, I record a

19  post-amble, which is essentially the same information in

03:17  20  reverse; it's the person recovering the device, the date, time,

21  the place.  And then it's turned off; and it's put into chain

22  of custody, either envelope or carried to where there's an

23  envelope.

24          It's transported to Houston, the FBI office,

03:17  25  placed into evidence.  And then, if it's a digital device,

03:17   1   it's -- the true data is taken off the digital device and

2   placed into evidence and then that -- the physical device is

3   placed back into inventory.

4            If it's a magnetic tape, a cassette tape or an

03:17   5   eight millimeter video, the tape is pulled out and put into

6   chain of custody and it's entered into evidence.  And working

7   copies are made of either the digital or the magnetic, so that

8   we can listen to them at a later date.

9   Q.   And that process was followed for all the audio and video

03:18   10   recordings done in this case.  Is that correct?

11   A.   Yes, sir.

12   Q.   Now, after the meeting between the source and the

13   defendant, did you make arrangements for the source to be added

14   to the visiter list for the defendant?

03:18   15   A.   Yes.  We contacted a jailer in the jail, that would be

16   working in the area that the defendant was going to be housed,

17   and asked him to go back to the defendant and state that the

18   CHS had requested to be put on the defendant's visitation log

19   and see if the defendant was willing to add him to the list.

03:18   20   The defendant said "yes."  And then procedures were made in

21   order to put the CHS's name on the visitation log.

22   Q.   Now, following this November 13th meeting, was there

23   another meeting between the confidential human source and the

24   defendant?

03:19   25   A.   Yes.  We decided to have another meeting within the jail in

03:19   1   order to have the CHS visit the defendant as he had suggested

2   he might.

3   Q.  And was this meet recorded or not recorded?

4   A.  That meeting was not recorded.

03:19   5   Q.  Why was it not recorded?

6   A.  We were familiar with the way the jail was set up.  And the

7   way visitation works at the jail at that time is it's

8   between -- the person in jail and the person out of jail, the

9   visitor, see each other through glass and they use the handset

03:19   10   to speak to one another.  So, we didn't think, technically, it

11   would work very well.

12          And also we did not want to inform too many

13   people in the jail of what was going on in case the defendant

14   saw something different than what he's used to.

03:19   15   Q.  And approximately how long did the defendant and the source

16   talk over the handset on this occasion on November 18th of

17   2009?

18   A.  I believe it was roughly 20 minutes.

19   Q.  And after the meeting, did the defendant -- after the

03:20   20   meeting with the defendant, did the confidential source go to

21   the residence of Mr. Bujol?

22   A.  Yes.  We conducted surveillance of -- the confidential

23   human source drove to the defendant's apartment.  This was late

24   at night now.  This is close to 10:00 o'clock at night.  And

03:20   25   the CHS approached the door, knocked.  And after awhile,

03:20   1    Ernestine Johnson came out and met the CHS.

2    Q.   And what was the purpose of the source going out to meet

3    Ernestine Johnson?

4    A.   It's traditional in the culture and religion that if

03:20   5    someone is in jail or the male of the family is in trouble that

6    the community, the Muslim community, assist the family.  So, we

7    sent the CHS over to give Ernestine $50.

8    Q.   Now, after this November 18th meeting at the jail, there

9    was a subsequent meeting on December 2nd of 2009.  Is that

03:21   10   correct?

11   A.   Yes.

12   Q.   And where did this meeting between the source and the

13   defendant occur?

14   A.   It occurred at the Waller County jail, in the visitation

03:21   15   area again.

16   Q.   And was this recorded or not recorded?

17   A.   It was recorded.

18   Q.   And at the time period that the source arrived at the jail,

19   did he have contact with any person other than the defendant?

03:21   20   A.   In the waiting area, where you're waiting and you sign in

21   to go visit, he -- the CHS ran into Ernestine Johnson at this

22   point -- the defendant had two young children at that point.

23   They were all there in the lobby.

24   Q.   And did the defendant eventually talk to the confidential

03:22   25   source, who had come to the jail?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

A.  Yes.

Q.  And approximately how long did they talk?

A.  I believe it was about 20 minutes, as well.

Q.  And you said this was recorded.  Did you later determine whether it was a good quality or poor quality?

A.  It was a poor quality.  And it, really, was only of the CHS's conversation because it was a handset and the recording device we used was not in the phone.  So, it only picked up what the CHS said.  It didn't pick up what the defendant said.

Q.  Now, after this December 2nd, 2009, meeting, did you or other investigators learn that Mr. Bujol was scheduled to get out some time around December 5th of 2009?

A.  Yes, sir.

Q.  And did you, organizationally, form a plan to have the confidential source come into contact with the defendant at or about the time he was being released from jail?

A.  Yes.  We decided that -- we didn't know what time he would be released on bail because he was -- he was not paying the fine.  He was what they call "sitting it out," which means that every day he sat in the jail it took a hundred dollars off of his fine.  So, there's no way of knowing, without too many people in the jail or the county court system knowing that we were interested, what time he was going to be released.

        So, instead of him being released at an odd hour on the 5th, we decided to set it up where the CHS went to the

03:23  1  jail on the 4th, with physical surveillance and everything, and

2  make it appear as if the CHS was bailing out the defendant.

3  Q.  And, so, what transpired between the confidential source

4  and the defendant during the time period he was being released

03:24  5  on December 4th, 2009?

6  A.  After the defendant went through the jail proceedings,

7  whatever the procedures are to be released, they met in the

8  lobby, the CHS and the defendant.  We observed them walk to the

9  CHS's car, which was parked in the parking lot.  And the CHS

03:24  10  had been directed to offer a ride home to the defendant.  And

11  the defendant took the ride offer up.  And we observed the two

12  of them driving together in the CHS's car from the jail to the

13  parking lot of the defendant's apartment complex.

14  Q.  And approximately how long was the source at the

03:24  15  defendant's apartment on this occasion?

16  A.  They sat in the parking lot for no more than 15 minutes.

17  And then the defendant went inside of his apartment.  And as

18  our normal protocol, we -- before a meeting, we tell the CHS a

19  place to meet us at the conclusion of the meeting.

03:24  20       The CHS met us and informed us that the defendant

21  wanted the CHS to come back in about an hour and a half so they

22  could talk further.

23  Q.  And did the confidential source come back in approximately

24  an hour and a half and meet with the defendant?

03:25  25  A.  Yes, sir.

03:25  1  Q.  And what transpired at that point between the confidential
2  source and the defendant?
3  A.  The defendant came out to the car and got into the CHS's
4  car.  They drove to the McDonald's in Hempstead, through the
03:25  5  drive-thru line; and they both got a hot beverage.  I'm not
6  sure what exactly it was.
7        Then they drove to Prairie View A~&~M University
8  and then eventually back to the defendant's apartment parking
9  lot, where they sat for five, ten minutes.  And then the
03:25  10  defendant went back into his residence; the CHS went back to a
11  predesignated position.
12  Q.  And were there audio and video recordings in the vehicle,
13  in the confidential source's vehicle, for these meetings?
14  A.  Yes, sir.
03:26  15  Q.  Now, during the December 4th, 2009, meeting, did the
16  confidential source give an e-mail address to the defendant?
17  A.  Yes.  Prior to any meeting, we give very clear instructions
18  to the CHS.  Safety, you can do this, you can't do that, and
19  then some very specific what I call "tactical," meaning just
03:26  20  very specific things that deal with the case, things that I
21  would like you to do.
22        In this particular case, we had directed the CHS
23  to create an e-mail account, a Yahoo! account.  We chose Yahoo!
24  because our entire case at this point -- when we decided to
03:26  25  institute the CHS, we wanted to mirror the year case we had

1    before that.

2              THE COURT:  The what case?

3              THE WITNESS:  Your Honor, the way we looked at this

4    case involving the defendant is everything that happened up to

5    and through New Jersey as one particular case, because those

6    are all things that he did of his own accord, without us ever

7    being involved.  And then the way I look at it is, starting in

8    November, we had almost a second case.

9              And the way we did that is we tried to mirror as

10   much as possible in the first case.  He used Yahoo!; so, we

11   used Yahoo!.  He wanted to travel; so, we made it sound like

12   our guy had traveled.  And, then, we continued to do that.

13             We used the "42 Ways" as kind of a blueprint.  We

14   would say some of the same things that were said there or we

15   would say some of the things -- same things that he said in his

16   own e-mails to people.

17             So in this case, we created a fake Yahoo! account

18   with instructions that if the opportunity arises and the

19   defendant wanted it to provide that e-mail account and not

20   another e-mail account.

21             THE COURT:  All right.

22   BY MR. McINTYRE:

23   Q.  Now, can you tell us the procedure for how you -- meaning

24   the case agent and the confidential source -- handled e-mails

25   that were sent to or received from the defendant?  What was the

procedure?

A.   We would direct the CHS to create an e-mail account.   The CHS would decide what name he would create.   But once the e-mail account was created, he was directed not to do anything with that e-mail account that was not related to this case.   We were given access to the account, meaning the handlers of the CHS, the case agents; and the CHS was given access to the account.

          The way it would work and the way it was directed and the way we did it throughout this operation was, if either one of us -- meaning the handlers, case agents, or the CHS -- saw that an e-mail came in, other than spam or anything -- that they would contact the other one and then we -- we would decide what to do next.

Q.   And did the source need approval from the case agents before he could e-mail the defendant?

A.   Later in -- as the operation went, there were opportunities where the CHS had to communicate with the defendant or the defendant was communicating with the CHS.   So, the way that worked was, once there was an e-mail sent to the CHS, both parties -- meaning the CHS and the case agents -- will look at it.   A decision will be made whether or not we would respond, how we would respond, and how soon we would respond.

          Typically what would happen is one of the other persons -- the CHS or case agents -- would draft an e-mail, the

03:29  1   other one would look at it and then adjust it so it had some

2   misspellings or maybe had a few Arabic characters in it or

3   whatever, so that it looked like it came from the CHS.  And

4   then final approval was always the case agents'.  CHS was not

03:29  5   allowed to send any e-mails without our approval.

6   Q.  Now, ultimately, there was a meeting between the source and

7   the defendant on December 23rd of 2009.  What sort of

8   preparations did you and the other agents do in regards to this

9   anticipated meeting on December 23rd of 2009?

03:30  10  A.  There were a few e-mails exchanged prior to this meeting

11  between the defendant and the CHS that kind of suggested they

12  were going to meet that day and -- and visit.  And the

13  defendant agreed to that.

14          The CHS, we set up physical surveillance both for

03:30  15  the safety of the CHS but also to gather intelligence and

16  evidence.  There were a number of digital and audio recording

17  devices used.  And, then, we would always place props within

18  the vehicle to bolster what we thought the -- the character the

19  CHS was portraying:  Someone who travels, someone who traveled

03:30  20  frequently; so, we would place hotel pens from foreign hotels,

21  foreign newspapers, prayer beads, foreign currency, things of

22  that nature, throughout the car.  Because the defendant was

23  very keen on looking around inside the car; so, we wanted him

24  to think that the CHS traveled frequently.

03:31  25          On that particular day, we gave the CHS an

envelope.  It didn't contain anything.  But with instructions

to go to a particular place in Cypress, Texas, hand that to an

FBI employee who looked Middle Eastern -- or was Middle Eastern

but not talk about it, see if the defendant brought it up.

Because that's just not normal behavior at 9:30 at night.  And

then drive to another location and they could talk or do

whatever they wanted to do.

         We gave the CHS latitude on whether they went and

got something to drink or not based off what the defendant

wanted to do.  We would always give the CHS particular places

we wanted him to avoid, places we wanted him to go in case we

lost him or he was in danger.

         And we gave the CHS instructions every meeting

that he was not to assume the role as a spiritual leader and

was never to assume the role with the defendant that he was an

employer looking to hire the defendant.

Q.  And on this date, did surveillance observe what you

previously talked about in the instance of the confidential

source passing some sort of note or envelope to another Middle

Eastern individual?

A.  Yes.

Q.  What was the defendant's reaction when he saw this?

A.  He seemed pleased.  He never brought it up.  Didn't get out

of the car and walk away, stayed in the car.  And they drove to

another location and began to speak for probably close to an

03:32  1    hour after that.

2    Q.  What were the specific circumstances of where and how the

3    source handed this envelope to this undercover Middle Eastern

4    person?

03:33  5    A.  As I mentioned, we wanted the defendant to see in the CHS

6    what the defendant had been looking for all along, somebody who

7    thought like him, traveled, could, you know -- so, in order to

8    do that, hints were dropped that the CHS had connections and

9    just did stuff and he would never say exactly what it was.

03:33  10         So, we made arrangements at a particular time at

11   a CVS Pharmacy, just outside of a CVS Pharmacy, that the FBI

12   employee would be there, that the defendant would be in the car

13   with the CHS and the CHS would pass the envelope, not talk

14   about it after, not explain it and, if asked, to just tell the

03:33  15   guy to not ask.

16   Q.  Okay.  Now, after this December 23rd meeting, there was a

17   subsequent meeting on January 20th of 2010.  Can you tell us

18   what preparations that you and other agents took in order to

19   get ready for this meeting between the source and the defendant

03:34  20   on that date?

21   A.  After every meeting, we would talk to the CHS and we would

22   review the working copies of what was said in the meetings and

23   kind of come up with a plan.  In this particular case they --

24         THE COURT:  What do you mean "working copies"?  What

03:34  25   do you mean by that?

03:34  1      THE WITNESS:  As I mentioned earlier, your Honor,

2   that -- we wouldn't use the actual original copy of a

3   transcript -- I mean, of an audio recording.  We would use a

4   duplicate.  That way, we never touched the original; and it

03:34  5   stayed in evidence.

6      THE COURT:  Right.

7      THE WITNESS:  So, a "working copy" was one that the

8   case agents could play and play back and forth and not have to

9   worry about chain of custody issues.

03:34  10      THE COURT:  Go on.

11      By the way, we'll take a break in about 10

12   minutes.  We usually take a break about 3:45.  So, we're right

13   on schedule.

14      Go on.

03:34  15      THE WITNESS:  In this particular case, there had been

16   a discussion about the two of them dining.  So, the CHS was

17   provided -- or directed to go purchase some chicken.  And the

18   idea behind the meeting was they were going to go to the

19   defendant's house and have a meal.

03:35  20   BY MR. McINTYRE:

21   Q.  Okay.

22   A.  And, then, we set up the normal protocols with surveillance

23   and recording devices and things like that.

24   Q.  Okay.  And can you tell us what was observed by

03:35  25   surveillance agents on January 20th, 2010, in the instance of

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:35   1   where the confidential source and the defendant met, where they

        2   traveled, and where they ultimately ended up?

        3        THE COURT:  All right.  Now, counsel, let me just ask

        4   you.  You're not going through every single meeting, are you?

03:35   5   You're just going through what you think is relevant and has

        6   some importance in this case.  Is that correct?

        7        MR. McINTYRE:  Your Honor, I have been going through

        8   every single meeting; but I can --

        9        THE COURT:  It's strictly up to you.  In other words,

03:35   10  just hit the main points.

        11       MR. McINTYRE:  Yes, your Honor.

        12       THE COURT:  I'm not moving you along.  I'm not forcing

        13  you to speed up.  But I'm saying give us as much detail as you

        14  think is necessary under the facts of the case.

03:36   15       MR. McINTYRE:  Yes, your Honor.

        16       THE COURT:  Go on.

        17            You certainly have to link up each transcript

        18  that you put in.  Don't get me wrong about that.

        19            Go on.

03:36   20       MR. McINTYRE:  Yes, your Honor.  Okay.

        21  BY MR. McINTYRE:

        22  Q.  On January 20th of 2010, was there an instance during this

        23  meeting where the defendant and the confidential source

        24  traveled to a Best Buy?

03:36   25  A.  Yes.

03:36   1   Q.  What transpired during the time period they were at the

2   Best Buy?

3   A.  They both went into the Best Buy.  The defendant had been

4   told to go to an area where they have GPS units, global

03:36   5   positioning units.

6            THE COURT:  Wait a second.  Say the wording again.

7            THE WITNESS:  Global positioning system.

8            THE COURT:  Yeah, I know.  But what -- who suggested

9   they go to the GPS section?

03:36   10           THE WITNESS:  We suggested it to the CHS, that that's

11   where he go when he goes into the Best Buy.

12           THE COURT:  Just to walk over there?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  All right.

03:36   15           THE WITNESS:  They went to that area and the CHS

16   looked at different GPS receivers in the store and actually

17   spoke to someone that worked there about them and then they

18   exited the Best Buy.

19           THE COURT:  They just looked and exited.  Is that

03:37   20   correct?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Okay.

23   BY MR. McINTYRE:

24   Q.  And then where did they travel to; and, ultimately, when

03:37   25   did the meeting end on that date?

03:37   1   A.  Prior to getting into the car, they both went to the

2   Starbuck's which is in the same parking lot, got a drink, got

3   into the CHS's car, drove back to the defendant's apartment,

4   went inside for 30 or 35 minutes, had a meal.

03:37   5        We observed the CHS return.  In this particular

6   meeting and many others after it, there was a transmitter on

7   the CHS that allowed it to play a certain distance on a radio

8   channel.  So, we were listening through that transmitter, in

9   addition to the recording devices.

03:37   10        They ate the meal.  We recovered the source, and

11   went to the next meeting.

12   Q.  Now, the next meeting was January 25th of 2010.  And that

13   was going to take place in a hotel.  Is that correct?

14   A.  Yes.

03:38   15   Q.  And was there e-mail correspondence between the source and

16   the defendant prior to then, that referenced the meeting?

17   A.  Yes.  There were e-mails setting up the time and the place.

18   And in this particular case the defendant was requested to go

19   to the Hampton Inn at 1960 and 290 and park in a particular

03:38   20   area of the parking lot at a particular time and come to a

21   certain room where the CHS would be waiting, as if he had just

22   had a meeting with some unknown brothers prior to.

23   Q.  And what sort of staging did you do in the hotel room to

24   make it appear that he had just met with some brothers -- or

03:38   25   the brothers?

*Cheryll K. Barron, CSR, CM, FCRR*                      *713.250.5585*

03:38  1    A.   In addition, to putting the cameras in the room, we moved

2    the furniture to make it look like there had been a meeting

3    taking place on the table.   So, we had multiple chairs around

4    the table.   We had a traditional Arab or Arabic or Middle

03:39  5    Eastern tea set.   There were pistachios; there were dates;

6    there was a prayer rug visible in the room; there were some

7    religious items visible in the room.

8    Q.   And can you tell us, you know, briefly, how long did they

9    meet, where did they meet, and ultimately what happened?

03:39  10   A.   This meeting, we -- again, we gave the source very clear

11   directions, meeting -- meet in the hotel room but, if at any

12   time you don't feel comfortable in there or the defendant

13   doesn't feel comfortable in there, go to your car.   The car is

14   outside.   It's already prewired with audio and video.   And

03:39  15   then, if you get in the car, go to a particular location and

16   stay in that area and then come back.

17          They stayed in the hotel room about 30, 35

18   minutes.   The source decided at that time to have the defendant

19   go down to the car, which he did.   A minute later or so the CHS

03:40  20   joined him.   They both got into the CHS's car and drove down

21   1960 for awhile, pulled into a Wal-Mart parking lot; then drove

22   back; sat in the hotel parking lot at least 25 minutes and

23   talked.   And at the end of the meeting, surveillance observed

24   the defendant exit, get into his vehicle, and return back

03:40  25   towards Hempstead.

03:40   1    Q.  Let me take you to February 3rd of 2010, and I'm not going
        2    to ask you what happened all during that meeting.  But was
        3    there a proposal for a note that was given on that date in
        4    regards to what you would call a "dead-drop" or a covert --
03:40   5    covert communications?
        6    A.  Yes.  We had already started in this investigation with the
        7    note passing and some of the props in the car to make it seem
        8    as if the CHS was involved in some unknown activity that wasn't
        9    to be made public.
03:41  10              So, in an effort to fulfill that and also the
       11    fact that one of the "42 Ways" that I know the defendant had
       12    received is that jihad -- the work of jihad is clandestine in
       13    nature and needs to be kept secret, it's a need-to-know basis,
       14    and all these type of things, we decided to give a note to the
03:41  15    CHS to provide to the defendant, that a directed the defendant
       16    to on the -- at the next meeting, which was February -- later
       17    in February, that he was going to go to a particular place, be
       18    there at a particular time, and -- go to Navasota, Texas, park
       19    at a gas station at the air-and-water station, walk across the
03:41  20    parking lot; and behind the ICE machine that the -- where you
       21    buy ice, there was supposed to be a note with more
       22    instructions.
       23    Q.  Okay.  And what did the agents do to prepare for these what
       24    we'll call "dead-drop" operations?
03:42  25    A.  We come up with instructions.  We write them out.  We have

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:42   1    the CHS rewrite them in his own hand.  We get whatever the note

2    is ready.  We emplace it.  We photocopy it or photograph it

3    before we put it there.  And then one of the agents is

4    responsible to observe it the whole time and then, at the

03:42   5    conclusion of the op, go back and make sure that whatever it

6    was is no longer there.

7    Q.  And where did you place things for this operation?

8    A.  There was a note taped behind the ice machine at the Shell

9    station in Navasota.  And inside the Ziploc bag was a note and

03:42   10   a 20-dollar bill.

11   Q.  And was there any other information or notes or other items

12   that were placed during this dead-drop?

13   A.  That dead-drop directed the defendant to go to College

14   Station, about 20 miles away, conduct some certain activities

03:43   15   in the mall, go back to his vehicle, which he did.  And on his

16   vehicle there was another note that directed him back to

17   Hempstead, at the McDonald's that the defendant and the CHS had

18   previously met at when he got out of jail.

19   Q.  And in this last meeting spot, was the defendant supposed

03:43   20   to bring the source some items that he had received to show

21   that he had completed the task that had been ascribed to him?

22   A.  Right.  When he got to Navasota, he was directed to go into

23   a particular entrance of the mall, exit at a different

24   entrance, not talk to anybody, and obtain proof that he had

03:43   25   been in the mall.  And when we concluded the meeting, we

03:43   1   recovered three items that the defendant provided the CHS as

    2   proof that he had been in the mall.

    3   Q.  And did surveillance observe him doing the things that he

    4   was directed to do at the mall?

03:43   5   A.  Yes, sir.

    6   Q.  Now, on February 21st there was another meeting between the

    7   defendant and the source.  And preceding that, there was an

    8   e-mail --

    9        THE COURT:  All right.  Hold it now, counsel.  It's

03:44  10   exactly 3:45.  I want to stick to the general schedule.  It's

   11   always worked.  We're going to take a break.  The first break

   12   is generally either 15 or 20 minutes.  We'll take 20 minutes,

   13   allow everybody to have a break.  Then we'll go on, and we'll

   14   adjourn between 6:00 and 6:05.  But we will take a short

03:44  15   10-minute break somewhere in between there, just a short break,

   16   so we don't go over two hours without a break.

   17        So, at this time, it's right at 3:45.  Please be

   18   back, ready to resume, in 20 minutes.  We'll see you at that

   19   time.

03:44  20     (Recess was taken)

   21        THE COURT:  Thank you.  Be seated.

   22        All right.  Let's continue, please.  All right.

   23        MR. McINTYRE:  Yes, your Honor.

   24   BY MR. McINTYRE:

04:09  25   Q.  Agent Cannon, let me show you what is marked and admitted

04:09    1    as Exhibit 151 and have you tell me what Exhibit 151 is.

    2    A.  It's an e-mail from an e-mail account that the defendant

    3    had created and was using at the time, to the e-mail that the

    4    CHS was using at the time, dated February 19th.  And it's --

04:09    5    the defendant replies that he will be at the place that the CHS

    6    suggested he be at, which is at the bottom of the e-mail.

    7    Q.  And it tells him to go to a particular store and look under

    8    some bags?

    9    A.  Right.  The meeting previous to this, there were -- there

04:10   10    was what we call a "dead-drop."  It's kind of an espionage

   11    trade-craft kind of thing, which we're following on the "42

   12    Ways."  And prior to this meeting, the defendant had provided

   13    to this e-mail account some US cases, criminal complaints, and

   14    indictments via e-mail, some PDF documents.

04:10   15            THE COURT:  What was that for?  What was the purpose

   16    of that?

   17            THE WITNESS:  The defendant was providing the CHS

   18    these documents --

   19            THE COURT:  He was providing your person?

04:10   20            THE WITNESS:  Yes, sir.

   21            THE COURT:  All right.  These documents.

   22            THE WITNESS:  Yes.

   23            THE COURT:  Okay.  That was, it flowed from the

   24    defendant to the government's agent?

04:10   25            THE WITNESS:  Yes, sir.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:10  1         And upon reading those, they were the criminal

2    complaints of recent FBI counterterrorism stings throughout the

3    US.  One in particular was in St. Louis.  Another one was in

4    Dallas.  We read those because the defendant read them, and was

04:10  5    looking for someone -- what he called a "manafa," which is a

6    hypocrite, somebody working for the government, which, again,

7    was one of the "42 Ways," to look for those people.  He was

8    looking at those complaints as ways that the government would

9    try to arrest people.  So --

04:11  10   BY MR. McINTYRE:

11   Q.  And, so, did you feel like, since he was familiar with

12   these complaints and the tactics the FBI used in these previous

13   cases, that you needed to do something different than what was

14   outlined in the criminal complaints that the defendant had sent

04:11  15   to the confidential source?

16   A.  Right.  And we also knew that what the defendant had read

17   about jihad work being clandestine and secret by nature, we had

18   instructed the CHS to inform the defendant that that's the way

19   the brothers that the CHS was part of, that's the way they

04:11  20   communicated, you had to go to dead-drops, which are indirect

21   means of communication, which means there's no two people in

22   the same place at any given time.  So, in this one, we created

23   this e-mail, had the CHS in the same method I already described

24   send it.  And it directed the defendant, at a certain place --

04:12  25   at a certain time on that day to go to a Randall's Grocery

04:12   1   Store, go to a particular aisle that had a brand of chips

2   called "Flamin Hot Funyuns" and reach in that area to look for

3   instructions for the rest of the evening.

4   Q.   And can you tell me ultimately what transpired on the

04:12   5   evening of February 21st of 2010?

6   A.   Surveillance observed the defendant driving in a white Geo

7   Prizm registered to Ernestine Johnson, drove to this area, went

8   into the store and, I mean, got almost waist deep into the

9   aisle looking for a note which we did not place.  We ended up

04:12   10   having to place it on the defendant's windshield so that -- and

11   then, eventually, the defendant retrieved the note, followed

12   the remainder of the directions on the note, which were to

13   cross under 290, there's an Academy parking lot there, there's

14   a Chinese food restaurant in that lot.  He was instructed to go

04:13   15   to that lot and approach the CHS's car only when the CHS's

16   headlights were on.  And we observed him do that.  He got into

17   the CHS's car, sat for 45 or 50 minutes.  And, then, at the

18   conclusion of that meeting, the defendant was observed leaving

19   in his own car.

04:13   20   Q.   Was a note provided from the confidential source to the

21   defendant on the February 21st meeting with additional

22   instructions?

23   A.   Yes.  We drew up a note, had the CHS rewrite it.  And the

24   note gave the CHS instructions for the next night -- so, this

04:13   25   was February 21st -- for instructions for on February 22nd to

04:13   1   create a new e-mail address, a Yahoo! account.  It provided the

2   defendant eight quarters, told him to bring them, and directed

3   the defendant to a particular HEB in Cypress, Texas; park at a

4   particular location, walk a certain way, go to a certain

04:14   5   newspaper stand.  And the defendant was shown a magnetic key

6   box that's a small black box that's got a sliding door that you

7   usually place under your key and hide a spare key.

8           THE COURT:  Place under your key or under your car?

9           THE WITNESS:  Under you car, your Honor.  And it

04:14   10  usually contains a key.

11              He was told to look for that at a particular

12  newspaper stand.

13  BY MR. McINTYRE:

14  Q.  And what sort of preparations did you and other agents take

04:14   15  for this February 27, 2010, what you call "dead-drop" or covert

16  communication exercise?

17  A.  On February 22nd, prior to the meeting, the first place

18  that the defendant was supposed to go, we set up surveillance

19  at multiple locations and we -- we created a number of notes

04:14   20  with props, that would lead, if the defendant chose to do it

21  and follow the instructions, would lead him throughout the area

22  of Cypress and ultimately end up in one location with certain

23  items --

24              THE COURT:  Now, what's the purpose of that, of that

04:15   25  operation?  I mean, you know, that complexity.

1          THE WITNESS:  Well, your Honor, at this point in time

2     we wanted to determine if the defendant was willing to go to

3     lengths in order to remain associated with the CHS who he

4     believed to have like minded radical ideologies.  Also, we were

5     mirroring the things we knew about that the defendant had

6     looked at and received prior to our insertion of a CHS.  For

7     example, the document from Anwar Awlaki specifically mentions

8     that the work of jihad by the mujahideen is clandestine and

9     secret in nature and we need -- and that the people that

10    practice it need to be careful with what they say and be

11    careful how they communicate.

12          The defendant, in his open words, previously said

13    he didn't trust phones.  So, we were trying to use these

14    dead-drops to mirror what we thought that the defendant was

15    already expecting to see if he was talking to one of a jihadi

16    nature, to see his -- to gauge his willingness to go through

17    what's -- what's considered by many not normal behavior,

18    running around in the middle of the night, sneaking under many

19    different items --

20          THE COURT:  All right.  All right.  Go on.

21    BY MR. McINTYRE:

22    Q.  Okay.  And, so, to summarize, on February 22nd, there was

23    surveillance; and it observed him go to these various locations

24    and retrieve these various items.  Is that correct?

25    A.  Yes, sir.

04:16   1    Q.  And let me show you some photographs, starting at

2    Exhibit 146, and have you explain to the judge what these

3    photographs are that were taken on the night of February 22nd.

4    A.  This is the defendant reaching into the previously

04:16   5    described newspaper stand.  That's at the HEB, entrance of the

6    HEB, which is where we told him to be.

7    Q.  And what was he reaching inside the stand for?

8    A.  He was told to look for one of those magnetic key boxes he

9    had seen the night before.

04:17   10   Q.  And let me show you what is admitted as Exhibit 147.

11   A.  If you look closely, you can see, instead of reaching in

12   the bottom part of the newspaper stand where newspapers should

13   be, he's reaching to the upper, the roof section, where the key

14   box would be.

04:17   15   Q.  And Exhibit 148, is also a surveillance photo.  Is that

16   correct?

17   A.  It's a close-up.

18   Q.  And 149?

19   A.  That's a surveillance photo of him walking away with one of

04:17   20   the newspapers.

21   Q.  And Exhibit 150?

22   A.  You can see the newspapers in front.  He's looking at

23   something behind it, and I believe that to be the key box.

24   Q.  And if we go to Exhibit 144, can you explain to the Court

04:17   25   what Exhibit 144 is?

*Cheryll K. Barron, CSR, CM, FCRR*                        *713.250.5585*

04:18  1    A.  That's the note that was in the key box.  Prior to us

2    putting it in there, we photographed it before we did that.

3    And it basically instructs him to go to another location in

4    Cypress and retrieve an item.

04:18  5    Q.  Let me show you what is marked Exhibit 142 from that same

6    operation.  And what is Exhibit 142?

7    A.  This is another note that was retrieved out of a "Houston

8    Chronicle" newspaper stand in front of the Wal-Mart in --

9    again, in Cypress.

04:18  10   Q.  And what is the 20-dollar bill that's contained there in?

11             THE COURT:  It was what?  What was the purpose of it?

12   What was it there for?

13             THE WITNESS:  The 20-dollar bill?

14             THE COURT:  Yes.

04:18  15             THE WITNESS:  We didn't tell him.  It was just -- but

16   we told him to purchase an item in this note.  And we didn't

17   give him instructions on what to do with the 20, but we

18   anticipated he would use the 20 to purchase the items.

19   BY MR. McINTYRE:

04:18  20   Q.  And let's look at Exhibit 145.  Again, from this same

21   operation, what is Exhibit 145?

22   A.  This is a note that was hidden in the CHS's gas cap.  And

23   the defendant was directed, near the end of the operation, to

24   end up at the car.  And this is a note that directs the

04:19  25   defendant to do four or five more things on his way to meeting

04:19  1  the CHS.

2  Q.  Now, there was a short meeting on March the 4th of 2010.

3  Is that correct?

4  A.  Yes.

04:19  5  Q.  Can you briefly tell us what occurred at the meeting of

6  March the 4th, 2010?

7  A.  The CHS arrived at the defendant's apartment complex,

8  walked inside.  They had prayer together.  This was very early

9  morning.  It's called a "fajr" prayer, which is the first

04:19  10  prayer of the morning.  They weren't inside more than a few

11  minutes.  They came outside and sat in the car together, the

12  CHS's car, which is wired.  And after a short meeting, they --

13  the defendant went back into his house.

14  Q.  Now, there was a more substantial meeting on March the 14th

04:20  15  of 2010.  What sort of planning and preparation did you take in

16  anticipation of the March 14th, 2010, meeting between the

17  confidential source and the defendant?

18  A.  Again, this had some degree of secrecy and trade craft in

19  it, as well.  By this point in the relationship, they had

04:20  20  created, between the defendant and the CHS, code words, a word

21  to represent a place that they had previously been.  And in

22  this particular case, on the 14th, they were supposed to meet

23  at "ice," which is the place I previously mentioned where there

24  was something hidden behind the ice machine in Navasota.

04:20  25          They met at the time.  What we set up was that

04:20   1   the -- the CHS was to take the defendant to a particular

2   pharmacy in College Station to obtain passport photos and then

3   go to another location and obtain a dead-drop of a French book.

4   Q.   And where would the French book be that was at the

04:21   5   dead-drop?

6   A.   It was hidden in a newspaper stand outside the IHOP in

7   College Station.

8   Q.   Now, during the course of the surveillance, did you see the

9   defendant and confidential source drive to two separate

04:21   10   pharmacies?

11   A.   Yes.

12   Q.   And what did you learn about whether the pharmacies could

13   make the passport photos that were requested of the defendant?

14   A.   Both pharmacies were open, but the person that took the

04:21   15   passport photos was not there; so, they weren't able to take

16   photos.

17   Q.   And then, ultimately, what happened after they weren't able

18   to get the passport photos from the two pharmacies?

19   A.   This was a meeting that we had instructed the CHS to

04:21   20   finally say exactly who he worked for and who he was a part of.

21   And he told him -- told the defendant he worked for al-Qaeda in

22   the Arabian Peninsula.  And previous to this -- we chose

23   passport photos specifically because the defendant did not have

24   a passport but said he didn't want to obtain another one.  So,

04:22   25   after both pharmacies did not have passport photos, the CHS

04:22   1   began to text with his phone me and then, eventually, when they
        2   returned to Navasota, the CHS came up with an excuse for the
        3   defendant to leave the vehicle.  So, the CHS called me for
        4   permission -- this is an example of the CHS is kept in certain
04:22   5   guidelines and can't act on his own -- called me for
        6   permission, because the defendant had offered that he still had
        7   passport photos left from his previous attempt to travel in
        8   2009 and could take the CHS to his house, his apartment, to
        9   pick those up.  The CHS was asking for permission from me to do
04:22  10   that.  I gave it to him.
       11   Q.  And then, after you gave him permission, what was he
       12   observed on surveillance doing?
       13   A.  They left the McDonald's and went back across the street to
       14   where the defendant had his vehicle.  The CHS followed the
04:23  15   defendant back to the apartment.  I recall distinctly being
       16   behind him, and he was going at a high rate of speed past a
       17   marked unit that had pulled someone over, drove past the Waller
       18   County jail, that I knew he was familiar with, drove to his
       19   apartment and ran inside, ran back outside, got back to the
04:23  20   CHS's vehicle and provided a single passport photo with his
       21   likeness.
       22   Q.  Let me show you what is marked as Exhibit 187 and ask you
       23   if you recognize 187.
       24   A.  It's a photocopy of the passport that I seized out of the
04:23  25   CHS's car after the defendant placed it there.

Q.  Now, on March 29th, 2010, there was a meeting.  Can you tell me what the purpose of the meeting was in regards to March 29, 2010?

A.  For purposes of the investigation, all throughout this, there's -- you have to understand there's a number of e-mails going on between this -- there's a lot of conversations between the CHS and the defendant, and we're reacting to what they say. And in this case, we assessed that the defendant was getting a little bit antsy about getting overseas as soon as possible.

So, the purpose of this meeting was to meet, carry on the conversation, discuss the steps that both of them were taking in order to get the defendant overseas and specifically take the defendant by the Prairie View volunteer fire station, which is about a mile away from the defendant's residence.

That was the place, we informed the CHS, that would be the meeting location when the defendant, if he agreed to, eventually would leave the country from.

Q.  And this place, this volunteer fire department, where he was going to have the meet when he left the country and went overseas, did the defendant and the source come up with a code name for that particular location that they were supposed to meet at?

A.  They did.  They used codes frequently at this point in e-mails.  But the defendant was instructed that this

04:25   1   particular -- when they finally left, it would be done by a

2   text message.  So, they needed a word; and the defendant chose

3   "hot fries."

4   Q.  "Hot fries"?

04:25   5   A.  "Hot fries."

6   Q.  Now, let me show you what is marked as Exhibit 192.  And

7   can you tell me what Exhibit 192 is?

8   A.  It's a response from the CHS back to -- PatLex19@Yahoo.com,

9   which is an e-mail account created by the defendant.  And it's

04:25   10   a response to the lower e-mail, where the defendant puts

11   together a list of things that he will need in order to go what

12   they called "camping," which was to travel overseas.

13   And by this point the defendant had already been

14   told that the CHS worked for AQAP, which is al-Qaeda in the

04:26   15   Arabian Peninsula.

16   Q.  And what were the items in the e-mail that the defendant

17   listed as items that he could use to go "camping," which meant

18   going overseas?

19   A.  A good backpack, good walking shoes, a sleeping bag, a rain

04:26   20   jacket, a travel towel, a water bottle, a first aid kit, a

21   personal pouch to hold valuables, food stuff.

22   Q.  Now, there were multiple e-mail accounts that the defendant

23   used during the course of his communications with the

24   confidential source.  Is that correct?

04:26   25   A.  Yes, sir.

04:26  1   Q.  And many, if not all, of those e-mails contain the number

2   19.  Is that correct?

3   A.  Some of them do, yes.

4   Q.  And what's the significance of the number 19 that's

04:26  5   contained within the defendant's e-mails?

6   A.  The defendant was asked to create e-mails that wouldn't

7   lend themselves to be tracked.  And one of which -- like, one

8   example is use certain letters that don't exist in the Arabic

9   alphabet and then choose a favorite number.  The defendant

04:27  10   chose 19.  And based on my training and experience, people that

11   think the way that the defendant does, 19 has a symbolic value

12   because of the 19 hijackers.

13          THE DEFENDANT:  Objection.

14          THE COURT:  What's the objection?

04:27  15          THE DEFENDANT:  He's basing that purely off

16   speculation.  There's nothing where I've ever mentioned why I

17   personally have 19 as a favorite number.  That's always been my

18   favorite number, and it's not for the reason he just listed.

19          THE COURT:  Response?

04:27  20          MR. McINTYRE:  It's based on his training and

21   experience, your Honor.

22          THE COURT:  All right.  Then, hearing the defendant's

23   objection -- okay?  Overruled.  But I'll allow it to go to the

24   weight, not to the basic admissibility.  Basic admissibility is

04:27  25   objection sustained.  As to what weight we give it, I

04:27  1    understand your position and will consider it.

2                   Go right ahead.

3                   MR. McINTYRE:  Yes, your Honor.

4    BY MR. McINTYRE:

04:28  5    Q.  Now, after the e-mail that's shown in Exhibit 192 regarding

6    camping and the things that they needed to have for camping,

7    was there a meeting on April the 9th of 2010?

8    A.  Yes, sir.  We set up a meeting where we -- the CHS and the

9    defendant would meet.  They will travel to the same Starbuck's

04:28  10   they had been in to -- by the Best Buy on January 20th.  And

11   the defendant was directed to bring the items that he had

12   already procured for his travel, so that the CHS could offer

13   his advice and determine whether or not it was suitable for

14   where he was going and the austere conditions.

04:28  15   Q.  And did that -- did surveillance observe that meeting

16   transpire?

17   A.  Yes.

18   Q.  And were they observed looking at the camping items, so to

19   speak, that were contained within the vehicle?

04:29  20   A.  Yes.  The defendant and the CHS were observed at the trunk

21   of the defendant's white Prizm.

22   Q.  Let me show you what is marked as Exhibit 195, and can you

23   tell me what Exhibit 195 is?

24   A.  That's the defendant on the left, as I'm looking at it, and

04:29  25   on the right is the CHS and inside the trunk they're looking

04:29   1    and touching the items that -- the camping items.

     2    Q.  Now, on April 23rd of 2010 did you make preparations for

     3    another one of these dead-drop meetings that was supposed to

     4    take place at Memorial Park?

04:30   5    A.  Yes.  We -- there was a number of e-mails setting up the

     6    meeting, again using the code words "Meet at Chinatown," which

     7    was the Chinese restaurant they met at after looking for the

     8    note behind the Flamin Hot Funyuns on February 21st.  The

     9    instructions were given to the defendant to wear workout

04:30  10    attire.

    11          Again, we were going back to the things that we

    12    knew the defendant had already discussed, about working out,

    13    and the things that were in the "42 Ways."

    14          We on -- we set up a dead-drop that was to be

04:30  15    explained to the defendant as if it was between two al-Qaeda

    16    operatives, al-Qaeda in the Arabian Peninsula operatives, where

    17    the CHS was supposed to receive travel documents for the two of

    18    them to travel overseas.  So, we set in place a dead-drop in

    19    Memorial Park in Houston.

04:31  20    Q.  And what items did you place out at Memorial Park?  How did

    21    you set up signals so that they would know where the pickup

    22    zone was, and then what items were used to conceal the false

    23    identification cards that would be used for travel?

    24    A.  We set up a fairly elaborate surveillance, both where --

04:31  25    wherever the defendant was and then at the actual site where

04:31  1   the cards were going to be placed.

2             At Memorial Park, we took two fraudulent TWIC

3   cards, which are Transportation Worker Identification

4   Credential cards, which are issued by TSA, used to get into

04:31  5   ports and other facilities that are controlled by TSA for

6   security reasons, created two fake cards, one bearing the exact

7   same photo that was provided by the defendant of himself on a

8   previous meeting to the CHS and the other with the CHS's photo.

9   We used a name that the defendant was currently using in his

04:32  10  e-mails and created some fraudulent dates of birth.

11            We wrapped those into a very tightly wrapped

12  package, containing a very short Arabic note as if it was from

13  one operative to another.  That, in turn, was placed inside an

14  empty playing card box, like poker cards.  All that together

04:32  15  was placed into a hollowed out rock and then placed at a

16  particular grove of rocks in Memorial Park, along the running

17  trail.

18            About 20 yards away, there's a small post and on

19  the post is a green plastic box that people, when they're

04:32  20  walking their dogs, can grab bags to pick up droppings.  And on

21  that post we placed a bandaid as if it was a signal from the

22  operative that left it to the operative that was to pick it up

23  that the thing that they wanted to pick up was actually there.

24  Q.  And did surveillance observe the defendant and the

04:33  25  confidential source after they arrived at Memorial Park, and

04:33  1   can you tell the Court what they did once they arrived there?

2   A.   They parked at the location that the CHS was directed to

3   park.  They exited.  They jogged for a very short distance.

4   Then they walked to the signal site, which is what I just

04:33  5   described, the doggie box.  And they went back to the grove,

6   which is -- there's a flag pole there and things.  And the

7   defendant was observed looking for the rock and was observed

8   picking up something and placing it -- he was wearing a track

9   suit at the time, and it was placed in the track suit.

04:33  10          The CHS was observed as if he was stretching on a

11   park bench, which is what he had been coached to do to make it

12   look like he was conducting countersurveillance.  And then they

13   both went back to the CHS's vehicle.

14          They were observed in a short period of time at

04:33  15   the rear of the vehicle.  It was an SUV.  The hatch was open,

16   and they were looking at a footlocker.  In two or three

17   minutes, they both got back in the car and drove back to what

18   was called "Chinatown."

19   Q.   What was the purpose of the confidential source and the

04:34  20   defendant looking at a black footlocker?

21   A.   We provided a footlocker, and we instructed the defendant

22   that all his items that he would need to travel needed to fit

23   inside that footlocker at the time of travel.  So, it gave him

24   an idea how much stuff he could bring or not bring.

04:34  25   Q.   Let me show you what has been admitted as Exhibit 217

04:34   1    that's related to this dead-drop operation and have you explain

2    what that is to the Court.

3    A.   These are pictures we took of the fraudulent TWIC cards.

4    The one on the left, as I'm looking at it, is the defendant's.

04:34   5    The one on the right is the one we created for the CHS.

6    Q.   All right.   And let me show you what is marked and admitted

7    as 218.

8    A.   These are the reverse side of both of those cards.

9    Q.   And 219?

04:35   10   A.   Those are the cards as they were -- these are pictures we

11   took as we were wrapping it, to do complete chain of custody.

12   So, they're being wrapped in some brown paper.

13   Q.   And 220?

14   A.   That's the note that was placed with the package.

04:35   15   Q.   And what language is that written in?

16   A.   It's in Arabic.

17   Q.   And 221?

18   A.   That's the complete package on the bottom, with the rubber

19   band, and the note again.

04:35   20   Q.   And Exhibit 223?

21   A.   That's what it would have looked like with a -- that's the

22   final package.   We photoed it before we put it in.

23   Q.   And 224?

24   A.   That's another view.

04:35   25   Q.   And 225, can you tell the Court what 225 is?

04:35   1   A.   That's the walking path -- or running path at Memorial

2   Park.  And that's the -- what I am calling the "signal site,"

3   on the far right.

4   Q.   And are you referring to the green box that's hanging on a

04:36   5   post?

6   A.   Yes, sir.

7   Q.   How did you signal with the drop zone?

8   A.   There was a bandaid placed on the side.

9   Q.   Let me show you what is marked as 226.  And what is this

04:36   10   location?

11   A.   There's a grove, what they call a "grove."  And that's the

12   George and Barbara Bush Presidential Grove.  And there's a flag

13   pole.  It's what you see on the far right.  And there's park

14   benches around it.

04:36   15          And this is a bunch of rocks, and there's a

16   plaque on that rock that's to the top middle.  And, then, right

17   dead center, the tan rock is our rock that we had hollowed out

18   as a concealment device.

19   Q.   And Exhibit 227?

04:36   20   A.   That's after the operation, to recover it, to ensure that

21   it was gone.  That's the reverse side of that same rock.  So,

22   that's the cavity where we hid the TWIC cards.

23   Q.   And Exhibit 229?

24   A.   At the conclusion of the meeting, as the CHS has always

04:37   25   been directed that he's not allowed to do anything with

04:37   1   anything he receives during a meeting, he exits the vehicle

2   after we do the post downloads of the devices.  And we photo in

3   place anything that's recovered.  In this case, there's the

4   note, there's the packing material, and then there's the

04:37   5   playing card box that all that was in.

6   Q.  And let me show you what is marked Exhibit 230, and can you

7   tell me what that is and how you came into -- it came into your

8   possession?

9   A.  This is a photocopy of some e-mail pages that were printed

04:37   10  out and provided by the defendant to the CHS during that

11  meeting.  They were folded over and had some -- you can see

12  copies of where there were some highlighted marks.  Those were

13  highlighted by the defendant when he handed them to the CHS.

14  Q.  And the defendant handed these documents to the

04:38   15  confidential source in a -- I guess a hard paper format, not

16  electronically.  Is that correct?

17  A.  Yes, sir.

18  Q.  And what is the substance of this information, I guess,

19  that he has here and then also what he's highlighted for the

04:38   20  purposes of, I guess, the confidential source?

21  A.  This is a website GlobalSecurity.org, where you can --

22          THE COURT:  Slow down a little bit.

23          THE WITNESS:  Yes, sir.

24              This is a website.  It's called

04:38   25  GlobalSecurity.org.  You can find out all manners of things

*Cheryll K. Barron, CSR, CM, FCRR*                        *713.250.5585*

04:38    1    dealing with intelligence and militaries globally.  This is a

         2    section on the MQ-1B Predator, which is commonly known as the

         3    "Predator," which is a drone, or unmanned aerial vehicle, used

         4    by the US.  And at this point in time and today, it's commonly

04:38    5    used in military operations.

         6                    There's highlighted portions about particular

         7    places where certain activities take place, dealing with what I

         8    am calling "drones."  What's highlighted on this page is the

         9    contractor, the defense contractor, that actually builds and

04:39   10    produces these for the US Military.  And it's in California.

        11    Q.  And if we go to Page 3, there's another document that was

        12    given to the confidential source by the defendant.  Is that

        13    correct?

        14    A.  Yes.

04:39   15    Q.  And what is this document in reference to that was given

        16    over by the defendant to the confidential source?

        17    A.  There's a couple of highlights at the bottom; and it's

        18    highlighting specific units that are resident on Creech Air

        19    Force Base, which is in the vicinity of Las Vegas, Nevada.

04:39   20    This is a followup to a number of e-mails and discussions

        21    between the defendant and the CHS about the use of drones by

        22    the US Military against jihadis and what they -- the defendant

        23    and the CHS call "brothers" over in Afghanistan and Yemen and

        24    Iraq.

04:39   25                    THE COURT:  State again if you would -- maybe I missed

04:40    1    it.  Where does your understanding -- what is your

         2    understanding as to where the defendant got that?

         3                THE WITNESS:  My understanding --

         4                THE COURT:  By "that" I mean -- what exhibit number?

04:40    5                MR. McINTYRE:  It's 230, your Honor.

         6                THE COURT:  Yeah.

         7                THE WITNESS:  The Internet, your Honor.

         8                THE COURT:  Right off the Internet.

         9                THE WITNESS:  Printed out, highlighted, and delivered.

04:40   10    BY MR. McINTYRE:

        11    Q.  And during the course of your investigation, were there

        12    multiple e-mails --

        13                THE COURT:  Hold it.  Let me just ask you this.  Is

        14    this -- is this one of the items -- I'm looking at the

04:40   15    indictment.  This, then, is not one of the public access

        16    restricted US Military publications, right?

        17                THE WITNESS:  No, your Honor.

        18                THE COURT:  It is not.  Okay.  It's just adding to the

        19    weight of intent, I suppose.  Is that correct?

04:40   20                THE WITNESS:  Yes, your Honor.

        21                THE COURT:  Okay.  Thank you.

        22    BY MR. McINTYRE:

        23    Q.  And during the course of the correspondence between the

        24    source and the defendant, were there many e-mails from the

04:40   25    defendant that referenced drones and Predators and unmanned

04:40    1    aerial vehicles?

         2    A.   There were.   And to include actual publicly available

         3    US Army manuals on unmanned aerial vehicles, which is a drone.

         4    Q.   Now, let me take you to -- there's essentially two more

04:41    5    meetings.   Let me take you to a meeting on May the 3rd of 2010.

         6    And let me ask you what the purpose was of that meeting and

         7    what sort of preparation you took in anticipation of it.

         8    A.   We were -- "we" is the FBI, the JTTF -- were ready to -- we

         9    believed that the defendant was ready to travel and he knew the

04:41   10    person he was traveling with was a member of al-Qaeda in the

        11    Arabian Peninsula.

        12              So, in order to make the trip logistically

        13    feasible and plausible, we had to do a number of things.   And

        14    in this particular meeting, we had already -- by this point we

04:42   15    had already shown him TWIC cards and kept them.   This meeting

        16    that we're about to talk about on the 3rd, the goal was to

        17    provide the defendant with a cell phone, prepaid cell phone, so

        18    that the final meeting can be communicated by text message.

        19              And, then, the second goal was to show the

04:42   20    defendant some public access restricted military manuals and

        21    publications, one of which was dealing with UAVs, or drones;

        22    make sure that the -- we directed the CHS to make sure he told

        23    the defendant that they were restricted.

        24              And then we set up some props in the car to make

04:42   25    it look like the CHS had traveled recently and been provided

04:42   1   these public access restricted manuals to be shown to the
        2   defendant because the defendant had shown to the CHS that he
        3   knew a lot about drones and was willing to find out things
        4   about drones.
04:43   5           THE COURT:  Were they truly restricted or you just
        6   said that -- your person said that they were?
        7           THE WITNESS:  Your Honor, they were.  We went to the
        8   military and requested them, and they were restricted.  They're
        9   marked, clearly marked on the front and the back.
04:43  10   BY MR. McINTYRE:
       11   Q.  Let me show you what is marked as Government's Exhibit
       12   Number 279, and I'll ask you what Government's Exhibit 279 is.
       13   A.  It's a photograph of one of the public access restricted
       14   manuals.
04:43  15           This one is -- in the upper right-hand corner is
       16   essentially the way the military tracks a manual.  It's "FM,"
       17   which is "Field Manual" and it has a number and then it has a
       18   title.  In this case the title is "Army Unmanned Aircraft
       19   Systems Operations."
04:43  20   Q.  And in the first paragraph below that, does it talk about
       21   the restrictions associated with this manual?
       22   A.  Yes, it does.
       23   Q.  And let me show you what is marked as Government's Exhibit
       24   280 and ask if you recognize Government's Exhibit 280.
04:44  25   A.  Yes.

04:44  1    Q.  What is this --

2              THE COURT:  Let me ask you this.  Do you know if any

3    copies were made by the defendant of those restricted manuals

4    before the final arrest was made in this case?

04:44  5              THE WITNESS:  Your Honor, based on our agreement with

6    the military and the way we set up the operations, the

7    defendant was never allowed to take the manuals away from a

8    meeting in this particular meeting.  And then, when he was

9    provided them on the day of his arrest, he would not -- he did

04:44  10   not have access to a copier.

11             THE COURT:  What, he was provided them before he got

12   on that boat to Yemen?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  All right.  That's how it worked?

04:44  15   BY MR. McINTYRE:

16   Q.  And Exhibit 280, can you tell me what that is and what the

17   title of that particular military manual is?

18   A.  The title is "CALL," C-A-L-L, which is -- it's "Center for

19   Army Lessons Learned," which is a place at Fort Leavenworth

04:45  20   where they study different things that have taken place in

21   battles in order to learn lessons, as it implies.

22             The title of it is "Weapons Effects in Urban

23   Operations."  And it says at the bottom, "Tactics, Techniques,

24   and Procedures."

04:45  25             I reviewed this at the time that we chose it.

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

I'm familiar with it from my time in the military.  It's classified.  It's for official use only.  It's only allowed to go to certain countries, and it's supposed to be destroyed otherwise.

But it specifically deals with how well the weapons that the US Military had when they went into Afghanistan worked, and it's designed to provide military commanders that are about to deploy in Afghanistan some guidance on should you use this weapon versus that weapon or this type of round versus that type of round because -- whether it's working or not.

Q.  Now, also during this meeting, you talked about providing the defendant a phone.  Is that correct?

A.  Yes, sir.

Q.  And what was the purpose of providing the defendant a phone on May the 3rd, which was preceding the May 30th, 2010, meeting?

A.  Again, continuing the clandestine nature of the work that, you know, something so important as a message to travel overseas to be with al-Qaeda in the Arabian Peninsula, we were going to switch up communications again.  Instead of the same old e-mails, there would be text messages created and sent.

So, the FBI, we purchased a couple of -- two prepaid cell phones, made sure they had service, provided the two to the CHS with instructions to provide one to the

04:46  1   defendant, for the two of them to make sure they worked, and
       2   then instruct the defendant this was to be used only for --
       3   checked at certain times of the day and that if he got the
       4   message for hot fries then that meant to go to the place that
04:46  5   they had already seen and that was the day they were leaving.
       6   Q.  Now, preceding the May 30th, 2010, meeting, how did the
       7   confidential source communicate to the defendant that he was to
       8   meet at hot fries and ultimately leave the country?
       9   A.  There was a text message and then there was -- it was
04:47 10   followed up with an e-mail.  And there may have been a second
      11   text message.  I don't recall.  But there was definitely one
      12   text message on the 29th telling the defendant that after
      13   midnight on the 30th, "hot fries."
      14   Q.  And, now, preceding this May 30th, 2010, operation, I
04:47 15   assume there was a lot of planning and preparation on the part
      16   of the FBI.  Is that correct?
      17   A.  Operation of this magnitude requires a lot of help.  We had
      18   to obtain search warrants.  We had to obtain an arrest warrant
      19   for charges.  We had to set up surveillance, both at the
04:47 20   residence of the defendant and then at the Port of Houston
      21   where we intended the defendant to go if he chose.  We had to
      22   arrange for cameras and all the recording devices.  We had a
      23   plane.  We had people to set up for interviews.  It was pretty
      24   extensive.
04:48 25   Q.  And just operationally, what was the plan as far as where

04:48  1   the confidential source would meet the defendant, what would
2   happen at the hot fries location, and then how they would
3   ultimately travel to the port, and then what would happen once
4   the confidential source and the defendant arrived at the port?

04:48  5   A.   Okay.  We broke it down into phases.  Essentially, the
6   first phase was send a message, "hot fries," and observe the
7   defendant, whether or not he chose to leave in the middle of
8   the night and go to the hot fries location.

9            Then there was going to be a meeting where the
04:48  10  CHS was going to drive the defendant to the Port of Houston.
11  That was going to be followed by ground units and air units to
12  observe -- this is nighttime, so -- to observe the defendant
13  and the CHS go to the port.

14           At the port, we had set up a number of cameras,
04:48  15  had a number of role-players at the port, one posing as a guard
16  at the gate, the entrance to the port terminal.  We had a
17  number of people set up to handle cameras.  We had a few people
18  set up to pose as workers on the ship and workers around the
19  dock in order to make it safe for the FBI to operate there at
04:49  20  2:00, 3:00 in the morning.

21  Q.   How did you gain access to a ship at the port?
22  A.   We talked to a couple of agencies within the US
23  Government -- coast Guard, ICE, Customs and Border
24  Protection -- and determined that there would be a ship at that
04:49  25  particular place at that particular time and requested

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:49    1    assistance of using the ship in the hours that it was not

2    operational.

3    Q.  Now, did surveillance observe the defendant leaving his

4    house on May 30th of 2010; and approximately what time was

04:49    5    that?

6    A.  Surveillance did observe him leave.  I don't recall the

7    exact time, but it was 15 minutes prior to the time when he was

8    directed to be at hot fries, which it's about a mile; so, that

9    was about right.  But it was 1:00 or 2:00 in the morning.  I

04:50    10    don't recall exactly.

11    Q.  Let me show you what is marked as Exhibit 300.  I'm going

12    to play a video clip that's marked as 300-1 and have you take a

13    look at that and have you tell the Court what this represents

14    or shows.

04:50    15       (Tape playing)

16    BY MR. McINTYRE:

17    Q.  Where were these photos taken from?

18    A.  This is an infrared camera on an FBI plane that's flying

19    overhead at 20598 Pine Island Road.  So, the defendant's

04:50    20    apartment complex.

21    Q.  And on the video, can you see a person that's walking

22    that's close to the crosshairs?

23    A.  Yes.  I can see a person with a backpack and something

24    looks like, in his right hand, a gym bag.

04:51    25    Q.  And approximately how long -- or how far was the distance

04:51   1   between the apartment and the meeting location which is called

2   hot fries?

3   A.  It was about a mile.

4            THE COURT:  So, he walked it?

04:51   5            THE WITNESS:  Yes, sir.

6   BY MR. McINTYRE:

7   Q.  And this particular clip is shot at the apartment, shows

8   him leaving the apartment during the early evening hours.  Is

9   that correct?

04:51   10   A.  Yes, sir.  This is still his apartment complex.  He's

11   walking toward the exit of the complex.

12      *(Tape playing)*

13   BY MR. McINTYRE:

14   Q.  And what location is he at in relation to the apartment

04:52   15   complex?

16   A.  His apartment would be to the left as you're looking at the

17   screen.  He just walked through the gate.  And, then, to the

18   upper right -- or upper right of the screen, where he's about

19   to walk past now, is the mailbox area.  The road to the screen,

04:52   20   the right, that he's about to walk on now is Pine Island Road.

21   So, that's the entrance to the apartment complex.

22            And hot fries would be to the top of the screen,

23   just keep walking down that road, make another turn or two.

24   Q.  Let me show you another clip from Exhibit 300, which is

04:52   25   going to show the defendant arriving at the hot fries location.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:52   1   And you can tell me what you see on the screen.

2        (Tape playing)

3   A.  To the left of the screen, the defendant is walking, near

4   the crosshairs.  To the bottom right, that's the CHS's vehicle.

04:53   5   I see him running over.

6                He's been waiting about seven minutes at this

7   point.  We were running a little late that day.  We were kind

8   of busy.

9   BY MR. McINTYRE:

04:53   10  Q.  What is the confidential -- what is the defendant doing in

11  relation to the confidential source's car at this point?

12  A.  He's trying to put things in the rear passenger door.  And

13  then the CHS comes out and directs him to put the stuff in the

14  back of the vehicle, which they're about to do.

04:53   15  Q.  Now, at some point during this video clip, did the

16  defendant get rid of the phones that were used to arrange the

17  meeting?

18  A.  Yes.  The defendant took the cell phone that he had and the

19  cell phone that the defendant [sic] had and goes and puts them

04:53   20  in the grass and dirt, kind of covers them up to hide them.

21             THE DEFENDANT:  Objection.

22             THE COURT:  What's the objection?

23             THE DEFENDANT:  That's a false statement.  The CHS --

24             THE COURT:  Hold it.  You can't testify at this point.

04:54   25  You object.  You're saying it's a false statement?  Overruled.

04:54  1              But we'll certainly consider your testimony as to
       2   what happened if you elect to testify.  Okay?
       3              You understand the objection?
       4              In other words, this is their position.  If you
04:54  5   elect to testify yourself, then certainly you may contradict it
       6   and tell us your version of what happened.  All right,
       7   Mr. Bujol?
       8              THE DEFENDANT:  All right.
       9              THE COURT:  All right.  So, that's where we're at.
04:54 10              Go right ahead, please.
      11      (Tape playing)
      12              THE COURT:  All right.  What now?
      13              THE WITNESS:  They're still packing the vehicle, your
      14   Honor; and they're about to leave in a few seconds, get rid of
04:54 15   the phones.
      16              THE COURT:  What exhibit is this, again, just for the
      17   record?
      18              THE WITNESS:  It's Exhibit 300.
      19              THE COURT:  Thank you.
04:54 20   BY MR. McINTYRE:
      21   Q.  And what are they packing into the back of the vehicle, if
      22   you know?
      23   A.  The same gym bag that -- there's him putting the phones
      24   down, the defendant.
04:55 25              The defendant -- all the items that had been

04:55   1   talked about in the camping list, all those items that had been

2   shown to the CHS on April 9 and discussed in e-mails, were in a

3   gym bag that the defendant carried.  And there was also a small

4   black backpack.

04:55   5        So, all those items -- the gym bag was placed

6   into a black footlocker.  The purpose of that was for our own

7   safety, the arresting officers.  We didn't know what he would

8   bring.  So, we wanted to secure it into a footlocker that we

9   could control once he got on the ship, if he went to the ship,

04:55   10   so that our guys would not be injured by anything he may have

11   brought.

12   Q.  Now, that shows the vehicle leaving.  Is that correct?

13   A.  Yes, sir.

14   Q.  All right.  Now, after they drove away from the hot fries,

04:56   15   or the Prairie View Fire Department location, where did the

16   vehicle travel to?

17   A.  We had instructed the CHS to take a very particular route

18   to allow us the most time at the port to order and stage

19   things.  So, he took what I would call an indirect route to the

04:56   20   Port of Houston from hot fries, drove to the Port of Houston.

21   Q.  Now, once they arrived at the port, were some of the -- can

22   you tell me what happened to the items that were in the

23   vehicle?

24   A.  Well, this particular port is access controlled.  You have

04:56   25   to have a reason to be there; you have to show identity -- a

04:56 1    card, TWIC card.  So, there's a gate.  You can't just wander

2    onto it.  It's surrounded by fence or water, because it abuts

3    the Ship Channel.

4    Q.  So, were they surveilled and actually photographed, the

04:56 5    defendant and the confidential source, entering the port?

6    A.  Yes.  We had -- one of the other officers on the JTTF was

7    posing as a security guard to accept the card and let them in.

8    And they were observed coming in -- coming into the facility

9    and parking.  And then the items in the vehicle were unloaded.

04:57 10            Prior to this meeting, we had provided the CHS a

11   satchel, a tan satchel, containing a number of items: currency,

12   foreign currency; GPS receivers; batteries; flashlights;

13   prepaid phone cards; SIM cards out of cell phones; the same two

14   manuals that were restricted that he had seen on May 3rd and

04:57 15   had some commentary about with the CHS; there was a military

16   style compass; and two notes written by the CHS to a gentleman

17   and purported to be part of the movement al-Qaeda in the

18   Arabian Peninsula, that the CHS was part of.

19   Q.  Approximately how much money was contained in the tan

04:58 20   satchel?

21   A.  Again, because the defendant sent us a lot of complaints,

22   we were very attune to what was going on any given day.  We

23   knew the defendant spent many, many hours a day on the

24   Internet.  He was using somebody else's WiFi in that apartment

04:58 25   complex.  He spent many, many hours online.  So, we knew if it

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:58   1   was on the news chances are he knew about it.  There had been

2   an arrest just before this of two gentlemen moving some

3   currency out of, I believe, Chicago airport.

4                So, we chose, instead of using American money,

04:58   5   which we thought might scare him, we used Euros.  And we

6   used -- it was approximately 5,000 US dollars' worth of Euros.

7   It's in the neighborhood of either 2,030 or 2,080 Euros in

8   paper money.

9   Q.  Now, these items that you just mentioned, once the

04:58   10   defendant and the confidential source arrived at the port, what

11   did they do with relation to those items?

12   A.  The defendant?

13   Q.  Yes.

14   A.  He received them, put them on over his shoulder, which

04:59   15   is -- the satchel bag had the one single strap.  And then also

16   had his other items.  The CHS that we have been talking about

17   was instructed to in the presence of the defendant provide some

18   other money to a person that was working for the FBI and who

19   was posing as a ship worker who was being bribed to move the

04:59   20   defendant overseas.  So, that all took place there near the

21   gate.

22                And, then, in a short while after that, an FBI

23   vehicle driven by another JTTF officer drove the three males

24   now -- the defendant, the CHS, and then the gentleman posing as

04:59   25   a ship worker -- drove them a third of a mile or so to the

04:59   1   dockside of the ship.

2   Q.   Let me show you what has been admitted as Exhibit -- I'm

3   sorry -- 302.   And it's marked on our program for video

4   purposes as 1D184.

05:00   5              Can you tell me what Exhibit 302 is?

6   A.   This is a video from a camera that was emplaced in the

7   warehouse at the port.   And it's facing the ship, and that's

8   the FBI vehicle I just discussed.   Right in the center of the

9   screen is what's called a "gangway."   So, that's the way that

05:00   10   anybody could get on the ship when it's pulled up alongside the

11   terminal.

12              That's the defendant.   There's the satchel.   The

13   gentleman in the reflective vest is the one I mentioned before,

14   and, then, the other person is the CHS.

05:00   15   Q.   And what is he retrieving from the back of the vehicle at

16   the time?

17   A.   That's the footlocker.   We had instructed the gentleman in

18   the reflective vest to act like he knew his way around the

19   ship.   So, he had to actually stop the defendant and get in

05:01   20   front because he thought it would look bad if the defendant

21   went up first.   But the defendant clearly left quickly and got

22   up on the ship.

23   Q.   And approximately what time is it right now when the

24   defendant is getting on the ship?

05:01   25   A.   I believe it's around 2:30 a.m.

05:01   1   Q.  And where is the cabin that he was being directed to at

2   this time?

3   A.  It would just be off to the right of the screen, where

4   they're -- where they're at now.  There was a maintenance cabin

05:01   5   just to the right.

6   Q.  Now, once the defendant boarded the ship with the items

7   that you previously talked about, which are charged in the

8   indictment as material support, how long was he in the cabin

9   before there was an arrest plan effected?

05:02   10   A.  I believe it was four or five, maybe six minutes.  We had

11   directed the arrest team at the briefing we wanted to give the

12   defendant time to enter the cabin and leave of his own accord.

13   And we tactically decided five or six minutes was appropriate.

14   Q.  Now, as a part of the arrest plan, who did you have go in

05:02   15   and effect the arrest on the defendant once he was in the cabin

16   of the ship?

17   A.  We had an FBI SWAT team enter the cabin and arrest him.

18   Q.  And once he was arrested, how long was it before he was

19   transported out of the ship?

05:02   20   A.  I believe he was left in the cabin about 10 minutes or so,

21   so that we could set the conditions on the dock and he could be

22   safely brought overboard.  We had a Coast Guard boat around the

23   corner in case anybody fell overboard or got pushed over board.

24   But we also wanted to have both of the

05:03   25   cooperating individuals, the CHS and the guy in the reflective

05:03   1   vest that we just showed, laid out like they were being
       2   arrested, as if everyone was being caught and everyone was part
       3   of the operation.
       4   Q.  What was the purpose of having the confidential source
05:03   5   appear as being arrested as the defendant left the ship under
       6   arrest?
       7   A.  That allowed myself and the other co-case -- the other case
       8   agent some flexibility when we got to the -- what we hoped
       9   would be a post-Miranda interview, to see where he thought what
05:03  10   was going on with what happened that night.
      11   Q.  Now, in relation to the cell phones, where it shows an
      12   individual walking away from the car and getting rid of cell
      13   phones, were those eventually recovered?
      14   A.  Yes.
05:03  15   Q.  Where were they recovered?
      16   A.  In the location that we just saw.  We sent an agent over,
      17   recovered them, and booked them into evidence according to
      18   procedure.
      19           THE COURT:  You mean out of where?  The dirt?
05:04  20           THE WITNESS:  Yes, your Honor.  It was --
      21           THE COURT:  Buried?
      22           THE WITNESS:  Yes.
      23           THE COURT:  You dug them up?
      24           THE WITNESS:  I wouldn't use the word "dug."  It was
05:04  25   covered, but it wasn't in a hole.

05:04  1          THE COURT:  All right.  Let me just ask.  It's now

2     5:05.  I plan to go on for another hour.  Do you want to take a

3     10-minute break?  Otherwise, we're going to keep going.  I'll

4     leave it up's to you-all?  Anybody want to take a break?

05:04  5          Cher, how you doing?

6          THE COURT REPORTER:  I'm fine.

7          THE COURT:  Anybody?

8          Come on.  We're all among family here, so to

9     speak.  Anybody want to take a break, rather than go two hours

05:04  10    straight?

11         You okay, Mr. Bujol?

12         Oh, you have to go?  My intern, law intern has to

13    go.  All right.  We'll see you tomorrow.  Got to go to school.

14         Aside from that, fine.  Let's just keep going.

05:05  15    BY MR. McINTYRE:

16    Q.  Let me show you Exhibit 303 and ask you to describe these

17    photos, and I'm going to go through a series of photos.  What

18    is Exhibit 303?

19    A.  This is a still taken from yet another person working on

05:05  20    the operation, at our direction, who observed the defendant and

21    the other gentlemen before they entered the ship.  In the upper

22    right-hand corner is -- I think one of our agents who's posing

23    as if he's a ship crew member, as well.

24    Q.  And let me show you Exhibit 304.  Again, that's another

05:05  25    photo.  Is that correct?

05:05  1    A.   That's the defendant --

2              THE COURT:  Is that going up to the ship, initially?

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  What we saw in the movie and in the video?

05:05  5              THE WITNESS:  Yes, your Honor.

6              THE COURT:  All right.

7              THE WITNESS:  And this is the defendant walking up

8    with the satchel, backpack; and then there's the footlocker

9    between the two of them.

05:05  10   BY MR. McINTYRE:

11   Q.   Let me show you what is marked as Exhibit 305, again,

12   another photo of the defendant walking onto the ship.  Is that

13   correct?

14   A.   Yes.

05:06  15   Q.   And let me show you what is marked as Exhibit 306.

16   A.   That's them actually on the ship at this point.  So, we

17   had -- as part of the operation had a number of cameras,

18   approximately eight or nine video at this location.  Because,

19   to us, that constituted -- getting on the ship was across the

05:06  20   threshold to go overseas.

21   Q.   And Exhibit 307?

22   A.   That's the defendant with the cooperator, the agent.  And,

23   then, the room that -- the hatch that you see to the right

24   that's got a little red emblem on it, that's the room that the

05:06  25   defendant went into and was eventually arrested in.

---

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:06   1    Q.   Government's Exhibit 308?

        2    A.   That's the door being opened to allow the defendant in.

        3    Q.   Now, starting on Exhibit 268, there's some -- these are the

        4    items seized from the defendant.   And let me show you what 268

05:07   5    is and have you describe it.

        6          THE COURT:   You're saying "seized from the defendant."

        7    Lay out where.   Was it in that trunk or was it in his backpack

        8    or whatever?

        9    BY MR. McINTYRE:

05:07   10   Q.   Okay.   Can you tell me what Exhibit 268 is?

        11   A.   It is a picture of the tan satchel prior to us executing --

        12   "us" is JTTF, myself and others -- executing a federal search

        13   warrant on the belongings of the defendant after he was

        14   arrested.

05:07   15         THE COURT:   You said you had that ahead of time?   You

        16   had that warrant ahead of time?

        17         THE WITNESS:   No, your Honor.   We had to get it after.

        18   After.   It had to be approved at Washington.

        19   BY MR. McINTYRE:

05:07   20   Q.   And can you tell me what Exhibit 269 is?

        21   A.   This is the backpack the defendant was wearing and the hat

        22   that the defendant was wearing when he got on the ship.

        23   Q.   And Exhibit 272?

        24   A.   These are the items -- a picture of the items as we were

05:08   25   doing the search warrant, of the tan satchel.

_Cheryll K. Barron, CSR, CM, FCRR_                              _713.250.5585_

05:08   1   Q.  And, again, that's the tan satchel that the photos and the
        2   video show the defendant getting on the ship with, correct?
        3   A.  Yes.
        4   Q.  Can you tell us what these items are?
05:08   5   A.  Upper left-hand corner there's a flashlight with a number
        6   of packs of Lithium batteries.
        7           THE COURT:  Is that what -- they had sort of like a
        8   red label on it?
        9           THE WITNESS:  Yes, your Honor.
05:08   10          THE COURT:  Okay.  We'll go left to right, and then
        11  keep going left to right, top to bottom.
        12          THE WITNESS:  Yes, sir.
        13          THE COURT:  All right.  In the middle, what is it?
        14          THE WITNESS:  Middle top, there's two GPS receivers
05:08   15  inside a Ziploc bag, with all the cables and manuals.  Next to
        16  that is a white envelope which contains the currency and the
        17  letters.  Underneath that is a Ziploc bag containing a few
        18  hundred dollars' worth of prepaid calling cards.  And there's
        19  also a SIM card for a cell phone in there.
05:08   20          Bottom left is the "Weapons Effects" restricted
        21  manual dealing with weapons in Afghanistan we talked about
        22  before.  Bottom middle is the distribution restricted UAV
        23  manual from the army.  Lower right is a package, the lensatic
        24  military style compass.
05:09   25  BY MR. McINTYRE:

05:09    1  Q.  Now, the envelope that contains the letters that's
         2  referenced in this photo, were those written in Arabic or
         3  English?
         4  A.  Arabic.
05:09    5          THE COURT:  What?  Say that again.
         6          THE WITNESS:  Arabic.
         7          THE COURT:  No repeat the question, please.
         8  BY MR. McINTYRE:
         9  Q.  The letters that are contained in the envelope that's
05:09   10  referenced in this photo, were those letters written in Arabic
        11  or English?
        12  A.  Arabic.
        13  Q.  And who was the letter addressed to and what was the
        14  defendant supposed to do with those letters?
05:09   15  A.  They were addressed to a person named Abu Bakr, who the CHS
        16  was directed to write the letters and inform the defendant that
        17  Abu Bakr was the person that was going to meet the defendant
        18  when he made it on the other end of the ship.  And there was a
        19  code word passed of how Abu Bakr would know it's the defendant
05:10   20  and how the defendant would know it's Abu Bakr.
        21          And the defendant was told to keep this with him
        22  at all times and provide those monies and these other items, to
        23  include the correspondence, to Abu Bakr.  Specifically the
        24  correspondence, they discussed that it had to do with what
05:10   25  mission that the CHS was in the US to complete.

05:10  1          THE COURT:  Which was?

2          THE WITNESS:  Prior to this, they had discussed

3    that -- the defendant was so interested in drones, the CHS

4    informed the defendant that his purpose for being in Texas, in

05:10  5    this general area, was to look at whether drones were flown out

6    of Ellington or other bases in the US to target al-Qaeda in the

7    Arabian Peninsula overseas, the armed drones with the Hellfire

8    missiles.

9          THE COURT:  Go on.  Next question.

05:11  10   BY MR. McINTYRE:

11   Q.  Let's go to Exhibit 274.  And these were the letters that

12   you referenced to go to Abu Bakr, correct?

13   A.  Yes, sir.

14   Q.  And 275, what is 275?

05:11  15   A.  The two letters are folded and then currency, the Euro

16   bills, are in that envelope.

17   Q.  The let me show you what is marked as 276.

18   A.  Those are the same bills splayed out to get an idea of the

19   volume.

05:11  20   Q.  277?

21   A.  Inside the Ziploc bag there's some SIM cards, and outside

22   the bag are a bundle of prepaid calling cards.

23   Q.  What is a "SIM card"?

24   A.  It's the card that goes in the phone, allows it to operate

05:12  25   and carries identifiable information.  Essentially, you can

05:12   1    move SIM cards between cell phone to cell phone and take the
2    information that's stored on the phone with it.  So --
3    Q.  Let me show you what's been admitted as Exhibit 278.  Can
4    you tell me what 278 is?
05:12   5    A.  It's a military style lensatic compass.
6    Q.  What does a lensatic compass do?
7    A.  It's a more accurate compass that -- you know, for land
8    navigation.  This one actually has some luminous radioactive
9    kind of isotope on it so it can be seen in the dark.  It's used
05:12   10   commonly, something very similar to that, in the military, US
11   military.
12   Q.  Show you what is marked Exhibit 279.  Again, that's a
13   restricted manual.  Is that correct?
14   A.  Yes.  And it's got the destruction notice to destroy by any
05:12   15   method that will prevent the disclosure.
16   Q.  And 280?
17   A.  That's the -- that's the "Weapons Effects" manual.  It's
18   restricted.
19   Q.  And Exhibit 282?
05:13   20   A.  That's the GPS receivers and all the accessories.
21   Q.  Now, during the course of this investigation, did you learn
22   that the defendant had hidden a file on his computer at home?
23   A.  Prior to this date, based off of looking at the audio and
24   the video of the meetings, of all the meetings up to this
05:13   25   point, there was discussion on multiple occasions by the

05:13   1    defendant that -- he actually joked and bragged that he was

2    going to take a page out of the CHS's book and hide a message.

3    Just like there had been messages hidden throughout the

4    operation for him, he was going to hide a message for his wife.

05:13   5    Because his plans were not to inform his wife of his leaving.

6            So, we were aware that he had a laptop somewhere

7    in the residence.  So, we took measures to obtain a search

8    warrant for the apartment and for the laptop in particular,

9    regardless of where it was located.

05:14  10    Q.  In addition, to obtaining a search warrant for this hidden

11   file on a laptop, did you also arrange for a forensic computer

12   specialist to be there to extract the file off the laptop?

13   A.  Yes.  As part of the operation, I discussed before, we had

14   multiple teams.  One of the teams was a search team for the

05:14  15   apartment.  And there was an interview team a part of it and

16   security and other things like that.  But in a case like this,

17   we think we know a lot; but we don't know if, at the last

18   minute, there's something out there that we don't know, the

19   defendant has a co- -- you know, someone he's confided in or

05:14  20   another person that may be of harm to us.

21           So, we planned to have a dedicated forensic

22   examiner from the FBI whose sole job was to deal with that

23   laptop.  And then we had an additional one to deal with

24   anything else that may be in there that we may or may not have

05:15  25   known about ahead of.

05:15   1    Q.  Let me show you what is Exhibit 107, which is the hidden

2    file we referenced that came off the defendant's computer.  I'm

3    going to play a portion of it and have you comment after on it.

4         *(Tape playing)*

05:17   5    BY MR. McINTYRE:

6    Q.  Now, in this portion of the video that the defendant -- or

7    and audio that the defendant made, what did you find of

8    significance in this first portion, specifically in reference

9    to a lot of the symbolism involved?

05:17  10    A.  It's about almost an 11-minute video in totality and --

11             THE COURT:  What's the cat in the bag?

12             THE WITNESS:  Well, your Honor --

13             THE COURT:  If you know.  I mean, if you know.

14             THE WITNESS:  Well, it's "the cat is out of the bag."

05:17  15    He's opening up his secret.

16             THE COURT:  Oh, I see.

17             THE WITNESS:  That's what I believe.  Before that, at

18    the very beginning, there was some -- it was almost a video

19    clip within this video; and that's a known jihadi website that

05:17  20    posts videos all the time.  It's the media arm of al-Qaeda and

21    other groups.  So, what I see in this is he wants to lay out

22    that there's this video.  And it's entitled "For My Wife."  You

23    saw all the calligraphy "For My Wife."

24             The cat out of the bag, it wasn't just randomly

05:18  25    placed there.  It's the cat's out of the bag, "I'm about to

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:18  1  tell you what's going on."

2  This picture here, just before this, it said

3  "as-sadiqeen," which he mentions in the -- that's the most

4  righteous.  He said that throughout this operation to the CHS,

05:18  5  it's -- that's the most righteous.  That's who he wants to be a

6  part of.

7  I think, by putting the name superimposed over

8  this picture, he's defining what he means the "as-sadiqeen"

9  are.  That's the most righteous.

05:18  10  BY MR. McINTYRE:

11  Q.  What's the symbolism of this picture of Islamic -- Islamic

12  fighters praying and their position within the prayer?

13  A.  Well, it shows four, I presume, men are praying in the

14  foreground.  There's rifles, four rifles visible.  A number of

05:19  15  them have RPG rockets on their backpacks.  So, they're praying.

16  But what's also symbolic to me is that they're at the front of

17  the prayer.  And based on my knowledge of the religion, those

18  at the very front when they deliver the prayers, that's a

19  position -- it's an honor -- an honor to be in the very front.

05:19  20  So, the people in the back would be less significant to whoever

21  is in the front.

22  *(Tape playing)*

23  BY MR. McINTYRE:

24  Q.  Now, can you tell me some things that you thought were

05:21  25  significant in this portion of the videotape, especially in

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:21   1   regard to the pictures and the words that were superimposed

2   over certain pictures during this presentation?

3   A.  Right.  This -- again, this was meant to be viewed after he

4   left, because he left unannounced to his family.  So, it's --

05:21   5   it walks through --

6           THE COURT:  When you say "his family," who do you --

7   who is it your position that composes his family?

8           THE WITNESS:  Ernestine Johnson, and then he had two

9   young children.

05:21   10          THE COURT:  Children.

11          THE WITNESS:  Okay.  There's pictures, and there's

12  words that come on.  And they go --

13          THE COURT:  Now, were his two children those -- that

14  brief picture of two youngsters?

05:21   15          THE WITNESS:  I believe they were, your Honor.  I'm

16  not a hundred percent.

17          THE COURT:  Okay.

18          THE WITNESS:  There's different words that pop up, and

19  it's a chronology of how they met.  For example, Qiran.com,

05:22   20  Q-I-R-A-N.com, was a dating site that I believe they met on.

21  It was the same site that we talked about earlier, where he had

22  a profile name of A_B_Jihad.

23              And then it moved into Belleville, which is

24  Belleville, Illinois.  Greyhound, they went by Greyhound to

05:22   25  meet.  Prairie View -- it's a symbolism.

05:22   1          And then it talks about Islam.  First it shows a
2    picture of Malcolm X.  Hijrah, and there's a picture.  And
3    then, behind it, there's a picture of Colleen LaRose, who is
4    commonly known as Jihad Jane.  She was arrested and I believe
05:22   5    convicted for material support charges and her role in a plot
6    to kill a Danish cartoonist that had portrayed the Prophet
7    Muhammad.  The next picture, a picture of Najibullah Zazi being
8    escorted by two FBI agents.  He -- what's significant about
9    that, when you see the word "hijrah" over it, it tells me that
05:23  10    the definition to the defendant is it's, after you accept
11    Islam, you make a hijrah.  And the two -- he chose the photos
12    to be superimposed are of two arrested terrorists who both, in
13    the course of their case, traveled overseas for various
14    purposes.  In the case of Najibullah Zazi, before he was
05:23  15    arrested in a plot to make a bomb in New York, he traveled to
16    Pakistan for training, maybe Afghanistan, as well.  I'm not
17    sure.
18          THE DEFENDANT:  I object to that.
19          THE COURT:  On what grounds, please, sir?
05:23  20          THE DEFENDANT:  He's giving his interpretation of
21    something that I created, and it's baseless.  He's not basing
22    it --
23          THE COURT:  Hold it, hold it, hold it.  I'm not going
24    to go into whether it's baseless or not.  Sustained as to the
05:23  25    form of the answer.

05:23  1                        You may rephrase the question.  Sustain the

2      objection.  On the grounds, basically, of speculation.  Just

3      rephrase it if you would.

4                MR. McINTYRE:  Yes, your Honor.

05:24  5      BY MR. McINTYRE:

6      Q.  Now, also in this there's a picture -- or the word "jihad,"

7      and there's a picture that's superimposed behind that.  Is that

8      correct?

9      A.  Yes.  It's the --

05:24  10               THE COURT:  Hold it, hold it.  Don't -- since we had

11     an objection, we're going to go question and answer in that

12     same area.

13                        Go on.

14                MR. McINTYRE:  Okay.

05:24  15     BY MR. McINTYRE:

16     Q.  Was there a picture associated with the term "jihad" on

17     this video?

18     A.  Yes.

19     Q.  Okay.  And who was that picture of?

05:24  20     A.  The late Osama bin Laden.

21     Q.  Let's move on to the next portion.

22         (Tape playing)

23     BY MR. McINTYRE:

24     Q.  Let me stop right here.

05:26  25                        And during the course of this portion of the

05:26    1   video, the defendant describes going to jail and then meeting

2   someone.  Do you have an opinion as to who he's referring to

3   and what he's referring to?

4   A.   I believe he's referring to the CHS at the operation in

05:26    5   November 2009 when he was arrested and placed in jail and met

6   the CHS in jail.

7   Q.   Now, during the course of the video, the defendant also

8   said he met a brother who worked for the mujahideen; and

9   associated with that is a picture with the words "AQAP"

05:26   10   superimposed over them.  Is that correct?

11   A.   Yes.

12   Q.   Is it your opinion, based on your knowledge of the case,

13   that the brother he's referring to is the confidential source?

14   A.   Yes.

05:27   15   Q.   And do you know, based on your training and experience, who

16   the three individuals in the picture under the caption "AQAP"

17   are?

18           THE COURT:  "Yes" or "no"?

19           THE WITNESS:  I don't know all their names, your

05:27   20   Honor.

21           THE COURT:  All right, then.  Follow it up.  You can

22   follow it up.  He doesn't know the exact names.

23           MR. McINTYRE:  All right.

24   BY MR. McINTYRE:

05:27   25   Q.   Not asking whether you know their names or not, do you know

05:27  1   what sort of position they hold within the organization that's

2   known as al-Qaeda in the Arabian Peninsula?

3   A.   Yes.

4   Q.   What position do these three individuals hold?

05:27  5   A.   One is a bomb maker.   One is a regional leader.   I'm not

6   sure about the gentleman that's off the stage.   And, then,

7   another one is, like, an external operations chief at the time.

8          THE COURT:   All right.   Just for the record, I think

9   he said that "AQAP" stands for, I guess, in English --

05:28  10          THE WITNESS:   Al-Qaeda in the Arabian Peninsula.

11          THE COURT:   Al-Qaeda in the Arabian Peninsula.   Okay.

12   BY MR. McINTYRE:

13   Q.   All right.   Let's play another portion.

14          (Tape playing)

05:28  15   BY MR. McINTYRE:

16   Q.   And, again, he's talking about a meeting with an

17   individual.   And based on your knowledge of the case, who do

18   you think he's referring to that he met in jail?

19   A.   The CHS.

05:29  20   Q.   All right.

21          (Tape playing)

22   BY MR. McINTYRE:

23   Q.   Now, toward the end of this clip, the defendant says, "not

24   just pray for hijrah but pray for victory."   What is the

05:31  25   significance that you attach to the photos that are associated

05:31  1    with "hijrah" and "victory" in this creation by the defendant?

2    A.   The picture of a plane right before this image, to me means

3    travel overseas in order to obtain victory.  And the picture is

4    of someone with a mask, wearing RPG with ammunition across and

05:31  5    looks to me to be possibly a suicide vest, or a satchel.

6         THE COURT:  Looks like somebody is carrying some sort

7    of shoulder fired missile, isn't it?

8         THE WITNESS:  Yes, sir, your Honor, a rocket propelled

9    grenade.

05:32  10   BY MR. McINTYRE:

11   Q.   Now, other portions of that audio, did you feel like he was

12   referring to or did you form an opinion that he was referring

13   to the source and his meeting with the source and those types

14   of things?

05:32  15   A.   Yes.

16   Q.   Was there anything else that was significant to you

17   regarding this portion of the video?

18   A.   The images with the chess set and the one before that of

19   the numbers that moved around, with the narrative of testing

05:32  20   one another, that corresponded with the whole course of the

21   operation, sending e-mails and codes and not initially trusting

22   one another.

23   Q.   All right.  Let's play the remainder of this.

24        (Tape playing)

05:36  25   BY MR. McINTYRE:

05:36  1   Q.  There's a reference in the video, "If we're not reunited in

2   life, we'll be reunited in heaven."  Based on your

3   understanding of the case, what do you think the defendant is

4   referring to in that particular section?

05:36  5   A.  If he dies on his journey, in the jihad, that he'll see his

6   family in heaven.

7   Q.  And what is the significance of the picture of the --

8   picture of the doors and they're opening up to heaven, in your

9   opinion?

05:36  10  A.  I believe it's showing that that's his ultimate

11  destination, is to go --

12          THE DEFENDANT:  Object.

13          THE COURT:  Sustained.

14              Objection, you say?

05:36  15          THE DEFENDANT:  Yeah.

16          THE COURT:  Sustained.  Uphold the objection.

17  BY MR. McINTYRE:

18  Q.  And there's a portion of the video, near the end, where it

19  says, "Stay tuned."  Is that correct?

05:36  20  A.  Yes, sir.

21  Q.  Now, based on your knowledge of the case, there's also a

22  picture of a refrigerator and reference to a note.  Do you know

23  what is being referred to in that particular section?

24  A.  There's -- there was a card found in the kitchen of the

05:37  25  defendant's apartment, that had a note and then it had some

05:37   1   e-mail and some passwords, some other information, left behind.

2   Q.   Okay.  And are you aware --

3        THE COURT:  Wait.  What were they?  Have you been --

4   have you ever been able to find out what they were?

05:37   5        THE WITNESS:  They didn't say what they were,

6   specifically what they were to be used for.  But I believe --

7        THE COURT:  Did you find out what they were?  Or do

8   you have a professional opinion based upon your experience in

9   the case?

05:37   10        THE WITNESS:  There was a -- one was an e-mail that

11   was created with a password.  And I believe that to be, again,

12   another way for the two of them to potentially communicate

13   without anyone else knowing.

14        THE COURT:  Okay.

05:37   15   BY MR. McINTYRE:

16   Q.   And do you know whether or not al-Qaeda in the Arabian

17   Peninsula is a designated terrorist organization?

18   A.   Yes, sir, it is.

19        THE COURT:  Hold it one second.

05:38   20   BY MR. McINTYRE:

21   Q.   And are you aware or not if al-Qaeda in the Arabian

22   Peninsula was a designated terrorist organization at the time

23   of this offense?

24   A.   Yes, it was.

05:38   25        THE COURT:  Designated by who?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:38    1              MR. McINTYRE:  By the US Department of State, your
         2    Honor.
         3              THE COURT:  Hang on one second.
         4              MR. McINTYRE:  We did file a motion, your Honor, to
05:38    5    also take judicial notice of --
         6              THE COURT:  Which was designated -- I'm reading the
         7    indictment -- designated by the United States Secretary of
         8    State as a foreign terrorist organization pursuant to
         9    Section 219 of the Immigration Nationality Act.
05:38   10              You say you have a motion on file?
        11              MR. McINTYRE:  Yes, your Honor.
        12              THE COURT:  Again, what's the motion, just for the
        13    record?
        14              MR. McINTYRE:  It's to take judicial notice of the
05:39   15    fact that the organization known as al-Qaeda in the Arabian
        16    Peninsula was designated a foreign terrorist organization by
        17    the US Department of State on January 19th of 2010.  It's
        18    contained within our trial brief.
        19              THE COURT:  All right.  Judicial notice is so taken
05:39   20    for purposes of trial.
        21              MR. McINTYRE:  I would pass the witness, your Honor.
        22              THE COURT:  All right.  Mr. Bujol, they passed the
        23    witness.  Your witness.  Questions, please.
        24              By the way, sir, we have about 20 to 25 minutes
05:39   25    for the day -- remainder of the day.  So, you have about that

05:39   1   much time; and then you'll pick up tomorrow.

2          THE DEFENDANT:  Okay.

3          THE COURT:  Oh, yeah.

4          THE DEFENDANT:  Okay.

05:39   5          THE COURT:  Let's put it this way.  The government's

6   case moved along quickly.  I assume yours will also.  I have no

7   problem with time.  If I have a concern, just like I did with

8   them, when I thought it was dragging a little bit, I'm going to

9   tell them.  If I think yours is dragging, I'll let you know.

05:40   10  Aside from that, we have no time restraints right now.  Okay?

11              So, go right ahead.  It's your witness.

12                      **CROSS-EXAMINATION**

13  BY THE DEFENDANT:

14  Q.  Okay.  I want to start first with --

05:40   15          THE COURT:  Could you pull that in a little bit, sir?

16              Yeah.

17  BY THE DEFENDANT:

18  Q.  I'm going to start first with going back to the tip in 2008

19  that you received about an Abdul Bari.  Is that correct?

05:40   20  A.  Yes, sir.

21  Q.  Okay.  When did you receive that tip, approximately?

22          THE COURT:  You're talking date wise?

23          THE DEFENDANT:  Yes, date wise.

24          THE COURT:  Okay.  Approximately.

05:40   25          THE WITNESS:  Are you asking when I received it or

05:40   1   when the FBI received it?

2   BY THE DEFENDANT:

3   Q.  When did you receive it?  When did you become aware that it

4   was in your jurisdiction to be taken care of?

05:40   5   A.  I received the tip in late July 2008.

6   Q.  Late July of 2008?

7   A.  Right.  It was after some investigation -- I don't know the

8   exact date -- when we determined that one of the parties

9   mentioned in the tip resided in one of the counties that the

05:41   10   Bryan office investigates.

11   Q.  Could you repeat that?

12   A.  It was after some amount of investigation -- I don't recall

13   the exact date -- that one of the individuals mentioned in the

14   tip resided in one of the counties that my office investigates.

05:41   15   Q.  So, someone listed in this tip resided in a county that you

16   have jurisdiction over?

17   A.  In my job, I have jurisdiction for these type of charges

18   all over.  So, but my office is directed to handle seven

19   counties.  So, there were three people mentioned in the tip;

05:41   20   the father and then it mentions sons.  One of the sons was in

21   Waller County, which is one of the seven counties that the JTTF

22   I'm on investigates.

23   Q.  Well, actually, according to the tip, it says that the

24   father was the actual so-called terrorist who was recruiting

05:42   25   this individual who submitted this tip and his sons were

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:42    1    present at the mosque.  It doesn't implicate his sons.  It

         2    doesn't even mention his sons.  The only name mentioned here is

         3    the father.

         4              THE COURT:  Hold it.  You can't testify.  You can ask

05:42    5    him a question.

         6              All right.  You got a question.  You may answer,

         7    please.

         8              THE WITNESS:  The tip discusses the person tried to

         9    recruit the tipster, and it also says that the person that

05:42   10    tried to recruit the tipster was going to send or had sent his

        11    sons overseas to receive training.  So, after my investigation,

        12    I determined that he had at least two sons, one of which was in

        13    Waller County.

        14    BY THE DEFENDANT:

05:43   15    Q.  He was in Waller County at the time of this tip?

        16    A.  I'm not sure about what -- the time of the tip.  But the

        17    time that I was looking at the tip, yes.

        18    Q.  Which would be the end of July 2008?

        19    A.  Yes.

05:43   20    Q.  So, at the end of --

        21              THE COURT:  Hold it.  Wait.  Let me mention this.

        22    We're not going to go over and over the same thing.  You made

        23    your point.  Okay?  You need to keep moving forward.  You don't

        24    have to repeat his answer.  You can follow up on his answer.

05:43   25    All right?

05:43    1                    Go right ahead, sir.  We'll get this straight.

         2    You're doing fine.  Go on.

         3    BY THE DEFENDANT:

         4    Q.  According to this --

05:43    5                    THE COURT:  According to what?

         6                    THE DEFENDANT:  The tip.

         7                    THE COURT:  Okay.

         8    BY THE DEFENDANT:

         9    Q.  It lists an Abdul Bari at an address in Houston, Texas.

05:44   10    A.  Yes.

        11    Q.  77077, that's what this says?

        12    A.  I'm not looking at it.  So, yes.  I mean, I don't know.

        13    Q.  Is that Harris County or Waller County?

        14    A.  It's not Waller County.  I don't know if it's Harris or

05:44   15    not.

        16    Q.  But it's not Waller County.  So, it's not a county that you

        17    have jurisdiction over?

        18                    THE COURT:  Excuse me.  Is that -- has anything been

        19    filed here relative to this jurisdictional matter?

05:44   20                    MR. McINTYRE:  No, your Honor.

        21                    THE COURT:  All right.  I'll just take it, you know --

        22    I understand the FBI has got it and the case is ongoing.  But

        23    your point is, sir, that, in effect, the individual may not

        24    have been in Waller County.  Is that correct?

05:44   25                    THE DEFENDANT:  The individual listed here.

05:44  1              THE COURT:  That's correct.

2              THE DEFENDANT:  Yes.

3              THE COURT:  Okay.  Go on.

4    BY THE DEFENDANT:

05:44  5    Q.  This individual wasn't in Waller County?

6    A.  Which individual?

7    Q.  The individual listed in this tip.

8              THE COURT:  The name?  The name?

9              THE DEFENDANT:  The name Abdul Bari.

05:45  10             THE WITNESS:  He was at some points in time during

11   2008 in Waller County, because I surveilled him and watched him

12   in Waller County.

13   BY THE DEFENDANT:

14   Q.  You surveilled him?

05:45  15             THE COURT:  Personally, you did?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  Okay.

18   BY THE DEFENDANT:

19   Q.  Did you surveil anyone else with him?

05:45  20   A.  Yes.  His son.  I believe it was the son's maternal

21   grandmother.  Or maybe his paternal grandmother.  And there

22   were a couple of other people that were probably family

23   members, and they were on campus.

24   Q.  Do you know what they were on the campus for?

05:45  25   A.  At that particular day they were in the MSC.  They were on

05:45  1   the floor -- which I can't remember if it's second or third --

2   they were at student aid -- or financial aid.  Excuse me.

3            THE COURT:  "MSC" is?

4            THE WITNESS:  It's the student center, I think.

05:45  5   It's --

6            THE COURT:  Yeah.  Go on.  All right.

7            THE WITNESS:  It's on the campus.

8                 They went around different parking lots.  Looks

9   like they may have been looking at dorms.  They went over to

05:46  10  the field house, like, the athletic department, near the

11  football field.

12  BY THE DEFENDANT:

13  Q.  Would you say that Rafi, who's the son of this person, was

14  attempting to enroll in the college?

05:46  15  A.  He -- he applied and was accepted and then eventually

16  enrolled when the fall semester started, which I think was at

17  the very end of August or September of 2008, as a freshman.

18  Q.  Okay.  So, he actually didn't enroll until that fall.  But

19  someone had been using a computer that summer, which is why you

05:47  20  were at Prairie View.

21  A.  Yes.

22  Q.  That's why you were at Prairie View?

23  A.  Yes.

24  Q.  Because of some fraudulent computer access?

05:47  25  A.  Yes.

05:47   1    Q.   Which was what?

2    A.   We had a lead from another office, that led us to Coleman

3    Library, as I discussed.   And upon our investigation, we

4    determined that Rafi Abdul Bari was on the campus.   We were

05:47   5    trying to determine if Rafi Abdul Bari was the person accessed

6    the computer.

7              During that investigation, we determined that

8    Rafi had applied for admission as an architecture student.   We

9    also learned from the university that there was an ongoing

05:47   10   investigation that fake or improperly passed administrator

11   passwords were being given out of the architecture department.

12   So, we were operating as if there's a possibility that Rafi was

13   getting on the campus and using that password in order to

14   access Prairie View A & M's computer system.

05:48   15   Q.   So, what was the lead from the other office?

16   A.   The lead that started it?

17             It was a lead that led us to an IP address at

18   Prairie View A & M, and it had an e-mail address associated

19   with it.

05:48   20   Q.   Okay.   That's what resulted from the lead.   What was the

21   lead?

22             MR. McINTYRE:   Your Honor, I object.   May I approach

23   just briefly?

24             THE COURT:   No.

05:48   25             MR. McINTYRE:   Okay.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:48  1          THE COURT:  Sustained.  Rephrase the question.

2  BY THE DEFENDANT:

3  Q.  How did you obtain the IP address that led you to Prairie

4  View?

05:48  5          MR. McINTYRE:  Your Honor, I'm going to object.  It's

6  the subject of a previous Court order.

7          THE COURT:  Oh, okay.  All right.  That's right.

8          All right.  So, what's your request?  That he

9  move on to another subject?

05:48  10         MR. McINTYRE:  Yes, your Honor.

11         THE COURT:  All right.  That's granted.

12         Just move on to a different subject.  Or move

13  around it.  You know, Mr. Bujol, when I say you can move around

14  it, there are ways that if you need to ask key questions you

05:48  15  can move around that exact question you had.  And that's what I

16  mean.  All right?

17         So, as to that question, I'll sustain it.

18  BY THE DEFENDANT:

19  Q.  When did you -- were you provided pictures of Rafi Abdul

05:49  20  Bari after he enrolled at Prairie View?

21  A.  I believe I obtained them before he enrolled and then

22  again -- let me use the right word -- he applied, was accepted,

23  and then enrolled.  But before he enrolled, I had pictures.

24  And then, again, after he was accepted, I also had additional

05:49  25  pictures.

05:49   1   Q.   Did you also have an address?

        2   A.   For?

        3   Q.   Rafi Abdul Bari.

        4   A.   Multiple addresses.

05:49   5   Q.   Multiple addresses?

        6   A.   Yes.

        7   Q.   Did you also have a point of contact, a phone number or

        8   anything?

        9   A.   Yes.

05:50  10   Q.   Okay.  So if you had this person and this information, what

       11   prompted further investigation?

       12   A.   Of Rafi?

       13   Q.   Yes.

       14   A.   The tip, we wanted to determine whether Rafi Abdul Bari --

05:50  15   Q.   But the tip is about his father, though.

       16   A.   The way I read the tip is that the father has sons that may

       17   travel overseas for the same type of activity as discussed in

       18   the tip.

       19   Q.   Well, the way I read the tip --

05:50  20          THE COURT:  Wait.  You can't say how you read it.

       21   Later on, if you want to argue that, you can.  There will be

       22   a -- after the case is done, Mr. Bujol, there's summation.  And

       23   summation is where you can link in your interpretation of what

       24   the evidence showed.  Right now, we got to go question and

05:51  25   answer.

05:51   1   BY THE DEFENDANT:

2   Q.   Continue.

3   A.   Can you ask the question again so I remember?

4          THE COURT:   No.   Next question.

05:51   5   BY THE DEFENDANT:

6   Q.   When did you first obtain a warrant for the Abdul_Bari05

7   account?

8   A.   December 2008.

9   Q.   Okay.   When did you first obtain that header and footer

05:51   10   information?

11   A.   It was November of 2008.

12   Q.   So, at the point of December was when you could actually

13   read the e-mail contents?

14   A.   Yes.

05:51   15   Q.   So, before -- what about the login information, when did

16   you first get that?

17   A.   It would have been in -- sometime in early October, after

18   I'd viewed the Muslim Match in late September.

19   Q.   You got the IP correspondence for Abdul_Bari05 after

05:52   20   viewing the Muslim Match?

21   A.   Yes.

22   Q.   And the issue of -- we'll move forward to al-Awlaki.   When

23   did you determine that this account had been in contact with

24   al-Awlaki?

05:53   25   A.   Approximately?

05:53  1          MR. McINTYRE:  Your Honor, I'm going to make the same

     2   objection in reference to the previous Court order.

     3          THE COURT:  Sustained.  Just work around it,

     4   counsel -- Mr. Bujol.

05:53  5   BY THE DEFENDANT:

     6   Q.  At what point did you realize that the Abdul Bari account

     7   was being used by myself?

     8   A.   In October 31st, 2008, we saw who now I know to be you, the

     9   defendant, at the terminal.  After investigative steps after

05:54 10   that, I determined that the Abdul Bari account was logged on at

    11   the same time you were at that computer.  Once I saw the

    12   e-mails pursuant to the search warrant, there were pictures of

    13   you being sent from that account; and it said "pictures of

    14   myself."  So, over a series of -- a number of events led me to

05:54 15   believe that was you.

    16   Q.  And this was after you had viewed the -- what is it?  Jihad

    17   Fields postings?

    18   A.   Yes.  I looked at the Jihad Fields in September of 2008,

    19   same day that I was on the Muslim Match site.

05:54 20   Q.  With regard to those postings, the account Abdul_Bari05 was

    21   accessed on the dates that are listed on those postings.  Is

    22   that correct?

    23   A.   Yes.

    24   Q.  To your knowledge, are the dates listed on those postings

05:55 25   the same dates that they were posted by the moderator?

05:55  1   A.  To my knowledge, the date-time group that was on next to

2   Abdul Bari is the time that they were sent to the moderator.

3   I'm not sure when they were posted.  Because by the time I had

4   seen it there were already 22 posts.  So, it's a series of --

05:55  5   it's a running dialogue.

6   Q.  How do you know when they were sent to the moderator?

7   A.  I said "best of my knowledge."  When I look at the -- when

8   I look at -- can we pull -- can I look at it again?  Can I show

9   you what I am talking about?  There's --

05:56  10        THE COURT:  Just tell us about it.

11        THE WITNESS:  There's a name, and then there's a date

12  and a time that says, "Abdul Bari, date, time."  And, then,

13  below it is whatever the comments were.  And it's the same

14  throughout there.  So, to my knowledge, that's when the

05:56  15  moderator received it.

16  BY THE DEFENDANT:

17  Q.  I have a question in that regard, also.  Didn't you mention

18  in your search warrant for December of 2008 that you were, in

19  fact, unclear as to when that date -- whether or not that date

05:56  20  corresponded to its posting by the moderator?

21  A.  I was at that time.  I was unclear.

22        THE COURT:  Yes, you were?

23        THE WITNESS:  I was unclear in December 2008.  Since

24  then, I've done more investigation.

05:56  25        THE COURT:  Okay.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:56   1   BY THE DEFENDANT:

2   Q.  Is there anything on that Jihad Fields site that links that

3   post to the account Abdul_Bari05?

4   A.  Nothing that I am aware of.  I'm not sure if --

05:57   5   THE COURT:  Okay.  Nothing you're aware of.

6   Next question.

7   By the way, it will move a lot quicker if you

8   answer just the question that's asked.

9   THE WITNESS:  Yes, sir.

05:57   10   THE COURT:  Okay?

11   BY THE DEFENDANT:

12   Q.  Throughout the course of this investigation, did I discuss

13   Jihad Fields postings at any time with the CHS?

14   A.  Not that I am aware of.

05:58   15   Q.  So, can you be entirely sure that those postings were in

16   fact made by one and the same person?

17   A.  No.

18   Q.  You've assumed that they were made by me.

19   A.  Based on the content, the times, and the -- and what else

05:58   20   was going on in e-mails in that same two months.

21   Q.  Is there anything in the content that is specific to Barry

22   Bujol and not any other American Muslim?

23   A.  There's some specific things in there discussed about

24   learning Arabic and wanting to travel.  Those are things that I

05:59   25   know you've discussed on multiple occasions.

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

05:59    1                        Is your name in there?

         2   Q.  Is Barry the only person in America that wants to learn

         3   Arabic?

         4               MR. McINTYRE:  Objection, argumentative.

05:59    5               THE COURT:  Sustained.  Rephrase it, please.

         6   BY THE DEFENDANT:

         7   Q.  How many Muslims would you say --

         8               THE COURT:  How many what, sir?

         9   BY THE DEFENDANT:

05:59   10   Q.  How many people that -- in America are indigenous Muslims

        11   or people that are born in the United States that are Muslim,

        12   approximately?

        13               THE COURT:  Do you know?

        14               MR. McINTYRE:  Objection.

05:59   15               THE COURT:  Do you know?

        16               THE WITNESS:  No, I don't know.

        17               THE COURT:  Okay.

        18   BY THE DEFENDANT:

        19   Q.  Is it more than one?

05:59   20               MR. McINTYRE:  Objection, speculation.

        21               THE COURT:  Overruled.

        22                   More than one, right?

        23               THE WITNESS:  Yes.

        24               THE COURT:  Okay.

06:00   25   BY THE DEFENDANT:

06:00  1  Q.  Now, going back to the tip for a minute, you mentioned the

2  tip containing Abdul Bari.  He had a son named Rafi Abdul Bari.

3  I've been associated with the name Abdul Bari.  That's three

4  Abdul Baris on one college campus in one city in one state in

06:00  5  this nation.

6        THE COURT:  The question, please.

7  BY THE DEFENDANT:

8  Q.  Could that Abdul Bari have been another one on the Jihad

9  Fields posts?

06:00  10  A.  Yes.  Anybody using that name could have put "Abdul Bari"

11  on that post.

12  Q.  So, again, what is specific in that post that makes you

13  think it's Barry Bujol and not someone else?

14  A.  Again, there's things contained in the questions, about a

06:01  15  specific course of action -- wanting to travel, learning

16  Arabic -- that at the time, what I knew about the person that I

17  determined to be you, that was exactly what that person was

18  talking about.  It's very similar to what was sent to Anwar

19  Awlaki within a few days of that same posting.  That's one of

06:01  20  the specific things that led me to believe that you were the

21  person that posted --

22  Q.  This site discussed --

23        MR. McINTYRE:  Your Honor, I would request that he let

24  the witness answer the question before he asks --

06:01  25        THE COURT:  Have you finished the question?

06:01  1          THE WITNESS:  Yes.

2          THE COURT:  All right.  He's answered the question.

3              Next question, please.

4              By the way, I'm going to adjourn in about three

06:01  5    minutes, Mr. Bujol.  So, you know, you can wrap it or leave --

6    you certainly can pick it up any time tomorrow.

7              Go on.

8    BY THE DEFENDANT:

9    Q.   This Jihad Fields site dealt with, as you labeled it, a

06:01  10   call to arms.  Is that correct?

11   A.   That's the way I read it.

12   Q.   So, it dealt with numerous countries?

13   A.   Yes.

14   Q.   Which -- could it have been people on that site were not --

06:02  15   could be talking about any variety of locations?

16          MR. McINTYRE:  Objection, calls for speculation.

17          THE COURT:  Overruled.

18          THE WITNESS:  The article, in fact, talks about a

19   number of countries.  So, people asking questions could be

06:02  20   asking about any of those countries, sir, or nothing related to

21   it at all.

22   BY THE DEFENDANT:

23   Q.   And you referred to a person speaking English and wanting

24   to learn Arabic?

06:02  25   A.   Yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

06:02  1  Q.  If a person speaks English, does that automatically make
2  them African-American?
3  A.  No.
4  Q.  If a person wants to learn Arabic, does that automatically
06:03  5  make them a convert?
6  A.  No.
7  Q.  If a person wants to learn Arabic, does that automatically
8  make them a United States citizen?
9  A.  No.
06:03  10          THE COURT:  Mr. Bujol, how about let's break at this
11  time; and you can pick it up tomorrow.
12              It's now almost 6:05.  The case is moving along.
13  I want to thank both sides for moving it along.  We'll see you
14  tomorrow, ready to resume -- tomorrow we get on our regular
06:03  15  schedule.  See you at 10:00 a.m., ready to roll.  So, see you
16  tomorrow morning.
17      *(Proceedings recessed for evening)*
18                        * * * * *
19              COURT REPORTER'S CERTIFICATION
20      I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled cause.
21
22  Date:  April 4, 2012
23
24              /s/   Cheryll K. Barron
25              Cheryll K. Barron, CSR, CMR, FCRR
                Official Court Reporter

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*