1                       UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF TEXAS
2                            HOUSTON DIVISION

3   UNITED STATES OF AMERICA       .
                                   . H-10-CR-368
4          vs.                     . HOUSTON, TEXAS
                                   . NOVEMBER 8, 2011
5                                  . 10:10 A.M.
    BARRY WALTER BUJOL, JR.        .
6   . . . . . . . . . . . . . . .

7
                         TRANSCRIPT OF BENCH TRIAL
8                BEFORE THE HONORABLE DAVID HITTNER
                     UNITED STATES DISTRICT JUDGE
9                             VOLUME 2

10

11       *THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER
    THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY*
12  *COURT ORDER.  UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
    ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE*
13  *COPY AT THE OFFICIAL RATE.*
         *General Order 94-15, United States District Court,*
14  *Southern District of Texas.*

15

16  A P P E A R A N C E S:

17  FOR THE GOVERNMENT:

18       Stephen Mark McIntyre
         Craig M. Feazel
19       Assistant US Attorney
         P O Box 61129
20       Houston, TX 77208

21       Garrett M. Heenan
         United States Department of Justice
22       950 Pennsylvania Avenue NW
         Washington, DC 20530

23

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
25                         - - - - -

1    A P P E A R A N C E S:   (Continued)

2    STANDBY COUNSEL FOR THE DEFENDANT PRO SE:

3         Edward A. Mallett
          Mallett & Saper, L.L.P.
4         600 Travis
          Suite 1900
5         Houston, TX 77002-2911

6    OFFICIAL COURT REPORTER:

7         Cheryll K. Barron, CSR, CM, FCRR
          U.S. District Court
8         515 Rusk Street
          Houston, TX  77002

9                              - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2                                                              PAGE

3    WITNESSES

4    Bryan Cannon, Government's Witness

5        Cross-Examination by The Defendant              218

6    Jeff Dunn, Government's Witness

7        Direct Examination by Mr. Feazel               269

8        Cross-Examination by The Defendant             282

9    Amy Tehan, Government's Witness

10       Direct Examination by Mr. Heenan               283

11       Cross-Examination by The Defendant             298

12   Felix Bermudez, Government's Witness

13       Direct Examination by Mr. McIntyre             302

14       Cross-Examination by The Defendant             319

15   Hany Youssef, Government's Witness

16       Direct Examination by Mr. Heenan               322

17       Cross-Examination by The Defendant             343

18   Mohammad Aldwsari, Government's Witness

19       Direct Examination by Mr. Feazel               351

20

21

22

23

24

25

1         P R O C E E D I N G S

2              THE COURT:  We're ready to take up our criminal

3    matter.  We're ready to go.  We have a witness on the stand.

4                   Sir, you want to take the stand, Special Agent

10:10  5    Cannon?

6                   All right.  Let's go, please.

7              **BRYAN CANNON, GOVERNMENT'S WITNESS, TESTIFIED:**

8                        **CROSS-EXAMINATION**

9    BY THE DEFENDANT:

10:10  10   Q.  I believe we left off yesterday talking about the Jihad

11   Fields posts and how there was nothing linking those posts to

12   the Abdul Bari account and they essentially could have come

13   from anyone.  That puts us at about early August, mid August,

14   2008?

10:10  15   A.  I looked at the Jihad Fields posts at the end of

16   September 2008.

17   Q.  The end of September?

18   A.  (Nodding head).

19   Q.  And when did you first go to MuslimMatch.com?

10:10  20   A.  The end of the September 2008.  It was September 30th.

21   Q.  So, after looking at the Jihad Fields posts, you decided to

22   further your investigation it would be better to get more on

23   whoever this person was by going to MuslimMatch.com?

24   A.  No.  I went to MuslimMatch.com first.  There's a search

10:11  25   function on that page.  And from there, I found the postings on

10:11  1    Jihad Fields.

2    Q.  And you were on Muslim Match looking for any person in

3    particular at this time or just a name?

4    A.  I was looking for variants of the name Rafi Abdul Bari or

10:11  5    Abdul Bari, from the tip.

6    Q.  But by this time you also surveilled the gentleman by the

7    name of Abdul Bari with a son named Rafi Abdul Bari, correct?

8    A.  Yes, sir.

9    Q.  So, why didn't you continue the surveillance?  Why didn't

10:12  10   you follow them -- you said you had numerous locations,

11   telephone numbers.  If you were in need of information, why not

12   pursue that route as opposed to going to a site like Muslim

13   Match?

14   A.  We did do other investigative steps on Rafi Abdul Bari and

10:12  15   his father.  One of the steps was Muslim Match.  We went to --

16   we looked for him in Houston, Galveston.  We did a number of

17   things.

18   Q.  So, if you had a target, you got the individual, you got a

19   cause for suspicion.  This was the original lead.  Why not

10:12  20   pursue down this original lead?  What diverted your path

21   elsewhere?  You have the person; you have the calls; you have

22   the location.  Everything at this point, according to what you

23   are saying, is pointing to Abdul Bari and his son Rafi Abdul

24   Bari.  Because, as we'll later get into, when I became the

10:13  25   ultimate subject of investigation, I was pursued relentlessly.

10:13   1          MR. McINTYRE:  Object, your Honor, argumentative.

        2          THE COURT:  Sustained.

        3          THE DEFENDANT:  I'll rephrase that.

        4  BY THE DEFENDANT:

10:13   5  Q.  What did you know for you to determine that Rafi wasn't the

        6  person that you were looking for?

        7  A.  Over the course of a few months, that summer and into the

        8  fall, after he enrolled at Prairie View A & M University, we

        9  conducted multiple interviews operations, records checks,

10:13  10  interviews -- let's see.  We interviewed neighbors, apartment

       11  managers of places he had lived before, people that went to

       12  school with him, police officers at the high school that he had

       13  gone to high school.  And at some point we had also gone to a

       14  number of social networking sites, including My Space, another

10:14  15  couple of postings on a prep high school website where he had

       16  been named playing basketball or baseball.  I don't recall.  We

       17  did all that.

       18          At some point we determined that Abdul Bari, the

       19  father, had moved to the area of Galveston, Texas.  And that

10:14  20  definitively is not in the Bryan RA territory; so, that's no

       21  longer my issue.

       22          And at some point we determined -- after we

       23  identified you as the user of the Abdul Bari account, we

       24  concluded our investigation into Rafi Abdul Bari.

10:14  25  Q.  Well, that doesn't -- I don't think answers my question

10:14   1   with respect to the transition from one individual, albeit

2   Abdul Bari or his son, to me.

3          MR. McINTYRE:  Objection, your Honor, argumentative.

4          THE COURT:  Sustained.

10:15   5              He already told you how he got there.  You need

6   to take it from there, sir.

7   BY THE DEFENDANT:

8   Q.  Let's go to Muslim Match.

9          THE DEFENDANT:  What is the -- if I can ask, the

10:15   10  exhibit number for the Muslim Match site?

11         MR. McINTYRE:  It's Exhibit 3.

12         THE DEFENDANT:  Can we have a look at --

13         THE COURT:  Wait a second.  Do you -- have you talked

14  to each other about you putting up your exhibit?

10:15   15         MR. McINTYRE:  Yes, your Honor.  We don't have an

16  issue, if the Court doesn't mind, if he wants us to --

17         THE COURT:  All right.  To a limited extent, let's do

18  that if that's all right with the government.

19         THE DEFENDANT:  Scroll down to the next page.

10:16   20  BY THE DEFENDANT:

21  Q.  Now, you said earlier that this site, the issue of jihad is

22  what caused alarm in conjunction with the paragraph about world

23  change?

24  A.  It was the "Jihad," the paragraph about "World Change," and

10:16   25  the information on the lower right-hand corner about "Music is

10:16   1    haraam."

2    Q.   Okay.   Going back up to -- if we look on this website,

3    "Jihad" isn't the only category that's in bolded, is it?

4    A.   No, it's not.

10:16   5    Q.   There's a category that says "Janitorial" that's in bold?

6    A.   Yes.

7    Q.   There's a category that says "United States" which is also

8    in bold?

9    A.   Yes.

10:17   10   Q.   And there's a -- next to the "Language" category it says

11   "English" in bold?

12   A.   Yes.

13   Q.   Do you know these bold demarcations to be consistent with a

14   pull-down menu?

10:17   15   A.   I do not.

16          THE DEFENDANT:   Scroll back up to "Jihad" and "World

17   Change."

18   BY THE DEFENDANT:

19   Q.   "Jihad" does have multiple definitions, doesn't it?

10:17   20   A.   Yes.

21   Q.   And based on your knowledge and experience in the Islamic

22   culture, who is "Isa"?

23   A.   My understanding is that's the Prophet, Jesus or the Lord.

24   Q.   It's Jesus?

10:17   25   A.   Right.

10:17  1    Q.  So --

2    A.  In Islam, it's the prophet.  In Christianity, it's Jesus.

3    Q.  But it's the same person?

4    A.  Yes.

10:18  5    Q.  So, if we read this statement, it says, "If it was

6    possible, before the return of Jesus, I would make the entire

7    planet Islamic," that -- is that a statement consistent with

8    someone who wants to fight and force people to accept a way of

9    life?  Or is it consistent with someone who is sharing a common

10:18  10   religious belief and is waiting for something prophesied across

11   religious boundaries?

12   A.  The way I read it and the way I read it at the time was

13   when it says, "I would make the entire planet Islamic," to me,

14   that's an action, the person that posted this wanted to do

10:19  15   something in order to make the world Islamic as opposed to, "I

16   would wish the world was Islamic with the return of Isa."  I

17   see those as two different things.

18   Q.  Well, it says, if it was possible before --

19        THE COURT:  Hold it.  I'm not going to get into a

10:19  20   go-around on this.  You got the man's response.  So, you need

21   to -- I'm not saying move on.  But you're not going to get --

22   nobody, either side -- that goes for the government, too.

23   You're not going to get into an argument with a witness.  Okay?

24        That's how he interprets it and so forth.  If you

10:19  25   interpret it differently or you want us to know you interpreted

10:19  1    it differently or it should be interpreted differently, beyond

2    the questioning you've just done, if you elect the to testify

3    on your own, then you can go into it at that time to some

4    extent.  But we need to move along.  This is cross-examination.

10:19  5              By the way, there is a rule, which I will mention

6    to you that on cross -- and I'll give you some leeway.  But

7    cross-examination is limited just to what they put on, on their

8    direct case.  Got it?

9              In other words, I'll give you some leeway to go

10:20  10   beyond it so we don't have to call the man back again.  But

11   technically, in a civil case or in a criminal case, when

12   someone puts a witness on, when they go on cross-examination,

13   the questions are limited to what he talked about on direct

14   exam.

10:20  15             I'll give you some leeway, but we got to keep it

16   going.

17             THE DEFENDANT:  Okay.  Thank you, your Honor.

18             THE COURT:  Yes, sir.

19   BY THE DEFENDANT:

10:20  20   Q.  Okay.  We'll move forward to the communications with

21   al-Awlaki that occurred between that account and the

22   Abdul_Bari05 account.

23             How many messages did the account Abdul Bari

24   receive directly from Anwar al-Awlaki, approximately?

10:21  25   A.  There was one e-mail and then a number of e-mails generated

10:21   1   from his website.

2   Q.   So, it was generated from the automatic subscription to his

3   website?

4   A.   Some were.   There was one direct from --

10:21   5   Q.   There was one --

6   A.   -- Yahoo! account to the Abdul_Bari05 account.

7   Q.   Okay.   Now, are there any restrictions on anyone going and

8   subscribing to this website and, as a result, receiving

9   automatic e-mails?

10:21   10   A.   No.

11   Q.   Does this -- so, anyone could have been receiving these

12   e-mails in any period of time?

13   A.   I don't know about now; but at the time, anyone could go on

14   and log on and receive e-mails.

10:21   15   Q.   Now, receiving those e-mails, did that indicate that that

16   person has accepted or purports to believe in whatever that

17   message or that sermon was communicated?

18        MR. McINTYRE:   Objection, argumentative, speculative.

19        THE COURT:   Sustained.

10:22   20        In other words, you can't ask him does that mean

21   that's what someone believes.   If you want to do it, you can

22   ask him is that an indicator in your business that there might

23   be a problem there or something like that.   But you can't ask

24   him what that interpretation is.   So, that's why I sustained

10:22   25   the objection.

10:22  1  BY THE DEFENDANT:

2  Q.  If a person were to receive these e-mails from this

3  al-Awlaki website, does that indicate that they wholeheartedly

4  accept every single thing that comes through that e-mail?

10:23  5          MR. McINTYRE:  Objection, argumentative.

6          THE COURT:  Sustained.  But let me -- let me rephrase

7  that.  Okay?  Ask does that necessarily equate.  All right?

8          What I am going to do is -- Cher, read the

9  question back.

10:23  10          Listen to the question, and you need to just

11  moderate it a bit.

12          So, I'm having her read it back.  So, listen to

13  where I sustain the objection.

14          Read the question back, please.

10:23  15      *(The requested portion of the record was read back by the*

16  *court reporter)*

17          THE COURT:  Let me ask one.  Does that necessarily

18  equate that someone would accept it all, necessarily?

19          THE WITNESS:  No, your Honor.

10:23  20          THE COURT:  All right.

21          THE WITNESS:  It just means --

22          THE COURT:  Was that just an -- some indicator as to

23  how it continued to lead you to the defendant?

24          THE WITNESS:  Yes, your Honor.

10:24  25          THE COURT:  Okay.  It was an "indicator."  That's what

10:24   1   I want.  The word "necessarily" I put in there.  With that, I
         2   allowed him to answer it.
         3              Now, you may go right ahead.
         4   BY THE DEFENDANT:
10:24    5   Q.  Further, to your knowledge, if a person -- does -- are all
         6   of Anwar Awlaki sermons radical in nature?
         7   A.  I have -- there are some that I have listened to that are
         8   not, but I haven't listened to them all.  So --
         9   Q.  So, all of them are not radical?
10:24   10   A.  No.
        11   Q.  If a person, based on your knowledge and experience, were
        12   to go to a portion of a site where his -- his lectures are
        13   present, all included, would that necessarily mean that they're
        14   only looking for the radical material?
10:25   15   A.  I would have no idea what they're looking for.  I mean,
        16   so --
        17   Q.  When you searched my computer, did you find non-radical
        18   Islamic material as well from al-Awlaki?
        19              MR. McINTYRE:  Your Honor, I object to relevance.
10:25   20              THE COURT:  I'll allow -- I'll allow him to go a
        21   little more into this.
        22              Was there stuff on the computer that might be
        23   categorized, in your professional opinion, as non-radical?
        24              THE WITNESS:  Are we asking about the laptop?
10:25   25   BY THE DEFENDANT:

10:25   1    Q.  Yes.

     2    A.  Okay.  The search warrant of the laptop?

     3    Q.  Yes.

     4    A.  There were computer images that were not radical in nature.

10:25   5    There's clip art of just pictures also on there.

     6              THE COURT:  Okay.

     7    BY THE DEFENDANT:

     8    Q.  Well, I'm speaking specifically of the Awlaki sermons,

     9    because Awlaki is the issue here and whether or not he is

10:26  10    strictly on a radicalist anti-American agenda.  So, there

    11    were --

    12              THE COURT:  Wait a second.

    13                 You agree with that statement?

    14              MR. McINTYRE:  No, your Honor.  I have an objection.

10:26  15              THE COURT:  You can't -- you can't do that, sir.  You

    16    need to ask questions, not as to the reasons.  So, ask your

    17    question and he -- in other words, you want to know whether or

    18    not there are any sermons by that individual that did not

    19    appear to the agent to be radical, correct?

10:26  20              THE DEFENDANT:  Correct.

    21              THE COURT:  Were there any?

    22              THE WITNESS:  I don't know.  I don't know, your Honor.

    23              THE COURT:  You don't know.

    24              THE WITNESS:  No.

10:26  25              THE COURT:  Okay.  That's the best we can get.

BY THE DEFENDANT:

Q.   Okay.  We can go to the Abdul Bari account.  Did it also contain e-mails going to Arabic language institutes in Yemen?

A.   Yes.

Q.   Did it also contain e-mails received from Arabic language institutes in Yemen?

A.   Yes.

Q.   Were there e-mails to hijrah groups in Yemen, contained in this account?

A.   There were e-mails to a Yahoo! group that was called "Hijrah Islam."  I'm not sure if they were in Yemen.  It was in those e-mails.

Q.   Were there e-mails to overseas or Middle Eastern employers in this account?

A.   Yes.

Q.   When the defendant was first arrested on February 13th, 2009, where did that arrest occur?

A.   It occurred on Pine Island Road, about a half mile from the defendant's apartment complex.

Q.   And he was arrested for an outstanding warrant, correct?

A.   I believe it was three warrants, yes.

Q.   And they were out of Katy, Texas?

A.   Yes.

Q.   When was the defendant arrested the second time?  Was it Sunday the 15th, 2009?

10:29   1    A.  Yes.

        2    Q.  Where did that arrest occur?

        3    A.  At Intercontinental Airport in Houston, George Bush

        4    Intercontinental Airport.

10:29   5    Q.  So, the defendant was released between -- sometime between

        6    February 13th and February 15th from Waller County?

        7    A.  Yes.

        8    Q.  Based on your training and experience, do you know of a

        9    person to be released from county jail and still have warrants

10:30  10    in that county jail?

       11    A.  I've never worked for the state.  And I know that there are

       12    warrants that can only be found if they search county by

       13    county, but I'm not sure in this particular case.

       14            THE WITNESS:  I would like to go to Exhibit 25,

10:30  15    please.

       16    BY THE DEFENDANT:

       17    Q.  Okay.  You see in the middle of the screen it says

       18    "Emergency Contact: Ernestine Johnson"?

       19    A.  Yes.

10:31  20    Q.  Just to get a bearing of where we are on the page.

       21    A.  Yes.

       22    Q.  Right below that, it says "Warrant Number."  Could you --

       23    could you read that out?

       24    A.  "Warrant Number 200804376."

10:31  25    Q.  Okay.  Another -- and these are the charges out of Katy

10:31  1   that we already discussed; and there are no other warrants

       2   there, correct?

       3   A.  No.

       4   Q.  Okay.  And it says a fine of $785?

10:31  5   A.  Yes.

       6   Q.  So, for a person to have been at an airport in Houston less

       7   than two days after this document was created, with the

       8   information we've looked at, how could that have happened?

       9   A.  There was a valid warrant issued out of the state -- out of

10:32  10  Waller County for a charge other than these three, that was

       11  executed on February 15th after we informed Houston Police

       12  Department of its existence.

       13  Q.  So, you had to inform this same county we're looking at of

       14  their own warrant, that isn't present on this screen right now?

10:32  15  A.  No, that's not what I said.  I said we had to inform

       16  Houston Police Department of a warrant from another county.

       17          THE DEFENDANT:  Okay.  Go to -- I believe it's 26.

       18  BY THE DEFENDANT:

       19  Q.  This is dated February 18, 2009, correct?

10:33  20  A.  Yes.

       21  Q.  Now we see something different in the "Warrant" and

       22  "Offense" columns, correct?

       23  A.  Yes.

       24  Q.  So, based on your knowledge and experience, how does a

10:33  25  person walk out of a jail when he has a current warrant in that

10:33  1  jail?

2  A.  I don't work at that jail.  I'm not sure.

3  THE DEFENDANT:  All right.  Let's go to Exhibit 63.

4  Back this up a little bit.

10:34  5  BY THE DEFENDANT:

6  Q.  Now, this is a letter from Abdul Bari, the one e-mail that

7  we talked about earlier where he actually wrote and received

8  correspondence directly from al-Awlaki, correct?

9  A.  Yes.

10:34  10  Q.  Okay.  I want to go down to where it says, "I have come

11  across in an effort to find what is the correct thing to do.

12  In my quest, I've become convinced beyond a doubt that I need

13  to step up to the plate and contribute in some form or

14  fashion."

10:34  15  Given the document that was subsequently sent,

16  outlining a variety of ways to support jihad, does this

17  statement, in that context, indicate that this person is bent

18  specifically on committing acts of terror in or outside of the

19  United States?

10:35  20  MR. McINTYRE:  Objection, speculative and

21  argumentative.

22  THE COURT:  Sustained.  You can rephrase it,

23  Mr. Bujol.

24  Let me ask you this -- I'll just jump in on it --

10:35  25  was that -- was that language an indicator, one way or another,

10:35  1   that you were going to continue on this case or had reason to

2   believe that there was need to continue the case?

3           THE WITNESS:  Yes.  I knew who Anwar Awlaki is.  When

4   you ask him the question about jihad, that is definitely an

10:36  5   indicator for me.

6           THE COURT:  Okay.  It's an indicator for him.

7   BY THE DEFENDANT:

8   Q.  Well, for lack of a better way to phrase my question, with

9   respect to the sender of this message, does that indicate he is

10:36  10  solely interested in committing what is commonly known as acts

11  of terrorism?

12          MR. McINTYRE:  Objection, argumentative.

13          THE COURT:  Sustained.

14              Next question, please.

10:36  15          THE DEFENDANT:  Scroll down to the actual document.

16  "42 Ways of Supporting Jihad."

17  BY THE DEFENDANT:

18  Q.  Yesterday, in the testimony, you talked about the defendant

19  engaged in physical fitness, correct?

10:37  20  A.  Yes.

21          THE WITNESS:  Okay.  I believe Number 21 or 22 deals

22  with -- in this sequence, covers the topic of physical fitness,

23  if we could scroll down to that way to support.

24              Okay.  "22, Physical fitness."

10:37  25  BY THE DEFENDANT:

10:37   1   Q.  Now, could you read the last paragraph in "Physical

        2   fitness," starting after the word "flexibility"?

        3   A.  Okay.  "Even if a Muslim is not going to fight, physical

        4   fitness is still important.  For example, a fit person can

10:37   5   withstand prison and torture more than a person who is not."

        6   Q.  Okay.  So, we get from this statement that physical fitness

        7   isn't restricted to a person interested in fighting and

        8   committing acts of terror?

        9        MR. McINTYRE:  Your Honor, it's argumentative and it's

10:38  10   misleading and it omits -- it takes one sentence out of context

       11   when all the other sentences relate to jihad and fighting,

       12   armed battle.

       13        THE COURT:  I'll be -- we've been through that with

       14   the agent; in other words, as to what some of the other

10:38  15   elements are.  I'm going to allow him to do it.

       16        All right.  Just as to that one sentence, is

       17   that -- again, I don't want to -- ask the question again.  I've

       18   overruled the objection.  I'll listen to the question again.

       19        Now, he read that first sentence.  Okay?  Or the

10:38  20   first couple of sentences.  Now your question is?

       21   BY THE DEFENDANT:

       22   Q.  My question is, according to this document --

       23        THE COURT:  The whole document or according to --

       24   BY THE DEFENDANT:

10:38  25   Q.  According to this section of the document, this section

10:38    1    entitled "Physical Fitness" -- because this -- this document --

         2             THE COURT:  All right.  Go on.  Go on.  You can't

         3    testify.  You've got to ask him a question.

         4    BY THE DEFENDANT:

10:38    5    Q.  According to this, can a person be engaged in physical

         6    fitness and not have the intention to fight?

         7             THE COURT:  Well, again, would you -- no, you can't

         8    ask would a person have the intention, because somebody can't

         9    speculate on what someone's intention is.  So, rephrase it,

10:39   10    sir.

        11    BY THE DEFENDANT:

        12    Q.  Could a person --

        13             THE COURT:  All right.  Someone reading just that

        14    sentence, would that give you any indicator one way or another

10:39   15    whether it might be connected to some terrorism activity or

        16    terrorism propensity?

        17    A.  If I saw just that one sentence, no.

        18             THE COURT:  Okay.

        19    BY THE DEFENDANT:

10:39   20    Q.  Of these "42 Ways" --

        21             THE DEFENDANT:  Could you go back to the top of the

        22    page and just give the judge a chance to look at what these "42

        23    Ways" are?  Okay.

        24             THE COURT:  All of this is in evidence.  So, for sure,

10:40   25    I'm going to read it and consider it.  But if you want to point

10:40    1    out certain matters here, I'll allow you to do it.

2          THE DEFENDANT:  Yeah.  Just real quick, I'll just

3    point out what these -- what these ways are.  Okay.  Having --

4          THE COURT:  Sir?

10:40    5          MR. McINTYRE:  I object to the defendant testifying,

6    your Honor.

7          THE COURT:  Sustained.  That's part of testifying; and

8    you'll have an opportunity should you elect to do so later.

9    You need to question him on his testimony.

10:40    10    BY THE DEFENDANT:

11    Q.  With respect to these 42 ways of providing support, do all

12    of these ways constitute material support to a terrorist

13    organization?

14          MR. McINTYRE:  Your Honor, argumentative and calls for

10:40    15    a legal conclusion.

16          THE COURT:  That's correct.  That's a legal conclusion

17    that eventually I have to make as -- since there's no jury in

18    this case, the legal conclusions as well as the factual

19    conclusions.  Sustain the objection, as to the form of the

10:41    20    question.

21    BY THE DEFENDANT:

22    Q.  Were a person to possess or read --

23          THE COURT:  They're two different things.

24    BY THE DEFENDANT:

10:41    25    Q.  Were a person to read from this document and apply parts of

10:41  1    this document, in doing so committing a violation against the

2    United States? [sic]

3              MR. McINTYRE:  Object to the form of the question.

4              THE COURT:  Sustained.  Sustained.  That's a legal

10:42  5    question, would that be committing a crime against the United

6    States.  That's -- you can't ask a witness that.  That's a

7    legal conclusion.

8              In other words, what you need to do, you need

9    to -- Mr. Bujol, they have different -- they, in effect --

10:42  10   they're building blocks and you need to ask questions about the

11   building blocks to see whether or not, for want of a better

12   term, you can impeach the testimony that he gave.  In other

13   words, you can test it.  But on that question -- I'm just going

14   one question at a time.  So, next question, please.

10:42  15             THE DEFENDANT:  All right.  Let's go to the --

16   BY THE DEFENDANT:

17   Q.  One more question about the December -- the February 15th,

18   2009, arrest at George Bush Intercontinental.  Did the

19   defendant -- or did I ever discuss what he believed to be the

10:43  20   cause of that arrest?

21             MR. McINTYRE:  Objection, hearsay, your Honor.

22             THE COURT:  Now, "he" meaning who?  You?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Overrule the objection.

10:43  25   A.  Multiple times you discussed what you believed to be the

10:43  1    cause of the arrest, thought that you were being stopped

2    because -- you were being stopped because you had talked to

3    Anwar Awlaki.  You also said that you were being stopped

4    because you were Muslim and that the US Government was very

10:44  5    tight right now and stopping people from going overseas because

6    they wanted to prevent more Muslims to -- to have to fight more

7    Muslims, something to that respect.

8    BY THE DEFENDANT:

9    Q.   In the conversation that occurred between the CHS and the

10:44  10   defendant, when did the defendant state a desire to fight and

11   kill Americans or anyone abroad?

12        MR. McINTYRE:  Objection, argumentative, your Honor.

13   Object to the form of the question.

14        THE COURT:  Excuse me.  I was diverted for a moment.

10:45  15   May I hear the question again, please?

16        *(The requested portion of the record was read back by the*

17   *court reporter)*

18        THE COURT:  All right.  Well, you're jumping around a

19   bit.

10:45  20        I mean, the confidential informant you're

21   referring to; is that correct sir?

22        THE DEFENDANT:  Yes.

23        MR. McINTYRE:  There wasn't testimony from this

24   witness --

10:45  25        THE COURT:  Pardon me?

10:45  1         MR. McINTYRE:  There wasn't testimony from this

       2   witness --

       3         THE COURT:  "Was" or "was not"?

       4         MR. McINTYRE:  There was not testimony about what the

10:45  5   confidential source -- the defendant said.  That's going to

       6   come in through the confidential source through the course.

       7         THE COURT:  All right.  Sustained.  We can get into

       8   that later if we have to.

       9   BY THE DEFENDANT:

10:46  10  Q.  Let's move it along to some of the e-mails that took place

       11  between the source and the defendant.  Those were discussed

       12  yesterday, if I'm not mistaken, some of them.

       13        THE DEFENDANT:  I don't know what the exhibit is over

       14  there.

10:46  15        THE COURT:  Which one are you looking for, sir?

       16        THE DEFENDANT:  It's an e-mail that occurred

       17  March 17th of 2009.

       18        THE COURT:  Between who and who?

       19        THE DEFENDANT:  Between myself and the source.

10:46  20        THE COURT:  And the confidential source?

       21        THE DEFENDANT:  Yes.

       22        MR. McINTYRE:  It's 192, your Honor.

       23        THE COURT:  One ninety --

       24        MR. McINTYRE:  Two.

10:46  25        THE COURT:  All right.  Let's call it up if we can.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:47   1              All right.  There it is.

        2              THE DEFENDANT:  That says March 27th.  It was

        3      March 19th.

        4              MR. McINTYRE:  There were only two e-mails, to my

10:47   5      knowledge, your Honor.

        6              THE COURT:  You need to speak up, sir.

        7              MR. McINTYRE:  There were only two e-mails that he

        8      testified to, to my understanding.  One was February 19th,

        9      which is 151.  And this one is 192, which is the March e-mail.

10:47  10      Those are the only two that he testified in regards to.  So,

       11      maybe it was 151.  I don't know.

       12              THE COURT:  Do you want to try 151?  Mr. Bujol, do you

       13      want to see that one?

       14              THE DEFENDANT:  No.

10:47  15              THE COURT:  Okay.

       16      BY THE DEFENDANT:

       17      Q.  You said the defendant was issued a TWIC in this case, too,

       18      right?  A TWIC card?

       19      A.  The defendant was given a TWIC card, yes.

10:48  20      Q.  What agency purported to issue that card?

       21      A.  TSA, Transportation Security Administration.

       22      Q.  When it was issued, it had a picture on it which bore the

       23      likeness of the defendant, correct?

       24      A.  Yes.

10:48  25      Q.  And it also had a name on it, correct?

10:48   1    A.  Yes.

2    Q.  Which was, to your knowledge, what?

3    A.  Paul Mexia.

4    Q.  Spelling on that?

10:48   5    A.  P-A-U-L, Mexia, M-E-X-I-A.

6    Q.  On the night of May 30th, when the defendant was arrested,

7    he was found in possession of this government issued TWIC card

8    on his person, correct?

9    A.  Yes.

10:49   10   Q.  With the same picture, likeness, and same name?

11   A.  Yes.

12   Q.  Was there any evidence that the card had been tampered

13   with?

14   A.  I don't understand.

10:49   15   Q.  Was there any evidence that the card had been tampered

16   with, altered?

17   A.  It was a fake card.  So, do you mean from the time that you

18   had it to the time --

19   Q.  From the time --

10:49   20   A.  -- we recovered it?

21           THE COURT:  Hold it.  Hold it.  One question at a

22   time.

23               Ask your question now.

24   BY THE DEFENDANT:

10:49   25   Q.  From the time I possessed the card until the time you

10:49  1  recovered it -- or from the time it was issued until the time
       2  you recovered it, was it tampered with?
       3  A.  No.
       4  Q.  Was it in any way altered?
10:49  5  A.  No.
       6  Q.  So, just to be clear, it was issued but was not
       7  subsequently altered?
       8  A.  I don't understand the word "issued."  It was handed to
       9  you; and it was not altered after it was handed to you, from
10:50  10  the time that it was recovered off you.
       11  Q.  Okay.  When I say "issued," I mean coming from the TSA.
       12  A.  It never came from the TSA.  It -- you picked it up out of
       13  a rock in Memorial Park.  So, it -- I mean, it never came from
       14  TSA.
10:50  15  Q.  Where did it come from?
       16  A.  We had --
       17          THE COURT:  How was it generated?
       18          THE WITNESS:  We generated it.  We had elements of the
       19  Department of Homeland Security generate a fraudulent card
10:50  20  bearing the picture that you had provided, a name, and a
       21  fraudulent date of birth.
       22  BY THE DEFENDANT:
       23  Q.  So, it was a fraudulent card actually created by the FBI?
       24  A.  It was not created by the FBI, but it was created at the
10:50  25  request of the FBI.

10:50    1           THE COURT:  Wasn't a real card, right?

         2           THE WITNESS:  No, sir.

         3           THE COURT:  Okay.

         4  BY THE DEFENDANT:

10:51    5  Q.  Simple question, regardless of who created it or whether it

         6  was real, was it created under a governmental entity?

         7  A.  Yes.

         8  Q.  Okay.  So, we can establish that it was created under a

         9  governmental entity; and, at the point of its creation

10:51   10  throughout it being passed to me and being recovered from me,

        11  it was never tampered with or altered in any way?

        12  A.  No, it was not.

        13  Q.  Okay.

        14           THE DEFENDANT:  If we could pull up the video "For My

10:51   15  Wife."  I'm not sure what exhibit it is.  I think it's two --

        16           MR. McINTYRE:  107.

        17           THE DEFENDANT:  107.

        18      (Tape playing)

        19           THE DEFENDANT:  Okay.  Pause it right there.

10:54   20  BY THE DEFENDANT:

        21  Q.  What did he just say -- or what did I just say that I was

        22  going to do at this point?

        23  A.  You were going to emigrate and strive in Allah's cause.

        24  Q.  Okay.  And are you familiar with these words also being

10:54   25  words in the Arabic language?

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

10:54  1    A.  Yes.

2    Q.  Which are what?

3    A.  "Hijrah" for "migrating," is that --

4    Q.  Yes.

10:54  5    A.  Okay.

6    Q.  And what about "strive"?

7    A.  I'm not familiar with what the Arabic word is for that.

8    Q.  Not familiar with what the Arabic word is for "strive"?

9          THE COURT:  I guess not.  Next question.

10:55  10          THE DEFENDANT:  Keep playing it.

11      (Tape playing)

12          THE COURT:  Little more volume, please, just a little

13    bit.

14      (Tape playing)

10:55  15          THE DEFENDANT:  Okay.

16    BY THE DEFENDANT:

17    Q.  Okay.  Before this clip, we saw an image of a person

18    walking with a backpack on.  Now we see four guys armed,

19    praying, leading a prayer of non-armed people.  That's what's

10:55  20    in this picture, correct?

21          MR. McINTYRE:  Object to the defendant testifying,

22    your Honor.

23          THE COURT:  Overruled.  It's cross-examination.  He's

24    leading him.

10:56  25              Is that correct?

10:56  1              THE WITNESS:  Yes, it is.

2    BY THE DEFENDANT:

3    Q.  So, based on your knowledge and experience, is everyone in

4    this gathering prepared or geared towards armed conflict?

10:56  5              MR. McINTYRE:  Object to the form of the question,

6    speculation.

7              THE COURT:  Sustained.

8                   His testimony the last time, on direct

9    examination, was that -- at least the position of the FBI agent

10:56  10   with the background in this area, is that the people in the

11   most honored position at a prayer gathering are up front.  And

12   that's what his supposition was, that that's why those fully

13   armed guys, including the one with that rocket launcher there,

14   or whatever he's got on his backpack, were being either honored

10:57  15   or the most honored in that room, with everybody else behind.

16   That's basically what he said.

17   BY THE DEFENDANT:

18   Q.  And you would consider that the people behind are in the

19   presence of the people in the front?

10:57  20   A.  Yes.

21   Q.  Or they're with the people in the front?

22   A.  They're in the same area as the people in the front.

23   Q.  I mean, that's typically what -- if you're with someone,

24   that means you're in the same area, doesn't it, typically, in

10:57  25   common language?

10:57    1    A.  Yes.

2    Q.  So, if a person -- so, a person can be with armed fighters

3    and not themselves be an armed fighter?

4              MR. McINTYRE:  Objection, form of the question,

10:57    5    speculation.

6              THE COURT:  Sustained.

7              THE DEFENDANT:  Let's move it along.

8         (Tape playing)

9              THE DEFENDANT:  Okay.  Pause it, please.

10:59    10    BY THE DEFENDANT:

11    Q.  Now, if you noticed, when the audio message said the words

12    "time" and "chance" they appeared on the screen, as with

13    "as-sadiqeen" previously?

14    A.  Yes.

10:59    15    Q.  And these words were also superimposed over a globe?

16    A.  Yes.

17    Q.  What, if any, symbolism would you derive from that?

18    A.  The symbolism that I derive is that the world is controlled

19    by Allah, meaning the whole globe.

11:00    20              THE DEFENDANT:  Keep playing.

21         (Tape playing)

22              THE DEFENDANT:  Okay.  Let's -- if we can back up to

23    the beginning of this montage of rapid videos and superimposed

24    words here.

11:00    25         (Tape playing)

11:01  1          THE DEFENDANT:  Okay.  Stop it right there.

       2              Now, this is a bit fast; but to make this point,

       3      this following segment -- it's only a couple of seconds -- it

       4      needs to be played in slow motion so that the judge and

11:01  5      everyone here can have a chance to look at what the pictures

       6      are and what the words are.  And I need permission to do that.

       7          THE COURT:  What?

       8          THE DEFENDANT:  Just to have this 10 or 5 second

       9      segment played in slow motion so that all of the pictures can

11:01 10      be seen as with the superimposed words.

      11          THE COURT:  All right.  Can we do that?

      12          MR. McINTYRE:  We can't do that, Judge.

      13          THE COURT:  Okay.  You don't have the technology?

      14          MR. McINTYRE:  That's what my technology person --

11:02 15          THE COURT:  Okay.  They don't have the technology.

      16          THE DEFENDANT:  Okay.  Well, I have the disk here.

      17          THE COURT:  Yeah.

      18          THE DEFENDANT:  And I can play it over here.  And, you

      19      know, if -- if we can somehow hook that up, then that will

11:02 20      work.

      21          THE COURT:  Well, can you start it and stop it?

      22              I mean, in effect, put it on pause and then

      23      click, click, click?  Instead of playing it in slow motion, we

      24      can play it -- click it through.  How about that?

11:02 25              Probably the best we're going to do.  We're not

11:02   1    going to have any more technology in here.  But what would you

2    like the technician to do, please?

3             THE DEFENDANT:  Well, just -- okay.  Hook up a video

4    monitor to where I can have things that I want to display --

11:02   5             THE COURT:  No, sir.  No.  That's the best we can do.

6             In other words, ma'am, if you can --

7             You want -- you want from here on slow motion.

8    Is that correct?  Is that what you -- is that what you are

9    asking?  From this point forward --

11:03   10            THE DEFENDANT:  No, not from this point on.  Just for

11   the next few -- next few clips.

12            THE COURT:  Yeah.  Why don't we start -- can we click

13   through that?  Let's do the best we can.

14       *(Tape playing)*

11:03   15            THE DEFENDANT:  Okay.  Stop it.  Go back.

16       *(Tape playing)*

17   BY THE DEFENDANT:

18   Q.  Okay.  This is one example amongst many.  What's the word

19   on the screen?

11:04   20   A.  "Najya."

21   Q.  What is that, from your knowledge and experience?

22   A.  It's the name of your oldest daughter.

23   Q.  Okay.  And what's the picture in the background?

24   A.  Looks like it's a toucan maybe.

11:04   25            THE COURT:  A bird.

11:04   1                THE DEFENDANT:  Okay.

2                THE COURT:  A bird, just for the record.

3                THE WITNESS:  A bird.

4                THE COURT:  A toucan.

11:04   5    BY THE DEFENDANT:

6    Q.  Based on your knowledge and experience, is the defendant,

7    or any male in this courtroom, capable of fathering a toucan?

8                MR. McINTYRE:  Object to relevance.

9                THE COURT:  Overruled.

11:04   10                 Do you know?

11                THE WITNESS:  No.

12                THE COURT:  Okay.  We got that.  Go on.  Next

13   question.

14   BY THE DEFENDANT:

11:04   15   Q.  Would you -- do you see at the table, from where the voice

16   is emanating from this microphone, the likeness of Spielberg or

17   Scorsese, meaning movie directors?

18   A.  At this table?

19   Q.  Yes.

11:05   20   A.  I see you.

21   Q.  Okay.  With that in mind and with the current image, can we

22   duly associate every image in this video with every

23   corresponding word versus when the voice says a word and that

24   word enters onto the screen?

11:05   25                MR. McINTYRE:  Object to the form of the question.

11:05  1    THE COURT:  I don't understand it.  I don't understand

2    it.

3    THE DEFENDANT:  Let me put it another way.

4    BY THE DEFENDANT:

11:05  5    Q.  Yesterday you testified that "jihad" and "hijrah," those

6    words in and of themselves being superimposed over images

7    indicated a connection to that image.  I am asking the

8    question, in light of what we've just explored and of my

9    limited faculties as a movie maker, can we make that as an

11:06  10   infallible assumption, that every image and every word that is

11   superimposed over that image is meant to correspond to that

12   image?

13   MR. McINTYRE:  Object to the form of the question.

14   THE COURT:  Overruled.

11:06  15   You assume that or you just stating as to what

16   the --

17   THE WITNESS:  I believe that every picture was put

18   there for a purpose and there was a word put there for a

19   purpose.  I may not know every purpose of the connection, but I

11:06  20   know some of them.

21   BY THE DEFENDANT:

22   Q.  So, you don't know the purpose of a person --

23   THE COURT:  Wait a second.  He just gave you his

24   answer.  You need to move on, counsel.

11:07  25   THE DEFENDANT:  Keep going.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:07    1          *(Tape playing)*

         2                    THE DEFENDANT:   Okay.

         3     BY THE DEFENDANT:

         4     Q.   Who is the gentleman in the background, as you've pointed

11:07    5     out to us earlier?

         6     A.   The late Osama bin Laden.

         7     Q.   And what is he doing?

         8     A.   Holding his finger up.  Looks like he's speaking.

         9     Q.   Okay.  And you are familiar that the term "jihad" also

11:07   10     includes speaking, correct, as listed in the "42 Ways"?

        11     A.   Yes.  Yes.

        12     Q.   A form of that is speaking?

        13     A.   Yes.  There's a number in the "42 Ways" that are speaking

        14     on behalf of the mujahideen and the cause.

11:08   15     Q.   Okay.  In fact, most of the "42 Ways" are with regards to

        16     non-violent action?

        17     A.   I would have to look at it --

        18     Q.   Or do we have to go back and look at it again?

        19     A.   I would have to look at it to give you an exact number.

11:08   20     Q.   Okay.  We can go back and look at it.

        21                    THE COURT:   No, we're not.  We're going to keep

        22     moving.

        23     BY THE DEFENDANT:

        24     Q.   In fact, of those "42 Ways," there's only one way that

11:08   25     lists specifically armed -- arms training, preparing to fire a

11:08    1    weapon; and there's another tacit reference to physical

         2    fitness, which also, as we mentioned, could be done by someone

         3    who isn't --

         4             MR. McINTYRE:  Object to the defendant testifying and

11:09    5    not asking questions.

         6             THE COURT:  Overruled to some extent.  Because, if he

         7    wants to go back and look at one item, that's fine.  I'm not

         8    going to go back and look at all 42.  To that extent, overrule

         9    the objection.

11:09   10             Go on, Mr. Bujol.

        11    BY THE DEFENDANT:

        12    Q.  Did you know of the defendant to ever e-mail the CHS or

        13    any -- any e-mails emanating from the Abdul Bari account to

        14    contain lectures of the gentleman on the screen?

11:09   15    A.  There was a -- an e-mail from your account to your account

        16    that we looked at yesterday that was Yemen -- an al-Qaeda video

        17    that had his image superimposed.  I'm not sure if he was

        18    speaking, but there were words when his image was on the

        19    screen.  And that's the only one I'm aware of.

11:10   20    Q.  And that took place last -- last fall, approximately, just

        21    roughly?

        22    A.  It was in the summer of 2008.

        23    Q.  Summer of '08.  Okay.

        24             And the defendant at that point had been

11:10   25    expressing a -- a desire -- a limited understanding of Arabic,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:10    1    if any, at that point?

         2    A.   Around that time, yes, you were mentioning that you needed

         3    to learn Arabic, yes.

         4    Q.   And that segment you're referring to, what language was it

11:10    5    in?

         6    A.   Arabic.

         7    Q.   So, can you reasonably conclude that the defendant was both

         8    aware of the speaker and its contents?

         9            MR. McINTYRE:   Objection, calls for speculation.

11:11   10            THE COURT:   Overruled.

        11              Were you aware of that or not?

        12            THE WITNESS:   I was not.

        13    BY THE DEFENDANT:

        14    Q.   Were you aware of the defendant disseminating such -- this

11:11   15    one part of one video, that's all you were able to find?   Were

        16    you aware of the defendant disseminating any propaganda with

        17    regards to this individual, to other e-mails or to other

        18    individuals?

        19    A.   Regarding Osama bin Laden?   No, I don't believe I saw any

11:11   20    of those.

        21    Q.   Did you recover any of his lectures from the laptop that

        22    was seized on the night of May 30th, 2010?

        23    A.   I don't remember seeing any.

        24    Q.   Did you find any writings or lectures from this individual

11:12   25    in the house of the defendant when you did a search warrant on

11:12  1    his house?

2    A.  No.

3    Q.  I want to ask a personal question, but it's related to

4    testimony.  How did you join the army?  You said you joined the

11:12  5    army before you were an intelligence officer.

6             THE COURT:  Can we get this off, then?

7             THE DEFENDANT:  Yeah, we can get it off.  And we'll

8    come back to it.

9             THE COURT:  Turn the light on.  Turn that off.

11:12  10             Your question, sir?

11    BY THE DEFENDANT:

12    Q.  How did you get --

13    A.  I was commissioned as a second lieutenant in the army after

14    completing college and completing a series of courses from the

11:12  15    army.

16    Q.  I guess to rephrase it to put it more directly, what --

17    what, I guess, sparked your desire to want to join the armed

18    forces?

19             MR. McINTYRE:  Object to relevance.

11:13  20             THE COURT:  Sustained.

21             Next question, please.

22    BY THE DEFENDANT:

23    Q.  Prior to your conscription --

24             THE COURT:  Hold it.  Were you drafted or -- you

11:13  25    weren't drafted.

11:13  1                  "Conscription" means --

2            THE DEFENDANT:  Oh, I'm sorry.  "Commission."

3  BY THE DEFENDANT:

4  Q.  Prior to your commission, did you attend any meetings or

11:13  5  anything related to the armed services?

6  A.  Yes.  My minor was actually what's called "ROTC," military

7  science.  So, I had classes every semester; and, then, some

8  weekends and then during the summers, I had training courses

9  offered by the army.

11:14  10  Q.  So, your having a minor in this military science, taking an

11  array of courses, and the subsequent commission shows an

12  interest in your part on joining the armed services, correct?

13  A.  Yes.

14  Q.  Bet you were asked a lot of questions, right?

11:14  15  A.  Today or --

16  Q.  Well, at any point, about your desires, your endeavors.

17  A.  I was asked questions about joining the army?  Is that what

18  you are asking me?

19  Q.  I'm asking --

11:14  20          THE COURT:  Hold it a second.  I'm going to make a

21  statement.  Okay?  Everybody listen up.

22             I have never done this before, and I will not do

23  it yet in this criminal case.  The Fifth Circuit is the lead

24  circuit in the United States on timing orders in criminal

11:14  25  cases, in setting times for direct exam, for cross exam, and

11:15  1   shutting it down.  I've never done that before.

2          I don't -- want you to know that the research

3   that I've done on other cases, four other cases, that this

4   circuit is the lead circuit on allowing the judge to control

11:15  5   the time, even in a criminal case.  I'm not going to do it yet.

6   But I'm mentioning it to both sides, the government and the

7   defense.

8          I need you to move along, to tighten up the

9   questioning.  Make it relevant and move on.  Otherwise, there's

11:15  10  a possibility I may hit -- I may institute timing orders on

11  both sides.  And I don't want to do that.  We have plenty of

12  time to try this case.

13         I have plenty of time.  I'm not rushing anybody.

14  But I need this -- I need now, on cross-examination, tighten it

11:15  15  up.  Get to the main stuff.  What you are asking him now, I'm

16  going to -- I'm determining is irrelevant.  All right?

17         Now, get to a main -- get to what he testified

18  yesterday that affects the guilt, the innocence, the beyond a

19  reasonable doubt proof, and the proof itself.  You can impeach

11:16  20  this man, but you've got to get it going.

21         And that goes equal instructions for both sides.

22  So, let's get it moving.

23  BY THE DEFENDANT:

24  Q.  Throughout the course of this investigation, you have

11:16  25  made -- which you have made assumptions of the defendant which

11:16   1   has caused further investigation and ultimately led to the

        2   arrest, correct?

        3   A.   Yes.

        4   Q.   Were you always right about the defendant?

11:16   5   A.   No.

        6   Q.   So, you made mistakes about things you thought the

        7   defendant was or wasn't and, in reality, it turned out to be

        8   incorrect?

        9   A.   Yes.

11:17   10  Q.   When you asked the defendant, after he was arrested and

        11  Mirandized, how did he define "hijrah"?  What did he tell you?

        12          MR. McINTYRE:   Your Honor, I'm going to object because

        13  no testimony was taken of the statement that was --

        14          THE COURT:   Say that again.

11:17   15          MR. McINTYRE:   I'm objecting because, one, it exceeds

        16  the scope of direct, because he didn't testify about what the

        17  defendant said post-arrest on May 30th.

        18          And, number two, it's hearsay because it's --

        19  he's asking what the defendant said.  And, of course, it's an

11:17   20  admission of a party opponent when we ask that question; but

        21  it's hearsay as to this defendant.

        22          If he wants get the statement out, he needs to

        23  take the witness stand.

        24          THE COURT:   I see your point.  Sustained.  But -- but,

11:18   25  once again, there's no obligation for a defendant to take the

11:18   1   stand at all and to testify at all on a criminal case.  And

2   that continues straight through.

3               Mr. Bujol, if you elect to do it, for sure, you

4   can go into that.  Okay?  If you elect to take the stand

11:18   5   yourself and testify.

6   BY THE DEFENDANT:

7   Q.  With respect to the items provided on the night of the

8   arrest --

9               THE COURT:  Of the final arrest, sir?

11:18   10              THE DEFENDANT:  Yes, the final arrest, May 30 of 2010.

11   BY THE DEFENDANT:

12   Q.  -- did the defendant purchase any of those items?

13   A.  No.

14   Q.  Did the defendant contribute any money to the CHS to

11:19   15   purchase those items?

16   A.  No.

17   Q.  Did the defendant know aforetime what items would be

18   purchased?

19   A.  The defendant was told ahead of time he would be carrying

11:19   20   items but not specific items.

21   Q.  Did -- was the defendant told aforetime to whom these items

22   would be couriered to?

23              THE COURT:  Did they tell you who; is that what your

24   question is?  Or did you tell them or --

11:19   25              THE DEFENDANT:  Did they tell me.

11:19    1            THE WITNESS:  The CHS told you that it was going to a

2    person named Abu Bakr, who was another brother of the CHS, who

3    the CHS had told you he was al-Qaeda of the Arabian Peninsula

4    and --

11:20    5    BY THE DEFENDANT:

6    Q.  Did he say that he was a brother in the al-Qaeda of the

7    Arabian Peninsula?

8    A.  By that point in the investigation, again, with the code

9    words, "brothers" was used extensively to deal with the people

11:20   10    that were part of the group that the CHS was a part of.

11    Q.  Was "brothers" only used to refer to members of AQAP?

12    A.  In later stages of the investigation, yes.  Early in the

13    investigation, "brother" is a common term amongst Muslim men.

14            THE COURT:  "AQAP," again, "al-Qaeda in the Arabian

11:20   15    Peninsula," is that what the initials stand for, again?

16            MR. McINTYRE:  That's correct, your Honor.

17            THE COURT:  Okay.  Go on.

18    BY THE DEFENDANT:

19    Q.  Okay.  There was a second CHS at the port, as well,

11:20   20    correct?

21    A.  Yes.

22            THE COURT:  That was the guy in the yellow jacket,

23    helping carry the trunk up the gangway into the boat --

24            THE WITNESS:  Yes, sir.

11:20   25            THE COURT:  -- or into the ship?

11:21  1                    Okay.

2  BY THE DEFENDANT:

3  Q.  Was the defendant told of this person aforetime?

4  A.  Yes.

11:21  5  Q.  And how was he referred to?

6  A.  He was described as a "brother" who was not part of the

7  group that the CHS was a part of.  He was just someone who

8  helped the group and didn't know the purpose of your travel.

9  Q.  And that occurred the night of the arrest, correct?

11:21  10  A.  Yes.

11  Q.  So, the CHS was explicit and, in your assessment of that,

12  does it indicate that it is understood throughout this

13  investigation that the word "brother" is just a common phrase

14  used between Muslims?

11:21  15  A.  At this point in the investigation, "brothers," plural, was

16  used between you and the CHS to describe people like the CHS.

17  "Brother" was used throughout the investigation as a -- almost

18  a nickname for -- between two Muslim men.  And "akhi," A-K-H-I,

19  was also used, which is "brother" in Arabic.

11:22  20  Q.  Okay.  And the defendant was told he would be giving these

21  items to a brother, correct, that brother being Abu Bakr?

22  A.  He was told, yes, to Abu Bakr.

23  Q.  Okay.  So, he didn't refer to Abu Bakr as "the brothers,"

24  correct?

11:22  25  A.  He described Abu Bakr as being one of the brothers that

11:22  1    was --

2    Q.  Did he say "one of the brothers" or did he say "a brother"?

3          MR. McINTYRE:  Your Honor, I object to him

4    interrupting in the middle of answer.

11:23  5          THE COURT:  Sustained.  Let him finish his answer, and

6    then you can take him on the next question.

7                Sir, were you finished with your answer?

8          THE WITNESS:  This was at least an hour conversation,

9    and the CHS described the people that you would be meeting and

11:23 10    meeting you at the other end as "the brothers."  He gave you a

11    name, a descriptor, and a phone number in order to get in

12    contact with one of the brothers named Abu Bakr.

13    BY THE DEFENDANT:

14    Q.  Okay.  Where is al-Qaeda of the Arabian Peninsula based?

11:23 15    A.  In Yemen.

16    Q.  And it operates centrally out of Yemen.  Is that correct?

17    A.  Well, they operate, as the name implies, throughout the

18    Arabian Peninsula.  The leadership is believed to be in the

19    Yemen area.

11:23 20    Q.  Okay.  Where was the defendant headed on the night of

21    May 30th, 2010?

22    A.  He was told the ship was going to Annaba, Algeria, and to

23    stay there in a safe house about 30 days and then go on to

24    Yemen.

11:24 25    Q.  Was he told everything you just said, on the night of

11:24   1   May 30th?

2   A.  I don't recall.  He may have been told about the safe house

3   on a previous meeting.  I would have to look at it.

4             THE COURT:  Move back a little bit from the mike.

11:24   5             THE DEFENDANT:  Sorry.

6   BY THE DEFENDANT:

7   Q.  Is Algeria in the Arabian Peninsula?

8   A.  No.

9   Q.  Does it border the Arabian Peninsula?

11:24  10   A.  No.

11   Q.  Is it even in the Middle East?

12   A.  I would consider it to be in North Africa.  Some people

13   call it the "Middle East," that part of North Africa.

14   Q.  So, it's North Africa, below Spain, essentially?

11:24  15   A.  Yes.

16   Q.  Did the CHS ever mention to the defendant that he might go

17   somewhere other than Yemen or -- I'll withdraw that.

18             Is al-Qaeda in the Arabian Peninsula known to

19   have a base of operations in Algeria?

11:25  20   A.  I don't know.

21   Q.  But you've said they are centralized in Yemen, in the

22   Arabian Peninsula --

23   A.  Yes.

24   Q.  -- correct?

11:25  25   A.  Yes.

11:25  1    Q.   Okay.  Did the defendant, once he determined that the CHS

2    was a member of -- or purported to be a member of al-Qaeda in

3    the Arabian Peninsula, did he express a desire to join that

4    organization?

11:26  5    A.   He agreed and praised God when the CHS said that that's who

6    he would be joining.

7    Q.   You said he "praised God"?

8    A.   Yes.

9    Q.   And was that a statement or an action or what?

11:26  10   A.   It was words.

11   Q.   What did he say?

12   A.   "Alhamdulillah."

13   Q.   "Alhamdulillah"?

14   A.   Yes.

11:26  15   Q.   Okay.  And that's?

16   A.   "Praise be to God."

17   Q.   Okay.

18             THE COURT:  What did you take that to mean?

19             THE WITNESS:  Well, that meant that it was a good

11:26  20   thing.

21             And the fact that he didn't get out of the car

22   meant you agreed with it.

23   BY THE DEFENDANT:

24   Q.   Did he ever pledge an oath of loyalty to al-Qaeda in the

11:27  25   Arabian Peninsula?

11:27   1   A.  Not that I am aware of.

2   Q.  Did he ever -- what did he specifically offer to do for

3   al-Qaeda in the Arabian Peninsula?

4   A.  To carry the satchel that night; travel to be with them;

11:27   5   and then, on multiple occasions, the defendant, you, spoke

6   about being with the brothers, fighting with the brothers, and

7   dying with the brothers, which I took to mean -- since it was

8   after the CHS told you he was part of al-Qaeda in the Arabian

9   Peninsula and you would be joining it, to mean that that's what

11:28   10   you planned on doing with them.

11   Q.  So, the defendant -- you're stating now that the defendant

12   said he would fight for al-Qaeda in the Arabian Peninsula?

13   A.  No.  I said you would fight with the brothers, die with the

14   brothers.  And I took "brothers" at that point, since it was

11:28   15   after the CHS told you he was part of al-Qaeda in the Arabian

16   Peninsula, to mean that's the brothers you were speaking of.

17          THE COURT:  By the way, just for scheduling, we'll

18   take a break in about 15 minutes.

19   BY THE DEFENDANT:

11:29   20   Q.  After you heard these statements about -- that you're

21   purporting were said and the defendant boarded a ship headed to

22   Algeria, he still -- he was supposed to do what in Algeria?

23   A.  He was supposed to be met and picked up and was supposed to

24   deliver the items to a particular person.  And then there was

11:30   25   discussion about going to a safe house for about 30 days, to be

11:30    1    trained, and for -- that you need to be patient and then

         2    eventually you would be sent from there.

         3              THE DEFENDANT:  Your Honor, for lack of better ways to

         4    present this, I have an issue with a statement -- may be of his

11:30    5    lack of memory -- that the witness has just made about I said I

         6    wanted to fight for this organization.  That never occurred.

         7    He may be mistaken, and I would like to challenge that --

         8              THE COURT:  By what?  With what?

         9              THE DEFENDANT:  With the evidence, with whatever

11:31   10    channels I need to pursue to challenge that and tell him to

        11    produce that statement where I said I wanted to fight for this

        12    organization.

        13              THE COURT:  Okay.  Then ask him if he has a statement,

        14    where is it, and what's his recollection, is there anything in

11:31   15    writing, is there anything recorded.  Why don't you ask him

        16    that?

        17    BY THE DEFENDANT:

        18    Q.  Okay.  Where is the recorded statement where I said I

        19    wanted to fight for al-Qaeda in the Arabian Peninsula?

11:31   20    A.  Again, I said you would fight with and die with the

        21    brothers.

        22    Q.  Okay.  Well, fight or die with the brothers, where is the

        23    statement where I said that?

        24    A.  It's one of the exhibits.

11:31   25              MR. McINTYRE:  Your Honor, we have a video clip of it

```
11:31   1   if --
        2              THE COURT:  You got a video clip?
        3              MR. McINTYRE:  Yes, your Honor.
        4              THE COURT:  Well, when is it scheduled -- you have it?
11:31   5   Were you going to play it?
        6              MR. McINTYRE:  We were going to play it with the
        7   source because it was a conversation with the source.  But just
        8   letting the Court know that --
        9              THE COURT:  Well -- well, what's the government's
11:31  10   position?
       11              MR. McINTYRE:  Sounds like he's asking to see that
       12   evidence and present it to this witness, and we're just saying
       13   we do have that evidence.
       14              THE COURT:  You do have that?
11:32  15              MR. McINTYRE:  Yes.
       16              THE COURT:  Do you want to produce it now?  Is it on a
       17   clip?
       18              MR. McINTYRE:  Yes, your Honor.
       19              THE COURT:  Is there a transcript of it?
11:32  20              MR. McINTYRE:  It's a running transcript, your Honor.
       21              THE COURT:  What do you mean?  Oh, underneath.
       22              MR. McINTYRE:  A transcript, your Honor.
       23              THE COURT:  Do you want to see where it is now?
       24              THE DEFENDANT:  They're going to present it through
11:32  25   the witness.  So, we'll just keep --
```

11:32   1          THE COURT:  We're going to have the confidential

2    witness eventually on in this case.  So, is it okay to wait

3    till that point?  Because you've asked him -- you can ask

4    him --

11:32   5              That's the proof that you feel you have, right,

6    that recording; is that correct?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  All right.  That's their position.  Now,

9    we'll wait and see later or they can play it now, that very

11:32  10    small clip.  They can find it and put it on.

11              Is that correct, Mr. McIntyre?

12          MR. McINTYRE:  It's a three-minute clip.  We can do it

13    right now.

14          THE COURT:  It's a three-minute clip.  Or do you want

11:32  15    to wait and take it when you can ask somebody else about it?

16    You call it.  What's your preference?

17          THE DEFENDANT:  I'm going to, I guess, rest for now.

18    And --

19          THE COURT:  Okay.  So, you rest.  No further

11:33  20    questions?

21          THE DEFENDANT:  No further questions.

22          THE COURT:  Okay.  Thank you.

23              Anything further?

24          MR. McINTYRE:  No, your Honor.

11:33  25          THE COURT:  Okay.  Thank you.  Step down.

11:33    1                      This will be a good time to take a break.

2                      By the way, I see we got a class back there.

3   When do you have to leave?

4             UNIDENTIFIED FEMALE:  I think by 12:00.

11:33    5             THE COURT:  It's a class of students, just -- because

6   I'm making a record.  If you want, come back into my office.  I

7   can visit with you for about five minutes.  So, I always try to

8   visit with classes.  Rather than do it out here.  There's too

9   much going on.

11:33    10             If you want to stand -- if you would, why don't

11   you escort them -- how about escort them into my library area.

12   Okay?  Which is a big area.

13             I'll come in, and I'll visit with you a couple of

14   minutes.

11:33    15             All right.  We'll take a break for -- take a

16   look.  It's now 11:35.  We'll get back in at 11:55.  We'll see

17   you at 11:55.  So, everyone can just get a break.

18      *(Recess was taken)*

19        THE COURT:  Thank you.  Be seated.

12:00    20             Call your next witness.

21        MR. FEAZEL:  Government calls Officer Jeffrey Dunn.

22        THE COURT:  Yes, sir.  You want to come forward,

23   please?

24             Raise your right hand, be sworn, please.

12:00    25        THE CASE MANAGER:  Do you solemnly swear the testimony

12:00  1    you're about to give in the case now before the Court will be
       2    the truth, the whole truth, and nothing but the truth?
       3               THE WITNESS:  Yes, ma'am, I do.
       4               THE COURT:  Have a seat.
12:01  5                    All right.  Go right ahead.
       6         **JEFF DUNN, GOVERNMENT'S WITNESS, TESTIFIED:**
       7                    *DIRECT EXAMINATION*
       8    BY MR. FEAZEL:
       9    Q.  Officer, can you state your name for the judge and the
12:01 10    court reporter?
      11    A.  Yes, sir.  Officer Jeff Dunn, D-U-N-N.
      12    Q.  And where do you currently work?
      13    A.  I'm currently assigned, sir, to our airport division at
      14    Intercontinental Airport.
12:01 15               THE COURT:  What organization do work with?
      16               THE WITNESS:  Oh, I'm sorry.  Houston Police
      17    Department.
      18    BY MR. FEAZEL:
      19    Q.  How long have you been with the Houston Police Department?
12:01 20    A.  Thirty years, sir.
      21    Q.  How much longer do you have to go?
      22    A.  Hopefully only two months.
      23    Q.  Let's talk for a minute about your training and experience
      24    with the Houston Police Department.
12:01 25               THE COURT:  What division are you assigned to?

12:01  1          THE WITNESS:  In our airport division, sir.

2          THE COURT:  Airport division.

3          THE WITNESS:  Yes, sir.

4    BY MR. FEAZEL:

12:01  5    Q.  Can you tell the judge a little bit about your training and

6    experience you've had?

7    A.  Throughout my 30 years, sir?

8    Q.  That's correct.

9    A.  Yes, sir.  Originally I started out as a patrol officer.

12:01  10   And then, after 10 years, I went to investigations.  I worked

11   investigations, primarily auto theft, for about 16 years.  And

12   now I'm assigned to our airport division.  I've been there

13   about five years.

14   Q.  And what are your duties with the airport division?

12:02  15   A.  There's two primary duties there, sir.  First, you're

16   either assigned to a car -- and if you're assigned to a car,

17   you run calls for service, primarily traffic related,

18   accidents, stalled vehicles, traffic control.  There are some

19   businesses in that surrounding area we're responsible for.

12:02  20          And, then, your other duty there is to ensure the

21   perimeter security of the airport.  And then the other

22   assignment you can receive is assignment to one of the

23   terminals.  Again, you primarily run calls for service,

24   unattended bags, disturbance calls, intoxicated disturbance

12:02  25   calls.

12:02  1          We also assist other federal organizations there:

2    TSA, if they have issues with somebody perhaps bringing a

3    weapon through a check point; ID questions, sometimes somebody

4    may come in and may have some questionable ID.  We also work

12:02  5    with federal air marshals, usually on disturbances --

6          THE COURT:  Slow down a little bit.

7          THE WITNESS:  I'm sorry, sir.

8          THE COURT:  Court reporter needs to get it down.

9          THE WITNESS:  I got it.

12:03  10          THE COURT:  By the way, just as our schedule, we break

11    between 1:00 and 1:05 today.  So, we got -- just keep that in

12    mind.  Because we're in no rush.

13          Go on.

14          THE WITNESS:  Anyway, we sometimes work with the

12:03  15    federal air marshals involving disturbances onboard an aircraft

16    and sometimes with US Customs and Border Protection.  Usually

17    if they have somebody in custody for either --

18          THE COURT:  Slow down, please, sir.

19          THE WITNESS:  I'm sorry, sir.

12:03  20          -- transporting drugs or that may be a fugitive.

21    BY MR. FEAZEL:

22    Q.  And is it fair to say that all of your experience that you

23    have had in the past helps you with your job; such as being a

24    detective, being on patrol, all of those skills you acquired,

12:03  25    assist you to perform your duties at the airport?

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

12:03  1   A.  Yes, sir, absolutely.

2   Q.  And are you a Certified Peace Officer for the State of

3   Texas?

4   A.  Yes, sir, I am.

12:03  5   Q.  How long have you been so?

6   A.  Since I graduated from the Houston Police Academy, sir, in

7   August of 1981.

8   Q.  And are you also a Master Police Officer?

9   A.  Yes, sir, I am.

12:04  10   Q.  Can you tell the judge what that means?

11   A.  Basically, sir, that means you achieve credit and points

12   for both your years of service, your education, the training

13   that you go through, and any other additional training that you

14   take.

12:04  15       THE COURT:  Is that the what two stripes on the sleeve

16   mean --

17       THE WITNESS:  Yes, sir.

18       THE COURT:  -- that you achieve that?  In other words,

19   the recognition of Master Police Officer?

12:04  20       THE WITNESS:  Yes, sir, correct.

21       THE COURT:  About how many years does it take to

22   get --

23       THE WITNESS:  Again, your Honor, it depends on the

24   amount of your education.  In my case, it took about 19 years.

12:04  25       THE COURT:  Okay.  Thank you.

12:04   1          THE WITNESS:  Yes, sir.

     2   BY MR. FEAZEL:

     3   Q.  So, how long have you been a Master Peace Officer?

     4   A.  Since --

12:04   5          THE COURT:  Is it Master Peace Officer or Master

     6   Police Officer?

     7          THE WITNESS:  Same difference, sir.

     8          THE COURT:  Okay.

     9          THE WITNESS:  Well, if you subtract the -- so, that

12:04  10   would be 11 -- 11 years ago, sir.

    11   BY MR. FEAZEL:

    12   Q.  And how long have you been with the airport division?

    13   A.  This March, sir, it will be five years.

    14   Q.  And what airport are you assigned to?

12:04  15   A.  At Intercontinental, better known as George Bush.

    16   Q.  All right.  Let me direct your attention to February 15th,

    17   2009.

    18   A.  Yes.

    19   Q.  Were you on duty that day?

12:05  20   A.  Yes, sir, I was.

    21   Q.  And can you tell the judge what you were assigned to do?

    22   A.  I was assigned to Terminal D, which is -- primarily, it's

    23   the international departures and arrival building for the

    24   international carriers, the non-US carriers.  So -- I'm sorry.

12:05  25   Lufthansa, Singapore, Emirates, a lot of different foreign

12:05  1    carriers fly out of that terminal.

2    Q.   You mention Emirates as a foreign carrier.  Can you tell

3    the judge what that airline is?

4    A.   That's an Arab country.  I can't recall what exact country

12:05  5    they fly out of, sir, and are certified out of; but they are an

6    Arab country.  I think it's a conglomerate of maybe even the

7    United Arab Emirates.  I'm not positive about that.

8    Q.   So, do they fly to the Middle East?

9    A.   Yes, sir, they do.

12:05  10   Q.   What were your duties at Terminal D on that day, on the

11   15th of 2009 [sic]?

12   A.   Again, sir, like any terminal, I'm responsible for any

13   calls that originate out of that terminal.  We're also

14   responsible for ensuring traffic flow on the passenger dropoff

12:06  15   and return and, again, any other type of related calls that we

16   may get there.

17   Q.   Now, at some point in that day did you receive a call from

18   your sergeant, that was out of the ordinary?

19   A.   Yes, sir, I did.

12:06  20   Q.   Can you tell the judge when approximately you received that

21   call and whom it was from?

22   A.   Yes, sir.  At approximately 3:30, 3:40, in that range, I

23   received a call from my desk sergeant, Sergeant Loomis

24   [phonetic].

12:06  25   Q.   What was that -- what was that call in regards?

12:06   1   A.   She was advising myself, along with all the other terminal

2   units, that there was a task force that was expecting an

3   arrival of an individual that might have had an outstanding

4   warrant for his arrest.

12:06   5   Q.   Did they give you a description of the person who had these

6   outstanding warrants?

7   A.   Yes, sir, they did, both a name and a physical description

8   as well as the fact that he was probably going to be

9   accompanied by -- or was being accompanied by his wife and

12:07   10   young child.

11   Q.   So, did they give you the name Barry Walter Bujol, Jr.?

12   A.   Yes, sir, they did.

13   Q.   Okay.  And what did you do then, once you were given this

14   information?

12:07   15   A.   At that point, sir, myself and another officer that was

16   there, we went to -- there's three main entrances into the

17   terminal.  So, we positioned ourselves by the middle entrance

18   so that way we could see, you know, whoever could come into the

19   terminal.

12:07   20   Q.   Now, is it fair to say at this point in time you were

21   unaware of what terminal this person would be arriving at?

22   A.   Correct, sir.

23   Q.   Okay.  At some point in time, were you given an indication

24   that this individual, Mr. Bujol, would be coming to Terminal D

12:07   25   where you were stationed?

12:07    1    A.  Yes, sir.  At probably, literally, the very last minute, we

         2    were informed that he was pulling up to Terminal D.

         3    Q.  Were you given any specific instructions on what to do?

         4    A.  Yes, sir.  At that point we were informed that it was

12:08    5    requested that Mr. Bujol go to whatever airline counter he was

         6    going to check into and then allow him to pass through the TSA

         7    checkpoint, at which point we were supposed to intercept him.

         8    Q.  All right.  Now, why was he supposed to go through the TSA

         9    checkpoint?  Why didn't you just get him before that?

12:08   10    A.  I think primarily -- and, again, sir, I'm partially

        11    speculating.  I think, partially, there was some concern about

        12    what he might have been carrying on his person.  Also, as a

        13    means of further identifying exactly that this is the

        14    individual.

12:08   15    Q.  Okay.  So, based on your training and experience, you

        16    believed that he was going to go through screening for officer

        17    safety, to make sure he didn't have weapons on him?

        18    A.  Correct, sir.

        19    Q.  And a second point was to positively identify him?

12:08   20    A.  Correct.

        21    Q.  How is someone positively identified going through TSA?

        22    A.  At the point, sir, when you -- right before you enter,

        23    you're required to provide both your boarding pass and a valid

        24    ID, usually a driver's license or a passport, something along

12:09   25    that lines.

12:09  1    Q.  Now, did he present identification to the TSA screener?

2    A.  Yes, sir, he did.

3    Q.  Was he screened by TSA screeners?

4    A.  Yes, sir, he was.

12:09  5    Q.  Okay.  So, once Mr. Bujol goes through this TSA checkpoint,

6    what then happened?

7    A.  After he gathered up his belongings and such, along with

8    his wife's and his child -- the child was in a stroller --

9    they -- and the checkpoint is on a lower level.  The gates are

12:09  10   on the upper level there at Terminal D.  And they came up

11   through an elevator, where we were then waiting for them.

12   Q.  Okay.  How did you know he was going to go take that

13   specific route to where you were waiting?

14   A.  Well, sir, because, again, both in the -- what they were

12:09  15   carrying, with the young child -- you either come up through an

16   escalator or you come up through the elevator.  And the

17   escalator would be pretty risky for a child in a stroller.

18   Q.  All right.  So, it was forced flow, if you will.

19   A.  Yes, sir.

12:09  20   Q.  They had to go a certain way if --

21   A.  Yes, sir.  There was only one way, correct.

22   Q.  Okay.  Did you at some point in time see this individual?

23   A.  Yes, sir, we did.  We actually saw them enter the terminal.

24   Just based on the -- the description was good enough and such

12:10  25   and -- and both due to the fact that he was with his wife and a

12:10   1    small child, we really didn't have that much trouble

2    identifying him.

3    Q.  What did you do when you saw him?

4    A.  At that point, sir, we just maintained surveillance on him,

12:10   5    if you will.  We watched him.  And then, after he went to the

6    Emirates counter, I then went over to TSA and, when I was

7    reasonably confident he was going to check in and come on

8    through, notified them of the situation and that -- I asked

9    services --

12:10   10             THE COURT:  Slow down, please.

11             THE WITNESS:  Oh, I'm sorry, sir.

12             THE COURT:  Please, slow down.

13             THE WITNESS:  Oh, no problem.

14                  I asked for their assistance in positively

12:10   15    identifying him.

16    BY MR. FEAZEL:

17    Q.  And how did they assist you in identifying him?

18    A.  Again, sir, once he presented his boarding pass and ID,

19    then they basically gave me the thumbs up, letting me know that

12:10   20    that was in fact Mr. Bujol.

21    Q.  Once they gave you the signal, what did you then do?

22    A.  Again, sir, we just waited up on that upper level where,

23    again, the forced flow is and waited for his arrival.

24    Q.  Once he arrived, did you make contact with him?

12:11   25    A.  Yes, sir, I did.

12:11   1    Q.  How did that happen?

2    A.  I basically approached him, asked him if, in fact, he was

3    Mr. Bujol.  He indicated "yes."  I also asked him for some ID.

4    At that point then, sir, he then asked me why he was being

12:11   5    stopped or questioned.  And then I informed him that he had a

6    possible warrant for his arrest.

7    Q.  All right.  Well, let's go back real quickly.

8    A.  Okay, sir.

9    Q.  So, you asked him for his identification?

12:11  10    A.  Yes, sir.

11    Q.  What did he give you?

12    A.  He gave me a driver's license, sir.

13    Q.  Were you able to positively him as Barry Walter Bujol, Jr.?

14    A.  Yes, sir.

12:11  15    Q.  And do you see that person who you stopped and identified,

16    in the courtroom today?

17    A.  Yes, sir.  The gentleman sitting over there in the green.

18         MR. FEAZEL:  May the record please reflect the witness

19    identified the defendant?

12:11  20         THE COURT:  The record will so reflect.

21    BY MR. FEAZEL:

22    Q.  All right.  So, he asked you a question.  Can you repeat

23    what it was that he asked you?

24    A.  He basically asked me why I was stopping him, sir.

12:12  25    Q.  What did you tell him?

12:12   1    A.   I informed him at that point that we were notified he had a

         2    possible warrant for his arrest.

         3    Q.   What then happened?

         4    A.   At that point, sir, after gaining the ID, then I contact --

12:12   5    because at the terminals, unlike in other locations, we have no

         6    direct access to computers.   So, then what I did is contact our

         7    dispatch center; and then they ran Mr. Bujol to determine if

         8    he, in fact, did have a warrant.

         9    Q.   Okay.   Do you know where he was trying to fly to?

12:12  10    A.   Officer Wappacet [phonetic] checked, sir.   I believe he was

        11    informed that it was Abu Dhabi, I believe was the location.

        12    But I personally didn't talk to Emirates.

        13    Q.   Okay.   Now, after -- at some point in time, did you frisk

        14    him again?

12:12  15    A.   Just a light patdown, sir.   I watched TSA run him through.

        16    But as a matter of course, I just used the adage trust but

        17    verify.

        18    Q.   So, once the warrants were verified, did you arrest him?

        19    A.   At that point, sir, I didn't -- again, the warrant wasn't

12:13  20    verified yet.   He -- I requested for it -- once he identified

        21    himself, once dispatch did -- did ascertain that there was a

        22    possible warrant for him, we called for what's called a mobile

        23    unit, or patrol car.   He was then taken into custody and

        24    transported over to the station, awaiting verification of that

12:13  25    warrant.

12:13  1    Q.  Did anything else happen out of the ordinary?

2    A.  Just upon the initial stop, sir, and once Mr. Bujol

3    informed me -- he had made the statement that the warrants were

4    taken care of.  Of course, I informed him that, you know, we're

12:13  5    required to verify that.

6              At that point his wife became pretty upset.  She

7    was visibly and verbally upset and asking us why we were doing

8    this to them and what was going on.  And, again, I explained to

9    her the situation.  I also explained to her that she was

12:13  10   getting loud enough to become disruptive and that she needed to

11   calm herself both for her sake, her child's, and even her

12   husband's sake.

13   Q.  And did she, in fact, calm down?

14   A.  Yes, sir, reasonably.  She was still fairly agitated, but

12:14  15   she did calm down.

16   Q.  And was she allowed to leave?

17   A.  Yes, sir, she was.

18   Q.  And approximately what time, if you know, was the defendant

19   transported or given over to a marked patrol unit?

12:14  20   A.  I believe, sir, that was around 4:35, somewhere in that

21   range.

22             MR. FEAZEL:  No further questions.  Pass the witness.

23             THE COURT:  Thank you.

24                            - - - - -

25

**CROSS-EXAMINATION**

BY THE DEFENDANT:

Q.  You stated that I, the defendant, was arrested at the airport.  What did you find in the course of your searches and/or patdowns?

A.  Nothing, sir.

Q.  Okay.

A.  Nothing threatening.

Q.  When the defendant protested the warrants, saying that they had already been taken care of, did he elaborate on that?  What did I say about those warrants with respect to them already being taken care of?

A.  You did indicate, sir, that they had been paid for.  Again, I asked you if you had any documentation for that; and you had indicated "no."  But even if you did, I would still be required to verify the warrants.

Q.  At what point were the warrants verified?

A.  Once you were -- I believe, sir, once you were transported over to the station.  At that point, you were no longer in my custody.

Q.  So, they were verified once I was transported to Harris County, the same night?

A.  No, sir.  They were verified before you were transported. I believe you were taken over to our -- our station.

Again, at that point you were no longer in my

12:15  1    custody.  My job at that point was to generate what we call an

2    "Offense Report" to document at least my actions.  But I was

3    notified by the transport unit that the warrant was valid.

4    Q.  You said "by the transport unit"?

12:16  5    A.  Yes, sir.

6              THE DEFENDANT:  No further questions.

7              THE COURT:  Thank you.

8                   Anything further?

9              MR. FEAZEL:  Nothing further.

12:16  10             THE COURT:  Thank you, sir.  You may step down.

11    You're excused.  You're free to leave.

12                   Call your next witness.

13             MR. HEENAN:  United States calls Amy Tehan, your

14    Honor.

12:16  15             THE COURT:  Raise your right hand and be sworn,

16    please.

17             THE CASE MANAGER:  Do you solemnly swear the testimony

18    you're about to give in the case now before the Court will be

19    the truth, the whole truth, and nothing but the truth?

12:17  20             THE WITNESS:  Yes, I do.

21             THE COURT:  Have a seat, please.

22             **AMY TEHAN, GOVERNMENT'S WITNESS, TESTIFIED:**

23                   **DIRECT EXAMINATION**

24    BY MR. HEENAN:

12:17  25    Q.  Good afternoon, Ms. Tehan.

12:17   1    A.   Hello.

2    Q.   Before we get into the examination, I would just ask you to

3    speak slowly on the record so the court reporter can take your

4    statements.

12:17   5          THE COURT:   How do you spell your last name?

6          THE WITNESS:   T-E-H-A-N.

7    BY MR. HEENAN:

8    Q.   Ms. Tehan, how are you employed?

9    A.   I work for Canada Border Services Agency at the

12:17  10    Windsor/Detroit Tunnel.

11          THE COURT:   Again, say it again.   Which agency?

12          THE WITNESS:   Canada Border Services Agency, located

13    at the Windsor/Detroit Tunnel.

14          THE COURT:   It's Windsor, Ontario?

12:17  15          THE WITNESS:   Yes.

16    BY MR. HEENAN:

17    Q.   And that is for the Canadian Government, correct?

18    A.   Yes.

19    Q.   If you could just please tell the Court a bit about your

12:17  20    background and how you came to work in your current position.

21    A.   I went to school at Saint Clair College in Windsor,

22    Ontario.   I did a double degree in three years for police

23    foundations and law and security.   I then worked private

24    security for a few years until I applied for the job with

12:18  25    Canada Border Services Agency.   I took a 13-week training

course in Quebec.  Once I successfully completed that course, I
was hired on with the agency.

Q.  And what sort of work did you do for the agency when you
were first hired on?

A.  I determined the admissibility of goods and people coming
into Canada.

Q.  Is that a customs oriented position?

A.  Customs and immigration.

Q.  And what sort of work did you do specifically when you did
that customs inspections?

A.  We searched vehicles and determined what goods were coming
into Canada and if they were allowed to come into Canada.

Q.  Were you assigned to the Windsor Tunnel at that time?

A.  Yes.

        THE COURT:  How long have you been with the -- this
border security -- I guess, the border service agency in
Canada?  How long have you been a member of that police force?

        THE WITNESS:  Five and a half years.

        THE COURT:  Five and a half years.  And you went --
that's almost straight out of college?  You had some security
work before you went professionally to this customs and
immigration service?

        THE WITNESS:  Yes.  I worked security for about two
and a half years to build my résumé up to be able to get this
job.

12:19  1          THE COURT:  Okay.

2    BY MR. HEENAN:

3    Q.  You indicated you worked the customs area with respect to

4    your agency.  How long did you work in the customs area?

12:19  5    A.  Just under two years.

6    Q.  And do you have an approximation of how many vehicles

7    you've examined in the course of that time?

8    A.  Thousands.

9    Q.  And what did you do --

12:19  10          THE COURT:  Now, Windsor, Ontario, is that a major

11   immigration or border crossing point?

12          THE WITNESS:  Yes.  There's two in Windsor.  There's

13   the Ambassador Bridge, which I am located at now; and there's

14   also the Windsor Tunnel.  They're actually, I believe, the

12:20  15   busiest border crossings in all of Canada.

16   BY MR. HEENAN:

17   Q.  With respect to your job responsibilities, Officer Tehan,

18   did you go on to a different area of responsibilities after

19   your work with customs for two years?

12:20  20   A.  Yes.  I went over to the immigration, which is located at

21   the same place, inside the office.

22   Q.  When you say "same place," what place is that?

23   A.  At the Windsor Tunnel.

24   Q.  And what were your responsibilities working on the

12:20  25   immigration side?

12:20  1    A.  To interview travelers coming into Canada and determine

2    their admissibility and whether or not they would be allowed to

3    enter Canada.

4    Q.  How did the travelers that you interviewed typically arrive

12:20  5    at the port?

6    A.  By vehicle.

7    Q.  And were they cars, buses, or --

8    A.  Cars, buses, yes.

9    Q.  Where do you currently work with the agency?

12:20  10   A.  At the Ambassador Bridge in Windsor.

11   Q.  In terms of responsibilities, are you working solely

12   immigration at this point now or do you have other

13   responsibilities?

14   A.  Right now, I started with the commercial stream just a few

12:21  15   weeks ago.

16   Q.  What is the "commercial stream"?

17   A.  Dealing with trucks and cargo coming into Canada.

18   Q.  Your current responsibilities, do they involve solely

19   customs, solely immigration, or both?

12:21  20   A.  Everything.  Because, say, a truck comes into Canada.  I

21   have to determine the admissibility of the goods that are in

22   the truck, whether it be personal or commercial.  The

23   admissibility of the driver is the immigration portion of it,

24   which I would refer him to immigration if I have any concerns.

12:21  25   Q.  And have you had occasion to determine the admissibility of

12:21   1   people applying for admission into Canada?

2   A.   Every day, all the time.

3   Q.   And have you had occasion to rule upon or make

4   recommendations of whether they should be admitted into Canada?

12:21   5   A.   Yes.

6   Q.   Can you briefly describe that process?

7   A.   Well, if it's on primary inspection line, you just do basic

8   questioning to determine whether or not you want to have them

9   further examined for immigration purposes.

12:22   10          Once they come into immigration, you get into

11   more detail questioning about the purpose of their trip, how

12   long they're planning on staying, whether or not they're

13   admissible, whether it be criminally or whether they require

14   certain documentation to enter the country.

12:22   15   Q.   When you say they come into immigration, are you talking

16   about people who have been referred from a primary inspection

17   lane to a secondary inspection?

18   A.   Yes.   They would get referred from the primary inspection

19   lane into secondary, where their car would be searched.   If

12:22   20   they're referred to immigration, then they would then go from

21   there into the office and come and see me at the time.

22   Q.   And in terms of the process, if you're denying permission

23   to somebody who you've interviewed in secondary, what is the

24   process for denying them that admission?

12:22   25   A.   There's different processes you may choose to take.   One of

12:22   1    them you can just allow them to return to the United States

2    without any enforcement action.  Another one is you could

3    generate a report written against them if you find them to be

4    inadmissible to Canada.  And then there's different options

12:23   5    after that, that would determine where they would go from

6    there.

7    Q.  Officer Tehan, I would like to direct your attention to

8    March 21st, 2009.  Were you working that day?

9    A.  Yes.

12:23  10    Q.  Where were you working that day?

11    A.  In immigration at the Windsor/Detroit Tunnel.

12    Q.  And, again, immigration is the secondary inspection area at

13    the port?

14    A.  Yes.

12:23  15    Q.  Do you encounter a woman by the name of Ernestine Johnson

16    that day?

17    A.  Yes, I did, her and her small child.

18    Q.  Could you please describe what happened when you first

19    encountered Ms. Johnson?

12:23  20    A.  She was referred down from the primary inspection line.

21    There was a cursory search of her vehicle that was done.  The

22    officer that searched the vehicle relayed to me that she had

23    with her what we call her "worldly possessions," which normally

24    is things that -- anything of importance people bring with them

12:23  25    that they would need for future things and --

12:24    1   Q.  Was there anyone else in the vehicle that accompanied her,

2   beyond her infant daughter?

3   A.  No.

4   Q.  What kind of vehicle was it?

12:24    5   A.  It was a small weight sedan with a Texas plate.

6   Q.  And, so, if you would continue.  You said you learned that

7   her worldly possessions were in her vehicle?

8   A.  Yes.

9   Q.  And did you have occasion to talk to Ms. Johnson?

12:24   10   A.  Yes.  Through the interview that I conducted with her, I

11   learned that she was coming to Canada for two to three months.

12   She was unsure of where she was going.  She said she was going

13   to Toronto.  But Toronto has a lot of suburbs, but she didn't

14   have any place specific that she was going.  She had -- with

12:24   15   her, she had $5,000 cash.

16   Q.  And was that United States dollars?

17   A.  Yes.

18   Q.  Did you find anything unusual with the story that she was

19   telling you?

12:25   20   A.  Yes.  If someone is coming to take a trip, I believe that

21   they're going to have a place where they're going.  She also --

22   she had no hotel reservations.  She's traveling with a small

23   child.  She had traveled from Texas.

24        I asked her when she left, and she stated it was

12:25   25   about 26 or 27 hours ago.  And I learned that it takes about 23

12:25  1    hours to drive from Texas.  I asked her to provide hotel
       2    receipts for where she stayed in between that time, and she did
       3    not.  She stated that she slept on the side of the road, with
       4    the baby in the car, which I find to be very unusual
12:25  5    considering it's a very small child.  Number one, it's not
       6    safe; and it's out of the ordinary, I found.
       7    Q.  Did you have any concerns for her well being at that time
       8    of the interview?
       9    A.  Yes.  I was concerned of why she was coming to Canada with
12:26 10    her small child but no intended place of going to.  It just
      11    seemed odd to me.
      12    Q.  Did you make any inquiry of the whereabouts of her husband
      13    or partner?
      14    A.  Yes.  She provided to me a notarized letter from the father
12:26 15    of the child, named Barry Walter Bujol.  It did have contact
      16    information on it.  But the letter said that he gave permission
      17    for her to bring the child to Canada.
      18    Q.  Did you make any efforts to contact the Barry Walter Bujol
      19    mentioned in that letter?
12:26 20    A.  Yes.  Later on in the interview, I did try to contact him
      21    for approximately 45 minutes to an hour.  I left messages.  No
      22    call was ever returned to me.
      23    Q.  And do you know what telephone number it was that you
      24    called?  Was it a cell phone or a home in Texas; do you know?
12:27 25    A.  I'm not sure.

12:27  1    Q.  During the course of your communications with Ms. Johnson,
       2    did you make a determination about whether or not you would
       3    recommend her for admission or deny the admission into Canada?
       4    A.  Once I did a basic interview with her and I -- I felt that
12:27  5    something was wrong with her trip.  I thought she would be a
       6    non-genuine visitor, but I wanted to further investigate.

       7              So, I found an officer in secondary inspection
       8    and asked him to re-search the vehicle.  And I told him that
       9    she had no destine -- place in Canada to go, that she had
12:27  10   traveled straight through from Texas, and to look for any type
       11   of documentation on where she might be going or what her plans
       12   were for when she was in Canada.

       13             After he re-searched the vehicle, he found
       14   several items that were a little bit odd to be traveling with.
12:28  15   Q.  What sort of items?
       16   A.  There was previous tax -- income tax returns from several
       17   different years ago.  There was a lot of men's clothing in the
       18   vehicle, but there was no man traveling with them.  There was
       19   all the child's health and birth records, which I found odd,
12:28  20   that if you're just coming for a vacation that you would bring
       21   everything, including paternity documents that we found in the
       22   vehicle.

       23             There was a receipt from -- or a letter stating
       24   that she would receive $280 a month in food stamps, but she was
12:28  25   traveling with $5,000 cash.  I found that to be unreasonable.

12:28  1          There was education documents for Barry Walter
       2   Bujol but he wasn't in the vehicle and it was odd that she
       3   would travel with those.
       4          There was plane tickets that were never used.
12:28  5   She stated they were from February 2009, from the United States
       6   to -- the final destination, I believe, was Yemen.
       7          I checked her passport and I asked her about it
       8   and she stated that they never went on the vacation because her
       9   husband had to work.  And I asked her why she had the men's
12:29  10  clothing in the vehicle, and she stated that he left it in the
       11  car.
       12         There was also a printout of house hunting tips
       13  in Yemen.
       14         At that point there was -- there was a few things
12:29  15  that just weren't adding up.  And on --
       16  Q.  Based on all of these materials you've seen, did you make a
       17  determination of whether or not you were going to recommend her
       18  for admission or not?
       19  A.  Yeah.  I was going to recommend that she's a non-genuine
12:29  20  visitor and that possibly she was coming here to live, based on
       21  all the items that were in the car.
       22  Q.  Did you proceed to process her for non-admission to Canada?
       23  A.  Yes.  I wrote a -- what we call a "44 report."  It's
       24  written about a foreign national who we believe is inadmissible
12:30  25  to Canada.

12:30  1   Q.  And was that 44 report approved by someone else in your

2   agency?

3   A.  Yes.  The procedure is that another officer review it, and

4   they make a final determination on whether or not they can come

12:30  5   in or whether further enforcement action will be taken against

6   them.

7   Q.  What was the final determination on that 44 form you filed?

8   A.  Because she had a small child with her --

9        THE COURT:  Officer Tehan, slow down a little bit.

12:30  10  The court reporter needs to take it down.

11       THE WITNESS:  Okay.

12       Because she had a small child with her, he

13  allowed her to leave and return to the United States without

14  any further enforcement action.

12:30  15  BY MR. HEENAN:

16  Q.  After that 44 report was filed and that decision was made,

17  did you encounter anyone else at the port of entry, that you

18  associated with Ms. Johnson?

19  A.  Yes.  After I finished writing my report, I returned to my

12:30  20  regular duties, one which was to clear buses.  So, I went over

21  to the bus terminal and began to clear the Greyhound Bus that

22  had just arrived.

23  Q.  When you say "clear" the bus, what do you mean by "clear"

24  the bus?

12:31  25  A.  Process the travelers and the goods that are coming across

12:31   1    on it.

2    Q.  Was there anyone notable, from that day, that you processed

3    on the Greyhound Bus?

4    A.  Yes.  A gentleman approached me and handed me a Texas State

12:31   5    ID card which identified him as Barry Walter Bujol.  And

6    immediately I recognized the name as being the name on the

7    education documents, on the notarized letter that Ernestine

8    Johnson had provided me with.  So, I radioed to secondary to

9    stop the vehicle that was being returned to the United States

12:31  10    and --

11    Q.  The vehicle that Ms. Johnson was traveling in?

12    A.  Yes.  That her and her child were traveling in, yes.

13    Q.  Were they able to stop the vehicle before she returned to

14    the United States?

12:31  15    A.  Yes.

16    Q.  And what happened after they stopped her vehicle?

17    A.  Had her wait in secondary for a few minutes.  I asked

18    Mr. Bujol to come over to the counter so I could further

19    interview him.  I informed him that I had been trying to get

12:32  20    ahold of him for approximately an hour, and his eyes went very

21    wide in shock.  I asked him where he was going.  He said he was

22    going to visit friends.  I don't recall where he said those

23    friends were located.

24    Q.  Did he say how long he would be going to visit those

12:32  25    friends?

12:32   1   A.   Approximately two to three months.   But he was only

        2   traveling with a small backpack.   So, that was odd.

        3   Q.   And did he make any additional statement to you during that

        4   interview?

12:32   5   A.   Yes.   I informed him that his wife and child were being

        6   returned to the United States, that they were not being granted

        7   entry to Canada.   And I asked him where he was really going and

        8   his shoulders kind of just slumped in defeat and he stated that

        9   times were tough and that he was coming to look for work in

12:33  10   Canada.

       11           I asked him if he had a valid work permit to

       12   enter Canada; and he stated that, no, he didn't.   I informed

       13   him that he needs one if he wants to come and work here and

       14   that it's illegal for him to work in Canada without a permit.

12:33  15           I then informed him they'll be writing a report

       16   against him as I had his wife and that he will not be allowed

       17   to enter Canada.

       18   Q.   So, did you process a 44 report recommending that he be

       19   denied admission --

12:33  20   A.   Yes.

       21   Q.   -- to Canada, as well?

       22   A.   Yes.   I wrote a 44 report stating that he's inadmissible

       23   for coming to work in Canada, as his previous statements led me

       24   to believe.

12:33  25   Q.   What was the determination ultimately with his request for

12:33   1   application?

2   A.   Again, because of the small child, the other officer

3   allowed them to return to the United States.  Prior to the

4   return, I did notify US Customs and Border Protection that

12:33   5   these two individuals would be returning and I put a couple of

6   documents in an envelope for US Customs and Border Protection

7   to retrieve from the vehicle.

8   Q.   And was he then transferred over to Customs and Border

9   Protection on the United States side?

12:34   10   A.   Yes.  We gave him instructions on how to return back into

11   the tunnel to be processed on the United States side.

12   Q.   Prior to your encounter --

13        THE COURT:  Were any officials on the US side alerted

14   or you just got them back in the tunnel?

12:34   15        THE WITNESS:  No.  I called them prior, to let them

16   know these two people were coming and what vehicle they were

17   in.

18        THE COURT:  Okay.

19   BY MR. HEENAN:

12:34   20   Q.   Before you encounter Mr. Bujol on March 21st, 2009, are you

21   aware of any sort of lookout that existed in Canadian law

22   enforcement databases, looking out for Mr. Bujol?

23   A.   Absolutely not.

24   Q.   Had you received any sort of warning or heads-up from any

12:34   25   United States law enforcement about it?

12:34  1    A.   No.

2    Q.   For Ms. Johnson, was there any lookout for her?

3    A.   Absolutely not.

4    Q.   Any heads-up from the law enforcement in the United States?

12:34  5    A.   Nope.

6    Q.   Do you see Mr. Bujol, the person that you discussed from

7    March 21st, 2009, in the courtroom here today?

8    A.   Yes.

9    Q.   Can you please point to him and identify an article of

12:35  10   clothing he's wearing?

11   A.   Right.   At the defendant's table, in a green shirt.

12           MR. HEENAN:   Your Honor, I would just ask the record

13   reflect --

14           THE COURT:   Wait a second.   Oh, a green shirt.

12:35  15           Okay.   Yes, go right ahead.

16           MR. HEENAN:   I would just ask the record reflect the

17   identification of the defendant, your Honor.

18           THE COURT:   The record will so reflect.

19           MR. HEENAN:   No further questions.

12:35  20           THE COURT:   Thank you.

21           Mr. Bujol?

22                    **CROSS-EXAMINATION**

23   BY THE DEFENDANT:

24   Q.   You said you found some income tax refunds in your

12:35  25   search -- your cursory search of the vehicle?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:35  1    A.  It wasn't refunds.  It was --

2    Q.  Or income tax -- I'm sorry.

3    A.  The documents.

4    Q.  The documents.  I'm sorry.

12:35  5              You don't recall anything about those documents

6    that may have stood out of particular interest?

7    A.  No.  My concern was that they were in the vehicle for a

8    vacation.

9    Q.  Okay.  When you -- did you find anything that was

12:35  10   threatening or would be of a security interest to the Nation of

11   Canada?

12   A.  Of Canada?

13   Q.  Yes.  Or of the United States.

14   A.  There was a document titled "42 Ways of Supporting Jihad."

12:36  15   That is one of the documents that I did put in an envelope for

16   US Customs.

17   Q.  Okay.  And what -- other than that?

18   A.  There was the house hunting tips in Yemen and the plane

19   tickets to Yemen.

12:36  20   Q.  And what, if anything, can you tell us about the house

21   hunting tips in Yemen?  Did it --

22              THE DEFENDANT:  Your Honor, I have this document here

23   about what to bring to Yemen.

24              THE COURT:  What to where?

12:36  25              THE DEFENDANT:  What to bring to Yemen, and it just

12:36   1   lists these household general items.  And if I could present it

        2   or --

        3        THE COURT:  All right.  Let me ask you this.  Do you

        4   have --

12:36   5            Does the government know what he's talking about?

        6            I'm sorry.  Mr. Heenan.

        7        MR. HEENAN:  Your Honor, I would like to see the

        8   exhibit first.

        9        THE COURT:  Yeah.  Show it to opposing counsel,

12:37  10   please.

       11        THE DEFENDANT:  Yeah.  This is, you know, what to

       12   bring to Yemen, the house hunting tips.

       13        THE COURT:  All right.  Any objection by the

       14   government?

12:37  15        MR. HEENAN:  Your Honor, I have no objection to

       16   Mr. Bujol asking if the witness is familiar with this document.

       17        THE COURT:  All right.  Mr. Bujol, I know -- may I ask

       18   the marshal, if you would -- or the marshal back here --

       19   okay -- if that's easier.  If you would, just show it to the

12:37  20   witness, please.

       21            Mr. Bujol, you look like you're feeling better.

       22   You're out of the wheelchair.

       23        THE DEFENDANT:  It's a graduated process.

       24        THE WITNESS:  This was not the actual printout that

12:37  25   was shown to me.

12:37  1          THE COURT:  Have you seen one similar to it or you --

2    can you tell whether or not a similar -- that a similar copy is

3    what you were referring to, to the best of your knowledge?

4          THE WITNESS:  It was more of a list on a single page.

12:38  5          THE COURT:  Okay.  So, that's not the list that you --

6          THE WITNESS:  It's not the document, no.

7          THE COURT:  And if you would, let's return it to

8    Mr. Bujol.

9          I'm sorry, sir.  She cannot identify it as the

12:38  10   list that she saw.

11   BY THE DEFENDANT:

12   Q.  What items, if you can recall, in general, were contained

13   on that one-page list?

14   A.  I don't recall exactly what was on that list.  I just found

12:38  15   it odd that it was in the vehicle and that was the intention to

16   come to Canada.

17   Q.  Okay.  Okay.  I understand.

18         THE DEFENDANT:  I have no further questions.

19         THE COURT:  Anything further from the government?

12:38  20         MR. HEENAN:  No, your Honor.

21         THE COURT:  Thank you, ma'am.  You may step down.

22   You're excused.  You're free to leave.

23         Call your next witness.

24         MR. McINTYRE:  The government would call Felix

12:38  25   Bermudez.

12:38    1          THE COURT:  Okay.  You want to come forward, sir,

    2    please?

    3              Raise your right hand and be sworn.

    4          THE CASE MANAGER:  Do you solemnly swear that the

12:39    5    testimony you're about to give in the case now before the Court

    6    will be the truth, the whole truth, and nothing but the truth?

    7          THE WITNESS:  I do.

    8          THE COURT:  All right.  Go right ahead.

    9              Can you pull that mike in a little bit, sir, just

12:39   10    a bit?  I gather if you're reticent your voice will carry.

   11              Go on.  We'll see.

   12          THE WITNESS:  Yes, sir.

   13          THE COURT:  Go on.

   14    **FELIX BERMUDEZ, GOVERNMENT'S WITNESS, TESTIFIED:**

   15                    **DIRECT EXAMINATION**

   16    BY MR. McINTYRE:

   17    Q.  Can you state your name for the record, please?

   18    A.  Felix Bermudez.

   19    Q.  How do you spell your first and your last name?

12:39   20    A.  My first name is F-E-L-I-X.  My last name is

   21    B-E-R-M-U-D-E-Z.

   22    Q.  And where are you currently employed?

   23    A.  I'm employed with the New Jersey State Police.

   24    Q.  And how long have you been employed with the New Jersey

12:40   25    State Police?

12:40   1   A.   Ten years.

2   Q.   And prior to your employment with the New Jersey State

3   Police, did you have any other law enforcement experience?

4   A.   No.

12:40   5   Q.   What was your educational background before you joined the

6   New Jersey State Police?

7   A.   I got a degree in physical education with a concentration

8   in exercise science, and I worked for approximately --

9            THE COURT:   Which university?

12:40   10           THE WITNESS:   Kean College in New Jersey, sir.

11           THE COURT:   Okay.

12           THE WITNESS:   And then I worked in a cardiac

13   rehab/fitness facility for roughly about five years, six years

14   before I got into the police academy.

12:40   15   BY MR. McINTYRE:

16   Q.   And, so, other than working for the New Jersey State

17   Police, that's the only other job that you had had after you

18   graduated college.   Is that correct?

19   A.   Yes.

12:41   20   Q.   Now, what current -- what is the section or division that

21   you're currently assigned to in the New Jersey State Police?

22   A.   I'm assigned to the intelligence bureau.   Our section is

23   the cargo theft.   And at the time I encountered Mr. Bujol, I

24   worked for narcotics.

12:41   25   Q.   And, so, what does the cargo theft -- or the intelligence

12:41   1    division -- and you're assigned to cargo theft -- what do they

2    do in New Jersey regarding investigations?

3    A.  We investigate thefts of warehouses, hijackings of tractor

4    trailers, also all the nice groups that conduct those types of

12:41   5    activities.

6    Q.  When did you transfer into that division of the New Jersey

7    State Police?

8    A.  Roughly two, two and a half months ago.

9    Q.  And you previously testified that prior to that you worked

12:42   10   in a narcotics trafficking division.  Is that correct?

11   A.  Yes, sir.

12   Q.  And how long had you been in the narcotics trafficking

13   division?

14   A.  A little bit over five years.

12:42   15   Q.  And what were your job duties and what are the duties of

16   the other officers that work in the narcotics trafficking

17   division?

18   A.  My group was called the "corporate outreach squad," which

19   basically we did a lot of work in hotels, storage facilities,

12:42   20   rest areas.  Our primary objective was to stop trafficking as

21   it is in transport, using the locations that people may use to

22   store them in a -- or stop or state.

23   Q.  And what sort of investigative techniques did you and the

24   other officers in that division use to, I guess, identify drug

12:42   25   traffickers within hotels and these other types of areas that

12:42   1   you just described?

2   A.   If we're doing the hotels, we look for source areas.   We

3   also -- we do various investigations --

4            THE COURT:   What kind of investigations?

12:43   5            THE WITNESS:   The narcotics investigations.

6            THE COURT:   Pull the mike in a little bit.

7            THE WITNESS:   They're narcotics investigations.

8            THE COURT:   Thank you.

9            THE WITNESS:   We start out with the -- if we start in

12:43   10   a hotel, we start from the outside in.   We will look in at

11   cars, cars from the resorts area states, then try to maybe just

12   walk by the car, see what do we see in maps, just things of --

13   that may indicate suspicious activity.   After we identified a

14   vehicle of interest, we may proceed to ask some more questions

12:43   15   to staff or sources that we develop.   And some of the things we

16   look for is people who just will be called "walk-ins."   They

17   have no reservations.   They just decide to pop up and stay for

18   several days.   They pay in cash.

19            In the area I worked, some of the townships, due

12:43   20   to the high crime area, they require identifications.

21   Everybody must provide identifications.   And we also ask

22   people, "Who gave you a little headache, problems trying to

23   give you ID?   Who was questioning?"   So, those are some of the

24   leads that we use to start to identify our possible targets.

12:44   25   Q.   And you described a technique that you called "from outside

12:44  1   in."  And as you explained that, you started it and looked for

2   suspicious activity around the hotel and then zeroed in on

3   particular individuals or cars, and then ultimately used

4   information obtained directly from the people that ran the

12:44  5   hotel or the type of building.  Is that correct?

6   A.  Right.

7   Q.  Did the people that you use or had occasion to use, that

8   were associated with the hotel, were those considered sources

9   or were they just people that worked within the hotel that

12:44  10  provided information?

11  A.  Both.  Sometimes they are sources.  Some of them are just

12  hotel staff.

13  Q.  Now, prior to joining the drug trafficking squad, which

14  division or section did you work in?

12:44  15  A.  I was operations, which was regular patrol uniformed duty.

16  Q.  And what were your duties as a regular patrol officer?

17  A.  I was assigned to what we call -- we have general policing

18  and traffic.  I was assigned to a traffic station.  A lot of

19  our stuff was motor vehicle offenses.  We just -- crimes, some

12:45  20  of the rest areas, like theft.  Sometimes we have domestic

21  violence calls and stuff like that.  But a lot of it is just

22  regular patrolling.

23  Q.  And let's go back to March of 2009 when you were working in

24  the drug trafficking area.  Were you assigned a particular

12:45  25  geographical area, also?

12:45   1   A.   Yes.   Our team was assigned to work the Hudson County and

2   Bergen County area of the state.

3   Q.   And during the time that you had been in the drug

4   trafficking squad, were you always assigned to that

12:45   5   geographical area?

6   A.   Yes.

7   Q.   And as of March 25th of 2009, were you very familiar with,

8   I guess, the hot spots in that geographical area, for lack of a

9   better term?

12:46   10   A.   That's correct.

11   Q.   Now, let me take you to March 25th of 2009.   You worked

12   with another officer on that day, Sergeant Rich McKay

13   [phonetic].   Is that correct?

14   A.   Correct.

12:46   15   Q.   And during the course of March 25th, did you receive

16   information from Officer McKay [phonetic] regarding suspicious

17   activities that was occurring in the area?

18   A.   Yes.

19   Q.   And what was the information that you received?

12:46   20   A.   Sergeant McKay [phonetic] called me during our morning

21   checks and stated that he had an individual with a -- some kind

22   of custom T-intercept type notification, was notified to

23   contact other agencies.   So, he notified our group supervisor

24   Cesar -- Sergeant Cesar Human [phonetic].   And we all started

12:47   25   making our way to assist Sergeant McKay [phonetic] with his

12:47  1    investigation.

2    Q.   And what was the location that you made your way to at the

3    request of Sergeant McKay [phonetic]?

4    A.   The Days Inn Hotel.

12:47  5    Q.   And what is the address for the Days Inn Hotel?

6    A.   I know it's on Route 46 in Ridgefield Park.  The street

7    address, I don't recall.

8    Q.   And that will be in New Jersey.  Is that correct?

9    A.   Correct.  And it will be in the westbound side.

12:47  10   Q.   And did you learn what initially drew the car and the

11   individuals that you were ultimately looking at to Sergeant

12   McKay's [phonetic] attention?

13   A.   Sergeant McKay [phonetic] indicated he had a source in a

14   car and he proceeded to do further investigation.  He made a

12:47  15   couple of database checks, and it revealed that the registered

16   owner, Ms. Ernestine Johnson, was denied entry into Canada and

17   she was traveling with an other individual.  And then Sergeant

18   McKay [phonetic] proceeded to further inquire about the vehicle

19   in the hotel.  And it was learned Mr. Bujol was staying there

12:48  20   and he had, I believe, listed the vehicle to the room.  And --

21   Q.   And did you learn -- you had previously described people

22   that stopped in with no reservations and paid cash.  Did you

23   learn whether Mr. Bujol and Ms. Johnson had done that or did

24   you ever find that information out?

12:48  25   A.   Yes.

12:48   1   Q.   And what was the information that you found out?

        2   A.   He was a walk-in guest that was cash pay.

        3   Q.   And what is significant in that particular area of

        4   investigation about walk-in guests and cash pay?

12:48   5   A.   It's part of my -- what I have been involved with the last

        6   five years in narcotics, a lot of people -- walk-ins or that

        7   travel unannounced that are the traffickers are not really set

        8   on a time or -- or a set time when to meet.   It's just, "Be up

        9   here.   It will be ready."   And it will be two hours, could be

12:49  10   five days.

       11           So, having a walk-in guest just comes in is just

       12   basically being told, "Show up here and then someone will get

       13   in touch with you, and we'll see.   We'll go from there."   The

       14   cash paying is significant because it's less paper trail.

12:49  15   There's no credit cards being used.   There's no reservation

       16   being made.   So, you really can't track the origin of the

       17   person that's in the hotel if that hotel does not follow the

       18   policy of getting photo identification.

       19   Q.   So, at the time that you had arrived, you had learned

12:49  20   information these people had been turned back from Canada and

       21   the fact that it was a walk-in and a cash pay.   And that was --

       22   was that sort of the extent of your knowledge at the time you

       23   arrived at the Days Inn location?

       24   A.   Yes.   And, also, one of the -- I think it was a

12:50  25   notification of stop and detain from the EPIC check that we

12:50   1   conducted.  And that was the extent of my knowledge.

2   Q.  What is an "EPIC check," and what is a "stop and detain"?

3   A.  The "EPIC" is El Paso Intelligence Service -- Center.  And

4   basically we try to get as much information of the people that

12:50   5   we have that are involved in other investigations, have been

6   looked at by other agencies for -- in our case we were looking

7   specifically for narcotics trafficking, money laundering.  And

8   that was the reason why we call EPIC.

9        EPIC also has access to other databases, and some

12:50   10  of them are customs.  And they provided that information

11  from -- that list of Mr. Bujol and Ms. Johnson.

12  Q.  Okay.  And did you learn from Officer McKay [phonetic] as

13  to whether or not the defendant Mr. Bujol was wearing Muslim

14  garb or whether he was wearing American style clothes?

12:51   15  A.  When we first encountered him, he was wearing a Muslim

16  garment, a robe with a hat.

17  Q.  And later on, during the course of the investigation, did

18  you observe him in clothes other than Muslim garb?

19  A.  Yes.  He switched to slacks and a button-down shirt.

12:51   20  Q.  Now, when you arrived at the hotel, did you observe

21  Mr. Bujol packing up his car or -- or what did you observe when

22  you first arrived?

23  A.  We first arrived, we set up surveillance and we saw him

24  retrieve some items from the vehicle and he took them into the

12:51   25  room.  I want to say "moments," but a short while later he

12:51  1   retrieved the stuff back -- he took the stuff from the room and

2   put them back into his vehicle.

3   Q.  And how much time transpired between when you saw him

4   taking things out of the trunk of the vehicle and into the

12:52  5   hotel room and then coming back and packing or putting the

6   stuff back in the trunk of the car?

7   A.  Possibly between -- within a half hour and an hour.

8   Q.  During this half hour or hour, what were you and the other

9   officers doing regarding Mr. Bujol's vehicle?

12:52  10  A.  Once we -- it was determined that it was no stop and

11  detain, we were just going to follow surveillance -- establish

12  surveillance and follow him around.  Also, as we were setting

13  up to do that, we contacted the terrorism screening center and

14  we were put in touch with Sergeant Mike Ryenaldi [phonetic],

12:52  15  who was a sergeant in the Joint Terrorism Task Force.  And he's

16  a trooper.  So, he came out -- was on his way out to meet us to

17  take part in this surveillance.

18  Q.  Why was someone from the Joint Terrorism Task Force brought

19  out; do you know?

12:53  20  A.  Yes.  Because part of that EPIC information that we

21  received had a -- contact the TSA, which is the Terrorism

22  Screening Center.  So, that's how come Sergeant Reynaldi

23  [phonetic] came out.

24  Q.  And was the reason for calling him out to give you advice

12:53  25  on how to handle the investigation and whether to conduct a

traffic stop or what to do during the course of the

investigation, so as not to affect other investigations?

A.   That was part of it, to -- for him -- it's common courtesy

that we do as -- we like to contact those agencies involved.

And he -- I think he wanted us to, you know, do the

surveillance.

          And we did stop and detain them or interview them

just to get general information, but he just joined the

surveillance at that time.

Q.   All right.  Now, as you saw Mr. Bujol go back to his car

from the hotel room, put things in the trunk, what happened

next during the course of the surveillance?

A.   He put the stuff in his vehicle, his wife came out, and

they departed.  They traveled south down the Jersey turnpike.

They got off, I believe, the exit for Secaucus.  This is

Route 3 in the Lincoln Tunnel.

          He started driving through the area.  And we

believed he was doing countersurveillance by entering a parking

area, drove around it, pulled back out, performed several U

turns.  He finally pulled into a Wal-Mart, at which time his

travel companion, Ms. Johnson, she left the vehicle and he was

left behind.

          During that surveillance, he retrieved a backpack

and he was sort of looking through it.  And one of these

unknown, you know, guests that's going into the Wal-Mart was

12:55  1    walking by.  He quickly closed it and just returned back to his

2    vehicle and waited for Ms. Johnson.

3    Q.  Did you find that unusual?

4    A.  Yes.

12:55  5    Q.  Why did you find it unusual?

6    A.  The location that we was at, at the Wal-Mart, and the --

7    the person that was walking by, it wasn't -- it wasn't any need

8    for alarm or -- if you were just carrying out normal business,

9    there weren't need for a normal person to be alert if someone

12:55  10   is just walking, especially that person that was walking by.

11   There was no reason for alarm.

12   Q.  Now, you said that there were several U-turns done during

13   the surveillance, that you believed to be countersurveillance.

14   What exactly is "countersurveillance"?

12:55  15   A.  Well, it's people involved in some type of criminal

16   activity, use movements or maneuvers to try to identify

17   vehicles they are following, particular -- especially law

18   enforcement, in order to, you know, if they're going to --

19   doing a -- conduct a meet or conduct an illegal transaction,

12:56  20   they can either cancel it or move it to a different location or

21   for a different time.

22   Q.  Okay.  And then, once you had seen the defendant at the

23   trunk in the Wal-Mart, did him and his wife eventually leave

24   that location?

12:56  25   A.  Yes, they did.

12:56  1    Q.  And can you tell the Court where they traveled after they

2    left the Wal-Mart?

3    A.  They proceeded eastbound on Route 3 and met up in the Park

4    and Ride that would -- you can take a bus -- buses into New

12:56  5    York City from there.

6    Q.  And is that called the Port Authority Park and Ride?

7    A.  Correct.

8    Q.  Now, at some point did you or other officers make the

9    decision to stop the vehicle?

12:56  10    A.  Yes.  The sergeant made the decision to make -- approach

11    the vehicle, conduct an interview.

12    Q.  Did you have information that would lead you to stop the

13    vehicle, for example, probable cause related to driving without

14    a license or traffic violations?

12:57  15    A.  Yes.  Part of the database checks that we conducted after

16    we identified Mr. Bujol revealed that his driver's license was

17    suspended.

18    Q.  Did you or other officers observe traffic violations during

19    the course of your surveillance, that were committed by

12:57  20    Mr. Bujol driving the vehicle?

21    A.  Yes, those illegal U-turns.

22    Q.  Now, can you tell me how you effected the traffic stop of

23    the vehicle?

24    A.  I believe Mr. Bujol had already stopped, if I -- my memory

12:57  25    is a little off on that.  But we approached him and his wife,

12:57   1  and Sergeant McKay [phonetic] started speaking with Mr. Bujol.

        2  Q.  And do you recall who all was in the vehicle?

        3  A.  His wife, Ms. -- his wife Ms. Johnson and a small child.

        4  Q.  After Mr. Bujol was stopped, was he questioned?

12:58   5  A.  Yes.  Sergeant McKay [phonetic] with Sergeant Human

        6  [phonetic], they both -- asked them out of the vehicle and they

        7  talked in a separate area so as Ms. Johnson not to overhear the

        8  conversation.

        9  Q.  What was he questioned about, and how did he respond?

12:58  10  A.  He was asked, you know, what was he doing in the area.  He

       11  said he was on his way to New York City to visit the sights, I

       12  believe.

       13  Q.  And did you ask -- was he asked any other questions?

       14  A.  I believe he was asked if he had any money.  He indicated

12:58  15  "yes."  Asked him about the amount.  He said -- I think he said

       16  close to $5,000, which he eventually produced.

       17  Q.  Where did Mr. Bujol produce the $5,000 from?

       18  A.  He had, I believe, couple of -- maybe $800 in his pocket,

       19  and the rest was concealed in his sock.

12:59  20  Q.  And did he give you an explanation or provide an

       21  explanation as to why he had $5,000 cash?

       22  A.  I think he told Sergeant McKay [phonetic] it was his tax

       23  money.

       24  Q.  Was there anything else significant that Mr. Bujol stated

12:59  25  during that time period?

12:59   1   A.   I think when we asked him about the money -- there was also

2   some tax documents.   And when asked, if he only paid X-amount

3   of tax dollars, why such a high return, and he had no answer

4   for it.

12:59   5   Q.   And consent was obtained to search the vehicle, and the

6   vehicle was searched.   Is that correct?

7   A.   That's correct.

8   Q.   And you recall that there were two -- two computer drives

9   that were -- thumb drives that were seized.   Is that correct?

12:59   10   A.   Yes.

11   Q.   And there were other items that were seized out of the

12   vehicle, that were eventually turned over.   Is that correct?

13   A.   Correct.

14   Q.   Do you see the defendant in the courtroom today?

01:00   15   A.   Yes, I do.

16   Q.   And can you point to him and tell me what type of clothing

17   he's wearing?

18   A.   He's sitting right over there, and he's wearing a green

19   jumpsuit.

01:00   20       MR. McINTYRE:  May the record reflect that the witness

21   has identified the defendant, Mr. Bujol?

22       THE COURT:  The record will so reflect.

23       MR. McINTYRE:  Pass the witness, your Honor.

24       THE COURT:  Okay.  Mr. Bujol?

01:00   25       THE DEFENDANT:  It's kind of close to 1:05.  You want

01:00   1   to start and break or --

2        THE COURT:  Yeah.  How much time do you think you have

3   with this witness?

4        THE DEFENDANT:  Probably about 10 minutes.

01:00   5   THE COURT:  What do you want to do?  Keep going?

6        THE DEFENDANT:  That's fine.

7        THE COURT:  Okay.  Yeah, let's keep going.  And then

8   we can adjust our lunch by 10 minutes.  Because we got back in

9   here -- yeah, without my even going in to figure it, 10

01:00   10  minutes, sure.  Go right ahead.

11       THE DEFENDANT:  Okay.  First, I have another set of

12  documents that pertain to this incident.

13       THE COURT:  Okay.  And what -- what are you purporting

14  them to be?

01:01   15  THE DEFENDANT:  I purport them to be the arrest

16  report.

17       THE COURT:  Does he -- is it in evidence?

18       THE DEFENDANT:  Yes.  This is what I was provided with

19  by --

01:01   20  THE COURT:  Okay.  So, we can call it up on the

21  machine?

22       MR. McINTYRE:  No, it's not in evidence.  It was

23  provided in discovery as Jencks material.

24       THE COURT:  Oh, discovery.

01:01   25  MR. McINTYRE:  It's the offense report.  That's

01:01   1    what --
        2            THE COURT:  Okay.  Sure.  You want him to see if he
        3    can identify it?  Is that it?
        4            THE DEFENDANT:  Yes.
01:01   5            THE COURT:  I tell you what.  We can go 10 minutes.
        6    We'll see how it goes.  I'm not going to push it.  If we can't
        7    finish it, we'll pick it up this afternoon.
        8            Is that all right with your schedule, Officer?
        9            THE WITNESS:  Yes, sir.
01:01  10            THE COURT:  Marshal, why don't you, if you would, be
       11    of assistance.  Show the witness these documents, and see if he
       12    recognizes them.
       13            THE WITNESS:  Thank you.
       14            Some of them, I do recall.  Some of the stuff,
01:02  15    no, I don't.  The arrest reports, the -- the Bergen Police
       16    Department arrest reports, I remember.  The state police
       17    reports, some of this tax documents, I vaguely remember seeing
       18    them.
       19            The stuff from the superior court, I never seen
01:03  20    these documents.
       21            THE COURT:  And that's it?
       22            THE WITNESS:  Yes.  Some of the registration stuff.
       23            THE COURT:  All right.  Let me ask you this,
       24    Mr. Bujol.  Why don't we do this?  If you need to ask him
01:03  25    questions about those reports, make sure, now that you've seen

01:03 1   it -- he'll identify what he's speaking from.  Okay?

2                  THE WITNESS:  Okay.

3                  THE COURT:  It's the only copy he has.  Is there

4   another copy around?  I tell you what -- yeah, if you would,

01:03 5   return the documents to the defendant.

6                       And, Mr. Bujol, if he doesn't recognize the

7   document, we can't go any further.  If he does, then, sure, you

8   can take him on cross-examination.

9                          **CROSS-EXAMINATION**

10  BY THE DEFENDANT:

11  Q.  Okay.  You said when you first saw me, aside from the EPIC

12  check and the Muslim garb, what caught your attention was the

13  reported countersurveillance maneuvers?

14  A.  No.  We -- we were -- the reason we were following you was

01:04 15  because your vehicle was a vehicle of interest.  And

16  information -- and, in addition, with the information we

17  received, you had a vehicle of interest.  You were a walk-in

18  guest, you were cash paying, these are things that we normally

19  investigated in the course of our normal business day.  Some of

01:04 20  the information we received was just add -- bolstered all of

21  our other leads.

22  Q.  But you had mentioned after that, that I engaged in

23  countersurveillance maneuvers.  You said that several times, as

24  if I was trying to avoid someone or protect or conceal the

01:04 25  identity of my movements.  You said -- you said I engaged in

01:05   1    countersurveillance maneuvers.

2    A.   When you left the hotel, yes.

3    Q.   Yes, when I left the hotel --

4    A.   Right.

01:05   5    Q.   -- after I was being surveilled.

6              When you talked to me and you asked me what was I

7    doing in Jersey, did I -- did I tell you that I had ever been

8    to Jersey before?

9    A.   I don't remember.  I don't even think we had that kind of

01:05   10   interaction.

11   Q.   Could it have occurred to you that maybe I was lost and

12   looking for -- because you said I stopped at a location and

13   left and I kept making U-turns.  Well, in your examination of

14   countersurveillance, if a person is U-turning after a certain

01:05   15   amount of exits and U-turning, could that indicate that they're

16   looking for something in that area or they could be lost and

17   they're looking, trying to find a certain location?

18   A.   It's a possibility, yes.

19   Q.   Okay.  When you stopped me and you asked me about the money

01:06   20   and you asked me about the income tax refund, the discrepancy,

21   you mentioned that I had a job but the amount of income that I

22   had earned was not in accordance with the size of the refund.

23   Is that correct?  And that's why you questioned?

24   A.   That's why the sergeant questioned you.

01:06   25   Q.   Okay.

01:06  1    A.  I wasn't part of that --

2              THE COURT:  Okay.  You were not part of that.

3              THE WITNESS:  Correct.

4              THE COURT:  Okay.  He wasn't part of that.

01:06  5    BY THE DEFENDANT:

6    Q.  What was the defendant ultimately charged with in the

7    arresting -- once he was arrested?

8    A.  Money laundering.

9    Q.  Okay.  And what ultimately came of that?

01:07  10   A.  I don't know.  I was not -- since it wasn't my case, I

11   didn't follow it all the way to the end.  So, I don't know what

12   was the ultimate outcome of your case.

13   Q.  Okay.

14             THE COURT:  You testified as to just the role that you

01:08  15   played --

16             THE WITNESS:  Correct.

17             THE COURT:  -- as part of this whole scenario.  You've

18   already testified to that.

19             THE WITNESS:  Yes, sir.

01:08  20             THE COURT:  Okay.

21   BY THE DEFENDANT:

22   Q.  When the defendant was questioned with regards to the tax

23   revenue discrepancy, did he attempt to produce any

24   documentation to substantiate his claim?

01:08  25   A.  Again, that was something -- you and the sergeant were

01:08    1    speaking.  I was not part of that conversation.

         2                THE DEFENDANT:  No further questions.

         3                THE COURT:  Anything further?

         4                MR. McINTYRE:  No, your Honor.

01:08    5                THE COURT:  Thank you, sir.  You may step down.

         6    You're excused.  You're free to leave.

         7                We'll see everybody back, ready to resume, at

         8    2:15, about an hour and five minutes.

         9        (Recess was taken)

01:51   10                THE COURT:  Thank you.  Be seated.

        11                Call your next witness.

        12                MR. HEENAN:  Your Honor, United States calls Mr. Hany

        13    Youssef.

        14                THE COURT:  You want to come forward, please, sir?

02:22   15                Raise your right hand and be sworn.

        16                THE CASE MANAGER:  Do you solemnly swear that the

        17    testimony you're about to give in the case now before the Court

        18    will be the truth, the whole truth and nothing but the truth?

        19                THE WITNESS:  Yes.

02:23   20                THE CASE MANAGER:  Thank you.

        21        **HANY YOUSSEF, GOVERNMENT'S WITNESS, TESTIFIED:**

        22                    **DIRECT EXAMINATION**

        23    BY MR. HEENAN:

        24    Q.  Good afternoon, sir.

02:23   25    A.  Good afternoon.

02:23  1    Q.  Would you please state your name and spell it for the

2    record?

3    A.  Hany Youssef, H-A-N-Y, Y-O-U-S-S-E-F.

4    Q.  And how are you employed, sir?

02:23  5    A.  With the FBI.

6    Q.  And what is your job that you have --

7    A.  Language analyst for the Arabic language.

8    Q.  How long have you been employed by the FBI as a language

9    analyst?

02:23  10   A.  Five years.

11   Q.  And is there a skill that you have that is -- that you use

12   as a language analyst?

13   A.  Of course.  The skill of knowing the Arabic language.  And

14   since I was born in Egypt, too; so, my original language is --

02:24  15   native language is the Arabic.

16   Q.  Mr. Youssef, I would like to talk about a little bit --

17         THE COURT:  Is it -- now, your first -- what is your

18   last name?

19         THE WITNESS:  Youssef.

02:24  20         THE COURT:  Okay.

21   BY MR. HEENAN:

22   Q.  Mr. Youssef, I think you just mentioned that Arabic is your

23   native language.  If you could just tell the Court a little bit

24   about your background and upbringing.

02:24  25   A.  Born and raised in Egypt, passed my education in the

02:24  1    English Mission College, Cairo, Egypt; after which I had my GCE

2    London University; then I had a BSC degree in chemical

3    engineering from Cairo University, Egypt.  I worked --

4    Q.  Sir, in your school studies -- you just mentioned Cairo

02:25  5    University.  Did you receive instruction in Arabic or in

6    English for those studies?

7    A.  In both.

8    Q.  And did you graduate Cairo University, sir?

9    A.  Yes, sir.

02:25  10   Q.  And I think you mentioned -- what was your degree?

11   A.  Bachelor's degree in chemical engineering.

12   Q.  What did you do after graduating from Cairo University?

13   A.  I worked -- after graduation, I worked for three and a half

14   years for Novartis Pharmaceutical Company in --

02:25  15   Q.  What sort of work did you do for Novartis?

16   A.  Production of pharmaceuticals and quality control and

17   laboratory quality control for pharmaceuticals for three and a

18   half years.

19   Q.  Where did you work?

02:25  20   A.  In Cairo, Egypt, in the Novartis Pharmaceutical Company,

21   the branch of Cairo, Egypt.

22   Q.  What sort of work did you do after Novartis?

23   A.  After Novartis, I worked for almost 12 years in Qatar, in

24   the Arabian Gulf.

02:25  25   Q.  I'm sorry, sir.  Not to jump ahead, but with respect to

02:26  1    Novartis, did you use your Arabic?

2    A.  Yes.  Everything was in Arabic and in English.

3          THE COURT:  How do you pronounce it?  Is it "Qatar" or

4    "Qatar"?  What's the correct pronunciation?

02:26  5          THE WITNESS:  It is "Qatar," Q-A-T-A-R.

6          THE COURT:  It's kind of a combination of what I said,

7    right?

8          THE WITNESS:  Yes, your Honor.  If you are in Qatar,

9    sometimes the Qatari say it as "Qatar," the Qatari nationals.

02:26  10   They pronounce it as "Qatar."

11          THE COURT:  Thank you.

12          THE WITNESS:  You're welcome.

13   BY MR. HEENAN:

14   Q.  Mr. Youssef, you indicated after Novartis that you went to

02:26  15   work for a company in Qatar?

16   A.  Qatar Petrochemical.  It was the first petrochemical

17   company erected in the Middle East for producing polyethylene.

18   Q.  How long did you work at that petrochemical company?

19   A.  Twelve years.

02:26  20   Q.  Were those entire 12 years in Qatar?

21   A.  Yes, in Qatar.  But before those 12 years, I have to go

22   pass training in France.  It was a joint venture between the

23   French and the Qatari government.  So, I have to pass.  It was

24   a six-month training in France, because nobody has the

02:27  25   experience of thermoplastics at that time.

02:27   1    Q.   Do you speak French?

2    A.   Yes, sir.

3    Q.   Do you consider yourself fluent in French?

4    A.   No, sir.

02:27   5    Q.   Do you consider yourself fluent in Arabic?

6    A.   Yes, sir.

7    Q.   Do you consider yourself fluent in English?

8    A.   Yes, sir.

9    Q.   Now, with respect to the work you did at the petrochemical

02:27   10   company in Qatar, what sort of work did you do?

11   A.   Basically I worked in two areas: in the production, which

12   is the control of the process of producing the low density

13   polyethylene; and the other part, I worked as quality control

14   for that LDPE, the branch which is the low density polyethylene

02:27   15   laboratory.

16   Q.   And did you have occasion to use your Arabic language

17   skills while working for that company?

18   A.   Yes, sir, Arabic and English and French.

19   Q.   And during your time working for that company, did you deal

02:28   20   with people with different Arabic dialects?

21   A.   Yes, sir.

22   Q.   What sort of dialects did you --

23   A.   Basically, it was the Levantine, which is Lebanese,

24   Jordanian, Syrian, Palestinian, other than, of course, the

02:28   25   Arabian Gulf, which is, like, from Saudia Arabia, Qatar,

02:28   1   Kuwait, Iraq, Bahrain, United Arab Emirates, and Egypt,
        2   Tunisia, Algeria.  But they were mostly from Tunisia and
        3   Algeria and more.
        4   Q.  During that time, did you become familiar with the various
02:28   5   differences between the dialects?
        6   A.  Yes, sir.
        7   Q.  Sir, did you have occasion to move to the United States at
        8   a certain point?
        9   A.  Yes.  I moved to the United States in two thousand and --
02:28   10  I'm sorry -- 1992.
        11  Q.  1992?
        12  A.  Yes, sir.
        13  Q.  What did you do when you moved to the United States?
        14  A.  I used to work for the Prudential Relocation Company for
02:29   15  intercultural, crossculture relocation for the American expats
        16  who are moving to the Arabian Gulf for the oil companies, who
        17  work for the major oil companies in Houston.
        18  Q.  What sort of work did you do on that job for the relocation
        19  company?
02:29   20  A.  It's teaching, instructing the American expats who are
        21  selected to work over there for a period of three to five
        22  years.  For example, for British Petroleum, which it was Amoco
        23  at that time, or Exxon Mobil, et cetera, to work there.  So, I
        24  teach them how to understand and how to do business with the
02:29   25  Arabic culture, because doing business in the United States is

02:29  1   completely different than doing business in the Arabian
       2   countries.
       3   Q.  Was there also a component of instructing on some Arabic
       4   language skills?
02:29  5   A.  Yes, sir.  And I have to do a lot of translations from
       6   Arabic to English to let them be aware how the forms are
       7   written, how things are working there, because when they read
       8   the English which was translated from Arabic they may not
       9   understand.
02:30 10   Q.  Now, how long did you work for this relocation company
      11   Prudential?
      12   A.  Twelve years.
      13   Q.  And, so, would that have ended in approximately 2004?
      14   A.  2004, approximately, yes, sir.
02:30 15   Q.  And where did you work after that?
      16   A.  I worked for Harris County Psychiatric Center, University
      17   of Texas, for the -- it was a program known as the Prescription
      18   Assistance Program, bringing all the psychotic drugs from the
      19   drug companies in the United States to help those who are below
02:31 20   poverty limit, cannot afford to pay for their drugs.  So, I can
      21   help them bring their drugs for free.
      22   Q.  How long did you work for Harris County?
      23   A.  About two years.
      24   Q.  So, would that have been from 2004 to 2006?
02:31 25   A.  Yes, sir.

02:31  1   Q.  And did you leave that Harris County job?

2   A.  Yes, sir.

3   Q.  Where did you go after that?

4   A.  FBI.

02:31  5   Q.  Now, with respect to your current responsibilities at the

6   FBI, I think you mentioned you're a language analyst.

7   A.  Yes, sir.

8   Q.  What are your job responsibilities?

9   A.  Basically translation, which we have two kinds of

02:31 10   translation: verbatim and summary.  Other than help in

11   interrogations when some --

12   Q.  If I could just break that down, when you say -- you talk

13   about translation, verbatim and summary --

14   A.  Yes, sir.

02:32 15   Q.  -- are you -- what sort of language translation, what

16   language are you translating?

17   A.  Basically from Arabic to English or from English to Arabic.

18   Q.  And for, first, summary and verbatim, are you referring to

19   recordings obtained via electronic surveillance?

02:32 20   A.  Yes, sir.  Yes, recordings, documents.

21   Q.  And when you say you prepared summaries, what do you mean

22   by that?

23   A.  Sometimes with audio, they don't need -- the agent doesn't

24   need a full verbatim, which is -- that's to say it word by

02:32 25   word.  They need a summary for things that's concerning

02:32  1    intelligence or any points I can point out regarding

2    intelligence.  That's a summary.  I just outline the basic

3    conversation what's going on about.

4    Q.  And I would caution you, sir, you don't need to tell me

02:32  5    about any of the specifics about any of these other cases that

6    you worked on, or the substance.

7    A.  Sure.

8    Q.  With respect to verbatims that you have prepared, what is

9    involved in preparing a verbatim?

02:33  10   A.  I beg your pardon?

11   Q.  What is involved in translating a verbatim?  Is that also

12   involving electronic surveillance or audio?

13   A.  Yes, sir, this is, basically, yes.

14   Q.  What do you do when you prepare a verbatim?

02:33  15   A.  Usually when my supervisor tasks me to do a job, a

16   verbatim, he hands me the recorded CD; then I play it on our

17   system; use my headphones, listen exactly word -- first of all,

18   I listen to it in full, the whole recording.  Then I start

19   getting an idea.  Then I go step by step, translating what I am

02:33  20   hearing word by word.

21   Q.  Now, with respect to these transcripts, that you prepare,

22   the summaries and verbatims, you indicated that you will listen

23   to electronic surveillance as the source of the audio?

24   A.  There are two -- could you rephrase your --

02:34  25   Q.  Absolutely.

02:34   1    A.  Please.

2    Q.  The Arabic language that you are translating, where is that

3    coming from?

4    A.  It's coming either from phone calls or recordings.

02:34   5    Q.  And would some of those recordings on occasion involve

6    undercover informants --

7    A.  Yes, sir.

8    Q.  -- working for the FBI?

9    A.  Yes, sir.

02:34   10            THE COURT:  Hold it.  One at a time.  The court

11   reporter can take down only one at a time.  So, you were

12   talking over each other.

13            Let me ask the court reporter, though, if two

14   people are talking and one is the judge, who do you take down?

02:34   15            THE COURT REPORTER:  The judge.

16            THE COURT:  All right.  That's a constant.

17            MR. HEENAN:  Even I knew that answer.

18   BY MR. HEENAN:

19   Q.  Sir, with respect to other responsibilities and tasks that

02:34   20   you performed at the FBI, is there any other instances where

21   you've used your language skills?

22   A.  Yes.  I always do consecutive translation.  I went one time

23   to Mauritania for two weeks to do consecutive translation, and

24   I did it in French and English and Arabic.

02:35   25   Q.  What do you mean by "consecutive translation"?

02:35    1    A.  Meaning if there is, like -- when the instructor speaks,

         2    then he stops, I translate exactly what he said.  Then the

         3    instructor carries on; and after certain period of time, he

         4    stops and then I translate again what he said.  That's the

02:35    5    "consecutive."

         6              THE COURT:  What are the others?

         7              THE WITNESS:  There's consecutive; there's

         8    simultaneous interpretation, which is kind like used in the

         9    United Nations when the president is speaking and there's

02:35   10    somebody else after the president, word by word.

        11              THE COURT:  And what's the third?  Did I miss --

        12    what's the third one?  Third one is what?  Written?  You said

        13    three, you said there were three.

        14              THE WITNESS:  Your Honor, you mean verbal?

02:36   15              THE COURT:  There's consecutive --

        16              THE WITNESS:  Consecutive and simultaneous.

        17              THE COURT:  Simultaneous.  Oh, so, it's two.

        18              THE WITNESS:  Those are the two that are verbal.

        19              THE COURT:  That are verbal.

02:36   20              THE WITNESS:  Yes, sir.

        21              THE COURT:  Okay.  All right.

        22    BY MR. HEENAN:

        23    Q.  Mr. Youssef, is it fair to say that you use your Arabic

        24    language skills as a language analyst at the FBI on a daily

02:36   25    basis?

02:36  1   A.  Yes, it is, daily basis.

2   Q.  And do you have an approximation of how many times you have

3   translated documents from Arabic into English for the FBI?

4   A.  In the five years?

02:36  5   Q.  Yes.

6   A.  I think more than two, three thousand.

7   Q.  And do you also continue to speak Arabic when talking to

8   family members or friends --

9   A.  Yes, sir.

02:36  10  Q.  -- back home?

11       MR. HEENAN:  Your Honor, at this time I would tender

12  Mr. Youssef as an expert in Arabic language.

13       THE COURT:  In some courts you don't have to tender,

14  but I gather you're used to doing it.

02:37  15       I accept him.  He is accepted as an expert in his

16  area.

17       MR. HEENAN:  Thank you, your Honor.

18       THE COURT:  Yes, sir.

19  BY MR. HEENAN:

02:37  20  Q.  Mr. Youssef, I would like to just bring up onto the screen

21  certain government exhibits that have already been marked and

22  admitted into evidence in this case, starting with Government's

23  Exhibit Number 140.

24       Do you recognize this document, sir?

02:37  25  A.  Yes, sir.

02:37   1   Q.   And what is this document?

        2   A.   An e-mail.

        3   Q.   And does that e-mail contain any Arabic in it?

        4   A.   Yes, sir.

02:37   5   Q.   And did you prepare a translation of the Arabic that's

        6   contained in this e-mail?

        7   A.   Yes, sir.

        8   Q.   I would like to show you what has been marked and admitted

        9   as Government's Exhibit 141.  Do you recognize Government's

02:37  10   Exhibit 141?

       11   A.   Yes, sir.  It's the cover sheet of the translation.

       12   Q.   Does your name appear on this cover sheet?

       13   A.   Yes, sir.

       14   Q.   And do you typically prepare these cover sheets in

02:38  15   conjunction with your responsibilities as a translator?

       16   A.   Yes, sir.

       17   Q.   And what does it mean when you prepare a cover sheet like

       18   this?

       19   A.   It indicates all the information for the -- for the item

02:38  20   that I am translating, whether it's the case number, the dates,

       21   what kind of language, and the name of the translator and when

       22   it started and when it's ended in some other cases.

       23   Q.   I would like to show you the second page of Government

       24   Exhibit 141.  Do you recognize that?

02:38  25   A.   Yes, sir.

02:38    1    Q.   What is it?

         2    A.   It's my translation.

         3    Q.   And is this a translation of the document we just looked at

         4    previously, Government's Exhibit 140?

02:38    5    A.   Yes, sir.

         6    Q.   And do you believe it to be an accurate translation of

         7    Government Exhibit 140?

         8    A.   Yes, sir.

         9    Q.   I would like to show you Government's Exhibit 152.  Do you

02:39   10    recognize Government's Exhibit 152, sir?

        11    A.   Yes, sir.

        12    Q.   I should say this has been marked and admitted as

        13    Government Exhibit 152.

        14                 Showing you Government's Exhibit 153, which has

02:39   15    been marked and admitted, do you recognize Government's Exhibit

        16    153?

        17    A.   Yes, sir.

        18    Q.   And what is Government's Exhibit 153?

        19    A.   This is the translation of the e-mail that you showed me

02:39   20    before.

        21    Q.   And the earlier e-mail was --

        22    A.   The earlier, yes.

        23    Q.   -- 152?

        24    A.   152, yes.

02:39   25    Q.   See the second page of Government's 153, what is that

02:39   1   second page, sir?

2   A.  This is the cover page of this translation.

3   Q.  Does your name appear on this?

4   A.  No, sir.

02:39   5   Q.  Who's name appears on this?

6   A.  Linguist LA Mona G. Nashed.

7   Q.  Is she someone who works with you at the FBI?

8   A.  Yes, sir.

9   Q.  Have you examined the content of this e-mail, Government's

02:40   10   Exhibit 153, and compared it to Government's Exhibit 152?

11   A.  Yes, sir, I did.

12   Q.  And did you do that today?

13   A.  Yes, sir.

14   Q.  And do you have an opinion on whether or not Ms. Nashed has

02:40   15   made an accurate translation of Government's Exhibit 152?

16   A.  It is an accurate translation, sir.

17   Q.  Okay.  Mr. Youssef, I would like to now show you a series

18   of exhibits starting with Government's Exhibit 283; and some of

19   these exhibits have multiple pages.  I'm just going to ask you

02:40   20   to look at these exhibits and let me know if you recognize them

21   and we're going to go through them and then I'll have some

22   further questions for you.

23           But starting with Government Exhibit 283, I would

24   ask you to look at the first page.

02:40   25   A.  (Complies).

02:40   1   Q.   And now the second page.

2   A.   (Complies).

3   Q.   Do you recognize this document, Government's Exhibit 283?

4   A.   Yes, sir.

02:40   5   Q.   Government's Exhibit 284, do you recognize this document?

6   A.   Yes, sir.

7   Q.   Government's Exhibit 285 is three pages.  Do you recognize

8   those three pages?

9   A.   Yes, sir.

02:41   10   Q.   Showing you Government's Exhibit 286, one page, do you

11   recognize that sir?

12   A.   Yes, sir.

13   Q.   Government's Exhibit 287, three pages?

14   A.   Yes, sir.

02:41   15   Q.   Showing you Government's Exhibit 288, do you recognize

16   that?

17   A.   Yes, sir.

18   Q.   Showing you Government's Exhibit 289, do you recognize that

19   sir?

02:41   20   A.   Yes, sir.

21   Q.   Showing you Government's Exhibit 290, do you recognize

22   that?

23   A.   Yes, sir.

24   Q.   Showing you Government's Exhibit 291, it's three pages.  Do

02:42   25   you recognize that?

02:42   1   A.  Yes, sir.

2   Q.  Showing you Government's Exhibit 292, do you recognize

3   that?

4   A.  Yes, sir.

02:42   5   Q.  Mr. Youssef, Government's Exhibit 293, three pages, do you

6   recognize --

7   A.  Yes, sir.

8   Q.  -- do you recognize that?

9   A.  Yes, sir.

02:42   10   Q.  Showing you Government's Exhibit 294, do you recognize

11   that?

12   A.  Yes, sir.

13   Q.  Government's Exhibit 295, two pages, do you recognize that?

14   A.  Yes, sir.

02:42   15   Q.  Showing you Government's Exhibit 296, three pages, do you

16   recognize those three pages?

17   A.  Yes, sir.

18   Q.  And Government's Exhibit 297, two pages, do you recognize

19   those?

02:42   20   A.  Yes, sir.

21   Q.  And, finally, Government's Exhibit 298, two pages, do you

22   recognize that?

23   A.  Yes, sir.

24   Q.  Now, with respect, sir, to all of those items that I just

02:43   25   showed you in that sequence, which have been marked and

02:43    1    admitted as Government's Exhibit 283 through Government's

         2    Exhibit 298, do you know what those materials are?

         3    A.   Those materials are CDs that contain the recordings between

         4    Mr. Barry Bujol and the CHS.

02:43    5    Q.   And were those items, Government's Exhibit 283 through 298,

         6    provided to you during the course of this case and this

         7    investigation?

         8    A.   Yes, sir.

         9    Q.   And did you, yourself, listen to all of the CDs that are --

02:43   10    appear in the copies that are Government's Exhibit 283 --

        11    A.   Yes, sir.

        12    Q.   -- through 298?

        13                    And what is contained on those CDs?

        14    A.   Basically it's the conversation between Mr. Barry Bujol and

02:44   15    the CHS.

        16    Q.   And that would be the confidential human source in this

        17    case?

        18    A.   Confidential human source, yes, sir.

        19    Q.   Have you listened to all of the audio contained on the CDs

02:44   20    that is depicted in those exhibits?

        21    A.   Yes, sir.

        22    Q.   Now, have you had occasion to examine transcripts that were

        23    provided to you with respect to those exhibits, those CDs?

        24    A.   Yes, sir.

02:44   25    Q.   Now, with respect to the language in those CDs, is it in

02:44   1   English, Arabic, a mix?  What is it?

2   A.  It's a mix, English and Arabic.

3   Q.  I think I you just mentioned you've examined exhibits that

4   were provided to you of -- the recordings on those disks?

02:45   5   A.  Yes, sir.

6   Q.  Were those rough transcripts or were they final

7   transcripts?  What was the status of those transcripts?

8   A.  Those were final transcripts, after being reviewed several

9   times.

02:45   10   Q.  And were you then asked to do anything with respect to

11   those transcripts?

12   A.  I was asked to do the final operation review.

13   Q.  And with respect to that final review, did you understand

14   that you were going to be reviewing those transcripts to proof

02:45   15   them and make sure that the Arabic language translations were

16   accurate and that the transcripts were ready for trial?

17   A.  Yes, sir.

18   Q.  Now, I would like to show you what has been marked for

19   identification -- it is not yet in evidence, but marked for

02:45   20   identification as Government's Exhibit 310 through 324.

21          MR. HEENAN:  Your Honor, may I approach the witness?

22          THE COURT:  Yes.  Go on.

23          MR. HEENAN:  And, your Honor, I supplied a copy set of

24   these exhibits to the Court as well as to the defendant.  He

02:46   25   had them previously in discovery.  He now has a trial set that

02:46    1    is marked with the government's exhibit stickers.

         2            THE COURT:   Thank you.

         3    BY MR. HEENAN:

         4    Q.  Mr. Youssef, if you take your time, look at each of those

02:46    5    documents and let me know if you recognize them.

         6    A.  Yes, sir, I recognize them.

         7    Q.  You recognize each one of the exhibits?

         8    A.  Yes, sir.

         9    Q.  What are those exhibits, Government's Exhibit 310 through

02:47   10    324?

        11    A.  Those are verbatim translation for the conversation between

        12    Mr. Barry Bujol and the CHS.

        13    Q.  And do those transcripts contain English language

        14    translations of Arabic that you listened to on the calls?

02:47   15    A.  Yes, sir.

        16    Q.  Now, did you mark on these transcripts or prepare a cover

        17    sheet, as you mentioned earlier, to indicate that you reviewed

        18    those transcripts?

        19    A.  Yes, sir.

02:47   20    Q.  And where does that cover sheet appear on those

        21    transcripts?

        22    A.  It's always the first page.  (Indicating)

        23    Q.  And does your name appear --

        24    A.  Yes, sir.

02:47   25    Q.  -- on each one of those?

02:47    1                      Mr. Youssef, did you mark or indicate anywhere
         2    with your initials on any of those transcripts?
         3    A.  All are initialed with my initials.
         4    Q.  And did you examine those transcripts this morning for
02:48    5    purposes of your testimony here?
         6    A.  Yes, sir.
         7    Q.  And to be clear, each exhibit in Government's Exhibit 310
         8    through 324 is marked with your initials?
         9    A.  Yes, sir.
02:48   10    Q.  And does your marking those exhibits with your initials
        11    indicate that these translations contained in those documents
        12    are all accurate?
        13    A.  Yes, sir.
        14               MR. HEENAN:  Your Honor, at this time I would move
02:48   15    Government's Exhibit 310 through 324 into evidence.  They are
        16    the Arabic language translations of the transcripts.
        17               THE COURT:  I think we, at the beginning of trial,
        18    under our local rule, I admitted all of the evidence, correct?
        19    That was one of the -- has this been premarked and submitted in
02:48   20    advance?
        21               MR. HEENAN:  It has not, your Honor.  There was a disk
        22    containing electronic versions of these materials.  We're
        23    submitting paper copies.
        24               THE COURT:  Now you're asking for the paper copies?
02:49   25               MR. HEENAN:  Yes, your Honor.

02:49   1            THE COURT:  All right.  They've been proved up and

     2      identified.  I admit them into evidence.  They're admitted.

     3            MR. HEENAN:  Thank you, your Honor.

     4                  Mr. Youssef, I have no further questions.

02:49   5            THE COURT:  Okay.  No further questions.

     6                  Okay.  Mr. Bujol, please.

     7                      **CROSS-EXAMINATION**

     8      BY THE DEFENDANT:

     9      Q.  Throughout the period examining of the transcripts, did you

02:49  10      understand myself to speak or attempt to speak a particular

    11      dialect of Arabic?

    12      A.  The only, I think, dialect was the Quranic dialect.

    13            THE COURT:  How do you spell that?

    14            THE WITNESS:  It's Quranic, it's Q, apostro- -- U-R,

02:49  15      apostrophe, N-I-C.  [sic]

    16      BY THE DEFENDANT:

    17      Q.  This is a dialect based off of the --

    18      A.  Reciting verses.

    19      Q.  Reciting verses.  Okay.

02:50  20                  Is this dialect used commonly today amongst

    21      regular conversation?

    22            MR. HEENAN:  Your Honor, I object on relevance.

    23            THE COURT:  Overruled.

    24            THE WITNESS:  It is used if Muslim scholars are

02:50  25      talking to each other.  They use this language.

02:50  1                    THE COURT:  Muslim what?

       2                    THE WITNESS:  Scholars.

       3                    THE COURT:  Scholars.

       4                    THE WITNESS:  It is used, but not -- it's not the

02:50  5        street language or the formal language that's -- if a printed

       6        newspaper is printed in Egypt, anybody in the Arab country can

       7        read it.

       8                    THE COURT:  And what is that?  What dialect is that?

       9                    THE WITNESS:  I can't say --

02:51  10                   THE COURT:  It's a different dialect than was on these

       11       recordings?

       12                   THE WITNESS:  Basically, the -- it's -- I can't say

       13       it's a "dialect."  It is the wording of the Quran.

       14                   THE COURT:  I see.

02:51  15                   THE WITNESS:  And the wording of the Quran is not a

       16       language that we speak in the streets with or not a language

       17       that we print with it, newspapers or magazines or books.

       18                   THE COURT:  On those transcripts, on the recordings,

       19       you heard, let's say, two individuals speaking Arabic to each

02:51  20       other.  Is that correct?

       21                   THE WITNESS:  Yes, sir.

       22                   THE COURT:  Okay.  Is that -- the language they were

       23       using, the dialect they were using, is that -- do you hear that

       24       these days at all?  Is it unique?  Were they speaking in

02:51  25       biblical terms or a biblical dialect or is it an old dialect or

02:51   1    is it common in some areas?  Is it a conversational dialect?

        2    Let me put it that way.

        3         THE WITNESS:  Sometimes it's conversation; sometimes

        4    it's not.  When they say, for example -- (speaking in

02:52   5    Arabic) -- those are old, tends to be more Islamic, like

        6    greetings, like all this.

        7         THE COURT:  All right.  Go right ahead, sir.

        8    BY THE DEFENDANT:

        9    Q.  Your examination of the transcripts and their Arabic

02:52  10    contents, did the defendant ever use a word that translates or

       11    that is said in Arabic as "qatal"?

       12         MR. HEENAN:  Objection, your Honor, hearsay.

       13         THE COURT:  Overruled.

       14         THE WITNESS:  Could you please say the word?

02:53  15    BY THE DEFENDANT:

       16    Q.  "Qatal."

       17    A.  I can't recall, but there is a lot of other verses that

       18    mentions "jihad," which is part of "qatal."

       19    Q.  Well, I didn't -- that's your opinion.  The question I

02:53  20    asked was did the defendant use the word "qatal" and you

       21    surmised that he used the word "jihad" as opposed to saying

       22    whether or not he used the word "qatal," which as you know --

       23         THE COURT:  The word "qatal," did you hear that?  Of

       24    course, you've gone through lots of transcripts.

02:53  25         THE WITNESS:  I can't recall, your Honor.

02:53   1            THE COURT:  You can't recall.

        2            THE WITNESS:  I can't recall.  It's too --

        3            THE COURT:  One way or the other.

        4            THE WITNESS:  I can't recall it.

02:54   5            THE COURT:  Okay.

        6            THE WITNESS:  It could be there.  I could miss it

        7    right now; but if I had the chance to go through every page,

        8    maybe I can point it out.  But I can't recall.

        9    BY THE DEFENDANT:

02:54  10    Q.  Okay.  In your expertise, how is this word "qatal"

       11    translated in English?

       12    A.  "Qatal"?

       13    Q.  Yes, "qatal."

       14    A.  "Qatal" is "fighting."

02:54  15    Q.  Okay.  And what about the word "jihad"?

       16    A.  "Jihad" is "jihad" in English.

       17            THE DEFENDANT:  Your Honor, I -- I can't accept that.

       18    I mean, I object to that.  That's -- that's just not a true

       19    statement.  "Jihad" translates in English.  It's an Arabic

02:54  20    word.  It's not a borrowed word.  I have an Arabic dictionary

       21    on this computer that translates it.  If you'll give me the

       22    chance, I can show it to you.

       23            THE COURT:  Well let me say -- what does it translate

       24    to?  I know it's hearsay.  Okay?  But what does it translate

02:55  25    to?  You're asking about which word?  "Qatal"?

02:55   1            THE DEFENDANT:  No.  "Jihad."

       2            THE COURT:  "Jihad."

       3            THE DEFENDANT:  The word "jihad."

       4            THE COURT:  Okay.  Now, your question to our expert is

02:55   5    what's the -- in English, it's pronounced the same way.  Is

       6    that --

       7            THE DEFENDANT:  No.  My question is, in English --

       8    this is an Arabic word.  What is its meaning in English?

       9            THE COURT:  Okay.

02:55  10            THE DEFENDANT:  It has an English meaning.

      11            THE COURT:  Okay.  Does it have an English meaning?

      12            THE WITNESS:  Yes.  "To fight for."

      13            THE COURT:  "To fight for."  You can take it -- you

      14    can follow up if you'd like.

02:55  15            THE DEFENDANT:  Your Honor, here is what I have of

      16    modern day --

      17            THE COURT:  No, don't tell me.  The question should be

      18    could it also have a meaning of -- and, then, I don't care

      19    where you read it from.

02:55  20            THE DEFENDANT:  Okay.

      21            THE COURT:  Why don't we do it that way?

      22                 And let the record reflect Mr. Bujol is looking

      23    at his computer.

      24                 I'll allow -- and, the government, I'll allow him

02:56  25    to pursue this point.

BY THE DEFENDANT:

Q.   Could it also mean to strive, to endeavor, to labor, take pains, overwork, exhaust, go out of one's way, or go to great lengths?

A.   It could mean that, too, depending on its -- on the sentence, on the content and the context of the sentence.  You can use the word in many ways.  But what is the sentence that the word it's in?

Q.   So, if it's used in the context of a verse from the Quran and that verse is accompanied with an English translation, does that then become a non-Arabic speaker's understanding of what that word means?

A.   Could you rephrase, please?

Q.   If the word "jihad" is used in the context of a verse from the Quran, does it then assume the meaning of this, as you call it, Quranic dialect?

          MR. HEENAN:  Your Honor, objection, speculation.

          THE COURT:  Overruled.

BY THE DEFENDANT:

Q.   Are you familiar with the Quran being translated into English?

A.   Yes, sir.

Q.   In your analyzing the Arabic language, have you viewed the word "jihad" as is used in the Quranic dialect?

A.   Okay.  To clarify this issue here, in the bureau we have an

02:59   1   approved translation for the Quran.  And when I get an ayah or

2   a verse in any dialogue between two persons, I search for it, I

3   look at it, I pick it as it is, and I put it in the

4   translation.  Because from the point of respect, I cannot

02:59   5   translate a verse in the Quran.  Maybe I mistranslate it so

6   it's not right.  So, there are approved translations for the

7   Quran, where I chose the verses when I see it's there.

8   Q.  Okay.

9   A.  So, I don't choose any translation regarding the Quranic

02:59   10   verses.

11   Q.  Okay.  And this bureau-approved version, is it publicly

12   circulated or can non-bureau members --

13   A.  As far as I understand, it is publicly circulated and it's

14   well known and that's why the bureau approved it.

03:00   15   Q.  Okay.  And what is the name of that translation?

16   A.  I can't recall the name.  It's a translation of the Quran

17   in English, but I can't recall who translated it or the name of

18   the translator.

19          THE DEFENDANT:  No further questions.

03:00   20          THE COURT:  Anything further?

21          MR. HEENAN:  No, your Honor.

22          THE COURT:  Thank you, sir.  You may step down.

23          THE WITNESS:  Thank you, sir.

24          THE COURT:  You're excused.

03:00   25              Call your next witness.

03:00   1           MR. FEAZEL:  United States calls Mohammad Aldwsari.

        2                 May we approach real quickly, Judge?

        3           THE COURT:  Well, we have a problem, because we got to

        4    get Mr. Bujol up, too.

03:01   5           *(Sotto voce discussion at bench with court staff)*

        6           THE COURT:  All right.  Let's get back on the record.

        7    With this next individual only -- and this, you know, is the,

        8    shall we say, the accepted, approved way to do it.  I'm going

        9    to ask everyone in the gallery on my right to move to the left

03:02  10    side, just temporarily.  Because a special screen needs to be

       11    set up for the next witness.  All right?

       12                 So, I hate to do that.  I've not done it before.

       13    But in a rare case like this, we need to do that.  So -- and

       14    then, as soon as the gentleman leaves, certainly you can move

03:03  15    back.

       16                 All right.  We need to erect something, correct?

       17                 All right.  Sir, right where you are, remain

       18    seated; but you swear the testimony you're about to give in

       19    this case on trial will be the truth, the whole truth, and

03:05  20    nothing but the truth?

       21           THE WITNESS:  Yes, sir.

       22           THE COURT:  Okay.  Just pull that microphone in,

       23    please.

       24                           - - - - -

       25

1    **MOHAMMAD ALDWSARI, GOVERNMENT'S WITNESS, TESTIFIED:**

2    **DIRECT EXAMINATION**

3    BY MR. FEAZEL:

4    Q.  Sir, can you please state your name for the Court?

03:05    5    A.  Mohammad Aldwsari.

6    Q.  Where are you from?

7    A.  The Arabian Peninsula.

8    Q.  Can you please explain to the judge the countries that

9    encompass the Arabian Peninsula?

03:05    10    A.  Kuwait, Bahrain, Oman, Yemen, Saudi Arabia, United Arab

11    Emirates, Qatar.

12    Q.  Where were you educated?

13    A.  In the Arabian Peninsula.

14    Q.  Can you describe to the judge the background and your

03:06    15    education that you had while you were in the Arabian Peninsula?

16    A.  I went to school for 12 years, mainly in Arabic.

17    Fifty percent will be religious study; 50 percent would be

18    linguistic Arabic study besides a little bit of science and

19    math.

03:06    20    THE COURT:  So, your studies basically were in

21    linguistics?

22    THE WITNESS:  That's the basics.  That's the basics

23    that they teach over there, the native language.

24    BY MR. FEAZEL:

03:06    25    Q.  What is your native tongue?  What language were you taught?

03:06  1   A.  Arabic.

2   Q.  And can you tell the Court, the judge, how you learned

3   Arabic?

4   A.  My parents, the school, the environment.

03:06  5   Q.  And did this include formal courses in Arabic while you

6   were in school?

7   A.  Yes.

8   Q.  And what did those courses teach?

9   A.  They teach the basic grammar, spelling, dictation, the

03:06  10  basic Quran, translations of the Quran, the Hadith, which is

11  the prophet saying, used to be a little bit of the Companions

12  of the Prophet, and the friends of the Companions of the

13  Prophet.

14  Q.  Did you also have some more advanced Arabic training, as

03:07  15  well?

16  A.  Yes.

17  Q.  Can you describe what that is?

18  A.  That will be like grammar, on the grammars and the

19  dictations and some of the literature.

03:07  20  Q.  And for how many grades or how many years were you taught

21  courses in Arabic?

22  A.  Almost 12 years.

23  Q.  And was that the language you were taught before you even

24  went to school?

03:07  25  A.  Yes.

03:07   1    Q.  Do you speak it fluently?

        2    A.  Yes.

        3    Q.  Okay.  Now, let's talk for a minute about Arabic.  In the

        4    courses of working with the FBI, have you done any type of

03:07   5    Arabic translations?

        6    A.  Yes, I did.

        7    Q.  Have you done that on few or many times?

        8    A.  Many times.

        9    Q.  Have you translated from Arabic to English?

03:07   10   A.  Yes, I did.

        11   Q.  On few or many times?

        12   A.  Many times.

        13   Q.  What about from the opposite translation?

        14   A.  I did too.

03:08   15   Q.  Few or many times?

        16   A.  Many times.

        17   Q.  Okay.  Let's talk for a minute about the Islamic faith

        18   religion.  Can you tell the Court your training that you've

        19   received and your education in regards to that religion?

03:08   20   A.  Islam is basically you believe in Allah as the creator and

        21   his prophet is -- is his messenger.  So, you believe only in

        22   one god.

        23   Q.  And can you describe --

        24           THE COURT:  By the way, I understand that I'm sitting

03:08   25   as the judge and jury.  But don't -- you don't have to look

03:08   1   over here.  If you want to just have a conversation with the

2   Assistant US Attorney, that's fine.  I appreciate your turning

3   and turning.  It's not necessary.

4   BY MR. FEAZEL:

03:08   5   Q.   Okay.  So, can you explain where you learned about the

6   Islamic religion?

7   A.   From my parents --

8           THE COURT:  The microphone has to come up, sir.

9           THE WITNESS:  From my parents, from the school.

03:08   10   BY MR. FEAZEL:

11   Q.   Okay.  And in school, what are you taught?

12   A.   We're taught the basics.  We're taught -- we're taught

13   Quran.  We're taught how to memorize Quran.  We're taught how

14   to pray, and to memorize hadith which is called "Sunan," which

03:09   15   is what the prophet did.  And memorize some of it, too.  That's

16   the basics.

17   Q.   And would you characterize this as a peaceful religion?

18   A.   Yes.

19   Q.   At some -- sometimes there are misinterpretations.  Is that

03:09   20   correct?

21   A.   Yes.

22   Q.   And how does that happen?  Is that something that is

23   typically taught?  A more extremist view of the religion, is

24   that taught to people?

03:09   25   A.   Well, in any -- in any religion, in any -- in any culture,

03:09  1    there is the good and there is the bad.  So, there is bad

2    Muslims, not because they're Muslims; it's just because they're

3    bad.

4    Q.  And how does someone get exposed to some of the more

03:10  5    extreme schools of thought?

6    A.  We have -- we have two things.  We have Salafi, and we have

7    Salafi-Jihadis.  And the Salafi-Jihadi is the one that goes to

8    the extreme, which is -- the Salafi-Jihadi right now is -- is

9    the thought, the theologies that al-Qaedas have adopted all

03:10  10   these years.

11   Q.  Is this something that's common?

12   A.  No, it's not common.

13   Q.  Okay.  How -- then, where does one get exposed to this

14   Salafi-Jihadi interpretation of Islam?

03:10  15   A.  First, they will have to convert to Islam or they become

16   Muslims and they will have to adopt something called Salafi.

17   And from Salafi, they will move on to Salafi-Jihadi.

18   Q.  What is "Salafi"?

19   A.  "Salafi" is basically you're going to drop basically --

03:10  20   there is the Sunni and there's the Shiite Muslims.  The Sunnis

21   have four sectors.  But when you become Salafi, you're going to

22   drop basically the four sectors and you're going to become --

23   you only believe in the first 100 years of Islams.  And

24   anything after that, you're going to have to drop.

03:11  25   Q.  And, then, what about when you move on to the

03:11  1   Salafi-Jihadi?

2   A.   The Salafi-Jihadi is where you believe is -- is --

3   everybody is -- is a "mortet" [phonetic] which is mean you

4   believe everybody is not a Muslim, where you believe everybody

03:11  5   that is not like you is basically you're with me or you're

6   without me.  So, basically you're going to think all the -- all

7   the countries, all the Arabs in the Muslim countries are

8   occupied, all the governments are bad, you're going to -- you

9   know, you're going to hate the United States, you're going to

03:11  10   hate Westerns, you're going to hate Jews, you're going to hate

11   Christians, basically --

12           THE DEFENDANT:  Objection.

13           THE COURT:  What's your objection, sir?

14           THE DEFENDANT:  Speculation.

03:12  15           THE COURT:  Overruled.

16   BY MR. FEAZEL:

17   Q.   You may proceed.

18           THE COURT:  You can take him on cross-examination

19   later.  Okay, sir?  But this is his opinion.

03:12  20               Go on.

21           THE WITNESS:  That's what Salafi Jihadi is.  And

22   it's -- it's popular on the Internet.  They -- they explain it,

23   and they say it.

24   BY MR. FEAZEL:

03:12  25   Q.   And, once again, I believe you testified earlier this is

03:12  1    something that's rather uncommon.  It's not something that's

2    widely held amongst Muslims.

3    A.   Yes.

4    Q.   Okay.  Let's talk for a minute about when you came to the

03:12  5    United States.  When approximately was this?

6    A.   1994.

7    Q.   And what did you come here to do?

8         THE COURT:  Did you speak English before you came here

9    at that time?

03:12  10        THE WITNESS:  Very little.

11        THE COURT:  Go on.

12   BY MR. FEAZEL:

13   Q.   Proceed.  What did you come here to do?

14   A.   Study engineering.

03:12  15   Q.   And when you got here, were you going to take college

16   advanced courses in engineering?

17   A.   Yes.  But before that, we had to go to school to learn

18   English.

19   Q.   Right.  And when did you do this?

03:12  20   A.   The first -- the first year.

21   Q.   And describe to the Court your --

22   A.   We went to an intensive language program where they teach

23   you English.  It starts from 8:00 o'clock to 4:00 o'clock in

24   the afternoon every day.

03:13  25   Q.   And how long did this course last for?

03:13   1    A.  Almost six years to eight months.

        2             THE COURT:  How many?  Six to eight --

        3             THE WITNESS:  I mean, six to eight months, yes.

        4    BY MR. FEAZEL:

03:13   5    Q.  Okay.  And did you complete that?

        6    A.  Yes.

        7    Q.  Did you do anything else to help you practice your English?

        8    A.  During that program, I isolated myself completely from

        9    anybody that speaks my language, so I can make sure I speak

03:13  10    English very good.

       11    Q.  And how many college hours courses have you completed up to

       12    this date?

       13    A.  About 128 hours.

       14    Q.  Do you plan to finish at one point in time?

03:13  15    A.  Yes.  Yes, sir.

       16    Q.  What is your major going to be?

       17    A.  Mechanical engineering.

       18    Q.  All right.  Let's talk for a minute about what you've done

       19    in the past to earn a living.  What have you done while you've

03:13  20    been in the United States, as a profession?

       21    A.  I worked for the school.  I had my own business for awhile.

       22    Q.  Okay.  Have you done just various jobs, different odd jobs?

       23    A.  Yes.  Yes.

       24    Q.  At some point in time, did you start to work for the

03:14  25    Federal Bureau of Investigation?

03:14   1   A.   Yes, I have.

2   Q.   When was this?

3   A.   2001.

4   Q.   And can you tell the Court how this happened; how did you

03:14   5   get involved with the FBI?

6   A.   I got questioned by the FBI after September 11, and they

7   asked me if I can be a help to assist them; and I said "yes."

8   Q.   So, when you say you were questioned by the FBI after

9   September 11th, what were they questioning you about?

03:14   10   A.   What am I doing here, who do you know --

11           THE DEFENDANT:  Objection.

12           THE COURT:  What's that?

13           THE DEFENDANT:  Hearsay.  I have no --

14           THE COURT:  Hang on.  Hang on.

03:14   15           THE WITNESS:  Basically --

16           THE COURT:  Hold it.  Hold it.

17                Read the question back, please.

18           MR. FEAZEL:  I said it --

19           THE COURT:  No.  Have her read it back.

03:15   20       *(The requested portion of the record was read back by the*

21   *court reporter)*

22           THE COURT:  All right.  Now, the word -- let me

23   explain.  He asked what subjects were they asking him about.

24   If it was the exact words they used, that's hearsay.  But what

03:15   25   was discussed -- in generality, what was discussed?  For

03:15   1   instance, "Well, we discussed world history and how it

2   pertains, you know, to the United States," that's a broad

3   question; that's in the abstract.

4                    What particular questions did they ask you, what

03:15   5   were the wording, I'm going to hold that as hearsay.  So, just

6   generally, what were the areas.

7                    So, you're entitled to a ruling.  Overrule the

8   objection.

9                    Make it what -- what subjects generally were they

03:15   10   interested in or did -- did you come to understand they were

11   interested in.  Not the words they used.

12                    THE WITNESS:  They were just interested if I can help

13   them or not.

14                    THE COURT:  Okay.

03:16   15   BY MR. FEAZEL:

16   Q.  And what specific set of skills did you have that you could

17   help them with?

18   A.  Language, religion, basically anything that involved with

19   terrorism.

03:16   20   Q.  Okay.  So, they considered that you had a particular skill

21   set that you could assist them in their investigations.  Is

22   that correct?

23   A.  Yes.

24   Q.  What were some of the things they told you before you

03:16   25   started helping them investigate different people or

03:16  1    institutions?  What types of background or what types of

2    directions did they give you?

3    A.  They did not have any specific.  So, it could be -- it

4    could be any race, any color, any religion.  It was not

03:16  5    specifically was toward the Middle Eastern or anything like

6    that.

7    Q.  Did they tell you to always be honest?

8    A.  Yes.

9    Q.  What did they say in regard to honesty?

03:16  10   A.  I have to tell the truth no matter what.

11   Q.  And is there -- are there repercussions if you do not tell

12   the truth?

13   A.  If I don't tell the truth, I will be arrested or I will

14   be -- they will just simply going to get rid of me.

03:17  15   Q.  Okay.  And did they tell you anything else about maybe --

16   did they tell you about entrapment?

17   A.  Yes, they have.

18   Q.  And what did they tell you about entrapment?

19   A.  At any time, do not make sure if -- if the subject or

03:17  20   anybody you're talking to, make sure you do not force them to

21   do something that they really don't like.  Because that's

22   exactly what it is, you're making them -- you know, if you're

23   forcing them to do it, then that's no good.

24   Q.  So, don't do something they don't already have a

03:17  25   predisposition to do.  Is that correct?

03:17   1    A.  Yes.

2    Q.  Okay.  So, what happens if during the course of your

3    investigations someone acknowledges that they no longer want to

4    do this or this isn't something that they're into?

03:17   5    A.  If they no longer want to do it?

6    Q.  Yes.

7    A.  We just drop it.  We just drop it, let them go.

8    Q.  So, the investigation stops?

9    A.  Yes.

03:17   10   Q.  Okay.  What were the first types of cases you started

11   assisting the FBI with?

12   A.  Well, it was a little bit involvement about eco-terrorism

13   and PETA, animals, some -- I don't recall the actual name.

14   Q.  Was most of this related to domestic terrorism?

03:18   15   A.  Yes, domestic terrorists.

16   Q.  And how many investigations, approximately, were you

17   involved in relating to domestic terrorism?

18   A.  About two.

19   Q.  About two?

03:18   20   A.  Yes.

21   Q.  And let's talk for a minute about how you're compensated by

22   the FBI.  Are you paid for the work and your assistance to the

23   Federal Bureau of Investigation?

24   A.  Yes.

03:18   25   Q.  And how are you paid?

03:18   1   A.  I get paid for my -- for my expenses, and then I get paid

2   for my service.

3   Q.  And when you say your "expenses," what do you mean by you

4   get paid for your expenses?

03:18   5   A.  My gas, my hotel, my phone, my mileage.

6   Q.  So, these are reimbursements of out-of-pocket expenses?

7   A.  Yes.

8   Q.  And then you said you get paid for your services?

9   A.  Yes, based on how difficult is the information.

03:19   10   Q.  Okay.  So, you're getting paid on information that you give

11   the FBI; and that's a monetary system that's dependent on how

12   hard it was to get the information?

13   A.  Yes, sir.

14   Q.  And let's talk for a minute about international terrorism

03:19   15   and counterterrorism.  When did you get involved in these types

16   of cases?

17   A.  Pretty much 2004.

18   Q.  And at this time, how long had you been working for the

19   Federal Bureau of Investigation as an informant?

03:19   20   A.  About 11 to 10 years.

21   Q.  Eleven to ten years?

22   A.  Yeah, from 2001 until right now.

23   Q.  Okay.  But what about from the time -- would it be fair to

24   say you worked about three to four years before you started

03:19   25   doing the counterterrorism cases?

03:19   1    A.  Yes.

     2    Q.  Okay.  And do you have any moral or ethical issues about

     3    investigating other Muslims or people of the Islamic religion?

     4    A.  No.

03:19   5    Q.  And why is that?

     6    A.  Any religion and any race have good people and bad people.

     7    Q.  Let's get to the investigation of Barry Walter Bujol, Jr.

     8    When, approximately, did you get involved in this

     9    investigation?

03:20   10   A.  I was approached by the agents, I believe, in late 2008 --

     11   I don't recall -- or '9.

     12   Q.  Or early 2009?

     13   A.  Or early 2009.

     14                About that they have met somebody and they would

03:20   15   like me to talk to him to see what's -- what's in his head,

     16   what's going on.  And I said "yes."

     17   Q.  All right.  Let's talk about that for a minute.  They

     18   wanted you to talk to him and figure out what's inside his

     19   head.

03:20   20   A.  Yes.

     21   Q.  What do you mean by that?  What is it that you are looking

     22   for when you go meet with somebody?

     23   A.  To look at his belief, his ideology, his -- what -- I mean,

     24   what is he up to, what he wants, what he wants in life, what's

03:21   25   his objective, you know, he likes school, he likes -- he likes

03:21   1   to go out, he likes religion, he likes -- I mean, anything.

2   Q.   Are there certain things that you're specifically looking

3   for, though, when you meet with a possible target or someone in

4   an investigation?

03:21   5   A.   Not necessarily, no.

6   Q.   Okay.   What indicates that an investigation should continue

7   on, on a person -- a specific person when you meet them?

8   A.   If the person has an extremist view.

9   Q.   Okay.   So, you're looking for someone with an extremist

03:21   10   view?

11   A.   Yes.

12   Q.   Have you ever looked at someone and decided they do not

13   have an extremist view and they're not worth looking into?

14   A.   Yes, I have.

03:21   15   Q.   Okay.   So, the FBI asked you to meet with Mr. Bujol to

16   determine if he had an extremist view?

17   A.   Yes.

18   Q.   All right.   Let's talk for a minute about your handlers in

19   this case.   What types of stuff did they tell you before you

03:21   20   got involved and actually met the defendant?

21   A.   I'm sorry.   Can you repeat the question?

22   Q.   I will.   Before you actually met Mr. Bujol, what did your

23   handlers tell you that you were supposed to do, before you met

24   him?

03:22   25   A.   They told me not to do two things.   Number one, do not

03:22   1    offer him a job; number two, do not pretend you're going to be

2    his spiritual adviser.

3    Q.  Okay.  Did they also tell you not to entrap him?

4    A.  Yes, they have told me that.

03:22   5    Q.  Okay.  And that's something that has always been the

6    central focus of your investigation?

7    A.  Yes.

8    Q.  And something you're very familiar with?

9    A.  They told me at any time he wants to walk away just let him

03:22   10   walk away.

11   Q.  All right.  You were supposed to have a meeting with

12   Mr. Bujol at the courthouse.  Do you remember this?

13   A.  Yes, I do.

14   Q.  And this was sometime approximately in November of 2009?

03:22   15   A.  Yes.

16          THE COURT:  Which courthouse are we talking about?

17   BY MR. FEAZEL:

18   Q.  Which courthouse are we talking about?

19   A.  I don't remember the place.

03:22   20          THE COURT:  Anybody?  Is it a county courthouse?

21          MR. FEAZEL:  It was the Waller County courthouse.

22          THE WITNESS:  It's close to Katy.

23   BY MR. FEAZEL:

24   Q.  Was it a JP court, a justice of the peace court?

03:23   25   A.  Yes.

03:23   1   Q.  All right.  Now, when you tried to meet the defendant

2   there, did you see him there?

3           MR. FEAZEL:  Your Honor, may I have a quick second?

4           THE COURT:  No.  I know one -- they're both marshals,

03:23   5   correct?

6           A MARSHAL:  Yes, your Honor.

7           MR. FEAZEL:  Okay.

8           THE COURT:  Okay.  Both members of the marshal

9   service.

03:23   10          MR. FEAZEL:  Sorry.

11          THE COURT:  No.  Better to be safe than sorry, as they

12   say.  Go right ahead.

13          MR. FEAZEL:  May I proceed?

14          THE COURT:  Yes, sir.

03:23   15  BY MR. FEAZEL:

16   Q.  All right.  At this first meeting at the JP courthouse,

17   what happened?

18   A.  I was given a ticket, and I was supposed to wait that

19   Mr. Bujol will come and pay his ticket so I can start having a

03:23   20  conversation with him.  But I stayed in there, and he never

21   showed up.

22   Q.  So, you never actually got to see Mr. Bujol on that date?

23   A.  No, I haven't.

24   Q.  Okay.  Did your handlers determine that they would do

03:24   25  another attempt to meet the defendant?

03:24   1   A.  Yes.

2   Q.  And what did they tell you they would do to get you

3   introduced to the defendant?

4   A.  They told me that they going to have to take me inside a

03:24   5   holding cell and see if he can start having a conversation with

6   me.

7   Q.  Okay.  So, they told you that you had to meet him inside

8   the Waller County jail.  Is that correct?

9   A.  Yes.

03:24   10  Q.  All right.  Let's talk about a meeting on November 13th of

11  2009 in the Waller County jail.  What were you told by your

12  handlers before this meeting?

13  A.  "We are going to book you in inside, and we're going to --

14  you're going to have to go through the same process like

03:24   15  everybody else.  You're going to be arrested and you're going

16  to be inside the cell and then he's going to come inside.  Try

17  to have a conversation with him.  The situation is really

18  tense.  He just had a newborn baby.  If at any time he did not

19  want to have a conversation with you and he refused to talk to

03:25   20  you, it's okay.  It's going to be -- so don't push it hard."

21  Q.  Okay.

22  A.  "And don't offer him a job.  That's for sure.  And just

23  don't -- don't pretend to be his spiritual advisor."

24  Q.  So, on November 13th were you, in fact, booked into the

03:25   25  jail as if you had warrants?

03:25   1   A.  Yes, I was.

2   Q.  Okay.  What happened?  What happened as soon as you were

3   taken to the jail?

4   A.  I was -- I was booked in, and I believe we had another guy

03:25   5   with us.  After awhile, Bujol walks in and then we start --

6   everybody start talking about why you're here and why is there.

7   And, so, we started having a conversation with him.

8   Q.  Let's take a quick -- quick question here.  How did you

9   know that it was Mr. Bujol who you saw?

03:25   10   A.  They showed me a picture of him before.

11   Q.  Okay.  So, you were shown what he was to look like --

12   A.  Yes.

13   Q.  -- before they sent you in?

14   A.  Yes.

03:26   15   Q.  Okay.  So, you see him, right?

16   A.  Yes.

17   Q.  What happens then?

18   A.  Then we start having a conversations.  After that by a

19   little bit, he start praying.  So, I ask him if I can pray with

03:26   20   you.  So, I proceeded by praying with him.

21   Q.  Where did you pray?

22   A.  In the holding cell.

23   Q.  And where specifically in the holding cell?

24   A.  Well, on the floor, next to the -- next to the bathroom in

03:26   25   there.  I mean, there's just a bathroom and the holding cell

1  all is one.

2  Q.  What did they say to you about where he chose to pray?

3  A.  I'm sorry?

4  Q.  Did they say anything to you or did this mean anything to

5  you, his decision to pray at this location?

6  A.  I mean, I appreciated, like, he's either going -- he's

7  going to have to show off.  Because the place is really filthy.

8  And he didn't really want to wait, and he didn't really want to

9  sanitize the place.  It was extremely -- I mean, I'm leaning on

10 the floor really, I mean, next to a bathroom, literally.

11 Q.  Is this something that you consider to be a very devout

12 thing to do?

13 A.  You can say so, yeah.

14 Q.  All right.  But what was your opinion of this?

15 A.  I was not very pleased about it.  It was really not nice.

16 I mean, it could have waited until we got to more sanitized

17 places or cleaner places.  Because part of the prayer is you

18 have to have something called "taharah," which is you need to

19 be clean and the place where you need to pray has to be

20 absolutely clean, too.  And the place where we were was not

21 clean.

22 Q.  How did he react to you praying with him?

23 A.  He was pleased.  He was happy.

24 Q.  Were you able to strike up conversations with him?

25 A.  Yes, I did.

03:27  1   Q.  What did you-all talk about?

2   A.  We talked about a variety of things, why he was -- why he

3   was there.  He was a little bit anxious.  He was a little bit

4   nervous.  He start spinning on there.  He said, "Something

03:28  5   wrong, you know.  Both of you guys on the jumpsuit, you know.

6   They did not let me change my clothes.  I don't think I'm here

7   because of my traffic ticket.  I think I'm here because of my

8   situation."  He kept repeating that word a lot, "my situation"

9   and "my situation."

03:28  10  Q.  Did you ever find out what "my situation" meant?

11  A.  Yes, later on, I did.

12  Q.  What did this mean?

13  A.  He thought he was brought over there because of the

14  shooting at Fort Hood, where Nidal Hasan had shot 13 soldiers.

03:28  15  Q.  Did this just recently happen?

16  A.  It was -- I think it was a few weeks before -- before a --

17  before -- before that, yes.

18  Q.  What else did you-all talk about while you were in the

19  Waller County jail?

03:29  20  A.  Well, we talked about his education.  He told me he

21  finished school as a construction -- construction engineering.

22  He told me he studied a little bit of Arabic from couple of the

23  imams in there.  He told me he wanted to go to -- to one of the

24  Arabic countries and he wanted to go to Saudi Arabia but Saudi

03:29  25  Arabia was expensive so he changed his mind and he wanted to go

03:29   1   to Egypt.

2                    THE COURT:  Wanted you to go?

3                    THE WITNESS:  No, no.  He wanted to go.

4                    THE COURT:  He wanted to go.

03:29   5                    THE WITNESS:  Yes.

6   BY MR. FEAZEL:

7   Q.   So, he, himself, wanted to go to Egypt?

8   A.   Yes.

9   Q.   Did he say anything about Yemen at that time?

03:29   10   A.   No.

11   Q.   So, the story at that time was Egypt?

12   A.   Yes.

13   Q.   What else did you-all talk about?

14   A.   Oh, we talked about, like, how he was -- he was trying to

03:29   15   assist me in what to do with my traffic ticket and, you know --

16   basically, he was trying to help me out, finding a way of

17   getting out.  And I asked him if he needed help, if he wanted

18   me to bail him out.  And he said "no."

19   Q.   Okay.  Why did he say he did not want you to bail him out?

03:30   20   A.   He believed that any money -- any money that gets paid to

21   the government is riba, and that's a no-no.  That would be

22   against his belief.  That would be haraam.

23   Q.   You used two words here.  You used the word "riba" and

24   "haraam."  Let's talk about "riba."  What does "riba" mean?

03:30   25   A.   "Riba" in Islamic is basically if you lend someone money

*Cheryll K. Barron, CSR, CM, FCRR*                              *713.250.5585*

03:30   1    you're supposed to return it back the same amount.  Okay.  If

2    you lend someone money and he asks you for extra amount, if you

3    give someone a hundred and then he asks you for a hundred and

4    ten, that 10 percent, it will be -- it will be riba.

03:30   5    Q.  "Interest" is "riba"?

6    A.  "Interest" is "riba," basically, yes.

7    Q.  Is there an extremist view associated with interest?

8    A.  Well, Salafi -- basically, Salafi and Salafi-Jihadis always

9    think riba is an extreme things.  They really -- they believe

03:31  10    anything that you pay to the government will consider to be

11    riba.

12    Q.  Okay.  The second word you used was "haraam"?

13    A.  "Haraam" will be like illegal or like a sin.

14    Q.  Something that is wrong?

03:31  15    A.  That will be sinful, yes.  That will be committing

16    something against your belief.

17    Q.  So, the defendant made it clear he did not want you to bail

18    him out of jail because it was paying interest to the

19    government and that's something that's bad?

03:31  20    A.  Yes.

21    Q.  Okay.  What did you then talk about?

22    A.  Well, just talked about, like, his traffic tickets and

23    that.  And he told me he thinks and he really believed that he

24    had paid all the traffic tickets he had.

03:32  25    Q.  At some point in time were you taken out of the jail?

03:32   1   A.   Yes.

2   Q.   What did you do as soon as you got out of jail?

3   A.   I have to do the debriefing.  I have to go meet my handlers

4   and tell them exactly what happened.

03:32   5   Q.   Why do you do that so quickly after when you have a meeting

6   with the defendant?

7   A.   So everything will be fresh in my head; so I will not have

8   to forget.

9   Q.   Okay.  Do you see the defendant sitting in the courtroom

03:32   10   today?

11   A.   Yes, I do.

12   Q.   Could you please point to him and identify him by what he's

13   wearing?

14   A.   He's over there, in the jump green suit.

03:32   15          MR. FEAZEL:  Your Honor, may this record reflect that

16   the witness has identified the defendant?

17          THE COURT:  The record will so reflect.

18   BY MR. FEAZEL:

19   Q.   All right.  So, when you had your debriefing with your

03:32   20   handlers, did you explain to them what had happened?

21   A.   Yes, I have.

22   Q.   And were you honest?

23   A.   Yes, I have.

24   Q.   And then, after you did this, was there a decision that you

03:32   25   would go and have another meeting with the defendant?

03:32  1   A.  Yes.

2   Q.  What did they tell you in regard to this next meeting that

3   you were going to have with the defendant?

4   A.  They asked me to go and have a -- go to the jail back again

03:33  5   and try to have a conversation with him again, see what he

6   wants to talk about and if he's willing to talk to you more.

7   Q.  And before that, was there a decision on the 18th of

8   November to give the defendant's wife some money?

9   A.  Yes.

03:33  10  Q.  And can you tell -- tell us how that happened, the decision

11  on November 18th to give the defendant's wife some money?

12  A.  I went to the jail, and I saw that he had a -- just a

13  newborn baby.  So, after -- in the waiting room, I saw his wife

14  and I saw she had a newborn baby.  So, she walked away; and

03:33  15  then I went to talk to him in the visitation room.

16            So, in the visitation room, I asked him if he

17  needed something.  So, he asked me, "Yes.  Could you please if

18  you can do" -- something called "zakaah" or "sadaqat" -- "to my

19  wife."

03:34  20            So, I says, "Okay.  Just give me the address."

21  And he gave me the address where his wife lives.  So, I went

22  over there and I dropped her some money.

23  Q.  How much money did you give her?

24  A.  $50.

03:34  25  Q.  Was this reimbursed to you by the FBI?

03:34  1   A.  Yes.

2   Q.  All right.  Now, did you have a meeting with the defendant

3   on December 2nd of 2009 at the Waller County jail again?

4   A.  Yes, I have.

03:34  5   Q.  Can you tell us what happened at that meeting?

6   A.  I believe I went and bailed him out.

7   Q.  Before December 4th, on the 2nd, did you visit him on the

8   2nd?

9   A.  Oh, yes.  I visited him one more time so I can make sure,

03:34  10  you know, he still remembers me and we'll see how his demeanor

11  is.  So, I went and talked to him.

12          He was really in a good mood.  He told me that he

13  believes that it's no longer about the situation and he thinks

14  he's just -- just a simple traffic tickets that he forgot

03:35  15  about.  And the judge give him -- gave him 13 days.  And every

16  day he stays in there, they get cut off from his time.

17  Q.  Was he happy to see you?

18  A.  Yes, he was.

19  Q.  Did you ask if you could bail him out of jail?

03:35  20  A.  Yes, I did.

21  Q.  What did he tell you?

22  A.  He told me "no."  He told me, "No.  It's almost over."

23  Q.  After this meeting, did you have a debriefing with your

24  handlers?

03:35  25  A.  Yes, I have.

03:35    1    Q.  Was it decided that you would meet with him again?

         2    A.  Yes.

         3    Q.  What were you instructed that was going to happen next?

         4    A.  I was instructing that I am going to have to -- to pretend

03:35    5    that I bail him out, and then I'll see if I can offer him a

         6    ride to his house.

         7    Q.  Were you instructed to, again, not offer him a job and to,

         8    again, not act as his spiritual advisor?

         9    A.  In every single meeting, I was instructed never ever to

03:35   10    offer him a job and not ever be his spiritual leader.

        11    Q.  Okay.  Did you meet with the defendant on December 4th at

        12    the Waller County jail?

        13    A.  Yes, I have.

        14    Q.  What did you do at the Waller County jail on December 4th?

03:36   15    A.  Pretended I bail him out and then I offered him a ride to

        16    his house.  I drove him to the house, and then I asked him if

        17    he would like to continue the conversation with me.

        18              He said, "Yes.  Just give me about couple of

        19    minutes.  Let me refresh."  So, I gave him a little bit of

03:36   20    time; and then he came back out.

        21    Q.  Okay.  Let's talk about this for a minute.  He was in jail

        22    for a long period of time.  Is that right?

        23    A.  About -- I don't remember.  About 10 -- 10 -- two weeks, 10

        24    days or two weeks.

03:36   25    Q.  Based on your own opinion, was he more excited to continue

*Cheryll K. Barron, CSR, CM, FCRR*                        *713.250.5585*

03:36   1    a conversation with you or to go home and see his family?

2    A.   He was more interested in having a conversation with me.

3    Because he just had a newborn baby.

4    Q.   What did he do?

03:37   5    A.   He just freshen up and just came back to talk to me again.

6    Q.   Did he meet you in your car?

7    A.   Yes.

8    Q.   And where did you-all go?

9    A.   I think we went to McDonald's.

03:37  10    Q.   All right.   And what happened at McDonald's?

11    A.   We just kept talking and having a conversations, and we

12    bought a coffee and hot chocolate.

13    Q.   Was there anything rememberable about anything that

14    happened with the hot chocolate?

03:37  15    A.   Yeah.   I think he was not used to drinking hot beverages.

16    So, he burned his mouth a little bit taking a sip out of the

17    hot chocolate.

18    Q.   All right.   Did you-all have discussions about contacting

19    each other later?

03:37  20    A.   Yes.   I told him, "I would like to have a conversation with

21    you.   I'm going to have Passover here.   I really don't have

22    friends.   And, you know, can I have your phone number?   You

23    want to have my phone number?"

24               He said, "I don't trust phones at all.   Phones

03:37  25    are not good.   I trust e-mails.   E-mails are free."   So -- so,

03:37   1    I gave him my e-mail.

2    Q.  All right.  Now that you're not in the Waller County jail

3    and you're in a car, were these meetings recorded?

4    A.  Yes.

03:38   5              MR. FEAZEL:  All right.  At this time I would like to

6    play an excerpt from Exhibit 284, 17-2, a clip.

7        *(Tape playing)*

8    BY MR. FEAZEL:

9    Q.  Okay.  Sir, in this clip, he is discussing that he doesn't

03:39   10   like to use the phones, that he likes to use e-mail.  Did you

11   find this to be strange?

12   A.  Yes.

13   Q.  And why does he -- did he -- okay.  Excuse me.

14              He says that he doesn't like to use phones

03:40   15   because phones, they can track back to someone but e-mails are

16   safer because you can get rid of it.  Is that correct?

17   A.  Yes.

18   Q.  Did you-all exchange e-mail addresses?

19   A.  I gave him my e-mail address, yes.

03:40   20   Q.  Okay.  Once this meeting was done, did you go back and

21   debrief with your handlers?

22   A.  Yes, I have.

23              MR. FEAZEL:  At this time I would like to show

24   Exhibit 112.

03:40   25   BY MR. FEAZEL:

03:40   1    Q.  Let me show you Exhibit Number 112.  This is an e-mail

         2    dated December 7th, 2009.  Do you remember this e-mail?

         3    A.  Yes, I do.

         4    Q.  Could you please read the e-mail?

03:40   5    A.  "ASA," assalamu alaikum, "Just wanted to send you an e-mail

         6    as I said I would.  I really enjoyed the hot chocolate once it

         7    cooled off.  Hope to hear from you soon.  Insha Allah.  You can

         8    contact me here whenever you get time.  Your brother,

         9    Abdullah."

03:41  10    Q.  Okay.  Was this his first attempt to reach out to you?

        11    A.  Yes.

        12    Q.  What did you do upon receiving this e-mail?

        13    A.  I contact my handlers.

        14    Q.  What did they tell you?

03:41  15    A.  To wait.

        16    Q.  At some point in time did the defendant get impatient

        17    because he hadn't heard from you and you got another e-mail?

        18    A.  Yes, I did.

        19    Q.  Let me show you Exhibit 113.  Do you recognize this e-mail

03:41  20    dated Tuesday, December 15th, 2009?

        21    A.  Yes, I do.

        22    Q.  Could you please read this e-mail?

        23    A.  "Kayfa haluk?  La'laka bi khair?  I e-mailed you earlier

        24    but you didn't respond so I thought I would try again.  Just

03:41  25    wanted to see how you were doing and say thank again for the

03:41  1    hot chocolate.  Once it cooled off, I finally got to enjoy it.

2    Also, I think I know the difference between 'two' and 'twelve.'

3    I would like to tell you the next time I see you.  Insha Allah.

4    Hope to hear from you soon.  Your brother, Abdullah."

03:42  5    Q.  Let's talk for a minute about the e-mail address.  The

6    e-mail before, if we could go back to Exhibit 112, came from

7    someone by the name of a Robert Johnson.  Is that correct?

8    A.  Yes.

9    Q.  And he mentions "hot chocolate" in this.  Is that correct?

03:42 10    A.  Yes.

11    Q.  Why did he mention "hot chocolate"?

12    A.  It's because of the incidence where he burned his tongue

13    drinking the hot chocolate, so I will recognize it by giving

14    that incident.

03:42 15    Q.  Okay.  So, this hot chocolate is so you will know who

16    Robert Johnson is?

17    A.  Yes.

18    Q.  Because Robert Johnson is not the defendant?

19    A.  No.

03:42 20    Q.  Let's move to the next exhibit, which is 113.  Again, as

21    you can see -- expand it a little.  This e-mail comes from

22    Barry Bonner?

23    A.  Yes.

24    Q.  Once again, he mentioned "hot chocolate."  Is that correct?

03:42 25    A.  Yes.

03:42   1   Q.  Why is that?

2   A.  Well, I think he thought I did not recognize the first

3   e-mail so he had to create another one or maybe he got a little

4   bit impatient and he just sent it.

03:43   5   Q.  There's some Arabic at the beginning of this e-mail.  Can

6   you translate that for us?

7   A.  "Kayfa haluk," "how are you."

8           "La'laka bi khair," "I hope you're well."

9   Q.  And, then, again he mentioned "hot chocolate"?

03:43   10  A.  Yes.

11  Q.  Then he talks about, "I know the difference between 'two'

12  and 'twelve'."  What is he talking about there?

13  A.  He's talking about how to say the number "two" in Arabic

14  and the number ''twelve'' in Arabic.

03:43   15  Q.  Why did he mention this?

16  A.  I think in our conversation initially he said he's a little

17  bit confused about those two numbers.

18  Q.  Okay.  And after the meeting on December 4th, did you have

19  another meeting with the defendant?

03:43   20  A.  Yes, I have.

21  Q.  And let me direct your attention to December 23rd of 2009,

22  the meeting that took place at Cypress CVS and Walgreen's,

23  where you meet an FBI agent to do a drop to.  Do you remember

24  this meeting?

03:44   25  A.  Yes, I do.

03:44  1   Q.  Where did you first see the defendant?  Did you pick him
       2   up?
       3   A.  I believe so; yes, I did pick him up from his house.
       4   Q.  Where did you pick him up from?  His house?
03:44  5   A.  I believe so.
       6   Q.  What time of day was this, approximately?
       7   A.  Sometimes afternoon.
       8   Q.  And what was the purpose of this meeting?
       9   A.  The purpose of the meeting is to see if he's -- if he's
03:44  10  nervous, just to show him I'm going to do some kind of an
       11  illegal activity and if he's going to walk away from it or not
       12  and --
       13  Q.  All right.  Let's talk about that for a minute.  You're
       14  going to do some kind of illegal activity.  This activity
03:44  15  you're doing isn't a crime, is it?
       16  A.  It's not crime, but it's not normal to do it either.
       17  Q.  Okay.  Suspicious activity, is that fair to say?
       18  A.  Yes.
       19  Q.  What suspicious activity were you going to do?
03:44  20  A.  I am going to have to do some dropoff to somebody.  So, I'm
       21  going to have this envelope which is going to be stuffed with
       22  something.  And I'm just going to stop by somewhere, and I am
       23  going to meet some Middle Eastern descent.  I'm going to give
       24  him that envelope, and I'm just going to drive.
03:45  25  Q.  Okay.  Was this meeting recorded?

03:45   1    A.  Yes.

2    Q.  And did you have some conversations with the defendant

3    during this meeting?

4    A.  Yes.

03:45   5    Q.  I would like to play from Exhibit 285, 18-1.

6       (Tape playing)

7    BY MR. FEAZEL:

8    Q.  Can you explain to the judge what you were talking about

9    during this clip?

03:48   10   A.  In this clip he's talking about he met somebody of Middle

11   Eastern descent or Muslims, and he was talking to them about

12   this Quranic verse "Prepare" -- "Prepare for horses and for" --

13   "for a war."  There is a Quranic verse.  But in Jihadi Salafis,

14   they take this verse as at all time you should be prepare for a

03:48   15   war against the infidels.  And there's another things that he

16   says at the end.  It's called, "al-wala' wa'l-bara," which

17   means you supposed to be at all time loyal to your believer and

18   disloyal to anybody else.

19   Q.  And this person that he's telling this to doesn't agree

03:49   20   with it?

21   A.  He said this person -- this person did not believe in it

22   and this person believed that it was -- it was written 1400

23   years ago and it was written for the prophet.  But he was

24   outraged because he believes that this person did not carry the

03:49   25   same belief as he did.  So, he carried it only a superficial

03:49    1    relationship with him because of the differences.

       2    Q.  You spoke earlier about Salafi-Jihadis believing very old

       3    interpretation of Quranic verses or Hadith.  Is this what you

       4    meant by that, that that's --

03:49    5    A.  Yes.

       6    Q.  And can you explain that a little bit?

       7    A.  Well, they believe -- I mean, if -- if you will ever go to

       8    any Salafi-Jihadis website, you're going to see this one.  This

       9    verse is the first thing you're going to read in there on most

03:50   10    of their websites.  They believe that's the instruction from

     11    God sent to them to start -- to start their jihad.  And that's

     12    the verse he was talking about.

     13    Q.  Okay.  Let's show another clip, 18-2, from the same

     14    Exhibit 285.

03:50   15      (Tape playing)

     16    BY MR. FEAZEL:

     17    Q.  And can you explain to the judge what you-all were

     18    basically talking about in this paragraph?

     19    A.  We're basically talking about his story, that he had

03:53   20    planned to commit hijrah, where he wanted to go and study

     21    abroad and to go to an Islamic school so he made -- he made

     22    this things about that he's going to go to teach English and

     23    learn Arabic, and he have only told two guys about it before he

     24    leaves.

03:53   25    Q.  Okay.  So, he was coming up with an excuse for why he was

03:53  1    wanting to travel?

2    A.  Yes.  And his excuse was, "I'm going to go to teach English

3    and learn Arabic."

4    Q.  Okay.  Let me show you Exhibit Number 116.

03:53  5             THE COURT:  We're going to take a break in about five

6    minutes, the afternoon break.  Okay?  In about five minutes.

7    BY MR. FEAZEL:

8    Q.  Do you recognize Exhibit 116?

9    A.  Yes, I do.

03:53  10   Q.  Was this an attachment that the defendant sent you in an

11   e-mail?

12   A.  Yes, he did.

13   Q.  What is this article about?

14   A.  During the time that he was with me, he's explain his

03:54  15   outrage because some parents have called the FBI to bring their

16   sons back that their sons have left to Pakistan to join the

17   mujahideen.  So, they're actual parents.  And he was outraged.

18   And when I told him I never heard of it, he forward me the

19   e-mail.

03:54  20   Q.  All right.  Let me show you Exhibit Number 117.  This is an

21   e-mail dated January 13th of 2010 from Robert Johnson.  What is

22   this e-mail about?

23   A.  I asked two questions.  Number one is, "As for why?"  And

24   Number 2 is, "When it will end?"

03:55  25   Q.  And what do you mean by that, "Why" and "When it will end"?

03:55   1    A.  I wanted to see his answers.  So, he answers me with a
        2    Quranic verse.
        3    Q.  And, real quickly, when you're asking about "Why" and "When
        4    will it end," what are you talking about?  And what are you
03:55   5    talking about "why"?
        6    A.  It's very simple.  We're asking about when is the war
        7    against Islam will be over.  Or basically he sees everything as
        8    a war against the Muslims.  So, I ask him when is this war
        9    going to be over.
03:55   10   Q.  And does he respond?
        11   A.  Yes, he does.
        12   Q.  Can you please read the second part of this e-mail, the
        13   response from January 12th?
        14          I believe it comes in here -- and let's start
03:55   15   from where it says, "Obama."
        16   A.  "Obama is the same as Cowboy Bush.  When will it end?  Look
        17   forward to seeing you very soon so we can talk freely.  There
        18   is much going on now.  I will be around next week.  Insha
        19   Allah.  Maybe from the 19th to 21.  I will let you know soon.
03:56   20   Salam."
        21          MR. FEAZEL:  Can you scroll it down some more?
        22          And a little bit more?
        23          Okay.
        24          Sorry.  Excuse me.  Can we go all the way to the
03:56   25   top of the e-mail?

03:56    1    BY MR. FEAZEL:

         2    Q.   All right.   There's some Arabic written here?

         3    A.   Yes.

         4    Q.   It says, "As for why?"  And there's Arabic.  Can you please

03:56    5    read that?

         6    A.   The Arabic part is a Quranic verse which is going to say,

         7    "Well, they are going to fight you until they revert you from

         8    your religion as much as they can."

         9    Q.   Okay.  Who wrote that Quranic verse?

03:57   10    A.   He did.

        11    Q.   Okay.  Your question of, "When will it end," there's a

        12    response in Arabic?

        13    A.   Yes, there is.  And it reads, "Fight them until there is no

        14    problems, until the whole religions belongs to Allah."

03:57   15    Q.   So, his response is to fight them until --

        16    A.   Yeah, until the whole world become believer in Allah.

        17    Q.   After this meeting, did you meet with the defendant again?

        18    A.   Yes, I have.

        19    Q.   Let me direct your attention to a meeting on

03:57   20    January 20th --

        21         MR. FEAZEL:  Well, your Honor, you mentioned that you

        22    wanted to --

        23         THE COURT:  Yeah.  This may be a good time to take a

        24    break.  Probably go straight through to 6:00 o'clock.  So,

03:57   25    we'll take a break.

03:57   1          And you need to get your witness out first.  Do
        2   you want to do that first before we -- get him out first.
        3          MR. FEAZEL:  Can we clear the courtroom first?  That's
        4   probably --
03:57   5          THE COURT:  Is he going to walk out this way?
        6          MR. FEAZEL:  Yes.
        7          THE COURT:  I don't want to clear the courtroom.  Have
        8   him come out the same way he came in.  Okay?
        9          MR. FEAZEL:  Okay.
03:58  10          THE COURT:  I don't believe in clearing courtrooms.
       11          Ladies and gentlemen, it's 4:00 o'clock.  As I
       12   say, we're going to adjourn between 6:00 and 6:05.  We'll take
       13   a break at this time.
       14          Please be back, ready to resume, at 4:20.  It
03:58  15   will be a 20-minute break.
       16       (Recess was taken)
       17          THE COURT:  All right.  Be seated, please.
       18          All right.  Why don't we pick up where we left
       19   off?
04:26  20          Go right ahead, please.
       21   BY MR. FEAZEL:
       22   Q.  Let me direct your attention to a meeting that took place
       23   on January 20th, 2010, that took place at Best Buy in Cypress.
       24   Do you remember this meeting?
04:26  25   A.  Yes, I do.

04:26   1   Q.  Were -- was it recorded?

        2   A.  Yes, it was.

        3   Q.  Let me show you --

        4         THE COURT:  Where were you in -- were you in an

04:26   5   automobile or where?

        6         THE WITNESS:  I was in an automobile first.  And then

        7   we parked.  We went inside Best Buy.  And then, from Best Buy,

        8   we went to get a coffee at Starbuck's.

        9         THE COURT:  And this is all you -- you moved through

04:27  10   all of these locations on the recording?

       11         THE WITNESS:  There will be a recording -- there will

       12   be several recordings in the car, and there will be recording

       13   devices on me at the same time.

       14         THE COURT:  Okay.  All right.  Let's play the next

04:27  15   one.

       16         MR. FEAZEL:  All right.  This is 21-1 of Exhibit 285.

       17     (Tape playing)

       18   BY MR. FEAZEL:

       19   Q.  All right, sir.  The defendant says that he wants to be "a

04:33  20   means of the victory."  When he is saying that, what is he

       21   talking about?

       22   A.  He said -- he said he wants to be part of --

       23         THE COURT:  Microphone up, please.

       24         THE WITNESS:  He said he wants to be part -- part of

04:33  25   what's going on, he wants to be part of the victories, where --

04:33   1    he said the Muslims are going to win the war and the problem is

        2    he wants to be part of that victory.  So, he wants to fight in

        3    the side of the Muslims in that war.

        4              THE DEFENDANT:  Objection.

04:33   5              THE COURT:  Yes, sir?

        6              THE DEFENDANT:  Speculation.

        7              THE COURT:  Is that -- is that what he said?  Are

        8    those -- because I read it myself.  I was reading as it went

        9    up.  Is that what the man -- pull the mike up a little bit,

04:34  10    sir.

       11                   Higher.  Higher.  That's it.  Now, you can back

       12    off from it a little bit.

       13                   How do you -- is that your interpretation of what

       14    he said or is that --

04:34  15              THE WITNESS:  Yes.

       16              THE COURT:  -- an interpretation based upon -- what

       17    upon?

       18              THE WITNESS:  Upon exactly what he said.  He said in

       19    the videos, "The Muslims are going to win the war."

04:34  20              THE COURT:  Right.

       21              THE WITNESS:  "But I want to be" --

       22              THE COURT:  I read that.  When I say "right," I read

       23    that.  What else?

       24              THE WITNESS:  That's all my interpretation, yes, he

04:34  25    wants to be part of it.

04:34  1          THE COURT:  And is that what he said?  Now, I'm not

2    saying -- I read it.

3          THE WITNESS:  Yes.  Yes, that's what he said.

4          THE COURT:  He's saying --

04:34  5          THE WITNESS:  That's what he said.

6          THE COURT:  That's what he said.

7          THE WITNESS:  That's what he said in there.

8          THE COURT:  That's his interpretation.  Or not

9    "interpretation."  That's literally what was said.

04:34  10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  Because there's two things.

12    There's literally as to what was said or what you believe, with

13    your Islamic academic background or in the vernacular of, you

14    know, the folks you deal with, what it means.  But you're

04:35  15    saying that was exactly what was said, not just putting an

16    interpretation upon what was said.  Or is it both?

17          THE WITNESS:  It's exactly what he said.

18          THE COURT:  Okay.  Next question, please.

19    BY MR. FEAZEL:

04:35  20    Q.  Okay.  He mentioned "ajar."

21    A.  "Ajar."

22    Q.  What is what "ajar"?

23    A.  "Ajar" is credit or what you gain for you doing a good

24    deed, then you accumulate ajar, yes.

04:35  25    Q.  So, not only is he saying he wants to do it; he wants to do

04:35   1    it for credit?

2    A.  Yes.

3    Q.  All right.  He also mentions -- he said, "soldiers for

4    Allah kill and get killed."  Based upon your understanding of

04:35   5    the Islamic religion and the training that you have had in it,

6    what is he saying there?

7    A.  He's saying during the war is -- if Muslims going to go in

8    a war, they either going to be killing or they're going to be

9    killed.

04:36  10    Q.  Okay.  So, this isn't some kind of a hidden message.  He's

11    just flat out talking "going to kill or get killed."  Is that

12    correct?

13    A.  Yes.

14    Q.  It's a plain meaning interpretation of that statement?

04:36  15    A.  Yes.

16    Q.  All right.  At this point, how long have you known the

17    defendant?

18    A.  Very few times.

19    Q.  So, you've had a couple of meetings, a handful of meetings.

04:36  20    Is that fair?

21    A.  Yes.

22    Q.  And he's already talking about this sort of stuff with you.

23    Is that correct?

24    A.  Yes.

04:36  25    Q.  All right.  Let me show you from Exhibit 285 Clip 21-2.

04:36  1      (Tape playing)

2  BY MR. FEAZEL:

3  Q.  What is the defendant saying here?

4  A.  He's saying that the thing that he said about him going

04:38  5  abroad to teach English and learn Arabic is nothing but an

6  excuse for --

7           THE DEFENDANT:  Objection.

8           THE COURT:  Overruled.

9              Is that what he said?

04:38  10           THE WITNESS:  That's what he's saying.

11           THE COURT:  You said what he said.

12              Now, again, sir, if you elect later to take the

13  stand, you can contradict that with your own testimony.  But,

14  remember, you have a right not to.  I keep saying that to you

04:39  15  each time.

16              So, overrule the objection.  But you certainly --

17  we'll hear from you later on if you elect to testify.  Okay?

18  Just make a note and go -- and then you can contest what he

19  said.

04:39  20              Now, you can cross-examine him later; but you

21  cannot tell us what you said unless you actually take the

22  stand.  All right?

23              Now, go on.  Ask your question.

24           MR. FEAZEL:  All right.

04:39  25           THE COURT:  I tell you what.  Do me a favor.  Move

04:39   1    that board a little closer to me a little -- yeah.  And then
         2    what you do is just push it all the way into the wall.  Because
         3    I can see --
         4              MR. FEAZEL:  Why don't we move it out?
04:39   5              THE COURT:  Yeah, why don't we move it out?
         6              It will be easier for me to see the words as they
         7    scroll up and have -- Mr. Feazel will also have the ability to
         8    stand on the wall.
         9              Okay.  Thanks.  If anybody needs it, we can get
04:39  10    it back.
        11              MR. FEAZEL:  Thank you, your Honor.
        12              THE COURT:  That helps.  All right.  Go right ahead,
        13    sir.  Ask your question.
        14              You're saying that he said that learning Arabic
04:39  15    and teaching English, is it your position he's saying that was
        16    not enough?  I don't want to put words in your mouth.  What is
        17    it that your answer is?
        18              Why don't you rephrase the question?
        19              MR. FEAZEL:  I'll rephrase the question.
04:40  20              THE COURT:  Go on.
        21    BY MR. FEAZEL:
        22    Q.  When he is talking to you and he's saying that he wanted to
        23    go -- that he was going to come up with this excuse that he was
        24    going to teach Arabic and he was also going to learn Arabic,
04:40  25    that's why he was going to the Middle East, what was he

04:40   1   implying that he wanted to do?

2                   THE DEFENDANT:  Objection.

3                   THE COURT:  Sustained.  Not "implying."  Not

4   "implying."  Unless there was some code words that were used or

04:40   5   some -- that they used within the vernacular of using a

6   coverup.  Okay?  Like, we know in drug cases they don't call

7   them narcotics, it can be "oranges" or "apples" and you can

8   get, you know, an expert to testify they never used those

9   words.

04:40  10                   So, if you ask him exactly what was said, that

11   was fine.  His interpretation really needs a little more than

12   just an individual -- a cold individual talking to someone

13   else.  It needs to be based upon his background in dealing in

14   this sort of stuff.

04:41  15                   MR. FEAZEL:  Yes, sir.

16                   THE COURT:  So, he's qualified; but it was the

17   phraseology of the question.  So, I sustain the objection; and

18   you need to rephrase it.

19   BY MR. FEAZEL:

04:41  20   Q.  What specifically did he say to you he was going to do

21   there while he was acting like he was studying Arabic and while

22   he was going to a language school?

23   A.  He needed a legitimate excuse so no one has to dig about

24   any of his intention.  So, once he's there, he's settled, then

04:41  25   he will go on in his own business, where he meant he's -- he's

04:41  1    just going to apply for --

2                    THE DEFENDANT:  Objection.

3                    THE COURT:  Hold it.  Overruled.

4                        He's going to apply for what?

04:41  5                    THE WITNESS:  He's going to apply for -- for the

6    school but then he's going to go on in his business, which

7    means he's going to go and join the mujahideen.

8    BY MR. FEAZEL:

9    Q.  Okay.  Let me show you Exhibit Number 119.  This is an

04:42  10   e-mail dated January 25th of 2010.  And it's from

11   MxPeterson19@Yahoo.  Can you explain to the Court how the

12   e-mail MxPeterson19@Yahoo.com came about?  How was that

13   determined, that the defendant would use it?

14   A.  I told him at this point, "We need to change the e-mails

04:42  15   since -- since it was being clear right now that your

16   intentions are different.  So, I need you to change an e-mail.

17   Come up with an e-mail that has two letters that does not exist

18   in Arabic," which I chose the letter "X" and the letter "P" and

19   choose any number you like.  And I told him -- and I repeat the

04:42  20   question, "So, what is the letters?"

21                    And he said, "Yeah, make an e-mail, the letter

22   'X' and the letter 'P.'"

23                    So, I ask him, "What's the number that you like?"

24                    He says, "The Number 19."

04:42  25   Q.  What is significant about the number "19"?

04:42  1          THE DEFENDANT:  Objection.

2          THE COURT:  All right.  I know you stated already that

3     it's your favorite number.  Correct?  I remember you saying

4     that.  But I'll allow him to give his understanding of the

04:43  5     number 19.  I mean, your point is already made; and you

6     certainly can testify to that fact again later should you

7     desire.  But I remember what went on, but I'll allow him to

8     testify as to what the significance is of number 19.

9              You're saying -- and, again, in the context that

04:43  10    it's used.  So, if you want to ask him that question in that

11    context.

12    BY MR. FEAZEL:

13    Q.  In the context that it is used, what is the significance of

14    number 19?

04:43  15    A.  Number 19 is -- is the favorite numbers that Salafi-Jihadi

16    likes all the time because of the hijackers, 19.

17    Q.  Let me direct your attention --

18         THE COURT:  Hijackers, what is that?  What

19    highjackers?

04:43  20         THE WITNESS:  September 11.

21         THE COURT:  Okay.

22    BY MR. FEAZEL:

23    Q.  Let me direct your attention to the middle of this e-mail

24    right here.  Will you please read that for the, Judge?

04:44  25    A.  "Assalamu alaikum.  We are meeting at 9:00 p.m.  I'll be in

04:44   1    Room 224.  Please just park at the side where the pool at and

2    go upstairs to the room.  See you then.  Let me know if you got

3    this e-mail.  Salam."

4    Q.  All right.  Why are you sending this to the defendant?

04:44   5    A.  So, I can schedule a meeting with him at a hotel room.

6    Q.  All right.  Let me direct your attention to a meeting at

7    the Hampton Inn on January 25th, 2010.  Do you remember this

8    meeting?

9    A.  Yes, I do.

04:44   10   Q.  And where was this Hampton Inn located?

11   A.  Cypress, Texas.

12   Q.  Where did you pick the defendant up?  Or did he meet you

13   there?

14   A.  No.  He drove.  He drove all the way.

04:44   15           THE COURT:  He drove, what do you mean he drove?

16           THE WITNESS:  He drove his car to the hotel.

17           THE COURT:  With you?

18           THE WITNESS:  No.  By himself.

19           THE COURT:  Okay.  So, you met there.

04:44   20   BY MR. FEAZEL:

21   Q.  Okay.  Can you describe to the judge the hotel room?

22   A.  Previously, since -- since I told him about his intentions;

23   so, I told him about we --

24           THE DEFENDANT:  Objection, your Honor.

04:45   25           THE COURT:  What?

04:45   1            THE DEFENDANT:  Never spoke of my intentions.

       2            THE COURT:  He's going -- that's --

       3            THE WITNESS:  No, not his --

       4            THE COURT:  All right.  Rephrase your question,

04:45   5   counsel.  Or state it again.

       6   BY MR. FEAZEL:

       7   Q.  All right.  Can you describe the hotel room to the Court?

       8   A.  The hotel rooms --

       9            THE COURT:  Who got the hotel room?

04:45   10  BY MR. FEAZEL:

       11  Q.  Who was the one who reserved the hotel room?

       12  A.  The FBI did.

       13  Q.  Okay.  What did -- can you describe how it looked inside

       14  the hotel room?

04:45   15  A.  It was staged like if there was -- if there was a previous

       16  meetings.  It had a little bit of Middle Eastern props in it.

       17  It has a little bit of Middle Eastern snacks.  Looked like I

       18  just finished meetings.  It has a prayer rugs on it.

       19  Q.  Okay.  And what time did the defendant get there?

04:46   20  A.  I believe it's at night somewhere, between 8:00 and

       21  9:00 o'clock.

       22  Q.  And when he gets there, what happens?

       23  A.  He had a CD with him.

       24  Q.  And what was --

04:46   25  A.  And, then, the CDs, he told me that it had a Quranic verse

04:46   1    on it.

2    Q.  All right.  When he arrived at the hotel room, could you

3    describe to the judge his demeanor, the way he was acting?

4    A.  He was a little bit nervous.

04:46   5    Q.  And how could you tell he was nervous?

6    A.  He was not at his norm.  He's not speaking freely.  He --

7    he will, you know -- he will -- he will switch from one story

8    to another.

9    Q.  So, you could tell, based upon knowing him for awhile, that

04:46   10   he was bothered?

11   A.  Yes.

12   Q.  All right.  Was this meeting recorded?

13   A.  Yes.

14   Q.  All right.  At this time I would like to play Exhibit

04:46   15   Number 286.  It's 20-2.

16        THE COURT:  And it's in the hotel room?

17        MR. FEAZEL:  Yes.

18     (Tape playing)

19   BY MR. FEAZEL:

04:49   20   Q.  All right.  Let me show another clip from the same meeting,

21   20-3.

22     (Tape playing)

23   BY MR. FEAZEL:

24   Q.  At some point in time during this meeting at the hotel, the

04:55   25   defendant, you testified, was becoming a little uncomfortable.

04:55  1    A.  Yes.

2    Q.  Did you do something to try to calm him down?

3    A.  I felt he was not comfortable in the hotel.  So, I

4    decided --

04:55  5           THE COURT:  Not comfortable where?

6           THE WITNESS:  Sitting in the hotel with me.

7           THE COURT:  Okay.

8           THE WITNESS:  So, we decided to take a spin on the

9    car.

04:56  10   BY MR. FEAZEL:

11   Q.  Okay.  Was the car recorded, as well?

12   A.  Yes.

13          THE COURT:  What was the purpose of this meeting?

14   Another just visit to talk?

04:56  15          THE WITNESS:  The purpose of this meeting is -- is --

16   it was supposed to -- he is going to meet fictitious two

17   people, but we didn't really have it.  So, they can test him if

18   he's willing to -- they help him, to assist him to go overseas.

19          THE COURT:  Okay.  But you never did meet with two

04:56  20   people?

21          THE WITNESS:  We never really had any people.

22          THE COURT:  Okay.

23   BY MR. FEAZEL:

24   Q.  Why was it that you never met with two people there?

04:56  25   A.  We never really -- we just wanted it to see how he will act

04:56   1    around -- around outside.  Because we didn't know about is he

2    fully trust me yet or he does not trust me at that point.

3    Q.  Okay.  So, was the car recorded, as well?

4    A.  Yes, it was.

04:56   5    Q.  Okay.  At this time I would like to play from Exhibit 287,

6    it's Clip 25-1.

7        *(Tape playing)*

8    BY MR. FEAZEL:

9    Q.  All right.  In this clip, you asked the defendant if he

04:58  10    wants to go over there and teach English?

11    A.  Yes, I did.

12    Q.  Why did you ask him that?

13    A.  I just want to make sure he -- he will not back up.  I

14    mean, if he's really going for to teach English, then he's

04:58  15    going to say, "I need to go teach English."  But he explained,

16    "I want to go there so I can meet with the righteous."

17            And I, "Who's the righteous?"

18            And he says, "The righteous are the people that

19    fight, the mujahideen."

04:58  20            THE DEFENDANT:  Objection.

21            THE COURT:  Well, it says something about -- what is

22    it -- person and property.

23            THE WITNESS:  Yeah, the people that --

24            THE COURT:  Oh, excuse me.  Overruled.

04:59  25            Go on.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:59  1    BY MR. FEAZEL:

2    Q.  You can continue.

3    A.  He said the people that commit the jihad with -- by

4    fighting or with a --

04:59  5              THE DEFENDANT:  Objection.

6              THE COURT:  Well, does it say "fighting"?

7              THE WITNESS:  "Mujahideen," that's the word.

8              THE COURT:  Is that what it says?

9              THE DEFENDANT:  Objection.  It's not "mujahideen."

04:59  10   The word is --

11             THE COURT:  Wait a second.  Hold it.  You can't

12   testify.  Okay?  That's up to you to do it later.  I know it's

13   frustrating, but those are the rules of court.  All right?

14   You'll have your opportunity, I assure you.  All right?

04:59  15             Now, let's get back to where we were.  You see

16   the questions that I had and the concern the defendant had.

17   Follow that up.  I want -- let's get to the -- you're saying --

18   where is that "mujahideen"?  Where is it?  Is that word in

19   there?

04:59  20             THE WITNESS:  He said it, yes.

21             THE COURT:  Okay.

22             THE WITNESS:  Yes.

23             THE COURT:  Now, also, what about that statement that

24   I just read as it came up with one -- what is it -- "person and

04:59  25   property"?  In what context was that us used?

05:00  1          THE WITNESS:  He -- when I asked him -- when I asked

2     him, "Do you want to go over there to teach English," his

3     answer, in the Arabic language, "I want to go" -- and he

4     answers with "as-sadiqeen."  That's the word that he said.

05:00  5          THE COURT:  What does that mean?

6          THE WITNESS:  "The righteous."

7          THE COURT:  And what does that mean?

8          THE WITNESS:  And then he --

9          THE COURT:  In today's context and in that context.

05:00  10         THE WITNESS:  Then he followed up with his

11    explanations to it, "The mujahideen" -- (speaking in Arabic)

12              "It's the people that commit the jihad with their

13    soul and their money."

14         THE COURT:  All right.  So, that was the Arabic; and

05:00  15    it was translated.

16         THE WITNESS:  Yes.

17         THE COURT:  Is that the correct translation?

18         THE WITNESS:  Yes.

19         THE COURT:  Okay.

05:00  20         THE DEFENDANT:  Objection.

21         THE COURT:  Yes, sir.

22              No.  Are you objecting to my question or his

23    answer?

24         THE DEFENDANT:  No.  I'm objecting to his answer.

05:00  25         THE COURT:  Overruled.  Overruled.  He's answering the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:00  1   question.

2   BY MR. FEAZEL:

3   Q.  All right.  After this meeting, did you come to the

4   decision that you needed to have another meeting with the

05:01  5   defendant?

6   A.  Yes.

7   Q.  Why did you feel that you needed to have another meeting

8   with the defendant?

9   A.  We felt he was not comfortable and he was -- so, we

05:01  10  still -- he's not really sure enough going on.  So, he's -- his

11  way of answering the questions and instead of saying it

12  directly, he just -- he just --

13          THE COURT:  Well, what is it?  Get to the bottom line.

14  You didn't think it was direct enough and you had to make sure

05:01  15  that's what he wanted to do?

16          THE WITNESS:  We wanted to get a direct answer from

17  him.

18          THE COURT:  A direct what?

19          THE WITNESS:  Of his intention.

05:01  20          THE COURT:  Of what he -- intention --

21          THE WITNESS:  Of what he's --

22          THE COURT:  Hold it.  Intention to do or not to do

23  what?

24          THE WITNESS:  To go over there to do jihad.

05:01  25          THE COURT:  Okay.  And join it?

05:01  1              THE WITNESS:  And join the al-Qaeda of the Arabian

2      Peninsula.

3              THE COURT:  Got it.  So, that's your position.

4      BY MR. FEAZEL:

05:01  5      Q.  So, what did you do to make him more comfortable with you?

6      A.  We decided to go and knock his doors early in the morning

7      and have a morning prayer with him.

8      Q.  Why did you decide to have an early morning prayer with the

9      defendant?

05:02  10     A.  Because -- because in that meeting he said -- he said that

11     he does not trust any Muslims that they don't do all day

12     prayers and the toughest --

13             THE COURT:  Wait, wait.  Hold it.  He doesn't trust

14     all Muslims to -- I didn't follow it.

05:02  15             THE WITNESS:  He doesn't trust all the Muslims,

16     especially the one that does not commit to their prayers.

17             THE COURT:  Okay.  I got it.

18     BY MR. FEAZEL:

19     Q.  Is the early morning prayer a prayer that is commonly

05:02  20     skipped by a lot of non-serious Muslims?

21     A.  Yes.  It's -- it's very, very difficult to wake up early in

22     the morning and pray.  So, if you're really devoted Muslims,

23     you definitely have to wake up and do the morning prayer.

24             THE COURT:  How long are the prayer sessions, usually?

05:02  25             THE WITNESS:  It's about, I'll say, five, five to

05:02   1  seven minutes.

     2              THE COURT:  Each time?

     3              THE WITNESS:  Every morning.

     4              THE COURT:  Okay.  That's the morning prayer.

05:03   5              THE WITNESS:  That's the morning prayer.

     6              THE COURT:  Do the different prayers throughout the

     7  day have different time frames?

     8              THE WITNESS:  Yes.

     9              THE COURT:  What's the longest one?

05:03  10              THE WITNESS:  The longest one will be the afternoon,

    11  and the one after afternoon.

    12              THE COURT:  How many minutes?

    13              THE WITNESS:  I'll say about seven to ten minutes.

    14              THE COURT:  All right.  All right.

05:03  15  BY MR. FEAZEL:

    16  Q.  All right.  So, you felt that this would endear yourself to

    17  the defendant, to do an early morning prayer?

    18  A.  Yes.

    19  Q.  All right.  On February 3rd, did you, in fact, go over to

05:03  20  do early morning prayer with the defendant?  And when I say

    21  February 3rd, I mean of the year 2009.

    22  A.  Yes.

    23  Q.  Can you tell the Court what happened?

    24  A.  I went over there.  We went in the morning.  I knocked the

05:03  25  doors, waited for a little bit.  And then he -- took him

05:03   1   awhile, and then he opened the door.

2   Q.  Was he awake at this time?

3   A.  No.  He was -- I think he was asleep.

4          THE COURT:  Was this the family residence?  Was he

05:03   5   living there by himself or with his family?

6          THE WITNESS:  It was with his family.

7          THE COURT:  Okay.

8   BY MR. FEAZEL:

9   Q.  Were there any lights on in the house, that you could tell?

05:04   10   A.  The lights were off.

11   Q.  Did it appear that he was ready to do the early morning

12   prayer?

13   A.  He was not ready.

14   Q.  Okay.  So, what happened?  You see him, and what happens?

05:04   15   A.  I saw him.  I saw a little bit of pillow marks on his face.

16   So, I told him I'm driving to Austin and the morning prayer had

17   came so I needed to come and pray.  He was excited.  He was

18   happy.  He told me, "Just give me a little bit of second.  Just

19   stay outside."

05:04   20          He prepared some -- you know, turn on the lights.

21   So, then, we went and did the morning prayer.

22          THE COURT:  In his home?

23          THE WITNESS:  At his apartment, yes.

24          THE COURT:  Oh, his apartment.  Okay.

05:04   25   BY MR. FEAZEL:

05:04  1    Q.  Did this seem to make him trust you more after this?

       2    A.  Yes.

       3    Q.  In fact, did you receive an e-mail with a complaint in it,

       4    basically a complaint from a criminal case, the Finton

05:04  5    complaint?

       6    A.  I think after the prayers he came to the car and explained

       7    to me that he -- he had read something on the -- on the

       8    Internet about that complaint, and I asked him send it to me in

       9    an e-mail because I don't -- I don't understand it.  And then,

05:05 10    yes, he sent me an e-mails about that complaint.

      11    Q.  Was this a way to kind of explain to you why he was being

      12    so cryptic and cagey with you?

      13    A.  Yes.

      14    Q.  Okay.  I'm going to show you Exhibit 121.  This is an

05:05 15    e-mail from the MxPeterson19 address the defendant was using

      16    on -- dated February 3rd, 2010.  Can you please read this for

      17    the Court?

      18    A.  "Assalamu alaikum.  I wanted to pass along something I

      19    thought may be useful.  Please view the attachment documents.

05:05 20    That doesn't work, try this link."

      21    Q.  Let me show you the next exhibit, 122.  Is this a criminal

      22    complaint in the United States District Court?

      23    A.  Yes.

      24    Q.  And can you read the name on there?

05:06 25    A.  "Michael C. Finton."

05:06   1    Q.   And also known as -- what is the name there?

       2    A.   Talib Islam.

       3    Q.   Is this a defendant who was being charged for a terrorism

       4    offense in another court?

05:06   5    A.   Yes.

       6    Q.   Why did he send you this?

       7          THE COURT:  That was what?  Out of the Illinois,

       8    Central District of Illinois?

       9          MR. FEAZEL:  That's correct.

05:06  10    BY MR. FEAZEL:

      11    Q.   Why did he send you this?

      12    A.   He's basically giving me an indirect why he was nervous in

      13    the hotel.  Because he obviously studied this before.  And in

      14    that complaint over there, he thinks or he believes something

05:06  15    happened in the hotels.  That's why he was nervous inside the

      16    hotel.

      17          THE DEFENDANT:  Object.

      18          THE COURT:  Overruled.

      19    BY MR. FEAZEL:

05:07  20    Q.   Okay.  So, he was studying the investigative techniques

      21    that were out laid in the criminal complaints?

      22    A.   Yes.

      23    Q.   Okay.  Let me show you Exhibit 123.  It's an e-mail dated

      24    February 4th, 2010, from Max Peterson at

05:07  25    MxPeterson19@Yahoo.com.  Who is this from?

05:07   1    A.   The defendant.

2    Q.   Can you please read this e-mail?

3    A.   "I just wanted to update you on some findings over here

4    that I thought were interesting."

05:07   5    Q.   Are these links to two articles?

6    A.   Yes.

7    Q.   Let me show you what is Exhibit 124.  Could you please read

8    the title of this article?

9    A.   "Experts:  Al-Qaeda in Yemen may send American jihadis,

05:07   10   recruited by Anwar al-Awlaki, to attack US."

11   Q.   Okay.   "Al-Qaeda in Yemen," can you tell us what "al-Qaeda

12   in Yemen" is also known as?

13   A.   You can call it al-Qaeda in the Arabian Peninsula.  It's

14   all the same.

05:08   15   Q.   So, al-Qaeda in the Arabian Peninsula is also known as

16   "AQAP," correct?

17   A.   Yes.

18   Q.   And this also mentioned Anwar Awlaki?

19   A.   Yes.

05:08   20   Q.   Let me show you Exhibit 125.  Can you please explain --

21   read the title of this article to the Court?

22   A.   "Yemeni Tankers Okay'd in Harbor."

23   Q.   Why was this article sent to you?

24   A.   He was -- he was trying to give me a hint about that, "I

05:08   25   know that you know of" -- that will be me -- "of a way of going

05:08  1    through over the seas between the United States and Yemen."

2    Q.  Okay.  So, he sends you an article talking about tankers

3    that travel by sea?

4    A.  Yes.

05:08  5    Q.  From port to port?

6    A.  Yes.

7    Q.  Had you ever mentioned traveling by sea to the defendant

8    before this?

9    A.  No, I have not.

05:09  10   Q.  So, this was his own article that he sent you, without you

11   even talking about it to him?

12   A.  Yes.

13   Q.  Let me show you Exhibit Number 127.  This is an e-mail sent

14   on February 6, 2010.  And it is from Moh Adwas.  Who is that?

05:09  15   A.  That would be me.

16   Q.  What was this e-mail about?

17   A.  "Thanks for the e-mails and the attachment.  I will read

18   closely.  I think they will be helpful to us.  Why did you send

19   the one four times?"

05:09  20   Q.  Okay.  And there's some more --

21   A.  "The one" -- yeah.  "The one article is very important.  Be

22   careful, akhi.  We do not mention the Sheik Anwar al-Awlaki" --

23   that's written in Arabic -- "name right now.  Things are

24   too" -- says -- (Speaking in Arabic) -- means "be careful now."

05:10  25                "It is" -- (speaking in Arabic) -- "We are in a

05:10   1   very -- very hard shape right now.  We will -- we will be

2   talking soon, but we'll be watchful, for the infidels are

3   talking about him now."

4   Q.  Okay.  Let's take a minute real quickly.  In this first

05:10   5   paragraph, you say -- and you're talking about the attachments

6   he sent you -- "they will be helpful to us."  What do you

7   mean -- because you wrote "us."  What do you mean by "us"?

8   A.  Meant al-Qaeda in the Arabian Peninsula.

9   Q.  Okay.  Also known as "the brothers"?

05:10   10   A.  Yes.

11   Q.  In this article, you say, "We do not" -- in the second

12   paragraph, you've mentioned, "We do not mention the sheikh" and

13   there's Arabic right there.  What does the Arabic mean?

14   A.  "Anwar al-Awlaki," which is Anwar al-Awlaki.  That's his

05:11   15   name in Arabic.  That's how to pronounce -- that's how to write

16   his name in Arabic.

17   Q.  Why did you send him that?

18   A.  Because anybody who is associated with him will be known is

19   going to be associated with the al-Qaeda in the Arabian

05:11   20   Peninsula.

21   Q.  Okay.  So, Anwar Awlaki is associated with the al-Qaeda in

22   the Arabian Peninsula?

23   A.  Yes.

24   Q.  All right.  Let me direct your attention to February 8th of

05:11   25   2010.  This was a meeting with the defendant at the Post Oak

05:11  1   Mall.  It was an operation that Special Agent Cannon had

2   organized.  And you were to meet him after the operation, at a

3   McDonald in Hempstead.  Do you remember this meeting?

4   A.  Yes, I do.

05:11  5   Q.  Can you tell the judge the purpose of this meeting?

6   A.  The purpose of this meeting is we can see if he is willing

7   to do certain things.  Okay.  If he's willing to go for the

8   jihad, we'll see if he's willing to do some kind of dead-drops

9   and navigate from one place to another.

05:11  10  Q.  Okay.  And was this meeting recorded that you had with the

11  defendant?

12  A.  Yes, it was.

13  Q.  And at this time I would like --

14         THE COURT:  Where was it?  Where did it take place?

05:12  15         THE WITNESS:  It took -- took place outside McDonald's

16  in Hempstead.

17         THE COURT:  Okay.

18  BY MR. FEAZEL:

19  Q.  I would like to show from Exhibit 289 a Clip 32-3.

05:13  20      (Tape playing)

21  BY MR. FEAZEL:

22  Q.  You mention to the defendant they just lost six of their

23  CIA operatives.  He says something in Arabic to you in

24  response.  What is that?

05:13  25  A.  "Praise to God.  Praise to God."

05:13   1   Q.  Okay.  And what is that in Arabic?

2   A.  "Hamdulillah."

3   Q.  So, he's saying praise be to God after the death of six CIA

4   American operatives?

05:13   5   A.  Yes.

6   Q.  All right.  After this meeting, let me direct your

7   attention to another meeting on February 21st at a Randall's

8   store after an operation in Chinatown with Special Agent

9   Cannon.  What was the purpose of this meeting?

05:13   10   A.  Also to see one more time if he's willing to navigate and

11   do a little bit of these dead-drops.  And then, after that, we

12   had a meeting.  I believe it was Chinatown.  It was a

13   Chinese -- it was a Chinese restaurant, and I think it was in

14   front of Academy somewhere on 290.

05:14   15   Q.  Were you supposed to talk about what was involved in

16   traveling overseas at this meeting with this defendant?

17   A.  At this time it's like I'm just going to be direct with him

18   what he really needs and what is -- what is he going to be

19   facing in the travel, like what he needs to have for him to be

05:14   20   able to join the mujahideen.

21   Q.  Okay.  I would like to publish 37-1 from Exhibit 290 at

22   this time.

23       (Tape playing)

24       THE COURT:  Stop the recording.  All right.  Move

05:15   25   it -- since this is a non-jury case -- all right?  I can do

05:16   1    that.  The jury can't talk.  In most cases they can't.  Can you

2    move that back up a little bit?  Just scroll that back up a

3    little bit.

4        *(Tape playing)*

05:16   5        THE COURT:  Was that -- is that coordinated still?

6        MR. FEAZEL:  I think, your Honor, when we backed it up

7    we lost the tracking of the transcript underneath.

8        THE COURT:  Just leave that right there for a moment.

9    You got the written transcript for this?

05:17   10       MR. FEAZEL:  We do.

11       THE COURT:  Let me have it, please.  Get me that

12   portion.

13           I want this exact portion.  Hand it up, please.

14   Just hand it to my clerk, please.  Hand it up just for a

05:18   15   second.

16       MR. FEAZEL:  Start on Page 19 going through 20.

17       THE COURT:  Hang on.  Meanwhile, you can get it

18   coordinated back if you have to.

19       THE DEFENDANT:  Your Honor, I would like to know

05:18   20   what's the date on that transcript.

21       THE COURT:  Okay.  What's the date that this was made?

22       MR. FEAZEL:  February 21st.

23       THE COURT:  February 21st what year?

24       MR. FEAZEL:  2010.

05:18   25       THE COURT:  All right.  Hang on a second.

05:19   1                    Okay.  You can have the transcript back.

        2                    All right.  We back coordinated?  We have to

        3    start again?

        4          MR. McINTYRE:  I think we have to start over, but it's

05:19   5    only a one minute fifty second clip.

        6          THE COURT:  All right.  Do it if you have to, and

        7    let's move on.

        8       (Tape playing)

        9    BY MR. FEAZEL:

05:22  10    Q.  What does "the mujahideen" mean?

       11    A.  "Mujahideen"?

       12    Q.  Yes.

       13    A.  "Mujahideen" is basically -- what he meant is the fighters.

       14          THE DEFENDANT:  Objection.

05:22  15          THE COURT:  Overruled.

       16    BY MR. FEAZEL:

       17    Q.  And when you told him that you didn't want to prepare food

       18    and that you wanted him --

       19          THE COURT:  You didn't want him to prepare food,

05:22  20    right?

       21          THE WITNESS:  Right.

       22          MR. FEAZEL:  Right.

       23          THE COURT:  Yeah, to do the menial tasks.  He wanted

       24    to lead four, five, or six people, something like that, right?

05:22  25    BY MR. FEAZEL:

05:22  1   Q.  You were explaining to him what it was that you wanted him

2   to do?

3   A.  Exactly.

4   Q.  And he could have backed out at any time, right?

05:23  5   A.  He could have opened the door and left.

6             THE COURT:  What was his response?

7             THE WITNESS:  His response, he was happy.  He wanted

8   it, yes.

9             THE DEFENDANT:  Objection.

05:23  10            THE COURT:  The record will speak for itself.

11   Overruled.

12   BY MR. FEAZEL:

13   Q.  All right.  Let me show you Exhibit Number 133.

14             THE COURT:  That was what, exhibit what?

05:23  15            MR. FEAZEL:  That was the video, 290.

16            THE COURT:  No.  That -- what we just saw.

17            MR. FEAZEL:  That was Exhibit -- that was Clip 37-1.

18            THE COURT:  37-1?  What is it -- but it said down

19   there.  Exhibit 317?

05:23  20            MR. McINTYRE:  It's Exhibit 290.  It's a portion of

21   Exhibit 290, and it's just loaded on Sanctions as 37-1.

22            THE COURT:  Wait a second.  It says "317."

23            MR. McINTYRE:  The transcript in 290 --

24            THE COURT:  All right.  The transcript -- all right.

05:23  25   Got it.  Transcript number, that's Transcript Number 317,

05:23  1    correct?  Is that right?

2                   MR. McINTYRE:  Yes, your Honor.

3                   THE COURT:  Okay.

4    BY MR. FEAZEL:

05:23  5    Q.  All right.  Let me direct your attention to this e-mail

6    dated February 12th, 2010, from MxPeterson19@Yahoo.com.  Who is

7    sending this?

8    A.  Max Peterson would be the defendant.

9    Q.  Okay.  Can you please read this e-mail for the judge?

05:24  10   A.  (Speaking in Arabic)

11   Q.  What does that mean?

12   A.  "Hi, how are you.  Praise Allah."

13                   (Speaking in Arabic)  "God is the greatest."

14   Q.  Okay.  Please proceed.

05:24  15   A.  "I didn't know about that.  I haven't came across anything

16   new lately but I will keep a lookout.  I feel sad inside myself

17   to see so much ajar being handed out while I'm sitting at home

18   doing nothing."

19   Q.  Once again, what does "ajar" mean?

05:24  20   A.  "Ajar" is "credit."

21                   THE COURT:  "Credit"?

22                   THE WITNESS:  Yes.

23   BY MR. FEAZEL:

24   Q.  So, what is he saying, based upon this e-mail?

05:25  25   A.  From what I understood is --

_Cheryll K. Barron, CSR, CM, FCRR_                    _713.250.5585_

05:25  1          THE DEFENDANT:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  From what I understood is he's saying

4     that he's missing out in the actions with the mujahideen.

05:25  5     So -- he's just sitting at home; he's missing out, he's missing

6     out on the action.

7     BY MR. FEAZEL:

8     Q.  Let me show you Exhibit Number 140.  All right.  This is an

9     e-mail dated February 17th, 2010.  And I'm going to direct your

05:25  10    attention to the bottom.  We're going to go through a bunch of

11    this.

12          MR. FEAZEL:  Okay.  Keep going up a little more.

13    BY MR. FEAZEL:

14    Q.  There are a list of questions on this e-mail.  Can you read

05:25  15    these questions out?

16    A.  "If can directions, how soon can the brother leave?  Is the

17    brother has extra weight or in good shape and fit?  Have he

18    ever been to Mexico?  Does he have any family or friends

19    overseas that he use as four excuse to travel?  Does the

05:26  20    brother's wife have some?  Does the brother know high tech

21    equipment, cameras and hand-held devices?  Can the brother

22    swim?"

23    Q.  Okay.  These questions were developed by the FBI, your

24    handlers, correct?

05:26  25    A.  Yes.

05:26  1    Q.  And what were they designed -- what was this designed to
       2    look like?
       3    A.  Designed to look like if -- if the mujahideens in the
       4    Arabian Peninsula is asking about how was he fit to join them.
05:26  5    Q.  So, this looked like it was clipped off from another e-mail
       6    and then you were sending that to the defendant --
       7    A.  Yes.
       8    Q.  -- in order to give the appearance this came from someone
       9    other than you?
05:26  10   A.  Yes.
       11   Q.  So, this was to give the appearance that someone was
       12   wanting to know more -- not you, but someone -- about the
       13   defendant's capabilities?
       14   A.  Yes.
05:27  15   Q.  Did you forward this to the defendant?
       16   A.  Yes.
       17   Q.  Okay.  On February 22nd, did you have another meeting with
       18   the defendant at a Cypress Starbuck's next to a Best Buy?
       19   A.  Yes.
05:27  20   Q.  What was the purpose of this meeting?
       21   A.  So we can discuss these questions.
       22   Q.  Okay.  At this time I would like to publish Exhibit 291.
       23   This is clip 40-3.
       24       (Tape playing)
05:28  25   BY MR. FEAZEL:

05:28   1    Q.  All right.  When you mention "the sheikh," who were you

2    talking about?

3    A.  Anwar al-Awlaki.

4    Q.  All right.  And in this clip, is the defendant

05:29   5    acknowledging and agreeing that Anwar Awlaki is wanted by the

6    United States Government?

7    A.  Yes.

8    Q.  And he also talks, again, about these hidden intentions?

9    A.  Yes.

05:29   10   Q.  Let me show you Exhibit 154.  This is an e-mail from

11   February 23rd, 2010, from PatLex19@Yahoo.  Who is

12   PatLex19@Yahoo?

13   A.  The defendant.

14   Q.  Does this use the letter "P" and "X" and the number "19"?

05:29   15   A.  Yes, sir.

16   Q.  "P" and "X" being letters that do not exist in the Arabic

17   language?

18   A.  Yes.

19   Q.  And "19" is the number the defendant chose?

05:29   20   A.  Yes.

21   Q.  Can you please read this paragraph in the body of the

22   e-mail?

23   A.  "I got some information that I thought was interesting, and

24   I wanted it to pass it along.  It's kind of lengthy; so, I

05:30   25   would recommend going through the tables of context [sic] and

05:30   1   selecting certain topics to focus on rather than looking

2   through the whole thing.  But it's up to you.  Also, check out

3   the following link when you get time."

4   Q.  Okay.  This link is www.BayAreaSailing.com.  Let me show

05:30   5   you Exhibit 155.

6                   Bay Area Sailing School, what is the significance

7   of Bay Area Sailing School?  Why did he send you this?

8   A.  He wanted -- he wanted me to join that school and take up

9   with one of the boats.

05:30   10                  THE DEFENDANT:  Objection.

11                  THE COURT:  Wait a second.  Is that what he told you?

12                  THE WITNESS:  Yes.

13                  THE COURT:  Overruled.

14   BY MR. FEAZEL:

05:30   15   Q.  Okay.  Once again --

16                  THE COURT:  In other words, what the defendant said,

17   someone else heard, in a criminal case is admissible.  When it

18   comes time, you can cross-examine him; and you can also, if you

19   elect later to, testify.  Okay?  But this is the government's

05:31   20   case.

21                   Go on.

22   BY MR. FEAZEL:

23   Q.  All right.  The Bay Area Sailing School, is this, once

24   again, an idea about leaving through the seas?

05:31   25   A.  Yes.

05:31  1   Q.  Okay.  He also mentioned in that e-mail that he sent you

       2   something else.  Let me show you Exhibit 159.  Can you please

       3   read what this says?

       4   A.  "Tactics in Counterinsurgency."

05:31  5   Q.  This "Tactics in Counterinsurgency," it's a military

       6   manual.  Do you know where he got this from?

       7   A.  Not really.

       8   Q.  Okay.  And this is what he was talking about, that e-mail

       9   that will help the brothers learn?

05:31  10  A.  Yes.

       11  Q.  Let me show you Exhibit Number 160.  This is an e-mail from

       12  PatLex19@Yahoo.com on March 2nd, 2010.  Can you please read the

       13  body of the e-mail?

       14  A.  "I came across this bit of info and thought it may be of

05:31  15  use.  Again, I would suggest looking first at the table of

       16  context [sic] and then focusing on specific topics as opposed

       17  to reading it cover to cover.  Salams."

       18  Q.  Okay.  Is there another -- okay.  I'll show you Exhibit

       19  Number 165.

05:32  20         MR. FEAZEL:  Okay.  This is kind of -- since this has

       21  already been admitted, your Honor, can I please read from it to

       22  the Court?

       23         THE COURT:  Sure.  Yeah.

       24  BY MR. FEAZEL:

05:32  25  Q.  This is from PatLex19.  Who is the person who sent this to

05:32  1   you?

2   A.  The defendant.

3   Q.  Okay.  It says, "It was good meeting you today.  Please

4   view the attachment.  Let me know if you need anything else."

05:32  5          Okay.  These -- the "Tactics in

6   Counterinsurgency" military manual, did you have a chance to

7   look through it?

8   A.  Just browsed through it, really, didn't read it.

9   Q.  Did you give that to your handlers?

05:33  10  A.  Yes.

11  Q.  Let me show you Exhibit Number 171.

12          MR. FEAZEL:  If you can make it just a little bit

13  smaller.

14          And, your Honor, once again, may I read this?

05:33  15          THE COURT:  Yep.  Go on.  It's in evidence.  Go on.

16  BY MR. FEAZEL:

17  Q.  Okay.  This is another e-mail dated March 5th, 2010, from

18  Pat Lex.  Pat Lex, again, who is that?

19  A.  The defendant.

05:33  20  Q.  Okay.  And I'm going to read the body of the e-mail.

21          "You know when the Muslims engaged the Persians

22  in the battle of Al-Jisr, they encountered a new, advanced

23  weapon that they had never seen before, the elephant.  This

24  animal completely neutralized the Muslim cavalry, horsemen,

05:33  25  because it had bells on it that would scare the horses stiff.

05:33  1   Not only that, but the elephant would just pulverize and crush

2   the soldiers' ranks.  The Muslims decided that the best way to

3   counter the elephant would be to remove its pilots.  But what's

4   interesting is that this was only after they tried

05:34  5   unsuccessfully to destroy the elephant itself."

6         "Elephant" is underlined.

7         "Please view the following link.  It may be of

8   some good."  And there's a link sent there.

9         MR. FEAZEL:  Can you please show Exhibit Number 172?

05:34  10  BY MR. FEAZEL:

11  Q.  And this is the link that he sent you, correct?

12  A.  Yes.

13  Q.  Okay.  And this is entitled "General Atomics Aeronautical."

14  What is the significance of this?

05:34  15  A.  He's trying to show an example of that elephant is the

16  strongest weapon at that time and right now the strongest

17  weapon that they're using against the mujahideen will be the

18  drone.

19  Q.  And when you say "drone," you mean an unmanned aircraft?

05:35  20  A.  Yes, sir.

21  Q.  And this link is to someone who makes drones.  Is that

22  correct?

23  A.  I believe so.

24  Q.  Okay.  Let me show you Exhibit 181.  I'll open this up a

05:35  25  little bit more.

05:35   1                    And, again, this is from -- it's e-mail from
        2       PatLex19@Yahoo.com.   It says, "I recently came across the
        3       following news."
        4                    And if I could go to Exhibit Number 182, the link
05:35   5       to it -- this is an article that was linked, "American Held in
        6       Yemen After Shootout."   What is this about?
        7       A.   This is about an articles about Sharif Mobley, who got
        8       caught in Yemen, and -- in the hospitals, I believe he got in a
        9       conflict.   That's -- that's the story.
05:36  10       Q.   Okay.   So, once again, he's sending you article about an
       11       American, an American who went to Yemen?
       12       A.   Yes.
       13       Q.   And this person went to Yemen to go fight for al-Qaeda?
       14       A.   Yes.
05:36  15       Q.   Let me direct you to March 14th, 2010.   This is a meeting
       16       at a Shell station regarding a passport photo.   Could you tell
       17       the judge the purpose of this meeting?
       18       A.   The purpose of this meeting is to get a passport, pictures
       19       of him.
05:36  20       Q.   Okay.   And was there anything else at this meeting that you
       21       were to mention to the defendant for the first time?
       22       A.   I'm supposed to tell him that I'm a member of the al-Qaeda
       23       in the Arabian Peninsula.
       24       Q.   Okay.   At this time I would like to publish Exhibit 292,
05:36  25       and it's Clip 50-2.

05:36   1          *(Tape playing)*

2    BY MR. FEAZEL:

3    Q.   Okay.   What is he talking about when he says "elephants"?

4    A.   Drones.

05:38   5    Q.   He says specifically, "That wasn't" -- "That was not much

6    help, but that's why I sent you the link to that place that

7    makes the elephants."   Is that correct?

8    A.   Yes, sir.

9              THE COURT:   And that was what?   The place that made

05:38  10    the drones?

11              THE WITNESS:   Yes, sir.

12              MR. FEAZEL:   Okay.

13              THE COURT:   That was an exhibit that you put up on the

14    screen just a moment ago.

05:38  15              MR. FEAZEL:   That's correct, Judge.   I put that up.

16              THE COURT:   All right.

17    BY MR. FEAZEL:

18    Q.   All right.   He says "help."   So, he's trying to assist you,

19    correct?

05:38  20    A.   Yes, sir.

21    Q.   And he thinks that you are part of an organization that

22    commits violence?

23    A.   Yes, sir.

24    Q.   Let me show you 50-3.

05:39  25          *(Tape playing)*

05:39   1   BY MR. FEAZEL:

     2   Q.   Okay.   When he said that -- previously the riders -- I

     3   mean, the "elephants," he meant the drones.   He's now

     4   mentioning "riders."   Can you tell the judge what the defendant

05:39   5   means by "riders"?

     6   A.   The pilots that operates the drone.

     7   Q.   The human pilots?

     8   A.   Yes.

     9   Q.   Okay.   So, what is he suggesting to do in this e-mail?

05:39   10   A.   Target -- targeting the pilots.

    11          THE DEFENDANT:   Object.

    12          THE COURT:   Overruled.

    13   BY MR. FEAZEL:

    14   Q.   Sorry.   What was he suggesting in this e-mail?

05:39   15   A.   Targeting the pilots.

    16          THE COURT:   What?   Where the control center for the

    17   drones are?

    18             I mean, there's no pilot.   It's a pilotless

    19   aircraft.

05:40   20          THE WITNESS:   Well, he's trying to find out -- trying

    21   to assist me to find out where the pilots are so we can target

    22   them.

    23          THE COURT:   Go on.

    24   BY MR. FEAZEL:

05:40   25   Q.   Okay.   Let me show you 50-4.

05:40  1   *(Tape playing)*

2              MR. FEAZEL:  Can we pause it real quick?

3   BY MR. FEAZEL:

4   Q.  You just mentioned an organization.  Is that correct?

05:42  5   A.  Yes, I did.

6   Q.  And how did you mention that organization?

7   A.  I mentioned it in Arabic.  And I says, "I'm a member of

8   al-Qaeda fi Jazirat al-'Arab," which means, "I'm a member of

9   al-Qaeda in the Arabian Peninsula."

05:42  10  Q.  Okay.  At that point in time when you told the defendant

11  you were a member of al-Qaeda in the Arabian Peninsula, does he

12  get scared?

13  A.  No.

14  Q.  Does he ask to get out of the car?

05:42  15  A.  No.

16  Q.  Does he say, "Hey, wait a minute.  I don't want a part of

17  this"?

18  A.  No.

19             MR. FEAZEL:  Okay.  You can play it.

05:42  20  *(Tape playing)*

21  BY MR. FEAZEL:

22  Q.  And at the very end of this, you said, "Right now we're

23  interested in supporting the mujahideen."  Is that correct?

24  A.  "We're supporting the mujahideen," yes.

05:43  25  Q.  And what does he say?

05:43  1    A.   "Yes."

2    Q.   He understands and agrees?

3    A.   Absolutely.

4    Q.   Okay.  Let me show you Exhibit Number 187.  At that

05:43  5    meeting, did you ask the defendant to bring something with him?

6    A.   We went supposedly to take a pictures of him; but for some

7    reason, those places that we went to take passport pictures,

8    they didn't have it.  So, then, he offered me that he had an

9    old passport pictures.  So, we went to his apartments; and he

05:43  10   gave me those photo.

11   Q.   So, Exhibit 187 was a photograph he gave you at that

12   meeting?

13   A.   Yes.

14   Q.   Did you tell him what you were going to do with it?

05:43  15   A.   Yes.

16   Q.   What did you tell him?

17   A.   I'm going to make some kind of fake ID.

18   Q.   Okay.  Let me show you Exhibit Number 188.  This is an

19   e-mail of March 18th, 2010, from PatLex19@Yahoo.com.  Who is

05:44  20   this from?

21   A.   The defendant.

22   Q.   What is the subject line of this e-mail?

23   A.   "How to Ride an Elephant."

24   Q.   He tells you in this e-mail, "I recently came across the

05:44  25   following link."  And he gives the link.  And he says, "I think

05:44   1   there are some interesting things here.  Let me know what you
        2   think."
        3                   And let me show you Exhibit Number 189, the
        4   attachment -- the link to this.  Will you please read this
05:44   5   headline?
        6   A.  "Hunting Down the Taliban in Nevada."
        7   Q.  All right.  "Hunting Down the Taliban in Nevada," what is
        8   this article about?
        9   A.  From what I remember, you can see this soldier over here is
05:44  10   talking about he just finished working of -- of operating one
       11   of the drones to fight the Taliban in Afghanistan, from -- from
       12   Nevada."
       13   Q.  So, he already mentioned that the most effective way to
       14   fight the elephants, or the drones, is to attack the riders?
05:45  15   A.  Yes.
       16   Q.  So, he sends an e-mail saying, "How to Ride an Elephant";
       17   and he provides an article of an American soldier who's located
       18   in Nevada?
       19   A.  Yes, sir.
05:45  20   Q.  Let me show you Exhibit Number 192.  This is an e-mail
       21   dated March 27, 2010, from Moh Dawsri.  Who's that?
       22   A.  That would be me.
       23   Q.  What is the purpose of this e-mail?  What is it you're
       24   sending him?
05:45  25                   And if I could direct your attention to the

05:45  1    bottom here.

2    A.  To start gathering some stuff.  So, the traveling is very

3    soon.

4    Q.  Okay.  And if we can enlarge this section, what is it --

05:45  5    can you please read what you're asking him to start gathering?

6    A.  "A good backpack, good walking shoes, sleeping bag, a rain

7    jacket, travel towel, a water bottle, first aid kit, personal

8    pouch to hold valuables, food stuff."

9    Q.  Okay.  So, this is the defendant suggesting this is what he

05:46  10   is going to bring?

11   A.  Yes.

12   Q.  And you're agreeing that this is stuff that's okay to

13   bring?

14   A.  I have to look at it, yes.  And at that time, yes, and

05:46  15   approve it, yes.

16   Q.  It says here, "I'm thinking of going camping."  Is

17   "camping" code word for something?

18   A.  "Camping," yes.

19   Q.  Can you tell the judge what "camping" means?

05:46  20   A.  "Camping" is traveling overseas to join the mujahideen.

21          THE DEFENDANT:  Object.

22          THE COURT:  Overruled.

23   BY MR. FEAZEL:

24   Q.  All right.  Let me show you Exhibit Number 193.  Is

05:46  25   Exhibit 193 an attachment to an e-mail that the defendant sent

05:46   1    you?

2    A.  Yes.

3           THE COURT:  What's the date of that?

4           MR. FEAZEL:  This is from --

05:47   5           Can we go back real quick?

6           I got it right here.

7           THE COURT:  Just the date of that e-mail, that

8    article.

9           MR. McINTYRE:  March 29th, 2010, your Honor.

05:47  10    BY MR. FEAZEL:

11    Q.  Could you read the title to the judge?

12    A.  "Purported al-Awlaki Message Calls for Jihad Against US."

13    Q.  So, Anwar Awlaki sends a message calling for jihad against

14    the United States?

05:47  15    A.  Yes, sir.

16    Q.  Did this disturb you and your handlers?

17    A.  Yes.

18           THE COURT:  This disturbed -- oh, "handlers."

19    BY MR. FEAZEL:

05:47  20    Q.  And why is that?

21    A.  We thought that it's taking too long and he's not going to

22    wait and he's going to do something without us.  I mean, he's

23    just going to go and -- he's going to think this is a direct

24    message to him, and he might just run away or commit anything

05:48  25    just crazy.

05:48   1    Q.   Okay.   So, did you have another meeting on March 29th, to

        2    talk with him?   And this was at a McDonald and a volunteer fire

        3    station?

        4    A.   Yes, sir.

05:48   5    Q.   And what was the purpose of this meeting?

        6    A.   The purpose of this meeting is to give the code for the

        7    fire station, I believe.

        8            THE COURT:   Is to what?

        9            THE WITNESS:   To take the codes and still talk about

05:48  10    the stuff that he need to carry with him to that camping.

       11            THE COURT:   All right.

       12    BY MR. FEAZEL:

       13    Q.   And when you talked about a code, what do you mean by

       14    "code"?

05:48  15    A.   Codes, we created -- he created some kind of code with me

       16    that -- for example, "McDonald's" will be "hot chocolate."

       17    "Chinese restaurants" will be "Chinatown."   "Fire stations"

       18    will be "hot fries."

       19    Q.   Okay.   So, this is something the defendant came up with?

05:48  20    A.   Yes, sir.

       21    Q.   Was this meeting recorded?

       22            THE DEFENDANT:   Objection.

       23            THE WITNESS:   Yes, sir.

       24            THE COURT:   What's the objection, sir?

05:48  25            THE DEFENDANT:   That's a false statement.

05:49   1          THE COURT:  That's what you got cross-examination for.

        2   It will come.  You'll have your opportunity.

        3              Go on.

        4   BY MR. FEAZEL:

05:49   5   Q.  Let me show you Exhibit Number 294.

        6          THE COURT:  Oh, wait a second.  You're entitled to a

        7   ruling.  Overrule the objection.

        8   BY MR. FEAZEL:

        9   Q.  Let me show you Exhibit Number 294, Clip Number 51-4.

05:49  10      (Tape playing)

       11   BY MR. FEAZEL:

       12   Q.  In this meeting, you mention "the brothers" and "brother."

       13   What did you mean by that?

       14   A.  Mujahideen.

05:50  15   Q.  And you said that "you will be trained."  What did you mean

       16   by that?

       17   A.  That they're going to take him to a safe house, and they're

       18   going to train him how to do -- how to fight.

       19   Q.  And did he express any concern for leaving his wife and

05:50  20   family?

       21   A.  Not at all.

       22   Q.  And where was he going to be taken to?

       23   A.  He's going to be taken to -- to a country that's going to

       24   be, like, before he goes to the Yemen, where he's going to be

05:51  25   changing his identifications.  Because -- because we could not

05:51   1    get him into Yemen because he needs visa.  So, he's going to go

2    to a country.  That country, I believe, is going to be Algeria.

3    And from Algeria, he's going to go to join al-Qaeda of the

4    Arabian Peninsula in Yemen.

05:51   5    Q.   Did he at any time say, "That's not what I want to do"?

6    A.   No.  Actually he said "hamdulillah," "praise God."

7    Q.   Let me direct your attention to a meeting on April 9th of

8    2009 at a Starbuck's in Cypress.  Do you remember this meeting?

9    A.   Yes, sir.

05:51   10   Q.   What was the purpose of this meeting?

11   A.   To continue -- to continue the conversations and to -- to

12   just -- just give him more instructions in how things is going

13   to be operating.

14   Q.   Let me show you Exhibit 295, Clip 56-2.

05:52   15        *(Tape playing)*

16   BY MR. FEAZEL:

17   Q.   Okay.  So, in this clip, is the defendant talking about

18   sending the video to his wife?

19   A.   Yes, he does.

05:56   20   Q.   And is he also talking about how he's okay with

21   misinforming people for the purposes of whatever it is that he

22   wants to do?

23   A.   Yes, he does.

24   Q.   That he's totally comfortable with decoys and

05:57   25   misinformation?

05:57   1    A.  He's aware of it, yes.

2    Q.  Okay.  Let me show you 56-5.

3        *(Tape playing)*

4            THE COURT:  I tell you what we can do.  We're about to

05:58   5    the break time.  Why don't we do that -- turn the light --

6    well, leave the lights off just like this, if you want, for

7    your witness to exit at this time; and we'll take just a moment

8    with everybody just remaining where you are.

9            All right.  It's right at 6:00 o'clock.  With

05:59  10    five minutes, we can get the system straight.

11            You can turn the lights back on, please.

12            We'll see -- everybody be back, ready to resume,

13    tomorrow at 10:00 a.m.  Thank you and good afternoon.

14        *(Proceedings recessed for evening)*

15                          * * * * *

16            COURT REPORTER'S CERTIFICATION

17        I certify that the foregoing is a correct transcript from
         the record of proceedings in the above-entitled cause.

18

19    Date:  April 4, 2012

20

21                          /s/   Cheryll K. Barron

22                    Cheryll K. Barron, CSR, CMR, FCRR
                     Official Court Reporter

23

24

25

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*