1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3   UNITED STATES OF AMERICA      .
                                  . H-10-CR-368
4          vs.                    . HOUSTON, TEXAS
                                  . NOVEMBER 9, 2011
5                                 . 10:19 A.M.
    BARRY WALTER BUJOL, JR.       .
6   . . . . . . . . . . . . . . .


7                    TRANSCRIPT OF BENCH TRIAL
8            BEFORE THE HONORABLE DAVID HITTNER
                  UNITED STATES DISTRICT JUDGE
9                          VOLUME 3


10

11        THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER
    THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
12  COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
    ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
13  COPY AT THE OFFICIAL RATE.
          General Order 94-15, United States District Court,
14  Southern District of Texas.

15

16   A P P E A R A N C E S:

17  FOR THE GOVERNMENT:

18       Stephen Mark McIntyre
         Craig M. Feazel
19       Assistant US Attorney
         P O Box 61129
20       Houston, TX 77208

21       Garrett M. Heenan
         United States Department of Justice
22       950 Pennsylvania Avenue NW
         Washington, DC 20530

23

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
25                              - - - - -

```
 1    A P P E A R A N C E S:   (Continued)

 2    STANDBY COUNSEL FOR THE DEFENDANT PRO SE:

 3         Edward A. Mallett
           Mallett & Saper, L.L.P.
 4         600 Travis
           Suite 1900
 5         Houston, TX 77002-2911

 6    OFFICIAL COURT REPORTER:

 7         Cheryll K. Barron, CSR, CM, FCRR
           U.S. District Court
 8         515 Rusk Street
           Houston, TX  77002

 9                               - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

PAGE

WITNESSES

Mohammad Aldwsari, Government's Witness

    Direct Examination by Mr. Feazel                443

    Cross-Examination by The Defendant             478

Bowman Eric Price, Government's Witness

    Direct Examination by Mr. Feazel                487

Oscar X. Pena, Government's Witness

    Direct Examination by Mr. Feazel                498

Thomas Walter Hathaway, Government's Witness

    Direct Examination by Mr. Heenan                508

    Cross-Examination by The Defendant             516

Sean D. McCarroll, Government's Witness

    Direct Examination by Mr. McIntyre              517

    Cross-Examination by The Defendant             538

Evan F. Kohlmann, Government's Witness

    Direct Examination by Mr. Heenan                547

    Cross-Examination by The Defendant             613

10:19    1                       P R O C E E D I N G S

10:19    2          THE COURT:  You can turn the light off if you want,

         3   whatever you want, whatever is easiest for him.

         4          THE COURT:  All right.  Go right ahead.

10:21    5          MR. FEAZEL:  Thank you, your Honor.

         6   **MOHAMMAD ALDWSARI, GOVERNMENT'S WITNESS, TESTIFIED:**

         7                       **DIRECT EXAMINATION**

         8   BY MR. FEAZEL:

         9   Q.  Good morning.  How are you, sir?

10:21   10   A.  Good.

        11   Q.  You're the same Mohammad Aldwsari that testified under oath

        12   yesterday?

        13   A.  Yes, I am.

        14   Q.  Okay.  I believe yesterday we had talked about when we left

10:21   15   off the defendant's use of misinformation and how he's okay

        16   with misinformation to further his goals.  Is that correct?

        17   A.  Yes.

        18   Q.  And we are going right into a clip that we played from a

        19   meeting of April 9th.  And this is 56-5.  And at this time we

10:21   20   would like to publish 56-5.

        21       *(Tape playing)*

        22          THE COURT:  Counsel, can you step back just a little?

        23   That's fine.

        24          MR. FEAZEL:  We can start that over again?

10:22   25          THE COURT:  You either can stand here or -- just as

10:22  1    long as I can have a view of the screen.
2              MR. FEAZEL:  Yes, sir.
3         (Tape playing)
4              MR. FEAZEL:  If we can pause it?
10:22  5    BY MR. FEAZEL:
6    Q.  Okay.  Can you explain to the judge what you're talking
7    with the defendant about here?
8    A.  I was talking to him that he's going to join the best of
9    the best, al-Qaeda in the Arabian Peninsula; but I said it in
10:23  10   Arabic which is "al-Qaeda fi Jazirat al-'Arab," which he
11   understood as "al-Qaeda in the Arabian Peninsula."
12   Q.  And when you told him this, did he seem concerned?
13   A.  No.  He was happy.
14   Q.  In fact, what does he say when you tell him he's going to
10:23  15   join al-Qaeda in the Arabian Peninsula?
16   A.  "God willing.  God willing."  "Hamdulillah."
17             THE COURT:  And in your tradition, does that mean
18   assent, "yes" or "I'm pleased" or "that's good"?  What --
19             THE WITNESS:  It means he's -- yeah, it means you're
10:23  20   accepting and you're pleased.  Because if you're not pleased,
21   you can just open the door and get out.
22             THE COURT:  Okay.  Well, but, in other words, in your
23   culture, that means, what you said, "Yes, that's good"?
24             THE WITNESS:  Yes.
10:23  25             THE COURT:  You know, and no dissent?

10:23   1          THE WITNESS:  Yeah, "I'm with you 100 percent" when
       2   you say that, yeah.
       3          THE COURT:  Gotcha.  Go ahead.
       4          MR. FEAZEL:  Okay.  We can continue playing.
10:23   5      (Tape playing)
       6   BY MR. FEAZEL:
       7   Q.  All right.  Real quickly, after you told him again
       8   "al-Qaeda in the Arabian Peninsula," what was it that you-all
       9   talked about?
10:31  10   A.  We had a discussions about the drones.
      11   Q.  And when he mentions "elephants," again, those are the
      12   drones?
      13   A.  Yes, sir.
      14   Q.  What is he talking about when he mentions "riders"?
10:31  15   A.  The pilots.
      16   Q.  Okay.  In this video, we hear mentioned to him for the
      17   first time that you were sent by al-Qaeda to the United States
      18   to attack the drones and military personnel.  Is that right?
      19   A.  Yes, sir.
10:31  20   Q.  And when you told him that, what was his response?
      21   A.  "Hamdulillah."  He was pleased.
      22   Q.  When you say "hamdulillah," what does that mean?
      23   A.  "Praise God."
      24   Q.  Did he ever look distressed?
10:31  25   A.  No.

10:31 1  Q.  Did he ever say, "I don't want a part of this, I want to

2  get out of the car"?

3  A.  No.

4  Q.  In fact, he says he's ready to go tomorrow?

10:32 5  A.  Yes, he did.

6  Q.  Okay.  Another thing that I want to talk about is he

7  mentioned that he's looking to help you after you mention that

8  your objective is to attack military drone bases.  How does he

9  talk about how he can help you?

10:32 10  A.  He's going to try to look some -- for more manuals on the

11  Internet and send them to me.

12  Q.  When you say "manuals," what kind of manuals do you mean?

13  A.  Military manuals.

14  Q.  Let me show you Exhibit 195.

10:32 15       THE COURT:  Before I forget, what was this exhibit?

16  The transcript of this tape is what?  What's the exhibit

17  number?

18       MR. FEAZEL:  That's April 9th.

19       THE COURT:  April 9th, what year?

10:32 20       MR. FEAZEL:  2009.

21       THE COURT:  And what's the number of it?  Just like

22  you gave me the number of the other one.

23            In other words, if we have -- after this

24  testimony is over, if I want to see some of the evidence, where

10:32 25  do I look, what number?

10:33   1          MR. FEAZEL:  It's Exhibit 295 on the video.  We're

            2   finding the transcript for you right now.

            3            Hold on.  We'll get you the index, your Honor.

            4           THE COURT:  Okay.  Just someone find that out, the --

10:33   5   just like the other one was what?  317 or something?

            6           MR. FEAZEL:  Right.  We'll get Sean on that.

            7           THE COURT:  Okay.  Thanks.  Let's just before --

            8   before you get -- at your convenience.  Just let us know.

            9           MR. FEAZEL:  May I proceed, your Honor?

10:33 10          THE COURT:  Yeah.

           11            Now, is this another tape?

           12          MR. FEAZEL:  No.  This is going to be a photograph.

           13          THE COURT:  Going to be photograph.  Okay.

           14          MR. FEAZEL:  And at this time I would like to publish

10:33 15   195.

           16   BY MR. FEAZEL:

           17   Q.  All right.  You can explain to the judge what is going on

           18   in this photo?

           19   A.  That is me and the defendants checking the trunk of his

10:33 20   cars, making sure that he had everything in place, like the

           21   stuff that he needs to carry with him to travel overseas to

           22   join al-Qaeda in the Arabian Peninsula.

           23   Q.  So, you're looking at the personal effects he chose to

           24   bring on this trip?

10:34 25   A.  Yes, sir.

10:34  1   Q.  What kind of stuff did you see in the trunk?

2   A.  I think his -- some clothes, shoes, and a bag.  That's what

3   I remember.

4   Q.  Okay.  Let me show you Exhibit Number 202.  Do you remember

10:34  5   what Exhibit 202 is?

6   A.  Yes, sir.

7   Q.  And is this the "Desert Operations" military manual from

8   the United States Marine Corps?

9   A.  Yes, sir.

10:34  10   Q.  Was this sent by the defendant in an e-mail attachment to

11   you?

12   A.  Yes, sir.

13   Q.  Let me show you Exhibit Number 203.  This is an e-mail from

14   Pat Lex, that is PatLex19@Yahoo.com.  Whose e-mail address is

10:34  15   that?

16   A.  The defendant.

17   Q.  And can you -- okay.  I'm going to read this.  It says --

18   well, I'll let you read it.

19              Could you please read the e-mail?

10:35  20   A.  "Kayfa haluk?  Alhamdulillah.  I think I got something you

21   may be interested in know for good health.  Check these links

22   out."

23   Q.  Okay.  He brings two links on here, on the e-mail.  Is that

24   correct?

10:35  25   A.  Yes, sir.

10:35  1   Q.  What does he say below that?

2   A.  "Allahu alim," God knows, "maybe or not.  I just picked up

3   on what you mentioned and started searching" for the -- "from

4   there."

10:35  5   Q.  Okay.  This is an e-mail he sent after you told him your

6   objective was to attack military bases in the United States?

7   A.  That's specifically when I told him the places what I am

8   looking for is actually in the State of Texas.

9   Q.  Okay.

10:35  10  A.  Yes.

11         MR. FEAZEL:  And could we see Exhibit Number 204 now?

12  BY MR. FEAZEL:

13  Q.  Is this one of the links?

14  A.  Yes, sir.

10:35  15  Q.  And it is titled -- and it's a news article titled

16  "Goodfellow Dedicates Predator."  Is that correct?

17  A.  Yes, sir.

18  Q.  What does this article talk about?

19         THE COURT:  Now, "Predator" is what?  Is that one of

10:36  20  the -- a drone missile system, a Predator?

21         THE WITNESS:  They call it "Predator" or "drone," yes,

22  it's the same thing.

23  BY MR. FEAZEL:

24  Q.  Okay.  What does this article talk about?

10:36  25  A.  Talks about the training.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:36  1           To be honest, I really didn't read it all of it.
       2  But it talks mainly about Goodfellow location, which is located
       3  in San Angelo, Texas.
       4  Q.   Okay.  So, he's found a location for you in Texas?
10:36  5  A.   Yes, sir.
       6  Q.   And let me show you Exhibit Number 205.  Is this the other
       7  attachment he sent?
       8  A.   Yes, sir.
       9  Q.   And this is Goodfellow Air Force Base, from Wikipedia.  And
10:36 10  it gives a history and background about Goodfellow Air Force
      11  Base.  Is that correct?
      12  A.   Yes, sir.
      13           THE COURT:  What's that diagram on the right?  I think
      14  I know what it is.  You tell me if you can tell.
10:37 15           THE WITNESS:  That will be an aerial map.
      16           THE COURT:  Of?
      17           THE WITNESS:  Of the Goodfellow Air Force Base in San
      18  Angelo, Texas.
      19           THE COURT:  Go on.
10:37 20  BY MR. FEAZEL:
      21  Q.   Okay.  Exhibit Number 211, and this is another e-mail from
      22  Paul Mexia, and this is P19mexia@Yahoo.com?
      23  A.   Yes, sir.
      24  Q.   Who's that from?
10:37 25  A.   The defendant.

10:37  1    Q.  And who picked out the name Paul Mexia?

2    A.  He did.

3    Q.  Okay.  That name was not suggested by your handlers or you?

4    A.  No.

10:37  5    Q.  What is the subject of this e-mail?

6    A.  "A New Book."

7    Q.  And you can please read the body of the e-mail?

8    A.  "Kayfa haluk?  La'laka bi khair," which is "How are you?  I

9    hope you're doing good."

10:37  10              "I came across a pretty neat book you might like.

11   Take a look at the attachment.  Hope to hear from you.  Ma'

12   Salamah."  "Goodbye."

13   Q.  Okay.  We'll show EXhibit 212.

14              Is this the attachment that came -- that he was

10:38  15   talking about a new book?

16   A.  Yes, sir.

17   Q.  And it's called "Sniper Training"?

18   A.  Yes, sir.

19   Q.  And this is a field manual put out by the Headquarters of

10:38  20   the Department of Army?

21   A.  Yes, sir.

22   Q.  And if I could publish Exhibit 215 now.  This is an e-mail

23   dated April 22nd, 2010, from Paul Mexia, p19mexia?

24              THE COURT:  "Mexia," spell it for the record, please.

10:38  25              MR. McINTYRE:  Sure.  It's M-E-X-I-A.

*Cheryll K. Barron, CSR, CM, FCRR*                              *713.250.5585*

10:38    1          THE COURT:  Again?

         2          MR. FEAZEL:  M-E-X-I-A.

         3          THE COURT:  Go on.

         4   BY MR. FEAZEL:

10:38    5   Q.  Who's that from?

         6   A.  The defendant.

         7   Q.  And there is some Arabic and some Arabic writing, and the

         8   title is, "The First Step."  Could you please read this and

         9   translate it?

10:38   10   A.  "Asalamu alaykum wa rahmatullah."  And then there is in

        11   Arabic Quranic verse in there.

        12   Q.  Okay.

        13   A.  Then, "Take a look at this news.  Allahu Alim" -- God

        14   knows -- "but it seems as though maskar" -- which is mean

10:39   15   "camping" -- "kufr" -- which mean "infidels" -- is determined

        16   to bring the wrath of Allah upon itself."

        17   Q.  Okay.  Let's talk about this statement real quick, that

        18   "kufr is determined to bring the wrath of Allah upon itself."

        19   Who is he referring to by "kufr"?

10:39   20   A.  The infidels.

        21   Q.  Is that a negative word?

        22   A.  Yes, sir.

        23   Q.  So, he's saying that the westerners are destined to bring

        24   the wrath of God upon themselves?

10:39   25   A.  Yes, sir.

10:39    1    Q.  And he sends you an attachment?

         2    A.  Yes, sir.

         3    Q.  Let's talk about the meeting on April 23rd, 2009, that took

         4    place in Memorial Park, involving the TWIC card.  Can you tell

10:40    5    the judge the purpose of that meeting?

         6    A.  Say the question again, please.

         7    Q.  I'm going to direct your attention to a meeting that took

         8    place on April 23rd with the defendant at Memorial Park, the

         9    TWIC cards.

10:40   10    A.  Okay.  The purpose of that meeting is to go and collect the

        11    fake identifications, the TWIC card, from Memorial Park.

        12    Q.  Okay.  And where was this card concealed?

        13    A.  In Memorial Park.

        14    Q.  Was it put in any specific place at Memorial Park?

10:40   15    A.  It was put between a flag post, I believe, under a rock,

        16    inside a playing card.

        17    Q.  Okay.  And what was this designed to look like?  What was

        18    this operation designed to look like?

        19    A.  It was designed like we going to go -- we really don't have

10:40   20    to meet the person who is going to give us those cards, hand to

        21    hand; so, this person is going to leave it at a certain place

        22    which he's going to inform me about.

        23              And then we're going to take a run so we're going

        24    to look like casual people.  Then we're going to stop by the

10:41   25    post where the cards at, retrieve those cards; and then we

10:41   1   just -- we just go back.

2   Q.  Was this designed to give the appearance that you and the

3   defendant were participating in some sort of a spy operation?

4   A.  Definitely.

10:41   5   Q.  At this time I would like to publish Exhibit 296.  It's

6   Clip 60-3.

7          THE COURT:  First of all, do we have that -- do we

8   have the transcript designation yet?

9          MR. McINTYRE:  Yes, your Honor.

10:41   10          THE COURT:  What number was it that he made the

11   inquiry I made?

12          MR. McINTYRE:  It was 322.

13          THE COURT:  Exhibit 322.  And that is a transcript?

14          MR. McINTYRE:  Yes, your Honor.

10:41   15          THE COURT:  Thank you.

16      *(Tape playing)*

17   BY MR. FEAZEL:

18   Q.  Okay.  In this clip the defendant is discussing

19   astrological signs.  Why is he discussing this?

10:43   20   A.  When we going to use those fake cards, they -- he said they

21   might ask us for these -- this kind of question.

22          THE COURT:  Who is "they"?

23          THE WITNESS:  The guards where we're going to go.

24          THE COURT:  Okay.

10:43   25   BY MR. FEAZEL:

10:43   1   Q.  So, in order to confirm the legitimacy of these cards, he's
        2   having you know the date of birth and the astrological sign
        3   associated with them?
        4   A.  Yes, sir.
10:43   5   Q.  And this is his idea?
        6   A.  Yes, sir.
        7   Q.  So, he's directing you in a manner that will help you
        8   perpetrate this identity fraud, identity theft scheme?
        9   A.  Yes, sir.
10:43   10  Q.  Did he ever say, "Let's not do this"?
        11  A.  No, sir.
        12  Q.  Did he ever say, "I don't want to have anything to do with
        13  the fake identification"?
        14  A.  No, sir.
10:43   15  Q.  When you showed him the fake card, did he try to get out of
        16  the car and walk away?
        17  A.  No, sir.
        18  Q.  Let's show, from the same Exhibit 296, Clip 60-4.
        19      (Tape playing)
10:45   20  BY MR. FEAZEL:
        21  Q.  Okay.  The defendant, can you describe his demeanor in
        22  this?  Is he excited, is he sad?
        23  A.  He's very excited that he -- he was a step ahead of me by
        24  finding -- by finding this Goodfellow place in San Angelo.
10:46   25  Q.  In fact, he mentions two or three times it's the "largest

10:46   1   elephant school in the world."  Is that correct?

2   A.  Yes, sir.

3   Q.  Once again, "elephants" meaning "drones"?

4   A.  Yes, sir.

10:46   5   Q.  At this time I would like to publish Exhibit 231.  This is

6   an e-mail from Paul Mexia, P19Mexia@Yahoo.com.  Who is this

7   e-mail from?

8   A.  The defendant.

9   Q.  And the subject of the e-mail is, "What's your sign?"

10:46   10   A.  Yes, sir.

11   Q.  And can you please read the body of the e-mail?

12   A.  "I really enjoyed the Chinese today.  Did you know that

13   someone who is born on March 8 has a sign of Pisces?  I've been

14   doing some reading but still haven't been able to come across

10:46   15   any really good books.  I'll be in touch insha Allah" -- "God

16   willing" -- "salam."

17   Q.  This March 8 day, is that the fake birthday you were

18   assigned?

19   A.  Yes, sir.

10:47   20   Q.  And he's telling you the Pisces is the astrological sign

21   that coordinates with March 8?

22   A.  Yes, sir.

23   Q.  He mentions in here that he hasn't been able to come across

24   any really good books.  What does he mean by "good books"?

10:47   25   A.  He meant he has not found any good manuals for him to send

10:47   1    to me so I can send to my brothers in al-Qaeda in the Arabian

        2    Peninsula.

        3    Q.  Let me publish Exhibit Number 237.

        4            All right.  Here's an e-mail.  It's an e-mail

10:47   5    string.  And it's dated Tuesday, April 27th, 2010, from Paul

        6    Mexia.  Who is this Paul Mexia, again?

        7    A.  The defendant.

        8    Q.  Okay.  He sends you -- and I'll go through it briefly --

        9    that, "I thought that info might have been old" --

10:47   10           THE COURT:  Slow down, please.  Say it again.

        11   BY MR. FEAZEL:

        12   Q.  "I thought this information may have been old.  I found a

        13   list of books on this site."  And he sends you a link.  And

        14   another link to some more books.  But if we go down here -- and

10:48   15   a little bit more.

        16           Okay.  There's something in Arabic.  What is

        17   that?

        18   A.  There is -- okay.  Well, he wrote -- there is -- there was

        19   a Quranic verse.  Then he says, "I am very busy now akhi" and

10:48   20   then the words is -- (speaking in Arabic)

        21           Basically he says, "Don't you ever hate something

        22   that might be actually good for you?"  That's the translation

        23   of that Quranic verse.

        24   Q.  So, he's talking about hate being good for you?

10:48   25   A.  Yeah, don't -- you know, sometimes bad things happen; but

10:48   1    the consequences of it is good.

2    Q.  All right.  Let me show you Exhibit Number 239.  And this

3    is the link that he sent you in that e-mail.  What is the

4    significance of this link?

10:49   5    A.  It has multiple links, and it's about army intelligence and

6    security doctrine.

7    Q.  Okay.  So, is this a big master link to a bunch of military

8    manuals?

9    A.  Yes, sir.

10:49   10   Q.  All right.  Let me direct your attention to a meeting on

11   May 3rd, 2009.  And this was to be at a Shell in Navasota in

12   regards to phones.  Do you remember this meeting?

13   A.  Yes, sir.

14   Q.  Can you tell the judge what this meeting was about?  What

10:49   15   were you to do at this meeting, per your handlers?

16   A.  This meeting was a prior for us -- for him to departure the

17   country.  So, I was supposed to meet with him.  I'm going to

18   give him a cell phone, and we're going to activate the cell

19   phone.  He's going to have to remember his phone number, my

10:49   20   phone number.  And we're going to test it, if it works.  Make

21   sure to tell him that the time for him to departure the country

22   is very close.  That's -- that's about it.

23          THE COURT:  Why did you go -- is it Navasota?  Why did

24   you go to Navasota?

10:50   25          THE WITNESS:  It's very close to where he lives.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:50   1                    THE COURT:  Oh, okay.

        2    BY MR. FEAZEL:

        3    Q.  All right.  Let's talk for a minute about some military

        4    manuals, ones that are restricted and not available to the

10:50   5    general public.  Did you have any of those with you?

        6    A.  Yes, I did.

        7    Q.  Who did you get those from?

        8    A.  My handlers.

        9    Q.  Given that these were not for public dissemination and that

10:50  10    your average person can't get them, what did they tell you in

       11    regards to those two military manuals?

       12    A.  They strictly told me many times, "Make sure he does not

       13    take them.  Make sure he does not take them.  So, you can just

       14    have to show it to him and bring it back."

10:50  15    Q.  Okay.  Were these two military manuals "Unmanned Vehicle

       16    Operations" and "The Effects of Weaponry in US Operations"?

       17    A.  Yes, sir.

       18    Q.  All right.  Did you show these two restricted military

       19    manuals to the defendant?

10:51  20    A.  Yes, sir.

       21    Q.  How did you do that?

       22    A.  I told him to grab it up from where they're at and open it.

       23    And I -- we -- I -- my handlers had designated a certain area

       24    for me to -- for him to explain it.  So, he looked at it; and

10:51  25    he start reading from it a little bit.

                    Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

Q.  Okay.  When you say that --

        THE COURT:  Okay.  Where is it?  In the car or --

        THE WITNESS:  It's inside the car, yes, sir.

        THE COURT:  In the car.

        THE WITNESS:  Yes.

        THE COURT:  All right.

BY MR. FEAZEL:

Q.  And when you say that your handlers had identified certain areas, do you mean they tabbed it?

A.  Yes.

Q.  Okay.  Was he allowed to look past those tabs?

A.  I was -- I don't remember if there's a significant about that.

Q.  All right.  Let me show you Exhibit 297.  It's Video Clip 67-3.

    (Tape playing)

BY MR. FEAZEL:

Q.  Okay.  In this video, is he saying that he wants to be with the mujahideen?

A.  With the mujahideen, yes, sir.

        THE COURT:  He says that word specifically in that clip, correct?

        THE WITNESS:  Yes, sir.  It's his word.

BY MR. FEAZEL:

Q.  And does that mean a "physical fighter," someone who

10:55   1   actually fights?

2   A.   Absolutely.   Because he said he's willing to live with the

3   brothers and die with the brothers.

4           THE COURT:   What was the discussion about paradise and

10:55   5   the rivers and so forth?   What -- what relation does that have

6   to your impression?

7           THE WITNESS:   My impression is -- is that he is -- he

8   wants to die over there so he can go to the paradise that is

9   humongous in size and there will be rivers and there will be --

10:55  10           THE COURT:   Palaces.

11           THE WITNESS:   -- palaces, there will be wives, there

12   will be all the good stuff that he couldn't have in the present

13   time.

14   BY MR. FEAZEL:

10:55  15   Q.   Is that something that's associated with martyrdom?

16   A.   Absolutely.

17           THE COURT:   Let me ask you this.   Just -- I'm going

18   to -- if I need to go back and look at this, what's the

19   transcript number of this one?   The transcript number?   I'm

10:56  20   sorry.   But I got to -- if you can be prepared to -- because

21   I'm not going to start -- I know I can pull the disks out if I

22   need to, but it will be a lot easier for me if I want to relate

23   to anything to relate to certain transcripts.

24               Transcript number?

10:56  25           MR. McINTYRE:   It's 323.

*Cheryll K. Barron, CSR, CM, FCRR*                              *713.250.5585*

10:56  1           THE COURT:  323.  Thank you.

2   BY MR. FEAZEL:

3   Q.  All right.  Let me publish a clip from the same

4   Exhibit 67-4.

10:56  5      *(Tape playing)*

6           THE COURT:  The phrase "this obligation to religion,"

7   what context is that used there?

8               That was one of the phrases that he was -- in the

9   transcript.

10:58  10          THE WITNESS:  Yeah.  He believes that I am part of the

11   mujahideen, who is going to commit an act over here in the

12   United States.  And he thinks that it is my obligation and my

13   religion, I'm over here to fulfill it.

14           THE COURT:  Your obligations?

10:58  15          THE WITNESS:  Yes.

16           THE COURT:  They're talking -- the witness is --

17           THE WITNESS:  Yes.  He believes that's my obligation.

18           THE COURT:  That's your obligation.

19           THE WITNESS:  That's my obligations, yes.

10:58  20          THE COURT:  Okay.

21           THE WITNESS:  And he's saying that God will reward me

22   for it.

23           THE COURT:  Okay.

24   BY MR. FEAZEL:

10:59  25   Q.  And, in fact, he is saying "God willing."  Is that correct?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:59   1    A.   Yes.

        2    Q.   Is that like, "God willing, you'll be successful"?

        3    A.   Yes, sir.

        4    Q.   And how would you describe the defendant's demeanor?  Is he

10:59   5    excited?  Is he ready to go?

        6    A.   He said -- he said "Insha Allah" many times.  He's -- yes,

        7    he's basically praying for it and asking for it, yes.

        8    Q.   All right.  Let me show you Exhibit 261.  Okay.  This is an

        9    e-mail dated May 26, 2010, from Paul Mexia.  Who is that?

10:59  10    A.   The defendant.

       11    Q.   And in this e-mail, in the body, he says, "I've been

       12    thinking maybe if you or any friends and family want to go to

       13    the zoo.  There are plenty to choose from, with lots of dogs

       14    and elephants.  View the attachment.  Any questions?  Send me

11:00  15    an e-mail."

       16              All right.  When he says "maybe you and any

       17    friends," who is he talking about?

       18    A.   He's talking about if me and the mujahideen would like to

       19    go see the "zoo," the "zoo" is -- will be the installation

11:00  20    where they have the drones.

       21    Q.   Okay.  So, the "zoo" is the military bases?

       22    A.   Yes, sir.

       23    Q.   And when he says "you and friends" he's referring to

       24    al-Qaeda?

11:00  25    A.   Yes, sir.

11:00  1                  THE COURT:  What about "dogs"?

2                  THE WITNESS:  "Dogs" is a common -- is a common word

3       used by the mujahideen to tell about the soldiers, the American

4       soldiers.

11:00  5                  THE COURT:  Oh, okay.

6       BY MR. FEAZEL:

7       Q.  All right.  And let's show Exhibit -- and the attachment to

8       this e-mail, Exhibit Number 262.

9                       This is "Guide to Air Force Installations

11:00  10      Worldwide."  Is this what he sent you, meaning that these are

11      where the "zoos" are?

12      A.  Yes, sir.

13      Q.  And this is where the "zoos" are with the "dogs" and the

14      "elephants"?

11:00  15      A.  Yes, sir.

16      Q.  And what is laid out in this document?

17      A.  It's pretty much every location of the -- of the United

18      States Air Force worldwide.

19      Q.  So, this has air force bases in the United States and

11:01  20      outside the United States?

21      A.  Yes, sir.

22      Q.  All right.  Let me show you Exhibit Number 244.

23                      All right.  This is an e-mail and -- from Paul

24      Mexia.  And it's an e-mail string.

11:01  25                      But he says, "Just came across something I

11:01  1   thought you would like," and sent you a link to an article.

2   And above this -- is this your response to him?

3   A.  Yes.  The top one, I think will be my response.  The below

4   one is his e-mail.

11:01  5   Q.  All right.  Do you remember what this article was sent to

6   you?  Or what it's about?

7   A.  You have to open it.  I have to open it to see it.  But I

8   don't remember.

9   Q.  Okay.  Could we have the article?  I believe it's

11:02  10  Exhibit 245.

11  A.  Yes, I do remember now.

12  Q.  And it's titled "US Approval of Killing of Cleric Causes

13  Unease."  And who is the cleric they're speaking of in this

14  article?

11:02  15  A.  Anwar al-Awlaki.

16  THE COURT:  And what's the date?

17  MR. FEAZEL:  The date is May 13th, of the article,

18  2010.

19  THE COURT:  And that was before they were ultimately

11:02  20  successful, correct?

21  THE WITNESS:  Yes, sir.

22  BY MR. FEAZEL:

23  Q.  At this time he's still live.  Is that correct?

24  A.  Yes, sir.

11:02  25  Q.  Let me direct your attention to May 30th of 2009 -- I mean,

11:02  1    of 2010.  Do you remember that day?

2    A.  Yes, sir.

3    Q.  What was going to happen on that day?

4    A.  I think it's the final day.  Yeah.  We're supposed to -- to

11:02  5    talk about the "hot fries."

6    Q.  And what do you mean by that "talk about the 'hot fries'"?

7    A.  "Hot fries" is the -- the fire -- I think it's a volunteer

8    fire department where we decided to -- where we decided to pick

9    him up for his final -- final trip.

11:03  10   Q.  So, is "hot fries" code for something?

11   A.  The "hot fries," yes, is the last day, where we're going to

12   go overseas.

13   Q.  What were you going to do?  What were you supposed to do?

14   Call him?

11:03  15   A.  I'm supposed to send him a text or call him and tell him

16   ready.  I drive to that location, and he's supposed to meet me

17   over there.  I'm going to check the stuff.  I'm going to put it

18   on a box, lock it, throw the phones; and then we'll drive all

19   the way to Houston.

11:03  20   Q.  What time did you drive, approximately, to the fire

21   station?

22   A.  I believe sometimes after midnight, after 12:00.

23   Q.  When you get there, what did you do?

24   A.  I told him to throw the phones out.  He throws the phones

11:04  25   out; he puts a little bit of dust on it.  Then we go, and make

11:04  1    sure -- I had -- I had a box.  He puts all the stuff in there,

2    make sure that it fits.  Then I'm going to lock it.  I'm going

3    to keep the actual key, and I'm going to keep -- give him a

4    false key.

11:04  5    Q.  All right.  Let's talk about that.  You looked at his stuff

6    and you showed him what you had and then you gave him a false

7    key.  Why did you give him a false key?

8    A.  So that he will not have to open it and put something else

9    that I don't know of.

11:04  10   Q.  Okay.  It's a way to control what he was taking with him?

11   A.  Yes, sir.

12   Q.  Prevent him from maybe taking a weapon?

13   A.  Yes, sir.

14   Q.  All right.  When you showed him the items, what did you

11:04  15   show him?

16   A.  I showed him -- I showed him the box where -- and then the

17   keys.  That will be in -- in the fire station.

18   Q.  Okay.  All right.  Once you got him in there, what happened

19   in the car?

11:05  20   A.  He was ready.  I mean, he was -- he was -- just got in

21   there and just -- ready to go basically.

22   Q.  At any point in time could he have abandoned this?

23   A.  He just tell me -- he could have told me, "I need to go"

24   and he just stop.

11:05  25   Q.  What would have happened if during the car ride he would

11:05   1   have said, "Take me home"?

2   A.   I would have taken him home.

3   Q.   All right.  Where were you heading?

4   A.   Houston port.

11:05   5   Q.   The Port of Houston?

6   A.   Yes, sir.

7   Q.   Okay.  What's going on in the car on the way from the

8   volunteer fire station to the Port of Houston?

9   A.   I'm instructing him in what's going to happen, where is he

11:05   10   going to go, who he's going to meet, what kind of code he is --

11   he's going to have to tell who's going to come and pick him up.

12   Tell him not to be nervous and get prepared.

13   Q.   Did he seem nervous at all?

14   A.   Not a bit.

11:05   15   Q.   Okay.  How long did it take for you to get to the port?

16   A.   I would say approximately -- I'm not sure -- forty minutes,

17   an hour, something like that.

18   Q.   What happens when you get to the port, when you arrive

19   there?

11:06   20   A.   We arrive in a -- to a gateway.  We had to show the ID's,

21   the fake ID's, to get in.  So, we show the fake ID's.  We go

22   in --

23   Q.   Let's pause for a minute.  Did the defendant show his fake

24   ID to the security personnel before?

11:06   25   A.   Yes, he did.

11:06   1   Q.   Did you watch him do it?

2   A.   Yes, I did.

3   Q.   What did he do specifically?

4   A.   He just represented his ID to the security guard.

11:06   5   Q.   And this was the TWIC card that you talked about that he

6   got at Memorial Park?

7   A.   Yes, sir.

8   Q.   After he did this, what did you do?

9   A.   We retrieved the cards back again.  We were instructed to

11:06   10   park the car in a designated area.  So, we parked the cars.  We

11   waited for someone to come and pick us up.

12          At that time I opened -- I opened the trunk of

13   the car.  Then I had -- I had some -- some booklets and some

14   materials and some -- some money.  And I told him that "You are

11:07   15   going to have to take these to the brothers."

16          And he said, "Okay."

17   Q.   Were these booklets the restricted military manuals that

18   you showed him earlier?

19   A.   Yes, sir.

11:07   20   Q.   What kind of money did you give him?

21   A.   I think I gave him some Egyptian money and some Euros.

22   Q.   Did you give him a letter?

23   A.   I also gave him a letter that he's going to have to give it

24   to the person who's going to come and pick him up in the port

11:07   25   where he's going to arrive in Algeria.

11:07  1    Q.  Who is this person -- who did you tell him this person

2    would be?

3    A.  Some -- he's going to meet some guy, some brother.  He's

4    going to come pick him up.  For him to know who's this guy,

11:07  5    he's going to have a little bit of burn on his hand.  They're

6    going to ask him certain questions.  And they're going to tell

7    him, "Have you played soccer?"  And he said, yes, he's going to

8    answer that, "Yes, I played soccer."  And they're going to ask

9    him, "What is going to be your -- what is your position?"  And

11:08  10   he's going to answer with, "I'm a goalie."  And that's the code

11   where they're going to come and pick him up.

12   Q.  All right.  And when you say a "brother," what do you mean

13   by a "brother"?

14   A.  One of the mujahideen.

11:08  15   Q.  Did you also show him a lensatic compass that he was

16   taking?

17   A.  Yes, sir.

18   Q.  Did you also give him SIM cards and GPS navigation systems?

19   A.  Yes, sir.

11:08  20   Q.  Did you also give him some other types of currency?

21   A.  I believe so.  I'm not sure.

22   Q.  What about batteries and calling cards?

23   A.  Yes, I did.

24   Q.  After you -- did he say, "No, I don't want to take any of

11:08  25   this stuff over.  I -- this isn't good"?

11:08  1    A.  No, he did not.

2    Q.  Did he watch and see everything that you were giving him?

3    A.  Yeah.  Because I opened it, and I explained to him exactly

4    what it is.  So, I told him, "This one here goes to this and

11:09  5    this and that.  And these are common -- common things that the

6    brothers ask for."

7              And he said, "Okay."

8    Q.  Where did you tell him he was going to go?

9    A.  Told him he's going to go to Annaba.

11:09  10   Q.  And where is that?

11   A.  In Algeria.

12   Q.  And where did you tell him he would go from there?

13   A.  And then he's going to stay in a safe house; he's going to

14   be trained for a little bit; and then, after that, they're

11:09  15   going to have to issue him a different identity because he's

16   American and he needs a visa.  So, we're going to have to give

17   him false identification.  And from Algeria, we're going to

18   have to transport him all the way to Yemen to join al-Qaeda in

19   the Arabian Peninsula.

11:09  20   Q.  All right.  Now, you say that he was going to be trained.

21   What was your understanding with him that this training would

22   involve?

23   A.  It would involve military training, fighting training.

24   Q.  All right.  After you told him where he was going and you

11:09  25   showed him the documents, what happened?

11:09    1    A.   Then we came to the time where he needs to part.  We put

         2    everything in the box, and then we proceeded to go into the

         3    ship.

         4    Q.   All right.  At some point in time did you say good-bye to

11:10    5    him?

         6    A.   I tried, but he was in a rush and he just -- he didn't say

         7    goodbye or nothing.  He just took off.

         8    Q.   So, he was so excited to go, he just quickly got on the

         9    ship?

11:10   10    A.   Yes, sir.

        11    Q.   Did he ever hesitate at all?

        12    A.   No.

        13    Q.   Did he ever think of backing out or say to you, "This is a

        14    bad idea"?

11:10   15    A.   No.  I was instructed at any time he needs to back out I

        16    need to let him back out.  So, he did not back out.

        17    Q.   At this time I would like to play from Exhibit 298, 69-1.

        18         (Tape playing)

        19              THE COURT:  Hold it a second.  Where is this?

11:11   20                   I mean, in other words, where is this taking

        21    place?

        22    BY MR. FEAZEL:

        23    Q.   Where was this video recorded at?

        24    A.   This is recorded outside the volunteer fire stations in

11:11   25    Navasota.

11:11   1          THE COURT:  Okay.  Before -- before the ship.  In

2      other words, we're moving back to Navasota now?

3          THE WITNESS:  That's the time I'm picking him up in

4      the car before we head to the Highway 290 to go to Houston

11:11   5      port.

6          THE COURT:  Got it.  Thank you.

7      *(Tape playing)*

8      BY MR. FEAZEL:

9      Q.  Okay.  Any time during this clip, did he express

11:28  10      reservations about going on a boat trip to Algiers [sic], to

11      you?

12      A.  No.

13      Q.  And while he's on this trip, in fact, he's still

14      continuously talking about sending your friends and family to a

11:28  15      "zoo"?

16      A.  Yes, sir.

17      Q.  And while this is going on, how many -- well, how many

18      times previous to this did you tell him you were with al-Qaeda

19      in the Arabian Peninsula?

11:28  20      A.  Multiple times.

21      Q.  At this time I would like to play 69-3.

22          THE COURT:  Where is this taking place?

23          MR. FEAZEL:  It's following up in the car.

24          THE COURT:  How long is it?

11:28  25          MR. FEAZEL:  It's about -- a little over 11 minutes.

11:28   1          THE COURT:  All right.

        2      (Tape playing)

        3          THE COURT:  Are they still driving?

        4          MR. FEAZEL:  They paused the car, and I believe -- we

11:29   5   can ask him.

        6   BY MR. FEAZEL:

        7   Q.  At this point, sir, what's happening?

        8   A.  I think this is -- this is inside the port right now.  We

        9   already passed the checkpoint, and now we're just checking his

11:29  10   stuff back again before we get to the ship.

       11          THE COURT:  Okay.  So, now you've gone from Navasota

       12   all the way to the Ship Channel, correct?

       13          THE WITNESS:  Yes, sir.

       14          THE COURT:  And that prior tape was driving to the

11:29  15   Ship Channel.  And we saw some video, and we saw some still

       16   pictures.

       17              Is this where you pull up to the side of the ship

       18   and you're about to get that trunk out?

       19          THE WITNESS:  Yes, sir.

11:29  20   BY MR. FEAZEL:

       21   Q.  And while you're getting the trunk out, are you showing the

       22   items that he's going to be taking to the al-Qaeda brothers?

       23   A.  Yes, sir.

       24          THE COURT:  Okay.

11:30  25      (Tape playing)

11:32  1          THE COURT:  All right.  Stop it right there.

2                  What was it that you were going to keep with you

3      at all times?  What was that item?

4          THE WITNESS:  I believe those are the -- I think the

11:32  5      manual.  I don't remember quite.  I don't remember.

6          THE COURT:  Okay.

7          THE WITNESS:  But the stuff that I am giving him is

8      the stuff that he keeps with him all the time, but his luggage

9      and his stuff is going to be separated.

11:32  10         THE COURT:  What about the Euros, how many Euros were

11     there?  Do you remember?

12         THE WITNESS:  I don't --

13         THE COURT:  We have testimony on it.  How much was it?

14     Anybody remember?

11:32  15         MR. FEAZEL:  Conversion is about 5,000 United States

16     dollars.

17         THE COURT:  That's what it was.  That's what it was.

18                 All right.  The exchange rate was a little bit

19     different back then.

11:32  20         MR. FEAZEL:  A little bit.

21         THE COURT:  Because I remember you discussed about how

22     many Euros and -- it's in the record -- how many Euros and how

23     much that equates to -- equates to dollars.

24                 All right.  Please proceed.

11:33  25     *(Tape playing)*

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:41  1    BY MR. FEAZEL:

       2    Q.  Sir, this video that shows him going -- or you going up to

       3    the ship, was this the last time you have seen the defendant

       4    until today?

11:42  5    A.  Yes, sir.

       6          MR. FEAZEL:  Judge, at this time, for the purposes of

       7    the record, I would like to demonstrate that the defendant has

       8    had a clear view to the confidential human source for purposes

       9    of consultation.

11:42  10         THE COURT:  All right.  There is a screen for security

       11   purposes put up in front of the witness, and I will observe

       12   myself that the attorneys -- all the attorneys, including

       13   standby counsel, and the defendant have had a clear view,

       14   together with the Court and court personnel, of the

11:42  15   confidential witness.  And the rest -- the view is blocked to

       16   anyone who's not either law enforcement or court official or a

       17   party to the suit.

       18         MR. FEAZEL:  At this time we pass the witness.

       19         THE COURT:  All right.  We're going to pass the

11:42  20   witness.  We're also going to take a break.  Everyone remain

       21   seated for about one minute.  If you want to get the witness

       22   out, and we'll pick up in a few minutes.

       23         MR. HEENAN:  Your Honor?

       24         THE COURT:  Yes, sir.

11:43  25         MR. HEENAN:  There's one brief point I just wanted to

1   clear up to the Court and bring to the Court's attention.

2          THE COURT:  Okay.

3          MR. HEENAN:  Yesterday we had had admitted into

4   evidence transcripts of the audio recordings.  Those items were

5   labeled Government's Exhibit 310 through 324.  And it appears

6   we have two documents that have been marked 323.  We would just

7   ask the Court permit us to mark them 323A and 323B.

8          THE COURT:  All right.  And just make sure the case

9   manager is aware of that.

10         MR. HEENAN:  Yes, your Honor.

11         THE COURT:  Because she'll be custodian, at least

12  temporarily, for the exhibits in this case.  So, that's

13  granted.

14         MR. HEENAN:  I will inform her.

15             And with respect to, there was one -- at one

16  point you had asked for what transcript number corresponded

17  with the audio and we mentioned 323.  That was in fact 323B now

18  it's marked.

19         THE COURT:  It's now 323B, as far as 323 goes.

20         MR. HEENAN:  Thank you.

21         THE COURT:  The -- all right.  Now, all the other

22  transcripts have been admitted, correct?  We admitted those

23  before you started playing the videos and the audios, correct?

24         MR. HEENAN:  Correct, your Honor.

25         THE COURT:  All right.  That's in evidence.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:44  1              It's now 11:45.  We'll take a break at this time

       2     because folks have to -- I don't know -- I'm not sure if the

       3     defendant goes upstairs.  I'm not sure what's going on in the

       4     jury room.  So, we'll take a -- usually we take 15 minutes.

11:44  5     We've been taking -- at this break a 20-minute break.  We'll

       6     take a break to 12:05; and we'll go on for about another hour,

       7     hour five minutes.  So, we'll see you back at 12:05.

       8         (Recess was taken)

       9              THE COURT:  All right.  Let's bring our witness in,

12:11  10    shall we?

       11             All right.  Be seat.

       12             Ordinarily everybody remain standing when the

       13    door opens and the jury walks out, and we're all standing.

       14    So --

12:12  15             All right.  You pass the witness, correct?

       16         MR. FEAZEL:  Correct.

       17         THE COURT:  Mr. Bujol, go right ahead, sir.

       18                        **CROSS-EXAMINATION**

       19    BY THE DEFENDANT:

12:12  20    Q.  I'm going to move forward to March 17th of 2010 in which

       21    there was an article sent.  I believe it's Exhibit 193.  And

       22    you stated something along the lines of -- why did you state

       23    that the defendant sent you this document?

       24    A.  Why --

12:13  25    Q.  Why did you -- why did you believe that I sent you this

12:13   1   document?

2   A.   Because you did.

3   Q.   No.   What was the purpose in me sending you the document,

4   in your -- in your assessment?

12:13   5            I believe you said something like I might run

6   away or commit something -- something along those lines?

7   A.   Yeah.   After you sent that one, I was afraid you were going

8   to do something immediately, you were not going to wait until

9   you actually leave the country.   So, you might actually

12:13   10   participate in an act of jihad inside the United States.

11            THE DEFENDANT:   Okay.   I want to go to the next page,

12   please.   Blow it up.

13   BY THE DEFENDANT:

14   Q.   If you can read where it says -- starting where it says,

12:14   15   "Find this article at" -- and tell us what that is and read

16   that out for us, please?

17            MR. FEAZEL:   I would object to the form of the

18   question.

19            THE COURT:   Sustained.   Just rephrase it.

12:14   20   BY THE DEFENDANT:

21   Q.   Can you please read the link below, where it says, "Find

22   this article"?

23            THE COURT:   Well, let's put it this way.   It's in the

24   record.   It's in the record.   We've identified it.

12:14   25            Ask him the next question, please.

12:14  1          THE DEFENDANT:  Okay.  I'll have the government go to

2     Exhibit 192.

3               Next page.  Next page, please.  Okay.

4     BY THE DEFENDANT:

12:15  5     Q.  Do you recognize this e-mail to be the one wherein I sent

6     the link?

7     A.  I'm sorry.  Ask that question again.

8     Q.  Do you recognize this --

9               THE DEFENDANT:  Could you go to the previous page in

12:15  10    this -- no, no, no.  Went too -- one more.

11               Okay.  If you could blow up the bottom, because

12    it's a continuation.  It's a little difficult.

13    BY THE DEFENDANT:

14    Q.  Okay.  At the bottom here --

12:15  15          THE DEFENDANT:  No.  That's -- next page.  You're

16    going in the wrong direction.

17          THE COURT:  All right.  Just ask him the question.

18    Ask it instead of -- you have it up there.  We've just got to

19    move.

12:16  20          THE DEFENDANT:  Well --

21          THE COURT:  By the way, I'm not rushing you; but we

22    need to stay and not get bogged down at any point.  All right?

23          THE DEFENDANT:  Yeah.  This isn't going to take very

24    long.

12:16  25               Just go back to the final page, and we'll go to

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

12:16  1   the link and blow it up from there.

2          THE COURT:  Okay.  Got it.  There we go.

3   BY THE DEFENDANT:

4   Q.  Okay.  Below where it says, "Please take a look at this

12:16  5   link," read what it says after that, please.

6   A.  "Http.www" --

7   Q.  Oh, no.  The --

8          THE COURT:  No.  "Let me know" --

9          THE WITNESS:  Oh, "Let me know what you think.  I'm

12:16  10  not so sure about it."

11  BY THE DEFENDANT:

12  Q.  Okay.  Now, given what you said about why you believed I

13  sent the article and what it purports to do, do you find

14  someone having doubts with regards to this call to arms by

12:16  15  saying they're not sure about it consistent with wanting to run

16  away at any time and commit this atrocious act?

17         THE COURT:  Hold it a second.  The other attorney is

18  getting up to object.

19             Go on.

12:17  20         MR. FEAZEL:  Form and speculation.

21         THE COURT:  Technically, you're correct.  I'm going to

22  let him answer anyhow.

23             Do you know what was meant by that?

24         THE WITNESS:  (No audible response).

12:17  25         THE COURT:  Do you know what was meant by that?

12:17   1                      Now, you're on cross-examination.  Short and to
        2      the point, do you know what was meant by that?
        3                      THE WITNESS:  No, not clearly.
        4                      THE COURT:  Okay.  That's how we're going to get
12:17   5      going.  Cross-examination, short and to the point, that's the
        6      whole -- that's why he's asking very specific questions.
        7      BY THE DEFENDANT:
        8      Q.  Okay.  The significance of the word "Qandahar"?
        9      A.  Significant of the word --
12:17  10      Q.  Yes.  Have you heard this word?
       11                      First question, have you ever heard of the word
       12      "Qandahar"?
       13      A.  "Qandahar," yes.
       14      Q.  How would you spell that?
12:17  15      A.  In Arabic or in English?
       16      Q.  In Arabic.
       17      A.  In Arabic?  (speaking in Arabic)
       18      Q.  Okay.  And -- (speaking in Arabic) -- corresponds what in
       19      English?
12:18  20      A.  It could be "K," it could be "Q."
       21      Q.  Okay.  So, how would you spell it in English?
       22      A.  Could be different, could be with a "Q" or with a "K."
       23      Q.  Well, with -- with the "Q" or "K" spelling, how would you
       24      spell out the complete word?
12:18  25      A.   "Qandahar"?

12:18  1   Q.  Yes, sir.

2   A.  Would be Q-U-N-D-A-R -- A-H-R, "Qandahar."

3   Q.  If you spelled it out as Q-A-N-D-A-H-A-R, would you also

4   recognize it?

12:18  5   A.  Really, where you are going to put the words at?  I mean,

6   you have to put it in a sentence for me to understand what

7   exactly you mean.  If you're just going to have it in English

8   without any sentence, it would be gibberish to me.

9   Q.  Okay.

12:18  10  A.  So, you are going to have to put -- you're going to have to

11  put any kind of word that is specifically a foreign to the

12  English, you're going to have to put it in a sentence for me to

13  understand it.

14  Q.  Well, what is the word --

12:19  15  A.  It's a city name.  It's a city name.

16  Q.  Okay.  Where is that city?

17  A.  I believe it's in -- I think it's in Afghanistan.  I'm not

18  sure.

19  Q.  Afghanistan?  Okay.  Have you heard of the Yahoo! account

12:19  20  CYPX6YY@Yahoo.com?

21  A.  Have I heard of it?

22  Q.  Yes.

23  A.  Can you put it on the screen, please?

24          THE DEFENDANT:  Your Honor --

12:19  25          THE COURT:  Yes, sir.

12:19  1          THE DEFENDANT:  I want to move to -- this is a copy of

2      an e-mail from the source to myself, and I would like to have

3      it admitted.  Since I don't have screen access, it will have to

4      be read.

12:20  5          THE COURT:  Okay.  Any objection?

6          MR. FEAZEL:  No objection, your Honor.

7          THE COURT:  All right.  What -- okay.  Is this your

8      first exhibit?  In other words, if you're going to have

9      something coming into evidence -- I haven't put anything else

12:20 10      in for the defendant yet, have I, anybody?  Do you recall?

11          MR. McINTYRE:  I do not recall that you have.

12          THE COURT:  Okay.  So you want this marked and put in

13      as your Exhibit Number 1.  Is that correct?

14          THE DEFENDANT:  Yes.

12:20 15          THE COURT:  Okay.  Hang on a second.  Defendant's

16      Number 1.  Somehow, since Ellen is not here, as soon as it's

17      through, take a little yellow tag -- take just a -- that kind

18      of a tag, because she can put it later.  That would be

19      Defendant's Number 1 is in evidence.

12:20 20          Now, do you want to read it or do you want to

21      show it to him or both?

22          THE DEFENDANT:  I'll just read it.

23          THE COURT:  What's the date?

24          THE DEFENDANT:  It's --

12:20 25          THE COURT:  Hold it one second.

12:20   1                    Other side want to look at it first or just keep

2    moving?

3                    MR. FEAZEL:  I would like to look at it.

4                    THE COURT:  Okay.

12:21   5                    MR. FEAZEL:  I'm familiar with it.  No objection.

6                    THE COURT:  Okay.  Who's it from and who is it to,

7    sir?

8                    THE DEFENDANT:  It's from the source to me.

9                    THE COURT:  Okay.  Got it.

12:21  10   BY THE DEFENDANT:

11   Q.  And it's -- basically it says, "The brothers in Qandahar

12   are stronger.  The rest is with Allah," and some other Arabic

13   transliteration into English.  "And there's a lot that will be

14   happening.  I will be running again this week."

12:21  15                    Now, what I want to bring your attention to is

16   the "brothers in Qandahar."  And you just mentioned that

17   Qandahar is in Afghanistan, correct?

18   A.  Yes, sir.

19   Q.  So, these brothers being referred to here are not in fact

12:22  20   in the Arabian Peninsula?

21   A.  No, sir.

22                    THE DEFENDANT:  No further questions.

23                    THE COURT:  Thank you, sir.  Anything further?

24                    MR. FEAZEL:  Nothing further.

12:22  25                    THE COURT:  Very well.  You may step down.  You're

12:22   1   excused.  You're free to leave.

2               We can move that screen and turn the light on

3   now.

4               All right.  Government, call your next witness.

12:22   5           MR. FEAZEL:  At this time the United States would call

6   Bowman Price.

7           THE COURT:  Sir, you want to come forward, please?

8   You can come right down the center, may be quicker.

9               Raise your right hand and be sworn.

12:22   10              You swear the testimony you're about to give in

11   this case on trial will be the truth, the whole truth, and

12   nothing but the truth?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Have a seat right there.

12:23   15              Okay.  Pull that microphone in.  You can pull it

16   up, and it's completely flexible.

17              Okay.  Go right ahead.

18          MR. FEAZEL:  May I proceed?

19          THE COURT:  Yes, sir.

12:23   20              You got a microphone yourself over there now,

21   counsel?

22          MR. FEAZEL:  I do, your Honor.

23          THE COURT:  It will pick up.

24                          - - - - -

25

1          **BOWMAN ERIC PRICE, GOVERNMENT'S WITNESS, TESTIFIED:**

2                        **DIRECT EXAMINATION**

3    BY MR. FEAZEL:

4    Q.   Sir, will you please state your name for the judge?

5    A.   Bowman Eric Price.

6             THE COURT:  How do you spell your first name?

7             THE WITNESS:  B-O-W-M-A-N.

8             THE COURT:  P-R-I-C-E?

9             THE WITNESS:  Correct.

10   BY MR. FEAZEL:

11   Q.   And you go by Eric.  Is that right?

12   A.   Yes.

13   Q.   Where do you currently work?

14   A.   I'm senior investigator with the Friendswood Police

15   Department, assigned to the FBI task force.

16   Q.   How long have you been with the Friendswood Police

17   Department?

18   A.   Eleven years.

19   Q.   Are you a Certified Peace Officer within the State of

20   Texas?

21   A.   Yes.

22   Q.   How long have you been so?

23   A.   Since '83.

24   Q.   And where did you work before you were with the Friendswood

25   Police Department?

12:24  1    A.   Brazoria County Sheriff's Department.

2    Q.   At some point in time, did you get involved in the Safe

3    Streets Task Force with the Federal Bureau of Investigation?

4    A.   Yes.

12:24  5    Q.   When was this?

6    A.   Approximately five years ago.

7    Q.   And did you then join, as well, the JTTF?

8    A.   Correct.

9    Q.   Can you explain to the judge what the JTTF is?

12:24 10    A.   Investigations regarding counterterrorism.

11    Q.   And did you receive any training as a part of your time at

12    the Joint Terrorism Task Force?

13    A.   Yes.

14    Q.   Can you tell the judge your training that you have had?

12:24 15    A.   They sent me to Orlando for a week for JTTF school.  I've

16    been to Nevada and Dallas for other schools.

17    Q.   So, you've had a couple of weeks of extra -- additional

18    training?

19    A.   Correct.

12:24 20    Q.   Now, how often do you work at the Port of Houston or with

21    authorities at the Port of Houston?

22    A.   Every so often.

23    Q.   Would you say pretty frequently?

24    A.   Yes.

12:25 25    Q.   And at some point in time were you approached by the FBI

12:25   1   about posing as a security guard in a case that they were

2   investigating?

3   A.   Correct.

4   Q.   How did that come about?

12:25   5   A.   I was contacted by the Bryan RA through one of the ICE

6   agents at our task force and they asked if I would do it and I

7   said okay.

8   Q.   Were you briefed about the facts of the case?

9   A.   Correct.

12:25   10   Q.   And after you were briefed about the facts, what then

11   happened?

12   A.   We had a couple of meetings, we discussed everything, and

13   then they said the -- we had a couple of dates we were working

14   on and we show up the night that it happened.

12:25   15   Q.   And what were you specifically told that you were going to

16   do?

17   A.   I was going to work the security guard position at the main

18   gate of the terminal where the boat was located, ID the

19   individuals that came in, and basically let them through.

12:26   20   Q.   How were you to ID the individuals that came in?

21   A.   They would have TWIC cards with them.

22   Q.   When you say "TWIC cards," what does that mean?

23   A.   They -- I believe there's the -- I believe they're Texas

24   Workforce ID cards.

12:26   25   Q.   And are those official government documents?

12:26  1   A.   Yes.

2   Q.   Is that what you ID everyone who comes in the port with?

3   A.   That night, yes.

4   Q.   Someone entering the port, do they need the TWIC card to

12:26  5   enter?

6   A.   Yes.

7   Q.   All right.  Were you told -- were you given a heads-up as

8   to what type of a car the defendant would be in?

9   A.   Basically was shown what it was going to look like and the

12:26  10   name that was going to be on the card.

11   Q.   Well, let's talk about the car that he was going to come

12   in.

13   A.   Oh, the car.  Oh, okay.

14   Q.   What --

12:26  15   A.   It was an SUV, smaller type vehicle.

16   Q.   Was it a Honda Pilot?

17   A.   Right.

18   Q.   What color was it?

19   A.   I believe it was maroon.

12:27  20   Q.   All right.  When you saw this car, what were you instructed

21   to do?

22   A.   Basically ID the individuals, make sure they had those TWIC

23   cards, let them through the gate and tell them where they're

24   supposed to park and where they're supposed to gather to be

12:27  25   taken to the ship.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:27  1    Q.  Were you supposed to check the vehicle license plate, as
       2    well?
       3    A.  Correct.
       4    Q.  At some point in time did you get a call that -- on the
12:27  5    30th, that you were to be at the port at midnight?
       6    A.  Yes.
       7    Q.  And did you get there at midnight?
       8    A.  Yes.
       9    Q.  Where did they send you to?
12:27  10   A.  I went straight to the security guard shack.
       11   Q.  Were you given a certain uniform?
       12   A.  Right.  They gave me a -- we were able to obtain a security
       13   guard uniform.
       14   Q.  Were you given a special hat?
12:27  15   A.  It was a special hat, yes.
       16   Q.  What was special about it?
       17   A.  It had a video camera in it.
       18   Q.  And when you say a camera, was it a camera that can record
       19   video?
12:28  20   A.  Right.
       21   Q.  And were you stationed at the main entrance post?
       22   A.  Correct.
       23   Q.  At some point in time did you get a call from dispatch that
       24   the defendant's vehicle would be coming to you soon?
12:28  25   A.  Right.  We -- we knew pretty much where the vehicle was

12:28   1   located at all times.  And they told me approximately what time

2   they would arrive.

3   Q.  What time did the defendant arrive in that maroon Honda

4   Pilot?

12:28   5   A.  I believe it was around 2:45, 3:00 o'clock, in that area

6   there --

7   Q.  Did you make --

8   A.  -- in the morning.

9   Q.  In the morning.

12:28   10   A.  Okay.

11   Q.  Did you maintain a visual on his car the entire time as he

12   drove up?

13   A.  Right.

14   Q.  When he pulls up next to you, what did you do?

12:28   15   A.  I went up to the vehicle, noticed that there wasn't a front

16   license plate.  As I approach the driver's side, walked around

17   to the rear, saw the rear license plate, came around to the

18   passenger side, and asked for the TWIC cards at that time and

19   for positive ID.

12:29   20   Q.  Okay.  Now, when you say you came to the passenger side,

21   who was sitting in the passenger side?  Is that Barry Walter

22   Bujol, Jr.?

23   A.  Yes, it was the defendant.

24   Q.  Do you see that person in the courtroom today?

12:29   25   A.  Yes.  He's over there in the green jumpsuit.

12:29   1        MR. FEAZEL:  May the record reflect this witness has

2    identified the defendant?

3        THE COURT:  The record will so reflect.

4    BY MR. FEAZEL:

12:29   5    Q.  When you approached him, did you get a good visual on his

6    person?

7    A.  Yes.

8    Q.  Were you able to look at his face?

9    A.  Yes.

12:29  10    Q.  What did you ask him for?

11    A.  Basically, either -- a TWIC cards and what their business

12    was for the coming to the port.

13    Q.  Did he give you a TWIC card?

14    A.  Yes.

12:29  15        MR. FEAZEL:  May I approach the witness?

16        THE COURT:  You needn't ask; but, yes, you may.  You

17    have free range of the courtroom.

18    BY MR. FEAZEL:

19    Q.  Exhibit 325, do you recognize this?

12:29  20    A.  Yes.

21    Q.  Was this the card that the defendant, who you just ID'd

22    positively as Barry Walter Bujol, gave you?

23    A.  Yes, it is.

24    Q.  Is this a TWIC card?

12:30  25    A.  Right.

12:30   1          MR. FEAZEL:  At this time I would like to offer
2    Government Exhibit 325.  It was not previously offered.
3          THE COURT:  "Was" or "was not"?
4          MR. FEAZEL:  Was not.
12:30   5          THE COURT:  Okay.  325 is admitted.
6    BY MR. FEAZEL:
7    Q.  Can you tell the Court what it says on the card, in the
8    upper right-hand corner?
9    A.  "TWIC," T-W-I-C.
12:30  10    Q.  And what does that stand for?
11    A.  Get my glasses out first so I can see it.
12               "Transportation Worker Identification
13    Credentials."
14    Q.  When does it expire?
12:30  15    A.  April 10th, 2014.
16    Q.  Who's name is on this?
17    A.  Mexia, Paul.
18    Q.  And whose picture is on this?
19    A.  That's the defendant.
12:30  20    Q.  Okay.  And on the back, does this talk about how this is a
21    government ID and there's repercussions for falsely using it?
22    A.  Yes.
23    Q.  When he handed you this card, did you look at the
24    photograph and then look at his face?
12:31  25    A.  Yes, I did.

12:31  1    Q.  Was it one and the same person?

2    A.  Yes, it was.

3    Q.  Was he representing to you that this was his

4    identification?

12:31  5    A.  Yes.

6    Q.  Was he representing to you that this was who he was, a Paul

7    Mexia?

8    A.  Yes.  He handed me that card, yes.

9    Q.  After he gave you this card, what did he then do?

12:31  10    A.  I asked him a couple of questions:  Were they both going to

11    the boat, did they know where to park, and that kind of stuff.

12    And they acknowledged, and I let them through the gate.

13    Q.  All right.  Once you let them through the gate, did you

14    direct them where to park?

12:31  15    A.  Yes.

16    Q.  Where did you tell them to park?

17    A.  Just inside the gate, about 20 yards to the left, near the

18    gathering spot that they all use in there, in the port.

19    Q.  Was that the end of your involvement?

12:31  20    A.  Yes.

21    Q.  And you said that you had a hat camera on.  Is that

22    correct?

23    A.  Yes.

24    Q.  Was this recorded?

12:31  25    A.  Yes.

12:31   1   Q.  Have you seen the video?

2   A.  Yes.

3   Q.  Does it fairly and accurately represent what happened that

4   evening?

12:32   5   A.  Yes, it did.

6   Q.  At this time I would like to publish previously admitted --

7   it's Exhibit 2991D72.

8       (Tape playing)

9           THE COURT:  All right.  Hang on one second.

12:32   10              Is there appropriate blocking out of your

11   confidential source?

12           MR. FEAZEL:  He will not be depicted in this video.

13           THE COURT:  Not depicted in this portion.  In other

14   words --

12:32   15           MR. FEAZEL:  Exactly.

16           THE COURT:  -- it has been cut out?

17              Or that's not being submitted?

18           MR. FEAZEL:  That's correct.

19           THE COURT:  All right.

12:32   20      (Tape playing)

21           THE COURT:  By the way, just for the folks in the back

22   and in the audience, you're now free to sit on either side of

23   the courtroom.  That restriction was only in force because of

24   the prior witness.

12:34   25              All right.  Go right ahead, please.

12:34  1    BY MR. FEAZEL:

       2    Q.  Did that video depict just what we had talked about when

       3    you went and ID'd him and looked at the card and looked at him?

       4    A.  Yes, it did.

12:34  5                MR. FEAZEL:  Pass the witness.

       6                THE COURT:  Okay.  Mr. Bujol?

       7                THE DEFENDANT:  No questions.

       8                THE COURT:  No questions?  Okay.  No questions.

       9                Thank you, sir.  You may step down.  You're

12:35 10    excused.  You're free to leave.

      11                By the way, all prior witnesses, just for the

      12    record, the same thing I said for all last two witnesses, you

      13    may step down once you're done, you're excused, and you're all

      14    free to leave if you desire.

12:35 15                All right.  Call your next witness.

      16                MR. FEAZEL:  The United States would call Oscar Pena.

      17                THE COURT:  Raise your right hand, be sworn, please.

      18                You swear the testimony you're about to give in

      19    this case on trial will be the truth, the whole truth, and

12:35 20    nothing but the truth?

      21                THE WITNESS:  I do.

      22                THE COURT:  All right.  Have a seat, please.

      23                        - - - - -

      24

      25

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

**OSCAR X. PENA, GOVERNMENT'S WITNESS, TESTIFIED:**

**DIRECT EXAMINATION**

BY MR. FEAZEL:

Q.  Could you please state and spell your name for the judge and court reporter?

THE COURT:  Pull the mike over a bit.

THE WITNESS:  It's Oscar, O-S-C-A-R, X, Pena, P-E-N-A.

BY MR. FEAZEL:

Q.  And where do you work?

A.  The Houston Police Department.

Q.  And how long have you worked with the Houston Police Department?

A.  Twenty-seven years.

Q.  Are you a Certified Peace Officer within the State of Texas?

A.  Yes, sir, I am.

Q.  Are you also known as a Master Peace Officer?

A.  Yes, sir, I am.

Q.  How long have you been a Master Peace Officer?

A.  For about the last seven years.

Q.  Let's talk for a minute --

THE COURT:  Why don't you sit back and relax.  Pull that mike up.  People are afraid to straighten it out.  You're not afraid.  There you go.

We have a new system here.  We might as well take

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

12:36   1    full advantage of it.  It took me a long time to get it
        2    installed.
        3                All right.  Go right ahead.
        4    BY MR. FEAZEL:
12:36   5    Q.  All right.  Excuse me.  I think we were talking about how
        6    long you've been a Master Peace Officer?
        7                THE COURT:  Oh, Master Peace Officer since?
        8                THE WITNESS:  2003.
        9                THE COURT:  Thank you.
12:36   10   BY MR. FEAZEL:
        11   Q.  And can you describe the basic -- were you ever on patrol?
        12   A.  I was on patrol for 10 years.
        13   Q.  Where did you go after patrol?
        14   A.  I went to the robbery division as a robbery investigator.
12:37   15   Q.  How long were you in the robbery division?
        16   A.  Three years.
        17   Q.  And after robbery, where did you go?
        18   A.  I went to the narcotics division.
        19   Q.  How long were you with narcotics?
12:37   20   A.  Seven years.
        21   Q.  And what did you do in narcotics?
        22   A.  In the narcotics division, I was a case agent and
        23   undercover officer.
        24   Q.  And after seven years in narcotics, where did you go?
12:37   25   A.  I went to the criminal intelligence division.

12:37  1    Q.  Is that where you currently are?

2    A.  I am currently there now, yes, sir.

3    Q.  How long have you been there?

4    A.  Since -- for the last seven years.

12:37  5    Q.  And can you tell the judge your duties with the criminal

6    intelligence division?

7    A.  The criminal intelligence division, I was conducting

8    intelligence investigations for the police department.

9    Q.  And at some point in time did you join the Joint Terrorism

12:37  10   Task Force of the Federal Bureau of Investigation?

11   A.  For the last three years, I've been assigned over at the

12   JTTF.

13   Q.  Let's talk for -- or let me direct your attention to the

14   investigation involving Barry Walter Bujol, Jr.  How did you

12:38  15   get involved in this?

16   A.  I was approached by Agent Cannon to assist in the

17   investigation.

18   Q.  And what did he ask you to do?

19   A.  He asked if we could get a marked police car and wear our

12:38  20   uniforms on that night.

21   Q.  On the night of the arrest?

22   A.  On the night of the arrest, yes, sir.

23   Q.  So, did you have a briefing on what you would do and the

24   facts of the investigation and operations?

12:38  25   A.  Yes, sir, we did.

12:38  1   Q.  What did they discuss, just briefly, at this meeting?

2   A.  That they had an individual that was attempting to get out

3   of the country, was trying to go to the Middle East to join

4   al-Qaeda to fight overseas.

12:38  5   Q.  Now, I believe you testified that you were to show up in

6   full uniform and also a marked patrol unit?

7   A.  That is correct.

8   Q.  Why was it decided that you would show up in a uniform and

9   marked patrol unit?

12:39 10   A.  The marked patrol cars have a cage in the back, and it's

11   easier to transport individuals from one location to another.

12   Q.  Given that this was also an FBI investigation, was this

13   also to confuse him?

14   A.  It was also to keep the defendant off balance, yes, sir.

12:39 15   Q.  And can you explain to the judge what you mean by "off

16   balance"?

17   A.  So, that he wasn't actually sure of -- as him being the

18   target of the investigation, if it was being conducted by the

19   FBI or by the Houston Police Department.

12:39 20   Q.  Does this maybe prevent him from coming up with a story or

21   excuse on why you're transporting him?

22   A.  Yes, sir.

23   Q.  Once you got to the Port of Houston on the 30th of May,

24   2010, where were you stationed in your patrol car?

12:39 25   A.  We were stationed within the perimeter of the port, in a

12:39  1  secluded area where we were out of sight from anyone coming in

2  and out.

3  Q.  Were you made aware of the location of the ship that the

4  defendant was to board?

12:39  5  A.  Yes, sir, we were.

6  Q.  Where were you parked in relation to that ship?

7  A.  We were parked just -- I guess that would be the -- north

8  of the ship, in a secluded area.

9  Q.  Was he able to see you from where you were parked?

12:40  10  A.  He was not.

11  Q.  Did you have a dedicated radio frequency you were operating

12  on that night?

13  A.  Yes, sir, we did.

14        THE COURT:  What does that mean a "dedicated

12:40  15  frequency"?

16        THE WITNESS:  That's a frequency that we were using

17  for the operation, your Honor.

18        THE COURT:  Okay.

19  BY MR. FEAZEL:

12:40  20  Q.  At approximately 2:30 did you get a call on that radio

21  frequency?

22  A.  Yes, sir, we did.

23  Q.  What was that in regards to?

24  A.  That was in regards to the vehicle that the defendant was

12:40  25  going to be in had shown up to the area.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:40  1  Q.  And what did you do when you got that call?

2  A.  We just stood by until the vehicle had made its way into

3  the port area, and then we waited for the individual to be

4  transported to the ship itself.

12:40  5  Q.  Okay.  Once the individual was arrested by FBI SWAT, what

6  did you do?

7  A.  At that point we then proceeded directly to the ship and we

8  took custody of the defendant.

9  Q.  As you're driving up to the ship, can you describe what the

12:41  10  scene was like?

11  A.  There were several unmarked vehicles on the dock area; and

12  the defendant, along with another male, were handcuffed on the

13  ground.

14  Q.  Did you take custody of the defendant?

12:41  15  A.  Yes, sir, we did.

16  Q.  How did that happen?

17  A.  We just -- he was already handcuffed.  We switched out

18  handcuffs, and then he was searched.  I asked him for his name,

19  basic information; and he was placed in the patrol car.

12:41  20  Q.  What name did he give you?

21  A.  He gave us the name of Paul Mexia.

22  Q.  Did you later find out that was not his correct name?

23  A.  Yes, sir.

24  Q.  Did you later find out his name was Barry Walter Bujol,

12:41  25  Jr.?

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

12:41   1   A.  Yes, sir.

2   Q.  Do you see this person in the courtroom today?

3   A.  Yes, sir, I do.

4   Q.  Can you please point to him and identify him by an article

12:41   5   of clothing?

6   A.  Sitting at the table, wearing the green jump suit.

7           MR. FEAZEL:  May the record please reflect this

8   witness identified the defendant?

9           THE COURT:  The record will so reflect.

12:41   10   BY MR. FEAZEL:

11   Q.  So, you changed out cuffs, handcuffs; then you searched

12   him, according to police protocol?

13   A.  That's correct, sir.

14   Q.  What did you do next?

12:42   15   A.  We then placed him in the back of the police car.

16   Q.  Where did you take him to?

17   A.  We transported him to the FBI main office off of 290.

18   Q.  How long a drive is this?

19   A.  It's about a 20, 30 minute drive.

12:42   20   Q.  Approximately?

21   A.  Yes, sir.

22   Q.  And did you have a conversation with the defendant while he

23   was in the back of the car?

24   A.  Yes, sir, I did.

12:42   25   Q.  And was this conversation pursuant to protocol in

12:42  1   identifying the defendant?

2   A.  Yes, sir, it was.

3   Q.  Did you ask him any facts about his case?

4   A.  I did not.

12:42  5   Q.  What did you ask him?

6   A.  I asked him for his name, birthday, any identifying numbers

7   that he had, a driver's license or anything else, where he

8   lived, Social Security number, that type of information.

9   Q.  Did he give you the name Paul Mexia again?

12:42  10  A.  Yes, sir, he did.

11  Q.  Did he also give you the birthdate of April 10th?

12  A.  Yes, sir, I believe it was.

13  Q.  All right.  Was he able to give you any other additional

14  information?

12:43  15  A.  I believe he gave us a Social Security number.

16  Q.  And did you ask him any other questions, like where he was

17  from or anything like that?

18  A.  I did ask him where he was from.  He advised that he was

19  from the Dominican Republic.

12:43  20  Q.  All right.  And do you have an opinion, based on your

21  training and experience, why he said he was from the Dominican

22  Republic?

23  A.  To tell us -- or to reflect that he was not from the US.

24  Q.  Does that also match the last name Mexia?

12:43  25  A.  It does.

12:43  1    Q.  What did you do once you found out he was from -- or he
       2    claimed to be from the Dominican Republic?
       3    A.  I asked him several questions in Spanish.
       4    Q.  How did he respond?
12:43  5    A.  He had difficulty in answering those questions.
       6    Q.  What questions did you ask him?
       7    A.  I asked him if -- the town he was born, if he was born --
       8    if he was born in the Dominican.  And alls he could say was
       9    "yes" or "no."  That's all he could -- that's the only words he
12:43  10   seemed to know in Spanish.
       11   Q.  Did he tell you that he was born in the Dominican Republic?
       12   A.  He did.
       13   Q.  Did you ask him what town he was from?
       14   A.  I did.
12:44  15   Q.  Did he -- was he able to give you an answer quickly?
       16   A.  It took him a few seconds.
       17   Q.  What did he come up with?
       18   A.  He came up with Santo Domingo.
       19   Q.  At some point in time did he get booked in at the FBI
12:44  20   station, then?
       21   A.  Yes, sir, he did.
       22   Q.  Can you tell the judge what happened while he was being
       23   booked in?
       24   A.  He was being processed there at the FBI, and he continued
12:44  25   to use the name Paul Mexia.

12:44  1    Q.  And did he have a TWIC card on him?

2    A.  Yes, sir, he did.

3    Q.  And did he at some point in time show you-all the TWIC

4    card?

12:44  5    A.  Yes, sir, he did.

6    Q.  Let me show you what has been previously admitted as

7    Government's Exhibit 325.  Do you recognize that?

8    A.  Yes, sir, I do.

9    Q.  Is this the fake TWIC card that the defendant was

12:44  10   presenting on that evening during booking?

11   A.  Yes, sir, it was.

12           MR. FEAZEL:  Pass the witness.

13           THE DEFENDANT:  No questions.

14           THE COURT:  Thank you, sir.  You may step down.

12:45  15   You're excused.  You're free to leave.

16           Call your next witness.

17           MR. HEENAN:  The United States calls Tom Hathaway.

18           THE COURT:  Raise your right hand and be sworn.

19           You swear that the testimony you're about to give

12:45  20   in the case on trial will be the truth, the whole truth, and

21   nothing but the truth?

22           THE WITNESS:  I do.

23           THE COURT:  Have a seat, please.

24                        - - - - -

25

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

**THOMAS WALTER HATHAWAY, GOVERNMENT'S WITNESS, TESTIFIED:**

**DIRECT EXAMINATION**

BY MR. HEENAN:

Q.  Good afternoon, sir.  Could you please state your name and spell it for the record, please?

A.  My name is Thomas Walter Hathaway, T-H-O-M-A-S; Walter, W-A-L-T-E-R; and Hathaway, H-A-T-H-A-W-A-Y.

Q.  Sir, I would just ask you to speak slowly for the court reporter's sake.

How are you employed, Mr. Hathaway?

A.  I'm employed at the headquarters of the Transportation Security Administration in Arlington, Virginia, as the operations manager of the TWIC program.

Q.  How long have you been employed by the Transportation Security Administration?

A.  Six and a half years.

Q.  And how long have you been employed in the TWIC operations center?

A.  Six and a half years on the TWIC program.

Q.  What are your current job responsibilities?

A.  I oversee the national enrollment services for TWIC and the issuance of cards; I manage cases with security threat assessments and just do general administrative work overseeing the overall operations nationwide.

Q.  And with respect to the TWIC, what does that stand for,

12:47   1    "TWIC"?

2    A.   Transportation Worker Identification Credential.

3    Q.   Now, could you just tell the Court a little bit about the

4    program and why TSA has the TWIC program?

12:47   5    A.   The TWIC program was established around 2002 to meet a

6    mandate of the Maritime Transportation Security Act of 2002.

7    The provision of the Maritime Transportation Security Act that

8    requires TWIC requires the government to conduct a security

9    threat assessment and issue a biometric enabled credential to

12:47   10   anyone who requires secure or requires unescorted access to

11   secure areas of maritime facilities that are regulated by the

12   Coast Guard, as well as vessels.  And also there's a

13   requirement for all licensed merchant mariners to hold a TWIC.

14   Q.   Is the Port of Houston a port that would require workers of

12:48   15   that port to possess and use TWIC cards?

16   A.   Yes.

17   Q.   And is the possession/use of a TWIC card a prerequisite for

18   getting entry to the port for someone traveling there?

19   A.   Yes, in order to have unescorted access.

12:48   20   Q.   I think you indicated, sir, that you are familiar with the

21   enrollment process for how someone could obtain a TWIC card if

22   they wanted to.  Could you please describe for the Court that

23   enrollment process?

24   A.   The enrollment process involves a person physically

12:48   25   appearing at one of 135 enrollment centers that we have around

12:48  1   the country.   The person must provide biographical

2   information -- excuse me.

3   Q.   Is there an enrollment center in the Houston area?

4   A.   Yes, there is.

12:48  5   Q.   Where is that located?

6   A.   Turning Basin.

7             So, the person appears at the enrollment center,

8   provides biographical information.   The person must provide

9   fingerprints that are captured electronically, sit for a

12:48  10  digital photograph.   The person must fill out a disclosure form

11  revealing any prior criminal history or emigration status.

12  Q.   Is there a citizenship requirement for a TWIC card?

13  A.   Yes, there is.   A person, to obtain a TWIC, must be a US

14  citizen or lawful permanent resident.

12:49  15            There are classes of non-immigrate aliens who are

16  allowed to possess a TWIC, depending on their authorization to

17  work in the United States.

18  Q.   Now, with respect to the various items you mentioned that

19  are submitted, you also said, I think, there's a biometric

12:49  20  component to the card.   What is that?

21  A.   The fingerprints are captured in enrollment, and two

22  fingerprints from the 10 that are captured are digitally

23  encoded and loaded onto the chip of the card, the integrated

24  circuit chip of the card.

12:49  25  Q.   So, every TWIC card has an integrated circuit chip on it

12:49    1    that contains that information?

2    A.  Yes.

3    Q.  Is there additional information that's contained on that

4    chip?

12:50    5    A.  Yes, there is.  The name of the individual is contained,

6    but no other personal information, the name and the photograph.

7    Q.  Now, with respect to the information contained on the chip

8    and the card, is there a database that's maintained by the TSA

9    where authorized TWIC user's names and information are

12:50   10    contained?

11    A.  Yes.  We have a central database that contains all of the

12    enrollment records.  We have just over 2 million enrollment

13    records at this time.

14          We also have another database that contains all

12:50   15    the information pertaining to the security threats assessments.

16    Q.  Now, you mentioned at the enrollment center there is a

17    variety of things that are done as an initial matter, including

18    disclosure of criminal history, providing fingerprints.  What

19    happens after that information is collected?  Is a card issued

12:50   20    at that point?

21    A.  No.  The information from the enrollment record is

22    transmitted to the central database.  The information is parsed

23    out to the -- there are four elements of the security threat

24    assessment, and the information is sent out to those sources.

12:51   25          We receive information back, conduct an

assessment of the responses received, and decide whether the

person is eligible to hold a TWIC or not.  After that, once a

person is determined to be eligible, a card order is placed.

The card is produced and shipped back to the enrollment center,

where the person must return to pick it up.

Q.   Now, if a person is determined eligible to obtain a TWIC

card, how much time will typically take place for that

determination to be made?

A.   It depends upon the responses that come back to the

security threat assessment for analysis.  But it -- it can be

as short as four days and as long as a month before we either

approve or send a response to the person, saying they have to

provide us additional information.

Q.   Now, with respect to picking up the card, I think you

mentioned they have to return to the enrollment center to pick

it up?

A.   Yes.  The person must appear at the enrollment center.  One

of the requirements for a chain of trust in the whole system is

that we must be assured that the person that we're issuing the

card to is the person who enrolled.  So, at the enrollment

center, the person matches one of the two fingers that have

been selected to be loaded onto the chip, matches that against

the fingerprint template that's stored on the card.  If there's

a match, then we can go forward.  We're assured that that is

the person.

12:52  1   Q.  So, there's an actual determination that the person picking

2   up the card has the same fingerprint that matches what's

3   encoded on the chip?

4   A.  Correct.  The person also must provide an identity

12:52  5   document, a photo -- a government-issued photo ID before we

6   actually pull the card from the safe.

7   Q.  And is this a process that is in place at all of the

8   enrollment centers that TSA sponsors throughout the country?

9   A.  Yes.

12:53  10  Q.  Must the applicant also select a PIN for the card, a

11  Personal Identification Number?

12  A.  Yes.  At activation, the person selects a six, seven, or

13  eight digit PIN.

14  Q.  When is that selection made?

12:53  15  A.  Before the card is actually activated, before some digital

16  certificates are loaded onto the card.  The person enters it on

17  a keypad, and it gets loaded onto the chip.

18  Q.  And does that activation occur at the enrollment center

19  when the applicant has returned to pick it up?

12:53  20  A.  Yes.

21  Q.  Mr. Hathaway, I would like to show you what has been marked

22  and admitted into evidence as Government's Exhibit 325.

23           Sir, could you look that over and tell me what

24  that is?

12:54  25  A.  It's a fake TWIC card.

12:54   1   Q.  And are there any indicia on there that suggest to you that

2   it is fake?

3   A.  The color is slightly different.  There is no holographic

4   laminate on the front surface of the card.  There's no laminate

12:54   5   on the back of the card, which covers from below the magnetic

6   stripe here down to the bottom of the card.

7              There's a bar code at the top of the card, on the

8   back, on a -- an authentic TWIC.  That bar code is laser etched

9   into the card.  This one here is printed.

12:54  10   Q.  Does it appear to have an actual functioning computer chip

11   on the card?

12   A.  No, there is no chip in the card.

13   Q.  Thank you, sir.

14              Now, also with respect to this item, at a

12:55  15   distance of perhaps 15 feet, might it appear to be a real TWIC

16   card?

17   A.  Yes.

18   Q.  Mr. Hathaway, I just want to direct your attention briefly

19   to the screen, showing you what has been admitted into evidence

12:55  20   as Government's Exhibit 226.  I'll ask you, sir, does this

21   depict an enrollment center for TWIC card purposes?

22   A.  No.

23   Q.  And with respect to the rock that's located in the middle

24   of the picture, the white rock, is that an item which a TWIC

12:55  25   card would typically be contained in when an applicant picks up

12:55    1    the card from an enrollment center?

         2    A.  No.

         3    Q.  Same question with respect to that rock depicted in

         4    Government's Exhibit 227, which is admitted in evidence; is

12:56    5    that something which a TWIC card would be contained in at an

         6    enrollment center?

         7    A.  No.

         8    Q.  Showing you Government's Exhibit 228, admitted in evidence,

         9    same question.  Appears to be the same rock.  Is that an item

12:56   10    that the -- a TWIC card would be contained in at an enrollment

        11    center anywhere in this country?

        12    A.  No.

        13    Q.  And, Mr. Hathaway, you mentioned the databases that contain

        14    the information for all authorized TWIC cardholders.  Have you

12:56   15    conducted an examination of that database and done a query for

        16    whether or not there is a Paul Mexia, M-E-X-I-A, contained in

        17    that database and listed as an authorized TWIC holder?

        18    A.  I have done a search, and there is no Paul Mexia in the

        19    database.

12:57   20    Q.  When did you conduct that search?

        21    A.  I've conducted it a couple of times.  First time

        22    approximately two weeks ago; and the last time, I just did it

        23    this past weekend.

        24    Q.  And I would ask you the same question, sir, with respect to

12:57   25    the name Barry Walter Bujol.  Is there anyone listed in the

12:57  1   TWIC database for TWIC authorized users with the name of Barry

2   Walter Bujol?

3   A.  No.

4   Q.  And, sir, is there anyone who is an authorized TWIC holder

12:57  5   in the United States who would not be listed in that database?

6   A.  No.

7   Q.  Thank you, sir.

8       MR. HEENAN:  No further questions.  Pass the witness,

9   your Honor.

12:58  10      THE COURT:  Questions?

11                          **CROSS-EXAMINATION**

12   BY THE DEFENDANT:

13   Q.  I just want to go back to the fake TWIC.  Would the TSA,

14   who issues the TWIC, ever issue a card like that?

12:58  15   A.  No.

16      THE DEFENDANT:  No further questions.

17      THE COURT:  Anything further from the government?

18      MR. HEENAN:  Nothing further from the government, sir.

19      THE COURT:  Thank you, sir.  You may step down.

12:58  20   You're excused.  You're free to leave.

21          Call your next witness.

22      MR. McINTYRE:  The United States would call Task Force

23   Officer Sean McCarroll.

24      THE COURT:  Raise your right hand, be sworn.

12:58  25          You swear the testimony you're about to give in

12:58   1    the case now on trial will be the truth, the whole truth, and
        2    nothing but the truth?
        3                THE WITNESS:  I do.
        4                THE COURT:  Have a seat, please.
12:58   5                     How long is this witness going to take?
        6                MR. McINTYRE:  I'm thinking probably 30 minutes, your
        7    Honor.  And then we have one other witness that's probably
        8    going to take about an hour.
        9                THE COURT:  Okay.  I'm in no rush.  And -- it's moving
12:58  10    along fine.  It's now right at 1:00 o'clock.  You want to --
       11    why don't we get into it a little bit, and then we'll take our
       12    break to 2:15.  We'll get into it five or ten minutes, and take
       13    a break.  Okay?
       14                MR. McINTYRE:  Yes, your Honor.
12:59  15                THE COURT:  Get as much time as we can.
       16       **SEAN D. McCARROLL, GOVERNMENT'S WITNESS, TESTIFIED:**
       17                          **DIRECT EXAMINATION**
       18    BY MR. McINTYRE:
       19    Q.  Can you state your name for the record, please?
12:59  20    A.  Yes.  Sean D. McCarroll, S-E-A-N, D, M-C-C-A-R-R-O-L-L.
       21    Q.  And, Mr. McCarroll, where are you currently employed?
       22    A.  With the Brazos County Sheriff's Office.
       23    Q.  And what is your job title with the sheriff's office?
       24    A.  I'm an investigator.
12:59  25    Q.  And how long have you been an investigator with the Brazos

12:59  1  County Sheriff's Office?

2  A.  Little over four years.

3       THE COURT:  How long have you been with the Brazos

4  County Sheriff's Department.

12:59  5       THE WITNESS:  Little over 15 years.

6  BY MR. McINTYRE:

7  Q.  And what does an investigator for the Brazos County

8  Sheriff's Office do?

9  A.  Investigate crimes against the State of Texas.

12:59  10       THE COURT:  Pull the mike in a little bit, please.

11            Okay.

12  BY MR. McINTYRE:

13  Q.  And jurisdictionally or geographically, where is Brazos

14  County?

01:00  15  A.  It is -- well, it's where Texas A & M University is.

16  Q.  Okay.  And how long have you been associated with the Joint

17  Terrorism Task Force that operates in Bryan, Texas?

18  A.  Since 2007.

19  Q.  And what is your title with the Joint Terrorism Task Force?

01:00  20  A.  I'm a task force officer.

21  Q.  And what do task force officers with the Joint Terrorism

22  Task Force investigate?

23  A.  Investigate matters of terrorism, counterterrorism.

24  Q.  Now, you said, in addition to being an investigator with

01:00  25  the Brazos County Sheriff's Office, you had 15 other years with

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:00   1   that office.  Is that correct?

2   A.   Yes.  I've had 15 years total with Brazos County Sheriff's

3   Office.

4   Q.   In addition, to being an investigator, what sort of job

01:00   5   titles have you held during that 15-year period?

6   A.   I started off as a jailer, also worked as a patrol deputy,

7   also a narcotics investigator, and then into investigations.

8   Q.   And during that time period, have you had few or many

9   opportunities to investigate criminal offenses?

01:01   10   A.   Many.

11   Q.   Have you attended any college?

12   A.   Yes, I have.

13   Q.   And where did you attend college?

14   A.   Texas A & M University.

01:01   15   Q.   And have you graduated from Texas A & M University?

16   A.   I have.

17   Q.   What year did you graduate, and what was the -- what was

18   your degree in?

19   A.   I graduated 2001 with a political science degree.

01:01   20   Q.   When and how did you become involved in the case that's

21   before the Court today?

22   A.   I believe it was probably late July 2008, maybe into

23   August; and I was assigned as a co-case agent with Special

24   Agent Bryan Cannon.

01:02   25   Q.   And since that time period, have you expended a lot of time

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:02  1    and resources along with the co-case agent, Bryan Cannon, in

2    investigating this case?

3    A.   Yes.

4    Q.   And Mr. Cannon has previously testified in this case.   And

01:02  5    a lot of the testimony that he referenced, is it fair to say

6    that you also participated in those activities, along with

7    Mr. Cannon?

8    A.   Yes.

9    Q.   Now, I'm not going to ask you about all the things that

01:02  10   Agent Cannon testified to previously; but I am going to ask you

11   about May 30th of 2010, when Mr. Bujol was arrested out at the

12   port.   Okay?

13   A.   Yes.

14   Q.   Now, at the time that Mr. Bujol was arrested, where were

01:02  15   you located physically within the port?

16   A.   I was at the command post, which was -- as you enter the

17   gate, it would be behind some buildings within port.

18   Q.   And were you able to observe things via video cameras or

19   other electronic means during the time period that the activity

01:03  20   was occurring in the port, regarding Mr. Bujol?

21   A.   Yes, I was.

22   Q.   And who was with you in the command center at the time that

23   Mr. Bujol was arrested?

24   A.   Special Agent Bryan Cannon, among others.

01:03  25   Q.   And after Mr. Bujol was arrested, do you know what happened

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:03  1    to Mr. Bujol?

2    A.  He was transported to the FBI headquarters in Houston.

3    Q.  And at some point did you and Co-case Agent Cannon approach

4    Mr. Bujol about interviewing him?

01:03  5    A.  Yes.

6    Q.  And do you recall approximately what time that would have

7    been?

8    A.  It was probably around 5:30 a.m.

9    Q.  Now, before you begin the substantive interview, did you

01:04  10   ask him -- did you inform him of his rights and ask him if he

11   wished to waive those rights?

12   A.  Yes.

13   Q.  Let me show you what is marked as Government's Exhibit 309

14   and ask you if you recognize that.  And this has been

01:04  15   previously admitted.

16   A.  Yes, I do recognize it.

17   Q.  And in the upper right-hand corner, there's a title

18   regarding "Place."  And what does it say the place is?

19   A.  Houston, Texas.

01:04  20   Q.  And what is the date?

21   A.  May 30, 2010.

22   Q.  And what is the time?

23   A.  0541, which is 5:41 a.m.

24   Q.  And, then, below that, as we scroll down, it lists the

01:04  25   rights.  Did you and/or Agent Cannon inform Mr. Bujol of his

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:04  1    rights, in writing and also verbally?

2    A.  Yes.

3    Q.  And did he indicate that he wished to waive those rights?

4    A.  Yes, he did.

01:04  5    Q.  And did you ask him for a signature to acknowledge that he

6    was waiving those rights?

7    A.  Yes.

8    Q.  And can you tell the Court where Mr. Bujol signed this

9    document, waiving those rights?

01:05  10   A.  Underneath the "I have read this statement of my rights,"

11   there's a place that said "Signed" and an "X"; and that's

12   Mr. Bujol's signature.

13   Q.  And, then, to the left, there's a couple of spaces for

14   witnesses and then also another place for a time to be written

01:05  15   in.  Is that correct?

16   A.  That's correct.

17   Q.  And in the first witness signature blank, who signed as a

18   witness?

19   A.  I did.

01:05  20   Q.  And in the witness signature blank just below that, who

21   signed in that particular place?

22   A.  Agent Cannon.

23   Q.  And then, again, the time is 5:41.  Is that correct?

24   A.  That's correct.

01:05  25   Q.  Now, after Mr. Bujol waived his rights -- or actually maybe

01:05   1   even before that, did he make an acknowledgment when he saw you

2   and Agent Cannon walk into the room?

3   A.  Yes, he did.

4   Q.  What did Mr. Bujol tell you and Agent Cannon as you walked

01:06   5   into the room?

6   A.  He said, "Good job" and "Long time no see."

7   Q.  And based on your understanding of the case, what do you

8   think Mr. Bujol's reference was to "long time no see"?

9   A.  I believe that was in reference to the first interview we

01:06   10   had with him in New Jersey in 2009.  I'm sorry.  2010.

11                   No.  It was 2009.  I'm sorry.

12   Q.  In 2010.  Is that correct?

13   A.  Two -- yes.  I'm sorry, March 2010.  I'm -- no.  No, no,

14   no.  Let me correct.  March 2009, yes.

01:06   15                   THE COURT:  So, it's 2009?

16                   THE WITNESS:  Yes, sir.

17                   THE COURT:  That's the year?

18                   THE WITNESS:  Yes, sir, 2009.

19                   THE COURT:  All right.

01:06   20   BY MR. McINTYRE:

21   Q.  So it had been over a year since he had seen you.  Is that

22   correct?

23   A.  Yes, it is.

24   Q.  But based on your perception of how he reacted and what he

01:06   25   said, you understood him to acknowledge that he recognized you

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

01:06    1    and Agent Cannon.  Is that right?

         2    A.  Yes.

         3    Q.  Now, I'm just going to ask you about portions of the

         4    interview, because it was a lengthy interview.  Is that

01:07    5    correct?

         6    A.  That's correct.

         7    Q.  And approximately how long was the interview?

         8    A.  It was approximately four hours.

         9    Q.  And was the defendant allowed to take prayer and/or

01:07   10    restroom breaks during that time period?

        11    A.  Yes, he was allowed to take both.

        12    Q.  And was he offered any sort of food or drink?

        13    A.  Yes, he was.  He was given a water.

        14    Q.  Now, after this acknowledgment when you walked into the

01:07   15    room with Agent Cannon, was the defendant confronted with some

        16    information or evidence regarding an Awlaki CD?

        17    A.  Yes.  Agent Cannon asked him -- or brought up the previous

        18    interview we had with him in New Jersey and brought up the fact

        19    about the "Hereafter" CD by Anwar Awlaki.

01:07   20    Q.  And what was that particularly subtitled "After the

        21    Hereafter," the Awlaki CD you're referencing, that came up in

        22    the previous interview?

        23    A.  Yes.  It was "The Importance of Death" or "The Importance

        24    of Akhirah - Death."

01:08   25    Q.  And when Agent Cannon questioned him about that, what was

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:08   1   Mr. Bujol's response to Agent Cannon?

2   A.  Well, he said, "Listening to it would open your eyes."

3   Q.  And when the defendant said "it would open your eyes,"

4   whose eyes was he referring to?

01:08   5   A.  I believe he meant the interviewing agents and the world,

6   if anybody listened to it.

7   Q.  Now, also a little bit later in the interview, was

8   Mr. Bujol questioned about how he got out to the port --

9   A.  Yes.

01:08   10   Q.  -- and how he got onto the boat?

11   A.  Yes, he was.

12   Q.  And what did Mr. Bujol tell you regarding how he got out to

13   the boat and out to the port?

14   A.  He maintained that he did not know.  He said he got a ride

01:08   15   from someone, but he would not identify who that person was.

16   Q.  And did you or Agent Cannon also ask him how he even knew

17   that the boat or ship that he ultimately got on was going to be

18   there?

19   A.  He -- again, he said he didn't know.  He just got a ride

01:09   20   from someone.

21   Q.  At some point did he make a reference to the fact it was

22   better that he not know how he got out there or how he knew the

23   ship was there?

24   A.  Yes.  He actually said it was best -- or it was better that

01:09   25   he did not know, but he never elaborated on what that was.

01:09   1   Q.  Now, was he also asked about the fake --

2                THE COURT:  Why don't we adjourn?  We'll just keep

3       going.  We need to take a break.

4                MR. McINTYRE:  Okay.

01:09   5                THE COURT:  It's now 1:10.  We'll be back, ready to

6       resume, at 2:15.  We'll see you at that time.

7            (Recess was taken)

8                THE COURT:  Thank you.  Be seated.  Have a seat.

9                Let me ask the government.  We're in no rush.

02:22  10       We're going through what?  To get a second view of what

11      happened that night?  Is that correct?

12               MR. McINTYRE:  No, your Honor.  This is the testimony

13      about the statement the defendant made after he was arrested on

14      May 30th, and that's all I'm covering.  I'm not covering the

02:23  15      other stuff.

16               THE COURT:  By the way, is it cool in here?  Everybody

17      relatively comfortable?

18               Okay.  Just this outfit I wear.  I don't have a

19      feel of what it's really like to be working out there.  Okay.

02:23  20      But usually if there's a jury I ask the jury, because they

21      control.

22               All right.  Go right ahead, please.

23      BY MR. McINTYRE:

24      Q.  Officer McCarroll, we were talking about you had asked the

02:23  25      defendant how he had arrived at the boat, how he knew about the

02:23  1    ship being in the port and those types of questions.  And what

2    were his responses to those types of questions?

3    A.  That he didn't know about the boat or how -- anything about

4    that or the person who gave him a ride there.

02:23  5    Q.  Okay.  And based on your understanding of the case, did you

6    believe that he was still trying to protect the confidential

7    source, who he believed to be an al-Qaeda operative?

8    A.  Yes, I did.

9    Q.  Because based on your knowledge of the case at the time,

02:24  10   you knew that the defendant knew exactly who had taken him to

11   the ship and driven him through the port entrance, he knew

12   exactly the identity of that person.  Is that right?

13   A.  That's correct.

14   Q.  But, yet, when you asked him about it, he told you

02:24  15   something that was not truthful, which was he did not know.  Is

16   that correct?

17   A.  That's correct.

18   Q.  And at some point did he make a statement that it was

19   better for him not to know?

02:24  20   A.  Yes, he did.

21   Q.  And what was your understanding of what he meant when he

22   said it's better not to know?

23   A.  To me, it sounded like he was trying to protect the source

24   by saying --

02:24  25          THE COURT:  Pull that in little bit.

02:24  1          THE WITNESS:  He was trying to protector the source by

2    saying he didn't know anything about him and it was better for

3    him not to know because it would keep everything out of

4    suspicion.

02:24  5    BY MR. McINTYRE:

6    Q.  Now, at some point during the interview -- strike that

7    question.

8              Now, as part of this operation, when the

9    defendant was arrested and taken out of the cabin in the ship,

02:25 10   the confidential source was also purported to be being

11   arrested.  Is that correct?

12   A.  That is correct.

13   Q.  So, at the time you interviewed the defendant and he

14   claimed he didn't know who drove him to the port, he was under

02:25 15   the impression that the confidential source had also been

16   arrested.  Is that right?

17   A.  That is correct.

18   Q.  Now, at some point during the interview, did you show the

19   defendant a couple of documents which brought about a sea

02:25 20   change in attitude regarding his view of the source and

21   protecting the confidential source?

22   A.  Yes.

23   Q.  What did you show the defendant during the interview?

24   A.  He was shown the US Army Field manuals, and he was also

02:25 25   read some of the e-mail exchanges between the source and the

02:25    1    defendant.

2    Q.   And at this point in time did the defendant's attitude

3    toward protecting the source change?

4    A.   Yes.  He actually said that he had made some mistakes and

02:26    5    trusted the wrong people.

6    Q.   And did he also compare the source to a couple of animals?

7    A.   Yes, he did.  He referred to the source as a "ferret" and

8    also a "golden retriever."

9    Q.   Did you also ask the defendant, when he entered the port,

02:26   10    if he had been asked regarding whether he had any

11    identification or that he had to show identification to the

12    guard at the port entry?

13    A.   Yes.  He was asked if he showed identification at the port,

14    and he said "no."

02:26   15    Q.   Did you ask him who Paul Mexia was?

16    A.   Yes, we did.

17    Q.   And what did the defendant say about Paul Mexia?

18    A.   He said it was a fake and a made-up name.  He said he

19    actually went to the TWIC website and viewed the application

02:26   20    and, after viewing the application, it said that anyone with a

21    prior conviction or arrest could not get the TWIC card.

22    Q.   And in the course of talking about Paul Mexia and his

23    Internet visit to the TWIC website, did he also make some

24    comment regarding getting or applying for a job at the port?

02:27   25    A.   Yes.  He actually told us that he was -- his intention was

02:27  1   to work at the port.

2   Q.  Like, work in what capacity at the port?

3   A.  To work on the docks.  Possibly sweeping.

4   Q.  Also during this interview, did the defendant make

02:27  5   reference to Donald Trump's book "The Art of the Deal"?

6   A.  Yes, he did.

7   Q.  And did he make a comparison between a sort of a decision

8   tree that Donald Trump described in "The Art of the Deal" and a

9   decision tree that he used about whether to engage in the

02:27  10  illegal operation that he was caught engaging in?

11  A.  Yes.  He -- he spoke of Donald Trump and "The Art of the

12  Deal" and stated that whenever Mr. Trump goes into a deal he

13  factors in the ultimate worst consequence that could occur if

14  he -- if he were to take the deal.  He said if Mr. Trump were

02:28  15  to think that the ultimate worst consequence was okay to deal

16  with it then he would follow through with the deal.

17  Q.  Okay.  So, if, when you are looking at a deal or something

18  you were going to do, you determine what the worst consequence

19  is and if you can live with that, you go forward with the deal;

02:28  20  and, if you can't, you don't.  Is that correct?

21  A.  That is correct.

22  Q.  And did you ask him if he applied that lesson from "The Art

23  of the Deal" to his decision to make hijrah and go overseas?

24  A.  Yes.  He said he factored in the consequence also in his

02:28  25  attempt to make hijrah, and he said that the ultimate worst

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:28   1    thing that could happen to him was death and that the second

2    worst thing was prison time.  He was then asked was it worth

3    it, and he said "yes."

4    Q.  So, he gave his opinion that the worst consequences were

02:29   5    death and prison time and that, even now, sitting here, he felt

6    like it was worth it to make the attempt?

7    A.  Yes.

8    Q.  Also during the statement that you took from the defendant,

9    did he start talking about hijrah and other convicted

02:29  10    terrorists and how much prison time that they had received for

11    their crimes?

12    A.  Yes.  He spoke of John Walker Lindh; and also he referenced

13    a guy from Illinois, which I believe he was referring to

14    Michael Curtis Finton.

02:29  15    Q.  And let me stop you right there.  Was one of the complaints

16    that he e-mailed the source, was that the Finton complaint?

17    A.  Yes, it was.

18    Q.  Who were John Walker Lindh and Mr. Finton?

19    A.  John Walker Lindh, he's also known as the American Taliban.

02:29  20    He was captured overseas, in Afghanistan.

21    Q.  And what sort of discussion did you have with him regarding

22    the prison time that they had received and how it applied to

23    him?

24    A.  He contemplated the time that they received in prison and

02:30  25    what he might get, as well.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:30   1   Q.   And did he make a statement regarding his guilt?

2   A.   Yes, he did.

3   Q.   What --

4   A.   He said --

02:30   5   Q.   I'm sorry.  What did he say?

6   A.   Yes.  When he was making a reference to that, he said that

7   he was obviously guilty of what we alleged.

8   Q.   Now, also during the course of this statement, did the

9   defendant make a statement that I guess was also made famous by

02:30  10   Charlie Sheen, which is, "I'm still winning"?

11   A.   Yes.

12   Q.   And what did the defendant mean when he said, "I'm still

13   winning," while he was in custody for these crimes?

14   A.   Well, he had said that he was not sad about the decisions

02:31  15   that he made and that he was still winning and that -- I'm

16   sorry -- that he was still winning and that we -- or us, as in

17   the interviewing agents and our constituents, our underlings,

18   John Q. Citizen and Sally Q. Soccer Mom, would be supporting

19   him while he was in jail.

02:31  20   Q.   And did he make a statement that he would be allowed to

21   worship free, eat free?

22   A.   He made the comment that he would be living free, that he

23   would be reading and worshiping for free.

24   Q.   And that essentially he was winning because he was going to

02:31  25   cost --

02:31   1   A.   The taxpayers, yes, he was going to cost the taxpayers

        2   money.

        3   Q.   Do you see the individual that you interviewed on the night

        4   of May 30th, 2010?

02:31   5   A.   Yes, I do.

        6   Q.   And did you see him many times during the course of your

        7   investigation?

        8   A.   Yes, I did.

        9   Q.   And is that the same person that's charged in the

02:32  10   indictment before the Court?

       11   A.   Yes, it is.

       12   Q.   And can you point to that person you're describing?

       13   A.   Yes.  He's over there, in the green shirt.

       14        MR. McINTYRE:  May the record reflect the witness

02:32  15   identified the defendant?

       16        THE COURT:  The record will so reflect.

       17        MR. McINTYRE:  Pass the witness, your Honor.

       18        THE COURT:  Go right ahead, sir.

       19        THE DEFENDANT:  Your Honor, at this time what I have

02:32  20   is a transcript from this meeting to which has been referred;

       21   and I would like to admit it as Exhibit 2.

       22        MR. McINTYRE:  Objection, hearsay, your Honor.

       23        THE COURT:  Sustained.  The transcripts don't come in.

       24   You can use them, and you can talk about them but -- excuse me.

02:32  25   Those kind of transcripts don't come in.  But you can talk

02:32   1    about, ask him about it, show it to him, and that sort of
        2    thing.
        3                THE DEFENDANT:  Well, I have the audio which
        4    corresponds to this transcript; and I would like to admit that
02:32   5    into evidence as Exhibit 2.
        6                MR. McINTYRE:  Same objection, your Honor.
        7                THE COURT:  Why?
        8                MR. McINTYRE:  It's the defendant's statement.
        9                THE COURT:  The defendant's own statement?
02:32   10               MR. McINTYRE:  It's not admissible.  It's admissible
        11   on our side because it's an admission of party opponent.  But
        12   it's hearsay as to him.
        13               THE COURT:  Well, let me ask you this.  Who was
        14   present at that meeting, that get-together?
02:33   15               THE DEFENDANT:  Myself, Agent McCarroll, and Agent
        16   Cannon.
        17               THE COURT:  Now, aside from that -- and I don't -- oh,
        18   wait a second.  Hold it.  Hold it.  I see your point.  That
        19   this is -- the government's case is still ongoing, correct?
02:33   20               MR. McINTYRE:  Yes, your Honor.
        21               THE COURT:  Okay.  The government's case -- I may
        22   consider it later if he elects to testify.  Is that your
        23   position?
        24               MR. McINTYRE:  My position is even if he testified it
02:33   25   wouldn't be admissible.  He can testify to what he said at the

02:33  1    time.  But he's also free to cross-examine with it, but it's

    2    just not admissible because --

    3         THE COURT:  All right.  What I am going to rule is

    4    this, that at this time I'm going to sustain the objection to

02:33  5    it coming into evidence itself based upon that.  Now, if you

    6    elect to testify yourself, then you can testify as to what's on

    7    there.  I may or I may not then let it in, or I might keep it

    8    out.

    9              But right at this moment, I'm not permitting it

02:34 10    in because this is still their case, Mr. Bujol.  Okay?  It's

   11    still their case.  But you may cross-examine the gentleman.  Go

   12    on.

   13         THE DEFENDANT:  No questions.

   14         THE COURT:  All right.  All right.  Step down.  You're

02:34 15    excused.  You're free to leave.

   16              Call your next witness.

   17         MR. HEENAN:  Your Honor, the United States calls Evan

   18    Kohlmann.

   19         THE COURT:  Mr. Kohlmann, please.

02:34 20              Raise your right hand and be sworn.

   21         THE CASE MANAGER:  Do you solemnly swear that the

   22    testimony you're about to give in the case before the Court

   23    will be the truth, the whole truth, and nothing but the truth?

   24         THE WITNESS:  I do.

02:34 25         THE COURT:  Hang on one second.  Go back and have a

02:34    1    seat.

         2              THE WITNESS:  Of course, your Honor.

         3              THE COURT:  Now, Mr. Bujol, is it your position that

         4    you want to play it or you just want to get it into evidence?

02:34    5              THE DEFENDANT:  I just want to get it into evidence.

         6              THE COURT:  All right.  What I am going to do, then,

         7    I'm going to mark it for identification purposes only.  Okay?

         8    I'm going to mark it.  I'll allow it -- where is the disk

         9    itself?  You got it there?  Where is it, please?  You need to

02:35   10    get the disk.  I'm going to allow it to be marked.  This is --

        11              By the way, after we --

        12              Did you find it?  You don't have to take it out,

        13    put it on.

        14              THE DEFENDANT:  No.

02:36   15              THE COURT:  You just want to double-check?

        16              THE DEFENDANT:  Yes.

        17              THE COURT:  Okay.  I'm going to -- I'll tell you,

        18    while he's doing that, he's checking it -- you can listen to

        19    what I am saying, Mr. Bujol.

02:36   20              I'm going to have it marked -- both items marked

        21    and filed with the Court at this time.  I'm not admitting it

        22    into evidence.  But that may change his mind about having some

        23    questions for the witness, in which case, I'm going to have an

        24    opportunity for your witness -- what is it -- Deputy McCarroll

02:36   25    to retake the stand if now he has any questions for him.

                    *Cheryll K. Barron, CSR, CM, FCRR*              *713.250.5585*

02:36   1              MR. McINTYRE:  Okay.

        2              THE COURT:  Okay?

        3              MR. McINTYRE:  Yes, your Honor.

        4              THE COURT:  So, we'll give him -- let's do it that way
02:37   5      for right now.

        6                   By the way, Mr. Bujol, you have time.  We're in

        7      no rush.  Go through the stack and get me the disk.  Because

        8      you're going to have to do that anyhow, whether you use it or

        9      not or get it into evidence or not.  We got plenty of time.

02:38   10                  Come up here for a second.  While we're doing

        11     this, I'm going to look at something else.

        12         *(Court confers with court staff)*

        13             THE COURT:  Is that it?

        14             THE DEFENDANT:  Yeah.

02:39   15             THE COURT:  Okay.  If you would -- all right.  I'm

        16     going to ask now that the -- and we will, we'll do it for

        17     you -- that the disk itself be marked Defendant's Exhibit 2,

        18     the transcript be marked as Defendant's Exhibit 3.  They're

        19     marked for identification.

02:39   20                  They'll be kept in the file with the

        21     understanding, Mr. Bujol, if there are other grounds later

        22     on -- and keep in mind you're not required to put any evidence

        23     on yourself.  Okay?  But if you elect to do so and it becomes

        24     relevant, I would be glad to reconsider it going into evidence.

02:39   25     Okay?

02:39  1                    THE DEFENDANT:  Okay.

2                    THE COURT:  All right.  So, do you have them

3       segregated?

4                        Now, do you want the witness back on the stand

02:39  5       now, now that we have that marked?

6                    THE DEFENDANT:  Yeah.

7                    THE COURT:  Yes, sir.

8                    THE DEFENDANT:  Yes, please, your Honor.

9                    THE COURT:  Yes, sir.

02:40  10                       Why don't you retake the stand?

11                       So, this is Deputy Sean McCarroll retaking the

12      stand.

13                       Go right ahead, then.

14                          **CROSS-EXAMINATION**

02:40  15      BY THE DEFENDANT:

16      Q.  During the course of this interview, do you recall the

17      topic of the Jihad Fields posts being discussed?

18      A.  I can remember some of that, yes.

19                    THE COURT:  Mic, please.  You're not carrying now.

02:40  20      Pull it in.

21                    THE WITNESS:  I'm sorry.

22                    THE COURT:  That's all right.

23      BY THE DEFENDANT:

24      Q.  Do you remember anything with respect to the defendant's

02:40  25      comments on those postings or what did he have to say about

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:40   1   them?

2   A.  (No response).

3   Q.  If you don't recall, that's fine.

4   A.  Let's see.  I do remember that you were asked about a

02:41   5   specific question.  I believe it was Posting Number 5 on Jihad

6   Fields.  And it was read to you as, "What can English-speaking

7   Muslims do to support jihad or to help?"  And then I think

8   another one was referenced to -- that you didn't get the reply

9   that you wanted, and then you said that -- that it was -- that

02:41   10   people have a right to know things and it's un-American to tell

11   people what they can't read or write.

12   Q.  On what charges was the defendant arrested on the night of

13   May 30th?

14   A.  Let's see.  Misuse of Social Security number, false

02:41   15   statements, conspiracy to use the identifying information of

16   another person.

17   Q.  And prior to the start of this interview, was he informed

18   of these charges?

19   A.  Yes, he was.

02:42   20   Q.  Was he informed of any other charges?

21   A.  No, he wasn't.

22   Q.  Did he ever explain what he was doing at the port?

23   A.  Well, again, you said you didn't -- you got a ride to the

24   port, that you didn't know who took you, and that you were

02:42   25   going to get possibly a job at the port.

02:43   1   Q.  So, if I understand you correctly, you interpreted my

2   statements to mean that I wanted a job that night or I told you

3   I wanted a job that night at the port?

4   A.  I don't know if it was that night or what.

02:43   5   Q.  But I said -- you're saying that I said I wanted a job at

6   the Port of Houston?

7   A.  You said something about a job at the port and working the

8   docks.

9   Q.  Was the defendant ever asked to explain prior attempts to

02:43   10  travel, throughout the course of this interview, to explain the

11  circumstances surrounding his current attempts to travel?

12  A.  I don't remember if you were asked to explain the prior

13  trips, no.

14  Q.  Do you remember them ever being explained?

02:44   15  A.  No.

16  Q.  Did the defendant tell you that he didn't know who it was

17  that brought him to the port?  That's correct?

18  A.  That is correct.

19  Q.  Over the course of this investigation, did the defendant,

02:45   20  to the best of your recollection, ever refer to the CHS by his

21  name?

22  A.  Through the course of the investigation?

23  Q.  Yes.  Through the course of conversation between the CHS

24  and the defendant, did the defendant every reference the CHS by

02:45   25  his name?

02:45  1    A.  Not to my knowledge, no.

2    Q.  Further, when they communicated via e-mail, would the CHS

3    always use the same name and the same e-mail account?

4    A.  The same name in the e-mail account?

02:46  5    Q.  The same name and --

6    A.  "And."

7    Q.  -- the same e-mail account?

8    A.  I think there may have been two e-mail accounts that the

9    CHS used.

02:46  10   Q.  And were they the same names?

11   A.  No.  They're -- I don't know what you mean by "names."

12   Q.  Well, typically when a person has an e-mail account, there

13   has to be a name associated with that account.

14   A.  Okay.  That, I don't know.

02:46  15   Q.  And the address is -- the address is different, but the

16   name on the account is -- what is that name that's being used?

17   A.  That, I don't know.

18   Q.  Do you remember Agent Cannon, in the course of this

19   meeting, mentioning, describing, and defining the term "jihad"?

02:47  20   A.  In the course of the interview?

21   Q.  This interview.

22   A.  Okay.  Could you repeat that one more time?

23   Q.  Do you recollect Agent Cannon mentioning, describing, and

24   defining the term "jihad"?

02:47  25   A.  I believe what he said is jihad had multiple meanings and

02:47   1    that he believed your definition of jihad was to travel

2    overseas and fight.

3    Q.  Does the definition of "jihad" involve traveling?

4    A.  Well, my definition of "jihad" means it's just a struggle.

02:48   5    Q.  So, that could be any kind of struggle?

6    A.  It could.

7    Q.  Did you recall Agent Cannon discussing how he had made

8    mistakes with respect to some of his assumptions about the

9    defendant?

02:48   10   A.  Yes, I remember him stating that.

11   Q.  And in what respect?

12   A.  I have no idea.

13   Q.  What --

14   A.  I cannot speak for Agent Cannon.  I have no idea.

02:48   15   Q.  When he stated that he had made mistakes in some of his

16   assumptions, to what was he referring?

17   A.  I do not know.  You would have to ask Agent Cannon.  I

18   cannot speak for him.

19   Q.  Are you familiar with a document "42 Ways of Supporting

02:49   20   Jihad"?

21   A.  Yes, I am familiar with it.

22   Q.  Do you recall where the agent mentioned this document in

23   regards to a person needing a cover story?

24   A.  Yes, it seems familiar.

02:49   25   Q.  The document is purported to state that a cover story is

02:49   1    needed.

2    A.   That, I don't recall.

3    Q.   Okay.   When you talked about the defendant's comments with

4    respect to "The Art of the Deal" and this factoring into

02:50   5    decisions, did he elaborate on what exactly it was, the

6    decision, that he was talking about?

7    A.   Well, the context of the interview was about making hijrah;

8    and that's what we were referring to in "The Art of the Deal."

9    Q.   And did he also elaborate on how he could make -- meet

02:50  10    death in the course of hijrah?

11    A.   Yes, he did.

12    Q.   And what did he say?

13    A.   The defendant said that he was willing to accept death --

14    Q.   No.

02:50  15    A.   -- in the course of hijrah.

16    Q.   I asked did he elaborate on how he could possibly meet

17    death.

18    A.   I believe the defendant said that he could be killed in an

19    engine room, for example.

02:51  20    Q.   Did he say "killed in an engine room"?

21    A.   I don't know.   I don't know for sure.

22    Q.   How could someone -- in your understanding, how could

23    someone be killed in an engine room?

24    A.   They were your words.

02:51  25    Q.   Do you recall also discussing when you said at which point

02:51   1    the defendant became aware that there was a CHS in the

2    investigation you said you showed some e-mails.  Was one of

3    those e-mails an e-mail of al-Jisr, or the e-mail about

4    elephants?

02:51   5    A.   Yes.

6    Q.   Okay.  And do you remember the agent stating that a word

7    was underlined in that e-mail?

8    A.   I don't recall that, no.

9    Q.   Was the defendant ever asked to define "hijrah"?

02:52   10   A.   Yes, I believe so.

11   Q.   And did he give a response?

12   A.   The only response I can remember is that you defined it as

13   a freedom.

14   Q.   Was the defendant ever asked to define "jihad"?

02:52   15   A.   Yes.

16   Q.   And did the defendant, in this interview, define the term

17   "jihad"?

18   A.   I don't remember that.

19   Q.   Do you recall the defendant making statements like

02:53   20   "congratulations," "good job," "job well done," things like

21   that?

22   A.   Yes.

23   Q.   And you asked him to explain what he meant, correct?

24   A.   I believe so.

02:53   25   Q.   Did he mention something about you put in a lot of

02:53   1   effort -- something along the lines of you put in a lot of
        2   effort for one unimportant person?
        3   A.   Maybe so, yes.
        4   Q.   So, it was more of a -- would you say, with that taken into
02:54   5   consideration, a remark of sarcasm on the part of the
        6   defendant?
        7            MR. McINTYRE:   Objection, calls for speculation.
        8            THE COURT:   Sustained, sustained as to the form of the
        9   question.
02:54  10   BY THE DEFENDANT:
       11   Q.   Did the agent also talk with the defendant about his
       12   research into prior sting operations -- about the defendant's
       13   research into prior sting operations and it's subsequent effect
       14   on this investigation?
02:55  15   A.   In the interview, you mean?
       16   Q.   Yes, sir.
       17   A.   I do not remember that, no.
       18   Q.   You don't remember or it wasn't discussed?
       19   A.   I don't remember if it was discussed.
02:55  20   Q.   But you said the defendant referred to Michael Curtis
       21   Finton in the interview.   Is that correct?
       22   A.   That is correct.   And it was in reference to the
       23   contemplation of the amount of time they received in jail, not
       24   the actual stings that were used or not used against them.
02:56  25   Q.   The agent also mentioned the video entitled --

02:56   1          THE COURT:  By "the agent," which agent?

        2          THE DEFENDANT:  I'm referring to Agent Cannon.

        3          THE COURT:  Okay.

        4   BY THE DEFENDANT:

02:56   5   Q.  With regards to the video entitled "For My Wife," there

        6   were pictures and the words "hijrah" superimposed over those

        7   pictures.  Do you recall something like that?

        8   A.  Actually, I don't -- I don't remember the "hijrah" part,

        9   no.  The only thing I remember, that Agent Cannon mentioned,

02:56   10   was that there was a picture of the mujahideen holding weapons.

        11   Q.  Okay.  So, when the defendant said the statement he was

        12   guilty to -- he would be guilty to what was being alleged, what

        13   was being alleged at that point in time?

        14   A.  In the interview at that time we had discussed jail time,

02:57   15   hijrah, I believe the -- the Finton and John Walker Lindh; and

        16   then you discussed your hijrah and that you were obviously

        17   guilty of the crimes we alleged.

        18   Q.  The defendant -- what charges or allegations were brought

        19   the night of this interview?

02:58   20          MR. McINTYRE:  Objection, it's already been answered,

        21   your Honor.

        22          THE COURT:  That's sustained.

        23          THE DEFENDANT:  No further questions.

        24          THE COURT:  Thank you.  Anything further from the

02:58   25   government?

02:58  1          MR. McINTYRE:  No, your Honor.

2          THE COURT:  Thank you.  Now you may step down.

3          THE WITNESS:  Thank you.

4          THE COURT:  I noted that Mr. Bujol was using the

02:58  5     document that's marked, I think, Exhibit 3 as a part-time

6     reference for that cross-examination.  So, I'm glad you were

7     able to use it for that purpose.

8               Call your next witness.

9               I'm sorry.  We've already sworn the witness.

02:58  10    What's his name?

11         MR. HEENAN:  Yes, your Honor, Evan Kohlmann.

12         THE COURT:  Mr. Kohlmann, please.

13              You've already been sworn.  Have a seat.

14         THE WITNESS:  Thank you, your Honor.

02:59  15        THE COURT:  By the way, Mr. Bujol, make sure you keep

16    those -- the disk and that transcript segregated somewhere,

17    because eventually we got to get it in the record.  Okay?

18              All right.  Go right ahead.

19         **EVAN F. KOHLMANN, GOVERNMENT'S WITNESS, TESTIFIED:**

20                        **DIRECT EXAMINATION**

21    BY MR. HEENAN:

22    Q.  Good afternoon, sir.  Could you please state your name and

23    spell it for the record?

24    A.  Of course, my name is Evan F. Kohlmann, E-V-A-N, F,

02:59  25    K-O-H-L-M-A-N-N.

02:59  1    Q.  What do you do for a living?

2              THE COURT:  Again, how do you spell your last name?

3              THE WITNESS:  Excuse me, your Honor.  It's

4    K-O-H-L-M-A-N-N.

02:59  5    BY MR. HEENAN:

6    Q.  Mr. Kohlmann, what do you do for a living?

7    A.  I work as an international terrorism consultant.

8    Q.  And how long have you worked as an international terrorism

9    consultant?

02:59  10   A.  Approximately the last nine years.

11   Q.  Do you have a college degree?

12   A.  Yes, I do.  I have a Bachelor in the science of foreign

13   service from the Edmond A. Walsh School of Foreign Service at

14   Georgetown University in Washington, DC.

03:00  15   Q.  And what was the degree you obtained at that school?

16   A.  I have a degree in international politics with a focus in

17   international security studies.  I also have a second degree

18   from Georgetown, from The Center for Muslim-Christian

19   Understanding, in Islam and Muslim Christian Understanding.

03:00  20             THE COURT:  Is that a second Bachelor's or a

21   certificate or --

22             THE WITNESS:  It is a certificate, your Honor.

23             THE COURT:  A certificate of specialty?

24             THE WITNESS:  That's correct, your Honor.  The Center

03:00  25   for Muslim-Christian Understanding is one of four programs

03:00  1    within the -- in Georgetown University that offers that.

2                    THE COURT:  When did you get that last degree?

3                    THE WITNESS:  Both degrees were earned in 2001, your

4      Honor.

03:00  5                    THE COURT:  Thank you.

6      BY MR. HEENAN:

7      Q.  And, Mr. Kohlmann, did you complete a thesis prior to

8      graduating in 2001?

9      A.  I did.

03:00  10   Q.  And what was that thesis on?

11   A.  It was an honors thesis for honors in international

12   politics.  And the title of the thesis was "The Legacy of the

13   Arab Afghans, a Case Study."

14   Q.  Mr. Kohlmann, you have a graduate degree?

03:00  15   A.  I do.

16   Q.  What is your graduate degree?

17   A.  I have a Juris Doctor, or a graduate law degree, from the

18   University of Pennsylvania Law School in Philadelphia,

19   Pennsylvania.

03:01  20   Q.  And did you continue your studies of international

21   terrorism during the time that you obtained that law degree?

22   A.  I did.  While in law school, in addition to taking classes

23   in the law school on subjects such as cybercrime and terrorism

24   in democracy, I also took classes outside in the graduate

03:01  25   School of Arts and Sciences --

03:01  1              THE COURT:  Slow down a little bit.

2              THE WITNESS:  Sorry, your Honor.

3      A.  -- in subjects such as Afghanistan and Islamism.

4      BY MR. HEENAN:

03:01  5      Q.  Sir, are you familiar with a group called The Investigative

6      Project?

7      A.  Yes, I am.

8      Q.  What is that?

9      A.  The Investigative Project is a think-tank and policy group

03:01  10     that was set up in 1995 in Washington, DC, by a former CNN

11     journalist.  The purpose of The Investigative Project was to

12     service as a watchdog group with regards to international

13     terrorism --

14             THE COURT:  Slow down, please.  Slow down.

03:01  15             THE WITNESS:  Sorry, your Honor.  I apologize.

16             THE COURT:  We got time.  No rush.  Go on.

17             THE WITNESS:  The purpose of the think-tank was to

18     study the communications, financing, history, infrastructure of

19     international terrorist organizations with a focus on groups

03:02  20     like al-Qaeda, Hamas, Hezbollah, et cetera.

21     BY MR. HEENAN:

22     Q.  And did you work there, at The Investigative Project?

23     A.  I did.

24     Q.  For how long?

03:02  25     A.  I began working there in February of 1998.  I ended my term

03:02    1    there in December of 2003.

    2    Q.   How are you currently employed, Mr. Kohlmann?

    3    A.   I am currently employed -- I run my own business known as

    4    Flashpoint Global Partners.  We provide consulting services to

03:02    5    government agencies, foreign governments, think-tanks, media

    6    organizations.

    7              I'm also employed by NBC News, MSNBC, as an

    8    on-air terrorism analyst; and I serve a role at NBC in such

    9    that I provide NBC with access to original materials produced

03:02   10    by international terrorist organizations, in other words, video

   11    recordings, audio recordings, magazines, websites, original

   12    interviews, that kind of thing.

   13    Q.   And when you talk about the consulting services -- I think

   14    you touched on it a little bit -- but what specifically -- what

03:03   15    sort of subject matter do you provide consulting services on?

   16    A.   Sure.  I provide consulting services on the financing,

   17    communications, infrastructure, leadership of al-Qaeda

   18    primarily but a variety of groups that are interlinked with

   19    al-Qaeda, including al-Qaeda's global affiliates that roughly

03:03   20    constitute what I describe as the "global jihadi movement."

   21    Q.   And what are some of those affiliates, in addition to

   22    al-Qaeda, that comprise the global jihadi movement?

   23    A.   Well, you have the official al-Qaeda affiliates, such as

   24    al-Qaeda in the Arabian Peninsula, al-Qaeda in the Islamic

03:03   25    Maghreb, the Islamic State of Iraq.

03:03  1              But there are other groups aside from that, that

2      are not official al-Qaeda affiliates, but function as al-Qaeda

3      affiliates.  This would include groups like Shabaab

4      al-Mujahideen, the Mujahideen Youth Movement in Somalia,

03:04  5      et cetera.

6      Q.  How long ago was Flashpoint Global Partners founded, your

7      firm?

8      A.  It was initially founded in 2003 as GlobalTerrorAlert.com,

9      and then it became Flashpoint about three years ago.

03:04  10     Q.  And does your firm or do you operate a website?

11     A.  I do.

12     Q.  What is the purpose of that website?

13     A.  The purpose of that website is to assist policy makers,

14     academics, scholars, other experts that study this material.

03:04  15     What we do is we put out excerpts of the material that we're

16     working on.  We put out excerpts from translations of al-Qaeda

17     videos.  We put out excerpts from actually al-Qaeda videos

18     themselves.

19             In other words, we're trying to provide others,

03:04  20     such as ourselves, who are studying this material, with access

21     to the original information so that proper research, proper

22     scholarship is possible with regard to the al-Qaeda and similar

23     organizations.

24     Q.  And during the course of preparing the website with those

03:05  25     materials, have you had an opportunity to view al-Qaeda videos?

03:05 1   A.  I personally view almost every single video released by

2   al-Qaeda or any of its affiliate groups.  I personally save

3   these videos.  I personally put them into a giant database

4   which we maintain at Flashpoint.  In our company database, we

03:05 5   have copies of virtually every single video recording, audio

6   recording, magazine, communique, website produced by any

7   terrorist organization that you can think of.

8   Q.  Now, with respect to how you obtained your information --

9   you mentioned this a little bit earlier, but what sort of

03:05 10   sources do you look to when researching terrorist

11   organizations?

12   A.  Well, there are different kinds of sources you can turn to.

13   There are primary sources; there are secondary sources; and

14   there are tertiary sources.

03:06 15      A primary source would be going out into the

16   field and actually interviewing someone directly, observing an

17   event happening.  With regard to international terrorism, those

18   kind of sources are rather difficult to get to.  Terrorists are

19   oftentimes on front lines.  They're not always willing to meet

03:06 20   with westerners such as myself.

21      However, we do gather that kind of information.

22   I have traveled overseas in order to interview individuals who

23   are -- who have been convicted of recruiting, financing,

24   communicating on behalf of international terrorist groups.

03:06 25      We also maintain an office in a Pashwer,

03:06   1   Pakistan, where we conduct direct research on the ground with

2   regards al-Qaeda, the Taliban, and other similar groups.

3   However, again, that's only one small part of it.  A large part

4   of our research is on secondary sources.

03:06   5   Q.   What is that?

6   A.   A secondary source would be a video recording produced by a

7   terrorist group, a magazine, photographs, and audio recording,

8   websites.  It's not quite the same thing as being there on the

9   ground; however, these are official products of the groups that

03:07   10   we are -- we are studying.  So, they do accurately reflect what

11   these groups are trying to communicate; they do accurately

12   reflect what these groups are trying to tell their own members.

13   Because we're gathering this information from the same location

14   that supporters of these groups, that members of these groups

03:07   15   would go to get that same information.

16        THE COURT:  Hold it one second.

17        *(Court confers with staff)*

18        THE COURT:  Go right ahead.

19   BY MR. HEENAN:

03:08   20   Q.   Mr. Kohlmann, with respect to the secondary sources you

21   just mentioned, would an example of that be these al-Qaeda

22   videos you just referenced that you download and you keep in a

23   database in your firm?

24   A.   Exactly.  Video recordings --

03:08   25        THE COURT:  Hold it.  It will go a lot quicker if it's

03:08   1    just a "yes" or a "no."

2              THE WITNESS:  Excuse me, your Honor.

3                   Yes.

4              THE COURT:  Go a lot quicker.

03:08   5              THE WITNESS:  No problem.

6    BY MR. HEENAN:

7    Q.   Mr. Kohlmann, have you ever personally interviewed a

8    primary source, a terrorist or an alleged terrorist?

9    A.   Yes, I have.

03:08  10   Q.   Who?

11   A.   I've interviewed a number of such individuals: Abu Hamza

12   al-Masri, A-B-U, H-A-M-Z-A, A-L, dash, M-A-S-R-I.

13   Q.   Who's that?

14   A.   Abu Hamzal al-Masri is a hook-handed cleric from the United

03:08  15   Kingdom.

16             THE COURT:  A what?

17             THE WITNESS:  A hook-handed cleric.

18             THE COURT:  What does that mean?

19             THE WITNESS:  His hands were blown off in an

03:08  20   explosion --

21             THE COURT:  Oh, okay.

22             THE WITNESS:  -- and he has hooks for hands.

23             THE COURT:  Got it.

24             THE WITNESS:  -- who is based -- or was based in the

03:09  25   United Kingdom, originally from Egypt.

03:09  1          Abu Hamzal al-Masri is a veteran of the Afghan

2    jihad.  That's where he lost his hands.  He was convicted in

3    the United Kingdom, I believe in 2004, on terrorism offenses.

4    BY MR. HEENAN:

03:09  5    Q.  Mr. Kohlmann, what type of products does Flashpoint

6    Partners produce in conjunction with these consulting services?

7    A.  What we generally do is that we produce reports, video

8    recordings, other materials in which we take original products

9    produced by terrorist groups and we distill those materials

03:09  10   down into the essential parts.  In other words, we try to

11   understand the inside of these groups based on their propaganda

12   and their public materials.

13          We distill that mostly into written reports;

14   although, there have been also video recordings, testimony in

03:09  15   court, et cetera.

16   Q.  And these groups that you mentioned that are a part of this

17   global jihadist movement, do they frequently use these public

18   materials and put them out on the Internet?

19   A.  Yes, these groups do.

03:10  20   Q.  Now, I think you may have mentioned; but have you worked

21   for the US Government previously?

22   A.  Yes, I have.

23   Q.  And have you worked for the department of justice

24   previously?

03:10  25   A.  Yes, I have.

03:10   1   Q.  Can you give an example of the type of work you've done for
     2   the United States Government?
     3   A.  Yes.  I've done a number of different tasks.  I've done
     4   everything from providing expert consulting services, reviewing
03:10   5   hard drives, seized computer hard drives, and analyzing the
     6   data in there, comparing and contrasting it with material from
     7   our own database.
     8          I have interviewed individuals who were
     9   cooperating witnesses in terrorism cases.  I have traveled
03:10  10   abroad to foreign countries in order to speak and work with
    11   United States allies in conjunction with the US State
    12   Department.  I have assisted in terror financing
    13   investigations --
    14          THE COURT:  Slow down, please.
03:10  15          THE WITNESS:  Excuse me, your Honor.
    16          -- with regards to both the treasury department
    17   and the department of justice.  And I also work on behalf of
    18   the department of defense in Guantanamo Bay, Cuba.
    19   BY MR. HEENAN:
03:11  20   Q.  Have you worked with any foreign governments?
    21   A.  Yes, I have.
    22   Q.  What sort of work have you done with foreign governments?
    23   A.  Similar work on behalf of groups such as the
    24   Counterterrorism Division at New Scotland Yard, the Danish PET
03:11  25   police intelligence service, the Australian federal police,

03:11  1   prosecutors in all those countries, prosecutors and police in

2   Bosnia and Herzegovina, supposed to go to Uganda soon, a

3   variety of different countries.

4   Q.   And are all of those foreign engagements, do they involve

03:11  5   terrorism suspects or terrorism cases?

6   A.   Almost certainly, yes.

7   Q.   Now, you indicated that you have done some work with MSNBC.

8   Have you worked as an on-air terrorism expert?

9   A.   That's correct, yes.  I've worked with NBC since -- or I've

03:11  10  been on contract since 2005.

11  Q.   And did you -- were you contacted by MSNBC for your

12  services after Anwar Awlaki was killed by a drone strike on

13  September 30th of this year?

14  A.   That's correct, I was.

03:12  15  Q.   Have you done any work for non-profit organizations?

16  A.   Yes.  I've done work on behalf of the non-profit

17  organization called the Nine Eleven Finding Answers Foundation,

18  otherwise known as "NEFA," N-E-F-A.

19  Q.   Sir, with respect to any books or journals that you may

03:12  20  have published, have you published any books or articles in

21  your career?

22  A.   I have.

23  Q.   And I'll start with books.  Any books?

24  A.   Yes.  In 2004 I published the book "Al-Qaida's Jihad in

03:12  25  Europe:  The Afghan-Bosnian Network."

03:12  1   Q.  And is that a book that has been adopted or used in any

2   schools, to your knowledge?

3   A.  Yes.  It has been used in such institutions as the Harvard

4   Kennedy School of Government, the Johns Hopkins School of

03:12  5   Advanced International Studies, and various other institutions

6   in the US and abroad.

7   Q.  And have you published any articles in conjunction with

8   your work as a terrorism expert?

9   A.  Yes, I have.

03:13  10  Q.  Approximately how many?

11  A.  Dozens.  I think the last one I published was in "African

12  Security" -- which is a journal about African security -- on

13  the subject of the Shabaab al-Mujahideen movement in Somalia.

14  Q.  Sir, I would like to ask you now about your prior

03:13  15  engagements as an expert witness.

16  A.  Of course.

17  Q.  Have you ever previously been retained as an expert witness

18  in other cases?

19  A.  Yes, I have.

03:13  20  Q.  And have those prior expert witness engagements involved

21  you testifying as an expert on terrorism in terrorism cases?

22  A.  Yes, they have.

23  Q.  Have you ever served as an expert witness on a criminal

24  case prosecuted by the department of justice?

03:13  25  A.  Yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:13   1    Q.  And have you ever engaged in consulting activities in any

2    of those cases, where you've consulted with the prosecutors

3    outside of court?

4    A.  Yes.

03:13   5    Q.  And what sort of consulting work -- you mentioned a little

6    bit generally.  But specifically, with respect to the

7    department of justice, what sort of consulting services have

8    you provided?

9    A.  Sure.  Again, I've provided forensic analysis of seized

03:14  10    hard drives in terrorism investigations.  I have provided

11    review of evidence, interpretations of evidence.  We have.

12          provided recovered documents from our own

13    database, which are required or necessary with regards

14    terrorism investigations.

03:14  15          I've provided insight in regards to the links

16    between various different terrorism investigations, as many of

17    these investigations tend to cross both national and

18    international boundaries.

19    Q.  Have you testified in federal court previously, where

03:14  20    you've been admitted and accepted as an expert?

21    A.  I have.

22    Q.  Approximately how many times have you been found qualified

23    to testify as an expert on a terrorism-related matter in

24    federal court?

03:14  25    A.  I believe I've been qualified 18 times.

03:14   1    Q.   Have you been qualified previously in 2011, this year?

2    A.   Yes, I have.

3    Q.   How many times?

4    A.   Twice.

03:15   5    Q.   What federal districts was that in?

6    A.   The Eastern District of New York, and the -- sorry -- the

7    Eastern District of North Carolina, I believe.

8            THE COURT:  You can move on.  I'll accept him as an

9    expert.  In other words, you can get right down now to your

03:15   10   questions.

11           THE WITNESS:  Thank you, your Honor.

12           MR. HEENAN:  Very well, your Honor.  Although, I do

13   want to just --

14           THE COURT:  No.  Now, wait.  Unless there's some

03:15   15   matter that you need to get into the record, that you feel --

16   then go right ahead.

17           MR. HEENAN:  Compensation of the witness, your Honor.

18           THE COURT:  Sure.

19   BY MR. HEENAN:

03:15   20   Q.   Mr. Kohlmann, are you typically paid for your service as an

21   expert witness?

22   A.   I hope so, yes.

23   Q.   Approximately how much do you bill for your services

24   nowadays?

03:15   25   A.   It depends on the case, depending on what the work is

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:15   1   involved.  It generally varies between about 300 and 400

2   dollars an hour.

3   Q.  And how much have you earned thus far in connection with

4   your work on this particular case, United States versus Barry

03:15   5   Bujol?

6   A.  Well, so far, I've been paid nothing; but I think I've

7   submitted a bill for something like $9,000 or $10,000,

8   something like that.

9   Q.  And is there a cap to that contract in terms of the maximum

03:16  10   that you can make?

11   A.  Yes, there is a -- it's something like $30,000.

12   Q.  Now, in addition to the work you've done serving as an

13   expert witness for the department of justice, have you also

14   previously provided assistance to the FBI in conjunction with

03:16  15   ongoing investigations?

16   A.  Yes, I have.

17   Q.  And over approximately what time period have you provided

18   assistance to the FBI?

19   A.  I have provided assistance to the FBI since approximately

03:16  20   2003.

21   Q.  And does that assistance continue to the present day?

22   A.  It does, yes.

23   Q.  Have you received compensation for assistance you have

24   provided to the FBI?

03:16  25   A.  Yes, we have.

03:16   1    Q.  Approximately how much have you been compensated by the FBI
        2    over all those years?
        3    A.  Over the space of about nine or ten years, it's been about
        4    $60,000.
03:16   5    Q.  And with respect to the other cases where you have
        6    testified as an expert witness for the department of justice,
        7    have you been paid for those other engagements, as well?
        8    A.  Yes.
        9    Q.  Sir, the Court has qualified you -- or found you qualified
03:17  10    to serve as an expert witness.  So, I would like to get into
       11    some broader subjects that you have been called to testify on.
       12            You described earlier the global jihadist
       13    movement.
       14    A.  Yes.
03:17  15    Q.  I think you indicated sort of your expression --
       16            MR. HEENAN:  And, your Honor, for the record, that is
       17    what I would -- I have tendered Mr. Kohlmann for, what I
       18    believe he is an expert on, is on the global jihadist movement
       19    and specifically al-Qaeda in the Arabian Peninsula as a
03:17  20    terrorism organization and how it recruits.
       21            THE COURT:  It's accepted.  Move on, please.
       22    BY MR. HEENAN:
       23    Q.  Mr. Kohlmann, what is the global jihadist movement?
       24    A.  The global jihadist movement is a movement of various
03:17  25    different Sunni militant organization.  By "Sunni," I'm

1    referring to a particular sect in Muslim.

2              There are Sunnis, and there are Shiites.  Sunnies

3    are the majority.  There are various, different Sunni militant

4    organizations or extremist groups spread cross the world.

5    There are groups like al-Qaeda; there's groups like Shabaab

6    al-Mujahideen in Somalia; there's al-Qaeda in the Arabian

7    Peninsula in Yemen.

8              Not all of these groups are necessarily working

9    together hand-in-glove in terms of all the orders are

10   centralized and they all come from the very top of al-Qaeda in

11   Afghanistan.  Some of these groups are somewhat autonomous.

12             Nonetheless, all of these groups perceive the

13   fact that they are part of one global movement.  And as much as

14   they have their own local concerns and their own local

15   conflicts and sometimes there are differences between various

16   different conflicts in organizations, they all perceive the

17   fact that they are struggling for the same basic goal and they

18   perceive that it is in their interests to cooperate with each

19   other, to share resources, to communicate, and to work together

20   to the greatest extent possible.

21   Q.  Now, with respect to the al-Qaeda organization in

22   particular, are you familiar with the branch al-Qaeda in the

23   Arabian Peninsula?

24   A.  Yes, I am.

25   Q.  And tell the Court, if you could, a little bit about that

03:19   1   organization.

2   A.   Yes.  Al-Qaeda in the Arabian Peninsula began actually as

3   early as 2003.  It first began inside Saudi Arabia.  It was

4   founded by veterans of al-Qaeda in Afghanistan, Saudis.  That

03:19   5   branch of al-Qaeda was shut down in approximately 2006 because

6   of aggressive law enforcement actions by the Saudi government.

7   However, remaining members of that group, veterans of that

8   group, including individuals returning from Guantanamo Bay,

9   Cuba --

03:19   10              THE COURT:  Slow down a little bit.

11              THE WITNESS:  Excuse me, your Honor.

12              THE COURT:  The court reporter needs to get it down.

13              THE WITNESS:  No problem, your Honor.

14                 -- crossed over the border from Saudi Arabia into

03:19   15   Yemen and joined up with a faction of al-Qaeda based there,

16   that at the time was calling itself "al-Qaeda in Yemen."

17                 In January of 2009 a video was released by these

18   individuals, this group of Saudis and Yemenis; and they

19   announced that they were now reforming al-Qaeda in the Arabian

03:20   20   Peninsula based in Yemen as opposed to Saudi Arabia.

21   BY MR. HEENAN:

22   Q.   Are you aware, Mr. Kohlmann, of how al-Qaeda in the Arabian

23   Peninsula uses the Internet to communicate?

24   A.   It uses it very aggressively.

03:20   25   Q.   And when you say that, how does it use the Internet in

03:20  1    communicating?

2    A.   It uses the Internet to communicate in the sense that it

3    communicates in multiple languages.  It puts out propaganda in

4    Arabic, in English, and in other languages.  And it directly

03:20  5    attempts to recruit individuals over the Internet.  It attempts

6    to recruit individuals to travel to the Arabian Peninsula and

7    to join al-Qaeda there.  It also attempts to recruit

8    individuals to carry out terrorist attacks within the borders

9    of the countries that they are already living in.

03:21  10   Q.   Are you familiar with the now deceased individual Anwar

11   al-Awlaki?

12   A.   I am.

13   Q.   Who was Anwar al-Awlaki?

14   A.   Anwar al-Awlaki is a well-known cleric, Yemeni-American

03:21  15   cleric.  He was born in New Mexico.  He is -- I guess, he's

16   practiced his faith in places such as New Mexico; the

17   Washington, DC, area; San Diego.  He quickly became well known

18   for the fact that he was very charismatic.  He was a fluent

19   English speaker with a flat American accent.

03:21  20             And he was an extreme Salafi.  By "extreme

21   Salafi," I mean, he was part of the Sunni Salafi sect.  He had

22   fairly conservative -- you could call them puritanical views on

23   Islam.  He believed in Muslims living according to the way that

24   the prophet lived at the time of the establishment of Islam in

03:22  25   the Arabian Peninsula.

03:22  1   Q.  When you say a "conservative Salafi," the individuals in
2   the global jihadist movement that you described, are they of
3   like mind as the conservative Salafis?
4   A.  Yes.  Generally speaking, the Sunni militant movements that
03:22  5   I'm describing all describe themselves as Salafi.  The idea --
6   "Salafi" means the "predecessors," the "elders" of Islam.  In
7   other words, these individuals would like to return the
8   conditions of living back to the conditions lived by the people
9   who founded Islam.
03:22  10  Q.  Now, with respect to Anwar al-Awlaki, do you recall roughly
11  when the Nidal Hasan incident happened?
12  A.  Yes, I do.
13  Q.  When was that, approximately?
14  A.  It was approximately two years ago.
03:22  15  Q.  And you're obviously familiar with the media and Anwar
16  Awlaki.  Is it fair to say that he came to the public attention
17  of the United States most prominently in the wake of the Fort
18  Hood shootings?
19  A.  Yes, that's true.  Al-Awlaki had already come, I think, to
03:23  20  the attention of the American media prior to that on the basis
21  of his contacts with 9-11 hijackers in San Diego.  However, up
22  till then, there was still some who believed that he might
23  be -- it might be a case of mistaken identity or there was
24  something wrong.
03:23  25               However, at the time of Fort Hood, it became

03:23  1   clear that Mr. al-Awlaki had extreme anti-American views, that

2   he supported terrorism against the United States, and that he

3   was directly engaged in recruiting individuals to carry out

4   terrorist attacks against US interests abroad and against the

03:23  5   United States within its own borders.

6   Q.   Mr. Kohlmann, amongst the conservative Salafis and the

7   global jihadist participants you've mentioned, was Mr. Anwar

8   al-Awlaki known in those circles prior to Fort Hood?

9   A.   Yes, he was.

03:24  10   Q.   And what was his reputation amongst the individuals in the

11   global jihadist movement prior to Fort Hood?

12   A.   He was known as the preeminent English-speaking voice for

13   radical jihad in the entire world.  There was nobody who spoke

14   English, who was as charismatic, who was as well taught or as

03:24  15   well learned on subjects of jihad, and certainly there was

16   nobody as popular.  He was a rock star amongst jihadis,

17   English-speaking jihadis primarily, even prior to Fort Hood.

18   Q.   Do you speak Arabic, Mr. Kohlmann?

19   A.   Not fluently, but I do know some.

03:24  20   Q.   And the Arabic words that you know, are they words that

21   relate to the global jihadist movement?

22   A.   Islam, in general, the global jihadist movement.  I mean,

23   studying Islam, you have to learn some Arabic because Islam

24   came from the Arabian Peninsula.  So, I know quite a bit of

03:25  25   Arabic vocabulary relating to Islam and, of course, the area

```
03:25    1    of -- my particular area of study, which is jihad and the
         2    global jihadi movement.
         3    Q.   What is "jihad"?
         4    A.   "Jihad" itself is an Arabic word which simply means a "holy
03:25    5    struggle."
         6    Q.   And is there a more nefarious meaning to that word amongst
         7    the conservative Salafi circles?
         8    A.   Yeah.  There are two basic interpretations of "jihad."
         9    There is the interpretation of "jihad" as being an "internal
03:25   10    jihad."  In other words, if you're an alcoholic, if you're a
        11    chain smoker, you could wage internal jihad against alcoholism,
        12    against chain smoking and you could give it up.  It will be a
        13    struggle inside of yourself.
        14            However, there's another form of jihad, which is
03:25   15    the external form of jihad, the form of physical jihad, which
        16    is more closely associated with the concept of holy war; in
        17    other words a physical struggle, a physical battle against
        18    enemies of Islam.
        19    Q.   Are you familiar with the Arabic term "ajar"?
03:26   20    A.   Yes.
        21    Q.   And what does "ajar" mean?
        22    A.   Means you get the honor, the credit.
        23    Q.   And within the global jihadist movement, is there any
        24    special significance ascribed to the word "ajar"?
03:26   25    A.   Yes.  I mean, it can be used in the form of getting credit
```

03:26   1    to get to paradise.  The idea of waging jihad is that you are

2    trying to seek the pleasure of Allah, you're trying to seek the

3    pleasure of God.

4                And why are you doing that?  Because of the fact

03:26   5    that you want to get to paradise.  And the only people that

6    supposedly will be allowed into paradise are those people who

7    have struggled for Islam and who have gained credit in the eyes

8    of the law as being true Muslims.

9    Q.   Are you familiar with the word "hijrah"?

03:26   10   A.   Yes.

11   Q.   What is "hijrah"?

12   A.   "Hijrah" simply means a "pilgrimage."  It's most commonly

13   associated with the idea of the "hajj," which is the pilgrimage

14   to Mecca.  Every Muslim is required once in his lifetime to

03:27   15   travel to Mecca in Saudi Arabia and visit the Grand Mosque

16   there during the Month of Ramadan and pray and experience what

17   a pilgrimage is in Islam.

18   Q.   In the global jihadist movement circles, is there an

19   additional meaning or different meaning subscribed to "hijrah"?

03:27   20   A.   Yes, there is.

21   Q.   What is that meaning?

22   A.   That meaning is the idea that there are two different kinds

23   of places out there in the world.  There's dar al-Harb and

24   there's dar al-Islam; there's the house of war and there's the

03:27   25   house of Islam.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:27    1        If you're living in the house of war, if you're

2    living among disbelievers and you're a Muslim, it is your

3    obligation to travel to an Islamic land, to live there, and to

4    fight on behalf of Muslims, to fight on behalf of Islam.

03:27    5    That's the way the jihadis see it.  In fact, in the jihadi

6    ideology, the concepts of hijrah and jihad are very closely

7    tied in with each other because it's the idea of traveling to

8    go participate in a holy struggle, a physical holy struggle.

9        THE COURT:  What is it you said?  It was the house of

03:28   10    war and the other was a house of --

11        THE WITNESS:  House of Islam, dar al-Harb and dar

12    al-Islam, exactly.

13    BY MR. HEENAN:

14    Q.  Mr. Kohlmann, are you familiar with the word "mujahideen"?

03:28   15    A.  "Al-mujahideen," yes.

16    Q.  What is "al-mujahideen"?

17    A.  "Al-mujahideen" comes -- it's an Arabic word.  It comes

18    from the same root word as jihad.  However, it refers to the

19    holy warriors.

03:28   20    Q.  And is there a benign meaning when you say "holy warriors"?

21    Are there more than one meaning for "mujahideen" in Islamic

22    faith?

23    A.  Well, in my 14 years of study and work, both studying Islam

24    and studying the global jihadi movement, I've never seen an

03:28   25    organization or anyone refer to themselves as "mujahideen"

03:28   1    other than in the sense of physical combat, fighting.

2                    You can't -- if you're a part of the mujahideen,

3    you can't struggle inside of somebody else.  By definition, if

4    you're fighting is part of a group, it's got to be an external

03:29   5    struggle; it can't be an internal struggle.

6    Q.  Do you know the term "as-sadiqeen"?

7    A.  Yes.

8    Q.  What does that mean?

9    A.  It means the "honest ones," the "truthful ones."

03:29   10   Q.  And within the global jihadist movement, when the term

11   "as-sadiqeen" is paired with "mujahideen," does that suggest

12   anything to you?

13   A.  Well, it could be used as a synonym.

14                    THE COURT:  Meaning what?  Same meaning?

03:29   15                    THE WITNESS:  Well, your Honor, in the world of jihad

16   or the world of people that believe in jihad, the truthful

17   ones, the honorable ones are the people that are on the

18   battlefield, the people that are fighting for their beliefs.

19   So, anyone who is -- anyone who is truthful to themselves and

03:29   20   truthful to their religion, in the view of jihadis, should be

21   out there fighting on the front line.

22   BY MR. HEENAN:

23   Q.  You are you familiar with the term "kufr"?

24   A.  "Kufr," yes.

03:29   25   Q.  What is that?

A.  "Kufr," K-U-F-R, means "disbelief."  There's other -- two

other words --

          THE COURT:  That means "disbelief"?

          THE WITNESS:  "Disbelief," in other words disbelieving

in Islam or disbelieving in faith.

               And, then, there is two other words that go along

with that, which is "kafir," K-A-F-I-R, again, from the same

root, which means a "disbeliever" or "infidel."  And, then,

there's the "kuffar," which is the plural.  You have

K-U-F-F-A-R, which is the "disbelievers" or the "infidels."

Q.  Are you familiar with the term "dunya"?

A.  Dunya, yes.

Q.  What is "dunya"?

A.  "Dunya" refers to the material world.  In other words,

there's the spiritual world, and then there's the material

world.  You can enrich yourself in the material world or you

can enrich yourself spiritually.

Q.  Mr. Kohlmann, I would like to show you some exhibits that

have already been admitted at trial and have been discussed

previously at various points.  So, I'll ask you to direct your

attention to the screen.

               I show you Exhibit 4.  Sir, do you know what this

document is?

A.  I believe I do, yes.

Q.  What is that document?

03:31  1    A.  This is the front page from a now defunct jihadi website

2    known as "Jihad Fields."  It was hosted by a blogging service

3    known as WordPress.com.

4    Q.  I would like to direct your attention to a page in there.

03:31  5    Let's see the page.

6              It's Page 9.  And if we could blow up at the

7    bottom there.

8              At the very bottom of that Paragraph Number 12,

9    there's an entry on the blog from an Abdul Bari, which I will

03:31  10   just read to you and have a question for you.

11             "Asalamu alaikum.  To 'follow the path of the

12   American or John Walker Lindh' is a pretty broad answer.  I've

13   tried to find out how they made their way to the battlefields

14   but that information isn't out there.  I'm looking for a

03:32  15   specific course of action.  Right now, I'm learning Arabic and

16   exercising.  But still that isn't going to tell me how to get

17   overseas to the Land of Ribaat and fulfill my obligations."

18             Sir, are you familiar with the term "Land of

19   Ribaat"?

03:32  20   A.  Yes.

21   Q.  What is the "Land of Ribaat"?

22   A.  The "Land of Ribaat" refers to the land of preparation, the

23   land of preparing yourself for physical combat.  It's often

24   referred to -- the expression, rather, is used frequently to

03:32  25   refer to conflict zones, such as the Palestinian territories,

03:32  1  Yemen, Afghanistan, et cetera.

2  Q.  And is that a common expression or concept in the global

3  jihadist movement?

4  A.  Yes, "Ribaat" is -- the "Land of Ribaat" and "Ribaat" in

03:32  5  general is a very common term among jihadis.

6  Q.  I would like to show you what has been admitted as

7  Government's Exhibit 33.  Do you recognize what that is, sir?

8  A.  Yes, I do.

9  Q.  What is that?

03:32  10  A.  This is a CD recording of Sheikh Anwar al-Awlaki, the title

11  of which is "The Hereafter."  I believe this is CD 1, Volume I.

12  Q.  Have you, yourself, listened to this recording?

13  A.  Yes.

14  Q.  And what is contained on this CD?

03:33  15  A.  This particular CD, I believe, is on the subject of the

16  importance of hijrah, or the importance of death.

17  Q.  Government's Exhibit 34, what is that, sir?

18  A.  This is -- I believe this is another recording of Anwar

19  al-Awlaki.  And it says "The Hereafter Prophets"; and it's

03:33  20  about Ummar Ibn al-Hkattaab and Abu Bakr al Siddiq.

21  Q.  Is that also an item that contains a sermon from Anwar

22  al-Awlaki?

23  A.  Yes.  He's speaking here about the righteously guided

24  leaders of Islam.

03:33  25  Q.  I'm going to show you Government's Exhibit 35, which is

03:33  1   admitted into evidence.  Do you recognize this document?

2   A.  Yes, I do.

3   Q.  And what is that document?

4   A.  This is a printout of a web page from a website known as

03:34  5   SalaatTime.com, which offers download links for audio sermons

6   recorded by Sheikh Anwar al-Awlaki.

7   Q.  And I would like to direct your attention to the links that

8   appear in the middle of the document to be blown up.  Right

9   under "Allah is Preparing Us for Victory," do you see those

03:34  10  three links?

11  A.  Yes, I do.

12  Q.  And what are those links?

13  A.  These are three links to the audio recording and transcript

14  of a sermon by Sheikh Anwar al-Awlaki, "Allah is Preparing Us

03:34  15  for Victory," which was recorded in 2006.

16  Q.  Is there anything significant about that recording with

17  respect to the global jihadist movement?

18  A.  A large part of it has to do with the obligation of jihad,

19  the obligation of physical struggling, the obligation of making

03:34  20  hijrah to the land of jihad.  It's one of the more radical

21  recordings by Anwar Awlaki.

22  Q.  I'm going to show you the second page of this same

23  document, Government's Exhibit 35.  And at the top right there

24  is a link for a file, "Preparing for Death."  Is that something

03:35  25  you are familiar with?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:35  1    A.  Yes, I am.

2    Q.  And what is that particular lecture?

3    A.  This is another lecture by Sheikh Anwar al-Awlaki about the

4    necessity to be always ready to die at any minute.

03:35  5    Q.  And a little further down the page, under "Current Events,"

6    there's a link for "Dust Will Never Settle Down."  Are you

7    familiar with that lecture?

8    A.  Yes, I am.

9    Q.  What is that lecture about?

03:35  10   A.  This is another lecture by Sheikh Anwar al-Awlaki that has

11   aggressively been promoted by jihadist groups around the world,

12   by actual mujahideen organizations.  It is suggesting that it

13   is against the nature of Muslims to sit on the sidelines, it is

14   in their nature to fight and to struggle.

03:36  15   Q.  And next to that there's also a link for "Battle of Hearts

16   and Minds."  Are you familiar with that lecture?

17   A.  Yes.

18   Q.  And, briefly, what is that lecture about?

19   A.  This is another Anwar al-Awlaki lecture.  This is about the

03:36  20   struggle between the West and Islam for the minds of Muslims

21   and the destiny of Muslims, again talking about the subject of

22   jihad.

23   Q.  I would like to show you the third page of this exhibit.

24   Towards the bottom, there is a lecture in there entitled

03:36  25   "Hijrah."  Are you familiar with that particular lecture from

03:36   1   Mr. Awlaki?

2   A.   Yes, I am.

3   Q.   What is that about?

4   A.   This is a lecture about the necessity of making hijrah to

03:36   5   an Islamic land and participating in Islamic organizations and

6   leaving the land of the infidels.

7   Q.   And at the bottom of this page, there are some additional

8   lectures.  Are you familiar with the two lectures at the

9   bottom, "Mashari al-Ashwaq"?

03:36   10   A.   Yes.

11   Q.   What is that about briefly?

12   A.   "Mashari al-Ashwaq" is an interpretation of a text that was

13   originally written about a thousand years ago.  However, it has

14   become an essential textbook for jihadis.  It was originally

03:37   15   written in Arabic.  So, Anwar al-Awlaki took the original

16   Arabic language text and he interpreted it into English and he

17   re-released it so that English-speaking jihadists would be able

18   to access that kind of same essential textbook which jihadis

19   around the world study.

03:37   20   Q.   And is that a popular lecture within global jihadists

21   circles?

22   A.   It is an exceptionally popular lecture.  It shows up in

23   many, many, many cases of suspected terrorists or terrorist

24   activity.

03:37   25   Q.   Immediately below those links, there is a link for a

03:37   1   lecture "Constants on the Path."  Are you familiar with that

2   particular lecture?

3   A.   I'm very familiar with it.

4   Q.   And if you could briefly tell the Court a little bit about

03:37   5   that particular lecture.

6   A.   Yes.  "Constants on the Path of Jihad" was originally a

7   training manual written by the founder of al-Qaeda in Saudi

8   Arabia, whose name was Yusuf al-Uyayry, U-Y-A-Y-R-Y.  Yusuf

9   al-Uyayry published this in 2003.  It was about the necessity

03:38   10   of engaging in physical battle and physical violent conflict.

11   However, it was originally released in Arabic.

12          Anwar al-Awlaki thought it was so great and

13   thought it was such a wonderful document, that he took it and

14   he created an English language sermon in which he not only

03:38   15   translated it but he tried to interpret the lessons from the

16   view of Muslims living in Western countries.

17          In other words, at one point during the

18   lecture -- in the original lecture al-Uyayry had written that

19   it is an obligation to engage in violent jihad no matter where

03:38   20   you live; no matter where you live around the world, it's an

21   obligation to engage in violent jihad.  And Anwar al-Awlaki

22   wrote that.  And then he added the next section saying, "and

23   this means that you if you live in the United Kingdom or North

24   America, you're obliged to still engage in violent jihad right

03:39   25   in your own backyard."

03:39  1   Q.  Has that particular lecture, "Constants on the Path of
       2   Jihad," has that been a popular lecture within the global
       3   jihadists movement?
       4   A.  I would say it is one of the single most influential, most
03:39  5   important English language sermons on jihad out there.  It
       6   shows up everywhere.  It shows up in multiple different
       7   countries.  It has turned up in almost every single terrorism
       8   investigation launched by the US Department of Justice over the
       9   last five years.
03:39  10  Q.  Mr. Kohlmann, as part of your expert services in this case,
       11  were you provided a copy by the FBI of the hard drive computer
       12  seized from Mr. Bujol's personal residence?
       13  A.  I was provided with material excerpted from it, or
       14  extracted from it, yes.
03:39  15  Q.  With respect to the materials extracted from the hard drive
       16  of Mr. Bujol, that were provided to you, did you find this
       17  particular lecture on that hard drive?
       18  A.  Yes.  All six sections of "Constants on the Path of Jihad"
       19  were on the hard drive.  In addition to that, there was also a
03:40  20  second copy of "Constants on the Path of Jihad" which was
       21  compressed in something known as ZIP format, .zip format.
       22  Q.  And showing you the fourth page of Government's Exhibit 35,
       23  at the top, there's a link for a "44 Ways of Supporting Jihad."
       24  Is that a document you're familiar with?
03:40  25  A.  Yes, I am.

03:40 | 1   Q.  And you've heard some discussion, I think, here about the

2   "42 Ways of Supporting Jihad," which is a document that was

3   discussed earlier?

4   A.  Yes.

03:40 | 5   Q.  What's "44 Ways"; what's "42 Ways"?

6   A.  Well, both "42 Ways" and "44 Ways" are, again, English

7   language interpretations of a document that was originally

8   published by al-Qaeda in Saudi Arabia in 2003.

9       The original title of the document was "39 Ways

03:40 | 10  to Serve and Participate in Jihad."  And the original author of

11  that document was an individual named Esa al-Awshin, E-S-A,

12  A-W-S-H-I-N.  Esa al-Awshin was the official -- excuse me --

13  was the editor of the official magazine of al-Qaeda in Saudi

14  Arabia, which was known as "The Voice of Jihad" magazine.  He

03:41 | 15  published a guidebook on behalf of al-Qaeda, titled "39 Ways to

16  Serve and Participate in Jihad," which was meant to be a guide

17  for homegrown militants, for homegrown jihadists, about how

18  they could contribute and serve a role in the jihad that

19  al-Qaeda was leading.

03:41 | 20      In approximately 2008 Anwar al-Awlaki released a

21  second version of this, an updated version, much like

22  "Constants on the Path of Jihad," which he titled "44 Ways to

23  Serve and Participate in Jihad."  He added an extra five ways

24  on to that.  And he interpreted everything for an

03:41 | 25  English-speaking audience.

03:41  1    Q.  What was the "42 Ways of Supporting Jihad"?

2    A.  Prior to my involvement in this case, I had never seen that

3    document before.  Based on my analysis of material provided to

4    me in this case, I have determine that "42 Ways of Supporting

03:42  5    Jihad" was, in other words, a work in progress.  It was a

6    pre-release version of "44 Ways to Serve and Participate in

7    Jihad" that was never actually released publicly.  It was never

8    published on Anwar al-Awlaki's website.  It was never directly

9    disseminated by him, at least publicly.

03:42 10    Q.  But it is a document that could have been provided directly

11    from Mr. Awlaki to an individual?

12    A.  Oh, yeah, yeah.  And when I say "directly," I mean it was

13    never published on his website.

14              And, again, based on my analysis -- and I went

03:42 15    through this very carefully -- the content in "42 Ways" and the

16    content in "44 Ways" is not just similar; it's verbatim.  The

17    only difference is that there's an extra two ways that got

18    added on to that later on.  And, then, the final version was

19    apparently published on Anwar al-Awlaki's website.

03:43 20              So, again, the "42 Ways" was a pre-release

21    version.  It was like a sneak peek of a document that Anwar

22    al-Awlaki had been working on for several years.

23    Q.  I would like to direct your attention to Government's

24    Exhibit 57, which is in evidence, and just direct your

03:43 25    attention to the websites in the "To" field of this e-mail from

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

03:43   1   Abdul Bari on April 25th, 2008.  Do you recognize any of those
        2   web addresses?
        3   A.  Well, I recognize the "alqaeda" part of it.  I haven't seen
        4   these particular videos, not directly.
03:43   5   Q.  Does this appear to be an attempt by an individual, from an
        6   e-mail account at Abdul_Bari05@Yahoo.com, to contact al-Qaeda?
        7   A.  That was my assessment of it, yes.
        8   Q.  I would like to direct your attention to Government's
        9   Exhibit 58 which is in evidence.  This is an e-mail from
03:44  10   Abdul_Bari05@Yahoo.com to Abdul_Bari05@Yahoo.com.  It lists
       11   several web links for websites.  Do you recognize any of those
       12   websites, Mr. Kohlmann?
       13   A.  Yes, I do.
       14   Q.  And perhaps you could go down the list.  What are those
03:44  15   websites?
       16   A.  Well, at the time this e-mail was sent, these were
       17   al-Qaeda's most important websites on the Internet.
       18   Q.  When you say "al-Qaeda's most important websites," do these
       19   websites actually resolve back to al-Qaeda, the terrorist
03:44  20   organization?
       21   A.  Yes, directly.  The first website which you see, the first
       22   four links running down to Al-Ekhlaas.org, that was the Ekhlaas
       23   network.  Between 2005 and 2007 -- excuse me -- 2008, really,
       24   Ekhlaas served as the official distribution point for all
03:44  25   al-Qaeda media.  Every single video recording released by any

1  al-Qaeda faction you can think of officially came through that
2  website.
3          It was at various times a password protected
4  website.  In other words, you had to have a user name and a
5  password in order to access it.  The materials on there were
6  password protected.  The video recordings were encrypted.  They
7  were the official products of al-Qaeda.
8          In fact, not only was al-Qaeda disseminating
9  information on there, al-Qaeda was also soliciting questions
10 for Q-and-A sessions with its senior leadership from users on
11 that particular forum.
12 Q.  How about some of the -- the Ekhlaas websites, I believe,
13 are the first four links.
14 A.  That's correct.
15 Q.  Below that there are -- and I have trouble with --
16 A.  It's "m3ark,"[sic] "m3ark," [sic] which is the next three.
17 Q.  What are those?
18 A.  M3ark [sic] was another top tier jihadi web forum.  It
19 recently went offline, about six months ago.  It was another
20 place where you could go and get the latest recordings, video
21 recordings, audio recordings, communiques from any al-Qaeda
22 branch you can think of.  There's a specific section of m3ark
23 [sic] dedicated just to materials from official mujahideen
24 organizations.
25          Below that, you'll see three links: majahden.com,

03:46  1    majahden.org, and majahden.ubb.cc.  That is the mujahideen

2    electronic network.  That is another forum, very similar to

3    al-m3ark [sic], which is another top tier jihadi web forum.

4    Again, a place where you can go and get the latest video

03:46  5    recordings, audio recordings, communiques from al-Qaeda and its

6    affiliates.

7         Below that, there are three links: al-faloja.com,

8    al-faloja.org, and al-faloja.info.  This is the Fallujah

9    Islamic Network.  Between 2007 and 2009 the Fallujah Islamic

03:46  10   Network was the exclusive singular place where al-Qaeda

11   released every single video recording that they put out, every

12   single communique, every single audio recording, every single

13   magazine.  This website was at various times password

14   protected -- in other words, it required a special login and

03:47  15   password in order to get access.  The videos there were all

16   encrypted.

17        And the members of that forum included

18   individuals on front lines in Afghanistan, Pakistan, Somalia,

19   and elsewhere.  At least -- I have tracked at least seven to

03:47  20   eight different individuals from the Fallujah Islamic Network,

21   who were posting in April of 2008, who have since been killed

22   in drone strikes, who have blown themselves up while trying to

23   build explosive devices, or have been arrested in significant

24   international terrorism investigations.

03:47  25   Q.  I would like to direct your attention now to Government's

03:47   1   Exhibit 61.

2            Mr. Kohlmann, I'm going to show you just a

3   portion.  This video was played earlier in this trial and

4   identified as the "Juba Sniper" video by a previous witness.  I

03:48   5   just want to play a portion of it and ask you a little bit

6   about it.

7            THE COURT:  What exhibit are we referring to?

8            MR. HEENAN:  This is Government's Exhibit 61.

9            THE COURT:  Okay.  Go on.

03:48   10   (Tape playing)

11   BY MR. HEENAN:

12   Q.  Mr. Kohlmann, are you familiar with this particular video?

13   A.  Yes, I am.

14   Q.  And with respect to the materials that were provided to you

03:49   15   that were excerpted from the hard drive recovered from

16   Mr. Bujol's residence, the computer hard drive, was this video

17   included in those materials?

18   A.  It was, yes.

19   Q.  What is this video?

03:49   20   A.  This video consists of excerpts from a video that was

21   originally produced by an Iraqi insurgent group known as the

22   Islamic Army in Iraq, IAI.  The title of the video is "Juba

23   Sniper."  "Juba" is slang, regional slang, for Baghdad.  So, in

24   other words, another title would be "Baghdad Sniper."

03:49   25            It is the purported story of a sniper working

03:49   1   with the Islamic Army in Iraq, who kills American soldiers on a

2   daily basis.  The idea behind Juba Sniper was to show various

3   attacks taking place.

4                       About two years ago, I interviewed the Islamic

03:50   5   Army of Iraq about why they produced "Juba Sniper" because,

6   obviously, we were very curious about this.  This video has

7   been very, very popular.  It's been very popular both amongst

8   jihadis in Iraq as well as jihadis all around the world.

9                       I asked the individuals responsible for producing

03:50   10   this video why did they produce it and why did they market it

11   so heavily to non-Arabic speakers.  And what they explained to

12   me was, is that, as much as they hoped to achieve a propaganda

13   victory against the United States by showing US soldiers being

14   murdered in Iraq, they also hoped that this video would inspire

03:50   15   revolutionaries from around the world to follow suit and mimic

16   these same tactics.

17   Q.  I would like to show you Government's Exhibit 62, which is

18   in evidence.  And this is an item from what is "Islamic jihad"

19   backwards, @Yahoo.com, a web e-mail address to

03:51   20   Abdul_Bari05@Yahoo.com.  Do you recognize the web link there?

21   A.  Yes, I do.

22   Q.  What is that web link to?

23   A.  This web link is to a website called Hoor-al-Ayn.com, which

24   is -- Hoor-al-Ayn is the virgins of paradise which are

03:51   25   supposedly the reward for martyrs in Islam.  You get 72 virgins

03:51   1    in paradise when you're martyred.  And specifically, this is to

        2    a page on that website which offers various audio recordings of

        3    Anwar al-Awlaki free for download to any visitors.

        4    Q.  I show you Government's Exhibit 63, second page.  This is

03:51   5    in evidence, Mr. Kohlmann.  I think we've spoken about it

        6    already today.  But do you recognize this document?

        7    A.  I do, yes.

        8    Q.  And what is this document?

        9    A.  This is "42 Ways of Supporting Jihad."  This is what I had

03:52   10   described as being a pre-release or a sneak-peak version of "44

        11   Ways of Supporting Jihad."  This version was never disseminated

        12   publicly.

        13   Q.  I would like to direct your attention to the top of the

        14   page.  This is Page 1.  It's an e-mail from Al_Aulaqi@Yahoo.com

03:52   15   to Abdul_Bari05@Yahoo.com.

        16          Mr. Kohlmann, are you familiar with the web

        17   address on the "From" link for Anwar Awlaki,

        18   Al_Aulaqi@Yahoo.com?

        19   A.  Yes, I am.

03:52   20   Q.  Is that an e-mail address that you understand was in fact

        21   used by Anwar Awlaki in July 2008?

        22   A.  Yes.  That address was being openly advertised on

        23   Anwar-alAwlaki.com.  It was also being advertised by various

        24   Islamic organizations.  If you wanted to get in contact with

03:53   25   Anwar al-Awlaki directly, you were advised to send e-mail to

03:53  1    that address.

2    Q.  And based on your familiarity with the global jihadist

3    movement and how Anwar Awlaki operates, do you have an opinion

4    on whether Mr. Awlaki himself would have produced an e-mail

03:53  5    responding through this account or had an intermediary do it?

6    A.  Well, obviously, I can't say for certain.  But what I can

7    say is that Anwar al-Awlaki has boasted of directly sending

8    e-mails with individuals in the United States who he hoped to

9    radicalize and turn into Islamic militants.

03:53  10   Q.  I would like to show you now what has been admitted into

11   evidence as Government's Exhibit 65.  And I think what I am

12   going to do, sir, is I'm going to go through -- there are

13   several of these.  They all state at the top "Anwar al-Awlaki

14   On-Line."

03:53  15            Let me ask, first, are you familiar with this

16   particular e-mail?

17   A.  Yes, I am.

18   Q.  And what is this?

19   A.  This was an item posted on Anwar-alAwlaki.com, the official

03:54  20   website of Anwar-alAwlaki.com.  It was essentially Anwar

21   al-Awlaki's blog.  This was a blog entry posted on that website

22   in July 13th of 2008.

23   Q.  And do you, at your company, have all the postings from

24   this particular website?

03:54  25   A.  I have a complete copy of Anwar-alAwlaki.com downloaded on

03:54  1    the same day of Fort Hood -- the Fort Hood massacre.

2    Q.  Okay.  This is Exhibit 65.  I just want to direct your

3    attention to a few of them.

4                 Exhibit 66, is this a similar posting?

03:54  5    A.  This is another item, again, posted on Anwar-alAwlaki.com,

6    the Anwar al-Awlaki blog.  You can see here this was sent out

7    as part of a mailing list which was enabled on the website.  In

8    other words, if you visited Anwar-alAwlaki.com, you could sign

9    up to subscribe to be updated every time a new item was added

03:55  10   to the blog.  The e-mail came from Suppport@DeenWorks.com,

11   DeenWorks.com being the service that Anwar al-Awlaki was using

12   to help disseminate his media.

13   Q.  Based on that, would Abdul_Bari05@Yahoo.com be an e-mail

14   address that would have been in the databases for this Anwar

03:55  15   al-Awlaki On-Line?

16   A.  Yes.  Yes.  Almost certainly, yes.

17   Q.  Government's Exhibit 69 is another Anwar al-Awlaki On-Line

18   post?

19   A.  Yes.  This is from August 1st, 2008.

03:55  20   Q.  Government's Exhibit 72.  Same?

21   A.  Once again, yeah, this is again also from August 2008,

22   posted on Anwar-alAwlaki.com.

23   Q.  Government's Exhibit 73.  Same?

24   A.  Yes.  Once again, this is another item posted in August of

03:56  25   2008 on the Anwar al-Awlaki blog and disseminated to

03:56  1   subscribers by e-mail.

2   Q.   74, Government's Exhibit 74, I'll just go ahead and go

3   through them, sir.

4            76, 79, 81, 89, 101 -- if I could stop on this

03:56  5   one, the exhibits that I have just shown you, Mr. Kohlmann,

6   again, those are Anwar al-Awlaki On-Line items that were

7   posted?

8   A.   All items posted on his blog, that's correct, yes.

9   Q.   Are you familiar with the one I'm showing you now,

03:56  10  Government's Exhibit 101, entitled "Suicide or Martyrdom"?

11  A.   Yes, I am.

12  Q.   I would like to direct your attention to the second page,

13  last paragraph, where it says, "Today the world turns upside

14  down when one Muslim performs a martyrdom operation.  Can you

03:57  15  imagine what would happen if that is done by 700 Muslims on the

16  same day?"

17            Does that particular paragraph have any special

18  significance to you with respect to how it would be viewed by

19  the global jihadist movement?

03:57  20  A.   Yes.   It would be viewed by the global jihadist movement as

21  Anwar al-Awlaki encouraging or calling upon homegrown

22  extremists, individuals who are -- who may not necessarily be

23  directly affiliated with al-Qaeda, to carry out suicide

24  bombings in league -- or suicide attacks in league with

03:57  25  al-Qaeda's cause because, according to what he is saying, it

*Cheryll K. Barron, CSR, CM, FCRR*                      *713.250.5585*

03:57   1   doesn't really matter whether or not you're al-Qaeda or
        2   whatever you are, as long as you're carrying out a martyrdom
        3   operation on a particular day for a particular cause, the
        4   effect is the same.  So, this is a call to arms.
03:58   5   Q.  I would like to show you Government's Exhibit 103.  Do you
        6   recognize what this is, sir?
        7   A.  Yes, I believe I do.
        8   Q.  And what is this?
        9   A.  This is a posting on a Yahoo! chat group, or discussion
03:58  10   group.  The Yahoo! chat group, discussion group title is
       11   "Hijrah_ Islam."
       12           THE COURT:  Let me jump in right here.  It's right
       13   about 4:00 o'clock.  We need to take the afternoon break.  Let
       14   me ask, Mr. Kohlmann, sounds as if the company you founded --
03:58  15   what year?  2003, was it?
       16           THE WITNESS:  I initially founded it in 2003, that's
       17   correct, yes.
       18           THE COURT:  You track everything, you try to track
       19   everything relevant to your area of expertise as an expert in
03:58  20   this case?
       21           THE WITNESS:  Your Honor, yes, we do.  With regards
       22   to, for instance, discussion forums run by terrorist groups, we
       23   not only save the material posted on there, we save every
       24   single message.  So, we have every single message from most of
03:59  25   the jihadi forums out there.

03:59    1          THE COURT:  You founded the group, correct?

         2          THE WITNESS:  That's correct, yes, sir.

         3          THE COURT:  How many folks do you have in your employ?

         4          THE WITNESS:  We have approximately 10 people, plus an

03:59    5    additional five or six interns.

         6          THE COURT:  Okay.  You say you do speak some Arabic?

         7          THE WITNESS:  Not only do I speak some Arabic, but my

         8    chief -- one of our chief analysts is a native Arabic speaker

         9    in our office, from Jordan.  He sits side by side with me.  In

03:59   10    addition, we have at least three other individuals in our

        11    office who are native Arabic speakers.

        12          THE COURT:  If I remember, you have traveled the world

        13    and met with as many of these, shall we say, opposition folks

        14    as anyone, it sounds like.

03:59   15          THE WITNESS:  I have interviewed at least a dozen such

        16    individuals, including individuals who have been either

        17    convicted in terrorism cases or have been designated by the US

        18    Government as SDGTs, Specially Designated Global Terrorists.

        19          THE COURT:  Okay.  It's 4:00 o'clock.  Since we're

03:59   20    going to go right through to 6:00 or 6:05, let's take a

        21    20-minute break.  And we'll wrap it up for the day after that.

        22    We'll see you back in 20 minutes.

        23          (Recess was taken)

        24          THE COURT:  Okay.  Thank you.  Be seated.

04:31   25                All right.  Let's go, please.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

BY MR. HEENAN:

Q.   Mr. Kohlmann, before the break, we were talking about what has been admitted in evidence as Government's Exhibit 103 and you describe it as a lecture that had been prepared by Anwar Awlaki in the past.  I would like to direct your attention to Page 5 of this exhibit, at the bottom, and direct your attention to the bottom paragraph, the third notice where it says, "I pray that Allah destroys America and all its allies and the day that happens, and I assure you it will sooner than you think, I will be very pleased.  Pleased as every true believer should be pleased and as Sarah was pleased when she heard that the angels will destroy the towns of the people of Lut."

Are you familiar with that particular concept Mr. Awlaki is articulating?

A.   Yes, I am.

Q.   And what is he talking about there?

A.   Well, he's talking about -- when he's talking about "Lut," he's talking about Sodom and Gomorrah.  He's talking about the destruction of the sinners.

But what he's saying here is he wants to see the United States destroyed.  But that's consistent with everything he's said ever since about 2008.

Q.   And is this also a call to arms by Mr. Awlaki to other violent or radical jihadists throughout the world?

04:33  1    A.  Yes.  I think you could say this is him directly endorsing

       2    the idea of someone launching a violent attack against the

       3    United States or US interests abroad, yes.

       4    Q.  I'd direct your attention to what's been admitted as

04:33  5    Government's Exhibit 182.

       6                And there was testimony about this exhibit, an

       7    article from the "New York Times" entitled "American Held in

       8    Yemen after Shootout," discussing an individual by the name of

       9    Sharif Mobley.  Do you know who Sharif Mobley is?

04:33  10   A.  Yes, I do.

       11   Q.  Who's Sharif Mobley?

       12   A.  Sharif Mobley is an individual originally from New Jersey,

       13   who traveled to Yemen supposedly or allegedly to join al-Qaeda

       14   in the Arabian Peninsula.  He was captured after being wounded

04:34  15   by Yemeni security forces.

       16                He was transferred to a hospital.  He thereupon

       17   attempted to escape from that hospital, killing a Yemeni

       18   security guard.  He was eventually recaptured, and I believe he

       19   is now back in the United States.

04:34  20   Q.  Was Sharif Mobley a natural born United States citizen, to

       21   your knowledge?

       22   A.  He was a natural born US citizen.  He is a convert to

       23   Islam, and he was recruited by al-Qaeda in the Arabian

       24   Peninsula.

04:34  25   Q.  I would like to direct your attention to what has been

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:34  1   admitted as Government Exhibit 193; and there's been discussion

2   about this CNN article previously at trial, as well.  This

3   article is entitled "Purported Al-Awlaki Message Calls for

4   Jihad Against the United States."

04:34  5               Are you aware of the circumstances surrounding

6   what's reported in this article?

7   A.   Yes, I have -- I'm in possession of the audio recording

8   describing that article.

9   Q.   And what is this article about?

04:34  10   A.   Well, the audio recording itself that the article describes

11   was released by Sheikh Anwar al-Awlaki shortly after the Fort

12   Hood massacre.  It was the first audio recording in which Anwar

13   al-Awlaki explicitly declared war, in his own voice, against

14   the United States, offering an explanation for why he was

04:35  15   declaring war against the United States, for why he had changed

16   from being, a quote, unquote, moderate Muslim to being a,

17   quote, unquote, extreme -- extremist, exploiting the genesis of

18   that, explaining the impact of him being in prison, et cetera,

19   et cetera.  It was his open declaration of conflict with the

04:35  20   United States.

21   Q.   I would like to direct your attention now to a video clip,

22   Government's Exhibit 71.  I'm not going to play all of it, but

23   I want to play some.  It's been played at trial previously.

24      *(Tape playing)*

04:36  25   BY MR. HEENAN:

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:36 1    Q.  Mr. Kohlmann, are you familiar with this particular video?

2    A.  I am familiar with it, and it is in my database.

3    Q.  Is it also a video that appeared in the materials that the

4    FBI provided to you which you understood to be taken from

04:36 5    Mr. Bujol's computer?

6    A.  That is correct, yes.

7    Q.  And what is this video?

8    A.  This video recording or video clip is an official video

9    clip produced by al-Qaeda's network in Yemen.  This was

04:36 10   produced before al-Qaeda in Yemen became, AQAP, al-Qaeda in the

11   Arabian Peninsula.  This was released in 2008.

12           What this video shows is a rocket attack on the

13   Safir Oil Refinery -- it's S-A-F-I-R Oil Refinery -- I believe

14   in Maarib Province in Yemen.  This was one of the, again,

04:37 15   official video recordings produced by al-Qaeda's network in

16   Yemen at the time.  And it was released on the website that you

17   saw previously shown here.

18   Q.  Mr. Kohlmann, are you aware that al-Qaeda in the Arabian

19   Peninsula, that specific affiliate, has been designated by the

04:37 20   department of state as a foreign terrorist organization?

21   A.  I am.

22   Q.  Do you know when that decision occurred?

23   A.  Not off hand, although I believe it was in 2009 or 2008.

24   Q.  I would like to direct your attention now to Government's

04:37 25   Exhibit 285.  And before I show this clip, sir, I just want to

04:37   1   mention that this has been shown previously here at trial and
        2   this exhibit is admitted into evidence.
        3      *(Tape playing)*
        4   BY MR. HEENAN:
04:39   5   Q.  Mr. Kohlmann, do you understand these two speakers to be
        6   discussing a Quranic verse?
        7   A.  Yes.
        8   Q.  And what Quranic verse do you understand them to be
        9   speaking about?
04:39  10   A.  They're reading from the Chapter Surah al-Anfal, which
       11   in -- A-N-F-A-L -- which in English is translated roughly to
       12   "The Spoils of War."  They're speaking about Verse 60, which is
       13   often taken out of context by extremists to justify terrorism
       14   and --
04:39  15   Q.  How is it taken out of context?
       16   A.  Because if you keep reading in that verse -- or you keep
       17   reading that chapter, there's a whole long list of
       18   qualifications saying that you're not actually supposed to do
       19   this unless there's no other option, you're supposed to seek
04:40  20   peace and accommodation and compromise.
       21          But extremists don't really want to hear that.
       22   So, they take this out of context, to say, "Well, look, here it
       23   says terrorism, strike terrorism into the hearts of the enemies
       24   of Allah.  That means that causing terrorism is good, and it's
04:40  25   justified."

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

```
04:40    1              But the vast majority of Muslims do not believe
         2    this to be applicable, of any school, do not believe this to be
         3    applicable to present day circumstances; and they certainly do
         4    not believe it's to justify terrorism.
04:40    5              THE COURT:  Hold on one second, please.
         6              THE WITNESS:  Right.
         7         (Court confers with staff)
         8              THE COURT:  All right.  Sorry.  Go right ahead.
         9    BY MR. HEENAN:
04:42   10    Q.  Mr. Kohlmann, I would like now to direct your attention to
        11    Government's Exhibit 289, which is in evidence.  And before the
        12    clip starts, Mr. Kohlmann, this is another audio recording
        13    between two speakers, that's been admitted previously in trial,
        14    one of which is the defendant.
04:42   15         (Tape playing)
        16    BY MR. HEENAN:
        17    Q.  Mr. Kohlmann, are you familiar with the reference to the
        18    CIA officers that's discussed in this recording?
        19    A.  I am.
04:43   20    Q.  What do you understand that reference to be?
        21    A.  I believe it is a reference to a suicide bombing attack
        22    that took place on December 27th, 2009.  It was a suicide
        23    bombing attack by an individual who had self-radicalized over
        24    the Internet and had traveled from Jordan to Pakistan,
04:43   25    supposedly in the service of the CIA and the Jordanian
```

04:43  1    intelligence service; but, in fact, he became a double agent on

2    behalf of al-Qaeda.

3              Al-Qaeda and the Pakistani Taliban gave him a

4    suicide bomb vest.  He entered a CIA base on the

04:43  5    Afghan-Pakistani border, known as Camp Chapman,

6    C-H-A-P-M-A-N -- and he blew himself up, killing seven CIA

7    agents.

8    Q.  Do you know what the Arabic word "alhamdulillah" means?

9    A.  Yes.

04:43  10   Q.  What does that mean?

11   A.  "Praise be to God."

12   Q.  Is this particular event, the killing of the CIA officers

13   at Camp Chapman, an event that you understand to be celebrated

14   in jihadist circles?

04:44  15   A.  It's particularly celebrated because of the fact that this

16   individual, number one, infiltrated the CIA and infiltrated

17   Jordanian intelligence but most importantly because of the fact

18   that he self-radicalized, that he was a member on a jihadi

19   messaging forum.  He was actually a member --

04:44  20            THE COURT:  Slow down, please.

21            THE WITNESS:  Excuse me, your Honor.

22            He was a member of the Fallujah Islamic Network,

23   one of the websites that was on this list and that he

24   eventually then, via that website, became a member of al-Qaeda.

04:44  25   BY MR. HEENAN:

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:44   1    Q.  I would like to direct your attention now to the

2    Government's Exhibit 295, which is admitted into evidence.  I'm

3    just going to play a brief 20 seconds at the beginning of this

4    clip.

04:45   5        (Tape playing)

6    BY MR. HEENAN:

7    Q.  We're going to play it one more time.  I'm sorry,

8    Mr. Kohlmann.  The text didn't scroll at the bottom.  We're

9    going to reload this clip.

04:45   10       (Tape playing)

11   BY MR. HEENAN:

12   Q.  Mr. Kohlmann, were you able to hear the recording?

13   A.  Yes, I was.

14   Q.  And did you hear the reference in Arabic to al-Qaeda in the

04:46   15   Arabian Peninsula?

16   A.  Yes.  He said, "al-Qaeda fi Jazirat al-'Arab."  It means

17   "al-Qaeda in the Arabian Peninsula."

18   Q.  And that's an Arabic expression that you have heard

19   frequently and associate with al-Qaeda in the Arabian

04:46   20   Peninsula?

21   A.  That is the verbatim way, in Arabic, that you refer to

22   al-Qaeda in the Arabian Peninsula.  It is the verbatim

23   translation of "al-Qaeda in the Arabian Peninsula."

24   Q.  Okay.  Now, Mr. Kohlmann, I would like to show you what has

04:46   25   been admitted into evidence as Government's Exhibit 107.  It's

04:46  1    a video clip entitled "For My Wife."  It has been shown at

2    trial previously.

3              MR. HEENAN:  Okay.  Let me try to start this again

4    sir.

04:47  5       (Tape playing)

6    BY MR. HEENAN:

7    Q.  Mr. Kohlmann, I would like to direct your attention to the

8    screen.  And, again, this is Government's Exhibit 107, at one

9    second of the clip.  Do you recognize what's depicted on the

04:47 10    screen right now?

11    A.  Yes, I do.

12    Q.  What is that that's depicted on the screen?

13    A.  This is a video watermark.  In other words, it's something

14    that's shown -- it shows in videos to watermark the owner or

04:47 15    the original creator of the video.

16    Q.  Who created this mark?

17    A.  This watermark is for something called the Ansar al Jihad

18    Network.  This is, at the moment, probably the second most

19    important jihadi website on the Internet.  It's the second most

04:47 20    important website to al-Qaeda on the Internet.  It is a website

21    which is officially endorsed by the Taliban and by other jihadi

22    groups.

23              It is used by individuals to self-recruit.  It

24    has been used by individuals inside the United States to try to

04:48 25    travel abroad and join jihadi organizations.  And they put out

04:48  1    their own media, their own jihadi media.  And anything they
       2    produce, they put that in the front.
       3    Q.  Does this appear to be something that would have been
       4    downloaded off the Internet and placed into this particular
04:48  5    exhibit?
       6    A.  Based on my review, this was cut and pasted out of another
       7    video from the Ansar al Jihad Network into this video.  That's
       8    correct.  It was borrowed.
       9    Q.  Okay.  Continue watching.
04:48  10        (Tape playing)
       11   BY MR. HEENAN:
       12   Q.  Mr. Kohlmann, I think you've already testified as to the
       13   meaning of the "as-sadiqeen"; but, again, what is the
       14   "as-sadiqeen"?
04:50  15   A.  Well, "as-sadiqeen" means the truthful ones, the honest
       16   ones.  But in this context, I think it's fairly clear that it
       17   is a direct synonym for the mujahideen, for the people that are
       18   striving in the cause of Allah, that are striving in the cause
       19   of God.  And in this case it's in -- by this definition of the
04:50  20   "as-sadiqeen," this is the mujahideen, the people that are
       21   fighting for Allah.
       22        (Tape playing)
       23   BY MR. HEENAN:
       24   Q.  Mr. Kohlmann, are you familiar with -- do you understand
04:50  25   what "Surah Tawba" is?

04:50  1    A.  Yes.

2    Q.  What is "Surah Tawba"?

3    A.  This is another chapter of the Quran, like Surah al-Anfal,

4    this is Surah al-Tawba.

04:50  5    Q.  And is this a section of the Quran that you understand to

6    be popular in global jihadists circles?

7    A.  This is one of the more popular chapters used by jihadis to

8    justify violent jihad.

9    Q.  Now we're at one minute 39 seconds of the recording.

04:51  10   (Tape playing)

11   BY MR. HEENAN:

12   Q.  Mr. Kohlmann, do you understand the speaker to be

13   discussing a section of the Quran here?

14   A.  Yes.

04:51  15   Q.  And it says "Sit" on the screen.  We're at two minutes and

16   12 seconds of the exhibit video.  What do you understand the

17   reference to "sit" to mean?

18   A.  Well, in the context of jihad or the context of the

19   ideology of jihadi, it's usually this is a reference to someone

04:52  20   who is a sitter, someone who is sitting at home.  In other

21   words, if you believe in violent jihad, you have an obligation

22   not just to sit at home.  And if you're sitting at home, if

23   you're sitting behind, if you're remaining behind and not

24   joining the front line, you're not following your ideology.

04:52  25   You're not following that which is required upon you to enter

04:52    1    paradise.

         2         *(Tape playing)*

         3    BY MR. HEENAN:

         4    Q.   And, Mr. Kohlmann, I'm going to try to capture a couple of

04:53    5    clips here, because they move pretty fast.  So, bear with me.

         6    A.   No problem.

         7         *(Tape playing)*

         8    BY MR. HEENAN:

         9    Q.   I'm having a tough time.  One moment.

04:54   10         *(Tape playing)*

        11    BY MR. HEENAN:

        12    Q.   Directing your attention to the screen, we're at three

        13    minutes 15 seconds of the exhibit.

        14              Do you recognize the word on the screen?  It's

04:54   15    "hijrah," which I believe you previously described.  Do you

        16    recognize the person on the screen over which the word "hijrah"

        17    is superimposed?

        18    A.   Yes, I do.

        19    Q.   Who is that person?

04:54   20    A.   That is a US national and Pennsylvania resident Colleen

        21    LaRose, otherwise known as Fatima LaRose, F-A-T-I-M-A, LaRose.

        22    Q.   Is she also referred to in the public press as "Jihad

        23    Jane"?

        24    A.   She -- yes.  She referred to herself online and she has

04:54   25    since been referred to in the media as Jihad Jane.

04:54   1   Q.  Do you ascribe any significance to the word "hijrah" paired
        2   with the photograph of Ms. LaRose?
        3   A.  Ms. LaRose is not a cleric; and she has no association
        4   whatsoever with the religion of Islam or any concept of Islam,
04:55   5   other than jihad.
        6           She's primarily known, she's only known for the
        7   fact that she has pled guilty to attempting to travel overseas
        8   in a hijrah, what she described as a "hijrah" to participate in
        9   violent jihad in Pakistan, Afghanistan, and eventually inside
04:55  10   Europe.  She conspired to try to murder individuals inside of
       11   Europe in the name of jihad.
       12   Q.  I direct your attention -- if I can get the next clip --
       13       (Tape playing)
       14   BY MR. HEENAN:
04:55  15   Q.  One more time.
       16       (Tape playing)
       17   BY MR. HEENAN:
       18   Q.  Do you recognize that individual?
       19   A.  Yes, I do.
04:55  20   Q.  And who is that?
       21   A.  That is Sheikh Osama bin Mohammed bin Laden, the founder of
       22   al-Qaeda.
       23   Q.  And do you ascribe any meaning to the word that is
       24   superimposed over his image at 3:16 of the exhibit, three
04:56  25   minutes and 16 seconds, "jihad"?

04:56    1   A.   Yeah.   It's "jihad."   And paired with the image of bin

         2   Laden, there cannot be any other explanation other than holy

         3   war, violent holy struggle.   It could not refer to internal

         4   struggle.   Osama bin Laden has no association with the internal

04:56    5   meaning of jihad.

         6   Q.   I'm going to try to capture one more still, immediately

         7   before the bin Laden photograph and immediately after the

         8   Colleen LaRose photograph.   And if I can't get it, I'll just

         9   ask you to talk about it.

04:56   10   A.   Uh-huh.

        11      (Tape playing)

        12   BY MR. HEENAN:

        13   Q.   Were you able to see the individual who appeared to be in

        14   handcuffs on the frame immediately before the one depicting

04:56   15   Osama bin Laden?

        16   A.   Yes.   I'm familiar with that image.

        17   Q.   Did you also see that the word "hijrah" was superimposed

        18   over that individual's photograph, as well?

        19   A.   Yes, I did.

04:56   20   Q.   Who was the person depicted in that photograph who was in

        21   handcuffs, being accompanied by FBI agents?

        22   A.   That person is US national Najibullah Zazi,

        23   N-A-J-I-B-U-L-L-A-H, Z-A-Z-I.

        24   Q.   Do you ascribe any significance to the fact that the word

04:57   25   "hijrah" was superimposed over Najibullah Zazi's picture just

04:57  1   as it was over Colleen LaRose's picture?

2   A.  Once again, Najibullah Zazi is not a cleric.  He is not

3   known in Islam.  He has no status in Islam.  He's a nobody.

4            His only claim to fame is that he traveled to

04:57  5   Pakistan to join al-Qaeda, where he attended a training camp

6   and learned how to build explosives.  He thereupon returned to

7   the United States in a bid to bomb the New York City subway

8   system.

9            There's no meaning whatsoever of his name or his

04:57  10  personage to Islam.  The only meaning I can see with regards

11  "hijrah," with him, is the fact that he made hijrah to Pakistan

12  to attend a training camp there to learn how to build

13  explosives.

14  Q.  And to be clear, it was after he performed -- Najibullah

04:58  15  Zazi performed that hijrah that he returned to the United

16  States and engaged in a conspiracy to detonate bombs in the New

17  York subway system?

18  A.  That's correct.  And I believe he also referred to it as a

19  "hijrah."

04:58  20           And, once again, you can notice that this picture

21  was taken after his arrest.  He did plead guilty, I believe, as

22  well.

23  Q.  I'll continue with the video, sir.

24       (Tape playing)

04:59  25  BY MR. HEENAN:

Cheryll K. Barron, CSR, CM, FCRR          713.250.5585

05:00   1    Q.  Mr. Kohlmann, I may have cut it off; but in terms of the

2    audio, the still that's at four minutes and 47 seconds of this

3    exhibit, what was the organization the speaker was describing?

4    A.  He said the "Mujahideen fi Jazirat al-'Arab," which is the

05:00   5    Mujahideen in the Arabian Peninsula.  The only mujahideen in

6    the Arabian Peninsula are al-Qaeda in the Arabian Peninsula,

7    known as "AQAP."

8    Q.  And in fact is "AQAP," those letters, superimposed over the

9    photograph that appears at 4:47 of this clip?

05:00   10   A.  Yes, "AQAP," al-Qaeda in the Arabian Peninsula.  And the

11   individuals you see in the back there are the original founders

12   of al-Qaeda in the Arabian Peninsula.

13   Q.  Mr. Kohlmann, I'm going to back out a little bit from this

14   photo so all four people can be seen; and then ask you some

05:00   15   questions.

16   A.  Sure.

17   Q.  With respect to the photograph on the screen -- and there

18   are four individual depicted there -- we're at 4:48 of the

19   clip -- you said you recognize who these individuals are?

05:01   20   A.  Yes.

21   Q.  Who are the four individuals?  And if you could start from

22   left to right and describe them individually.

23   A.  Of course.  On the left, very far left, you have a Yemeni

24   national whose real name is Qasim al-Rimi, Q-A-S-I-M, A-L,

05:01   25   dash, R-I-M-I.  He is a senior military commander of al-Qaeda

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:01  1    in the Arabian Peninsula.  He is within the top three or

2    four -- the top leaders of the group.

3              To his right is Saudi Arabian national Said

4    al-Shehri, S-A-I --

05:01  5              THE COURT:  To his right?  Or looking at it to the

6    right, going left to --

7              THE WITNESS:  Coming from left to right, exactly, your

8    Honor.

9              THE COURT:  You're reading the photo from the reader's

05:01  10   left to right.

11             THE WITNESS:  Correct, from there to there, your

12   Honor.

13             THE COURT:  Correct.

14             THE WITNESS:  Right.

05:01  15             So, the individual who's sitting kind of right in

16   front of the flag right there, that individual is Said

17   al-Shehri, S-A-I-D, S-H-E-H-R-I.  Said al-Shehri is a senior

18   member of al-Qaeda in Saudi Arabia.  He was captured in

19   Afghanistan in approximately 2001 and was transferred to

05:02  20   Guantanamo Bay, Cuba.

21             He was released from Guantanamo Bay in 2007,

22   returned to Saudi Arabia, and then promptly rejoined al-Qaeda

23   by traveling into Yemen.  He is currently considered to be

24   among the top two leaders of al-Qaeda in the Arabian Peninsula.

05:02  25             To his right is Abu Basir --

BY MR. HEENAN:

Q.  To our right, I think you said.  I think you're talking
about third person from the left --

A.  Exactly.  I should be clear.  The individual wearing the
white turban, with the missile sitting directly in front of
him, the missile on the ground, sitting directly in front of
him, that is Abu Basir al-Wahishi -- A-B-U, B-A-S-I-R, A-L,
dash, W-A-I -- excuse me -- W-A-H-I-S-H-I -- otherwise known as
Nasir al-Wahishi, N-A-S-I-R, al-Wahishi.  He is the official
emir, or top commander, of al-Qaeda in the Arabian Peninsula.

        The individual on the very far right, with the
black turban, is Mohammed -- Saudi Arabia national Mohammed
al-Harbi, H-A-R-B-I.  Mr. al-Harbi was also captured in 2001 in
Afghanistan while fighting coalition forces.  He was
transferred to Guantanamo Bay, Cuba.  He was also released from
Guantanamo Bay in 2007.

        He returned to Saudi Arabia and, like
Mr. al-Shehri, crossed into Yemen and promptly rejoined
al-Qaeda.  If he's still alive and if he is still at large, he
is also considered to be among the top three leaders of
al-Qaeda in the Arabian Peninsula.

        THE COURT:  Hold it just one second.

        (Court confers with staff)

        THE COURT:  All right.  Let's get back on the record,
and let's go.  Thank you.

BY MR. HEENAN:

Q.  Mr. Kohlmann, you were describing -- or you had described now the four individuals depicted in this photograph at 4 minutes and 48 seconds of Government's Exhibit 107.  You described them, I believe, as the senior leadership of al-Qaeda in the Arabian Peninsula.

Are you familiar with the flag that appears in the background, behind these individuals?

A.  Yes.  That is the official flag used by al-Qaeda in the Arabian Peninsula as their official banner.  It is also used by al-Qaeda in Iraq and occasionally by Shabaab al-Mujahideen in Somalia.  But it is the official banner of al-Qaeda in the Arabian Peninsula.

Q.  Are you aware of the circumstances surrounding the creation of this particular photograph?

A.  Yes.

Q.  What was this particular photograph created for?

A.  This is a still image taken from a video recording which was originally released in January of 2009.  It is an official video recording produced by al-Qaeda in the Arabian Peninsula. It was released to announce the coming-out party of al-Qaeda in the Arabian Peninsula.

It was released to announce the merger of al-Qaeda in Yemen with al-Qaeda in Saudi Arabia to form al-Qaeda in the Arabian Peninsula.  This is the very first

05:06  1    video, official video, produced by al-Qaeda -- the unified

       2    al-Qaeda in the Arabian Peninsula in Yemen.

       3    Q.  And, Mr. Kohlmann, just a moment ago I believe you saw that

       4    the letters "AQAP" were superimposed over this particular

05:06  5    photograph.

       6    A.  Uh-huh.

       7    Q.  Is it fair to say that the person who made this video was

       8    accurate in placing those letters "AQAP" over this photograph?

       9    A.  One hundred percent.  That's exactly accurate.  Al-Qaeda in

05:06  10   the Arabian Peninsula, AQAP, this is the iconic image and this

       11   is the top four leaders of the organization, the top four.

       12   There's no one higher than these four.

       13   Q.  Thank you, Mr. Kohlmann.  I have no further questions.

       14        MR. HEENAN:  Your Honor, I pass the witness.

05:07  15        THE COURT:  Mr. Bujol, please.

       16                    **CROSS-EXAMINATION**

       17   BY THE DEFENDANT:

       18   Q.  All right.  I'll stick with the video.

       19            Being that these are the top four leaders, that

05:07  20   automatically, I'm assuming, gives them a role of prominence,

       21   correct?

       22   A.  They are fairly prominent within the world of jihad, yes.

       23   Q.  In your understanding of the world of jihad and prominence

       24   with respect to prayer, where would they pray if they were to

05:07  25   be in prayer session?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:07   1   A.  You mean what direction would they pray to?

2   Q.  No.  Where would they pray in -- would they pray in the

3   front of the prayer group or in the middle or the back?

4   A.  I have no idea what their prayer practice -- or where

05:07   5   they're locate -- generally speaking, the leaders of an

6   organization sit in the front when they pray; but that may or

7   may not be the case, depending on operational security and a

8   variety of other circumstances.

9   Q.  Okay.  And you mentioned earlier that the term

05:08   10   "as-sadiqeen" is synonomous with the term "mujahideen,"

11   correct?

12   A.  I didn't say it was synonymous in all cases.  I said that

13   in the context here it is synonomous with "mujahideen," yes.

14          THE DEFENDANT:  I would like to go back to the clip

05:08   15   where the word "as-sadiqeen" is used and it's superimposed over

16   an image.

17          *(Tape playing)*

18   BY THE DEFENDANT:

19   Q.  Looking at this photo, can you identify these individuals

05:08   20   as the same individuals that were in the same photo we just

21   looked at?

22   A.  I don't believe they are, no.

23   Q.  Well, if the defendant identifies these people as one and

24   the same, why didn't he just put the image here with

05:09   25   "as-sadiqeen" instead of referring to this as a separate and

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:09  1    distinct entity from himself?

2           MR. HEENAN:  Object as to form, your Honor.

3           THE COURT:  I don't understand the question, but our

4    expert might.  So --

05:09  5           Do you understand the question?

6           THE WITNESS:  Your Honor, I'm afraid I don't

7    understand the question.

8           THE COURT:  Okay.  Rephrase it, please.  Just rephrase

9    it, sir.

05:09  10   BY THE DEFENDANT:

11   Q.  Is it safe to say that a person who, in the jihadi context,

12   would make one term synonomous with another, to impose an image

13   of al-Qaeda with regards to this term than to some unknown

14   image with non-fighters behind them? [sic]

05:10  15   A.  I have no idea what organization these individuals are, but

16   clearly they're armed individuals.  They are praying.  It's the

17   traditional Muslim prayer.

18          I think under most circumstances they would

19   generically be described as "mujahideen."  But I don't think

05:10  20   there's any way of knowing from this image alone what conflict

21   zone they're from, what conflict zone they're fighting in, what

22   the context is that they're praying to.

23          Clearly, though, the vast majority of Muslims,

24   when they're describing the as-sadiqeen, would not be

05:10  25   describing armed individuals wearing masks as the honest ones

05:11   1   or the truthful ones.

2   Q.   Is everyone in the photo armed and wearing masks?

3   A.   No.

4        THE DEFENDANT:   Your Honor, at this time I would like

05:11   5   to submit the expert report, if it's not already submitted, as

6   Exhibit 4.

7        THE COURT:   Whose expert report?

8        THE DEFENDANT:   Mr. Kohlmann's expert report.

9        THE COURT:   I just need to tell you that in all my

05:11   10   experience, civil and criminal cases, I do not permit expert

11   reports in evidence.   You can use it; you can cross-examine him

12   from it; but I do not admit them into evidence.

13        Unless the government has no objection.   Do you

14   have any objection?   It's strictly up to you.

05:11   15        MR. HEENAN:   No objection, your Honor.

16        THE COURT:   All right.   No objection.   That's fine.

17        All right, sir.   Then your exhibit, Defendant's

18   Exhibit Number 4, without objection, is admitted into evidence.

19        Go right ahead, sir.

05:12   20   BY THE DEFENDANT:

21   Q.   Document's essentially divided into sections dealing with

22   characteristics that are endemic amongst what is known as a

23   homegrown terrorist, one of which is the formulation of

24   self-selecting schemes aimed at traveling abroad to join

05:12   25   foreign terrorist organizations and/or achieving imminent acts

05:12   1   of physical violence.

2   A.   That's correct, yes.

3   Q.   And you mention that, in your assessment, from the context

4   of conversations, that the defendant is not simply referring to

05:12   5   making a traditional mandated pilgrimage or even to live in a

6   country governed by Islamic Sharia law.   What conversations are

7   you referring to here?

8   A.   The conversations referring to the Mujahideen fi Jazirat

9   al-'Arab, the conversations referring to using logistical

05:13   10   subterfuge to gain entry into Yemen, the conversations talking

11   about AQAP, none of these things are consistent with a

12   religious pilgrimage or going to live in a country of Sharia.

13   If you went to go to live in Yemen under Sharia and you began

14   advertising your interest in al-Qaeda, you would end up in

05:13   15   jail, just like Anwar al-Awlaki did.

16   Q.   So, these were conversations between the defendant and the

17   confidential source?

18   A.   I believe so, yes.

19   Q.   Okay.   I want to go to a -- you wrote here that the

05:14   20   defendant says, "We have to make an escape from -- because it's

21   a shame, for me to be a Muslim is really shameful to be a part

22   of this and live here.   I cannot look myself in the face and

23   say that I am from the nation of the Prophet Muhammad and just

24   continue to live here, go to the mosque and make prayers.

05:14   25   You're contributing to this infidelity.   You're paying into

05:14  1    this infidelity.  You're strengthening the numbers of the

       2    infidels.  You're strengthening their ability.  I want to get

       3    out of here."

       4                    Do you recognize this statement?

05:14  5    A.  I believe so, yes.

       6    Q.  And who is this statement from?

       7    A.  I believe it's from yourself, the defendant.

       8    Q.  Okay.  And where in this statement does the defendant

       9    suggest that he wants to commit imminent acts of violence?

05:15 10    A.  That's not about committing imminent acts of violence.

      11    That's about the idea of the imminency of leaving; in other

      12    words, the idea that there -- part of understanding whether or

      13    not someone is a threat or understanding whether someone is

      14    really radicalized is understanding about the imminency, about

05:15 15    how much they want to travel abroad to join a jihadi

      16    organization, how much do they want to carry out an act of

      17    violence.

      18                    THE COURT:  Slow down, please.

      19                    THE WITNESS:  Excuse me, your Honor.

05:15 20                    When someone continually discusses about their

      21    imminent desire to leave, that is an indicator of imminency,

      22    that they really are interested in this; this is not just a

      23    passing fancy; this is something that they are obsessed with.

      24    BY THE DEFENDANT:

05:15 25    Q.  So, you don't understand this, that a person could also see

05:15  1    himself as residing in one place and paying and contributing

2    taxes as also being a source of his imminence in wanting to

3    leave?

4    A.  Oh, no, no.  Certainly so.  And I think if you took that

05:16  5    statement out of context alone, it's possible.

6                    But not in the context of the other

7    conversations.  And the other conversations, paired with that,

8    make it clear that this is not simply about leaving the United

9    States and avoiding paying taxes, that this is something having

05:16  10   to do with joining -- again, verbatim, joining the Mujahideen

11   fi Jazirat al-'Arab, joining the Mujahideen in the Arabian

12   Peninsula.

13   Q.  Okay.  You mention that this person talks about an

14   opportunity, an opportunity to go and join the mujahideen in

05:17  15   the Arabian Peninsula.

16   A.  Uh-huh.

17   Q.  You mentioned also the Sharif Mobley case, wherein he

18   traveled to Yemen and received training there.  Is that

19   correct?

05:17  20   A.  That is my understanding, yes.

21   Q.  Okay.  And you're also familiar with the underwear bomber,

22   who traveled and received training in Yemen.  Is that correct?

23   A.  Umar Farouk Abdulmutallab, yes, I am.

24   Q.  So, it isn't to your knowledge that the organization of

05:17  25   al-Qaeda in the Arabian Peninsula has training camps in Yemen?

05:17   1   A.  Yes.  They are not -- they are not static training camps.

2   They're not based in one physical location and they stay there.

3   They're mobile training camps.  They set them up in the desert

4   and in remote areas, depending on when there are trainees

05:18   5   available for such sessions.

6   Q.  Okay.  Where do these remote camps tend to -- are they

7   trying to avoid detection or what's the -- what's the -- is it

8   just counter security?

9   A.  What is "counter security"?  I'm sorry.  I don't

05:18   10  understand.

11  Q.  Having a roving location on these -- on these camp sites.

12  A.  I believe the -- the concern is because of drone strikes.

13  The concern is that if you have a physical camp located

14  somewhere, both the Yemeni Air Force and US-built drone

05:18   15  aircraft are capable of launching strikes on those camps and

16  destroying them.

17          The camp that we have the most information on was

18  actually featured, I believe, in a video recording which was

19  recovered from the hard drive presented to me in this case.

05:18   20  Q.  And where was that camp?

21  A.  I'm not certain offhand.  I believe it was in Maarib

22  Province in Yemen.  It was either Maarib or al-Jawf.  Al-Jawf

23  is -- J-A-W-F.  It's a region up near the Saudi border.

24  Q.  Okay.  So, would you say that these roving camps are in a

05:19   25  geographical area of Northern Central Yemen, Southern Central?

05:19  1    A.  My understanding is that there are training camps in

2    various different locations in Yemen.  There's al-Jawf, which

3    is the northern part, near the Saudi border.  However, more

4    recently, there are also camps farther south, near the Gulf of

05:19  5    Aden, on the coast.

6          There are a variety of different al-Qaeda cells

7    now active in Yemen.  They all operate under AQAP, but they are

8    located in various different regions, presumably so that they

9    can launch operations across the entire country versus being

05:19  10   centralized in one location.

11   Q.  And, so, being that you recovered a featured camp location

12   off the defendant's computer, is it safe to say that he was in

13   fact aware to some extent of these camps existing in Yemen

14   itself?

05:20  15   A.  Yeah.  Again, I don't know per se whether or not they

16   identified the actual physical location of where the camp was

17   in Yemen.  But I can say for sure that there was video footage

18   of one of those training camps in a video recording recovered

19   from the hard drive presented to me in this case.

05:20  20   Q.  Okay.  With that said and the defendant's presumed

21   knowledge, are you aware -- with that said and the presumed

22   knowledge, would the defendant reasonably believe that he's

23   going to a country that's not in the Arabian Peninsula, doesn't

24   border the Arabian Peninsula, but is going to get trained at a

05:21  25   camp by al-Qaeda in the Arabian Peninsula?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:21   1          MR. HEENAN:  Objection, your Honor.  Calls for a legal

2      conclusion, I think, on the charges in this case.

3                  THE COURT:  I didn't understand the question.

4                      Did you understand it?

05:21   5          THE WITNESS:  I think so, your Honor.

6                  THE COURT:  Okay.  Overrule the objection.  You may

7      answer.

8                  THE WITNESS:  I think so.

9                  The fact is that AQAP has networked with several

05:21   10     other al-Qaeda affiliates, including Shabaab al-Mujahideen in

11     Somalia, and I believe also al-Qaeda in the Islamic Maghreb in

12     Algeria.  These organizations tend to communicate with each

13     other privately as well as publicly.  They share resources.

14                 Even Anwar al-Awlaki has issued open statements

05:21   15     on behalf of AQAP to some of these organizations.  I believe it

16     would be feasible for AQAP to network with these groups in

17     order to share recruits and in order to provide a travel path

18     for those recruits into Yemen.  Yes, I believe that is

19     possible.  And moreover, likely.

05:22   20     BY THE DEFENDANT:

21     Q.  Okay.  From your analysis of the conversation that took

22     place between the defendant and the informant, did he discuss

23     the group al-Shabaab that you mentioned?

24     A.  You know, I don't recall specifically offhand.

05:22   25     Q.  And what was the other group you mentioned?

05:22  1   A.  Al-Qaeda in the Islamic Maghreb, AQIM, which was the
2   regional al-Qaeda affiliate -- excuse me -- "Maghreb" is
3   M-A-G-H-R-I-B [sic].  It is the regional al-Qaeda affiliate in
4   Algeria, primarily based in Algeria.

05:22  5                Excuse me.  I should go back, though, for a
6   second.  I do recall there were -- I don't recall if there was
7   any discussions involving Shabaab.  However, I do recall that
8   of the materials that I was presented with recovered from the
9   hard drive --

05:23  10               THE COURT:  Slow down, please.
11               THE WITNESS:  Excuse me, your Honor.
12               -- there were images, still images, taken from
13   official video recordings produced by Shabaab al-Mujahideen in
14   Somalia.  In other words, there were excerpts of propaganda,
05:23  15   produced by Shabaab, on the hard drive presented to me.
16   BY THE DEFENDANT:
17   Q.  You said in this report that, during the recorded
18   conversations, the defendant referred to AQAP as the "faithful
19   fighters," in quotation marks.  And below that, there's a
05:24  20   number, a superscripted number "15," which refers to a footnote
21   from a transcript that was dated January 20th of 2010.
22   A.  I believe so.  I don't have a copy of the report in front
23   of me; but I believe that is correct, yes.
24   Q.  However, are you aware that the defendant was never told --
05:24  25   or al-Qaeda was never mentioned until March 14th of 2010?

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

05:24   1   A.  I'm not familiar with that if that is the case.

2   Q.  Well, I would like to show you the transcript from

3   March 14th of 2010, wherein the CHS, in fact, opens the secret

4   with regards to his true affiliations, or his heretofore

05:25   5   undisclosed affiliations.

6            It's Page 30 on the transcript.  Basically says,

7   "I'm part of the group.  That has a name."

8            "We just call it whatever name it is.  So, in

9   Iraq they call us insurgents.  You know?  In Afghanistan they

05:25   10  have -- they call us something" -- "you know?  And

11  Al-Jazeera" -- "but in all of them, we're really one.  One

12  group."

13           "However" -- "the group that I work for

14  specifically is what they call it" -- "al-Qaeda" -- in the

05:26   15  Arabian Peninsula.

16           Having said that, how is it possible for the

17  defendant to have referred to al-Qaeda in the Arabian

18  Peninsula?

19           Or would you please show us where the defendant

05:26   20  referred to al-Qaeda in the Arabian Peninsula as the "faithful

21  fighters"?

22  A.  I would have to see the transcript to be specific, but I

23  believe it is correct that the defendant in this case was aware

24  of the existence and the nature of al-Qaeda in the Arabian

05:26   25  Peninsula before it was -- before the CHS introduced himself as

05:26  1    being a representative of the AQAP.

2                   In other words, simply -- simply knowing about

3    AQAP would have been enough to refer to them as the "faithful

4    fighters."  That was my interpretation.

05:26  5                   But I don't have the report in front of me, and I

6    don't have the transcript in front of me.  That is my

7    recollection, however.

8          THE DEFENDANT:  At this time the defendant would move

9    to have the audio recording from January 20th admitted into

05:27  10   evidence, along with the accompanying transcript, because there

11   doesn't exist a single statement mentioning al-Qaeda in the

12   Arabian Peninsula.

13         MR. HEENAN:  Your Honor, these two items are already

14   in evidence; and I will provide the numbers to the Court here

05:27  15   in just a moment.

16         THE COURT:  Okay.

17         THE DEFENDANT:  Well, there's actually excerpts.

18   And -- well, you can provide the excerpts, which don't contain

19   the defendant --

05:27  20         THE COURT:  We're not going to play the whole thing.

21         THE DEFENDANT:  Yeah.  Well, just -- you can look at

22   the transcript and read it.  I mean -- or whatever you want to

23   do.

24         THE COURT:  All right.  If you want.  It's a non-jury

05:27  25   case, if you want to hand it up and tell me which -- what you

05:27   1    want me to read, I'll do it right now.  How many excerpts are
        2    there?
        3            MR. HEENAN:  Your Honor, I believe the excerpt that
        4    Mr. Bujol is referring to is an excerpt from Government's
05:28   5    Exhibit 312, which is from the January 20th, 2010, meeting
        6    between the source and Mr. Bujol.
        7            THE COURT:  All right.  How long is it?
        8            MR. HEENAN:  It's a one -- I think one paragraph.
        9            May I confer with Mr. Bujol?
05:28   10    *(Mr. Heenan confers with defendant)*
        11            THE DEFENDANT:  Actually, what that is, is the
        12    defendant referring to a purported news article he had read --
        13            THE COURT:  All right.  Let me ask you this.  Why
        14    don't you -- if it's not too long, why don't you find it and
05:28   15    read it?  Okay?  If you find and read the excerpt that you
        16    want -- you're looking for a particular excerpt, that's the
        17    easiest way to do it.  I'll be glad to consider it.
        18            All right.  While Mr. Bujol is looking this up,
        19    the government, tell me what's the date of this?
05:29   20            MR. HEENAN:  If this is, in fact, the meeting that he
        21    is looking to get an excerpt from, it's a January 20th, 2010,
        22    meeting between the source and Mr. Bujol.  And it's
        23    Government's Exhibit 312, the transcript.
        24            THE COURT:  Okay.
05:29   25            THE DEFENDANT:  Okay.  This is on Page 3, and it just

```
05:29    1   says --
         2              THE COURT:  Okay.  You can read.  And it's Page --
         3              THE DEFENDANT:  Yes.  It says --
         4              THE COURT:  Hold it.  Wait a second.
05:29    5              It's on Page 3 of that exhibit.  Is that correct,
         6   sir?
         7              THE DEFENDANT:  Yes, your Honor.
         8              THE COURT:  All right.  Why don't you read what -- the
         9   questions and answers and who's talking.  Okay?
05:29   10              THE DEFENDANT:  Well, it's just me talking.  And I'm
        11   talking about how the news comes on and I've been trying, in my
        12   efforts to learn Arabic, listen to the news stations in Arabic.
        13   Because the first time, it's really fast and I don't understand
        14   it.  Then, the second time, I start hearing it and I'm
05:30   15   trying -- and I am giving him an example, and I am talking
        16   about how there was a report where more than 40 men, women, and
        17   children were killed.
        18              MR. HEENAN:  Your Honor, I object.  The defendant is
        19   testifying right now.  We can read the transcript, read the
05:30   20   excerpt.
        21              THE COURT:  Exactly.  I'll allow you to read the
        22   excerpts.
        23              THE DEFENDANT:  Oh, okay.
        24              THE COURT:  Just read it.  What page are you on?
05:30   25   Three?
```

05:30   1          THE DEFENDANT:  Yes.

    2          THE COURT:  Okay.  Read what you want in.

    3          THE DEFENDANT:  "Then" -- "so I can understand it,

    4   because the first time is really fast and I may not

05:30   5   understand" --

    6          THE COURT:  Hold it, sir.  Hang on.  Now, you heard

    7   me.  People have a tendency to speed up when they read.  Court

    8   reporter needs to take it down and get it accurately.  So, if

    9   you would, start again, please.

05:30   10         THE DEFENDANT:  Okay.

    11         THE COURT:  Go on.

    12         THE DEFENDANT:  "Then" -- "so I can understand it,

    13  because the first time is really fast and I may not understand,

    14  then the second time, I'll look and I can -- I can start to

05:31   15  hear what the person is saying, because, you know, it's the

    16  news.  They're -- they're -- but I can get it, like, for

    17  example" -- "al-Qaeda in the Arabian Peninsula" -- "in the

    18  Arabian Peninsula -- after, after, after, before" --

    19              And this part here is embolded; so, it's in

05:31   20  Arabic.

    21              -- "before, before, before, before one month ago,

    22  the United States and the Yemeni government attacked al-Qaeda

    23  in the Arabian Peninsula" -- "in the Arabian Peninsula by

    24  weapons and killed" -- "more than 40 children, women, and men."

05:31   25              Now, this isn't -- this is just a reported news

05:31  1    article.  It's not me referring to these people as the

2    "faithful fighters."

3                THE COURT:  Okay.  What's your question now?

4    BY THE DEFENDANT:

05:32  5    Q.  My question is where is it in this document where I am

6    referring to this organization as "faithful fighters" as it's

7    reported because --

8                THE COURT:  In his report?

9                THE DEFENDANT:  As it's reported in his report.

05:32  10               THE COURT:  Okay.  Why don't you hold it right there.

11               Can you answer that?

12               THE WITNESS:  Your Honor, I would have to refer back

13   to the transcripts.  I know that it's in there.

14               The specific reference there is to an air strike

05:32  15   that took place in December of 2009, targeting a group of AQAP

16   fighters.  And the reference was to, again -- but that was --

17   again, it was my conclusion based upon all the evidence that I

18   looked at; it was based upon reading all the transcripts; and

19   it was based upon the comments of the defendant.  That's all I

05:32  20   can say.

21               THE COURT:  All right.  Now you have to move on.  Go

22   right ahead, sir.

23   BY THE DEFENDANT:

24   Q.  Also in this report, you mention that, in spite of visiting

05:33  25   the site by Anwar al-Awlaki, that not everyone who went to that

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

```
05:33   1    site went on to commit acts of terrorism.  Is that correct?
        2    A.  A hundred percent, that's a hundred percent correct.
        3    Q.  So, then, based on that, it is safe to say that everyone
        4    who's ever heard of this individual or listened to this
05:34   5    individual hasn't aspired to become a terrorist and/or a
        6    suicide bomber?
        7    A.  Not everyone.
        8    Q.  Okay.  When we looked at the "My Wife" video, one of the
        9    images shown was that of Colleen LaRose, aka Jihad Jane, with a
05:35  10    superimposed word "hijrah."  Is that correct?
       11    A.  That is correct, yes.
       12          THE DEFENDANT:  And at this time I would like to point
       13    to Government's Exhibit 186, which is an article sent by the
       14    defendant to the CHS.
05:35  15    BY THE DEFENDANT:
       16    Q.  If I could direct your attention to the bottom of the
       17    article, down where it's -- next to the date, it says March 15,
       18    2010.  And you see a one of characters next to it.  What is
       19    that?
05:36  20    A.  That is the URL, the "Universal Resource Locator."  In
       21    other words, the address it was on the Internet.
       22          THE DEFENDANT:  Okay.  At this time, your Honor, I
       23    would like to admit into evidence an e-mail from the defendant
       24    to the CHS with the URL to this -- this article here.
05:37  25          THE COURT:  You got it there?
```

05:37  1                    THE DEFENDANT:  Yes, sir.

2                    THE COURT:  Okay.  Why doesn't the government take a

3        look at it, see if you have any objection?

4                    MR. HEENAN:  I believe this is already in evidence as

05:37  5        a government exhibit, but I can't recall offhand.  So, I have

6        no objection, though, to this --

7                    THE COURT:  To it coming in?

8                    MR. HEENAN:  To it coming in.

9                    THE COURT:  All right.  We'll mark it Defendant's

05:37  10       Number 5.  Group of e-mails, correct?

11                   THE DEFENDANT:  Yes.

12                   THE COURT:  Okay.  I'm saying both to my staff and

13       everyone here, let's make sure we keep track of these so at the

14       end we have a copy of the defendant's exhibits also to stay

05:37  15       with the case.

16                        So, that's Defendant's Number 5, admitted into

17       evidence.  A group of e-mails.  Right?

18                   THE DEFENDANT:  Yes, your Honor.

19                   THE COURT:  Okay.

05:38  20       BY THE DEFENDANT:

21       Q.  What is your -- in the realm of Salafi jihadists, how would

22       they identify with the actions of Ms. LaRose?

23       A.  There's a mixed reaction.  Some people have been very much

24       inspired by what she did and what she was trying to do and who

05:38  25       she is.  Others felt that her approach was foolish and that,

05:38   1   while her intentions were good, her approach was overly brash

2   and she -- she attracted too much outside attention with her

3   activities on YouTube and elsewhere.  So, it's mixed.

4         I think the Salafi-Jihadis, in general, would

05:38   5   agree with her intentions; but her methodology in terms of

6   trying to achieve hijrah and join a violent jihadi

7   organization, I think it's fair to say there are some that

8   might quibble with that.

9   Q.   So, she was making -- strike the last question.

05:39   10         So, in spite of the fact that there's a mixed

11   reaction, would you say that there is a universal acceptance of

12   her attempted or aspired actions?

13   A.   Universal in --

14   Q.   In the Salafi-Jihadi community.

05:39   15   A.   I can't speak for all Salafi-Jihadis.  But I can say Jihad

16   Jane was -- Colleen LaRose was specifically hailed by al-Qaeda

17   in the Arabian Peninsula in its "Inspire" magazine as being an

18   unjustly held prisoner, as being a hero of Islam.  However, I'm

19   also aware that there are those within her immediate network

05:39   20   online, who are Salafi-Jihadis, who, you know, very much agreed

21   with her intentions, just felt that she approached this in the

22   wrong way, that she should have done this in a more secretive

23   or in a way that employed more subterfuge rather than openly

24   identifying herself on YouTube.

05:40   25   Q.   So, again, my question is, they didn't condemn her actions;

05:40  1    they just condemned her way of going about achieving those
       2    actions or achieving those goals?
       3    A.  I mean, anyone that believes in the concept of traveling
       4    abroad to join in a violent jihad, yeah, of course, they would
05:40  5    support anyone who tried traveling abroad and joining a violent
       6    jihad.  And that's exactly what Colleen LaRose was trying to
       7    do.  I think that's why al-Qaeda in the Arabian Peninsula
       8    hailed her in the "Inspire" magazine.
       9    Q.  Okay.  At this time I want to bring your attention to this
05:40  10   previously submitted e-mail, the subject title is "Even looking
       11   at Sisters," where it says, "I want you to take a look at this
       12   following article.  This is ridiculous.  I just think it's some
       13   kind of false prop to start -- to justify starting to harass
       14   sisters, as well."
05:41  15          And then the author, who's the defendant, says,
       16   "I ask Allah that he make a way out for all sincere Muslims
       17   before they are stuck in the land of kufr or disbelief, ameen."
       18          What are you familiar with at any time with the
       19   term "ameen"?
05:41  20   A.  "Ameen"?
       21   Q.  Yes.
       22   A.  "Amen."
       23   Q.  "Amen," correct?
       24   A.  Yes.
05:41  25   Q.  I would like to go at this time to -- I would like to go

05:41  1    back to the March 14th transcript, wherein the -- the defendant

2    says, after sending this e-mail, "she was just a person who

3    was, you know, on her own and was trying to find out and asking

4    too many -- asking and trying to do the wrong things, asking

05:42  5    and trying to do the wrong things by herself.  Because I did

6    find the court complaints.  She has actually been arrested for

7    five months, and they just now put it out because they want

8    to -- like you said, it's a scare tactic.  They want to gain

9    popular support and then they show that they are doing their

05:43  10   job.  But they arrested her, and she already came back from

11   Europe.  They knew she was not a threat.  They knew -- okay.

12   This is just a woman, you know, asking the wrong questions.

13   She wanted to marry a brother overseas, and she went over there

14   to I guess meet the brother or whatever.  And she was coming

05:43  15   back, and they arrested her.  So, it's not -- it's not --

16   it's -- it's -- she's not a threat at all.  But they want to

17   try to make it, you know, look like they're doing."

18           Again, with her actions being hailed in the

19   jihadi aspiring terrorist community, would that be consistent

05:43  20   with someone saying "she was asking and trying to do the wrong

21   things"?

22   A.  I'm not sure I understand the question.

23   Q.  When the defendant states in this -- according to this

24   document, that Jihad Jane is asking and trying to do the wrong

05:44  25   things, is that consistent with what you have previously

05:44    1   denoted as a "praise" of her activities?

         2   A.  I'm sorry.  I still don't think I fully understand what the

         3   question is.  Can you clarify a little bit?

         4   Q.  Would a person supportive of her actions refer to her

05:45    5   actions as "the wrong things"?

         6   A.  Possibly, yes.  Again, it depends what you mean by "her

         7   actions."  If you mean her desire to travel abroad, to travel

         8   and join in violent jihad, or the methodology in which she

         9   engaged in it -- again, there were -- there were people who

05:45   10   were critical of the way she went about it because of the fact

        11   that she advertised herself online and she went about it

        12   without employing sufficient logistical subterfuge.  So, there

        13   were some people who were critical.

        14         But I think, in general, the idea any -- again, I

05:45   15   can only go back to what I just said, which is that among

        16   people who support the concept of traveling abroad to

        17   participate in violent jihad naturally they're going to support

        18   others who are traveling abroad to participate in violent

        19   jihad, even if they may criticize the methodology that they

05:46   20   employ in terms of getting there or joining an organization or

        21   traveling there or, you know, et cetera.

        22         But, I mean, theoretically, I have not seen too

        23   many hard core jihadis saying her idea of traveling abroad to

        24   participate in violent jihad was the wrong thing.  The only

05:46   25   possible criticism would be that women, in general, among

05:46  1    Salafi-Jihadis are not, generally speaking, encouraged to

2    directly participate in violent conflict.  It's possible

3    someone might have a disagreement with that part; but the rest

4    of it, no, I don't see why not.

05:47  5    Q.  Okay.  You mentioned this recurring idea of "logistical

6    subterfuge."  What are you referring to there?

7    A.  I'm referring here to the use of coded language, the use of

8    language ciphers, language substitution.  I'm referring to

9    elaborate travel patterns that are unnecessary except if there

05:47  10   is an illicit purpose or illicit methodology being used to

11   travel.  I am referring to the use of stolen or fraudulent

12   identification.

13              These are all things that individuals who are

14   engaging in legal activity do not need to engage in; and, thus,

05:47  15   that is an indicator of illicit activity.

16   Q.  Do you recall an instance wherein the defendant mentioned

17   one of these logistical maneuvers that you're referring to?

18   A.  There are dozens of such instances.  They're in my report;

19   but -- I mean, there are dozens of such instances.  There are

05:48  20   references to -- first of all, of course, there's the use of

21   the word "elephant" as a language substitution or as a word

22   substitution for "drones."  Someone engaging in a --

23              THE COURT:  Slow down, please.

24              THE WITNESS:  Excuse me, your Honor.

05:48  25              Someone engaging in a philosophical or technical

05:49  1   discussion of drones would not need to refer to them as

2   "elephants" nor refer to the pilots as "riders."

3            Someone traveling to Yemen to join a language

4   institute would fly through London or fly through Egypt or

05:49  5   Dubai.  They would not need to take a boat.  They certainly

6   would not need to take a boat to Algeria, which is

7   approximately, I believe, 2,000 miles away from Yemen, which

8   is --

9   Q.  I'm sorry.  You said Algeria is 2,000 miles away from

05:49  10  Yemen?

11  A.  It's at least a thousand miles, if not more.  It's a very

12  roundabout way of getting to Yemen.  I mean, you can get there;

13  but someone traveling with a legitimate purpose would not

14  travel in that direction, certainly not in that method.

05:49  15  Traveling by sea to Yemen is not something that people

16  attending language institutes in Yemen do.  I know this because

17  I have friends of mine who have attended those language

18  institutes.

19            When you use multiple e-mail addresses and you

05:49  20  continually change e-mail addresses and you attempt to

21  obfuscate the purpose or the subject of discussion in those

22  e-mails, again, that's not something that ordinary people do in

23  terms of communication.

24            These are all elements of logistical subterfuge;

05:50  25  they're all elements of illicit activity; and they're all

05:50  1    indicators of the presence of a violent homegrown extremist or

    2    extremist network.

    3    Q.   I want to pick up on where you mentioned about the code,

    4    code words.   From your analysis of this particular case, who

05:50  5    was it that insisted on the formation of that code?

    6    A.   I believe that both the -- yourself and the CHS both

    7    emphasized the need of it.   I know the CHS did, but I believe

    8    that you were the first person to use the word "elephant" as

    9    substitution for the word "drone."   So, it was my perception

05:51  10   that both individuals, in the transcripts, both the CHS and

    11   yourself were engaging in extensive logistical subterfuge.

    12        And it's certainly true that the CHS was

    13   encouraging the use of logistical subterfuge because of the

    14   fact that, again, engaging in these activities without engaging

05:51  15   in logistical subterfuge would tend to draw law enforcement

    16   attention and that -- that would be a bad thing, because some

    17   of this stuff is potentially illicit.

    18   Q.   So, you do agree that the CHS was encouraging logistical

    19   subterfuge?

05:51  20   A.   I believe he did, yes.

    21   Q.   Do you recall him giving a reason for that?

    22   A.   I believe he did; but I can't recall the exact wording, off

    23   the top of my head.   It may even be cited in my report.

    24   Q.   At this time I'm going to go to the transcript from

05:52  25   February 3rd.

05:52  1                    Okay.  I want to start with Page 11, where the
        2    CHS is talking.  He says, "I want to see if you can do this --
        3    referring to this logistical subterfuge.  Just because it's
        4    getting late I'll just move on to where he says, "You need to
05:53  5    have to find out everything on yourself."
        6                    "I cannot help you on that."
        7                    "Because if you can't do this, I think you cannot
        8    travel."
        9                    "It's very simple."
05:53  10                    We talked about it, like Mickey Mouse things."
        11                    Now, at this point there hasn't been a mention of
        12   al-Qaeda or any terrorist organization.  And at this point the
        13   CHS is clearly saying, "If you cannot do -- follow these simple
        14   instructions, you cannot travel."
05:54  15   A.  Are you saying --
        16   Q.  At this point --
        17   A.  Excuse me.
        18   Q.  At this point what I would like to ask is do you recall any
        19   conversation, up to this point, discussing traveling to join
05:54  20   not only al-Qaeda in the Arabian Peninsula or any designated
        21   terrorist organization for the purpose of committing acts of
        22   terrorism?
        23   A.  Were there discussions?
        24   Q.  Were there discussions on this -- this is saying -- this is
05:54  25   a specific -- this -- this -- this is recalling a specific

05:54  1    incident.  "If you can't do this, you can't travel," meaning --

2    he's talking to me.  So, that means we talked about traveling

3    before.

4              So, I'm asking, in those -- do you recall any

05:54  5    previous conversations where they talked about traveling to

6    fight or join any designated terrorist organization, fight

7    for -- I'm sorry -- or join that organization to commit acts of

8    terrorism?

9              MR. HEENAN:  Your Honor, I would like to object at

05:55  10   this point to relevance.  And we're pretty far afield outside

11   the scope of direct.

12             THE COURT:  Sustained.  It's outside the scope, and

13   you need to get on to a different subject.  I agree.

14   Sustained.  That's why I let him go, subject to an objection.

05:55  15             Go right ahead, sir.

16             THE DEFENDANT:  No further questions, your Honor.

17             THE COURT:  Thank you.

18             Anything further from this witness?

19             MR. HEENAN:  Nothing further, your Honor.

05:55  20             THE COURT:  Thank you, sir.  You may step down.

21   You're excused.  You're free to leave.

22             Call your next witness.

23             MR. HEENAN:  Your Honor, I believe we may be prepared

24   to rest, but if I could consult with my --

05:55  25             THE COURT:  All right.  The government may rest at

05:55   1  this time.  We'll see.

2       (Counsel confer)

3           MR. HEENAN:  Government rests, your Honor.

4           THE COURT:  Government rests its case.

05:56   5           It's now five minutes to 6:00.  So, we're not

6  going to begin.  So, tomorrow morning, Mr. Bujol, I'm going to

7  be asking if you desire to proceed with a case on behalf of the

8  defense.  Keep in mind you're not required to.  Okay?

9           THE DEFENDANT:  Yes, your Honor.

05:56   10          THE COURT:  So, I'll be asking you that.  And I have a

11  set of instructions if you elect, you know, to proceed with the

12  case and if you elect to testify yourself.

13          So, keep in mind you're under no obligation to

14  put any evidence on whatsoever.  That's -- but if you do, then

05:56   15  certainly you have the absolute right to do so.

16          So, at this time -- we're early tonight.  We'll

17  see you tomorrow, ready to resume -- keep in mind, tomorrow, no

18  matter where we are, we end at 1:45.  But we're going to go

19  straight through to 1:45 with an extra break in there

05:56   20  somewhere.  Okay?

21          See you then.

22      (Proceedings recessed for evening)

23              * * * * *

24

25

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

1                    COURT REPORTER'S CERTIFICATION

2          I certify that the foregoing is a correct transcript from
           the record of proceedings in the above-entitled cause.
3

4    Date:  April 3, 2012

5

6                                   /s/   Cheryll K. Barron

7                          Cheryll K. Barron, CSR, CMR, FCRR
                           Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25