1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
2                        HOUSTON DIVISION

3    UNITED STATES OF AMERICA      .
                                   . H-10-CR-368
4           vs.                    . HOUSTON, TEXAS
                                   . NOVEMBER 10, 2011
5                                  . 10:14 A.M.
     BARRY WALTER BUJOL, JR.       .
6    . . . . . . . . . . . . . . .

7
                     TRANSCRIPT OF BENCH TRIAL
8            BEFORE THE HONORABLE DAVID HITTNER
                    UNITED STATES DISTRICT JUDGE
9                          VOLUME 4

10

11        THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER
     THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
12   COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
     ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
13   COPY AT THE OFFICIAL RATE.
          General Order 94-15, United States District Court,
14   Southern District of Texas.

15

16   A P P E A R A N C E S:

17   FOR THE GOVERNMENT:

18        Stephen Mark McIntyre
          Craig M. Feazel
19        Assistant US Attorney
          P O Box 61129
20        Houston, TX 77208

21        Garrett M. Heenan
          United States Department of Justice
22        950 Pennsylvania Avenue NW
          Washington, DC 20530
23

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
25                          - - - - -

```
1   A P P E A R A N C E S:  (Continued)

2   STANDBY COUNSEL FOR THE DEFENDANT PRO SE:

3        Edward A. Mallett
         Mallett & Saper, L.L.P.
4        600 Travis
         Suite 1900
5        Houston, TX 77002-2911

6   OFFICIAL COURT REPORTER:

7        Cheryll K. Barron, CSR, CM, FCRR
         U.S. District Court
8        515 Rusk Street
         Houston, TX  77002

9                              - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2        THE COURT:  Please be seated.

3            All right.  At the end of yesterday's business

4    the government rested its case.  Mr. Bujol, what's your

5    pleasure?  Do you desire to present any testimony in this case?

6            It's now -- it's now in your court.  Now it's

7    your side.  The government has rested.  It's now up to the

8    defense.  What's your position?

9            Are you going to testify or are you going to have

10   any evidence you want to submit?  You tell me what you are

11   going to do.  It's strictly up to you.  This is a major

12   crossroads in the case.

13       THE DEFENDANT:  Yes, your Honor.  With regards to

14   testimony, I would greatly appreciate it if I had time to

15   really think about such an important decision.

16       THE COURT:  No, sir.  The case is ready to go.  You

17   had all night long.  It's been fully explained to you.  You've

18   had the ability of standby counsel.

19            Let the record reflect Mr. Mallett has been in

20   this courtroom since day one.  And I now need to know are you

21   going to proceed in this case.

22            Remember, there's no obligation in a criminal

23   case for a defense -- a defendant, or a defense counsel for

24   that matter, to even ask one question, like you've had -- been

25   able to do.  It's -- fully, the burden is on the plaintiff.

10:15  1  Under the Fifth Amendment, you have an absolute right to remain

2  mute, not to say a thing at this time.

3          Let me tell you what will happen.  If you're

4  ready to go, I have a few more instructions for you; and then

10:15  5  I'll ask you to proceed with, you know, your case.  If the

6  answer is that, you know, you've completed, you know, your case

7  as far as you're concerned, you elect not to put any evidence

8  on -- which is your absolute right -- then at that point we're

9  going to go right to summation.  "Summation" is to sum up the

10:16  10  case to the judge, and we'll see how much time each side needs.

11          The government will go first, and then you will

12  have the opportunity.  But at that time, you cannot testify.

13  You just have to sum up the testimony that we've heard.  Okay?

14  You can't testify, in effect, and tell your side of the case.

10:16  15  The -- so, let's say, for instance, that -- let's say, it's 20

16  minutes a side.  I haven't decided yet.  I don't know what you

17  want and what they want.  Okay?

18          They can take all 20 minutes, and then you go, to

19  sum up the evidence that went in.  More than likely, since

10:16  20  they've got the burden of proof, they may take 15 minutes and

21  stop, let you have all your time, and then they're entitled to

22  their last five minutes.  So, that's where we're at right now,

23  either proceed with the defense case or, under the absolute

24  right that you have, that the defendant declines either to

10:17  25  testify or to submit any evidence.

10:17  1          Then, at that point, I'll give everybody, if you

2     want, just a few minutes to get some notes together; and we'll

3     have summation.  And following that, there needs to be, of

4     course, a decision by the Court one way or another.

10:17  5          So, Mr. Bujol, what's your decision, sir?

6          THE DEFENDANT:  I'm going to decline testimony.

7          THE COURT:  All right.  The defendant exercises his

8     absolute right not to testify or present any further evidence.

9     So --

10:17  10          THE DEFENDANT:  However, I do want to present further

11    evidence.

12          THE COURT:  How are you going to get it in?  When I

13    say "how are you going to get it in," it needs to be some sort

14    of -- what is it -- some sort of predicate.  But if you want to

10:17  15    get some evidence in, let's talk about it.  But be careful now.

16    You're not to testify about anything.  Anything.  If the

17    evidence doesn't, what we say, speak for itself and it needs

18    some testimony on how to get in, then we're getting into, in

19    effect, testimony in the case.  So, that warning is absolutely

10:18  20    clear.

21          All the evidence right now that's been submitted

22    and all of your documents are in.  Okay?  Are in, in the

23    record.  But beyond that, if you elect to proceed, if you need

24    any background of your case, if you step over the line, they're

10:18  25    going to then be entitled to ask you questions.  In other

10:18   1    words, let me give you -- let me give you the instruction that

2    I was going to give you, give you a little more time to think

3    about it.  Okay?

4              It appears to me -- now, the government needs to

10:18   5    be in on this, also.  And if you have any suggestions, we want

6    to keep this clean, so to speak, relative to the defense

7    position.

8              So, these were the instructions, Mr. Bujol --

9    let's say you elected to testify or you may change your mind.

10:19   10   These are the instructions that I was going to give to you.

11   Okay?  And, so, then you determine if you want to step into the

12   defense case at all.

13             A defendant -- and this -- who takes the stand --

14   in other words, who elects to testify, waives any Fifth

10:19   15   Amendment privilege regarding cross-examination relevant to the

16   issues raised by your testimony.  So, if all the documents

17   don't speak for themselves, that's testimony and they can then

18   ask you direct questions on that.  Okay?

19             The next one is the breadth of the waiver.  The

10:19   20   scope of the waiver of relevant cross-examination by the

21   government is to be -- that's -- this is how it's determined.

22   The extent of the cross-examination is within the discretion of

23   the -- in this case, the judge.  In any event, it's the judge.

24             The Court -- the defendant may not claim the

10:20   25   privilege against cross-examination on any matters reasonably

10:20   1    related to the subject of his or her direct examination.

2    Meaning, we're talking about you cross-examine -- testifying

3    yourself relative to anything you're getting in.  I want to

4    repeat that.  This -- wait a second.  I've got to lay this out

10:20   5    for you.

6            The defendant may not claim the privilege against

7    cross-examination on matters reasonably related to the subject

8    matter of the defendant's direct examination.  There is no

9    direct examination of you, because you're doing it yourself, so

10:20   10   of your testimony or your basis for any piece of evidence.

11           Like any other witness, the defendant may have

12   his or her credibility impeached and/or the testimony assailed.

13   But that usually means that's within a reasonable scope.  If

14   you start in with any kind of testimony, they can go into

10:21   15   credibility.  And my understanding -- I'm looking at both sides

16   now -- that includes prior -- prior convictions or prior

17   problems and propensities.

18           Is that the understanding of the government?

19       MR. McINTYRE:  Yes, your Honor.

10:21   20       THE COURT:  If it's not -- and it's not my

21   interpretation.  We have standby counsel.

22           Is that your understanding also, Mr. Mallett, for

23   the record?

24       MR. MALLETT:  My understanding is that if he testifies

10:21   25   he testifies for all purposes relevant to the case.

THE COURT:  That's correct.

And the relevancy is determined by the judge as to the appropriateness of the questions they ask, if -- if you object to such questions from them later on, after you're done.

If a defendant testifies on his own behalf but refuses to answer relevant questions on cross-examination, the trial Court may properly advise, in effect the jury -- but advise the trier of fact that it may consider the defendant's refusal in assessing his or her credibility or, alternatively, the Court may strike the defendant's testimony in whole or in part.  If the defendant has testified -- now, if you elect to testify, the government may comment on the defendant's refusal to answer proper questions during its closing argument.

Now, that's taken directly out of a major treatise that we all use.  And I've done the best I can.

Now, once again, Mr. Bujol, do you elect to proceed at this time to any extent?

THE DEFENDANT:  Your Honor, all I want to do at this time is to play the clips that are part of what's already the government's evidence.

THE COURT:  You want to replay them?

THE DEFENDANT:  No, I don't want to replay them.  I -- they're -- they don't cover the entire scope of actual events that took place there.  So, all I'm doing is playing the same recordings that were played and letting it speak for itself.  I

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:23  1    don't have to give commentary or testify as to what the

2    recordings are saying.  They're self explanatory.

3         THE COURT:  Let me ask you this.  Is it already in

4    evidence?  Is all of that in evidence?

10:23  5         THE DEFENDANT:  Yes, it's already in evidence.

6         THE COURT:  Government agree?

7         MR. McINTYRE:  Yes, your Honor.

8         THE COURT:  All right.  Now, what's your feeling on

9    that status, about limiting it to that extent?  Play this --

10:23  10   it's in evidence; play the rest?  It's in evidence; play the

11   rest?

12        MR. McINTYRE:  I think that he would be entitled to

13   play video and audio that's already in evidence if he doesn't

14   comment or testify about it, Judge.

10:23  15        THE COURT:  All right.  Now, let me ask you this.

16   You're not going to play the whole thing, right?

17        THE DEFENDANT:  No, sir.

18        THE COURT:  You've got little bits and pieces.

19        THE DEFENDANT:  Yes, sir.  Yes, your Honor.

10:24  20        THE COURT:  All right.  Let's proceed that way.

21           Now, if you elect to -- I'm just mentioning it.

22   If you elect to elaborate on that, in effect, stop it and,

23   "See, that man here, he walked over there; and he didn't do

24   this," you're -- there you are.  You've got your instructions.

10:24  25   If you do that, you're going to open it up.

10:24   1              So, at this point, government agree?

       2              In other words, what portion, what small portion

       3   of what clip do you want?  Play it.  What portion do you want?

       4   Play it.  Anything beyond that, opens it up.  Do you agree?

10:24   5   Potentially opens it up.  Do you agree?

       6              MR. McINTYRE:  I agree, your Honor.

       7              THE COURT:  All right.  Mr. Mallett, potentially it

       8   could open it up; do you agree?

       9              MR. MALLETT:  I think, in all fairness to the Court, I

10:24  10   do need to comment that the witnesses who testified previously

      11   were examined by Mr. Bujol under the restriction he could only

      12   question them about matters raised on direct.  So, if he wants

      13   to play clips about matters not raised on direct, then I

      14   suppose he would ask questions of those witnesses now.

10:25  15              THE COURT:  But the witnesses have all been excused.

      16   Nobody was reserved here.  So, he's got the clips that he would

      17   like to play.  Right now, we're at the clips he would like to

      18   play.  If he wants to go any further, then we can talk about

      19   it.  Okay?  If he wants to go any further.  So, right now, it's

10:25  20   just the clips that he wants to play.

      21              MR. MALLETT:  Okay.

      22              THE COURT:  All right.  Good.

      23              Which one do you want?

      24              How many do you have, by the way, so I can note

10:25  25   it down?

10:25   1          THE DEFENDANT:  I don't have very many.

2          THE COURT:  Okay.  All right.  Let's play the clips.

3              I guess if we're going to do that we might as

4  well turn out that one light.

10:27   5          THE DEFENDANT:  Your Honor, I do have one question.

6          THE COURT:  Yes, sir.

7          THE DEFENDANT:  With respect to if I say something

8  just for the purposes of you knowing where to verify that this

9  is from such-and-such date, is that considered --

10:27  10          THE COURT:  No.  Because we have to identify what

11  exhibit it is.  No, sir.  That would be fine.

12          THE DEFENDANT:  Okay.

13          THE COURT:  So, what are we looking at?  What's the

14  first clip you want?

10:27  15          THE DEFENDANT:  Well, your Honor, in the interest of

16  time and convenience --

17          THE COURT:  Don't worry about the time.  That's why

18  we're here.  We're here to try the case.

19          THE DEFENDANT:  Okay.  This is from November 13th of

10:27  20  2009.

21          THE COURT:  Where is it?  Set the scene.  You can do

22  that for us.  Where is it?

23          THE DEFENDANT:  This is at the Waller County jail.

24          THE COURT:  Okay.  Is that -- Waller County jail?

10:28  25          THE DEFENDANT:  Yes.

10:28  1          THE COURT:  Okay.  Mr. McIntyre, what?

     2          MR. McINTYRE:  Your Honor, this is an audio-video that

     3  was not put in evidence actually.

     4          THE COURT:  Not what?

10:28  5          MR. McINTYRE:  This was not put into evidence.

     6          THE COURT:  Was not put into evidence.

     7          MR. McINTYRE:  No.

     8          THE COURT:  All right.  It's not in evidence.

     9              However -- however, do you deny its authenticity

10:28 10  or anything else?  Aside from relevancy.

    11          MR. McINTYRE:  I assume it's something that we gave

    12  him, your Honor.

    13          THE COURT:  Is that where you got it?

    14          THE DEFENDANT:  Yes, sir.  I have the disk here.

10:28 15          THE COURT:  All right.  Overruled.  I'll let him play

    16  it.

    17          MR. McINTYRE:  Okay.

    18          THE COURT:  Okay.  Go right ahead.  Play it, please.

    19      (Tape playing)

10:29 20          THE COURT:  Is there any sound attached to it?

    21      (Counsel confers with marshals to set speakers up for the

    22  defendant)

    23          THE COURT:  All right.  Let's try it.  We can fine

    24  tune it.

10:33 25              Yeah, move the microphone -- or move the speaker

10:33    1    as close as you can.

         2              All right.  Let's try it, shall we?

         3         *(Tape playing)*

         4              MR. McINTYRE:  Your Honor, are we moving on to a

10:36    5    different piece of evidence?

         6              THE COURT:  Yeah.  Hang on a second.

         7              MR. McINTYRE:  I don't know what he's plying.

         8              THE COURT:  Where are we now, Mr. Bujol?  Where is

         9    this from?

10:36   10              THE DEFENDANT:  Your Honor, this is December 4th,

        11    2009.

        12              THE COURT:  Okay.  And where are the parties located?

        13              THE DEFENDANT:  The parties are in the car after the

        14    defendant was bailed out of jail by the CHS.

10:36   15              THE COURT:  Okay.

        16         *(Tape playing)*

        17              THE COURT:  Okay.  Next clip?

        18              Before you play each one, just let us know what

        19    the scenario is.

10:39   20              THE DEFENDANT:  Yes, your Honor.

        21              THE COURT:  Okay.

        22              THE DEFENDANT:  This is the same conversation, same

        23    location and everything.

        24              THE COURT:  Okay.

10:39   25         *(Tape playing)*

10:39    1          THE COURT:  A little louder, please.  Can you get a

         2    little more volume?

         3       *(Tape playing)*

         4          THE COURT:  Mr. Bujol, we need a little more volume if

10:41    5    we can.

         6       *(Tape playing)*

         7          THE COURT:  That's better.  That's better.

         8       *(Tape playing)*

         9          THE DEFENDANT:  Your Honor, same conversation, in the

10:45   10    car with the --

        11          THE COURT:  Again.  It will continue.

        12          THE DEFENDANT:  -- CHS.

        13          THE COURT:  When it changes location, let us know.

        14          THE DEFENDANT:  Yes, your Honor.

10:45   15          THE COURT:  Let's assume that all these clips are from

        16    the same occurrence in the automobile on the date you

        17    mentioned.

        18       *(Tape playing)*

        19          THE DEFENDANT:  Your Honor, this is a subsequent

10:58   20    meeting that occurred on December 23rd between the two parties.

        21          THE COURT:  December 23rd what year?

        22          THE DEFENDANT:  Of 2009.

        23          THE COURT:  All right.  Remind me -- government,

        24    remind me what was the day that he was arrested on the ship?

10:58   25          MR. McINTYRE:  It was May 30th, 2010.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:58   1              THE COURT:  2010.

        2                   And this is December 2009?

        3              THE DEFENDANT:  Yes, your Honor.

        4              THE COURT:  Okay.

10:59   5              THE DEFENDANT:  But before I go to that, I would like

        6    to go to the government's exhibit wherein the defendant

        7    discusses in an e-mail --

        8              THE COURT:  Uh-uh, don't tell me what's there.  It's

        9    just discussing an e-mail.  You start getting into the depths

10:59  10    of that, you may open it up.

       11              THE DEFENDANT:  Do I have to -- when you say "in the

       12    depth," if I read what is on the e-mail or what extent --

       13              THE COURT:  All we're doing is -- that e-mail you're

       14    looking at, is that in evidence?

10:59  15              THE DEFENDANT:  Yes, your Honor.

       16              THE COURT:  All right.  What's the date of it?  What

       17    exhibit number?

       18                   The e-mail itself.

       19              THE DEFENDANT:  It should be Exhibit 113.

11:00  20              THE COURT:  What is 113, please?

       21                   Is that it?  You can go wherever you need to go.

       22    Is it a hard copy or a transcript?  I guess I can look it up.

       23    Is it here?

       24              MR. FEAZEL:  I believe we can get a hard copy and

11:00  25    direct you to where it is in our book.

11:00  1              THE COURT:  What page is it?

2              THE CLERK:  It's Volume 1.

3              THE COURT:  Volume 1?  All right.  I've got it up

4       here.  113.

11:00  5                   All right.  113, they're discussing hot

6       chocolate, right?  Is that part of it?  The difference between

7       "two" and "twelve"?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  All right.  So, you got a -- that's in

11:01 10       evidence.  So, you want to just bring my attention to it or --

11             THE DEFENDANT:  Yes.

12             THE COURT:  -- you have some --

13             THE DEFENDANT:  I'm just -- do I -- bringing your

14      attention to it --

11:01 15             THE COURT:  That would be in summation.  That would be

16      in summation, not in your part of the case.  Unless you want to

17      offer evidence concerning that.

18             THE DEFENDANT:  Yes.

19             THE COURT:  Okay.  And that's what you want to play?

11:01 20             THE DEFENDANT:  Yes.

21             THE COURT:  All right.  So, what we're listening to

22      today is you gave the date in December 2009, relevant to

23      Government's Exhibit 113, right?

24             THE DEFENDANT:  Right.

11:01 25             THE COURT:  All right.  Play the part.  Go on.

11:01   1            And is it in a vehicle also, sir?

2            THE DEFENDANT:  Yes.

3            THE COURT:  All right.

4        *(Tape playing)*

11:02   5            MR. McINTYRE:  Your Honor, I think we just played

6    this.

7            THE COURT:  We just played it.

8            THE DEFENDANT:  Yes.  But you were speaking with the

9    woman, and I presumed you may have overlooked it.

11:02   10           THE COURT:  I didn't overlook it, but you've drawn my

11   attention to it.  If you want to play it again, how long is it?

12           I was talking to my case manager just about 30

13   seconds.

14           THE DEFENDANT:  Okay.  Case manager.  My apologies.

11:03   15           THE COURT:  No.  It's all right.

16           THE DEFENDANT:  It's just about 80 seconds.

17           THE COURT:  Sure.  Go on.  Play it again.

18       *(Tape playing)*

19           THE DEFENDANT:  I would like at this time to turn your

11:05   20   attention, your Honor, to Exhibit 114.  It's an e-mail dated

21   December 15th, 2009.

22           THE COURT:  Okay.  115 is in evidence, correct?

23           THE DEFENDANT:  Yes.  It's all in evidence.

24           THE COURT:  It's in the book.

11:06   25           THE DEFENDANT:  Yes, your Honor.  114.

11:06   1              THE COURT:  I thought you said turn my attention to

2      115.

3              THE DEFENDANT:  No.  It was -- I said -- I'll repeat

4      that -- 114 dated December 15th, 2009.

11:06   5              THE COURT:  Oh, yes.  By the way, you don't have to

6      reference anything like that.  What I need you to do is give me

7      whatever evidence you want in that has not been played.  So,

8      that's what we are looking at.  As long as it's in here for the

9      record, your -- it's in the record.  I noted that document.

11:08   10             THE DEFENDANT:  We're going to move forward to the --

11     back to the meeting in the car, same conversation.  This is --

12     or this is a subsequent conversation to the day the defendant

13     was bailed out of jail by the CHS.

14             THE COURT:  All right.

11:08   15             THE DEFENDANT:  December 23rd, 2009.

16        *(Tape playing)*

17             THE DEFENDANT:  Your Honor, I would like to mention it

18     for the record that refers to --

19             THE COURT:  Uh-uh.  If you're going to do that, you're

11:10   20     opening it up.

21             THE DEFENDANT:  Oh, yes.  Yes.  Okay.

22                 May I ask a question?

23             THE COURT:  Yes, sir.

24             THE DEFENDANT:  If I'm referring to the page in the

11:10   25     transcript --

11:10  1          THE COURT:  You can do that, sure.

2          THE DEFENDANT:  Okay.  It's referring to Page 26

3    through 27 in the transcript.

4          THE COURT:  All right.  Because I was expecting you to

11:11  5    tell me what it refers to and give me some interpretation.

6          THE DEFENDANT:  Oh, no.  No, your Honor.

7          THE COURT:  All right.  That's fine.  I'm glad we got

8    it in the record.

9          THE DEFENDANT:  This is the same conversation; and

11:11  10   it's Page 7 of the transcript, starting at Page 7 of the

11   transcript.

12          *(Tape playing)*

13          THE DEFENDANT:  Your Honor, I would like to direct

14   your attention to Exhibit 93.

11:14  15          THE COURT:  All right.  That's looks like an e-mail

16   with a number of websites, correct?

17          THE DEFENDANT:  No.  There should be something about

18   admittance to a group and Hijrah_Islam.

19          THE COURT:  Oh, where it -- oh, you want the first

11:14  20   sentence, "The moderator of the Hijrah_Islam group has approved

21   your request for membership," correct?

22          THE DEFENDANT:  Yes.

23          THE COURT:  All right.  Is that what you want me to

24   note?

11:14  25          THE DEFENDANT:  Yes.  As with the subject of that

11:14  1  e-mail.

2      THE COURT:  Yeah.  They provided you with some

3  websites.

4      THE DEFENDANT:  Yes.  And I would also like to turn

11:14  5  your attention to Exhibit 94.

6      THE COURT:  All right.  This is from you.  Let me just

7  read it.

8      All right.  It's about your background.  I've

9  read it.  What else?

11:15  10     THE DEFENDANT:  I believe it's Exhibit 96.

11     THE COURT:  All right.  I've got some questions about

12  that, but I cannot ask you.  I've looked at it, and I've noted

13  it.  That's the best I can do right now within the limits of

14  your not being subject to questions.  Because if I start

11:15  15  questioning you -- I just keep out of that.  So -- I need to.

16  And the government has a right to no questions being asked,

17  because then they'll start following up.  So, I've noted it.

18     And, for the record, all of the exhibits in

19  evidence I will note and I will reference them before a

11:16  20  decision is made in this case.

21     Now, on something like this, Mr. Bujol, you

22  wanted me to note something, that's more summation than your

23  case.  When you get into summation, we'll set the time frames;

24  and I'll keep a timer up here.  I actually have a chess timer

11:16  25  that I use.  Okay?  And I'll let you know how the time is

going.

Basically what you're doing in a number of these things is more summation of the case, for me to consider as to -- because in summation you can state that -- that's what their burden is and they have not met their burden because of A, B, C, D, and E. So, what you are putting forward here is bordering on summation; but I'm allowing you to do it. Okay?

Just keep in mind you have time to sum up the case. So, this is your part -- in other words, if you want testimony within the boundaries that you have set, I'll be glad to consider it. But by my noting an exhibit abstractly, just like you want me to note that exhibit, that's summation. As you say, they can -- for instance, in summation, you can say, "They said A, B, C, and D. But look in the book, on page -- on exhibit number so-and-so and, you know, that contradicts what they just said." Now, that's arguing the case like a lawyer.

What you are doing now is more like summation than putting on your version of what went on. That's what really the defense case would be about. And you can, in effect, through your testimony try to punch a hole in what they say. You can't comment on it -- or you can take the stand or whatever you need to do. I just want to mention that to you.

But I noted it. But if I feel it's more summation than your case, I'm going to let you know and ask you to move on. But you'll have opportunity to do that sort of

11:18   1   stuff in summation.  You'll bring my attention to certain

2   exhibits.

3       *(Tape playing)*

4           THE DEFENDANT:  Your Honor, I would like to reflect

11:18   5   this does contain Arabic, Arabic being spoken by the defendant.

6           THE COURT:  Right.

7           THE DEFENDANT:  And it corresponds to Page 8, starting

8   in the transcript of December 23rd, 2009.

9           THE COURT:  All right.

11:19   10      *(Tape playing)*

11          THE DEFENDANT:  This is the -- corresponding with

12   Page 12, beginning at Page 12 in the transcript.

13          THE COURT:  All right.

14      *(Tape playing)*

11:25   15          THE COURT:  Hold it one second.

16      *(Court confers with staff)*

17          THE DEFENDANT:  Your Honor, at this time I'm going to

18   move to a subsequent meeting that occurred on January 20th of

19   2010.  And this is -- I believe it's in the car.

11:29   20              Yes, it should be in the car.

21              But first, I have here a copy of the transcript.

22   And this -- it -- I would like to read a portion of the

23   translator's notes, the person who created this document.  And

24   it talks about -- it's on Page 1 of the document.  And it

11:30   25   says --

11:30  1          THE COURT:  Hold it.

2                 Before he reads from it, what's the government's

3     position?  Is this transcript primary or the secondary

4     evidence?

11:30  5          MR. McINTYRE:  It's in evidence, your Honor.

6          THE COURT:  Is it primary evidence?  In other words,

7     how many --

8                 How much are you going to read from it?

9          THE DEFENDANT:  I'm just going to read a sentence.

11:30  10         THE COURT:  All right.  Just tell them where it is.

11    Because there's always a question, remember, in cases where

12    there are transcriptions as to what's primary and what's

13    secondary evidence.  And I gave an instruction so if a jury was

14    in the box -- I don't have to do it to myself.

11:31  15         MR. McINTYRE:  Right.

16         THE COURT:  But, basically, remember transcripts are

17    secondary evidence even though it is evidence.  But primary

18    evidence is the actual recording itself.

19               THE DEFENDANT:  Okay.  This page is --

11:31  20         THE COURT:  What page?

21               THE DEFENDANT:  It's just a generic page.  It's on

22    every transcript.  It's just a --

23               THE COURT:  All right.  Read it, then.  What does it

24    say?

11:31  25               THE DEFENDANT:  It has a list of Arabic terms, one of

11:31   1    which is "hijrah."  And it says -- and they're defining the

2    Arabic terms for a non-Arabic person or a person who speaks

3    Arabic.  And it says, "hijrah," then a dash, "the flight of

4    Prophet Muhammad from Mecca to Medina.  In this conversation,

11:31   5    it refers to the act of fleeing from danger or from the land of

6    sin."

7            THE COURT:  All right.  Now play what you need to.

8        (Tape playing)

9            THE DEFENDANT:  And forgive me, your Honor, but I do

11:32   10   have to remind myself that because there is Arabic in here I

11   would like to give you this begins at Page 6 of that

12   transcript.

13           THE COURT:  Okay.

14           THE DEFENDANT:  This particular clip here.

11:32   15           THE COURT:  Okay.

16       (Tape playing)

17           THE DEFENDANT:  Okay.  Your Honor, I'm going to go to

18   Page 5 of that same transcript.

19           THE COURT:  All right.

11:38   20       (Tape playing)

21           THE DEFENDANT:  Your Honor, this is that same

22   conversation, beginning with Page 26 of the transcript.

23       (Tape playing)

24           THE DEFENDANT:  Your Honor, this is Page 27, same

11:44   25   transcript.

11:44  1      *(Tape playing)*

2              THE DEFENDANT:  Starting at Page 28.

3      *(Tape playing)*

4              THE COURT:  All right.  It's now 10 minutes to 12:00.

11:49  5      We'll take our first break.  I want the record to reflect we're

6      listening to bits and pieces from the stacks of transcripts and

7      the stacks of disks.  However, I do want to note that Mr. Bujol

8      is just flipping through the transcripts and putting various

9      pieces on that we're all considering.

11:50  10             I do want to mention, however, I'm going to ask

11     Mr. Bujol during this break to tighten it up and let's move it

12     along.  In other words, you're here in court.  Go through, put

13     it on, take it off, put it on, take it off, put it on, take it

14     off.  And I want to move quicker than just flipping through

11:50  15     almost ahead of time just as one segment is on, flipping

16     through as to what might be relevant in the defendant's

17     opinion.

18             All right.  We'll take a break.  It's 11:51.

19     We'll take a break to 12:10, and then we'll keep moving.

11:50  20             Let me ask this marshal here.  I think we got a

21     scout in the back.  Okay?  If you want to bring him in my

22     waiting room, I'll be glad to visit with him for a moment.

23     Okay?

24             All right.  So, we'll see you back in a little

11:50  25     less than 20 minutes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:50   1      *(Recess was taken)*

2          THE COURT:  Thank you.  Be seated.

3              By the way, you can sit on either side.  We have

4      a couple of guests there or whatever.  Don't be hesitant if you

12:15   5      want to shift either way, left or right.

6              Let me see Ellen for a minute, please.

7          *(Court confers with staff)*

8          THE COURT:  All right.  Let's continue, Mr. Bujol,

9      please.

12:15   10         THE DEFENDANT:  Before I go to the next clip, I would

11     like to draw your attention to -- I believe it's 237, an e-mail

12     dated April 27, 2010.

13         THE COURT:  All right.  It's noted.  Go right ahead,

14     sir.

12:16   15         THE DEFENDANT:  I'm going to go to February 8th, 2010,

16     a conversation after the defendant completed the first

17     dead-drop.

18     *(Tape playing)*

19         THE DEFENDANT:  This corresponds beginning with

12:17   20     Page 34 of the transcript.

21     *(Tape playing)*

22         THE DEFENDANT:  We'll go next to February 21st, 2010.

23     This is in the car, at a parking lot of -- between a restaurant

24     and an Academy shoe store.

12:20   25     *(Tape playing)*

12:21  1          THE DEFENDANT:  This is Page 11.

2          *(Tape playing)*

3          THE DEFENDANT:  Same transcript, Page 15.

4          *(Tape playing)*

12:29  5          THE DEFENDANT:  Your Honor, I'm going to go to

6    February 22nd, the very next day after the dead drop meeting.

7    In the car -- in the parking lot of Starbuck's Coffee.

8          THE COURT:  Thank you.

9          THE DEFENDANT:  I need to make a correction.  Before I

12:31  10   do that, your Honor, I would like to point your attention to an

11   audio recording of the defendant's, recovered from his laptop

12   seized at his apartment the night of his arrest.  And it's just

13   a short clip.  I'll go right to it.

14         MR. McINTYRE:  Objection, your Honor.  It's not in

12:31  15   evidence.

16         THE COURT:  It's not in evidence.  All right.  So, you

17   can't go there.  It's not in evidence.  Unless you want to open

18   up a full case and start admitting evidence.

19         *(Tape playing)*

12:32  20         THE COURT:  Hold it.  Hold it.  Are you playing that

21   one --

22         THE DEFENDANT:  Yes, your Honor.  I just returned back

23   to the original recording I was set to play, in the parking lot

24   of Starbuck's.

12:32  25         THE COURT:  Okay.  Yes.  Go right ahead.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:32  1          (Tape playing)

2                THE DEFENDANT:  Again, to be clear, this starts at

3      Page 16.

4                THE COURT:  All right.  Let's go.

12:33  5          MR. McINTYRE:  Your Honor, I would like to read in a

6      portion of that record that follows, the very next page, under

7      the rule of optional completeness.

8                THE COURT:  Under the rule of optional completeness,

9      yes, what -- how does it continue, please?

12:33  10         MR. McINTYRE:  "I mean, what -- so, not only is

11     freedom of speech is -- even if you heard it, you're guilty."

12               THE COURT:  Who's speaking?

13               MR. McINTYRE:  That's the source, your Honor.

14               THE COURT:  Okay.  The confidential source?

12:34  15         MR. McINTYRE:  Yes.

16               THE COURT:  Start again, please.

17               MR. McINTYRE:  The source stated, "I mean, what -- so,

18     not only freedom of speech is, even if you heard it, you're

19     guilty."

12:34  20               And then the defendant replies, "That's the

21     point.  And that's why, when I told you my situation, I didn't

22     see -- I didn't realize myself how tight they were.  I thought

23     just -- look, I haven't done anything wrong.  I have a

24     legitimate excuse.  Maybe I have hidden intentions, but I

12:34  25     haven't told anyone that.  Now, yes, I gave the Friday sermon,

12:34  1    which may have caused a problem and I may have said things

2    amongst people."

3            THE COURT:  Okay.  Thank you.

4            You may continue, Mr. Bujol.

12:36  5            All right.  I'm going to make a statement

6    relative to we have electronic court reporting and it does --

7    can record the time of these lapses.  It doesn't very often --

8    it doesn't appear generally in the transcripts, but there is a

9    timing mechanism.  And I wanted to note, in my mind, it's

12:36  10   getting to be exceedingly long pauses between the excerpts that

11   are going on the screen.

12            And I'm not telling Mr. Bujol yet to move it

13   along, but it's got to move along.  We've got to tighten it up.

14   And I checked with the court reporter.  There is a timing

12:37  15   mechanism, and I'm determining the time is coming close between

16   these excerpts that are much too long.

17            So, I don't want the whole courtroom and all of

18   the staff just sitting here in silence as Mr. Bujol hunts, you

19   know, as to the exact little snippets that he needs.  But I'll

12:37  20   give him some leeway at this time.

21            So, go right ahead, sir.  Next point.  Where are

22   we?

23            THE DEFENDANT:  Okay.  I'm just going to -- just in

24   the interest of time and our previously committed deadline of

12:37  25   approximately 1:45 --

12:37   1          THE COURT:  No.  We have -- don't worry about the

2      deadline 1:45.  We can always hold over.  We have some days

3      next week if we have to.  Nobody is in any rush, and I didn't

4      mean to state that for a rush.  I'm just talking about court

12:38   5      operations.  But we're in absolutely no rush, Mr. Bujol.  But

6      your point, you may move along or whatever your next point is.

7      Let's go.

8          THE DEFENDANT:  Yes.  This is from a meeting, the last

9      meeting before -- the night the defendant was arrested.  It's

12:38   10     in a parking lot of a Pizza Hut in Navasota, Texas, between the

11     two parties.

12          *(Tape playing)*

13          THE DEFENDANT:  I should state for the record that it

14     corresponds to Page 12 in the transcript.

12:39   15          THE COURT:  Thank you.

16          *(Tape playing)*

17          THE DEFENDANT:  At this time, your Honor, I don't have

18     any further exhibits to produce.

19          THE COURT:  All right.  Let me ask you this, then.

12:40   20     Does the defense -- the government rested its case, and you put

21     your excerpts on.  Does -- the government rested its case.

22     Does the defense rest its case?

23          THE DEFENDANT:  I'll say yes, your Honor.

24          THE COURT:  All right.  Defense rests.

12:40   25          Any rebuttal by the government?

12:40   1          MR. McINTYRE:  No rebuttal, and the government closes.

2          THE COURT:  All right.  How much time -- do you want

3    to take --

4          MR. McINTYRE:  Yeah, if we could take --

12:40   5          THE COURT:  Take the video down, please.

6              All right.  Let's turn the lights on, please.

7              All right.  How much time does the government

8    want for summation?

9          MR. McINTYRE:  Fifteen minutes would be fine, your

12:40  10    Honor.

11          THE COURT:  All right.  And, defense, how much time do

12    you want, sir?  Is that sufficient time, also?

13          THE DEFENDANT:  That's sufficient.

14          THE COURT:  All right.  It's now 12:41.  I'm just

12:41  15    going to sit up here if you want to get your notes together.

16    We'll go right into summation.  So, I'll be sitting right here

17    and -- for five minutes.

18              And if you need to get -- I'm not even getting in

19    the back.  I get in the back there, somebody is going to call

12:41  20    me.  But we will then immediately proceed to summation.

21              So, we're going -- Mr. Bujol, the government,

22    we're going off the record for five minutes.  And if everybody

23    is ready sooner than that, fine.  But let's get everything

24    ready to go.  Okay?

12:41  25          MR. McINTYRE:  Yes.

12:41  1              THE COURT:  For summation.

2                   And, of course, now I am going to -- what I will

3       do is this.  I will give each side a two-minute warning before

4       your 15 minutes are up.  Okay?

12:41  5                   Now, remember the government can stop whenever

6       they want.  You need to take at least half of that time on your

7       opening.  And you can reserve some time.  They've got the

8       burden of proof; so, they'll go first.  Then they'll stop.

9       Then you may go for your full 15 minutes.  And then, whatever

12:41  10      time they have left on the clock, that's it.  All right?

11                   So, let's go off the record for a few minutes.

12      And everybody just remain in the courtroom.  And as soon as a

13      few minutes have gone past and you put everything together,

14      we'll be ready to wrap it up.

12:42  15                   Thank you.  So, off the record.

16          (Recess was taken)

17              THE COURT:  Okay.  Everybody ready?

18              MR. McINTYRE:  Yes, your Honor.

19              THE COURT:  All right.  Ready to get on.

12:45  20              MR. McINTYRE:  Do you want me to argue from here, your

21      Honor?

22              THE COURT:  Wherever you're most comfortable.

23              MR. McINTYRE:  Yes.

24              THE COURT:  Just for the purposes of certainly this

12:45  25      here, Mr. Bujol, you can make your argument right from your

12:45   1   chair there when your time comes.

2   All right.  Hang on a second.

3   All right.  What sort of notice do you want, when

4   how much time is left?

12:45   5   MR. McINTYRE:  When there's five minutes left, your

6   Honor.

7   THE COURT:  Five minutes left.  You have 15 minutes,

8   and you want a five-minute notice.  All right?  Five minutes'

9   left notice.

12:45   10   All right.  Start your summation, please,

11   counsel.

12   MR. McINTYRE:  May it please the Court.

13   Your Honor, the evidence in this case regarding

14   Mr. Bujol is that he is a radicalized jihadi terrorist that

12:45   15   just happens to be born in the United States.  He was a

16   follower and a disciple of Anwar al-Awlaki, one of the world's

17   most well-known terrorists, publicizers, and radicalizers of

18   American jihadis.

19   The evidence in this case, your Honor, is that

12:46   20   the defendant, when he left -- or attempted to leave in

21   February and March of 2009, was intending not to go to language

22   school.  He never had any intention of going to language

23   school, but in fact was going overseas to aid al-Qaeda in the

24   Arabian Peninsula.

12:46   25   The evidence in this case is replete and the

transcripts are replete with statements from the defendant's own mouth that, when he attempted to make what he called "hijrah" to Yemen, that the Islamic school -- or it was simply a ruse. He called it a "legitimate excuse." He told the source that he had hidden intentions. And those hidden intentions were that he was going to join al-Qaeda in the Arabian Peninsula and commit terrorist acts against the United States and others.

Before the defendant in this case ever met the confidential source in November of 2009, he had already been radicalized through the Internet by Awlaki and others. The Court has seen the contents of his e-mails: the Juba Sniper video, which he e-mailed to himself, which showed American soldiers being murdered in Iraq; the list of sites that were described by the government expert, one of which was the original or official site of al-Qaeda.

He also had, with the moniker "check this out," one of the original al-Qaeda in Yemen videos that he had sent to himself. There's a multitude of this type of jihadist thought that occurred way in advance of the FBI introducing a confidential source in this case.

Once the -- once the confidential source was introduced in this case, there was no coercion from the government. There was no subterfuge. There was no unreasonable actions on the part of the government. The fact

12:48   1   is this defendant was predisposed to go fight for al-Qaeda in
2   the Arabian Peninsula.  And the confidential source in this
3   case simply offered him a vehicle to get overseas and do what
4   he always wanted to do, which is commit jihad.

12:48   5           On two occasions during the meetings between the
6   confidential source and the defendant, the confidential source
7   flatly tells the defendant that he is a member of al-Qaeda in
8   the Arabian Peninsula.  And the defendant's response is, "God
9   willing" and "God bless."

12:48   10          The recordings also show that he was told the
11   night -- the night that he was arrested, on May the 30th, that
12   he would be sent to a safe house, he would then go to Yemen.
13   And he was actually told by the confidential source that he
14   would be trained to shoot.  There's nothing that shooting has
12:49   15   to do with language school.  He was flat out told that he was
16   going to be taught to shoot.

17          And the best evidence of this case, regarding
18   what the defendant's true intentions are, is the hidden video
19   that he left for his wife.  He, of course, did not intend for
12:49   20   this video to be seen by anyone but his wife, never expected it
21   to be played in court.  And, therefore, he was very honest
22   about his intentions.  He flat out says, "I met a brother who's
23   a member of al-Qaeda in the Arabian Peninsula," described him
24   as someone that changed his life.  And then he goes on to
12:49   25   define the terms that are at dispute in this case or that he

12:49   1   would like to have the meaning that's less than what it really

2   is, "hijrah."  He puts up "hijrah."  What's his definition of

3   "hijrah"?

4            He put this presentation together, went out and

12:50   5   found two photographs of two known terrorists and superimposed

6   the word "hijrah" on there, Jihad Jane and Zazi, both people

7   that traveled overseas to train, one of which committed

8   terrorists acts overseas and one of which came back to the

9   United States to commit terrorist acts.

12:50  10            He has a picture which is called the "iconic

11   picture" of the al-Qaeda in the Arabian Peninsula leaders, all

12   four of them sitting next to a rocket propelled grenade.  All

13   four of those were identified in this case as the four top

14   leaders of al-Qaeda in the Arabian Peninsula.  He puts the

12:50  15   letters -- or superimposes the letters "AQAP" over the leaders

16   of al-Qaeda in the Arabian Peninsula.  He chose the photograph;

17   he chose the letters that went over it.

18            He has a picture of jihad.  And, once again, he

19   has superimposed a picture of jihad over a picture of Osama bin

12:51  20   Laden.  In this video, he demonstrates that his view of hijrah

21   is terrorist acts, his vision of jihad is Osama bin Laden's

22   vision of jihad and that he certainly knows -- the defendant

23   certainly knew that the confidential source was a member of

24   al-Qaeda in the Arabian Peninsula, because he was told twice

12:51  25   and then he put it in his own video that that's what he was a

12:51   1    member of.

2               Ultimately, it ended on May the 30th, with him

3    actually going through the items that he was going to take to

4    Abu Bakr, who was represented to be an AQAP representative that

12:51   5    would meet him once he arrived in Algeria.  He loaded on the

6    boat.  He was given every opportunity not to get on the boat.

7    They let him sit in the room for a little while, let him think

8    about it.  He never had any doubts.  And, in fact, the source

9    said, when he dropped him off, he didn't even give him a hug or

12:52   10   say goodbye, he just jumped right on the boat.

11              So, we think the evidence in this case, your

12   Honor, is very clear that the defendant is guilty of the charge

13   in Count 1.

14              Secondly, you also heard evidence from the agents

12:52   15   in this case that they created a false TWIC identification card

16   that the defendant picked up from a dead-drop zone underneath a

17   rock.  In the defendant's own statement, he admitted the card

18   was fake and the name was fake.  Not only did he present it to

19   gain access to the port, but even after he was arrested, even

12:52   20   after the gig was up, he told the HPD officer who was

21   transporting him back to the FBI that he was, in fact, Paul

22   Mexia, which is the fake name that's on the TWIC card.

23              So, we would ask the Court to find the defendant

24   guilty of Counts 1 and 2, your Honor.

12:52   25              THE COURT:  All right.  You've used seven minutes and

12:53   1    20 seconds.  It's now Mr. Bujol's opportunity.

2                    Go right ahead, sir.  Sir, you've got 15 minutes.

3                    THE DEFENDANT:  Your Honor, I would like to object and

4    say that the government has failed to prove its case with

12:53   5    regards to the defendant's intentions to fight for al-Qaeda in

6    the Arabian Peninsula.

7                    THE COURT:  All right.  You needn't object.  Your

8    position is --

9                    THE DEFENDANT:  My position --

12:53   10                   THE COURT:  -- that they failed to prove it, correct?

11                   THE DEFENDANT:  My position is, your Honor, yes,

12   they --

13                   THE COURT:  I can't practice law, but I want you to

14   phrase it that way because that's what we're looking at.

12:53   15                   THE DEFENDANT:  Okay.

16                   THE COURT:  Okay?  That they failed to prove it.  Why?

17                   THE DEFENDANT:  They failed to prove that I wanted to

18   be a fighter for this organization.  The record and the

19   evidence will indicate that I did, in fact, make efforts to

12:54   20   follow up on my goals of making hijrah to attend language

21   schools.  Because -- and the record will also show that just

22   saying you want to relocate to a Muslim country is not a

23   legitimate excuse.  The record will reflect that.

24                    It is not -- it is illegitimate, in other words,

12:54   25   as if a person just comes to the United States.  You can't do

that.  You have to have a legitimate reason for coming to this
country.  And being that the defendant wanted to exercise
his -- living in a Muslim country, you also need a legitimate
excuse.  And that legitimate excuse was also his desire,
anyway.  And the defendant, as is indicated in the evidence,
repeatedly expressed that.

However -- and the defendant drew conclusions,
that are indicated in the record, which may or may not have
been accurate.  He may have been mistaken, but he sincerely
thought that his prior two arrests were the subject of
anti-Muslim sentiment.  He may have been wrong, but he
sincerely thought that.  And as a consequence, he became, as
the record will show, more paranoid and more secluded and more
desirous to leave and, as a result of that, was eager to accept
the assistance of someone who had or had presented himself as a
person of dubious affiliations.

The defendant did not intend, as the record will
show, to provide this person and the organization with material
information.  In fact, the defendant sent documents he knew
they were old.  And in one e-mail in the record he said
"alhamdulillah" -- "praise to Allah" -- "I thought those
documents were old."  He knows it, and he isn't -- he's not
concerned about it.

Further, he sends the CHS a public document with
a clear disclaimer stating that this is not official army

material and it has all of the documents he previously sent,
him being aware of his information is not of material.  He also
indicated that I didn't intend to provide real intel.  He's --
I'm not, as the record will show, interested in joining this
organization in its battlefield capacity, in its -- and, with
regards material support, providing the classified or
restricted manuals.

         As is in the record, the defendant was shown on
May 3rd, 2010, both restricted manuals which were later sent.
However, the record will also show that when this CHS is
mentioning "restricted," he's bending over, away from the
defendant, picking up the documents, after which the defendant
doesn't ask for the document, he doesn't want to see it, he
doesn't become excited and want to take it with him.  He
just -- he doesn't even look -- he doesn't even -- he doesn't
even ask for it.

         You know, this individual offered the defendant
an opportunity to leave what the defendant had, in his mind,
concluded to be harassment.  And he saw -- the defendant saw a
way out and accepted assistance from the wrong person.  And
that led to the night of May 30th.

         And with respect to going to a training camp, the
record will reflect that at first the CHS told the defendant he
would be trained to do certain things and he never explained
what that was.  And then, the night of the arrest, he says,

1  "You might shoot, but I don't want you to say 'no.'"  He left

2  me the option.  He didn't force me to do it, and he never made

3  it appear as though I had to do it.

4          He -- and the record is replete with references

5  where he says, "You don't have to do anything you don't want to

6  do," which is, to my understanding, "I will help you, but I'm

7  not requiring of you anything."  I never -- and the record will

8  show I never pledged allegiance to the organization.  I never

9  pledged to do anything material, offer any expert opinion,

10  advice derived from scientific knowledge.  In spite of the fact

11  that he mentions frequently that I had computer knowledge, I

12  never offered that expertise.

13          I offered information off of Google.  And I will

14  say that with the global -- with respect to the global jihadi

15  movement and the Salafi-Jihadi ideology, as the record shows

16  and as Mr. Kohlmann pointed out, there are differences.  There

17  are people that within the Salafi-Jihadi movements agree with

18  the concepts like Sharia law and the Islamic state, which are

19  controversial.  However, those same groups don't agree with

20  committing terrorism -- i.e., suicide attacks and things like

21  9-11 -- to carry out or to -- to bring about that ultimate

22  goal.

23          And having said that, when I saw this person

24  willing to help me, it made me unsure as to whether this person

25  was really a part of something that would do these kinds of

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

1  acts.  We never talked about terrorism attacks.  We never

2  talked about attacking in the style of 9-11.  We talked about

3  in -- and the most we talked about, which is not material

4  support, are drones, the machine.

5         So, I will say that I made that error and I

6  trusted this individual and this individual led me to think

7  that I was taking those items to a brother and a -- and his

8  good friend.  And as the record will show, he's referred to --

9  "brother" is just a term used for any -- any Muslim.  It

10  doesn't -- it isn't just a fighter or a person who's in

11  al-Qaeda.  It's anyone.  It doesn't reflect this specific --

12  "this is the code for terrorists," and there's never any

13  mention of that in the record.  So, they haven't proved that I

14  intended to give these items to al-Qaeda in the Arabian

15  Peninsula.

16         I'm finished.

17         THE COURT:  You're complete?

18         THE DEFENDANT:  Yes.  Yes, sir.

19         THE COURT:  All right.  You used right at 10 minutes.

20         Government, you need to address some of those

21  points.

22         MR. McINTYRE:  Rather quickly, your Honor.

23         THE COURT:  Well, I'm just saying --

24         MR. McINTYRE:  Yes.

25         THE COURT:  I'm asking you to do that.

01:03    1            MR. McINTYRE:  Oh, okay.

         2            THE COURT:  Okay?

         3            MR. McINTYRE:  Yes, your Honor.

         4            THE COURT:  Address those points if you think it's

01:03    5    necessary.  And you've got -- you've used seven minutes and 20

         6    seconds.  And you'll get a five-minute warning, and I'll let

         7    you know when you get close.

         8            You want a two-minute warning now?

         9            MR. McINTYRE:  That would be fine, your Honor.

01:03   10            THE COURT:  Okay.  I'll give you a two-minute warning

        11    on when your time is up.

        12            All right.  Now, address, if you think it's

        13    necessary, some of the points Mr. Bujol raised.  But, you know,

        14    it's your time.  You've used exactly one half of your time now.

01:03   15            Go on.

        16            MR. McINTYRE:  Yes, your Honor.

        17            The term "brothers" was commonly used as a code

        18    word, like the other code words that were used in this case, to

        19    describe AQAP, members of AQAP.

01:03   20            THE COURT:  "AQAP" is?

        21            MR. McINTYRE:  Al-Qaeda in the Arabian Peninsula.

        22            In fact, I mean, there's -- there's a portion

        23    on -- of a transcript on May 3rd of 2010 where he goes into

        24    great detail -- this is on Page 17 -- Bujol does, about --

01:04   25            THE COURT:  Page 17 of?

01:04  1                    MR. McINTYRE:  It's 323B.

2                    THE COURT:  Thank you.

3                    MR. McINTYRE:  Yes, your Honor.

4                    He goes into great detail how he's preparing

01:04  5     himself to live and die with the brothers and how he has to be

6     firm.  And he talks about those who sit and stay behind and get

7     on their computer and spout jihadi ideas, but it takes -- when

8     it's time to really do what you need to do, which is live and

9     die with the brothers, in his view, that it takes steadfastness

01:04  10    and preparation and that he's been working on himself mentally

11    to be able to go and live and die with the brothers, which is

12    al-Qaeda in the Arabian Peninsula.

13                    As I pointed out before -- and this, again, is in

14    the record, 324 -- Exhibit 324, Page 31 -- the confidential

01:05  15    source, before he takes him to the ship, says, "They're going

16    to take you out and teach you to shoot."  So -- and the record

17    is replete with those types of examples, that makes the story

18    that he thought he was going to jump on a ship and go to

19    language school ludicrous.

01:05  20                    And it's ludicrous on its face.  He believed,

21    based on what he said, what he was told, and what the video

22    said for his wife, that the confidential source was a member of

23    al-Qaeda in the Arabian Peninsula and that he was going over

24    there to meet Abu Bakr and take restricted military manuals,

01:05  25    cash, military equipment, compasses, things like that, over to

01:05    1    Abu Bakr.  And, in fact, before he gets on the ship, to show

2    that he wasn't just trying to get a ride to go to language

3    school on a ship, he repeats -- right before he gets on the

4    ship, asks the source, "Where is the number for Abu Bakr?

01:05    5    Where the number for Abu Bakr?  I've got to get in touch with

6    him before I get on the ship."

7            THE COURT:  What's the requirement under the wording

8    of the indictment that's necessary for the government to show

9    beyond a reasonable doubt?  We've heard a lot of testimony.

01:06    10    What's the wording that's necessary?

11            MR. McINTYRE:  Your Honor, the elements of the crime

12    are that the defendant knowingly attempted to provide material

13    support or resources; the defendant believed that the support

14    or resources was going to an organization commonly known as

01:06    15    al-Qaeda in the Arabian Peninsula; that the organization

16    commonly known as al-Qaeda in the Arabian Peninsula previously

17    had been designated as a foreign terrorist organization by the

18    secretary of state; that the defendant knew that one or more of

19    the following conditions existed: that the organization

01:06    20    commonly known as AQAP had been designated a foreign terrorist

21    organization or that the organization commonly known as AQAP --

22            THE COURT:  You don't have to read the whole thing.

23            MR. McINTYRE:  -- engages in terrorist activity.

24            THE COURT:  That's the full indictment.  Is that

01:06    25    correct?

01:06  1            MR. McINTYRE:  That's the elements of the offense,

2      yes, your Honor.

3            THE COURT:  The elements of the offense.

4            MR. McINTYRE:  Yes, your Honor.

01:07  5            THE COURT:  And what about --

6            MR. McINTYRE:  And, clearly -- I'm sorry.

7            THE COURT:  Go on.  Those are the elements of the

8      offense.

9            MR. McINTYRE:  Yes.  And, clearly, the defendant knew

01:07 10     that al-Qaeda in the Arabian Peninsula committed terrorist acts

11     and committed acts of violence, because he sent a multitude of

12     e-mails to the confidential source about al-Qaeda in Yemen and

13     al-Qaeda in the Arabian Peninsula.

14            And, in fact, the defendant talks -- the

01:07 15     defendant is the first one to bring up al-Qaeda in the Arabian

16     Peninsula to the confidential source, where he's described,

17     wrongly, a drone attack on al-Qaeda in the Arabian Peninsula,

18     where he claims all these children were killed, when in fact

19     the expert testified that they took out militants for al-Qaeda

01:07 20     in the Arabian Peninsula.

21            And, further, your Honor, as I was saying before,

22     the fact that he is claiming he was going to go to language

23     school is ludicrous.  He's getting on a ship with a recruiter

24     with al-Qaeda in the Arabian Peninsula.  He -- did he think he

01:08 25     was simply going to arrive overseas and that al-Qaeda in the

01:08  1    Arabian Peninsula was going to say, "Yeah, we expended all

2    these resources and all this effort to get this jihadi over

3    here to commit terrorist acts and train him but he's decided he

4    wants to go to language school so we're just going to let him

01:08  5    go to language school"?  That's ludicrous.

6         He had the intention and would have, once he

7    arrived over there, been trained exactly like he was told, to

8    shoot and to commit terrorist acts.

9         One of the things that I wanted to point out to

01:08  10   you were the defendant claims he sent -- "Oh, I just sent these

11   military manuals.  And, yeah, I gave this al-Qaeda operative

12   advice on air force bases and drones.  But I never personally

13   tried to encourage anyone to commit a violent act."  If you'll

14   look at Government's Exhibit 261, this is from the defendant to

01:08  15   the confidential source just a few days before he gets on the

16   ship, where he's twice been told this is an AQAP operative.

17   And it's titled, "Take a trip to a local zoo."

18        And what he says is, "I've been thinking maybe if

19   you or any friends and family" -- and the only friends and

01:09  20   family that the confidential source had were his brothers in

21   AQAP -- "want to go to the zoo" -- the "zoo" is the air force

22   base -- "there are plenty to choose from, with lots of dogs" --

23   "dogs" being soldiers that are at the air force base -- "and

24   elephants," which are the drones.  "View the attachment.  Any

01:09  25   questions?  Send me an e-mail."

01:09    1              And if you look at the attachment, your Honor,
         2    which is 262, it's a guide to air force installations
         3    worldwide.  Knowing the confidential source is a member of
         4    AQAP, he is encouraging AQAP members to attack air force bases
01:09    5    worldwide and refers to American soldiers as "dogs."
         6              THE COURT:  You've got two minutes left.
         7              MR. McINTYRE:  Yes, your Honor.  And I would like to
         8    briefly go back to the "For My Wife" video because I think it's
         9    very important throughout the course of this trial that he's
01:10   10    tried to define these terms "hijrah," "jihad," to mean things
        11    that don't involve armed conflict.
        12              Once again, when he was talking to his wife, in
        13    the most private moment -- and in fact, left -- he left his two
        14    infant children, his wife, and just flat out walked out the
01:10   15    door with a backpack at 1:00 o'clock in the morning, walked a
        16    mile, determined to meet up with an AQAP representative and go
        17    overseas.
        18              In the video it's very clear -- it's almost like
        19    a martyrdom video -- there's signs of heaven and he's saying
01:10   20    his wife may or may not see him again and he leaves the
        21    moniker, "To be continued at the end."  That would be the most
        22    truthful he is about the terms that he commonly uses in these
        23    conversations with the confidential source.
        24              He says many times, "I want to commit hijrah."
01:11   25    He talks about jihad.  He talks about the as-sadiqeen, which is

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:11   1   the most righteous.  In every picture that's associated with

2   as-sadiqeen, jihad, or hijrah is either a convicted terrorist,

3   a member of a terrorist organization, or a militant with a

4   rocket propelled grenade.  That's his definitions.  That's what

01:11   5   he wanted to do.  That was essentially his last will and

6   testament, his most private moment to the only people in the

7   world that he probably cared about and which he didn't care

8   about very much, because he left and jumped on a ship in the

9   middle of the night.

01:11   10              That's all we have, your Honor.

11              THE COURT:  Thank you.  All right.  Let me take --

12              THE DEFENDANT:  Your Honor --

13              THE COURT:  No, sir.  That's it.  That's the

14   frustration, as we all know, being a defense lawyer.  You can't

01:12   15   rebut the rebuttal.  That's the end of the -- end of it.

16              All right.  There are four exhibits that were

17   entered into evidence by Mr. Bujol.  So, when I leave, we need

18   to make sure we have that.  So, if the marshals will give us a

19   moment or so.  We need to make sure we have that in the record.

01:12   20   And all the government's exhibit are in evidence.

21              You need not move your stuff unless you want.

22   Just neaten it up a little bit.  I've got a full docket on

23   Monday morning.  And nobody is going to disturb it.  We have --

24   I have all day tomorrow, Saturday, and Sunday to look through

01:12   25   all of the exhibits.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:12   1          I have taken my own personal notes, and I can get
        2   the exhibits if I need to.  I'm going to announce the verdict,
        3   the guilt or innocence verdict, on Monday.  And the time I'm
        4   setting has a reason.  That way, no one will be hanging around
01:13   5   and stalling around.  Because I have civil cases that may or
        6   may not -- there's no need at this point to move it off.  It
        7   will also give me some opportunity, after the weekend, if
        8   I -- you know, I don't have to come down each day.  If I make
        9   some notes at home, I can come down that morning.
01:13  10          So, the verdict in the case will be handed down
       11   by the Court at 3:00 p.m. on Monday.  And that completes all
       12   the testimony and the summation of both sides.  The first thing
       13   we need to do with the marshal service, he needs to stay here a
       14   few minutes and make sure we have those four exhibits.
01:13  15          You need to get all yours together with Ellen
       16   after we make sure Mr. Bujol's are here.  And I will see you
       17   all Monday at 3:00 p.m.  We'll stand adjourned.
       18      *(Proceedings recessed for evening)*
       19                          * * * * *
       20              COURT REPORTER'S CERTIFICATION
       21      I certify that the foregoing is a correct transcript from
            the record of proceedings in the above-entitled cause.
       22
       23   Date:   April 3, 2012
       24                      /s/   Cheryll K. Barron
       25                      Cheryll K. Barron, CSR, CMR, FCRR
                              Official Court Reporter

*Cheryll K. Barron, CSR, CM, FCRR*                      *713.250.5585*